# UNI ED STATES DISTRICT CC JRT

## District of Minnesota

**RESPOND TO:**

☐ U.S. District Court, 700 Federal Building, 316 N. Robert St., St. Paul, MN 55101      Phone (651) 848-1100

☐ U.S. District Court, 202 U. S. Courthouse, 300 S. Fourth St., Minneapolis., MN 55415      Phone (612) 664-5000

☐ U.S. District Court, 417 Federal Building, 515 W. First St., Duluth, MN 55802      Phone (218) 529-3500

| **DATE:** December 14, 2004 | **CIVIL FILE NUMBER:** 04-3358 ADM/AJB |
|---|---|

**CASE TITLE:** Amazin' Raisins Intl. Inc.    VS  Ocean Spray Cranberries, Inc.

☐ The above entitled action was: ☐ removed from county court, ☐ transferred from another district, and filed in ☐ Minneapolis ☐ St. Paul ☐ Duluth, on _____ , and assigned to Judge _____ and to Magistrate Judge            *Please direct future filings to the office indicated at the top of this form.*

☐ The above entitled action was filed in this court on _____, and assigned to Judge _____ and referred to Magistrate Judge _____ The file will be maintained at the Clerk's office in the District of Minnesota in _____ *Please note for future reference.* cc to:

☐ Discovery documents are returned pursuant to Federal Rule of Civil Procedure 5(d).

☐ A certified copy of the Order of Remand is enclosed.

☒ The above entitled action is being transferred to your court pursuant to Order of Judge __Ann D. Montgomery__ filed on 11/15/04 _____ A certified copy of the order and docket entries are included, along with the original court file. Please acknowledge receipt of this file by returning a date-stamped copy of this notice indicating the filing date and civil case number assigned in your court.

☐ A Bill of Costs is to be submitted on Form AO133. The form, and a guide entitled "Taxation of Costs in a Civil Case in the United States District Court for the District of Minnesota" for use by attorneys and legal staff are available on our website: www.mnd.uscourts.gov.

☐ Your original documents are returned as copies of state court documents were submitted upon removal of the action to federal court.

☐ Your in forma pauperis application was approved. Please complete the enclosed Marshal Service Form(s) (one per defendant) and return to the office indicated at the top of this form. Service cannot be performed until these completed forms have been received by the clerk's office.

☐ OTHER:

MAGISTRATE JUDGE _____

Deputy Clerk: s/G. Schneider

Gloria Schneider

# 04-12679MLW

K:\XFR\forms\civilNCklist.frm

Modified 10/30/03

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Amazin' Raisins International, Inc.,

                    Plaintiff/Counterclaim
                    Defendant,

            v.                                      **MEMORANDUM OPINION**
                                                    **AND ORDER**
                                                    Civil No. 04-3358 ADM/AJB
Ocean Spray Cranberries, Inc.,

                    Defendant/Counterclaim
                    Plaintiff.

_____

Matthew A. Doscotch, Esq., Merchant & Gould, Minneapolis, MN, appeared for and on behalf of
Amazin' Raisins International, Inc.

John C. Adkisson, Esq., Fish & Richardson, Minneapolis, MN, appeared for and on behalf of Ocean
Spray Cranberries, Inc.

_____

## I. INTRODUCTION

On October 26, 2004, oral argument before the undersigned United States District Judge was

heard on Defendant Ocean Spray Cranberries, Inc.'s ("Ocean Spray" or "Defendant") Motion to

Transfer Venue [Docket No. 7], pursuant to 28 U.S.C. § 1404(a). In its complaint [Docket No. 1],

Plaintiff Amazin' Raisins International, Inc. ("ARI" or "Plaintiff") alleges Ocean Spray's process for

manufacturing its dried fruit product infringes its United States Patent No. 5,188,861 ("861 Patent").

Ocean Spray filed a counterclaim [Docket No. 4] seeking a declaratory judgment of non-infringement.

Ocean Spray seeks to transfer venue for this case from the District of Minnesota to the District of

Massachusetts. For the reasons set forth below, Defendant's Motion to Transfer Venue is granted.

## II. BACKGROUND

ARI is a small corporation based in Ontario, Canada.  Mazin Decl. ¶¶ 1, 6 [Docket No. 15].

Ocean Spray is a large United States corporation whose headquarters and principal place of business

are located in Lakeville-Middleboro, Massachusetts. Ocean Spray: About Us (Doscotch Decl.

[Docket No. 14] Ex. K).  On February 23, 1993, Jack Mazin, the Chief Executive Officer and owner

of ARI, and Amir Lalji received the 861 patent for their process for manufacturing dried fruit.  Mazin

Decl. ¶¶ 2, 4; Patent No. 861 (Doscotch Decl. Ex. A).  Through its Minnesota counsel, in May 2003,

ARI notified Ocean Spray that it believed Ocean Spray's process for manufacturing Craisins® violated

its 861 Patent.  May 27, 2003 letter (Doscotch Decl. Ex. B).  Ocean Spray denied the charge, claiming

Craisins® were manufactured according to its own patented process.[1]  June 19, 2003 letter (Doscotch

Decl. Ex. C).  ARI subsequently made three requests for samples of Ocean Spray's decharacterized

cranberry pieces to determine whether the process infringed the 861 Patent.  Sept. 8, 2003 letter

(Doscotch Decl. Ex. D); Nov. 11, 2003 letter (Doscotch Decl. Ex. E); Feb. 26, 2004 letter (Doscotch

Decl. Ex. F).  Ocean Spray refused these requests. Dec. 17, 2003 letter (Doscotch Decl. Ex. G);

March 5, 2004 letter (Doscotch Decl. Ex. H).  All communications by both ARI and Ocean Spray

were conducted by their respective Minnesota counsel.[2]

On July 22, 2004, ARI filed the current action against Ocean Spray in the United States District

---

[1] United States Patent No. 5,320,861 was issued to Harold Mantius, an Ocean Spay employee on January 14, 1994.  Mantius Decl. ¶¶ 1, 3 [Docket No. 19].

[2] Other than ARI's initial letter to Ocean Spray, which was addressed to an employee at Defendant's corporate headquarters, all other correspondence was also directed to the parties' respective attorneys.

Court in Minnesota. On September 2, 2004, Ocean Spray submitted its answer denying infringement and filing a counterclaim. On the same day, Ocean Spray sent a letter notifying ARI of its intent to seek transfer and asking for any reasons why the case was venued in the District of Minnesota. Sept. 2, 2004 letter (Woodford Decl. [Docket No. 11] Ex. D). ARI responded by indicating it believed venue in Minnesota was proper but noted it would stipulate to a transfer to Buffalo, New York. Sept. 7, 2004 letter (Woodford Decl. Ex. E). At oral argument, ARI explained that it proposed Buffalo because it is close to the Ontario, Canada residence of Jack Mazin, the inventor of the 861 Patent.

Ocean Spray moved to transfer venue on September 10, 2004. ARI claims Minnesota is the appropriate venue for this matter because it learned of Ocean Spray's alleged patent infringement through the sale of Craisins® in Minnesota and because the parties had communicated solely through counsel in Minnesota. In addition, ARI notes that Ocean Spray manufactures Craisins® in a facility located in Tomah, Wisconsin. Bryson Decl. ¶ 5 [Docket No. 10]. Ocean Spray argues that transfer of venue is appropriate because neither ARI nor Ocean Spray have facilities or employees in Minnesota. Furthermore, Ocean Spray contends all of the witnesses to the case are located in Massachusetts.

### III. DISCUSSION

Section 1404(a) grants a district court the authority to transfer a civil matter to another district in which the suit might have been brought.[3] In evaluating whether transfer is proper, the Court should

---

[3] 28 U.S.C. 1404(a) provides:

> "For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

3

consider the convenience of the parties, the convenience of the witnesses and the interests of justice. 28 U.S.C. § 1404(a). The Court also has the discretion to take into account, on a case-by-case basis, any other factors or circumstances that may be relevant. Terra Int'l Inc. v. Mississippi Chem. Corp., 119 F.3d 688, 691 (8th Cir. 1997). Federal courts generally "give considerable deference to a plaintiff's choice of forum and thus the party seeking transfer . . . typically bears the burden of showing that the transfer is warranted." Id. at 695. However, courts afford plaintiff's choice of forum "significantly less deference when (1) plaintiff does not reside in the selected forum or (2) the transaction or underlying facts did not occur in the chosen forum." Nelson v. Soo Line R.R. Co., 58 F. Supp. 2d 1023, 1026 (D. Minn. 1999) (citations omitted).

## A.    Appropriate Venue

As an initial matter, the Court must determine whether it would have been possible for ARI to originally bring its patent infringement claim in the District of Massachusetts. 28 U.S.C. 1404(a). It is uncontested that Ocean Spray's corporate headquarters is located in Massachusetts. As a result, Plaintiff could have filed the instant matter in the District of Massachusetts, pursuant to 28 U.S.C. § 1400(b).[4] Having determined that the District of Massachusetts would have been a proper venue to file suit, it is necessary to evaluate the convenience of the parties and the witnesses as well as the interests of justice to determine whether transfer is appropriate.

---

[4] 28 U.S.C. § 1440(b), in pertinent part, provides:

"Any civil action for patent infringement may be brought in the judicial district where the defendant resides. . . ."

**B.    Convenience of the Parties**

Ocean Spray argues that Massachusetts is a more convenient forum for the parties because neither ARI nor Ocean Spray have offices, facilities or employees in Minnesota. It also notes that Massachusetts is geographically closer to Ontario, Canada, ARI's corporate headquarters, than Minnesota. Conversely, ARI argues that its counsel is located in Minnesota and that the parties, through their attorneys, engaged in a nine-month string of pre-trial negotiations in this District. ARI also notes that Ocean Spray manufactures Craisins® in a facility in Tomah, Wisconsin.

In assessing the relative convenience of the parties, courts begin by analyzing the location of "their residences in relation to the district court chosen by the plaintiff and the proposed transferee district." Facilitec Corp. v. Omni Containment Sys., 2003 U.S. Dist. LEXIS 13250, *3 (D. Minn. July 31, 2003) (citations omitted). It is uncontested that neither party maintains offices, facilities or employees in Minnesota. It is obviously more convenient for Ocean Spray to litigate in the District in which its corporate headquarters is located than in one in which it merely sells its products.[5] Furthermore, transferring the case from Minnesota to Massachusetts does not demonstrably inconvenience ARI. ARI's corporate headquarters in Ontario, Canada is closer to Massachusetts than Minnesota. ARI can demonstrate no tie to justify venue in the District of Minnesota except that Craisins® are sold in the state and it chose to retain counsel in Minnesota.

ARI attempts to argue that the District of Minnesota is more convenient to Ocean Spray's Tomah, Wisconsin plant than the District of Massachusetts. This argument would be more persuasive if

---

[5] Ocean Spray apparently sells its products in all judicial districts in the United States.

ARI had originally filed suit in the District of Wisconsin rather than the District of Minnesota. Tomah is approximately 170 miles, or a two hour and forty minute drive, from this Courthouse. Mapquest Driving Directions (Doscotch Decl. Ex. J). When this Court suggested at oral argument that the District of Wisconsin might be a more appropriate venue and closer to "neutral turf", both ARI and Ocean Spray indicated little interest in litigating in Wisconsin.

Ultimately, ARI attempts to argue that a transfer to Massachusetts would be inconvenient because its counsel is located in Minneapolis. However, "it is axiomatic that convenience to plaintiff's counsel is not a factor to be considered in deciding the propriety of transfer." Nelson, 58 F. Supp. 2d at 1027 (citations omitted). ARI claims that venue in Minnesota is appropriate because of negotiations which took place in Minnesota between the respective parties' counsel over a nine-month period prior to the complaint being filed. Accepting ARI's argument, however, would allow plaintiffs to engage in an end run around § 1404(a) by entering into pre-trial negotiations and thereby eviscerate the purpose of the transfer provision. For the aforementioned reasons, the Court finds that the convenience of the parties strongly supports transfer.

## C.    Convenience of the Witnesses

The parties contest what witnesses will be necessary to try the present claim. Ocean Spray contends that only six persons have personal knowledge of facts relating to the infringement allegation. Bryson Decl. ¶ 7. All of these potential witnesses are located in Massachusetts; five are current employees who work at Ocean Spray's corporate headquarters, while one is a retired employee now residing in Plymouth, Massachusetts. Id. ARI contends discovery will show employees at the Tomah, Wisconsin facility have knowledge of information relevant to the lawsuit. ARI further claims that

6

pertinent documents are housed at the Tomah, Wisconsin plant. Although Ocean Spray acknowledges that the Tomah facility contains relevant documents, it argues that copies of all such documents are also kept at its Middleboro, Massachusetts corporate headquarters.

The convenience of the witnesses also supports transfer. In assessing this factor, the party seeking transfer must clearly specify the essential witnesses and provide a general statement of their testimony. Facilitec Corp., 2003 U.S. Dist. LEXIS at *4. The court then evaluates the materiality and importance of the anticipated witnesses' testimony, as well as their accessibility to the forum. Reid-Walen v. Hansen, 933 F.2d 1390, 1396 (8th Cir. 1991). Ocean Spray has provided a list of the anticipated relevant witnesses in this case, all of whom reside in the District of Massachusetts. ARI relies on the possibility that discovery will reveal relevant witnesses at the Tomah, Wisconsin plant. Although ARI correctly notes that five of the six witnesses are current Ocean Spray employees, and Ocean Spray can secure their attendance at trial, it is nevertheless true that these witnesses reside in Massachusetts, rather than Minnesota. See Kleinerman v. Luxtron Corp., 107 F. Supp. 2d 122, 125 (D. Mass. 2000). Furthermore, ARI's counsel will be forced to depose Ocean Spray's witnesses in Massachusetts whether the trial is held in Minnesota or Massachusetts.

Finally, ARI argues that the relevant documents are located in the Tomah, Wisconsin manufacturing facility. Conversely, Ocean Spray argues that copies of the documents are uploaded in real time and available at its Middleboro, Massachusetts headquarters. As the instant case pointedly illustrates, the actual physical location of voluminous documents "is not a particularly salient factor in a section 1404(a) determination" in present day litigation. American Standard, Inc. v. Bendix Corp., 480 F. Supp. 254, 261 (W.D. Mo. 1980). Relevant documents will have to be gathered for ARI's counsel

7

in Minnesota whether they are housed in Wisconsin or Massachusetts. As a result, this Court finds that the convenience of the witnesses also militates in favor of transfer.

**D.    Interests of Justice**

When evaluating whether the interests of justice warrant transfer, courts typically consider such factors as "(1) judicial economy, (2) the plaintiff's choice of forum, (3) the comparative costs to the parties of litigating in each forum, (4) each party's ability to enforce a judgment, (5) obstacles to a fair trial, (6) conflict of law issues, and (7) advantages of having a local court determine questions of local law." Terra, 119 F.3d at 696. Specifically, in the instant case, ARI argues that the interests of justice disfavor transferring venue because plaintiff's choice of forum should be given significant weight, Ocean Spray is better able to bear the costs of the litigation, and the District of Minnesota has a less congested docket than the District of Massachusetts. For its part, Ocean Spray argues the interests of justice favor transfer because ARI's status as a foreign plaintiff, coupled with its willingness to transfer the suit to Buffalo, New York, diminishes the deference that should be given to plaintiff's choice of forum and because the comparative costs of litigation will be reduced by a transfer to the District of Massachusetts.

ARI vigorously contends its choice of forum should be granted substantial deference. ARI notes it is a foreign plaintiff who, under United States law, must retain U.S. counsel to litigate its patent infringement claim. ARI argues that, were this Court to transfer venue to Massachusetts, it would effectively signal foreign corporations cannot choose their forum and must litigate in a defendant corporation's home state. This argument is flawed because it is well-established that significantly less deference is granted when the plaintiff does not reside in the forum. Nelson, 58 F. Supp. 2d at 1026.

Further, ARI could have brought the present action in the District of Wisconsin, where the Tomah manufacturing plant is located, or in Buffalo, New York, as the closest venue to Jack Mazin's residence, and thus ensured some significant connection to the forum.

Both parties argue the expense of litigation supports their respective positions for transfer. This factor does not significantly favor one party's position over the other. The costs of depositions, document review and the resulting litigation will be much the same whether the matter is tried in Minnesota or Massachusetts. ARI does argue transfer will force it to endure the additional expense and inconvenience of finding local counsel. Although ARI has every right to retain Minnesota-based counsel to represent its interests, it cannot use its selection of counsel to dictate venue. Furthermore, ARI's willingness to transfer this matter to Buffalo, New York, where it would also need to retain local counsel, indicates that this additional expense was not preeminent in the choice of venue.

Finally, both parties seek to show docket congestion (or the lack thereof) supports their respective positions for venue choice. Dockets vary by judge and by time period. Even similar cases filed at the same time are often resolved in different amounts of time, depending on the vagaries of court calendars. Thus, this argument does not weigh in favor of one party over the other.

In summary, after weighing the convenience of the parties, the convenience of the witnesses and the interests of justice, this Court finds that Ocean Spray has carried its burden of showing a transfer of venue to the District of Massachusetts is appropriate.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.  Defendant/Counterclaim Plaintiff's Motion to Transfer Venue [Docket No. 7] is

**GRANTED**, and

2.  Venue shall be transferred to the United States District Court for the District of

Massachusetts.

BY THE COURT:

_____ s/Ann D. Montgomery _____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  November 15, 2004.

10

CLOSED

# U.S. District Court
## District of Minnesota (DMN)
## CIVIL DOCKET FOR CASE #: 0:04-cv-03358-ADM-AJB
### Internal Use Only

Amazin' Raisins International Inc v. Ocean Spray Cranberries, Inc.

Assigned to: Judge Ann D Montgomery
Referred to: Magistrate Judge Arthur J Boylan
Cause: 35:271 Patent Infringement

Date Filed: 07/22/2004
Jury Demand: Both
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

**Plaintiff**

**Amazin' Raisins International Inc**
*an Ontairo, Canada corporation*

represented by **Douglas J Williams**
Merchant & Gould
80 S 8th St Ste 3200
Mpls, MN 55402
(612) 332-5300
Fax: 6123329081
Email: dwilliams@merchant-gould.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew A Doscotch**
Merchant & Gould
80 S 8th St Ste 3200
Mpls, MN 55402
(612) 332-5300
Fax: 16123329081
Email: mdoscotch@merchant-gould.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Ocean Spray Cranberries, Inc.**

represented by **John C Adkisson**
Fish & Richardson - Mpls
3300 Dain Rauscher Plz
60 S 6th St Ste 3300
Mpls, MN 55402
(612) 335-5070
Fax: 6122889696
Email: adkisson@fr.com

*12/14    04*
*G. Schneider*

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William R Woodford**
Fish & Richardson - Mpls
60 S 6th St Ste 3300
Mpls, MN 55402
(612) 766-2004
Fax: 612-288-9692
Email: woodford@fr.com
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Ocean Spray Cranberries, Inc.**     represented by **John C Adkisson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William R Woodford**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**Amazin' Raisins International Inc**     represented by **Matthew A Doscotch**
*an Ontairo, Canada corporation*                   (See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/22/2004 | ❶1 | COMPLAINT against Ocean Spray Cranberries, Inc., filed by Amazin' Raisins International Inc; JURY DEMAND. Assigned to Judge Ann D. Montgomery per Patent list and referred to Magistrate Judge Arthur J. Boylan, rcpt. no. 432234, (Filing Fee $150). (Attachments: # 1 Civil Cover Sheet)(DFL) (Entered: 07/23/2004) |
| 07/22/2004 | ❶ | Summons Issued as to Ocean Spray Cranberries, Inc. (DFL) (Entered: 07/23/2004) |
| 07/23/2004 | ❶2 | Mailed copy of complaint to Patent Office. (DFL) Additional attachment(s) added on 7/23/2004 (La Fond, Denise). (Entered: 07/23/2004) |
| 08/20/2004 | ❶3 | SUMMONS Returned Executed by Amazin' Raisins International Inc. Ocean Spray Cranberries, Inc. served on 8/13/2004, answer due 9/2/2004. (Williams, Douglas) (Entered: 08/20/2004) |

| 09/02/2004 | 🔵4 | ANSWER to Complaint with Jury Demand, COUNTERCLAIM against Amazin' Raisins International Inc by Ocean Spray Cranberries, Inc..(Woodford, William) (Entered: 09/02/2004) |
|---|---|---|
| 09/02/2004 | 🔵5 | RULE 7.1 DISCLOSURE STATEMENT of Ocean Spray Cranberries, Inc.. (Woodford, William) (Entered: 09/02/2004) |
| 09/02/2004 | 🔵6 | CERTIFICATE OF SERVICE by Ocean Spray Cranberries, Inc. re4 Answer to Complaint, Counterclaim, 5 Rule 7.1 - Disclosure Statement (Woodford, William) (Entered: 09/02/2004) |
| 09/02/2004 | | *** Attorney John C Adkisson for Ocean Spray Cranberries, Inc. and Ocean Spray Cranberries, Inc. added. (LJD) (Entered: 09/03/2004) |
| 09/10/2004 | 🔵7 | MOTION to Transfer *Venue* by Ocean Spray Cranberries, Inc.. (Woodford, William) (Entered: 09/10/2004) |
| 09/10/2004 | 🔵8 | NOTICE of Hearing on Motion 7 MOTION to Transfer *Venue*: Motion Hearing set for 10/26/2004 09:00 AM in Minneapolis - Courtroom 13W before Judge Ann D Montgomery. (Woodford, William) (Entered: 09/10/2004) |
| 09/10/2004 | 🔵9 | MEMORANDUM in Support re 7 MOTION to Transfer *Venue* filed by Ocean Spray Cranberries, Inc.. (Woodford, William) (Entered: 09/10/2004) |
| 09/10/2004 | 🔵10 | Declaration of Neil Bryson in Support of 7 MOTION to Transfer *Venue* filed by Ocean Spray Cranberries, Inc.. (Woodford, William) (Entered: 09/10/2004) |
| 09/10/2004 | 🔵11 | Declaration of William R. Woodford in Support of 7 MOTION to Transfer *Venue* filed by Ocean Spray Cranberries, Inc.. (Attachments: # 1 Exhibit A (Exhibit Index)# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D# 5 Exhibit E)(Woodford, William) (Entered: 09/10/2004) |
| 09/10/2004 | 🔵12 | CERTIFICATE OF SERVICE by Ocean Spray Cranberries, Inc. re9 Memorandum in Support of Motion, 10 Declaration in Support, 11 Declaration in Support,, 7 MOTION to Transfer *Venue*, 8 Notice of Hearing on Motion (Woodford, William) (Entered: 09/10/2004) |
| 10/06/2004 | 🔵13 | MEMORANDUM in Opposition re 7 MOTION to Transfer *Venue* filed by Amazin' Raisins International Inc. (Doscotch, Matthew) (Entered: 10/06/2004) |
| 10/06/2004 | 🔵14 | DECLARATION of Matthew A. Doscotch in Opposition to 7 MOTION to Transfer *Venue*, 13 Memorandum in Opposition to Motion filed by Amazin' Raisins International Inc. (Doscotch, Matthew) (Entered: 10/06/2004) |
| 10/06/2004 | 🔵15 | DECLARATION of Jack Mazin in Opposition to 7 MOTION to Transfer *Venue*, 13 Memorandum in Opposition to Motion, 14 Declaration in Opposition filed by Amazin' Raisins International Inc. (Doscotch, Matthew) (Entered: 10/06/2004) |

| | | |
|---|---|---|
| 10/06/2004 | 16 | CERTIFICATE OF SERVICE by Amazin' Raisins International Inc re 13 Memorandum in Opposition to Motion, 14 Declaration in Opposition, 15 Declaration in Opposition (Doscotch, Matthew) (Entered: 10/06/2004) |
| 10/14/2004 | 17 | REPLY to Response to Motion re 7 MOTION to Transfer *Venue* filed by Ocean Spray Cranberries, Inc.. (Woodford, William) (Entered: 10/14/2004) |
| 10/14/2004 | 18 | Supplemental Declaration of William R. Woodford in Support of 7 Motion to Transfer Venue filed by Ocean Spray Cranberries, Inc. (Attachments: # 1 Exhibit F - Supplemental Index# 2 Exhibit G# 3 Exhibit H# 4 Exhibit I# 5 Exhibit J)(Woodford, William) Modified text and links on 10/15/2004 (HLL). (Entered: 10/14/2004) |
| 10/14/2004 | 19 | Declaration of Harold Mantius in Support of 7 Motion to Transfer Venue filed by Ocean Spray Cranberries, Inc. (Woodford, William) Modified text and links on 10/15/2004 (HLL). (Entered: 10/14/2004) |
| 10/14/2004 | 20 | CERTIFICATE OF SERVICE by Ocean Spray Cranberries, Inc. re 17 Reply to Response to Motion, 18 Declaration in Support,, 19 Declaration in Support (Woodford, William) (Entered: 10/14/2004) |
| 10/26/2004 | 21 | DOCKET TEXT ENTRY: Minute Entry for proceedings held before Judge Ann D Montgomery : Motion Hearing held on 10/26/2004 re 7 MOTION to Transfer Venue filed by Ocean Spray Cranberries, Inc. The motion is taken under advisement. (Court Reporter Tim Willette) (GS) (Entered: 10/26/2004) |
| 10/26/2004 | | *** Motions Taken Under Advisement: 7 MOTION to Transfer Venue. (GS) (Entered: 10/26/2004) |
| 10/29/2004 | 22 | LETTER TO DISTRICT JUDGE by Amazin' Raisins International Inc *regarding venue issue*. (Doscotch, Matthew) (Entered: 10/29/2004) |
| 11/01/2004 | 23 | LETTER TO DISTRICT JUDGE by Ocean Spray Cranberries, Inc., Ocean Spray Cranberries, Inc. *regarding venue issue*. (Woodford, William) (Entered: 11/01/2004) |
| 11/15/2004 | 24 | ORDER granting 7 Defendant's Motion to Transfer Venue. Venue shall be transferred to the USDC for the District of Massachusetts. Signed by Judge Ann D Montgomery on 11/15/2004. (TLU) (Entered: 11/15/2004) |
| 11/15/2004 | | ***Civil Case Terminated. (TLU) (Entered: 11/15/2004) |
| 12/14/2004 | 25 | Letter transmitting orginal case file to the U.S. District Court, District of Massachusetts at 1 Courthouse Way, Room 2300, Boston MA 02210, with certified copy of transferring order and docket entries. (GJS) (Entered: 12/14/2004) |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| AMAZIN' RAISINS INTERNATIONAL, INC., an Ontario, Canada corporation, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No 04-3358ADM/AJB. |
| v. | ) ) ) | |
| OCEAN SPRAY CRANBERRIES, INC., a Delaware corporation, | ) ) ) | |
| Defendant. | ) ) ) ) | **JURY TRIAL DEMANDED** |

## **COMPLAINT**

Plaintiff Amazin' Raisins Int'l, Inc. ("Amazin' Raisins") for its Complaint against Defendant Ocean Spray Cranberries, Inc. ("Ocean Spray") states and alleges as follows:

### **The Parties**

1.     Plaintiff Amazin' Raisins is a corporation organized and existing under the laws of Ontario, Canada, and has a principal place of business at 23 Boom Lane C, Atholville, New Brunswick, Canada, E3N, 4E8.

2.     Upon information and belief, Defendant Ocean Spray is a corporation organized and existing under the laws of Delaware and has a principal place of business at One Ocean Spray Drive, Lakeville-Middleboro, MA, 02349.

3.     Upon information and belief, defendant Ocean Spray has manufactured a dried fruit product, has had a dried fruit product manufactured on its behalf, and/or

imported dried fruit product manufactured by a process that treats a fruit with an acidulant, adds a flavor to the fruit, and dehydrates the fruit.  Defendant Ocean Spray has done business in this district by offering for sale, distributing, and selling its products in this District on a continuous and systematic basis.

**<u>Background</u>**

4.      The United States Patent and Trademark Office issued United States Patent No. 5,188,861 ("the '861 patent") to Jack Mazin and Amir Lalji, which includes claims to a flavored dried fruit product and process for preparing the dried fruit product. Mr. Mazin and Mr. Lalji subsequently assigned the entire right, title, and interest in and to the '861 patent to Plaintiff Amazin' Raisins.

5.      Upon information and belief, Defendant Ocean Spray sells flavored dried fruit products entitled "Craisins" manufactured by a process that treats a fruit with an acidulant, adds a flavor to the fruit, and dehydrates the fruit.

6.      Plaintiff Amazin' Raisins gave notice of United States Patent No. 5,188,861 to Defendant Ocean Spray on May 27, 2003.  Ocean Spray subsequently responded by describing the process it claims it uses to make its flavored Craisins.

7.      On September 8, 2003, in an attempt to further understand Ocean Spray's treatment process in view of the '861 patent, Plaintiff Amazin' Raisins requested that Defendant Ocean Spray provide Plaintiff with samples of Defendant's "decharacterized cranberry pieces."  Defendant Ocean Spray refused to provide the requested samples.

8.      On November 11, 2003, Plaintiff Amazin' Raisins again requested that Defendant Ocean Spray provide Plaintiff Amazin' Raisins with samples of Defendant's

2

"decharacterized cranberry pieces" to aid in Plaintiff Amazin' Raisins' evaluation of the Ocean Spray process. Again, Ocean Spray did not provide the requested samples.

### Jurisdiction

9.     This is a claim of patent infringement arising under the Acts of Congress relating to patents, 35 U.S.C. §§ 271; 281-285; 295.

10.     This Court has jurisdiction under 28 U.S.C. § 1331 and 1338(a).

### Count I

### Patent Infringement of United States Patent No. 5,188,861

11.     On February 23, 1993, United States Patent No. 5,188,861 entitled PROCESS FOR PREPARING A DRIED FRUIT PRODUCT was duly and legally issued to Jack Mazin and Amir Lalji. Plaintiff Amazin' Raisins, as assignee of United States Patent No. 5,188,861, is the owner of the entire right, title, and interest in and to United States Patent No. 5,188,861 and still is the owner thereof. United States Patent No. 5,188,861 is attached as Exhibit A.

12.     Upon information and belief, Defendant Ocean Spray has manufactured, used, imported, and/or offered for sale and sold, dried fruit products, which infringe the '861 patent, or otherwise infringe or induced infringement.

13.     Defendant Ocean Spray has had actual knowledge of the '861 patent, and its infringement, on information and belief, continues unabated. Defendant Ocean Spray's infringing activities at least since it received notice from Plaintiff Amazin' Raisins have been and continue to be willful and deliberate.

14. Plaintiff Amazin' Raisins has been damaged by Defendant Ocean Spray's infringement of the '861 patent and will continue to be damaged in the future unless defendant Ocean Spray is enjoined from infringing said patent.

**Prayer for Relief**

WHEREFORE, Plaintiff Amazin' Raisins prays for the following relief:

a. A judgment that Defendant Ocean Spray has infringed United States Patent No. 5,188,861;

b. An injunction preliminarily and permanently enjoining and restraining Defendant Ocean Spray, its officers, directors, agents, servants, employees, attorneys, and all others acting under or through it, directly or indirectly, from infringing, inducing, or contributing to the infringement of United States Patent No. 5,188,861;

c. A judgment and order requiring Defendant Ocean Spray to pay damages under 35 U.S.C. § 284, including treble damages for willful infringement of United States Patent No. 5,188,861, and the costs of this action as provided by 35 U.S.C. § 284, with interest;

d. A judgment that this case is exceptional and order directing Defendant Ocean Spray to pay Plaintiff Amazin' Raisins reasonable attorney fees as provided by 35 U.S.C. § 285;

e. A judgment that Defendant Ocean Spray's flavored "Craisin" products shall be presumed to have been made according to the process disclosed in United States Patent No. 5,188,861 as provided for by 35 U.S.C. § 295; and

f. Such other and further relief as this Court may deem just and equitable.

## **Demand for Jury Trial**

Plaintiff hereby demands that all issues be determined by a jury.


AMAZIN' RAISINS INTERNATIONAL, INC.

By Its Attorneys,


Date: <u>July 22, 2004</u>       <u>s/Douglas J. Williams</u>

Douglas J. Williams, 117353
Matthew A. Doscotch, 029973X
MERCHANT & GOULD P.C.
3200 IDS Center
80 South Seventh Street
Minneapolis, MN 55402-2215
(612) 332-5300

# United States Patent [19]

## Mazin et al.

US005188861A

[11] Patent Number: **5,188,861**

[45] Date of Patent: **Feb. 23, 1993**

[54] **PROCESS FOR PREPARING A DRIED FRUIT PRODUCT**

[75] Inventors: **Jack G. Mazin**, Maple; **Amir Lalji**, Weston, both of Canada

[73] Assignee: **Royal Domaine Inc.**, Concord, Canada

[21] Appl. No.: **530,863**

[22] Filed: **May 31, 1990**

[51] Int. Cl.5 ............................................. A23L 1/212
[52] U.S. Cl. ..................................... **426/640**; 426/639
[58] Field of Search ................................ 426/640, 639

[56]          **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,609,720 | 12/1926 | Humphrey | 426/640 |
| 1,717,489 | 6/1929 | Barlow | 426/640 |
| 4,542,033 | 9/1985 | Agarwala | 426/640 X |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 61-216641 | 9/1986 | Japan | 426/640 |

### OTHER PUBLICATIONS

Furia, CRC Handbook of Food Additives, vol. I, 1972, CRC Press Inc.: Cleveland, pp. 225-253.

*Primary Examiner*—Joseph Golian
*Attorney, Agent, or Firm*—Bereskin & Parr

[57]          **ABSTRACT**

A process for preparing a flavored dried fruit product having a flavor which does not substantially correspond to the natural flavor of the dried fruit is provided. As a first step, a dried fruit is treated with an acidulant being selected from the group consisting of tartaric acid, malic acid, citric acid, ascorbic acid, phosphoric acid, and fumaric acid in an amount and for a period of time which is sufficient to substantially remove the natural flavor of the dried fruit. As a second step, the treated dried fruit is then dehydrated to the desired moisture content. The dried fruit is treated during the first step or after the second step with a flavoring agent having a flavor which does not correspond to the natural flavor of the dried fruit. The flavoring agent is employed in an amount and for a period of time which is sufficient to impart to the dried fruit a flavor which is substantially the same as the flavoring agent.

**7 Claims, No Drawings**

5,188,861

1

## PROCESS FOR PREPARING A DRIED FRUIT PRODUCT

### BACKGROUND OF THE INVENTION

The invention relates to the field of dry fruits, and particularly, to a new dried fruit product having a flavor which does not substantially correspond to the natural flavor of the dried fruit, and a process for preparing the product.

Dried fruits such as raisins, prunes, apples, apricots, and peaches are recognized as highly nutritious food products. Raisins, for example, are a good source of iron, and they supply calcium, magnesium, potassium, phosphorous, B vitamins, protein and dietary fibre. (Foods and Food Production Encyclopedia, Considine, D.M. ed., Van Nostrand Reinhold Company, New York 1982, pages 1639–1942). Dried fruits are utilized as snack foods, confectionaries, etc., and as ingredients in foods such as snack foods, confectionaries, biscuits, cookies, cakes, dairy products, cereals, etc.

There is a need for dried fruit products which are inexpensive, have an appealing taste, aroma and texture, and are nutritious. Fruit leather products which are commercially available are expensive and contain ingredients such as sweeteners which make them nutritionally less desirable. Many of the sun dried or artificially dried fruits commercially available do not have an appealing taste, aroma or texture and therefore are not readily consumable as snack foods or readily incorporated into foods such as confectionaries, biscuits, cereals, etc.

There is also a need for a new and useful process which is capable of producing dried fruit products which retain more of their shape, size and natural nutrients, while imparting desirable taste, texture and aroma qualities to the dried fruit products.

U.S. Pat. No. 1,717,489 (issued Jun. 18, 1929 to Barlow) discloses a method of changing the flavor of dried fruits comprising combining the expressed juice of one fruit with another fruit which has been sun-dried or evaporated or which is in the process of drying. In one method disclosed a dry or drying fruit is immersed in the fruit juice of another fruit for a short time and then put again to dry; the process being repeated until the desired result is fully obtained. The method disclosed in the reference leaves much to be desired in terms of processing efficiency and processing costs and the tendency of the fruit juice to ferment over time may result in a product having an alcoholic taste. In addition, the absence of preservatives in the fruit juice and/or repeated applications of the fruit juice to the dry or drying fruit may introduce undesirable microorganisms into the dried fruit product shortening the shelf life of the product and more importantly, rendering the product harmful to consumers. Further, the repeated application of the fruit juice to the dry or drying fruit increases the sugar content resulting in a sticky product which is nutritionally less desirable. Repeated drying of the fruit also reduces the content of nutrients and volatiles in the fruit which effects the nutritional, and aroma and flavor qualities, respectively of the product.

### SUMMARY OF THE INVENTION

The present invention provides dried fruit products, particularly raisins, having flavors which do not correspond to the natural flavor of the dried fruits and having desirable nutritional, texture and aroma qualities; and a process for preparing the dried fruit products. The improvements in the product attributes provided by the dried fruit products of the invention compared to prior art products is in texture, flavor, nutrition and aroma. The improvements are realized using the easily carried out process of the present invention.

Broadly stated, the present invention provides a process for preparing a flavored dried fruit product said process comprising:

(a) treating a dried fruit with an acidulant being selected from the group consisting of tartaric acid, malic acid, citric acid, ascorbic acid, phosphoric acid and fumaric acid, in an amount and for a period of time which is sufficient to substantially remove the natural flavor of the dried fruit;

(b) dehydrating the treated dried fruit to obtain a desired moisture content; and,

(c) treating the dried fruit during step (a) or after step (b) with a flavoring agent having a flavor which does not substantially correspond to the natural flavor of the dried fruit, said flavoring agent being employed in an amount and for a period of time which is sufficient to impart to the dried fruit a flavor which is substantially the same as the flavoring agent; and so forming a flavored dried fruit product having a flavor which is substantially the same as the flavor of said flavoring agent and having an outer surface which is substantially non-sticky whereby the flavored dried fruit product may be easily handled.

In one embodiment of the invention, a process for preparing a flavored raisin product is provided which process comprises a one step rehydration of raisins in a flavor solution comprising water, an acidulant, and a flavoring agent, and optionally comprising one or both of a sweetening agent and a colouring agent, said flavor solution being employed in an amount of about 10 to 100% by weight of final product, said acidulant being selected from the group consisting of tartaric acid, malic acid, citric acid, ascorbic acid, phosphoric acid and fumaric acid and being employed in an amount of 0.1 to 2.5% by weight of final product, said flavoring agent having a flavor which does not substantially correspond to the natural flavor of the raisins, said rehydration step being employed for a period of time to permit the flavor solution to stabilize in the raisins and to impart to the raisins a flavor which is substantially the same as the flavoring agent, and washing the rehydrated raisins to substantially remove any residual of the flavor solution on the outer surface or skin of the raisins, and a one step dehydration of the washed rehydrated raisins to obtain a desired moisture content, and so forming a flavored raisin product having a flavored meat comprising the flavor of the flavoring agent, and having an outer surface which is substantially non-sticky whereby the raisin product may be easily handled.

In a second preferred embodiment of the invention, a process for preparing a flavored raisin product is provided which process comprises treating raisins with an acidulant being selected from the group consisting of tartaric acid, malic acid, citric acid, ascorbic acid, phosphoric acid and fumaric acid, said acidulant being employed in an amount and for a period of time sufficient to provide raisins wherein the natural flavor of the raisins is substantially removed; dehydrating the so treated raisins to obtain a desired moisture content in the raisins, and treating the dehydrated raisins with a

3

4

flavoring agent having a flavor which does not substantially correspond to the natural flavor of the raisins, said flavoring agent being employed in an amount and for a period of time which is sufficient to impart to the raisins a flavor which is substantially the same as the flavoring agent; and so forming a flavored raisin product having a flavor which is substantially the same as the flavor of the flavoring agent and having an outer surface which is substantially non-sticky whereby the flavored raisin product may be easily handled.

The process of the invention, by employing minimal steps, economically decreases the time and ingredients required to obtain a dried fruit product with a desired taste, aroma and texture. The processing temperatures and times also make it possible to produce flavored dried fruit products having little or no loss of natural nutrients. Another feature of the present invention is the improved flow properties attained when the process is employed. Using conventional methods such as Barlow, the dried fruit products may form lumps which cause difficulties in handling, packaging, obtaining exact product weights, and incorporating into other food stuffs. It is also possible using the present invention to obtain a flavored dried fruit product which is more uniform in size and shape when compared to the prior art. In addition, the presence of the acidulant, significantly decreases the possibility of contamination and fermentation occurring.

The preferred process of the invention has a number of additional advantages. There is no heating of the flavoring agent so there is little or no loss of the volatile constituents of the flavoring agent which contribute to the flavor and aroma of the final product. Thus, the flavor and aroma of the flavoring agent are more readily retained in the flavored dried fruit product. The flavor and aroma will also penetrate the dried fruit on storage and provide the flavored dried fruit with a more well-developed flavor and aroma. In the preferred process of the invention, no sweetening agent is contacted with or applied to the dried fruit providing a more nutritionally desirable product. The absence of added sweetening agent in the preferred process also provides a product with superior flow properties which makes the product easy to handle, facilitating its use as a consumer product or in further processing as an ingredient in other food stuffs.

The invention also relates to flavored dried fruit products, particularly flavored raisin products produced by the processes of the invention. The flavored dried fruit products of the invention have a more appealing taste, aroma and texture than conventional dried fruit products and thus may be more readily consumable as snack foods or more readily incorporated into foods such as confectionaries, biscuits, cereals, etc.

## DETAILED DESCRIPTION OF THE INVENTION

The dried fruits which may be flavored employing the processes of the invention include peach, apple, pear, raisins, prunes, apricots and cherries. Any dried fruit which contains between about 10% to 18% moisture may be employed. The process can be employed on whole or sectioned pieces of dried fruit.

Preferably the dried fruit is a raisin including Thompson seedless raisins, golden seedless raisins, muscat raisins or sultana raisins. The variety of raisin to be used in the processes of the invention will be determined by the desired end product color. Particularly preferred raisins

to be used in the processes of the invention are Australian sultanas, VISTA TM raisins from California, seeded raisins from Australia and Dunas seedless raisins from Mexico.

The processing of many of the different dried fruits will require conditions specifically adapted to the dried fruit. The following description will be restricted to the conditions which are particularly suitable for preparing raisin products but it will be understood that persons skilled in the art, given the particular process conditions and steps set forth in this general description as well as in the Examples, could readily adapt the processes of the invention to other dried fruits.

As hereinbefore mentioned, in one embodiment of the invention, a process is provided for preparing a flavored raisin product which includes a one step rehydration of the raisins in a flavor solution. The amount of flavor solution employed is about 10 to 100% by weight of the final product, preferably about 15 to 20% by weight of the final product. The raisins and flavor solution may be mixed, without breaking up the raisins, in a mixer, for example a Hobart. The raisins are rehydrated in the flavor solution for a sufficient time to permit the flavor to stabilize in the raisins; in general, about 3 to 48 hours, preferably 4 to 6 hours, at about 70° to 120° F. The raisins and flavor solution may also be mixed in a steam kettle with a vacuum pump. The raisins and flavor solution are mixed without breaking up the raisins for 5 to 10 minutes, preferably 7 minutes, and then a vacuum of about 15″ to 30″, preferably 21″ to 28″ of mercury is applied for about 2 to 4 minutes.

The flavor solution contains water, an acidulant, a flavoring agent and, if desired, it may contain one or both of a sweetening agent or a colouring agent. As discussed above, the acidulant lowers the pH of the flavor solution, significantly decreasing possible contamination by undesirable microorganisms and fermentation. The acidulant also substantially removes the natural flavor of the dried fruit. In addition, the acidulant may also give the dried fruit product a tart taste and assist in breaking down any alkali film that may be on the outer surface of the raisins due to prior processing of the raisin which may inhibit absorption of the flavoring agent. Among the suitable acidulants which may be used in the processes of the invention are tartaric acid, malic acid, citric acid, ascorbic acid, phosphoric acid, or fumaric acid. The selection of a particular acidulant will be made with knowledge of the flavor compatibility of the acidulant with the particular dried fruit to be flavored and the flavoring agent. Thus, flavoring of a particular dried fruit or even a particular raisin using the processes of the invention will require a balancing of the flavoring agent and acidulant to achieve a desired result. For example, the preferred acidulant in the case of flavoring seeded raisins from Australia with cherry flavor is malic acid. Generally, the acidulant is present in an amount of 0.1 to 2.5% by weight of final product. The desired result as well as the nature of the acidulant will determine the actual amount used in any particular incident.

The flavoring agent used in the processes of the invention has a flavor which does not substantially correspond to the flavor of the fruit which is to be flavored in accordance with the processes of the invention. The flavoring agent may be one or more of a natural flavor or an artificial flavor or a combination of natural and artificial flavors. Natural flavors include fruit juices, concentrates and commercially available natural fla-

5

vors, for example Fries & Cino, Cherry Flavor No. 96243; Naarden's Natural Banana Flavor No. D014654; and BBA's Natural Lemon/Lime Flavor No. 5-9591. Among the artificial flavors that may be used in the process of the invention are Florasynth's Artificial Raspberry Flavor No. W388076, IFF Artificial Pineapple Flavor No. IC578122, BBA's Artificial Coconut Flavor No. M5, IFF's Artificial Pineapple Flavor No. IC578122 combined with BBA's Artificial Coconut Flavor M5 (Pina Colada), and FDO Artificial Passion Fruit Flavor No. 987114. Other natural or artificial fruit flavors that may be used in the process of the invention are orange, grapefruit, tangerine, guava and kiwi. Non-fruit flavors such as peanut butter and cinnamon, may also be used in the process of the invention. The flavoring agent when employed in the first embodiment of the process of the invention should be heat stable at the temperatures at which the process of the invention is carried out. Generally the flavoring agent is present in an amount of about 0.05 to 3% by weight of final product. The desired result as well as the nature of the flavoring agent will determine the actual amount used in any particular incident. The flavoring agent may additionally include vitamin and mineral premixes such as vitamin A, vitamin C, calcium, sodium, thiamine, riboflavin, vitamin B, vitamin B₂, etc.

If desired, the flavor solution may contain one or both of a sweetening agent or a coloring agent. The sweetening agent may be a natural sweetener such as sucrose, fructose or glucose or an artificial sweetening agent such as aspartame. Generally, for a natural sweetening agent an amount of about 0 to 15% by weight of the final product is employed. The coloring agent may be a natural or artificial coloring agent. The amount of coloring agent to be added can be determined by visual requirements.

The flavor solution may additionally contain a humectant such as glycerol and sorbitol. Sodium citrate may also be added to the flavor solution to provide a more tart taste, for example when preparing a lemon/-lime flavored dried fruit product.

The treated raisins in the first embodiment of the process of the invention are dehydrated using methods known in the art such as air-oven drying and vacuum drying. In particular, the treated raisins may be dehydrated in a home dehydrator, with adequate ventilation of about 20 m.p.h. wind velocity for a period of about 4 to 6 hours at about 125° to 175° F, preferably 5 to 6 hours at 145° to 150° F, till about 12% moisture remains in the product. The treated raisins prior to drying may also be subjected to a vacuum of about 15" to 30", preferably 21" to 28" of mercury for about 2 to 4 minutes to hasten the absorption of the flavor solution. If the flavor solution contains a sweetening agent it is advantageous to wash the treated raisins prior to drying.

In accordance with a preferred embodiment of the invention, a process is provided for preparing a flavored raisin product which comprises treating raisins with an acidulant being selected from the group consisting of tartaric acid, malic acid, citric acid, ascorbic acid, phosphoric acid and fumaric acid said acidulants being employed in an amount and for a period of time sufficient to provide raisins wherein the natural flavor of the raisin is substantially removed; dehydrating the so treated raisins to obtain a desired moisture content in the raisins, and treating the dehydrated treated raisins with a flavoring agent having a flavor which does not substantially correspond to the natural flavor of the

6

raisins, said flavoring agent being employed in an amount and for a period of time which is sufficient to impart to the raisins a flavor which is substantially the same as the flavoring agent; and so forming a flavored raisin product having a flavor which is substantially the same as the flavor of the flavoring agent and having an outer surface which is substantially non-sticky whereby the flavored raisin product may be easily handled.

As a first step in the second preferred embodiment of the invention, the raisins are treated with an acidulant. The starting raisins are mixed with an aqueous solution containing the acidulant, in a mixer such as a Hobart mixer. The acidulant is employed in an amount, preferably 0.1 to 2.5% by weight of final product, and for a sufficient time to substantially remove the natural flavor of the raisins; in general about 2 to 3 hours, preferably 2.5 hours. The mixing is carried out at a temperature of about 20° C. to 50° C., preferably 20° C. If the starting raisins are coated with oil it is advantageous to wash the raisins prior to mixing to remove the oil coat. The acidulant treated raisins are then dehydrated to obtain a desired moisture content in the treated raisins. In particular, the raisins may be dehydrated in a home dehydrator, with adequate ventilation of about 20 m.p.h. wind velocity for a period of about 1 to 3 hours, preferably 2 hours, at 145° F. to 150° F., preferably about 145° F., until about 12 to 18% moisture, preferably 15% remains in the product. The raisins may be vacuum dried by subjecting to a vacuum of about 18" to 30", preferably 28" of mercury for about 1 to 3 hours, preferably 2 hours, to provide an internal product temperature of 110 to 160° F., preferably 110 to 120° F., until about 12 to 18% moisture, preferably 15% remains in the product. The acidulant treatment step and dehydration step may also be carried out in an apparatus such as a Rota-Cone Dryer and Processor (Paul O. Abb Inc., Little Falls, N.J.)

The dehydrated treated raisins are mixed with a flavoring agent. The flavoring agent is employed in an amount and for a period of time sufficient to impart to the dehydrated raisins a flavor which is substantially the same as the flavoring agent. Generally, the dehydrated raisins and flavoring agent are mixed in a mixer such as a tumble mixer, to uniformly coat the dehydrated raisins. Generally an amount of flavoring agent which substantially coats the raisins is employed and in particular the flavoring agent may be present in an amount of about 0.5 to 3% by weight of the final product. In the preferred process, of the invention no sweetening agents are contacted or applied to the raisins.

The nature of the acidulants and flavoring agents which may be used in the preferred process of the invention are the same as the acidulants and flavoring agents hereinbefore described for the first embodiment of the process of the invention.

The dried raisins prepared according to the process of the invention can be used as a snack food or confectionery or an ingredient in products such as cakes, cookies, snack foods, confectioneries, dairy products, etc. The dried raisins may also be coated with chocolate.

The following non-limiting examples are illustrative of the present invention:

## EXAMPLE 1

A cherry flavor solution containing 4.0g malic acid, 3.0g Fries & Cino Natural Cherry Flavor No. 96243 and 73.0g water was added to 400g of seeded raisins from Australia. The mixture was allowed to stand with inter-

5,188,861

7

mittent mixing, for 6 hours at room temperature (70° F.) to allow the solution to be absorbed into the raisins. The treated raisins were then dehydrated in a home dehydrator at 145° F. with adequate ventilation of about 20 m.p.h. wind velocity for a period of 5- to 6 hours to 12% moisture remaining in the product. The dried treated raisins were then cooled. The resultant product had a desirable cherry flavor.

## EXAMPLE 2

The cherry flavor solution as described in Example 1 was added to 400g of seeded raisins from Australia and mixed in a Hobart mixer for about 10 minutes to allow uniform dispersion of the solution into the raisins. The mixture was then subjected to a vacuum of 21″ to 28″ of mercury for about 4 minutes to hasten the absorption of the solution. The treated raisins were then dehydrated as described in Example 1. The resultant product had a desirable cherry taste which was similar to the product prepared in accordance with the procedure as described in Example 1.

## EXAMPLE 3

A strawberry flavor solution containing 1.20g of citric acid, 0.80g Florasynth Artificial Strawberry Flavor No. WL16103 and 78.0g of water was added to 400g of seeded raisins from Australia. Subsequent processing was carried out as described in Example 1 or Example 2 and the raisin products resulting for each process had a similar desirable strawberry taste.

## EXAMPLE 4

A raspberry flavor solution containing 2.25g citric acid, 2.50g Florasynth Artificial Raspberry Flavor No. W388076 and 75.25g of water was added to 400g of seeded raisins from Australia. Subsequent processing was carried out as described in Example 1 or Example 2 and the raisin products resulting from each process had a similar desirable raspberry taste.

## EXAMPLE 5

A banana flavor solution containing 1.00g citric acid, 7.00g Naarden Natural Banana Flavor No. DQ14654 and 72.00g of water was added to 400g of VISTA raisins from California. Subsequent processing was carried out as described in Example 1 or 2 and the raisin products resulting from each process had a similar desirable banana taste.

## EXAMPLE 6

A pina colada flavor solution containing 3.0g citric acid, 4.0g IFF Artificial Pineapple Flavor No. IC5788122 0.4g BBA Artificial Coconut Flavor No. M%, and 72.6g of water was added to 400g of VISTA raisins from California. Subsequent processing was carried out as described in Example 1 or 2 and the raisin products resulting from each process had a similar desirable pineapple taste.

## EXAMPLE 7

A lemon./lime flavor solution containing 5.0g citric acid, 0.5g sodium citrate, 1.5g BBA Natural Lemon/-Lime Flavor No. 5-9591 and 73.0g of water was added to 400g of Australian sultana raisins. Subsequent processing was carried out as described in Example 1 or 2 and the raisin products resulting from each process had a similar desirable lemon/lime taste.

## EXAMPLE 8

8

A passion fruit flavor solution containing 3.0g citric acid, 0.8g F.D. & 0 Artificial Passion Fruit Flavor No. 987114, 8.0g passion juice concentrate and 68.2g of water was added to 400g of VISTA raisins from California. Subsequent processing was carried out as described in Example 1 or 2 and the raisin products resulting from each process had a similar desirable passion fruit taste.

## EXAMPLE 9

A 2000g sample of Australian sultana raisins was treated with hydrogenated vegetable oil (0.5%) and then washed with hot water and dried. The washed raisins (2060g) were treated with 250ml of a 10% anhydrous citric acid solution for 2 hours and the resulting acidified raisins (2310g) were then dehydrated in a home dehydrator at 145° F. with adequate ventilation of about 20 m.p.h. wind velocity for a period of 3 hours. The resulting dehydrated raisin product (1970-1980g) was substantially free of any natural raisin flavor. A 0.4% flavor solution of Bush Brooke Allen Flavor #5-9591 was added to coat the dehydrated raisin product. The process was repeated using a 2000g sample of Thompson seedless raisins. An Orange Flavored raisin product was prepared employing the described process, using 2000g samples of each of Australian sultana raisins and Thompson seedless raisins and 250ml of an 8% anhydrous citric acid solution and a 0.7% flavor solution of cold pressed California orange oil (Seeley).

As a comparison, the process described in U.S. Pat. No. 1,717,489 to Barlow was also used to prepare lemon flavored and orange flavored raisins. In particular, 2000g samples of Australian sultana raisins and Thompson seedless raisins were washed with hot water and dried. The washed raisin samples (2060g) were then soaked in 250ml of either fresh lemon juice squeezed form Florida lemons or fresh orange juice squeezed from Swaziland oranges and then dehydrated in a home dehydrator at 145° F with adequate ventilation of about 20 m.p.h. wind velocity for a period of 3 hours. The resulting raisins retained their natural flavor characteristics.

The raisin product produced by the process of the invention had a superior orange or lemon flavor when compared to the raisins produced by the process disclosed in Barlow. No difference in the color of the raisin product of the invention and the raisins produced by the Barlow process was observed.

In the case of the orange flavored raisin product of the invention, it had a less sticky texture than the raisins produced using the Barlow process.

The sugar and acid content of the raisin products of the invention and the raisins produced using the Barlow process were calculated.

As shown in Table 1, the orange and lemon flavored raisins produced using the Barlow process have a lower acid content and a higher sugar content when compared to the orange and lemon flavored raisin product of the present invention. If the acid content of the Barlow raisins were increased by soaking the raisins in additional orange or lemon juice, this would necessarily substantially increase the sugar content of the raisins, which is not desirable.

TABLE 1

| | Acid Content (%) | Sugar Content (%) |
|---|---|---|
| Invention | | |
| Orange raisin product | 1 | 71.2%* |

5,188,861

| | 9 | |
|---|---|---|

TABLE 1-continued

| | Acid Content (%) | Sugar Content (%) |
|---|---|---|
| Lemon raisin product Barlow | 1.4 | 71.2% |
| Orange Raisins | 0.08–0.28** | 72%* |
| Lemon Raisins | 0.72–1.05*** | 71.35–71.65 |

*71.2% is total sugar content of raisins from General Foods Specifications. Minimum sugar content of orange juice is 6.4%. (The Structure and Composition of Foods, details re publication p. 690).

$$250 \text{ g} \times \frac{.64}{100} = 0.8\%$$

**Minimum Citric Acid Content of Orange Juice is 0.64%. (The Structure and Composition of Foods, p. 690)

$$250 \text{ g} \times \frac{.64}{100} = 1.6/2000 = 0.08\% \text{ acidity}$$

***Minimum Citric Acid Content of Lemon Juice is 5.74%. (The Structure and Composition of Foods, Vegetables, Legumes and Fruits, Vol. II, Winton, A.L., and K. B. Winton, John Wiley & Sons, Inc., London, p. 704).

$$250 \text{ g} \times \frac{5.74}{100} = 14.35/2000 = .007175 = 0.72\%$$

## EXAMPLE 10

A 2000g sample of Australian sultana raisins with hydrogenated vegetable oil coating (0.5%) were washed with hot water and dried. The washed raisins were treated with 250ml of an 8% malic acid solution for 2 hours and then dehydrated in a home dehydrator at approximately 145° F. with adequate ventilation of about 20 m.p.h. wind velocity for a period of 3 hours. The raisins may alternatively be dehydrated by vacuum drying by subjecting to a vacuum of about 28″ of mercury for a period of 2 hours to provide an internal raisin temperature of approximately 110 to 160° F. The resulting dehydrated raisin product was substantially free of any natural raisin flavor. A 1.0% solution of Natural Cherry Flavor #77742 from F & C International was added to coat the dehydrated raisin product.

## EXAMPLE 11

A passion fruit raisin product was prepared employing the process described in Example 10 using 250ml of an 8% citric acid solution and a 0.6% solution of Artificial Flavor #987114 from Fritzsche, Dodge & Olcott.

## EXAMPLE 12

A pina colada raisin product was prepared employing the process described in Example 10 using 250ml of 0.8% citric acid and a solution containing 1.0% Artificial Pineapple #IC5-78122 from International Flavor & Fragrances and 0.1% Artificial Coconut #M5 from Bush Brooke Allen.

## EXAMPLE 13

A banana flavored raisin product was prepared employing the process described in Example 10 using 250ml of 0.8% citric acid and a 0.5% solution of Natural Banana Flavor #82641 from F & C International.

## EXAMPLE 14

A strawberry flavored raisin product was prepared employing the process described in Example 10 using 250ml of 1% malic acid and a solution of Strawberry No. 987148 from FD & 0 International.

While certain representative embodiments of the invention have been described herein for the purpose of illustration, it will be apparent to those skilled in the art that modifications therein may be made without departing from the spirit and scope of the invention.

We claim:

| | 10 | |
|---|---|---|

1. A process for preparing a flavored dried fruit product said process comprising:

(a) treating a dried fruit with an acidulant being selected from the group consisting of tartaric acid, malic acid, citric acid, ascorbic acid, phosphoric acid and fumaric acid, in an amount and for a period of time which is sufficient to substantially remove the natural flavor of the dried fruit;

(b) dehydrating the treated dried fruit to obtain a desired moisture content; and,

(c) treating the dried fruit during step (a) or after step (b) with a flavoring agent having a flavor which does not substantially correspond to the natural flavor of the dried fruit, said flavoring agent being employed in an amount and for a period of time which is sufficient to impart to the dried fruit a flavor which is substantially the same as the flavoring agent;

and so forming a flavored dried fruit product having a flavor which is substantially the same as the flavor of the flavoring agent and having an outer surface which is substantially non-sticky whereby the flavored dried fruit product may be easily handled.

2. A process for preparing a flavored raisin product comprising a one step rehydration of raisins in a flavor solution comprising water, an acidulant, and a flavoring agent, and optionally comprising one or both of a sweetening agent and a colouring agent, said flavor solution being employed in an amount of about 10 to 100% by weight of final product, said acidulant being selected from the group consisting of tartaric acid, malic acid, citric acid, ascorbic acid, phosphoric acid and fumaric acid and being employed in an amount of 0.1 to 2.5% by weight of final product, said flavoring agent having a flavor which does not substantially correspond to the natural flavor of the raisins, said rehydration step being employed for a period of time to permit the flavor solution to stabilize in the raisins and to impart to the raisins a flavor which is substantially the same as the flavoring agent, washing the rehydrated raisins to substantially remove any residual of the flavor solution on the outer surface or skin of the raisins, and a one step dehydration of the washed rehydrated raisins to obtain a desired moisture content, and so forming a flavored raisin product having a flavored meat comprising the flavor of the flavoring agent, and having an outer surface which is substantially non-sticky whereby the raisin product may be easily handled.

3. A process for preparing a flavored raisin product, said process comprising treating raisins with an acidulant being selected from the group consisting of tartaric acid, malic acid, citric acid, ascorbic acid, phosphoric acid and fumaric acid, said acidulant being employed in an amount and for a period of time sufficient to provide raisins wherein the natural flavor of the raisins is substantially removed; dehydrating the so treated raisins to obtain a desired moisture content in the raisins, and treating the dehydrated raisins with a flavoring agent having a flavor which does not substantially correspond to the natural flavor of the raisins, said flavoring agent being employed in an amount and for a period of time which is sufficient to impart to the raisins a flavor which is substantially the same as the flavoring agent; and so forming a flavored raisin product having a flavor which is substantially the same as the flavor of the flavoring agent and having an outer surface which is substantially

5,188,861

**11**

non-sticky whereby the flavored raisin product may be easily handled.

4. A process as claimed in claim 3, wherein the acidulant is employed in an amount of 0.1 to 2.5% by weight of final product and the flavoring agent is employed in an amount of .05 to 3% by weight of final product.

5. A process as claimed in claim 3 or 4 wherein the flavoring agent is one or more of a natural and an artificial cherry, strawberry, raspberry, banana, pineapple, coconut, lemon/lime, orange, grapefruit, tangerine, guava, kiwi, or passion fruit flavor.

6. A flavored raisin product produced by a process comprising treating raisins with an acidulant being selected from the group consisting of tartaric acid, malic acid, citric acid, ascorbic acid, phosphoric acid and fumaric acid, said acidulant being employed in an amount and for a period of time sufficient to provide so treated raisins wherein the natural flavor of the raisins is

**12**

substantially removed; dehydrating the so treated raisins to obtain a desired moisture content in the raisins, and treating the dehydrated raisins with a flavoring agent having a flavor which does not substantially correspond to the natural flavor of the raisins, said flavoring agent being employed in an amount and for a period of time which is sufficient to impart to the raisins a flavor which is substantially the same as the flavoring agent; and so forming a flavored raisin product having a flavor which is substantially the same as the flavor of the flavoring agent and having an outer surface which is substantially non-sticky whereby the flavored raisin product may be easily handled.

7. A process as claimed in claim 1, wherein no sweetening agent is contacted with or applied to the dried fruit.

* * * * *

**JS 44**
(Rev. 03/99)

# CIVIL COVER SHEET  04CV3358ADM/AJB

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I (a) PLAINTIFFS

AMAZIN' RAISINS INTERNATIONAL, INC.

### DEFENDANTS

OCEAN SPRAY CRANBERRIES, INC.

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM, NAME, ADDRESS, AND TELEPHONE NUMBER)
Douglas J. Williams
Matthew A. Doscotch
Merchant & Gould P.C.
3200 IDS Center
80 South Eighth Street
Minneapolis, MN  55402
(612) 332-5300

ATTORNEYS (IF KNOWN)
Dorothy P. Whelan
Fish & Richardson P.C., P.A.
3300 Dain Rauscher Plaza
60 South Sixth Street
Minneapolis, MN  55402
(612) 335-5070

## II. BASIS OF JURISDICTION  (PLACE AN x IN ONE BOX ONLY)

☐ 1  U.S. Government
Plaintiff

☐ 2  U.S. Government
Defendant

☒ 3  Federal Question
(U.S. Government Not a Party)

☐ 4  Diversity
(Indicate Citizenship of
Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES  (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT  (PLACE AN x IN ONE BOX ONLY)

### CONTRACT
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment
& Enforcement of
Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted
Student Loans
(Excl. Veterans)
☐ 153 Recovery of Overpayment
of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability

### REAL PROPERTY
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product
Liability
☐ 320 Assault, Libel &
Slander
☐ 330 Federal Employers'
Liability
☐ 340 Marine
☐ 345 Marine Product
Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle
Product Liability
☐ 360 Other Personal
Injury

**PERSONAL INJURY**
☐ 362 Personal Injury -
Med Malpractice
☐ 365 Personal Injury -
Product Liability
☐ 368 Asbestos Personal
Injury Product
Liability

**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal
Property Damage
☐ 385 Property Damage
Product Liability

### CIVIL RIGHTS
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/
Accommodations
☐ 444 Welfare
☐ 440 Other Civil Rights

### PRISONER PETITIONS
☐ 510 Motions to vacate
Sentence
HABEAS CORPUS:
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

### FORFEITURE/PENALTY
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of
Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs
☐ 660 Occupational
Safety/Health
☐ 690 Other

### LABOR
☐ 710 Fair Labor Standards
Act
☐ 720 Labor/Mgmt.
Relations
☐ 730 Labor/Mgmt.
Reporting &
Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor
Litigation
☐ 791 Empl. Ret. Inc.
Security Act

### BANKRUPTCY
☐ 422 Appeal
28 USC 158
☐ 423 Withdrawal
28 USC 157

### PROPERTY RIGHTS
☐ 820 Copyrights
☒ 830 Patent
☐ 840 Trademark

### SOCIAL SECURITY
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
☐ 870 Taxes (U.S. Plaintiff
of Defendant)
☐ 871 IRS - Third Party
26 USC 7609

### OTHER STAT'DIES
☐ 400 State
Reappointment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation
☐ 470 Racketeer Influenced and
Corrupt Organizations
☐ 810 Selective Service
☐ 850 Securities/Commodities/
Exchange
☐ 875 Customer Challenge
12 USC 3410
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization
Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of
Information Act
☐ 900 Appeal of Fee
Determination
Under Equal Access to
Justice
☐ 950 Constitutionality of
State Statutes
☐ 890 Other Statutory
Actions

## V. ORIGIN  (PLACE AN x IN ONE BOX ONLY)

☒ 1 Original
Proceeding
☐ 2 Removed from
State Court
☐ 3 Remanded from
Appellate Court
☐ 4 Reinstated or
Reopened
☐ 5 Transferred from
another district
(specify)
☐ 6 Multidistrict
Litigation
☐ 7 Appeal to District
Judge from
Magistrate
Judgment

## VI. CAUSE OF ACTION  (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE.)
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)
35 U.S.C. §§ 271; 281-285; 295.

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

**DEMAND $**

Check YES only if demanded in Complaint:
**JURY DEMAND:** ☒ YES ☐ NO

## VIII. RELATED CASE(S) IF ANY  (See instructions):
JUDGE _____   DOCKET NUMBER _____

DATE
July 22, 2004

SIGNATURE OF ATTORNEY OF RECORD
s/Douglas J. Williams

FOR OFFICE USE ONLY

RECEIPT #_____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# UNITED STATES DISTRICT COURT

## District of Minnesota

***RESPOND TO:***

9  U.S. District Court, 700 Federal Building, 316 N. Robert St., St. Paul, MN  55101        Phone (651) 848-1100

:  U.S. District Court, 202 U. S. Courthouse, 300 S. Fourth St., Minneapolis., MN  55415        Phone (612) 664-5000

9  U.S. District Court, 417 Federal Building, 515 W. First St., Duluth, MN  55802        Phone (218) 529-3500

| **DATE:**  July 23, 2004 | **CIVIL FILE NUMBER:**  04cv3358ADM/AJB |
|---|---|

**CASE TITLE:**        Amazin' Raisins        vs      Ocean Spray Cranberries Inc

9  The above entitled action was:  9  removed from county court,  9  transferred from another district, and filed in 9  Minneapolis  9  St. Paul  9  Duluth, on _____ , and assigned to Judge _____ and to Magistrate Judge        *Please direct future filings to the office indicated at the top of this form.*

9  The above entitled action was filed in this court on _____ , and assigned to Judge _____ and referred to Magistrate Judge _____ The file will be maintained at the Clerk's office in the District of Minnesota in _____ *Please note for future reference.* cc to:

9  Discovery documents are returned pursuant to Federal Rule of Civil Procedure 5(d).

9  A certified copy of the Order of Remand is enclosed.

9  The above entitled action is being transferred to your court pursuant to Order of Judge _____ filed on _____ A certified copy of the order and docket entries are included, along with the original court file.  Please acknowledge receipt of this file by returning a date-stamped copy of this notice indicating the filing date and civil case number assigned in your court.

9  A Bill of Costs is to be submitted on Form AO133.  The form, and a guide entitled "Taxation of Costs in a Civil Case in the United States District Court for the District of Minnesota" for use by attorneys and legal staff are available on our website: www.mnd.uscourts.gov.

9  Your original documents are returned as <u>copies</u> of state court documents were submitted upon removal of the action to federal court.

9  Your in forma pauperis application was approved.  Please complete the enclosed Marshal Service Form(s) (one per defendant) and return to the office indicated at the top of this form.  Service cannot be performed until these completed forms have been received by the clerk's office.

| :  OTHER: | Enclosed please find copy of complaint in the above-entitled matter. |
|---|---|

Deputy Clerk:  s/ Denise La Fond

Denise La Fond

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| AMAZIN' RAISINS INTERNATIONAL, INC., an Ontario, Canada corporation, ) ) ) ) ) ) ) Plaintiff, ) ) v. ) ) OCEAN SPRAY CRANBERRIES, INC., a ) Delaware corporation, ) ) ) Defendant. ) | SUMMONS IN A CIVIL ACTION  CASE NUMBER: **04-3358ADM/AJB** |

TO:  Ocean Spray Cranberries, Inc.
      One Ocean Spray Drive
      Lakeville-Middleboro, MA 02349


YOU ARE HEREBY SUMMONED and required to file with the Clerk of this Court and serve upon PLAINTIFFS ATTORNEY:

Douglas J. Williams
Matthew A. Doscotch
Merchant & Gould P.C.
3200 IDS Center
Minneapolis, MN 55402
612/332.5300

an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.


**RICHARD D. SLETTEN**
_____
CLERK

_____
BY DEPUTY CLERK

JUL 2 2 2004
_____
DATE

AUGUST 13, 2004

# *QUICKSERV*
### ALLSTATE PROCESS SERVERS

## RETURN OF SERVICE

*I this day summoned the within named* OCEAN SPRAY CRANBERRIES, INC.

*to appear as within directed by delivering to*  NEIL BRYSON, GENERAL COUNSEL
12:20 P

**X**  *in hand*

*No.*  ONE OCEAN SPRAY DRIVE
*in the*  LAKEVILLE  *District of said*  PLYMOUTH  *County an attested*
*copy of the SUMMONS AND COMPLAINT, DEMAND FOR JURY TRIAL*

*it being necessary I actually used a*
*motor vehicle in the distance of*
45  *miles in the service of*
*this process*

Process Server/Disinterested Person

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

AMAZIN' RAISINS INTERNATIONAL, INC.,
an Ontario, Canada corporation,

          Plaintiff/Counterclaim Defendant,

      v.

OCEAN SPRAY CRANBERRIES, INC.,
a Delaware corporation,

          Defendant/Counterclaim Plaintiff.

Civ. No. 04-3358 (ADM/AJB)

**JURY TRIAL DEMANDED**

## <u>ANSWER AND COUNTERCLAIM</u>

Defendant Ocean Spray Cranberries, Inc. ("Ocean Spray") hereby answers the Complaint of Amazin' Raisins International, Inc. ("ARI"). Except as expressly admitted below, Ocean Spray denies each and every allegation contained in ARI's complaint. Ocean Spray specifically responds to ARI's allegations as follows:

1.      Upon information and belief, Ocean Spray admits the allegations of paragraph 1.

2.      Ocean Spray admits the allegations of paragraph 2.

3.      Ocean Spray admits that it manufactures certain varieties of its dried fruit products by a process that treats a fruit with an acidulant, adds flavor to the fruit, and dehydrates the fruit. Ocean Spray also admits that it has sold certain varieties of its products in this District.

4.      Ocean Spray admits that the United States Patent and Trademark Office issued United States Patent No. 5,188,861 ("the '861 patent") to Jack Mazin and Amir Lalji. Ocean Spray also admits that the '861 patent includes claims directed to process for preparing a flavored raisin product, claims directed to a process for preparing a flavored dried fruit product, and a claim directed to a flavored raisin product. Ocean Spray lacks sufficient information to admit or deny the remaining allegations contained in paragraph 4.

5.      Ocean Spray admits that it sells a product called Craisins®, and that certain varieties of Craisins® are manufactured by a process that treats a fruit with an acidulant, adds a flavor to the fruit, and dehydrates the fruit.

6.      Ocean Spray admits that on May 27, 2003, ARI provided a copy of the '861 patent to Ocean Spray.  Ocean Spray also admits that it responded by describing the process that it uses to make its flavored Craisins® product, and provided to ARI a copy of United States Patent No. 5,320,861.

7.      Ocean Spray admits that on September 8, 2003, ARI requested that Ocean Spray provide it with samples of "decharacterized cranberry pieces."  Ocean Spray also admits that it did not provide the requested samples.  Ocean Spray denies the remaining allegations contained in paragraph 7.

8.      Ocean Spray admits that on November 11, 2003, ARI requested samples of decharacterized fruit pieces.  Ocean Spray also admits that it did not provide the requested samples.  Ocean Spray denies the remaining allegations contained in paragraph 8.

9.      Ocean Spray admits that this action purports to be one for patent infringement brought pursuant to 35 U.S.C. § 271.

10.      Ocean Spray admits the allegations of paragraph 10.

11.      Ocean Spray admits that, on February 23, 1993, United States Patent No. 5,188,861 entitled PROCESS FOR PREPARING A DRIED FRUIT PRODUCT issued to Jack Mazin and Amir Lalji.  Ocean Spray also admits that United States Patent No. 5,188,861 is attached as Exhibit A to the Complaint.  Ocean Spray denies that the '861 patent was duly and legally issued.  Except as expressly admitted and denied, Ocean Spray lacks sufficient information to admit or deny the remaining allegations contained in paragraph 11.

2

12.     Ocean Spray denies the allegations contained in paragraph 12.

13.     Ocean Spray admits that it had actual knowledge of the '861 patent before the Complaint was served.  Ocean Spray specifically denies that it is infringing the '861 patent or has infringed the '861 patent in the past.  Ocean Spray denies the remaining allegations contained in paragraph 13.

14.     Ocean Spray denies the allegations contained in paragraph 14.

15.     In response to ARI's Prayer for Relief, inclusive of paragraphs a through f, Ocean Spray denies that ARI is entitled to any relief from Ocean Spray, either as requested in its Prayer for Relief, or otherwise.

## AFFIRMATIVE DEFENSES

In addition to the affirmative defenses described herein, Ocean Spray specifically reserves the right to allege additional affirmative defenses as they become known throughout the course of discovery.

### First Affirmative Defense
#### (Noninfringement)

Ocean Spray has not infringed, and does not infringe, either directly, contributorily, or by inducement, any valid and enforceable claim of the '861 patent.

### Second Affirmative Defense
#### (Invalidity and Unenforceability)

The '861 patent is invalid and unenforceable for failure to comply with one or more of the requirements of 35 U.S.C. § 101 *et seq.*, including, without limitation, sections 101, 102, 103, 112, and/or 151.

3

### Third Affirmative Defense
**(Laches)**

ARI's claims are barred, in whole or in part, by the doctrine of laches.

### Fourth Affirmative Defense
**(Estoppel)**

ARI's claims are barred, in whole or in part, by the doctrine of estoppel.

### Fifth Affirmative Defense
**(Time Limitation on Damages)**

ARI is precluded by 35 U.S.C. § 286 from recovering damages for any alleged infringement of the '861 patent that occurred more than six years before the filing of the Complaint.

### Sixth Affirmative Defense
**(Limitation on Damages)**

Upon information and belief, ARI is precluded by 35 U.S.C. § 287 from recovering damages for any alleged infringement of the '861 patent that occurred before ARI made an actual and specific charge of infringement to Ocean Spray.

### Seventh Affirmative Defense
**(Unclean Hands)**

Upon information and belief, ARI's claims are barred, in whole or in part, by the doctrine of unclean hands.

## COUNTERCLAIM

Defendant Ocean Spray Cranberries, Inc. ("Ocean Spray"), for its counterclaim against Plaintiff Amazin' Raisins International, Inc. ("ARI"), states and alleges as follows:

### Nature of the Action

1.     This counterclaim seeks a declaratory judgment of noninfringement, invalidity, and unenforceability of the '861 patent under the patent laws of the United States, 35 U.S.C. §101 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

### The Parties

2.     Ocean Spray is a corporation organized and existing under the laws of Delaware and has a principal place of business at One Ocean Spray Drive, Lakeville-Middleboro, MA 02349.

3.     Upon information and belief, ARI is a corporation organized and existing under the laws of Ontario, Canada, and has a principal place of business at 23 Boom Lane C, Atholville, New Brunswick, Canada, E3N, 4E8.

### Jurisdiction and Venue

4.     This Court has subject matter jurisdiction over this counterclaim pursuant to 28 U.S.C. §§ 1331 and 1338(a).

5.     ARI has consented to personal jurisdiction through the commencement of its action for patent infringement as set forth in the Complaint.

6.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(c) and (d).

### Count I
### Noninfringement of the '861 Patent

7.     Ocean Spray restates and realleges paragraphs 1-6 of this counterclaim.

8.      Ocean Spray does not infringe and has never infringed any valid and enforceable claim of the '861 patent, either directly or indirectly, contributorily, or by inducement.

**Count II**
**Invalidity and Unenforceability of the '861 Patent**

9.      Ocean Spray restates and realleges paragraphs 1-6 of this counterclaim.

10.     The '861 patent is invalid and unenforceable for failure to comply with one or more of the requirements of 35 U.S.C. § 101 *et seq.*, including, without limitation, sections 101, 102, 103, 112, and/or 151.

**Jury Trial Demand**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Ocean Spray hereby demands on its Answer, affirmative defenses, and counterclaims a jury trial on all issues so triable.

**Prayer for Relief**

WHEREFORE, Ocean Spray respectfully prays for judgment as follows:

a.      A declaration that Ocean Spray has not infringed and is not infringing, either directly, indirectly, contributorily, by inducement or otherwise, any valid and enforceable claim of the '861 patent;

b.      A declaration that the claims of the '861 patent are invalid and unenforceable;

c.      That ARI, its officers, agents, employees, attorneys, and all persons in active concert or participation with it are permanently enjoined from charging that the '861 patent is infringed by Ocean Spray;

d.      Reasonable attorney fees and costs be awarded to Ocean Spray under, but not limited to 35 U.S.C. § 285; and

   e.     That Ocean Spray be awarded such further relief as the Court deems just and

proper.

Dated:    September 2, 2004               FISH & RICHARDSON P.C., P.A.


                                          By:  s/ William R. Woodford
                                               John C. Adkisson (#266358)
                                               William R. Woodford (#322593)
                                               FISH & RICHARDSON P.C., P.A.
                                               60 South Sixth Street
                                               Suite 3300 Dain Rauscher Plaza
                                               Minneapolis, MN 55402

                                          Attorneys for Defendant
                                          OCEAN SPRAY CRANBERRIES, INC.


60241231.doc

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

AMAZIN' RAISINS INTERNATIONAL, INC.,
an Ontario, Canada corporation,

      Plaintiff/Counterclaim Defendant,

    v.

OCEAN SPRAY CRANBERRIES, INC.,
a Delaware corporation,

      Defendant/Counterclaim Plaintiff.

Civ. No. 04-3358 (ADM/AJB)

**DEFENDANT OCEAN SPRAY CRANBERRIES, INC.'S
CORPORATE DISCLOSURE STATEMENT**

Defendant Ocean Spray Cranberries, Inc. ("Ocean Spray") hereby discloses that it is a nongovernmental corporate party to the above-captioned action. Ocean Spray has no parent corporation, and there is no publicly held corporation that owns 10% or more of its stock.

Dated: September 2, 2004

FISH & RICHARDSON P.C., P.A.

By: s/ William R. Woodford
    John C. Adkisson (#266358)
    William R. Woodford (#322593)
    FISH & RICHARDSON P.C., P.A.
    60 South Sixth Street
    Suite 3300 Dain Rauscher Plaza
    Minneapolis, MN 55402

Attorneys for Defendant
OCEAN SPRAY CRANBERRIES, INC.

60242865.doc

## CERTIFICATE OF SERVICE

I certify that on September 2, 2004, I have caused the following documents:

1. **ANSWER AND COUNTERCLAIM**

2. **DEFENDANT OCEAN SPRAY CRANBERRIES, INC.'S CORPORATE DISCLOSURE STATEMENT**

3. **CERTIFICATE OF SERVICE**

to be filed electronically with the Clerk of Court through ECF, and ECF will send an e-notice of the electronic filing to the following:

Douglas J. Williams                     dwilliams@merchant-gould.com
Merchant & Gould P.C.

Matthew A. Doscotch                  mdoscotch@merchant-gould.com
Merchant & Gould P.C.


Date:  September 2, 2004              **s/ William R. Woodford**
                                                    William R. Woodford


60242120.doc

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

AMAZIN' RAISINS INTERNATIONAL, INC.,
an Ontario, Canada corporation,

       Plaintiff/Counterclaim Defendant,

    v.

OCEAN SPRAY CRANBERRIES, INC., a
Delaware corporation,

       Defendant/Counterclaim Plaintiff.

Civ. No. 04-3358 (ADM/AJB)

## OCEAN SPRAY'S MOTION TO TRANSFER VENUE

Defendant Ocean Spray Cranberries, Inc. hereby moves this Court, pursuant to 28 U.S.C.

§ 1404(a), for an Order transferring this action to the United States District Court for the District

of Massachusetts.  The grounds for this motion are set forth in the accompanying Memorandum

in Support of Ocean Spray's Motion to Transfer Venue, Declaration of Neil Bryson, Declaration

of William R. Woodford, including the exhibits filed therewith, the arguments of counsel, and all

of the papers and proceedings in this matter.

Dated:  September 10, 2004

FISH & RICHARDSON P.C., P.A.

By:  **s/William R. Woodford**
     John C. Adkisson (#266358)
     William R. Woodford (#322593)
     FISH & RICHARDSON P.C., P.A.
     60 South Sixth Street
     Suite 3300 Dain Rauscher Plaza
     Minneapolis, MN 55402

     Attorneys for Defendant
     OCEAN SPRAY CRANBERRIES, INC.

60243379.doc

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

AMAZIN' RAISINS INTERNATIONAL, INC.,
an Ontario, Canada corporation,

       Plaintiff/Counterclaim Defendant,

v.

OCEAN SPRAY CRANBERRIES, INC., a
Delaware corporation,

       Defendant/Counterclaim Plaintiff.

Civ. No. 04-3358 (ADM/AJB)


## OCEAN SPRAY'S NOTICE OF MOTION TO TRANSFER VENUE

PLEASE TAKE NOTICE that Defendant Ocean Spray Cranberries, Inc. will move this

Court, on October 26, 2004 at 9:00 a.m., in Courtroom 13W, United States District Court, 202

U.S. Courthouse, 300 South 4th Street, Minneapolis, Minnesota, for an Order transferring this

action to the United States District Court for the District of Massachusetts.


Dated:  September 10, 2004         FISH & RICHARDSON P.C., P.A.

                      By:  **s/William R. Woodford**
                        John C. Adkisson (#266358)
                        William R. Woodford (#322593)
                        FISH & RICHARDSON P.C., P.A.
                        60 South Sixth Street
                        Suite 3300 Dain Rauscher Plaza
                        Minneapolis, MN 55402

                        Attorneys for Defendant
                        OCEAN SPRAY CRANBERRIES, INC.

60243396.doc

# EXHIBIT A

**EXHIBIT INDEX**

1. **Exhibit B** is a true and correct copy of the Complaint filed by Amazin'

Raisins International, Inc. on August 13, 2004.

2. **Exhibit C** is a true and correct copy of the Answer and Counterclaim filed by

Ocean Spray Cranberries, Inc. on September 2, 2004.

3. **Exhibit D** is a true and correct copy of a letter to Douglas J. Williams from

John C. Adkisson dated September 2, 2004.

4. **Exhibit E** is a true and correct copy of a letter to John C. Adkisson from

Matthew A. Doscotch dated September 7, 2004.

60244206.doc

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| AMAZIN' RAISINS INTERNATIONAL, INC., an Ontario, Canada corporation, | ) ) ) ) |
| Plaintiff, | ) Case No 04-3358ADM/AJB. |
| v. | ) |
| OCEAN SPRAY CRANBERRIES, INC., a Delaware corporation, | ) ) |
| Defendant. | ) **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Amazin' Raisins Int'l, Inc. ("Amazin' Raisins") for its Complaint against Defendant Ocean Spray Cranberries, Inc. ("Ocean Spray") states and alleges as follows:

### The Parties

1.  Plaintiff Amazin' Raisins is a corporation organized and existing under the laws of Ontario, Canada, and has a principal place of business at 23 Boom Lane C, Atholville, New Brunswick, Canada, E3N, 4E8.

2.  Upon information and belief, Defendant Ocean Spray is a corporation organized and existing under the laws of Delaware and has a principal place of business at One Ocean Spray Drive, Lakeville-Middleboro, MA, 02349.

3.  Upon information and belief, defendant Ocean Spray has manufactured a dried fruit product, has had a dried fruit product manufactured on its behalf, and/or

imported dried fruit product manufactured by a process that treats a fruit with an acidulant, adds a flavor to the fruit, and dehydrates the fruit. Defendant Ocean Spray has done business in this district by offering for sale, distributing, and selling its products in this District on a continuous and systematic basis.

## Background

4. The United States Patent and Trademark Office issued United States Patent No. 5,188,861 ("the '861 patent") to Jack Mazin and Amir Lalji, which includes claims to a flavored dried fruit product and process for preparing the dried fruit product. Mr. Mazin and Mr. Lalji subsequently assigned the entire right, title, and interest in and to the '861 patent to Plaintiff Amazin' Raisins.

5. Upon information and belief, Defendant Ocean Spray sells flavored dried fruit products entitled "Craisins" manufactured by a process that treats a fruit with an acidulant, adds a flavor to the fruit, and dehydrates the fruit.

6. Plaintiff Amazin' Raisins gave notice of United States Patent No. 5,188,861 to Defendant Ocean Spray on May 27, 2003. Ocean Spray subsequently responded by describing the process it claims it uses to make its flavored Craisins.

7. On September 8, 2003, in an attempt to further understand Ocean Spray's treatment process in view of the '861 patent, Plaintiff Amazin' Raisins requested that Defendant Ocean Spray provide Plaintiff with samples of Defendant's "decharacterized cranberry pieces." Defendant Ocean Spray refused to provide the requested samples.

8. On November 11, 2003, Plaintiff Amazin' Raisins again requested that Defendant Ocean Spray provide Plaintiff Amazin' Raisins with samples of Defendant's

2

"decharacterized cranberry pieces" to aid in Plaintiff Amazin' Raisins' evaluation of the Ocean Spray process. Again, Ocean Spray did not provide the requested samples.

### Jurisdiction

9.      This is a claim of patent infringement arising under the Acts of Congress relating to patents, 35 U.S.C. §§ 271; 281-285; 295.

10.      This Court has jurisdiction under 28 U.S.C. § 1331 and 1338(a).

### Count I

### Patent Infringement of United States Patent No. 5,188,861

11.      On February 23, 1993, United States Patent No. 5,188,861 entitled PROCESS FOR PREPARING A DRIED FRUIT PRODUCT was duly and legally issued to Jack Mazin and Amir Lalji. Plaintiff Amazin' Raisins, as assignee of United States Patent No. 5,188,861, is the owner of the entire right, title, and interest in and to United States Patent No. 5,188,861 and still is the owner thereof. United States Patent No. 5,188,861 is attached as Exhibit A.

12.      Upon information and belief, Defendant Ocean Spray has manufactured, used, imported, and/or offered for sale and sold, dried fruit products, which infringe the '861 patent, or otherwise infringe or induced infringement.

13.      Defendant Ocean Spray has had actual knowledge of the '861 patent, and its infringement, on information and belief, continues unabated. Defendant Ocean Spray's infringing activities at least since it received notice from Plaintiff Amazin' Raisins have been and continue to be willful and deliberate.

3

14.     Plaintiff Amazin' Raisins has been damaged by Defendant Ocean Spray's infringement of the '861 patent and will continue to be damaged in the future unless defendant Ocean Spray is enjoined from infringing said patent.

### Prayer for Relief

WHEREFORE, Plaintiff Amazin' Raisins prays for the following relief:

a.     A judgment that Defendant Ocean Spray has infringed United States Patent No. 5,188,861;

b.     An injunction preliminarily and permanently enjoining and restraining Defendant Ocean Spray, its officers, directors, agents, servants, employees, attorneys, and all others acting under or through it, directly or indirectly, from infringing, inducing, or contributing to the infringement of United States Patent No. 5,188,861;

c.     A judgment and order requiring Defendant Ocean Spray to pay damages under 35 U.S.C. § 284, including treble damages for willful infringement of United States Patent No. 5,188,861, and the costs of this action as provided by 35 U.S.C. § 284, with interest;

d.     A judgment that this case is exceptional and order directing Defendant Ocean Spray to pay Plaintiff Amazin' Raisins reasonable attorney fees as provided by 35 U.S.C. § 285;

e.     A judgment that Defendant Ocean Spray's flavored "Craisin" products shall be presumed to have been made according to the process disclosed in United States Patent No. 5,188,861 as provided for by 35 U.S.C. § 295; and

f.     Such other and further relief as this Court may deem just and equitable.

4

## Demand for Jury Trial

Plaintiff hereby demands that all issues be determined by a jury.

AMAZIN' RAISINS INTERNATIONAL, INC.

By Its Attorneys,

Date:  July 22, 2004          s/Douglas J. Williams

Douglas J. Williams, 117353
Matthew A. Doscotch, 029973X
MERCHANT & GOULD P.C.
3200 IDS Center
80 South Seventh Street
Minneapolis, MN 55402-2215
(612) 332-5300

5



US005188861A

## United States Patent [19]

### Mazin et al.

[11] **Patent Number:** **5,188,861**

[45] **Date of Patent:** Feb. 23, 1993

[54] **PROCESS FOR PREPARING A DRIED FRUIT PRODUCT**

[75] Inventors: Jack G. Mazin, Maple; Amir Lalji, Weston, both of Canada

[73] Assignee: Royal Domaine Inc., Concord, Canada

[21] Appl. No.: 530,863

[22] Filed: May 31, 1990

[51] Int. Cl.⁵ .......................................... A23L 1/212
[52] U.S. Cl. .......................................... 426/640; 426/639
[58] Field of Search ............................. 426/640, 639

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 1,609,720 | 12/1926 | Humphrey | 426/640 |
| 1,717,489 | 6/1929 | Barlow | 426/640 |
| 4,542,033 | 9/1985 | Agarwala | 426/640 X |

**FOREIGN PATENT DOCUMENTS**

61-216641 9/1986 Japan ............................. 426/640

### OTHER PUBLICATIONS

Furia, CRC Handbook of Food Additives, vol. I, 1972, CRC Press Inc.: Cleveland, pp. 225-253.

*Primary Examiner*—Joseph Golian
*Attorney, Agent, or Firm*—Bereskin & Parr

[57] **ABSTRACT**

A process for preparing a flavored dried fruit product having a flavor which does not substantially correspond to the natural flavor of the dried fruit is provided. As a first step, a dried fruit is treated with an acidulant being selected from the group consisting of tartaric acid, malic acid, citric acid, ascorbic acid, phosphoric acid, and fumaric acid in an amount and for a period of time which is sufficient to substantially remove the natural flavor of the dried fruit. As a second step, the treated dried fruit is then dehydrated to the desired moisture content. The dried fruit is treated during the first step or after the second step with a flavoring agent having a flavor which does not correspond to the natural flavor of the dried fruit. The flavoring agent is employed in an amount and for a period of time which is sufficient to impart to the dried fruit a flavor which is substantially the same as the flavoring agent.

**7 Claims, No Drawings**

5,188,861

## PROCESS FOR PREPARING A DRIED FRUIT PRODUCT

### BACKGROUND OF THE INVENTION

The invention relates to the field of dry fruits, and particularly, to a new dried fruit product having a flavor which does not substantially correspond to the natural flavor of the dried fruit, and a process for preparing the product.

Dried fruits such as raisins, prunes, apples, apricots, and peaches are recognized as highly nutritious food products. Raisins, for example, are a good source of iron, and they supply calcium, magnesium, potassium, phosphorous, B vitamins, protein and dietary fibre. (Foods and Food Production Encyclopedia, Considine, D.M. ed., Van Nostrand Reinhold Company, New York 1982, pages 1639–1942). Dried fruits are utilized as snack foods, confectionaries, etc., and as ingredients in foods such as snack foods, confectionaries, biscuits, cookies, cakes, dairy products, cereals, etc.

There is a need for dried fruit products which are inexpensive, have an appealing taste, aroma and texture, and are nutritious. Fruit leather products which are commercially available are expensive and contain ingredients such as sweeteners which make them nutritionally less desirable. Many of the sun dried or artificially dried fruits commercially available do not have an appealing taste, aroma or texture and therefore are not readily consumable as snack foods or readily incorporated into foods such as confectionaries, biscuits, cereals, etc.

There is also a need for a new and useful process which is capable of producing dried fruit products which retain more of their shape, size and natural nutrients, while imparting desirable taste, texture and aroma qualities to the dried fruit products.

U.S. Pat. No. 1,717,489 (issued Jun. 18, 1929 to Barlow) discloses a method of changing the flavor of dried fruits comprising combining the expressed juice of one fruit with another fruit which has been sun-dried or evaporated or which is in the process of drying. In one method disclosed a dry or drying fruit is immersed in the fruit juice of another fruit for a short time and then put again to dry; the process being repeated until the desired result is fully obtained. The method disclosed in the reference leaves much to be desired in terms of processing efficiency and processing costs and the tendency of the fruit juice to ferment over time may result in a product having an alcoholic taste. In addition, the absence of preservatives in the fruit juice and/or repeated applications of the fruit juice to the dry or drying fruit may introduce undesirable microorganisms into the dried fruit product shortening the shelf life of the product and more importantly, rendering the product harmful to consumers. Further, the repeated application of the fruit juice to the dry or drying fruit increases the sugar content resulting in a sticky product which is nutritionally less desirable. Repeated drying of the fruit also reduces the content of nutrients and volatiles in the fruit which effects the nutritional, and aroma and flavor qualities, respectively of the product.

### SUMMARY OF THE INVENTION

The present invention provides dried fruit products, particularly raisins, having flavors which do not correspond to the natural flavor of the dried fruits and having desirable nutritional, texture and aroma qualities; and a

process for preparing the dried fruit products. The improvements in the product attributes provided by the dried fruit products of the invention compared to prior art products is in texture, flavor, nutrition and aroma. The improvements are realized using the easily carried out process of the present invention.

Broadly stated, the present invention provides a process for preparing a flavored dried fruit product said process comprising:

(a) treating a dried fruit with an acidulant being selected from the group consisting of tartaric acid, malic acid, citric acid, ascorbic acid, phosphoric acid and fumaric acid, in an amount and for a period of time which is sufficient to substantially remove the natural flavor of the dried fruit;

(b) dehydrating the treated dried fruit to obtain a desired moisture content; and,

(c) treating the dried fruit during step (a) or after step (b) with a flavoring agent having a flavor which does not substantially correspond to the natural flavor of the dried fruit, said flavoring agent being employed in an amount and for a period of time which is sufficient to impart to the dried fruit a flavor which is substantially the same as the flavoring agent; and so forming a flavored dried fruit product having a flavor which is substantially the same as the flavor of said flavoring agent and having an outer surface which is substantially non-sticky whereby the flavored dried fruit product may be easily handled.

In one embodiment of the invention, a process for preparing a flavored raisin product is provided which process comprises a one step rehydration of raisins in a flavor solution comprising water, an acidulant, and a flavoring agent, and optionally comprising one or both of a sweetening agent and a colouring agent, said flavor solution being employed in an amount of about 10 to 100% by weight of final product, said acidulant being selected from the group consisting of tartaric acid, malic acid, citric acid, ascorbic acid, phosphoric acid and fumaric acid and being employed in an amount of 0.1 to 2.5% by weight of final product, said flavoring agent having a flavor which does not substantially correspond to the natural flavor of the raisins, said rehydration step being employed for a period of time to permit the flavor solution to stabilize in the raisins and to impart to the raisins a flavor which is substantially the same as the flavoring agent, and washing the rehydrated raisins to substantially remove any residual of the flavor solution on the outer surface or skin of the raisins, and a one step dehydration of the washed rehydrated raisins to obtain a desired moisture content, and so forming a flavored raisin product having a flavored meat comprising the flavor of the flavoring agent, and having an outer surface which is substantially non-sticky whereby the raisin product may be easily handled.

In a second preferred embodiment of the invention, a process for preparing a flavored raisin product is provided which process comprises treating raisins with an acidulant being selected from the group consisting of tartaric acid, malic acid, citric acid, ascorbic acid, phosphoric acid and fumaric acid, said acidulant being employed in an amount and for a period of time sufficient to provide raisins wherein the natural flavor of the raisins is substantially removed; dehydrating the so treated raisins to obtain a desired moisture content in the raisins, and treating the dehydrated raisins with a

5,188,861

3

flavoring agent having a flavor which does not substantially correspond to the natural flavor of the raisins, said flavoring agent being employed in an amount and for a period of time which is sufficient to impart to the raisins a flavor which is substantially the same as the flavoring agent; and so forming a flavored raisin product having a flavor which is substantially the same as the flavor of the flavoring agent and having an outer surface which is substantially non-sticky whereby the flavored raisin product may be easily handled.

The process of the invention, by employing minimal steps, economically decreases the time and ingredients required to obtain a dried fruit product with a desired taste, aroma and texture. The processing temperatures and times also make it possible to produce flavored dried fruit products having little or no loss of natural nutrients. Another feature of the present invention is the improved flow properties attained when the process is employed. Using conventional methods such as Barlow, the dried fruit products may form lumps which cause difficulties in handling, packaging, obtaining exact product weights, and incorporating into other food stuffs. It is also possible using the present invention to obtain a flavored dried fruit product which is more uniform in size and shape when compared to the prior art. In addition, the presence of the acidulant, significantly decreases the possibility of contamination and fermentation occurring.

The preferred process of the invention has a number of additional advantages. There is no heating of the flavoring agent so there is little or no loss of the volatile constituents of the flavor and aroma of the final product. Thus, the flavor and aroma of the flavoring agent is more readily retained in the flavored dried fruit product. The flavor and aroma will also penetrate the dried fruit on storage and provide the flavored dried fruit with a more well-developed flavor and aroma. In the preferred process of the invention, no sweetening agent is contacted with or applied to the dried fruit providing a more nutritionally desirable product. The absence of added sweetening agent in the preferred process also provides a product with superior flow properties which makes the product easy to handle, facilitating its use as a consumer product or in further processing as an ingredient in other food stuffs.

The invention also relates to flavored dried fruit products, particularly flavored raisin products produced by the processes of the invention. The flavored dried fruit products of the invention have a more appealing taste, aroma and texture than conventional dried fruit products and thus may be more readily consumable as snack foods or more readily incorporated into foods such as confectionaries, biscuits, cereals, etc.

DETAILED DESCRIPTION OF THE INVENTION

The dried fruits which may be flavored employing the processes of the invention include peach, apple, pear, raisins, prunes, apricots and cherries. Any dried fruit which contains between about 10% to 18% moisture may be employed. The process can be employed on whole or sectioned pieces of dried fruit.

Preferably the dried fruit is a raisin including Thompson seedless raisins, golden seedless raisins, muscat raisins or sultana raisins. The variety of raisin to be used in the processes of the invention will be determined by the desired end product color. Particularly preferred raisins

4

to be used in the processes of the invention are Australian sultanas, VISTA ™ raisins from California, seeded raisins from Australia and Dunas seedless raisins from Mexico.

The processing of many of the different dried fruits will require conditions specifically adapted to the dried fruit. The following description will be restricted to the conditions which are particularly suitable for preparing raisin products but it will be understood that persons skilled in the art, given the particular process conditions and steps set forth in this general description as well as in the Examples, could readily adapt the processes of the invention to other dried fruits.

As hereinbefore mentioned, in one embodiment of the invention, a process is provided for preparing a flavored raisin product which includes a one step rehydration of the raisins in a flavor solution. The amount of flavor solution employed is about 10 to 100% by weight of the final product, preferably about 15 to 20% by weight of the final product. The raisins and flavor solution may be mixed, without breaking up the raisins, in a mixer, for example a Hobart. The raisins are rehydrated in the flavor solution for a sufficient time to permit the flavor to stabilize in the raisins; in general, about 3 to 48 hours, preferably 4 to 6 hours, at about 70° to 120° F. The raisins and flavor solution may also be mixed in a steam kettle with a vacuum pump. The raisins and flavor solution are mixed without breaking up the raisins for 5 to 10 minutes, preferably 7 minutes, and then a vacuum of about 15" to 30", preferably 21" to 28" of mercury is applied for about 2 to 4 minutes.

The flavor solution contains water, an acidulant, a flavoring agent and, if desired, it may contain one or both of a sweetening agent or a colouring agent. As discussed above, the acidulant lowers the pH of the flavor solution, significantly decreasing possible contamination by undesirable microorganisms and fermentation. The acidulant also substantially removes the natural flavor of the dried fruit. In addition, the acidulant may also give the dried fruit product a tart taste and assist in breaking down any alkali film that may be on the outer surface of the raisins due to prior processing of the raisin which may inhibit absorption of the flavoring agent. Among the suitable acidulants which may be used in the processes of the invention are tartaric acid, malic acid, citric acid, ascorbic acid, phosphoric acid, or fumaric acid. The selection of a particular acidulant will be made with knowledge of the flavor compatibility of the acidulant with the particular dried fruit to be flavored and the flavoring agent. Thus, flavoring of a particular dried fruit or even a particular raisin using the processes of the invention will require a balancing of the flavoring agent and acidulant to achieve a desired result. For example, the preferred acidulant in the case of flavoring seeded raisins from Australia with cherry flavor is malic acid. Generally, the acidulant is present in an amount of 0.1 to 2.5% by weight of final product. The desired result as well as the nature of the acidulant will determine the actual amount used in any particular incident.

The flavoring agent used in the processes of the invention has a flavor which does not substantially correspond to the flavor of the fruit which is to be flavored in accordance with the processes of the invention. The flavoring agent may be one or more of a natural flavor or an artificial flavor or a combination of natural and artificial flavors. Natural flavors include fruit juices, concentrates and commercially available natural fla-

5,188,861

5

vors, for example Fries & Cino, Cherry Flavor No. 96243; Naarden's Natural Banana Flavor No. D014654; and BBA's Natural Lemon/Lime Flavor No. 5-9591. Among the artificial flavors that may be used in the process of the invention are Florasynth's Artificial Raspberry Flavor No. W388076, IFF Artificial Pineapple Flavor No. 1C578122, BBA's Artificial Coconut Flavor No. M5, IFF's Artificial Pineapple Flavor No. 1C578122 combined with BBA's Artificial Coconut Flavor M5 (Pina Colada), and FDO Artificial Passion Fruit Flavor No. 987114. Other natural or artificial fruit flavors that may be used in the process of the invention are orange, grapefruit, tangerine, guava and kiwi. Nonfruit flavors such as peanut butter and cinnamon, may also be used in the process of the invention. The flavoring agent when employed in the first embodiment of the process of the invention should be heat stable at the temperatures at which the process of the invention is carried out. Generally the flavoring agent is present in an amount of about 0.05 to 3% by weight of final product. The desired result as well as the nature of the flavoring agent will determine the actual amount used in any particular incident. The flavoring agent may additionally include vitamin and mineral premixes such as vitamin A, vitamin C, calcium, sodium, thiamine, riboflavin, vitamin B, vitamin $B_2$, etc.

If desired, the flavor solution may contain one or both of a sweetening agent or a coloring agent. The sweetening agent may be a natural sweetener such as sucrose, fructose or glucose or an artificial sweetening agent such as aspartame. Generally, for a natural sweetening agent an amount of about 0 to 15% by weight of the final product is employed. The coloring agent may be a natural or artificial coloring agent. The amount of coloring agent to be added can be determined by visual requirements.

The flavor solution may additionally contain a humectant such as glycerol and sorbitol. Sodium citrate may also be added to the flavor solution to provide a more tart taste, for example when preparing a lemon-/ lime flavored dried fruit product.

The treated raisins in the first embodiment of the process of the invention are dehydrated using methods known in the art such as air-oven drying and vacuum drying. In particular, the treated raisins may be dehydrated in a home dehydrator, with adequate ventilation of about 20 m.p.h. wind velocity for a period of about 4 to 6 hours at about 125° to 175° F, preferably 5 to 6 hours at 145° to 150° F, till about 12% moisture remains in the product. The treated raisins prior to drying may also be subjected to a vacuum of about 15" to 30', preferably 21" to 28" of mercury for about 2 to 4 minutes to hasten the absorption of the flavor solution. If the flavor solution contains a sweetening agent it is advantageous to wash the treated raisins prior to drying.

In accordance with a preferred embodiment of the invention, a process is provided for preparing a flavored raisin product which comprises treating raisins with an acidulant being selected from the group consisting of tartaric acid, malic acid, citric acid, ascorbic acid, phosphoric acid and fumaric acid said acidulants being employed in an amount and for a period of time sufficient to provide raisins wherein the natural flavor of the raisin is substantially removed; dehydrating the so treated raisins to obtain a desired moisture content in the raisins, and treating the dehydrated treated raisins with a flavoring agent having a flavor which does not substantially correspond to the natural flavor of the

6

raisins, said flavoring agent being employed in an amount and for a period of time which is sufficient to impart to the raisins a flavor which is substantially the same as the flavoring agent; and so forming a flavored raisin product having a flavor which is substantially the same as the flavor of the flavoring agent and having an outer surface which is substantially non-sticky whereby the flavored raisin product may be easily handled.

As a first step in the second preferred embodiment of the invention, the raisins are treated with an acidulant. The starting raisins are mixed with an aqueous solution containing the acidulant, in a mixer such as a Hobart mixer. The acidulant is employed in an amount, preferably 0.1 to 2.5% by weight of final product, and for a sufficient time to substantially remove the natural flavor of the raisins; in general about 2 to 3 hours, preferably 2.5 hours. The mixing is carried out at a temperature of about 20° C. to 50° C., preferably 20° C. If the starting raisins are coated with oil it is advantageous to wash the raisins prior to mixing to remove the oil coat. The acidulant treated raisins are then dehydrated to obtain a desired moisture content in the treated raisins. In particular, the raisins may be dehydrated in a home dehydrator, with adequate ventilation of about 20 m.p.h. wind velocity for a period of about 1 to 3 hours, preferably 2 hours, at 145° F. to 150° F., preferably about 145° F., until about 12 to 18% moisture, preferably 15% remains in the product. The raisins may be vacuum dried by subjecting to a vacuum of about 18" to 30", preferably 28" of mercury for about 1 to 3 hours, preferably 2 hours, to provide an internal product temperature of 110 to 160° F., preferably 110 to 120° F., until about 12 to 18% moisture, preferably 15% remains in the product. The acidulant treatment step and dehydration step may also be carried out in an apparatus such as a Rota-Cone Dryer and Processor (Paul O. Abb Inc., Little Falls, N.J.)

The dehydrated treated raisins are mixed with a flavoring agent. The flavoring agent is employed in an amount and for a period of time sufficient to impart to the dehydrated raisins a flavor which is substantially the same as the flavoring agent. Generally, the dehydrated raisins and flavoring agent are mixed in a mixer such as a tumble mixer, to uniformly coat the dehydrated raisins. Generally an amount of flavoring agent which substantially coats the raisins is employed and in particular the flavoring agent may be present in an amount of about 0.5 to 3% by weight of the final product. In the preferred process, of the invention no sweetening agents are contacted or applied to the raisins.

The nature of the acidulants and flavoring agents which may be used in the preferred process of the invention are the same as the acidulants and flavoring agents hereinbefore described for the first embodiment of the process of the invention.

The dried raisins prepared according to the process of the invention can be used as a snack food or confectionery or an ingredient in products such as cakes, cookies, snack foods, confectioneries, dairy products, etc. The dried raisins may also be coated with chocolate.

The following non-limiting examples are illustrative of the present invention:

EXAMPLE 1

A cherry flavor solution containing 4.0g malic acid, 3.0g Fries & Cino Natural Cherry Flavor No. 96243 and 73.0g water was added to 400g of seeded raisins from Australia. The mixture was allowed to stand with inter-

5,188,861

7

mittent mixing, for 6 hours at room temperature (70° F.) to allow the solution to be absorbed into the raisins. The treated raisins were then dehydrated in a home dehydrator at 145° F. with adequate ventilation of about 20 m.p.h. wind velocity for a period of 5- to 6 hours to 12% moisture remaining in the product. The dried treated raisins were then cooled. The resultant product had a desirable cherry flavor.

## EXAMPLE 2

The cherry flavor solution as described in Example 1 was added to 400g of seeded raisins from Australia and mixed in a Hobart mixer for about 10 minutes to allow uniform dispersion of the solution into the raisins. The mixture was then subjected to a vacuum of 21" to 28" of mercury for about 4 minutes to hasten the absorption of the solution. The treated raisins were then dehydrated as described in Example 1. The resultant product had a desirable cherry taste which was similar to the product prepared in accordance with the procedure as described in Example 1.

## EXAMPLE 3

A strawberry flavor solution containing 1.20g of citric acid, 0.80g Florasynth Artificial Strawberry Flavor No. WL16103 and 78.0g of water was added to 400g of seeded raisins from Australia. Subsequent processing was carried out as described in Example 1 or Example 2 and the raisin products resulting for each process had a similar desirable strawberry taste.

## EXAMPLE 4

A raspberry flavor solution containing 2.25g citric acid, 2.50g Florasynth Artificial Raspberry Flavor No. W388076 and 75.25g of water was added to 400g of 35 seeded raisins from Australia. Subsequent processing was carried out as described in Example 1 or Example 2 and the raisin products resulting from each process had a similar desirable raspberry taste.

## EXAMPLE 5

A banana flavor solution containing 1.00g citric acid, 7.00g Naarden Natural Banana Flavor No. DQ14654 and 72.00g of water was added to 400g of VISTA raisins from California. Subsequent processing was carried out as described in Example 1 or 2 and the raisin products resulting from each process had a similar desirable banana taste.

## EXAMPLE 6

A pina colada flavor solution containing 3.0g citric acid, 4.0g IFF Artificial Pineapple Flavor No. IC5788122 0.4g BBA Artificial Coconut Flavor No. M%, and 72.6g of water was added to 400g of VISTA raisins from California. Subsequent processing was carried out as described in Example 1 or 2 and the raisin products resulting from each process had a similar desirable pineapple taste.

## EXAMPLE 7

A lemon./lime flavor solution containing 5.0g citric acid, 0.5g sodium citrate, 1.5g BBA Natural Lemon./Lime Flavor No. 5-9591 and 73.0g of water was added to 400g of Australian sultana raisins. Subsequent processing was carried out as described in Example 1 or 2 and the raisin products resulting from each process had a similar desirable lemon/lime taste.

## EXAMPLE 8

8

A passion fruit flavor solution containing 3.0g citric acid, 0.8g F.D. & 0 Artificial Passion Fruit Flavor No. 987114, 8.0g passion juice concentrate and 68.2g of water was added to 400g of VISTA raisins from California. Subsequent processing was carried out as described in Example 1 or 2 and the raisin products resulting from each process had a similar desirable passion fruit taste.

## EXAMPLE 9

A 2000g sample of Australian sultana raisins was treated with hydrogenated vegetable oil (0.5%) and then washed with hot water and dried. The washed raisins (2060g) were treated with 250ml of a 10% anhydrous citric acid solution for 2 hours and the resulting acidified raisins (2310g) were then dehydrated in a home dehydrator at 145° F. with adequate ventilation of about 20 m.p.h. wind velocity for a period of 3 hours. The resulting dehydrated raisin product (1970-1980g) was substantially free of any natural raisin flavor. A 0.4% flavor solution of Bush Brooke Allen Flavor #5-9591 was added to coat the dehydrated raisin product. The process was repeated using a 2000g sample of Thompson seedless raisins. An Orange Flavored raisin product was prepared employing the described process, using 2000g samples of each of Australian sultana raisins and Thompson seedless raisins and 250ml of an 8% anhydrous citric acid solution and a 0.7% flavor solution of cold pressed California orange oil (Seeley).

As a comparison, the process described in U.S. Pat. No. 1,717,489 to Barlow was also used to prepare lemon flavored and orange flavored raisins. In particular, 2000g samples of Australian sultana raisins and Thompson seedless raisins were washed with hot water and dried. The washed raisin samples (2060g) were then soaked in 250ml of either fresh lemon juice squeezed form Florida lemons or fresh orange juice squeezed from Swaziland oranges and then dehydrated in a home dehydrator at 145° F with adequate ventilation of about 20 m.p.h. wind velocity for a period of 3 hours. The resulting raisins retained their natural flavor characteristics.

The raisin product produced by the process of the invention had a superior orange or lemon flavor when compared to the raisins produced by the process disclosed in Barlow. No difference in the color of the raisin product of the invention and the raisins produced by the Barlow process was observed.

In the case of the orange flavored raisin product of the invention, it had a less sticky texture than the raisins produced using the Barlow process.

The sugar and acid content of the raisin products of the invention and the raisins produced using the Barlow process were calculated.

As shown in Table 1, the orange and lemon flavored raisins produced using the Barlow process have a lower acid content and a higher sugar content when compared to the orange and lemon flavored raisin product of the present invention. If the acid content of the Barlow raisins were increased by soaking the raisins in additional orange or lemon juice, this would necessarily substantially increase the sugar content of the raisins, which is not desirable.

### TABLE 1

| | Acid Content (%) | Sugar Content (%) |
|---|---|---|
| Invention | | |
| Orange raisin product | 1 | 71.2%* |

5,188,861

9

TABLE 1-continued

| | Acid Content (%) | Sugar Content (%) |
|---|---|---|
| Lemon raisin product | 1.4 | 71.2% |
| Barlow | | |
| Orange Raisins | 0.08–0.28** | 72%* |
| Lemon Raisins | 0.72–1.05*** | 71.35–71.65 |

*71.2% is total sugar content of raisins from General Foods Specifications. Minimum sugar content of orange juice is 6.44%. (The Structure and Composition of Foods, details in publication p. 690).

250 g × $\frac{6.44}{100}$ = 0.8%

**Minimum Citric Acid Content of Orange Juice is 0.64%. (The Structure and Composition of Foods, p. 690)

250 g × $\frac{6.44}{100}$ = 1.6/2000 = 0.08% acidity

***Minimum Citric Acid Content of Lemon Juice is 5.74%. (The Structure and Composition of Foods, Vegetables, Legumes and Fruits, Vol. II, Winton, A.L., and K. B. Winton, John Wiley & Sons, Inc., London, p. 706).

250 g × $\frac{5.74}{100}$ = 14.35/2000 = .007173 = 0.72%

## EXAMPLE 10

A 2000g sample of Australian sultana raisins with hydrogenated vegetable oil coating (0.5%) were washed with hot water and dried. The washed raisins were treated with 250ml of an 8% malic acid solution for 2 hours and then dehydrated in a home dehydrator at approximately 145° F. with adequate ventilation of about 20 m.p.h. wind velocity for a period of 3 hours. The raisins may alternatively be dehydrated by vacuum drying by subjecting to a vacuum of about 28" of mercury for a period of 2 hours to provide an internal raisin temperature of approximately 110 to 160° F. The resulting dehydrated raisin product was substantially free of any natural raisin flavor. A 1.0% solution of Natural Cherry Flavor #77742 from F & C International was added to coat the dehydrated raisin product.

## EXAMPLE 11

A passion fruit raisin product was prepared employing the process described in Example 10 using 250ml of an 8% citric acid solution and a 0.6% solution of Artificial Flavor #987114 from Fritzsche, Dodge & Olcott.

## EXAMPLE 12

A pina colada raisin product was prepared employing the process described in Example 10 using 250ml of 0.8% citric acid and a solution containing 1.0% Artificial Pineapple #1C5-78122 from International Flavor & Fragrances and 0.1% Artificial Coconut #M5 from Bush Brooke Allen.

## EXAMPLE 13

A banana flavored raisin product was prepared employing the process described in Example 10 using 250ml of 0.8% citric acid and a 0.5% solution of Natural Banana Flavor #8264) from F & C International.

## EXAMPLE 14

A strawberry flavored raisin product was prepared employing the process described in Example 10 using 250ml of 1% malic acid and a solution of Strawberry No. 987148 from FD & 0 International.

While certain representative embodiments of the invention have been described herein for the purpose of illustration, it will be apparent to those skilled in the art that modifications therein may be made without departing from the spirit and scope of the invention.

We claim:

10

1. A process for preparing a flavored dried fruit product said process comprising:

(a) treating a dried fruit with an acidulant being selected from the group consisting of tartaric acid, malic acid, citric acid, ascorbic acid, phosphoric acid and fumaric acid, in an amount and for a period of time which is sufficient to substantially remove the natural flavor of the dried fruit;

(b) dehydrating the treated dried fruit to obtain a desired moisture content; and,

(c) treating the dried fruit during step (a) or after step (b) with a flavoring agent having a flavor which does not substantially correspond to the natural flavor of the dried fruit, said flavoring agent being employed in an amount and for a period of time which is sufficient to impart to the dried fruit a flavor which is substantially the same as the flavoring agent;

and so forming a flavored dried fruit product having a flavor which is substantially the same as the flavor of the flavoring agent and having an outer surface which is substantially non-sticky whereby the flavored dried fruit product may be easily handled.

2. A process for preparing a flavored raisin product comprising a one step rehydration of raisins in a flavor solution comprising water, an acidulant, and a flavoring agent, and optionally comprising one or both of a sweetening agent and a colouring agent, said flavor solution being employed in an amount of about 10 to 100% by weight of final product, said acidulant being selected from the group consisting of tartaric acid, malic acid, citric acid, ascorbic acid, phosphoric acid and fumaric acid and being employed in an amount of 0.1 to 2.5% by weight of final product, said flavoring agent having a flavor which does not substantially correspond to the natural flavor of the raisins, said rehydration step being employed for a period of time to permit the flavor solution to stabilize in the raisins and to impart to the raisins a flavor which is substantially the same as the flavoring agent, washing the rehydrated raisins to substantially remove any residual of the flavor solution on the outer surface or skin of the raisins, and a one step dehydration of the washed rehydrated raisins to obtain a desired moisture content, and so forming a flavored raisin product having a flavored meat comprising the flavor of the flavoring agent, and having an outer surface which is substantially non-sticky whereby the raisin product may be easily handled.

3. A process for preparing a flavored raisin product, said process comprising treating raisins with an acidulant being selected from the group consisting of tartaric acid, malic acid, citric acid, ascorbic acid, phosphoric acid and fumaric acid, said acidulant being employed in an amount and for a period of time sufficient to provide raisins wherein the natural flavor of the raisins is substantially removed; dehydrating the so treated raisins to obtain a desired moisture content in the raisins, and treating the dehydrated raisins with a flavoring agent having a flavor which does not substantially correspond to the natural flavor of the raisins, said flavoring agent being employed in an amount and for a period of time which is sufficient to impart to the raisins a flavor which is substantially the same as the flavoring agent; and so forming a flavored raisin product having a flavor which is substantially the same as the flavor of the flavoring agent and having an outer surface which is substantially

5,188,861

**11**

non-sticky whereby the flavored raisin product may be easily handled.

4. A process as claimed in claim 3, wherein the acidulant is employed in an amount of 0.1 to 2.5% by weight of final product and the flavoring agent is employed in an amount of .05 to 3% by weight of final product.

5. A process as claimed in claim 3 or 4 wherein the flavoring agent is one or more of a natural and an artificial cherry, strawberry, raspberry, banana, pineapple, coconut, lemon/lime, orange, grapefruit, tangerine, guava, kiwi, or passion fruit flavor.

6. A flavored raisin product produced by a process comprising treating raisins with an acidulant being selected from the group consisting of tartaric acid, malic acid, citric acid, ascorbic acid, phosphoric acid and fumaric acid, said acidulant being employed in an amount and for a period of time sufficient to provide so treated raisins wherein the natural flavor of the raisins is

**12**

substantially removed; dehydrating the so treated raisins to obtain a desired moisture content in the raisins, and treating the dehydrated raisins with a flavoring agent having a flavor which does not substantially correspond to the natural flavor of the raisins, said flavoring agent being employed in an amount and for a period of time which is sufficient to impart to the raisins a flavor which is substantially the same as the flavoring agent; and so forming a flavored raisin product having a flavor which is substantially the same as the flavor of the flavoring agent and having an outer surface which is substantially non-sticky whereby the flavored raisin product may be easily handled.

7. A process as claimed in claim 1, wherein no sweetening agent is contacted with or applied to the dried fruit.

* * * * *

20

25

30

35

40

45

50

55

60

65

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

AMAZIN' RAISINS INTERNATIONAL, INC.,
an Ontario, Canada corporation,

        Plaintiff/Counterclaim Defendant,

    v.

OCEAN SPRAY CRANBERRIES, INC.,
a Delaware corporation,

        Defendant/Counterclaim Plaintiff.

Civ. No. 04-3358 (ADM/AJB)

**JURY TRIAL DEMANDED**

## ANSWER AND COUNTERCLAIM

Defendant Ocean Spray Cranberries, Inc. ("Ocean Spray") hereby answers the Complaint of Amazin' Raisins International, Inc. ("ARI"). Except as expressly admitted below, Ocean Spray denies each and every allegation contained in ARI's complaint. Ocean Spray specifically responds to ARI's allegations as follows:

1.    Upon information and belief, Ocean Spray admits the allegations of paragraph 1.

2.    Ocean Spray admits the allegations of paragraph 2.

3.    Ocean Spray admits that it manufactures certain varieties of its dried fruit products by a process that treats a fruit with an acidulant, adds flavor to the fruit, and dehydrates the fruit. Ocean Spray also admits that it has sold certain varieties of its products in this District.

4.    Ocean Spray admits that the United States Patent and Trademark Office issued United States Patent No. 5,188,861 ("the '861 patent") to Jack Mazin and Amir Lalji. Ocean Spray also admits that the '861 patent includes claims directed to process for preparing a flavored raisin product, claims directed to a process for preparing a flavored dried fruit product, and a claim directed to a flavored raisin product. Ocean Spray lacks sufficient information to admit or deny the remaining allegations contained in paragraph 4.

5. Ocean Spray admits that it sells a product called Craisins®, and that certain varieties of Craisins® are manufactured by a process that treats a fruit with an acidulant, adds a flavor to the fruit, and dehydrates the fruit.

6. Ocean Spray admits that on May 27, 2003, ARI provided a copy of the '861 patent to Ocean Spray. Ocean Spray also admits that it responded by describing the process that it uses to make its flavored Craisins® product, and provided to ARI a copy of United States Patent No. 5,320,861.

7. Ocean Spray admits that on September 8, 2003, ARI requested that Ocean Spray provide it with samples of "decharacterized cranberry pieces." Ocean Spray also admits that it did not provide the requested samples. Ocean Spray denies the remaining allegations contained in paragraph 7.

8. Ocean Spray admits that on November 11, 2003, ARI requested samples of decharacterized fruit pieces. Ocean Spray also admits that it did not provide the requested samples. Ocean Spray denies the remaining allegations contained in paragraph 8.

9. Ocean Spray admits that this action purports to be one for patent infringement brought pursuant to 35 U.S.C. § 271.

10. Ocean Spray admits the allegations of paragraph 10.

11. Ocean Spray admits that, on February 23, 1993, United States Patent No. 5,188,861 entitled PROCESS FOR PREPARING A DRIED FRUIT PRODUCT issued to Jack Mazin and Amir Lalji. Ocean Spray also admits that United States Patent No. 5,188,861 is attached as Exhibit A to the Complaint. Ocean Spray denies that the '861 patent was duly and legally issued. Except as expressly admitted and denied, Ocean Spray lacks sufficient information to admit or deny the remaining allegations contained in paragraph 11.

12. Ocean Spray denies the allegations contained in paragraph 12.

13. Ocean Spray admits that it had actual knowledge of the '861 patent before the Complaint was served. Ocean Spray specifically denies that it is infringing the '861 patent or has infringed the '861 patent in the past. Ocean Spray denies the remaining allegations contained in paragraph 13.

14. Ocean Spray denies the allegations contained in paragraph 14.

15. In response to ARI's Prayer for Relief, inclusive of paragraphs a through f, Ocean Spray denies that ARI is entitled to any relief from Ocean Spray, either as requested in its Prayer for Relief, or otherwise.

## AFFIRMATIVE DEFENSES

In addition to the affirmative defenses described herein, Ocean Spray specifically reserves the right to allege additional affirmative defenses as they become known throughout the course of discovery.

### First Affirmative Defense
### (Noninfringement)

Ocean Spray has not infringed, and does not infringe, either directly, contributorily, or by inducement, any valid and enforceable claim of the '861 patent.

### Second Affirmative Defense
### (Invalidity and Unenforceability)

The '861 patent is invalid and unenforceable for failure to comply with one or more of the requirements of 35 U.S.C. § 101 *et seq.*, including, without limitation, sections 101, 102, 103, 112, and/or 151.

3

### Third Affirmative Defense
**(Laches)**

ARI's claims are barred, in whole or in part, by the doctrine of laches.

### Fourth Affirmative Defense
**(Estoppel)**

ARI's claims are barred, in whole or in part, by the doctrine of estoppel.

### Fifth Affirmative Defense
**(Time Limitation on Damages)**

ARI is precluded by 35 U.S.C. § 286 from recovering damages for any alleged infringement of the '861 patent that occurred more than six years before the filing of the Complaint.

### Sixth Affirmative Defense
**(Limitation on Damages)**

Upon information and belief, ARI is precluded by 35 U.S.C. § 287 from recovering damages for any alleged infringement of the '861 patent that occurred before ARI made an actual and specific charge of infringement to Ocean Spray.

### Seventh Affirmative Defense
**(Unclean Hands)**

Upon information and belief, ARI's claims are barred, in whole or in part, by the doctrine of unclean hands.

## COUNTERCLAIM

Defendant Ocean Spray Cranberries, Inc. ("Ocean Spray"), for its counterclaim against Plaintiff Amazin' Raisins International, Inc. ("ARI"), states and alleges as follows:

### Nature of the Action

1.    This counterclaim seeks a declaratory judgment of noninfringement, invalidity, and unenforceability of the '861 patent under the patent laws of the United States, 35 U.S.C. §101 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

### The Parties

2.    Ocean Spray is a corporation organized and existing under the laws of Delaware and has a principal place of business at One Ocean Spray Drive, Lakeville-Middleboro, MA 02349.

3.    Upon information and belief, ARI is a corporation organized and existing under the laws of Ontario, Canada, and has a principal place of business at 23 Boom Lane C, Atholville, New Brunswick, Canada, E3N, 4E8.

### Jurisdiction and Venue

4.    This Court has subject matter jurisdiction over this counterclaim pursuant to 28 U.S.C. §§ 1331 and 1338(a).

5.    ARI has consented to personal jurisdiction through the commencement of its action for patent infringement as set forth in the Complaint.

6.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(c) and (d).

### Count I
### Noninfringement of the '861 Patent

7.    Ocean Spray restates and realleges paragraphs 1-6 of this counterclaim.

8.      Ocean Spray does not infringe and has never infringed any valid and enforceable claim of the '861 patent, either directly or indirectly, contributorily, or by inducement.

**Count II**
**Invalidity and Unenforceability of the '861 Patent**

9.      Ocean Spray restates and realleges paragraphs 1-6 of this counterclaim.

10.     The '861 patent is invalid and unenforceable for failure to comply with one or more of the requirements of 35 U.S.C. § 101 *et seq.*, including, without limitation, sections 101, 102, 103, 112, and/or 151.

**Jury Trial Demand**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Ocean Spray hereby demands on its Answer, affirmative defenses, and counterclaims a jury trial on all issues so triable.

**Prayer for Relief**

WHEREFORE, Ocean Spray respectfully prays for judgment as follows:

a.      A declaration that Ocean Spray has not infringed and is not infringing, either directly, indirectly, contributorily, by inducement or otherwise, any valid and enforceable claim of the '861 patent;

b.      A declaration that the claims of the '861 patent are invalid and unenforceable;

c.      That ARI, its officers, agents, employees, attorneys, and all persons in active concert or participation with it are permanently enjoined from charging that the '861 patent is infringed by Ocean Spray;

d.      Reasonable attorney fees and costs be awarded to Ocean Spray under, but not limited to 35 U.S.C. § 285; and

    e.       That Ocean Spray be awarded such further relief as the Court deems just and

proper.

Dated:    September 2, 2004           FISH & RICHARDSON P.C., P.A.

                                     By: _____
                                         John C. Adkisson (#266358)
                                       William R. Woodford (#322593)
                                       FISH & RICHARDSON P.C., P.A.
                                       60 South Sixth Street
                                       Suite 3300 Dain Rauscher Plaza
                                       Minneapolis, MN 55402

                                       Attorneys for Defendant
                                       OCEAN SPRAY CRANBERRIES, INC.

60241231.doc

# EXHIBIT
# D

# FISH & RICHARDSON P.C.,P.A.

3300 Dain Rauscher Plaza
60 South Sixth Street
Minneapolis, Minnesota
55402

Frederick P. Fish
1855-1930

W.K. Richardson
1859-1951

Telephone
612 335-5070

Facsimile
612 288-9696

Web Site
www.fr.com

September 2, 2004

*VIA FACSIMILE*

Douglas J. Williams, Esq.
Merchant & Gould P.C.
3200 IDS Center
80 South Seventh Street
Minneapolis, Minnesota 55402-2215

**FR**

BOSTON

DALLAS

DELAWARE

NEW YORK

SAN DIEGO

SILICON VALLEY

TWIN CITIES

WASHINGTON, DC

Re:    *Amazin' Raisins International v. Ocean Spray Cranberries, Inc.*
       Civ. No. 04-3358 (ADM/AJB)

Dear Mr. Williams:

We represent Defendant Ocean Spray Cranberries, Inc. in the above-captioned action.
I write to inform you that we have scheduled a hearing before Judge Montgomery on
October 26, 2004, at 9:00 a.m. and will be seeking an order transferring this case to
the District of Massachusetts.

Based on our review of publicly-available documents, we are not aware of any factor
that would make it convenient for either party to litigate in this District aside from
your client's choice of counsel, which is irrelevant in the Court's determination of the
most convenient forum. *See, e.g., Nelson v. Soo Line R.R. Co.*, 58 F. Supp. 2d 1023,
1027 (D. Minn. 1999) ("[I]t is axiomatic that convenience to plaintiff's counsel is not
a factor to be considered in deciding the propriety of transfer."). If you are aware of
any information that supports litigating this case in the District of Minnesota, please
advise us immediately. We plan on filing our motion to transfer on September 10,
and would like to avoid wasting the Court's time if you are aware of significant
factors that weigh against the transfer of this case.

I look forward to your response.

Sincerely,

John C. Adkisson

60242286.doc

# EXHIBIT E

# Merchant & Gould

An Intellectual Property Law Firm

3200 IDS Center
80 South Eighth Street
Minneapolis, Minnesota
55402-2215 USA
TEL 612.332.5300
FAX 612.332.9081
www.merchant-gould.com

A Professional Corporation

Direct Contact | 612.371.5271
mdoscotch@merchant-gould.com

September 7, 2004

John C. Adkisson                    **VIA FACSIMILE**
Fish & Richardson P.C., P.A.
3300 Dain Rauscher Plaza
60 South Sixth Street
Minneapolis, MN 55402

Re:   Amazin' Raisins International, Inc. v. Ocean Spray Cranberries, Inc.
      M&G No. 14158.1-US-ZA

Dear Mr. Adkisson:

In response to your September 2, 2004 letter, although venue is proper in Minnesota,
Amazin' Raisins will stipulate to transfer the case to Buffalo, New York. Otherwise, Amazin'
Raisins will oppose Ocean Spray's motion to transfer the case to the District of Massachusetts.

In lieu of continuing down this litigious path, let us know if your client is willing to
explore a business resolution to this matter. We look forward to your response.

Sincerely,

Matthew A. Doscotch

MAD:lmb

Minneapolis/St. Paul
Denver
Seattle
Atlanta
Washington, DC

## CERTIFICATE OF SERVICE

I certify that on September 10, 2004, I have caused the following documents:

1. **OCEAN SPRAY'S MOTION TO TRANSFER VENUE;**

2. **OCEAN SPRAY'S NOTICE OF MOTION TO TRANSFER VENUE;**

3. **MEMORANDUM IN SUPPORT OF OCEAN SPRAY'S MOTION TO TRANSFER VENUE;**

4. **DECLARATION OF NEIL BRYSON IN SUPPORT OF OCEAN SPRAY'S MOTION TO TRANSFER VENUE;**

5. **DECLARATION OF WILLIAM R. WOODFORD IN SUPPORT OF OCEAN SPRAY'S MOTION TO TRANSFER VENUE; and**

6. **CERTIFICATE OF SERVICE.**

to be filed electronically with the Clerk of Court through ECF, and ECF will send an e-notice of the electronic filing to the following:

Douglas J. Williams         dwilliams@merchant-gould.com
Merchant & Gould P.C.

Matthew A. Doscotch        mdoscotch@merchant-gould.com
Merchant & Gould P.C.

I further certify that I have caused the proposed order to be filed with the court via e-mail to the following judge:

Honorable Ann D. Montgomery      montgomery_chambers@mnd.uscourts.gov

And I certify that I have caused a copy of the proposed order to be sent via facsimile or mailed by first class mail, postage paid, as noted below to the following:

| | |
|---|---|
| Douglas J. Williams | Matthew A. Doscotch |
| Merchant & Gould P.C. | Merchant & Gould P.C. |
| 3200 IDS Center | 3200 IDS Center |
| 80 South Seventh Street | 80 South Seventh Street |
| Minneapolis, MN 55402 | Minneapolis, MN 55402 |
| Facsimile: (612) 332-9081 | Facsimile: (612) 332-9081 |

Date: September 10, 2004        **s/William R. Woodford**
                                 William R. Woodford

60242120.doc

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

_____
                                 )

AMAZIN' RAISINS INTERNATIONAL, INC.  )
an Ontario, Canada corporation,            )
                                 )

        Plaintiff/Counterclaim Defendant,   )
                                 )

v.                                 )     Civ. No. 04-3358 (ADM/AJB)
                                 )

OCEAN SPRAY CRANBERRIES, INC.,    )
a Delaware corporation,                 )
                                 )

        Defendant/Counterclaim Plaintiff.   )
_____)

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
## DEFENDANT OCEAN SPRAY'S MOTION TO TRANSFER VENUE

## I.    INTRODUCTION

Ocean Spray Cranberries, Inc. ("Ocean Spray") seeks to transfer this case to Massachusetts, its corporate headquarters, increasing litigation expenses to Amazin' Raisins International, Inc. ("ARI") and depriving ARI of its forum choice. In basing its motion to transfer on the location of witnesses in Massachusetts, Ocean Spray ignores its manufacturing operation in Wisconsin that is much closer to Minnesota than Massachusetts and fails to acknowledge that depositions of Ocean Spray witnesses will occur in Massachusetts. Ocean Spray's only potential inconveniences are that five witnesses may have to travel to Minnesota for a trial that may or may not occur over two years in the future and that a former employee, that can be deposed and have his testimony designated for trial, may choose not to travel to Minnesota to provide live testimony. These potential inconveniences are counterbalanced by ARI's inconvenience and Ocean Spray's own inconvenience in having to bring Tomah, Wisconsin witnesses to Boston instead of Minneapolis. This is certainly not evidence that neither

strongly favors transfer to Massachusetts, nor overcomes ARI's right to chose the venue to resolve Ocean Spray's patent infringement.

ARI chose this forum because all of its contacts within the United States with regard to Ocean Spray's infringement have occurred in the District of Minnesota.  For example, ARI and its counsel are aware of infringing sales within Minnesota and ARI has made its infringement allegations to Ocean Spray for the past year and half through its Minnesota counsel. Essentially, ARI's United States presence is in Minnesota and it chose its forum accordingly.  Furthermore, Ocean Spray has and continues to use Minnesota counsel in response to ARI's pre- and post-filing infringement allegations.  Transferring the case to Massachusetts only adds to the immediate and certain expenses of both parties.  For example, ARI will incur substantial local counsel fees should the case be transferred. The interests of justice clearly point to retaining this case in Minnesota.

## II.    BACKGROUND

### A.    The Inventors and Invention of the '861 Patent.

In 1990, Jack Mazin and Amir Lalji filed an application for a United States patent for a process for preparing a dried fruit product.  (*See* Doscotch Decl. Ex. A).  At the time of filing, Mr. Mazin and Mr. Lalji were residents of Canada.  (*Id.*).  This is still true today.  Both men currently reside near Toronto, Canada.  (Declaration of Jack Mazin in Support of Plaintiff's Motion in Opposition to Defendant Ocean Spray's Motion to Transfer Venue ("Mazin Decl."), ¶¶ 3-4).

After almost three years of prosecution before the United States Patent and Trademark Office ("PTO"), United States Patent No. 5,188,861 ("the '861 patent") issued with Mr. Mazin

and Lalji's invention ultimately being assigned to ARI.[1]  (Mazin Decl., ¶ 5).  Claim 1 of the '861 patent describes a three-step process for preparing dried fruits that includes treating a dried fruit with an acidulant, dehydrating the dried fruit, and treating the dried fruit with a flavoring agent having a flavor that does not correspond to the natural flavor of the dried fruit.  As a process claim, ARI can only rely upon inspection of the finished product to determine if a party is infringing claim 1, unless the accused infringer provides ARI with access to information detailing its process for fruit flavoring and in process samples.

**B.      ARI's Reasonable Efforts To Determine Ocean Spray's Process.**

Through Minnesota counsel, in May 2003, ARI put Ocean Spray on notice of the '861 patent.  This communication offered a possible license to the '861 patent technology.  (Doscotch Decl. Ex. B).   On June 19, 2003, through its own Minnesota counsel, Ocean Spray denied infringement of the '861 patent.  (Doscotch Decl. Ex. C).  In its denial, Ocean Spray represented that its process for preparing its flavored dried fruit, Craisins®, is described in Ocean Spray's own patent.  (*Id.*).  ARI had no other information regarding the process other than Ocean Spray's representation that its process follows what was outlined in its patent.

In response to this representation and on three separate occasions, ARI, again through its counsel in Minnesota, requested samples of Ocean Spray's in process decharacterized cranberry pieces.  (Doscotch Decl. Ex. D, E, F).  ARI requested the sample because even with Ocean Spray's description of its process, ARI could not resolve whether Ocean Spray was infringing the '861 patent.  Simply, ARI could not replicate the conditions of the Ocean Spray process and, thus, needed the decharacterized cranberry sample.  (Doscotch Decl. Ex. D).  Also, ARI believed that if Ocean Spray provided the sample, the parties may be able to achieve an early resolution to

---

[1]      Mr. Mazin is also the President, Chief Executive Officer and owner of ARI, a small Canadian company that had less than 500,000 dollars in gross revenues in 2003.  (Mazin Decl. ¶ 6).

this dispute. (*Id.*). Ocean Spray, again through its Minnesota counsel, declined the requests for the samples summarily. (Doscotch Decl. Ex. G, H).

### C. ARI Had No Other Choice—It Had To File Suit To Obtain The Requested Information On Ocean Spray's Process For Preparing Its Flavored Craisins.

Having no other recourse because of Ocean Spray's refusal to seek an early resolution to this matter, on July 22, 2004, ARI filed suit in the District of Minnesota alleging that Ocean Spray infringes the '861 patent based on its manufacture and sale of its flavored Craisin® products. (Declaration of William R. Woodford in Support of Ocean Spray's Motion to Transfer Venue ("Woodford Decl.") Ex. B). With filing in the District of Minnesota, ARI brought its dispute to a court known for its experience with patent lawsuits and one has a docket shorter than a number of districts throughout the United States, including the District of Massachusetts.[2]

At the time of filing, ARI's counsel knew of only Ocean Spray's patent infringement through the sale of flavored Craisin® products in Minnesota. ARI also knew of infringing sales in Minnesota. (Mazin Decl., ¶ 7). Furthermore, ARI and Ocean Spray had only dealt with each other through their own Minnesota counsel.

Ocean Spray filed its Answer and Counterclaim on September 2. (Woodford Decl. Ex. C). In its Answer, Ocean Spray admits that it sells its products in this District. (*Id.* at ¶ 3). The Answer also identifies the same Minnesota counsel that represented Ocean Spray prior to the lawsuit.

### D. Ocean Spray's Motion To Transfer Venue Ignores Critical Facts

Following the filing of its Answer and Counterclaim, Ocean Spray filed this motion to transfer venue to the District of Massachusetts. Prior to the motion to transfer, no location in

---

[2]    In 2003, the District of Minnesota had a civil case median time from filing to trial of 24.5 months and only 0.4 percent of its civil cases pending over 3 years. (Doscotch Decl. Ex. I). For the same time period, the District of Massachusetts has a median time of 28.5 months from filing to trial and 5.4 percent of cases pending over 3 years. (*Id.*).

Massachusetts had ever entered the discussion between the parties. (*See* Doscotch Decl. Exs. B through H). Although ARI was aware that Ocean Spray was headquartered in Massachusetts, Ocean Spray did not mention in any of its prior correspondence that any of its processes, products, or facilities there produced flavored Craisins®.

In his declaration, Ocean Spray's General Counsel, Neil Bryson, not only references a facility in Massachusetts that manufactures flavored Craisins®, but more critically identifies a plant in Tomah, Wisconsin. (Declaration of Neil Bryson in Support of Ocean Spray's Motion to Transfer Venue ("Bryson Decl."), ¶ 5). The Tomah facility is under 180 miles from Minneapolis. (Doscotch Decl. Ex. J). Ocean Spray admits that relevant documents are located in Tomah. (Bryson Decl., ¶ 8).[3]

Mr. Bryson's declaration also identifies several witnesses with alleged knowledge relating to ARI's patent infringement allegations. (Bryson Decl., ¶ 7). Absent from the list are any witnesses that have actual knowledge of the process utilized at the Tomah facility. Namely, Ocean Spray has not identified witnesses that operate the plant and manufacturing line that actual produce flavored Craisins®. These are key witnesses with knowledge of the Ocean Spray process, which is the same information ARI sought prior to filing its lawsuit regarding the method of manufacture of Ocean Spray's decharacterized fruit pieces.

## III.    ARGUMENT

The ability of a federal district court to transfer a case to another district is governed by the venue transfer statute. 28 U.S.C. § 1404(a). The court must consider the following factors: the convenience of the parties, the convenience of the witnesses, and the interest of justice. *Facilitec Corp. v. Omni Containment Sys.*, 2003 U.S. Dist LEXIS 13250 at *2 (D. Minn. July 31,

---

[3]        Despite Ocean Spray's assurance to the contrary, it is improbable that every relevant document from the Tomah facility is also located at Ocean Spray's headquarters. (*See* Bryson Decl. ¶ 8).

2003) (attached to Doscotch Declaration as Ex. L) (*citing Terra Int'l, Inc. v. Mississippi Chem. Corp.*, 119 F.3d 688, 691 (8th Cir. 1997)); *DB Indus., Inc. v. B & O Mfg., Inc.*, 2004 U.S. Dist LEXIS 15208 at *13 (D. Minn. Aug. 4, 2004) (attached to Doscotch Declaration as Ex. M). Ocean Spray, as the party seeking transfer, "bears the burden of showing that the balance of these factors strongly favors transfer." *DB Indus.,* 2004 U.S. Dist LEXIS 15208 at *12-13.

An evaluation of a transfer motion should be made on a case-by-case evaluation of the particular circumstances of a given litigation. *Facilitec*, 2003 U.S. Dist LEXIS 13250 at *2. Among the factors courts have considered in deciding motions to transfer patent cases are: (1) the weight accorded the plaintiff's choice of forum; (2) the proximity of each party's trial counsel to the forum in question; (3) whether the defendant's witnesses are under its control and are willing to appear; (4) whether deposition testimony would be unsatisfactory; (5) the possibilities of trial delay; (6) the cost associated with trying the case most expeditiously and inexpensively; (7) the location of relevant documents; (8) the possibility of delay and prejudice if transfer is granted; (9) the place of the alleged wrong. *See Imation Corp. v. Sterling Diagnostic Imaging, Inc.*, 1998 U.S. Dist. LEXIS 16859 at *11-12 (D. Minn. April 21, 1998) (attached to Doscotch Declaration as Ex. N); *American Dental Technologies, Inc. v. Kreativ Inc.*, 1997 U.S. Dist. LEXIS 21578 at *4 (S. D. Tex. Sept. 17, 1997) (attached to Doscotch Declaration as Ex. O); *Mobil Oil Corp. v. W.R. Grace & Co.* 334 F. Supp. 117, 124-25 (S.D. Tex. 1971); *see HollyAnne Corp. v. TFT, Inc.*, 199 F.3d 1304, 1307 n.2 (Fed. Cir. 1999). Of all of these factors, the most weight should be given to a plaintiff's choice of forum. *Imation*, 1998 U.S. Dist. LEXIS 16859 at *10; *see HollyAnne Corp.*, 199 F.3d at 1307 n.2.

In the present litigation, Ocean Spray cannot show that the balance of venue transfer factors favors transfer to the District of Massachusetts. In fact, Ocean Spray's motion only

considers its convenience and ignores key facts that demonstrate its inconvenience. Most notably, Ocean Spray ignores that its witnesses are under its control and are willing to appear and the witnesses at its Tomah, Wisconsin are nearer Minnesota than Boston. Ocean Spray also discounts the fact that infringing sales occur in Minnesota and pre-suit discussions occurred between the same Minnesota counsels that have now appeared in this lawsuit.

ARI should not be forced into prolonged litigation in Ocean Spray's home forum simply because ARI is a foreign corporation. ARI's contacts and representation in the United States related to its patent infringement allegations against Ocean Spray run through Minnesota. Based upon Ocean Spray's logic, no foreign corporation would be able to choose its forum, in particular a forum in which its chosen counsel is located and known infringement has occurred. This logic cannot be used to circumvent ARI's choice of forum.

## A.   The Convenience of the Parties and Witnesses Does Not Clearly Point to Massachusetts.

The court may consider the convenience of the parties and witnesses in considering a motion to transfer venue. 28 U.S.C. § 1404(a). This court has recently reiterated that, under these convenience factors, the court "accords significant weight to the plaintiff's choice of forum." *DB Indus.*, 2004 U.S. Dist LEXIS 15208 at *13. In examining the convenience to the parties and witnesses, it is clear that Ocean Spray's claimed convenience is in fact minimal at best, and in any case insufficient to overcome ARI's choice of forum.

### 1.   All Pre-Suit Activity Has Occurred Within Minnesota And Plaintiff Properly Choose A Convenient Forum

Admittedly, ARI has no corporate or business operations in the United States. However, ARI has a United States patent and, therefore, must have United States counsel represent its interest in that patent. In May 2003, ARI chose Minnesota counsel to represent that interest

against Ocean Spray.  Since that time, all of the communications between ARI and Ocean Spray have been through Minnesota counsel.  (*See* Doscotch Decl. Exs. B through H).  These pre-suit communications between Minnesota counsels lasted for over nine months with Ocean Spray refusing to cooperate to achieve an early resolution to this dispute.  Minnesota counsel continues to represent both parties today.  Additionally, during its pre-suit activities and through its ties to Minnesota, ARI became aware of acts of infringement occurring in Minnesota.

Furthermore, ARI has no ties to Massachusetts and is unfamiliar with that venue. Compared to Minnesota, the District of Massachusetts is inconvenient for ARI.  Unlike Ocean Spray's counsel, who has its main office in Boston, ARI's Minnesota counsel does not have counsel waiting to assist in handling this litigation in the District of Massachusetts.  ARI will continue to use Minnesota counsel regardless of the outcome of this motion, thus requiring the additional expense and effort of using local counsel.  (Mazin Decl., ¶ 8).  Furthermore, ARI's, as well as Ocean Spray's, counsel will have to travel to Massachusetts for hearings if the case is transferred, further adding to the inconvenience to ARI.

Ocean Spray cites cases that disregard the location of trial counsel in the venue convenience inquiry.  However, these cases are unlike this lawsuit, which involves a patent.  As discussed above, district courts have considered trial counsel location in a patent venue dispute. *See, e.g., American Dental Technologies*, 1997 U.S. Dist. LEXIS 21578 at \*4; *Mobil Oil*, 334 F. Supp. at 124.  Furthermore, the cited cases do not involve a foreign plaintiff that files its lawsuit in a district in which the only United States representation with regard to its patent rights is located.

**2.      Ocean Spray Has Not Established That Convenience To Its Witnesses Overrides Plaintiff's Choice Of Forum.**

Ocean Spray's argument that the convenience to it and its witnesses should control the venue decision is unavailing.  Ocean Spray points to its headquarters and manufacturing operation in Massachusetts as evidence that transfer would make this litigation much more convenient.  However, Ocean Spray ignores its flavored Craisin® manufacturing operations in Tomah, Wisconsin, a town within driving distance of this court.  (*See* Doscotch Decl. Ex. J).

Ocean Spray also ignores the actual employees that are on the manufacturing line and practice the accused process in Tomah.  ARI expects that discovery will show that there are several Ocean Spray employees, such as a plant operations manager and production line managers, at that facility with information relevant to the lawsuit.  Ocean Spray conveniently fails to identify these witnesses in its General Counsel's declaration.  Ocean Spray instead points to six individuals in Massachusetts who do not have specific knowledge of the Tomah operation. (Bryson Decl., ¶ 7).  None of the witnesses have worked at the Tomah facility.

Ocean Spray also admits that relevant documents are located in Tomah.  (Bryson Decl., ¶. 8).  Although Ocean Spray claims that all relevant documents from the Tomah facility are also located at its Massachusetts headquarters, it seems absurd that <u>all</u> relevant documents are located in Massachusetts as well.  This simply cannot be the case.  Also, Ocean Spray's argument presumes that it can predetermine what documents are relevant to this lawsuit.

ARI will assuredly request documents from Ocean Spray's Tomah facility and identify additional witnesses located at that facility.  One or more of these employees will be witnesses in this lawsuit.  The Tomah witnesses will have access to and knowledge of the actual day-to-day process for preparing Ocean Spray's flavored Craisins® at that facility.  These witnesses also will

be more inconvenienced and incur additional expense by being forced to travel to Massachusetts rather than closer Twin Cities for trial.  This is a fact Ocean Spray completely ignores.

With regard to the Ocean Spray witnesses in Massachusetts, the mere location of these witnesses is not the only factor to consider.  First, ARI's counsel will have to travel to Massachusetts to take the depositions of these witnesses regardless of venue.   Next, the Court must consider other factors such as the willingness of witnesses of appear.  *Imation*, 1998 U.S. Dist. LEXIS 16859 at *12.  Five of the six witnesses Ocean Spray lists as having factual knowledge are current Ocean Spray employees and presumed to be willing to voluntarily appear in Minnesota on behalf of the company.  *Kleinerman v. Luxtron Corp.*, 107 F. Supp 2d 122, 125 (D. Mass. 2000) ("[The corporate defendant] can assuredly secure the appearance . . . of those witnesses required to testify.").  The sixth witness, Ray Borque, is a former Ocean Spray employee of 25 years residing in Massachusetts.  Even if this witness is not willing to travel to Minnesota for trial, he is certainly subject to the subpoena power of the federal courts, can be deposed, and his testimony designated for trial.

Ocean Spray has also identified that relevant documents and information are located at its Middleboro facility and headquarters. Ocean Spray claims that this warrants transfer to Massachusetts.  Ocean Spray's argument on this point is a red herring.  Regardless of venue, Ocean Spray will have to collect and produce documents to ARI in response to document requests.  Whether the case is in Massachusetts or Minnesota, ARI's Minnesota counsel will either receive the documents via shipment from Ocean Spray, have to travel to Massachusetts to inspect documents, or simply travel a few Minneapolis blocks to Ocean Spray's Minnesota counsel's office to review the document production.  If anything, ARI is inconvenienced by the current venue, not Ocean Spray.

None of the convenience considerations overcome the weight due to ARI's forum choice in the District of Minnesota. The only potential inconveniences to Ocean Spray are that witnesses may have to travel to Minnesota for a trial that may or may not occur over two years in the future and a former Ocean Spray employee of 25 years, that can be deposed, may chose not to travel to Minnesota for trial. These potential inconveniences are counterbalanced by ARI's inconvenience and Ocean Spray's own inconvenience in having to bring Tomah, Wisconsin witnesses to Boston instead of Minneapolis. This is certainly not evidence that strongly favors transfer to Massachusetts.

**B.      The Interests of Justice Weigh Heavily Against a Transfer to the District of Massachusetts.**

Factors included in the interest of justice factor include "the relative abilities of the parties to bear the expenses of litigating in a distant forum, judicial economy, the plaintiff's choice of forum, obstacles to a fair trial, and each party's ability to enforce a judgment." *Facilitec*, 2003 U.S. Dist LEXIS 13250 at *6. The court must examine these factors. In fact, these factors "may be determinative in a particular case, even if the convenience of the parties and witnesses might call for a different result." *Id.* (quotations omitted). In this case, these considerations warrant denial of transfer to the District of Massachusetts.

**1.      Ocean Spray Clearly Has A Greater Ability To Bear The Costs Of This Litigation.**

As the court to which this transfer is sought has stated, "there is a qualitative component to the balance of convenience which must focus on the comparative financial abilities of the parties and the cost of litigation should be borne by the party in the best position to absorb and spread it." *Kleinerman*, 107 F. Supp 2d at 125 (finding that a change in venue would improperly shift expenses and thereby deny a judicial remedy). First, ARI is a small corporation with less

than 500,000 dollars in revenue last year.  (Mazin Decl., ¶ 6).  This is hundreds of times less than the nearly 1 billion dollars in net sales Ocean Spray generated last year. (Doscotch Decl. Ex. K). Ocean Spray clearly is in a better position to bear its minimal inconvenience.

Next, as a foreign corporation, ARI cannot choose to litigate in its home forum, so it seeks a fair and knowledgeable venue where litigation costs could be minimized.  This is achieved in Minnesota.  ARI has chosen its patent litigation counsel and, even if this case is transferred, will continue to use its Minnesota counsel to litigate its case. (Mazin Decl., ¶ 8). ARI will have to spend the time and effort of finding local counsel and then incur significant additional expense for that representation in the District of Massachusetts.

Furthermore, Ocean Spray may easily defend its case in Minnesota.  In fact, Ocean Spray's counsel was before the filing of this lawsuit and still is located in Minnesota.  Ocean Spray also has relevant operations in Tomah, nearby both parties' Minnesota counsel.

In addition to being recognized by several courts as a convenience factor, the location of counsel is a significant factor as an expense saving measure. *See, e.g., Mobil Oil*, 334 F. Supp. at 124.  In the present case, the expense for the parties will be lowered by retaining this litigation in Minnesota.  For example, Minnesota counsel for both parties will not have to travel to Massachusetts for motion hearings on discovery issues and summary judgment.  Furthermore, as discussed above, Ocean Spray has local counsel in Massachusetts at the ready.  A transfer in venue only adds expense to ARI.

### 2.    Minnesota Has A Less Congested Docket.

Regarding judicial economy, it is appropriate to consider the relative docket congestion and potential speed of resolution by the courts at issue.  *Hupp v. Siroflex*, 848 F. Supp. 744, 749-51 (S.D. Tex. 1994).  The District of Minnesota presents the better opportunity for more

expeditious litigation.  In 2003, the time from filing to disposition was over four months faster in Minnesota than in Massachusetts.  (Doscotch Decl. Ex. J).  This lower disposition time provides ARI a faster resolution of its infringement claim.

### 3.    ARI's Choice Of Forum Should Be Given Significant Weight.

The final relevant factor to be considered under the interests of justice is ARI's choice of the District of Minnesota as the forum to hear this dispute.  *Facilitec*, 2003 U.S. Dist. LEXIS 13250 at *6.  Ocean Spray discounts the weight due to ARI's forum choice by arguing that ARI is a foreign plaintiff.  However, this court has consistently held that a plaintiff's choice of forum is to be given great weight.  *See Imation*, 1998 U.S. Dist. LEXIS 16859 at *10 ("the plaintiff's choice of a proper forum is entitled to great weight and will not be lightly disturbed.").  Although more weight is given to a plaintiff choosing their home forum, any choice is entitled to some deference.  ARI's choice of forum should not lightly be disturbed, since it did not have a choice between Minnesota and a home forum.  Since ARI has no home forum, the most logical place to bring this suit was where all of its contacts with regard to the assertion of its patent rights and the infringing activity have occurred and where its chosen counsel is located; that is Minnesota.

IV.     **CONCLUSION**

Because litigating this action in Massachusetts does not add convenience and is against the interests of justice, ARI requests that this motion be denied and that the case remains in the plaintiff's chosen forum, the District of Minnesota.


Dated: <u>October 6, 2004</u>                    <u>s/Matthew A. Doscotch</u>
                                              Douglas J. Williams (#117353)
                                              Matthew A. Doscotch (#029973X)
                                              MERCHANT & GOULD P.C.
                                              3200 IDS Center
                                              80 South Eighth Street
                                              Minneapolis, MN 55402
                                              Telephone: 612-332-5300
                                              Facsimile: 612-332-9081

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

_____

|  |  |
|---|---|
| AMAZIN' RAISINS INTERNATIONAL, INC. an Ontario, Canada corporation, | ) ) ) |
|  | ) |
| Plaintiff/Counterclaim Defendant, | ) |
|  | ) |
| v. | )   Civ. No. 04-3358 (ADM/AJB) |
|  | ) |
| OCEAN SPRAY CRANBERRIES, INC., a Delaware corporation, | ) ) |
|  | ) |
| Defendant/Counterclaim Plaintiff. | ) |

_____

## DECLARATION OF MATTHEW A. DOSCOTCH IN SUPPORT OF PLAINTIFF AMAZIN' RAISINS INTERNATIONAL'S MEMORANDUM IN OPPOSITION TO DEFENDANT OCEAN SPRAY'S MOTION TO TRANSFER VENUE

1.     I am an attorney with Merchant & Gould, P.C., counsel for Plaintiff Amazin'

Raisins International, Inc. ("ARI") in the captioned matter.  I make this declaration on my own

information, knowledge and belief.

2.     Attached hereto as Exhibit A is a true and correct copy of United States Patent

No. 5,188,861.

3.     Attached hereto as Exhibit B is a true and correct copy of a letter from Douglas J.

Williams to Randy Pappadellis, dated May 27, 2003.

4.     Attached hereto as Exhibit C is a true and correct copy of a letter from Dorothy P.

Whelan to Douglas J. Williams, dated June 19, 2003.

5.     Attached hereto as Exhibit D is a true and correct copy of a letter from Douglas J.

Williams to Dorothy P. Whelan, dated September 8, 2003.

6.     Attached hereto as Exhibit E is a true and correct copy of a letter from Douglas J.

Williams to Dorothy P. Whelan, dated November 11, 2003.

7.      Attached hereto as Exhibit F is a true and correct copy of a letter from Douglas J. Williams to Dorothy P. Whelan, dated February 26, 2004.

8.      Attached hereto as Exhibit G is a true and correct copy of a letter from Dorothy P. Whelan to Douglas J. Williams, dated December 17, 2003.

9.      Attached hereto as Exhibit H is a true and correct copy of a letter from Dorothy P. Whelan to Douglas J. Williams, dated March 5, 2004.

10.      Attached hereto as Exhibit I are true and correct copies of U.S. District Court-Judicial Caseload Profiles for the Districts of Minnesota and Massachusetts captured from the website <www.uscourts.gov/cgi-bin/cmsd2003.pl> on October 6, 2004.

11.      Attached hereto as Exhibit J is a true and correct copy of <www.mapquest.com> driving directions from Minneapolis, Minnesota to Tomah, Wisconsin captured on October 6, 2004.

12.      Attached hereto as Exhibit K is a true and correct copy of a page from Ocean Spray Cranberries, Inc.'s website <www.oceanspray.com/about/ataglance.asp> captured on October 6, 2004.

13.      Attached hereto as Exhibit L is a true and correct copy of *Facilitec Corp. v. Omni Containment Sys.*, 2003 U.S. Dist LEXIS 13250 (D. Minn. July 31, 2003).

14.      Attached hereto as Exhibit M is a true and correct copy of *DB Indus., Inc. v. B & O Mfg., Inc.*, 2004 U.S. Dist LEXIS 15208 (D. Minn. Aug. 4, 2004).

15.      Attached hereto as Exhibit N is a true and correct copy of *Imation Corp. v. Sterling Diagnostic Imaging, Inc.*, 1998 U.S. Dist. LEXIS 16859 (D. Minn. April 21, 1998).

16.      Attached hereto as Exhibit O is a true and correct copy of *American Dental Technologies, Inc. v. Kreativ Inc.*, 1997 U.S. Dist. LEXIS 21578 (S. D. Tex. Sept. 17, 1997).

I state under penalty of perjury that the foregoing is true and correct.


Date: October 6, 2004                      **s/Matthew A. Doscotch**
                                           Matthew A. Doscotch



US005188861A

# United States Patent [19]

## Mazin et al.

| | |
|---|---|
| [11] | Patent Number: **5,188,861** |
| [45] | Date of Patent: **Feb. 23, 1993** |

[54] **PROCESS FOR PREPARING A DRIED FRUIT PRODUCT**

[75] Inventors: Jack G. Mazin, Maple; Amir Lalji, Weston, both of Canada

[73] Assignee: Royal Domaine Inc., Concord, Canada

[21] Appl. No.: 530,863

[22] Filed: May 31, 1990

[51] Int. Cl.$^5$ ............................................ A23L 1/212
[52] U.S. Cl. ......................................... 426/640; 426/639
[58] Field of Search ................................. 426/640, 639

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,609,720 | 12/1926 | Humphrey | ............................ 426/640 |
| 1,717,489 | 6/1929 | Barlow | .............................. 426/640 |
| 4,542,033 | 9/1985 | Agarwala | ...................... 426/640 X |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 61-216641 | 9/1986 | Japan | .................................... 426/640 |

### OTHER PUBLICATIONS

Furia, CRC Handbook of Food Additives, vol. I, 1972, CRC Press Inc.: Cleveland, pp. 225–253.

*Primary Examiner*—Joseph Golian
*Attorney, Agent, or Firm*—Bereskin & Parr

[57] **ABSTRACT**

A process for preparing a flavored dried fruit product having a flavor which does not substantially correspond to the natural flavor of the dried fruit is provided. As a first step, a dried fruit is treated with an acidulant being selected from the group consisting of tartaric acid, malic acid, citric acid, ascorbic acid, phosphoric acid, and fumaric acid in an amount and for a period of time which is sufficient to substantially remove the natural flavor of the dried fruit. As a second step, the treated dried fruit is then dehydrated to the desired moisture content. The dried fruit is treated during the first step or after the second step with a flavoring agent having a flavor which does not correspond to the natural flavor of the dried fruit. The flavoring agent is employed in an amount and for a period of time which is sufficient to impart to the dried fruit a flavor which is substantially the same as the flavoring agent.

**7 Claims, No Drawings**



5,188,861

**1**

## PROCESS FOR PREPARING A DRIED FRUIT PRODUCT

### BACKGROUND OF THE INVENTION

The invention relates to the field of dry fruits, and particularly, to a new dried fruit product having a flavor which does not substantially correspond to the natural flavor of the dried fruit, and a process for preparing the product.

Dried fruits such as raisins, prunes, apples, apricots, and peaches are recognized as highly nutritious food products. Raisins, for example, are a good source of iron, and they supply calcium, magnesium, potassium, phosphorous, B vitamins, protein and dietary fibre. (Foods and Food Production Encyclopedia, Considine, D.M. ed., Van Nostrand Reinhold Company, New York 1982, pages 1639–1942). Dried fruits are utilized as snack foods, confectionaries, etc., and as ingredients in foods such as snack foods, confectionaries, biscuits, cookies, cakes, dairy products, cereals, etc.

There is a need for dried fruit products which are inexpensive, have an appealing taste, aroma and texture, and are nutritious. Fruit leather products which are commercially available are expensive and contain ingredients such as sweeteners which make them nutritionally less desirable. Many of the sun dried or artificially dried fruits commercially available do not have an appealing taste, aroma or texture and therefore are not readily consumable as snack foods or readily incorporated into foods such as confectionaries, biscuits, cereals, etc.

There is also a need for a new and useful process which is capable of producing dried fruit products which retain more of their shape, size and natural nutrients, while imparting desirable taste, texture and aroma qualities to the dried fruit products.

U.S. Pat. No. 1,717,489 (issued Jun. 18, 1929 to Barlow) discloses a method of changing the flavor of dried fruits comprising combining the expressed juice of one fruit with another fruit which has been sun-dried or evaporated or which is in the process of drying. In one method disclosed a dry or drying fruit is immersed in the fruit juice of another fruit for a short time and then put again to dry; the process being repeated until the desired result is fully obtained. The method disclosed in the reference leaves much to be desired in terms of processing efficiency and processing costs and the tendency of the fruit juice to ferment over time may result in a product having an alcoholic taste. In addition, the absence of preservatives in the fruit juice and/or repeated applications of the fruit juice to the dry or drying fruit may introduce undesirable microorganisms into the dried fruit product shortening the shelf life of the product and more importantly, rendering the product harmful to consumers. Further, the repeated application of the fruit juice to the dry or drying fruit increases the sugar content resulting in a sticky product which is nutritionally less desirable. Repeated drying of the fruit also reduces the content of nutrients and volatiles in the fruit which effects the nutritional, and aroma and flavor qualities, respectively of the product.

### SUMMARY OF THE INVENTION

The present invention provides dried fruit products, particularly raisins, having flavors which do not correspond to the natural flavor of the dried fruits and having desirable nutritional, texture and aroma qualities; and a

**2**

process for preparing the dried fruit products. The improvements in the product attributes provided by the dried fruit products of the invention compared to prior art products is in texture, flavor, nutrition and aroma. The improvements are realized using the easily carried out process of the present invention.

Broadly stated, the present invention provides a process for preparing a flavored dried fruit product said process comprising:

(a) treating a dried fruit with an acidulant being selected from the group consisting of tartaric acid, malic acid, citric acid, ascorbic acid, phosphoric acid and fumaric acid, in an amount and for a period of time which is sufficient to substantially remove the natural flavor of the dried fruit;

(b) dehydrating the treated dried fruit to obtain a desired moisture content; and,

(c) treating the dried fruit during step (a) or after step (b) with a flavoring agent having a flavor which does not substantially correspond to the natural flavor of the dried fruit, said flavoring agent being employed in an amount and for a period of time which is sufficient to impart to the dried fruit a flavor which is substantially the same as the flavoring agent; and so forming a flavored dried fruit product having a flavor which is substantially the same as the flavor of said flavoring agent and having an outer surface which is substantially non-sticky whereby the flavored dried fruit product may be easily handled.

In one embodiment of the invention, a process for preparing a flavored raisin product is provided which process comprises a one step rehydration of raisins in a flavor solution comprising water, an acidulant, and a flavoring agent, and optionally comprising one or both of a sweetening agent and a colouring agent, said flavor solution being employed in an amount of about 10 to 100% by weight of final product, said acidulant being selected from the group consisting of tartaric acid, malic acid, citric acid, ascorbic acid, phosphoric acid and fumaric acid and being employed in an amount of 0.1 to 2.5% by weight of final product, said flavoring agent having a flavor which does not substantially correspond to the natural flavor of the raisins, said rehydration step being employed for a period of time to permit the flavor solution to stabilize in the raisins and to impart to the raisins a flavor which is substantially the same as the flavoring agent, and washing the rehydrated raisins to substantially remove any residual of the flavor solution on the outer surface or skin of the raisins, and a one step dehydration of the washed rehydrated raisins to obtain a desired moisture content, and so forming a flavored raisin product having a flavored meat comprising the flavor of the flavoring agent, and having an outer surface which is substantially non-sticky whereby the raisin product may be easily handled.

In a second preferred embodiment of the invention, a process for preparing a flavored raisin product is provided which process comprises treating raisins with an acidulant being selected from the group consisting of tartaric acid, malic acid, citric acid, ascorbic acid, phosphoric acid and fumaric acid, said acidulant being employed in an amount and for a period of time sufficient to provide raisins wherein the natural flavor of the raisins is substantially removed; dehydrating the so treated raisins to obtain a desired moisture content in the raisins, and treating the dehydrated raisins with a

5,188,861

3 4

flavoring agent having a flavor which does not substantially correspond to the natural flavor of the raisins, said flavoring agent being employed in an amount and for a period of time which is sufficient to impart to the raisins a flavor which is substantially the same as the flavoring agent; and so forming a flavored raisin product having a flavor which is substantially the same as the flavor of the flavoring agent and having an outer surface which is substantially non-sticky whereby the flavored raisin product may be easily handled.

The process of the invention, by employing minimal steps, economically decreases the time and ingredients required to obtain a dried fruit product with a desired taste, aroma and texture. The processing temperatures and times also make it possible to produce flavored dried fruit products having little or no loss of natural nutrients. Another feature of the present invention is the improved flow properties attained when the process is employed. Using conventional methods such as Barlow, the dried fruit products may form lumps which cause difficulties in handling, packaging, obtaining exact product weights, and incorporating into other food stuffs. It is also possible using the present invention to obtain a flavored dried fruit product which is more uniform in size and shape when compared to the prior art. In addition, the presence of the acidulant, significantly decreases the possibility of contamination and fermentation occurring.

The preferred process of the invention has a number of additional advantages. There is no heating of the flavoring agent so there is little or no loss of the volatile constituents of the flavoring agent which contribute to the flavor and aroma of the final product. Thus, the flavor and aroma of the flavoring agent is more readily retained in the flavored dried fruit product. The flavor and aroma will also penetrate the dried fruit on storage and provide the flavored dried fruit with a more well-developed flavor and aroma. In the preferred process of the invention, no sweetening agent is contacted with or applied to the dried fruit providing a more nutritionally desirable product. The absence of added sweetening agent in the preferred process also provides a product with superior flow properties which makes the product easy to handle, facilitating its use as a consumer product or in further processing as an ingredient in other food stuffs.

The invention also relates to flavored dried fruit products, particularly flavored raisin products produced by the processes of the invention. The flavored dried fruit products of the invention have a more appealing taste, aroma and texture than conventional dried fruit products and thus may be more readily consumable as snack foods or more readily incorporated into foods such as confectionaries, biscuits, cereals, etc.

## DETAILED DESCRIPTION OF THE INVENTION

The dried fruits which may be flavored employing the processes of the invention include peach, apple, pear, raisins, prunes, apricots and cherries. Any dried fruit which contains between about 10% to 18% moisture may be employed. The process can be employed on whole or sectioned pieces of dried fruit.

Preferably the dried fruit is a raisin including Thompson seedless raisins, golden seedless raisins, muscat raisins or sultana raisins. The variety of raisin to be used in the processes of the invention will be determined by the desired end product color. Particularly preferred raisins to be used in the processes of the invention are Australian sultanas, VISTA TM raisins from California, seeded raisins from Australia and Dunas seedless raisins from Mexico.

The processing of many of the different dried fruits will require conditions specifically adapted to the dried fruit. The following description will be restricted to the conditions which are particularly suitable for preparing raisin products but it will be understood that persons skilled in the art, given the particular process conditions and steps set forth in this general description as well as in the Examples, could readily adapt the processes of the invention to other dried fruits.

As hereinbefore mentioned, in one embodiment of the invention, a process is provided for preparing a flavored raisin product which includes a one step rehydration of the raisins in a flavor solution. The amount of flavor solution employed is about 10 to 100% by weight of the final product, preferably about 15 to 20% by weight of the final product. The raisins and flavor solution may be mixed, without breaking up the raisins, in a mixer, for example a Hobart. The raisins are rehydrated in the flavor solution for a sufficient time to permit the flavor to stabilize in the raisins; in general, about 3 to 48 hours, preferably 4 to 6 hours, at about 70° to 120° F. The raisins and flavor solution may also be mixed in a steam kettle with a vacuum pump. The raisins and flavor solution are mixed without breaking up the raisins for 5 to 10 minutes, preferably 7 minutes, and then a vacuum of about 15″ to 30″, preferably 21″ to 28″ of mercury is applied for about 2 to 4 minutes.

The flavor solution contains water, an acidulant, a flavoring agent and, if desired, it may contain one or both of a sweetening agent or a colouring agent. As discussed above, the acidulant lowers the pH of the flavor solution, significantly decreasing possible contamination by undesirable microorganisms and fermentation. The acidulant also substantially removes the natural flavor of the dried fruit. In addition, the acidulant may also give the dried fruit product a tart taste and assist in breaking down any alkali film that may be on the outer surface of the raisins due to prior processing of the raisin which may inhibit absorption of the flavoring agent. Among the suitable acidulants which may be used in the processes of the invention are tartaric acid, malic acid, citric acid, ascorbic acid, phosphoric acid, or fumaric acid. The selection of a particular acidulant will be made with knowledge of the flavor compatibility of the acidulant with the particular dried fruit to be flavored and the flavoring agent. Thus, flavoring of a particular dried fruit or even a particular raisin using the processes of the invention will require a balancing of the flavoring agent and acidulant to achieve a desired result. For example, the preferred acidulant in the case of flavoring seeded raisins from Australia with cherry flavor is malic acid. Generally, the acidulant is present in an amount of 0.1 to 2.5% by weight of final product. The desired result as well as the nature of the acidulant will determine the actual amount used in any particular incident.

The flavoring agent used in the processes of the invention has a flavor which does not substantially correspond to the flavor of the fruit which is to be flavored in accordance with the processes of the invention. The flavoring agent may be one or more of a natural flavor or an artificial flavor or a combination of natural and artificial flavors. Natural flavors include fruit juices, concentrates and commercially available natural fla-

5,188,861

**5**

vors, for example Fries & Cino, Cherry Flavor No. 96243; Naarden's Natural Banana Flavor No. D014654; and BBA's Natural Lemon/Lime Flavor No. 5-9591. Among the artificial flavors that may be used in the process of the invention are Florasynth's Artificial Raspberry Flavor No. W388076, IFF Artificial Pineapple Flavor No. IC578122, BBA's Artificial Coconut Flavor No. M5, IFF's Artificial Pineapple Flavor No. IC578122 combined with BBA's Artificial Coconut Flavor M5 (Pina Colada), and FDO Artificial Passion Fruit Flavor No. 987114. Other natural or artificial fruit flavors that may be used in the process of the invention are orange, grapefruit, tangerine, guava and kiwi. Non-fruit flavors such as peanut butter and cinnamon, may also be used in the process of the invention. The flavoring agent when employed in the first embodiment of the process of the invention should be heat stable at the temperatures at which the process of the invention is carried out. Generally the flavoring agent is present in an amount of about 0.05 to 3% by weight of final product. The desired result as well as the nature of the flavoring agent will determine the actual amount used in any particular incident. The flavoring agent may additionally include vitamin and mineral premixes such as vitamin A, vitamin C, calcium, sodium, thiamine, riboflavin, vitamin B, vitamin $B_2$, etc.

If desired, the flavor solution may contain one or both of a sweetening agent or a coloring agent. The sweetening agent may be a natural sweetener such as sucrose, fructose or glucose or an artificial sweetening agent such as aspartame. Generally, for a natural sweetening agent an amount of about 0 to 15% by weight of the final product is employed. The coloring agent may be a natural or artificial coloring agent. The amount of coloring agent to be added can be determined by visual requirements.

The flavor solution may additionally contain a humectant such as glycerol and sorbitol. Sodium citrate may also be added to the flavor solution to provide a more tart taste, for example when preparing a lemon/-lime flavored dried fruit product.

The treated raisins in the first embodiment of the process of the invention are dehydrated using methods known in the art such as air-oven drying and vacuum drying. In particular, the treated raisins may be dehydrated in a home dehydrator, with adequate ventilation of about 20 m.p.h. wind velocity for a period of about 4 to 6 hours at about 125° to 175° F, preferably 5 to 6 hours at 145° to 150° F, till about 12% moisture remains in the product. The treated raisins prior to drying may also be subjected to a vacuum of about 15″ to 30″, preferably 21″ to 28″ of mercury for about 2 to 4 minutes to hasten the absorption of the flavor solution. If the flavor solution contains a sweetening agent it is advantageous to wash the treated raisins prior to drying.

In accordance with a preferred embodiment of the invention, a process is provided for preparing a flavored raisin product which comprises treating raisins with an acidulant being selected from the group consisting of tartaric acid, malic acid, citric acid, ascorbic acid, phosphoric acid and fumaric acid said acidulants being employed in an amount and for a period of time sufficient to provide raisins wherein the natural flavor of the raisin is substantially removed; dehydrating the so treated raisins to obtain a desired moisture content in the raisins, and treating the dehydrated treated raisins with a flavoring agent having a flavor which does not substantially correspond to the natural flavor of the

**6**

raisins, said flavoring agent being employed in an amount and for a period of time which is sufficient to impart to the raisins a flavor which is substantially the same as the flavoring agent; and so forming a flavored raisin product having a flavor which is substantially the same as the flavor of the flavoring agent and having an outer surface which is substantially non-sticky whereby the flavored raisin product may be easily handled.

As a first step in the second preferred embodiment of the invention, the raisins are treated with an acidulant. The starting raisins are mixed with an aqueous solution containing the acidulant, in a mixer such as a Hobart mixer. The acidulant is employed in an amount, preferably 0.1 to 2.5% by weight of final product, and for a sufficient time to substantially remove the natural flavor of the raisins; in general about 2 to 3 hours, preferably 2.5 hours. The mixing is carried out at a temperature of about 20° C. to 50° C., preferably 20° C. If the starting raisins are coated with oil it is advantageous to wash the raisins prior to mixing to remove the oil coat. The acidulant treated raisins are then dehydrated to obtain a desired moisture content in the treated raisins. In particular, the raisins may be dehydrated in a home dehydrator, with adequate ventilation of about 20 m.p.h. wind velocity for a period of about 1 to 3 hours, preferably 2 hours, at 145° F. to 150° F., preferably about 145° F., until about 12 to 18% moisture, preferably 15% remains in the product. The raisins may be vacuum dried by subjecting to a vacuum of about 18″ to 30″, preferably 28″ of mercury for about 1 to 3 hours, preferably 2 hours, to provide an internal product temperature of 110 to 160° F., preferably 110 to 120° F., until about 12 to 18% moisture, preferably 15% remains in the product. The acidulant treatment step and dehydration step may also be carried out in an apparatus such as a Rota-Cone Dryer and Processor (Paul 0. Abb Inc., Little Falls, N.J.)

The dehydrated treated raisins are mixed with a flavoring agent. The flavoring agent is employed in an amount and for a period of time sufficient to impart to the dehydrated raisins a flavor which is substantially the same as the flavoring agent. Generally, the dehydrated raisins and flavoring agent are mixed in a mixer such as a tumble mixer, to uniformly coat the dehydrated raisins. Generally an amount of flavoring agent which substantially coats the raisins is employed and in particular the flavoring agent may be present in an amount of about 0.5 to 3% by weight of the final product. In the preferred process, of the invention no sweetening agents are contacted or applied to the raisins.

The nature of the acidulants and flavoring agents which may be used in the preferred process of the invention are the same as the acidulants and flavoring agents hereinbefore described for the first embodiment of the process of the invention.

The dried raisins prepared according to the process of the invention can be used as a snack food or confectionery or an ingredient in products such as cakes, cookies, snack foods, confectioneries, dairy products, etc. The dried raisins may also be coated with chocolate.

The following non-limiting examples are illustrative of the present invention:

**EXAMPLE 1**

A cherry flavor solution containing 4.0g malic acid, 3.0g Fries & Cino Natural Cherry Flavor No. 96243 and 73.0g water was added to 400g of seeded raisins from Australia. The mixture was allowed to stand with inter-

5,188,861

**7**

mittent mixing, for 6 hours at room temperature (70° F.) to allow the solution to be absorbed into the raisins. The treated raisins were then dehydrated in a home dehydrator at 145° F. with adequate ventilation of about 20 m.p.h. wind velocity for a period of 5- to 6 hours to 12% moisture remaining in the product. The dried treated raisins were then cooled. The resultant product had a desirable cherry flavor.

## EXAMPLE 2

The cherry flavor solution as described in Example 1 was added to 400g of seeded raisins from Australia and mixed in a Hobart mixer for about 10 minutes to allow uniform dispersion of the solution into the raisins. The mixture was then subjected to a vacuum of 21" to 28" of mercury for about 4 minutes to hasten the absorption of the solution. The treated raisins were then dehydrated as described in Example 1. The resultant product had a desirable cherry taste which was similar to the product prepared in accordance with the procedure as described in Example 1.

## EXAMPLE 3

A strawberry flavor solution containing 1.20g of citric acid, 0.80g Florasynth Artificial Strawberry Flavor No. WL16103 and 78.0g of water was added to 400g of seeded raisins from Australia. Subsequent processing was carried out as described in Example 1 or Example 2 and the raisin products resulting for each process had a similar desirable strawberry taste.

## EXAMPLE 4

A raspberry flavor solution containing 2.25g citric acid, 2.50g Florasynth Artificial Raspberry Flavor No. W388076 and 75.25g of water was added to 400g of seeded raisins from Australia. Subsequent processing was carried out as described in Example 1 or Example 2 and the raisin products resulting from each process had a similar desirable raspberry taste.

## EXAMPLE 5

A banana flavor solution containing 1.00g citric acid, 7.00g Naarden Natural Banana Flavor No. DQ14654 and 72.00g of water was added to 400g of VISTA raisins from California. Subsequent processing was carried out as described in Example 1 or 2 and the raisin products resulting from each process had a similar desirable banana taste.

## EXAMPLE 6

A pina colada flavor solution containing 3.0g citric acid, 4.0g IFF Artificial Pineapple Flavor No. IC5788122 o.4g BBA Artificial Coconut Flavor No. M%, and 72.6g of water was added to 400g of VISTA raisins from California. Subsequent processing was carried out as described in Example 1 or 2 and the raisin products resulting from each process had a similar desirable pineapple taste.

## EXAMPLE 7

A lemon./lime flavor solution containing 5.0g citric acid, 0.5g sodium citrate, 1.5g BBA Natural Lemon/-Lime Flavor No. 5-9591 and 73.0g of water was added to 400g of Australian sultana raisins. Subsequent processing was carried out as described in Example 1 or 2 and the raisin products resulting from each process had a similar desirable lemon/lime taste.

## EXAMPLE 8

**8**

A passion fruit flavor solution containing 3.0g citric acid, 0.8g F.D. & 0 Artificial Passion Fruit Flavor No. 987114, 8.0g passion juice concentrate and 68.2g of water was added to 400g of VISTA raisins from California. Subsequent processing was carried out as described in Example 1 or 2 and the raisin products resulting from each process had a similar desirable passion fruit taste.

## EXAMPLE 9

A 2000g sample of Australian sultana raisins was treated with hydrogenated vegetable oil (0.5%) and then washed with hot water and dried. The washed raisins (2060g) were treated with 250ml of a 10% anhydrous citric acid solution for 2 hours and the resulting acidified raisins (2310g) were then dehydrated in a home dehydrator at 145° F. with adequate ventilation of about 20 m.p.h. wind velocity for a period of 3 hours. The resulting dehydrated raisin product (1970-1980g) was substantially free of any natural raisin flavor. A 0.4% flavor solution of Bush Brooke Allen Flavor #5-9591 was added to coat the dehydrated raisin product. The process was repeated using a 2000g sample of Thompson seedless raisins. An Orange Flavored raisin product was prepared employing the described process, using 2000g samples of each of Australian sultana raisins and Thompson seedless raisins and 250ml of an 8% anhydrous citric acid solution and a 0.7% flavor solution of cold pressed California orange oil (Seeley).

As a comparison, the process described in U.S. Pat. No. 1,717,489 to Barlow was also used to prepare lemon flavored and orange flavored raisins. In particular, 2000g samples of Australian sultana raisins and Thompson seedless raisins were washed with hot water and dried. The washed raisin samples (2060g) were then soaked in 250ml of either fresh lemon juice squeezed form Florida lemons or fresh orange juice squeezed from Swaziland oranges and then dehydrated in a home dehydrator at 145° F with adequate ventilation of about 20 m.p.h. wind velocity for a period of 3 hours. The resulting raisins retained their natural flavor characteristics.

The raisin product produced by the process of the invention had a superior orange or lemon flavor when compared to the raisins produced by the process disclosed in Barlow. No difference in the color of the raisin product of the invention and the raisins produced by the Barlow process was observed.

In the case of the orange flavored raisin product of the invention, it had a less sticky texture than the raisins produced using the Barlow process.

The sugar and acid content of the raisin products of the invention and the raisins produced using the Barlow process were calculated.

As shown in Table 1, the orange and lemon flavored raisins produced using the Barlow process have a lower acid content and a higher sugar content when compared to the orange and lemon flavored raisin product of the present invention. If the acid content of the Barlow raisins were increased by soaking the raisins in additional orange or lemon juice, this would necessarily substantially increase the sugar content of the raisins, which is not desirable.

### TABLE 1

|  | Acid Content (%) | Sugar Content (%) |
|---|---|---|
| Invention |  |  |
| Orange raisin product | 1 | 71.2%* |

5,188,861

9

TABLE 1-continued

| | Acid Content (%) | Sugar Content (%) |
|---|---|---|
| Lemon raisin product | 1.4 | 71.2% |
| Barlow | | |
| Orange Raisins | 0.08–0.28** | 72%* |
| Lemon Raisins | 0.72–1.05*** | 71.35–71.65 |

*71.2% is total sugar content of raisins from General Foods Specifications. Minimum sugar content of orange juice is 6.4%. (The Structure and Composition of Foods, details re publication p. 690).

$$250 \text{ g} \times \frac{.64}{100} = 0.8\%$$

**Minimum Citric Acid Content of Orange Juice is 0.64%. (The Structure and Composition of Foods, p. 690)

$$250 \text{ g} \times \frac{.64}{100} = 1.6/2000 = 0.08\% \text{ acidity}$$

***Minimum Citric Acid Content of Lemon Juice is 5.74%. (The Structure and Composition of Foods, Vegetables, Legumes and Fruits, Vol. II, Winton, A.L., and K. B. Winton, John Wiley & Sons, Inc., London, p. 704).

$$250 \text{ g} \times \frac{5.74}{100} = 14.35/2000 = .007175 = 0.72\%$$

### EXAMPLE 10

A 2000g sample of Australian sultana raisins with hydrogenated vegetable oil coating (0.5%) were washed with hot water and dried. The washed raisins were treated with 250ml of an 8% malic acid solution for 2 hours and then dehydrated in a home dehydrator at approximately 145° F. with adequate ventilation of about 20 m.p.h. wind velocity for a period of 3 hours. The raisins may alternatively be dehydrated by vacuum drying by subjecting to a vacuum of about 28" of mercury for a period of 2 hours to provide an internal raisin temperature of approximately 110 to 160° F. The resulting dehydrated raisin was substantially free of any natural raisin flavor. A 1.0% solution of Natural Cherry Flavor #77742 from F & C International was added to coat the dehydrated raisin product.

### EXAMPLE 11

A passion fruit raisin product was prepared employing the process described in Example 10 using 250ml of an 8% citric acid solution and a 0.6% solution of Artificial Flavor #987114 from Fritzsche, Dodge & Olcott.

### EXAMPLE 12

A pina colada raisin product was prepared employing the process described in Example 10 using 250ml of 0.8% citric acid and a solution containing 1.0% Artificial Pineapple #IC5-78122 from International Flavor & Fragrances and 0.1% Artificial Coconut #M5 from Bush Brooke Allen.

### EXAMPLE 13

A banana flavored raisin product was prepared employing the process described in Example 10 using 250ml of 0.8% citric acid and a 0.5% solution of Natural Banana Flavor #82641 from F & C International.

### EXAMPLE 14

A strawberry flavored raisin product was prepared employing the process described in Example 10 using 250ml of 1% malic acid and a solution of Strawberry No. 987148 from FD & 0 International.

While certain representative embodiments of the invention have been described herein for the purpose of illustration, it will be apparent to those skilled in the art that modifications therein may be made without departing from the spirit and scope of the invention.

We claim:

10

1. A process for preparing a flavored dried fruit product said process comprising:
    (a) treating a dried fruit with an acidulant being selected from the group consisting of tartaric acid, malic acid, citric acid, ascorbic acid, phosphoric acid and fumaric acid, in an amount and for a period of time which is sufficient to substantially remove the natural flavor of the dried fruit;
    (b) dehydrating the treated dried fruit to obtain a desired moisture content; and,
    (c) treating the dried fruit during step (a) or after step (b) with a flavoring agent having a flavor which does not substantially correspond to the natural flavor of the dried fruit, said flavoring agent being employed in an amount and for a period of time which is sufficient to impart to the dried fruit a flavor which is substantially the same as the flavoring agent;
and so forming a flavored dried fruit product having a flavor which is substantially the same as the flavor of the flavoring agent and having an outer surface which is substantially non-sticky whereby the flavored dried fruit product may be easily handled.

2. A process for preparing a flavored raisin product comprising a one step rehydration of raisins in a flavor solution comprising water, an acidulant, and a flavoring agent, and optionally comprising one or both of a sweetening agent and a colouring agent, said flavor solution being employed in an amount of about 10 to 100% by weight of final product, said acidulant being selected from the group consisting of tartaric acid, malic acid, citric acid, ascorbic acid, phosphoric acid and fumaric acid and being employed in an amount of 0.1 to 2.5% by weight of final product, said flavoring agent having a flavor which does not substantially correspond to the natural flavor of the raisins, said rehydration step being employed for a period of time to permit the flavor solution to stabilize in the raisins and to impart to the raisins a flavor which is substantially the same as the flavoring agent, washing the rehydrated raisins to substantially remove any residual of the flavor solution on the outer surface or skin of the raisins, and a one step dehydration of the washed rehydrated raisins to obtain a desired moisture content, and so forming a flavored raisin product having a flavored meat comprising the flavor of the flavoring agent, and having an outer surface which is substantially non-sticky whereby the raisin product may be easily handled.

3. A process for preparing a flavored raisin product, said process comprising treating raisins with an acidulant being selected from the group consisting of tartaric acid, malic acid, citric acid, ascorbic acid, phosphoric acid and fumaric acid, said acidulant being employed in an amount and for a period of time sufficient to provide raisins wherein the natural flavor of the raisins is substantially removed; dehydrating the so treated raisins to obtain a desired moisture content in the raisins, and treating the dehydrated raisins with a flavoring agent having a flavor which does not substantially correspond to the natural flavor of the raisins, said flavoring agent being employed in an amount and for a period of time which is sufficient to impart to the raisins a flavor which is substantially the same as the flavoring agent; and so forming a flavored raisin product having a flavor which is substantially the same as the flavor of the flavoring agent and having an outer surface which is substantially

5,188,861

**11**

non-sticky whereby the flavored raisin product may be easily handled.

4. A process as claimed in claim 3, wherein the acidulant is employed in an amount of 0.1 to 2.5% by weight of final product and the flavoring agent is employed in an amount of .05 to 3% by weight of final product.

5. A process as claimed in claim 3 or 4 wherein the flavoring agent is one or more of a natural and an artificial cherry, strawberry, raspberry, banana, pineapple, coconut, lemon/lime, orange, grapefruit, tangerine, guava, kiwi, or passion fruit flavor.

6. A flavored raisin product produced by a process comprising treating raisins with an acidulant being selected from the group consisting of tartaric acid, malic acid, citric acid, ascorbic acid, phosphoric acid and fumaric acid, said acidulant being employed in an amount and for a period of time sufficient to provide so treated raisins wherein the natural flavor of the raisins is

**12**

substantially removed; dehydrating the so treated raisins to obtain a desired moisture content in the raisins, and treating the dehydrated raisins with a flavoring agent having a flavor which does not substantially correspond to the natural flavor of the raisins, said flavoring agent being employed in an amount and for a period of time which is sufficient to impart to the raisins a flavor which is substantially the same as the flavoring agent; and so forming a flavored raisin product having a flavor which is substantially the same as the flavor of the flavoring agent and having an outer surface which is substantially non-sticky whereby the flavored raisin product may be easily handled.

7. A process as claimed in claim 1, wherein no sweetening agent is contacted with or applied to the dried fruit.

* * * * *

# Merchant & Gould

An Intellectual Property Law Firm

3200 IDS Center
80 South Eighth Street
Minneapolis, Minnesota
55402-2215 USA
TEL 612.332.5300
FAX 612.332.9081
www.merchant-gould.com

A Professional Corporation

Direct Contact | **612.336.4632**
**dwilliams@merchant-gould.com**

May 27, 2003

Randy Papadellis
Ocean Spray Cranberries, Inc.
Corporate Headquarters
One Ocean Spray Drive
Lakeville-Middleboro, MA 02349

Dear Mr. Papadellis,

We represent Amazin Raisin Inc., which owns United States Patent No. 5,188,861. After examining Ocean Spray's product line, we have determined that at least two of Ocean Spray's flavored craisin products relate to this patent. The '861 patent is enclosed for your reference to assist in avoiding any infringement issues in the future. Amazin Raisin would like to license its patented technology to Ocean Spray or reach another business solution that is agreeable to both companies instead of entering into litigation. Please contact me to discuss this matter further.

Sincerely,

Douglas J. Williams

DJW:lmb
Enclosure

**EXHIBIT**
B
Decl f Dosedach

Minneapolis/St. Paul
Denver
Seattle
Atlanta
Washington, DC

# FISH & RICHARDSON P.C.,P.A.

3300 Dain Rauscher Plaza
60 South Sixth Street
Minneapolis, Minnesota
55402

Frederick P. Fish
1855-1930

W.K. Richardson
1859-1951

Telephone
612 335-5070

Facsimile
612 288-9696

Web Site
www.fr.com

June 19, 2003

Douglas J. Williams., Esq.
Merchant & Gould
3200 IDS Center
Minneapolis, MN 55402-2215

Re:        Ocean Spray Cranberries, Inc.
Our Ref.:   00414-075001



BOSTON

DALLAS

DELAWARE

NEW YORK

SAN DIEGO

SILICON VALLEY

TWIN CITIES

WASHINGTON, DC

Dear Mr. Williams:

We represent Ocean Spray Cranberries, Inc. and are writing in response to your letter of May 27, 2003 to Randy Papadellis in which you allege that "at least two" of Ocean Spray's flavored craisin products "relate" to U.S. Patent No. 5,188,861 assigned to Amazin Raisin Inc. The '861 patent contains 7 claims. None of these claims covers the process Ocean Spray uses to prepare its products, or the products themselves, for at least the following reasons.

Claims 1 and 7 of the '861 patent require treating a "dried fruit" with a certain acidulant "in an amount and for a period to time which is sufficient to substantially remove the natural flavor of the dried fruit." Ocean Spray's process does not involve treating "dried fruit," nor does it involve treating fruit with an acidulant to remove the natural flavor of the fruit.

Ocean Spray's process is described in Mantius et al., U.S. Patent No. 5,320,861 ("the Mantius patent"), a copy of which we enclose. Mr. Len Kasang of Ocean Spray also furnished a copy of the Mantius patent to Jack Mazin in a letter dated January 23, 2002. As discussed in the Mantius patent, Ocean Spray starts with frozen, whole cranberries, rather than dried cranberries. It subjects the frozen, whole cranberries to an acid-free, water-based, countercurrent extraction process that removes substantially all of the natural flavoring and juices from the cranberries, and replaces these liquids with water.

Following the extraction, Ocean Spray treats the cranberries with an infusion syrup. At this point, the cranberries contain a substantial amount of water, rather than being in dried form. Most of the infusion syrups that Ocean Spray uses lack any acid whatsoever. However, in the case of citric acid-containing syrups, the acid does not remove the natural flavor of the fruit. The purpose of the acid is to act as a flavorant to provide an acid "bite," and/or to replace natural cranberry juices removed during the initial extraction. It is the extraction that removes the natural flavoring and juices from the cranberries. Thus, at the point where the infusion syrup is applied, the

EXHIBIT
C
Decl of Drscatch

FISH & RICHARDSON P.C.,P.A.

Douglas J. Williams., Esq.
June 19, 2003
Page 2

natural flavoring and juices have already been removed.  Moreover, as discussed in the Mantius patent, the composition of the infusion syrup is adjusted to maintain or increase the level of natural flavoring and juices of the cranberry.  The infusion syrup, therefore, adds natural flavoring and juices to the cranberries, rather than removing them, as claims 1 and 7 of the '861 patent require.

Because Ocean Spray neither treats dried fruit, nor removes natural flavoring by means of an acidulant, claims 1 and 7 do not cover Ocean Spray's process and products.  Claims 2-6 are limited to treating raisins, and likewise do not cover Ocean Spray's process and products, which use cranberries.

We also observed, upon reading the prosecution history of the '861 patent, that the patent application was abandoned for failure to pay the issue fee.  The applicant revived the application, claiming he unintentionally abandoned it due to lack of funds. A decision to abandon an application due to lack of funds is not unintentional abandonment.  Therefore, we question whether the '861 patent is valid and enforceable.

We trust our remarks address and eliminate any concerns you may have had regarding Ocean Spray's craisin products.   Nevertheless, please contact me if you would like to discuss this matter further.

Very truly yours,

Dorothy P. Whelan

DPW/jxw

60147217.doc

# Merchant & Gould

An Intellectual Property Law Firm

3200 IDS Center
80 South Eighth Street
Minneapolis, Minnesota
55402-2215 USA
TEL 612.332.5300
FAX 612.332.9081
www.merchant-gould.com

A Professional Corporation

Direct Contact | **612.336.4632**
**dwilliams@merchant-gould.com**

September 8, 2003

Dorothy P. Whelan, Esq.
Fish & Richardson, P.C., P.A.
3300 Dain Rauscher Plaza
60 South Sixth Street
Minneapolis, MN 55402

Dear Ms. Whelan:

After review of your letter of June 19, 2003, we have determined that we need additional information from Ocean Spray to be ensured that its process for treating its fruit does not infringe the '861 patent. In particular, Ocean Spray claims that its "countercurrent extraction process . . . removes substantially all of the natural flavoring and juices from the cranberries, and replaces these liquids with water." However, we cannot exactly replicate the conditions that Ocean Spray uses during this process because neither the patent or your June 19 letter provides sufficient detail of the countercurrent extraction process. We propose that Ocean Spray provide samples of Ocean Spray's pre-processed cranberries and "decharacterized cranberry pieces" for our analysis. This will facilitate our evaluation of your position and may provide the basis for an early resolution. We look forward to your response.

Very truly yours

Douglas J. Williams

DJW:lmb

**EXHIBIT**
D
Decl of DoScotch

Minneapolis/St. Paul
Denver
Seattle
Atlanta
Washington, DC

# Merchant & Gould

An Intellectual Property Law Firm

3200 IDS Center
80 South Eighth Street
Minneapolis, Minnesota
55402-2215 USA
TEL 612.332.5300
FAX 612.332.9081
www.merchant-gould.com

A Professional Corporation

Direct Contact    **612.336.4632**
**dwilliams@merchant-gould.com**

November 11, 2003

Dorothy P. Whelan, Esq.
Fish & Richardson, P.C., P.A.
3300 Dain Rauscher Plaza
60 South Sixth Street
Minneapolis, MN 55402

Dear Ms. Whelan:

       It has been two months since we responded to your letter of June 19, 2003 requesting samples for evaluation. We again make that request for the decharacterized fruit pieces prior to your claim of further treatment for our evaluation. If you have now found that you agree with our analysis, please contact us regarding further discussions about licensing.

       We look forward to your prompt response.

Very truly yours

Douglas J. Williams

DJW:lmb



EXHIBIT
E
Decl of Doscoth

Minneapolis/St. Paul
Denver
Seattle
Atlanta
Washington, DC

# Merchant & Gould

An Intellectual Property Law Firm

3200 IDS Center
80 South Eighth Street
Minneapolis, Minnesota
55402-2215 USA
TEL 612.332.5300
FAX 612.332.9081
www.merchant-gould.com

A Professional Corporation

Direct Contact | **612.336.4632**
**dwilliams@merchant-gould.com**

February 26, 2004

Dorothy P. Whelan, Esq.                    **VIA FACSIMILE**
Fish & Richardson, P.C., P.A.
3300 Dain Rauscher Plaza
60 South Sixth Street
Minneapolis, MN  55402

Dear Ms. Whelan:

      In response to your correspondence of December 17, 2003, we can only consider Ocean Spray's decision not to provide a sample of its decharacterized fruit pieces as an admission that it believes that the production of such a sample supports my client's infringement claim. Certainly, Ocean Spray can obtain a sample and produce it to us for our review and testing. We believe that production of a decharacterized fruit piece sample, which is discoverable, may prove useful in resolving this dispute short of filing a lawsuit. Therefore, we renew our request for the production of a sample referred to in our earlier correspondence. We are willing to cover any expenses related to providing the requested sample. Thank you in advance for your cooperation.

Very truly yours

Douglas J. Williams

DJW:lmb



Minneapolis/St. Paul
Denver
Seattle
Atlanta
Washington, DC

# FISH & RICHARDSON P.C., P.A.

3300 Dain Rauscher Plaza
60 South Sixth Street
Minneapolis, Minnesota
55402

Telephone
612 335-5070

Facsimile
612 288-9696

Web Site
www.fr.com

Frederick P. Fish
1855-1930

W.K. Richardson
1859-1951

December 17, 2003

Douglas J. Williams, Esq.
Merchant & Gould
3200 IDS Center
Minneapolis, MN 55402-2215

Re:    Ocean Spray Cranberries, Inc.

Dear Mr. Williams:

We are writing in regard to your request for samples of decharacterized fruit pieces. After considering the matter, we are of the opinion that production of such samples is neither practical nor necessary. Our letter of June 19, 2003 adequately sets out the basis for our non-infringement position.

We also continue to question whether the '861 patent is valid and enforceable. According to the prosecution history of the '861 patent, the patent application was abandoned for failure to pay the issue fee. The applicant revived the application, claiming he unintentionally abandoned it due to lack of funds. A deliberate decision to abandon an application due to lack of funds is not unintentional abandonment. Neither of your letters addressed this issue.

Very truly yours,



Dorothy P. Whelan

cc:  Alana Sharenow, Esq.

60184402.doc

BOSTON

DALLAS

DELAWARE

NEW YORK

SAN DIEGO

SILICON VALLEY

TWIN CITIES

WASHINGTON, DC



EXHIBIT
G

# FISH & RICHARDSON P.C.,P.A.

3300 Dain Rauscher Plaza
60 South Sixth Street
Minneapolis, Minnesota
55402

Telephone
612 335-5070

Frederick P. Fish
1855-1930

W.K. Richardson
1859-1951

Facsimile
612 288-9696

Web Site
www.fr.com

March 5, 2004

Douglas J. Williams, Esq.
Merchant & Gould
3200 IDS Center
Minneapolis, MN 55402-2215

Re:    Ocean Spray Cranberries, Inc.

Dear Mr. Williams:

BOSTON

DALLAS

DELAWARE

NEW YORK

SAN DIEGO

SILICON VALLEY

TWIN CITIES

WASHINGTON, DC

We are writing in response to your letter of February 26, 2004. Our decision not to produce decharacterized fruit pieces is in no way an admission that we agree with your infringement claim. As noted in previous correspondence, we are of the opinion that production of such samples is neither practical nor necessary.

We further note that any discussion of infringement is premature until issues regarding the enforceability and validity of the '861 patent are resolved. Specifically, the prosecution history of the '861 patent demonstrates that the patent application was abandoned for failure to pay the issue fee. The applicant revived the application, claiming he unintentionally abandoned it due to lack of funds. A deliberate decision to abandon an application due to lack of funds is not unintentional abandonment. Despite our repeated requests, you have yet to address this issue. Without a valid and enforceable patent, there can be no infringement.

Very truly yours,

Dorothy P. Whelan

cc: Alana Sharenow, Esq.

60200917.doc



# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| | | | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **MINNESOTA** | | | 2003 | 2002 | 2001 | 2000 | 1999 | 1998 | Numerical Standing | |
| | | | | | | | | | U.S. | Circuit |
| OVERALL CASELOAD STATISTICS | Filings* | | 7,190 | 4,718 | 2,730 | 3,216 | 2,431 | 3,322 | U.S. | Circuit |
| | Terminations | | 4,021 | 2,876 | 2,754 | 3,357 | 2,766 | 3,053 | | |
| | Pending | | 7,202 | 4,031 | 2,195 | 2,213 | 2,349 | 2,819 | | |
| | % Change in Total Filings | Over Last Year | | 52.4 | | | | | 1 | 1 |
| | | Over Earlier Years | | | 163.4 | 123.6 | 195.8 | 116.4 | 1 | 1 |
| | Number of Judgeships | | 7 | 7 | 7 | 7 | 7 | 7 | | |
| | Vacant Judgeship Months** | | .0 | 4.1 | .0 | .0 | 4.1 | 3.0 | | |
| ACTIONS PER JUDGESHIP | FILINGS | Total | 1,028 | 674 | 390 | 459 | 347 | 475 | 1 | 1 |
| | | Civil | 962 | 614 | 344 | 411 | 305 | 429 | 1 | 1 |
| | | Criminal Felony | 54 | 47 | 46 | 48 | 42 | 46 | 65 | 9 |
| | | Supervised Release Hearings** | 12 | 13 | - | - | - | - | 67 | 10 |
| | Pending Cases | | 1,029 | 576 | 314 | 316 | 336 | 403 | 3 | 1 |
| | Weighted Filings** | | 733 | 725 | 450 | 477 | 436 | 566 | 7 | 1 |
| | Terminations | | 574 | 411 | 393 | 480 | 395 | 436 | 12 | 1 |
| | Trials Completed | | 12 | 14 | 12 | 13 | 14 | 19 | 81 | 10 |
| MEDIAN TIMES (months) | From Filing to Disposition | Criminal Felony | 7.9 | 8.4 | 7.5 | 7.5 | 8.0 | 7.5 | 52 | 6 |
| | | Civil** | 6.5 | 7.1 | 8.9 | 12.6 | 10.0 | 9.2 | 8 | 1 |
| | From Filing to Trial** (Civil Only) | | 24.5 | 26.0 | 20.7 | 20.8 | 22.0 | 22.3 | 58 | 8 |
| OTHER | Civil Cases Over 3 Years Old** | Number | 27 | 50 | 53 | 57 | 27 | 119 | | |
| | | Percentage | .4 | 1.3 | 2.7 | 2.8 | 1.3 | 4.6 | 4 | 2 |
| | Average Number of Felony Defendants Filed Per Case | | 1.4 | 1.6 | 1.5 | 1.6 | 1.7 | 1.5 | | |
| | Jurors | Avg. Present for Jury Selection | 47.85 | 39.62 | 35.94 | 39.08 | 35.83 | 37.08 | | |
| | | Percent Not Selected or Challenged | 40.6 | 31.1 | 35.3 | 35.7 | 33.0 | 35.3 | | |

| 2003 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 6731 | 99 | 7 | 334 | 37 | 17 | 338 | 344 | 4730 | 181 | 463 | 10 | 171 |
| Criminal* | 373 | 13 | 14 | 55 | 11 | 7 | 147 | ** | 9 | 63 | 13 | 13 | 28 |

\* Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.
\*\* See "Explanation of Selected Terms."



Case 1:04-cv-12853-ADM-AJB Document 27-194 Filed 12/26/2004 Page 29 of 36

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| | | | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **MASSACHUSETTS** | | | 2003 | 2002 | 2001 | 2000 | 1999 | 1998 | Numerical Standing | |
| | | | | | | | | | U.S. | Circuit |
| OVERALL CASELOAD STATISTICS | | Filings* | 3,720 | 3,765 | 3,276 | 3,651 | 3,770 | 3,626 | U.S. | Circuit |
| | | Terminations | 3,513 | 3,565 | 3,470 | 3,501 | 3,842 | 3,414 | | |
| | | Pending | 4,416 | 4,300 | 4,126 | 4,275 | 4,117 | 4,231 | | |
| | % Change in Total Filings | Over Last Year | | -1.2 | | | | | 56 | 3 |
| | | Over Earlier Years | | | 13.6 | 1.9 | -1.3 | 2.6 | 58 | 1 |
| | Number of Judgeships | | 13 | 13 | 13 | 13 | 13 | 13 | | |
| | Vacant Judgeship Months** | | 7.0 | .0 | .0 | .0 | .0 | .0 | | |
| ACTIONS PER JUDGESHIP | FILINGS | Total | 285 | 289 | 252 | 281 | 290 | 279 | 84 | 2 |
| | | Civil | 246 | 243 | 222 | 249 | 258 | 251 | 75 | 1 |
| | | Criminal Felony | 31 | 38 | 30 | 32 | 32 | 28 | 90 | 5 |
| | | Supervised Release Hearings** | 8 | 8 | - | - | - | - | 80 | 4 |
| | Pending Cases | | 340 | 331 | 317 | 329 | 317 | 325 | 65 | 1 |
| | Weighted Filings** | | 327 | 332 | 305 | 335 | 328 | 335 | 84 | 3 |
| | Terminations | | 270 | 274 | 267 | 269 | 296 | 263 | 84 | 2 |
| | Trials Completed | | 15 | 15 | 12 | 13 | 14 | 15 | 69 | 4 |
| MEDIAN TIMES (months) | From Filing to Disposition | Criminal Felony | 14.3 | 13.4 | 13.2 | 12.6 | 12.4 | 11.3 | 93 | 5 |
| | | Civil** | 10.7 | 11.5 | 10.2 | 10.2 | 10.9 | 9.8 | 69 | 4 |
| | From Filing to Trial** (Civil Only) | | 28.5 | 25.5 | 23.8 | 26.4 | 23.0 | 23.7 | 70 | 5 |
| OTHER | Civil Cases Over 3 Years Old** | Number | 198 | 229 | 275 | 260 | 160 | 264 | | |
| | | Percentage | 5.4 | 6.3 | 7.7 | 7.0 | 4.4 | 7.0 | 63 | 4 |
| | Average Number of Felony Defendants Filed Per Case | | 1.4 | 1.6 | 1.6 | 1.5 | 1.7 | 1.7 | | |
| | Jurors | Avg. Present for Jury Selection | 49.14 | 46.26 | 51.51 | 44.40 | 41.94 | 39.13 | | |
| | | Percent Not Selected or Challenged | 33.4 | 23.2 | 26.2 | 14.8 | 15.2 | 14.2 | | |

| 2003 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 3202 | 72 | 25 | 373 | 50 | 58 | 259 | 509 | 466 | 232 | 477 | 32 | 649 |
| Criminal* | 402 | 32 | 5 | 80 | 1 | 17 | 107 | ** | 7 | 100 | 4 | 11 | 38 |

\* Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.
\*\* See "Explanation of Selected Terms."

Driving Directions from Minneapolis, MN to Tomah, WI                        Page 1 of 2

    

**FIND IT    MAPS    DIRECTIONS**    Home | Help | Settings | Mobile | Toolbar    **YELLOW PAGES**

**CHECK THE MEDICINE LABEL**
**TO MAKE SURE YOU'RE ABLE**

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES   FOOD AND DRUG ADMINISTRATION

**Directions**              Print | E-Mail | Download to PDA | Reverse | New Directions | Revise

 Minneapolis, MN US - Hotel Offers - Flight Deals

 Tomah, WI US - Hotel Offers - Flight Deals

| Maneuvers | | Distance | Maps |
|-----------|---|----------|------|
| 1: | Start out going Northwest on S WASHINGTON AVE/CR-152 N/MN-65 N toward S 3RD AVE/MN-65/3RD AVE S. | <0.1 miles | Map |
| 2: | Make a U-TURN onto CR-152 S. | 1.4 miles | Map |
| 3: | Merge onto I-94 E via the ramp- on the left. | 166.8 miles | Map |
| 4: | Take the US-12 exit- exit number 143- toward WI-21/TOMAH/NECEDAH. | 0.2 miles | Map |
| 5: | Turn RIGHT onto N SUPERIOR AVE/US-12 E. | 2.9 miles | Map |
| 6: | Turn LEFT onto E LACROSSE ST. | <0.1 miles | Map |
| 7: | End at Tomah WI | | Map |

**Total Est. Time:**  2 hours, 42 minutes          **Total Est. Distance:** 171.58 miles

**Need a place to stay?**

**Expedia: Discount Hotels**
Hot Deals at Over 10,000 **Hotels**
Save up to 50% on **hotels** at Expedia
www.Expedia.com

**Discount** Hotel Rooms
Our Exclusive Rates Come With
A 110% Lowest Price Guarantee
www.CheapTickets.com

**Tomah Offers:**

Hotels

**Expedia: Discou**
Hot Deals at Over 10,
Save up to 50% on h
www.Expedia.com

**Discount** Hotel
Our Exclusive Rates C
A 110% Lowest Price
www.CheapTickets.com

**Cheap Hotels**
Low Rates Guarantee
Prices, View Photos &
www.hotels.com

**ORBITZ Discou**
Find More Options & S
Book Hotel Rooms wit
www.ORBITZ.com

**Choice Hotels**
Official Site- Book and
with Best Choice e-Ra
www.ChoiceHotels.com

**Discount** Hotel
Great Rooms With Gr
Book Fall Deals Now!
www.travelocity.com

**Priceline Discou**
Incredibly Low Prices
40% on **Hotels** with I
www.priceline.com

**Deep Discount**
From Budget to Resor
wherever your travels
www.myrateplan.com

Hotels

**Route Overview Map**                          Make this map interactive



**EXHIBIT**
J
Decl of Doscotch



© 2004 MapQuest.com, Inc.

All rights reserved. Use Subject to License/Copyright | Map Legend

These directions are informational only. No representation is made or warranty given as to their content, road conditions or route usability or expeditiousness. User assumes all risk of use. MapQuest and its suppliers assume no responsibility for any loss or delay resulting from such use.

Site Index | About | Partners | Advertise | Privacy Policy & Legal Notices © 2004 MapQuest.com, Inc. All rights reserved.

EXHIBIT

10/6/2004



(Ocean Spray) **Crave the wave**®

products  recipes  nutrition  news  worldwide  contact us  search  site map

# OCEAN SPRAY
*at a glance*

## about us »

Ocean Spray At A Glance
History of Ocean Spray
Ocean Spray Worldwide
Foodservice Division
Ingredients Division
Harvest
Contact Us
Join Us
FAQs
Directions

- Ocean Spray is an agricultural cooperative owned by more than 800 cranberry growers and 126 grapefruit growers located throughout the United States and Canada.

- Ocean Spray was formed in 1930 by three cranberry growers from Massachusetts and New Jersey. Florida grapefruit growers joined the Cooperative in 1976.

- Ocean Spray is North America's leading producer of canned and bottled juices and juice drinks, and has been the best-selling brand name in the canned and bottled juice category since 1981.

- Ocean Spray posted fiscal 2003 net sales of roughly $1 billion.

- Ocean Spray employs more than 2,000 people worldwide.

- Ocean Spray cooperative headquarters is located in Lakeville-Middleboro, Massachusetts. Fruit receiving stations and processing and bottling plants are located throughout the United States and Canada.

- More than 120,000 consumers call the Ocean Spray Consumer Helpline (800-662-3263) every year for recipe ideas, nutrition information and brochures.



Copyright© 2002-2004 Ocean Spray Cranberries, Inc. and Ocean Spray International, Inc. All rights reserved.

LEXSEE 2003 U.S. DIST LEXIS 13250

**Facilitec Corp. and Ecolab, Inc., Plaintiffs, v. Omni Containment Systems, LLC, Defendant.**

**Civil No. 03-3187 (RHK/AJB)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MINNESOTA**

*2003 U.S. Dist. LEXIS 13250*

**July 31, 2003, Decided**

**DISPOSITION:** [*1] Defendant's Motion to Transfer denied.

**LexisNexis(R) Headnotes**

**COUNSEL:** Thomas L. Hamlin and Stacie E. Oberts, Robins, Kaplan, Miller & Ciresi L.L.P., Minneapolis, Minnesota, for Plaintiffs.

Seymour J. Mansfield and Brian R. Dockendorf, Mansfield, Tanick & Cohen, Minneapolis, Minnesota; George W. Hamman, Law Offices of George W. Hamman, Chicago, Illinois, for Defendant.

**JUDGES:** RICHARD H. KYLE, United States District Judge.

**OPINIONBY:** RICHARD H. KYLE

**OPINION:**

### MEMORANDUM OPINION AND ORDER

#### Introduction

Plaintiffs Facilitec Corp. ("Facilitec") and Ecolab, Inc. ("Ecolab") have sued Defendant Omni Containment Systems, LLC ("Omni") alleging that Omni's GREASE GUTTER product infringes U.S. Patent Nos. 5,196,040 and 6,143,047. Omni, a corporation with its principal place of business in Elgin, Illinois, has moved to transfer venue under *28 U.S.C. § 1404(a)*. For the reasons below, the Court will deny the Motion.

#### Analysis

*Section 1404(a)* of Title 28, United States Code, states that "for the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." n1 [*2] *28 U.S.C. § 1404(a)*. *Section 1404(a)* lays out three general categories of fac-

tors: (1) the convenience of the parties, (2) the convenience of the witnesses, and (3) the interest of justice. *Terra Int'l, Inc. v. Mississippi Chem. Corp., 119 F.3d 688, 691 (8th Cir. 1997)* (internal citations omitted). The district court's evaluation of a transfer motion, however, is not limited to these factors. Id. Rather, such determinations require a case-by-case evaluation of the particular circumstances at hand and a consideration of all relevant factors. Id. "The idea behind § *1404(a)* is that where a 'civil action' to vindicate a wrong – however brought in a court – presents issues and requires witnesses that make one District Court more convenient than another, the trial judge can, after findings, transfer the whole action to the more convenient court." *Continental Grain Co. v. The FBL-585, 364 U.S. 19, 26, 4 L. Ed. 2d 1540, 80 S. Ct. 1470 (1960)*. The burden is on the moving party to show why a change of forum is warranted. *Stinnett v. Third Nat'l Bank of Hampden County, 443 F. Supp. 1014, 1017 (D. Minn. 1978)* (MacLaughlin, J.). The Court finds [*3] that Omni has not met that burden.

    n1 Omni concedes that venue is proper in the District of Minnesota.

#### A. The Convenience of the Parties

The first factor is the convenience of the parties. "The logical starting point for analyzing the convenience of the parties is a consideration of their residences in relation to the district chosen by the plaintiff and the proposed transferee district." 17 Moore's Federal Practice § 111.13[1][e][I] (quotation omitted). Here, Ecolab is located in the District of Minnesota, while Facilitec and Omni are located in the Northern District of Illinois. Although Omni asserts that this militates in favor of transfer, Ecolab's declarations make clear that Facilitec's administrative work is now conducted out of Ecolab's headquarters in St. Paul. Given the deference generally accorded a plaintiff's choice of its own home forum, see 15 Wright, Miller & Cooper, Federal Practice and



EXHIBIT

L

Decl of Dockendorf

2003 U.S. Dist. LEXIS 13250, *3

Procedure § 3849 (1986); see also *Morales v. Navieras de Puerto Rico, 713 F. Supp. 711, 713 (S.D.N.Y. 1989)* **[\*4]** (noting that a plaintiff that chooses its home forum is generally presumed to have chosen the forum because it is convenient), and because *Section 1404(a)* provides for transfer to a more convenient forum, "not to a forum likely to prove equally convenient or inconvenient," *Graff v. Qwest Communication Corp., 33 F. Supp. 2d 1117, 1121 (D. Minn. 1999)* (Doty, J.) (citing *Van Dusen v. Barrack, 376 U.S. 612, 646, 11 L. Ed. 2d 945, 84 S. Ct. 805 (1964))*, the Court finds that Omni has failed to carry its burden as to this factor.

**B. Convenience of the Witnesses**

The next factor is the convenience of the witnesses. To demonstrate that this factor tips in favor of transfer, the party seeking the transfer must clearly specify the essential witnesses to be called and must make a general statement of what their testimony will cover. *Nelson v. Master Lease Corp., 759 F. Supp. 1397, 1402 (D. Minn. 1991)* (MacLaughlin, J.) (citing Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3851 at 425). In determining the convenience of the witnesses, the Court must examine the materiality and importance of **[\*5]** the anticipated witnesses' testimony and then determine their accessibility to the forum. *Reid-Walen v. Hansen, 933 F.2d 1390, 1396 (8th Cir. 1991)*. Here, Defendants have not produced any evidence by which the Court could conduct this analysis. While Defendants summarily identify their prospective witnesses, the Court cannot begin to assess the materiality and importance of their testimony without a general statement of what their testimony will cover. See *Nelson, 759 F. Supp. at 1402*. Because Omni has not provided such a statement, Omni has also failed to carry its burden as to this factor.

**C. Interest of Justice**

The final factor is the interest of justice. Courts weigh the interest of justice factor very heavily. *Radisson Hotels Int'l, Inc. v. Westin Hotel Co., 931 F. Supp. 638, 641 (D. Minn. 1996)* (Kyle, J.). The interest of justice factor "may be determinative in a particular case, even if the convenience of the parties and witnesses might call for a different result." *Coffey v. Van Dorn Iron Works, 796 F.2d 217, 221 (7th Cir. 1986)*. Among the considerations that may be relevant to a court in analyzing **[\*6]** this factor are the relative familiarity of the two courts with the law to be applied, the relative abilities of the parties to bear the expenses of litigating in a distant forum, judicial economy, the plaintiff's choice of forum, obstacles to a fair trial, and each party's ability to enforce a judgment. *Terra, 119 F.3d at 696*.

Omni's sole argument implicating these considerations is that it is a "start-up" that would find it "extremely burdensome to have to litigate in Minnesota." (Hamman Decl. 2, 9.) Having failed, however, to carry its burden as to the other factors, the size of Omni's operations alone cannot be determinative. Even were its cursory submissions to the Court sufficient to demonstrate that it is a "small company [that] can ill afford the burden of litigating in a distant state," *Jane Russell Designs, Inc. v. Mendelson & Assocs., 114 F. Supp. 2d 856, 862 (D. Minn. 2000)* (Tunheim, J.), a transfer to the Northern District of Illinois "would simply shift that inconvenience to plaintiff. Such a shift is impermissible in light of the presumption in favor of a plaintiff's choice of forum." Id. Because Defendant's other arguments **[\*7]** do not implicate the interest of justice factor—and because its sole relevant argument is wanting—the Court finds that this factor also weighs against transfer.

Omni has failed to carry its burden as to any of the relevant factors. Accordingly, the Court concludes that a transfer to the Northern District of Illinois is not warranted.

**Conclusion**

Based on the foregoing and all of the files, records, and proceedings herein, **IT IS ORDERED** that Defendant's Motion to Transfer (Doc. No. 7) is **DENIED**.

Date: July 31, 2003

RICHARD H. KYLE

United States District Judge

LEXSEE 2004 U.S. DIST LEXIS 15208

**DB INDUSTRIES, INC. and SINCO, INC., Plaintiffs, v. B & O MANUFACTURING, INC., Defendant.**

Civil No. 03–5277 (JRT/FLN)

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MINNESOTA**

*2004 U.S. Dist. LEXIS 15208*

**August 4, 2004, Decided**

**DISPOSITION:** [*1] Court OVERRULED defendant's objection and ADOPTED the Magistrate Judge's Report and Recommendation . Defendant's motion to dismiss plaintiff DB Industries, Inc., to dismiss plaintiffs' complaint, or to strike plaintiff's complaint, and for change of venue GRANTED IN PART and DENIED IN PART. Motion GRANTED with respect to the dismissal of plaintiff DB Industries, Inc. and DENIED in all other respects. Plaintiff DB Industries, Inc. DISMISSED from the case.

**LexisNexis(R) Headnotes**

**COUNSEL:** David P. Pearson, WINTHROP & WEINSTINE, Minneapolis, MN, for plaintiffs.

Paul E. Rice, PAUL E. RICE, APC, Palo Alto, CA; Robert C. Hill, HILL LAW OFFICE, San Francisco, CA; and Peter J. Ims and Z. Peter Sawicki, WESTMAN CHAMPLIN & KELLY, Minneapolis, MN, for defendant.

**JUDGES:** JOHN R. TUNHEIM, United States District Judge.

**OPINIONBY:** JOHN R. TUNHEIM

**OPINION:**

**MEMORANDUM OPINION AND ORDER ADOPTING THE REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

Defendant moves to dismiss this patent infringement action for lack of personal jurisdiction. Defendant also moves to dismiss plaintiff DB Industries, Inc. from the case and to transfer venue to the Northern District of California. For [*2] the following reasons, the Court grants the motion to dismiss plaintiff DB Industries, Inc., but denies defendant's motion in all other respects.

**BACKGROUND**

Plaintiffs DB Industries, Inc. and Sinco, Inc. ("DB" and "Sinco," respectively) filed this patent infringement action against defendant B & O Manufacturing, Inc. ("B&O"). DB is a Minnesota corporation with its principal place of business in Red Wing, Minnesota. Sinco, a wholly owned subsidiary of DB, is a Delaware corporation with its principal place of business in Middletown, Connecticut. Defendant B&O is a California corporation with its principal place of business in South San Francisco, California.

The patent at issue in this case is *United States Patent No. 6,609,621 B2* ("*'621 Patent*"), entitled "Net Anchorage Methods and Apparatus." The *'621 Patent* describes a method of net anchorage to prevent loose items from falling off storage shelves. Sinco is the sole owner of the *'621 Patent*. B&O manufactures and sells competing products.

B&O has filed a motion to dismiss plaintiff DB Industries, Inc., to dismiss plaintiffs' complaint for lack of personal jurisdiction, or to strike plaintiffs' complaint, and for change of [*3] venue. Following a hearing, United States Magistrate Judge Franklin Noel issued a Report and Recommendation to the Court with respect to this motion. The Magistrate Judge recommended dismissing DB from the case, finding personal jurisdiction over B&O, and declining to transfer the matter out of the District of Minnesota. B&O timely objected to portions of the Report and Recommendation, and the plaintiffs' timely response to the objections followed.

Under *28 U.S.C. § 636(b)(1)*, the Court makes a *de novo* review of those portions of the Report and Recommendation to which the defendant objects. The plaintiffs' complaint, the Magistrate Judge's Report and Recommendation, the defendant's objections, the plaintiffs' response, the transcript of the motions hearing, and the relevant case law have each been carefully examined. For the reasons set forth below, the Court overrules the


EXHIBIT
M
Decl of Doscotch

defendant's objections and adopts the Magistrate Judge's Report and Recommendation.

## ANALYSIS

### I. IMPROPER PLAINTIFF

B&O asserts that DB does not have standing as a plaintiff in this case. The Court agrees. *The Patent Act* explains, "[a] patentee shall have remedy by civil [*4] action for infringement of his patent." *35 U.S.C. § 281; Prima Tek II, L.L.C. v. A-Roo Co., 222 F.3d 1372, 1376–77 (Fed. Cir. 2000).* Only the holder of legal title to a patent at the time of the infringement can bring an action for damages resulting from the infringement. *See Crown Die & Tool Co. v. Nye Tool & Mach. Works, 261 U.S. 24, 40, 67 L. Ed. 516, 43 S. Ct. 254, 1923 Dec. Comm'r Pat. 651 (1923); Enzo APA & Son, Inc. v. Geapag A.G., 134 F.3d 1090, 1092–93 (Fed. Cir. 1998); Arachnid, Inc. v. Merit Indus., Inc., 939 F.2d 1574, 1579–80 (Fed. Cir. 1991).* Assignees and exclusive licensees may have standing to participate in a patent infringement suit in some situations. *See Prima Tek, 222 F.3d at 1377.* Sinco is the sole owner of the *'621 Patent*; DB is neither an assignee nor exclusive licensee. Absent an ownership interest in the patent at issue, DB does not have standing to sue B&O for the patent infringement and is not a proper plaintiff in this matter. B&O's motion to dismiss DB as a plaintiff is therefore granted.

### II. PERSONAL JURISDICTION

The Federal Circuit maintains exclusive jurisdiction over appeals [*5] from a district court when the district court's jurisdiction is based on claims arising under the patent laws of the United States. *See 3D Sys., Inc. v. Aarotech Labs., Inc., 160 F.3d 1373, 1376–77 (Fed. Cir. 1998).* As the instant case is based on a patent infringement claim, Federal Circuit law controls. Nevertheless, in determining whether the Court has personal jurisdiction over a nonresident defendant, the Court looks first to the forum state's long-arm statute and the *Due Process Clause of the United States Constitution. Id.* Minnesota's long-arm statute, *Minn. Stat. § 543.19,* extends jurisdiction over nonresident defendants to the fullest degree allowed by the *Due Process Clause. See Guinness Import Co. v. Mark VII Distribs., Inc., 153 F.3d 607, 614 (8th Cir. 1998)* (citing *Trident Enters. Int'l, Inc. v. Kemp & George, Inc., 502 N.W.2d 411, 414 (Minn. Ct. App. 1993)).* To determine whether personal jurisdiction is proper under the *Due Process Clause,* the Federal Circuit employs a three-prong test. Under this analysis, the Court examines: (1) whether the defendant purposefully directed its activities to residents of the [*6] forum state; (2) whether the claim arises out of or re-

lates to those activities; and (3) whether the assertion of personal jurisdiction is reasonable and fair. *See 3D Sys., 160 F.3d at 1378* (citing *Akro Corp. v. Luker, 45 F.3d 1541, 1545–46 (Fed. Cir. 1995)).*

B&O intentionally distributed and sold its allegedly infringing products within Minnesota, and secured profits from those sales. In 2002, sales in Minnesota of the allegedly infringing products constituted 2.43 percent of B&O's overall domestic sales of the products. Minnesota sales of the products continued in 2003. In short, B&O purposefully directed its activities toward forum state residents when it distributed and sold the allegedly infringing products in Minnesota. *See World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297–98, 62 L. Ed. 2d 490, 100 S. Ct. 559 (1980); cf. Hanson v. Denckla, 357 U.S. 235, 253, 2 L. Ed. 2d 1283, 78 S. Ct. 1228 (1958)* (unilateral activity by a third party cannot satisfy minimum contacts).

The second prong of the test is also fulfilled. "The proper test for 'giving rise' to a cause of action is … whether the activity in the forum state is a basis for [*7] the cause of action." *Hollyanne Corp. v. TFT, Inc., 199 F.3d 1304, 1308 n.4 (Fed. Cir. 1999).* Patent infringement occurs when someone "without authority makes, uses, *offers to sell or sells* any patented invention." *35 U.S.C. § 271 (a)* (emphasis added). B&O manufactures and tests its products in California. However, as noted previously, B&O distributes and sells its allegedly infringing products in Minnesota. This activity constitutes B&O's contacts with the forum market. B&O's distribution and sales in Minnesota therefore triggered the plaintiffs' cause of action, satisfying the second prong.

Finally, the assertion of personal jurisdiction is reasonable and fair. In making this assessment, the Court balances five factors: (1) the nature and quality of the defendant's contacts with the forum state; (2) the quantity of the contacts; (3) the relationship between the cause of action and the contacts; (4) the forum state's interest in providing a forum for its residents; and (5) the convenience of the parties. *See World-Wide Volkswagen, 444 U.S. at 299.*

### A. "Reasonable and Fair" Factors 1–3

B&O argues that its contacts [*8] with Minnesota are not extensive enough to support personal jurisdiction. B&O points out that it distributes its products nationwide, sells more of the allegedly infringing products in California than in any other state, and makes only 2.43% of its sales of the allegedly infringing products in Minnesota. The Court is not persuaded. As discussed above, B&O marketed, sold, and shipped its products to Minnesota customers. These contacts with Minnesota

were neither random nor fortuitous. Rather, B&O's actions were intentional and regular. Further, a small percentage of sales does not necessarily denote either a small quantity of products or number of transactions. Finally, as noted previously, the instant cause of action arises directly from B&O's contacts with Minnesota. Factors one through three weigh in favor of finding personal jurisdiction in this Court.

## B. "Reasonable and Fair" Factor 4

The fourth factor concerns Minnesota's interest in the action. Although Sinco is not a Minnesota resident, Minnesota has other interests in this litigation. Minnesota's "interest in discouraging injuries that occur within the state" is well established. *Beverly Hills Fan Co. v. Royal Sovereign Corp., 21 F.3d 1558, 1568 (Fed. Cir. 1994).* [*9] Patent infringement injury "occurs in the state where the infringing product is sold." *Id. at 1570-71.* The products at issue were sold in Minnesota. Since any injury occurred in Minnesota, the state has an interest in discouraging such injury by way of instate litigation.

Additionally, Minnesota "has definite and well-defined interests in commerce and scientific development." *Viam Corp. v. Iowa Export-Import Trading Co., 84 F.3d 424, 430 (Fed. Cir. 1996).* Interests in commerce and scientific development are impacted when another party infringes on a patent and thus stifles creative development and diverts instate sales. Minnesota thus has an interest in the potential effect on commerce and scientific development that may result from the alleged infringement in this case.

Finally, while no longer a party in this case, DB, a Minnesota resident, has an interest in this matter. As the sole owner of Sinco, the outcome of this litigation will affect DB. Minnesota has an interest, albeit a more attenuated one, in ensuring that an adequate forum is available to its residents. In sum, the Court is satisfied that Minnesota has an interest in this action, and [*10] that factor four therefore weighs in favor of finding personal jurisdiction over B&O.

## C. "Reasonable and Fair" Factor 5

The fifth factor, touching on the convenience of the parties, also weighs in favor of finding jurisdiction. First, documents relating to the device design and the *'621 Patent* are located in Minnesota. The Minnesota-based IPLM Group drafts and prosecutes Sinco's patents, making much of the information related to the *'621 Patent* and many of the people involved in the patent most easily available in Minnesota. Also, Wes Cutter, a former DB employee who worked with Sinco in designing the device at issue, resides in Minnesota.

Location of documents and other evidence is an important factor when analyzing party convenience. *See Serco Servs. Co. v. Kelley Co., 51 F.3d 1037, 1040 (Fed. Cir. 1995).*

B&O argues that documents are easily copied and transported, in either hardcopy or electronic form. While this statement is increasingly true, it applies equally to B&O and does little to demonstrate why it is more reasonable for Sinco to have to copy and transport evidence than for B&O to copy and transport evidence. Additionally, such assertion neglects [*11] the inconvenience inherent in copying and transporting potentially voluminous documents, as well as in arranging for the participation of out-of-state witnesses.

The defendant also fails to compellingly identify why the Northern District of California is a more appropriate forum. As B&O is located in California, a California courtroom is presumably more convenient for B&O. However, the availability and location of witness Cutter and IPLM employees makes Minnesota a convenient forum for the plaintiffs. Additionally, plaintiffs have chosen Minnesota as their preferred forum. Any potential burden on B&O, such as traveling to Minnesota, is not one of those "unique burdens ... [given] significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction." *Asahi Metal Indus. Co. v. Superior Court of California, 480 U.S. 102, 114, 94 L. Ed. 2d 92, 107 S. Ct. 1026 (1987).* Having weighed the relevant factors, the Court concludes that this case does not present "the rare situation in which the plaintiff's interest and the state's interest in adjudicating the dispute in the forum are so attenuated that they are clearly outweighed by the burden of subjecting [*12] the defendant to litigation within the forum." *Viam Corp., 84 F.3d at 429* (internal quotations omitted). In other words, the assertion of personal jurisdiction is reasonable and fair.

As all factors weigh in favor of finding personal jurisdiction, the Court finds that personal jurisdiction is proper in this Court. Defendant's motion to dismiss or strike plaintiffs' complaint for lack of personal jurisdiction is therefore denied.

## III. TRANSFER

B&O seeks to transfer the instant action from Minnesota to the Northern District of California. In a motion to transfer venue, the Court applies the law of the regional circuit to which appeal from this court would normally lie. *See Regents of the Univ. of California v. Eli Lilly & Co., 119 F.3d 1559, 1565 (Fed. Cir. 1997).* Under *28 U.S.C. § 1404(a),* the Court examines three factors when deciding a motion to transfer: (1) the con-

venience of the parties; (2) the convenience of the witnesses; and (3) the interests of justice. *See Terra Int'l, Inc. v. Mississippi Chem. Corp., 119 F.3d 688, 691 (8th Cir. 1997).* B&O bears the burden of showing that the balance of **[*13]** these factors "strongly favors" transfer. *Brockman v. Sun Valley Resorts, Inc., 923 F. Supp. 1176, 1179 (D. Minn. 1996).* Ultimately, the decision of whether to transfer a case is committed to the discretion of the district court. *Terra Int'l, 119 F.3d at 691; see also In re Carnegie Mellon Univ., 1995 U.S. App. LEXIS 38425, 1995 WL 769024, at \*2 (Fed. Cir. Dec. 18, 1995) (citing Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508, 91 L. Ed. 1055, 67 S. Ct. 839 (1947)).*

### A. Convenience of Parties and Witnesses

The Court accords significant weight to the plaintiff's choice of forum. *See K-Tel Int'l., Inc. v. Tristar Prods., Inc., 169 F. Supp.2d 1033, 1045 (D. Minn. 2001).* The mere fact that the case is to be heard outside the defendant's home state cannot alone be an adequate reason for a change of venue in a diversity action, since in such an action one of the parties will almost always have to litigate in a foreign state. *Hughes v. Wheeler, 364 F.3d 920, 925 (8th Cir. 2004).* In other words, transfer should be denied if the effect is simply to shift the inconvenience to the other party. *See Graff v. Qwest Communications Corp., 33 F. Supp. 2d 1117, 1121 (D. Minn. 1999)* **[*14]** (citation omitted); *Norval Indus. v. Superior Co., 515 F. Supp. 895, 899 (D. Minn. 1981).* In this case, B&O is attempting to transfer this case to the district in which it maintains its principal place of business. B&O has not provided a basis for such transfer other than to assert that it would be more convenient for it to litigate this matter there. Sinco's decision to file in Minnesota indicates that Sinco considers Minnesota a convenient forum. As discussed previously, documents and other evidence relevant to this matter are likely to be found in both Minnesota and California. In light of the above, a transfer to California would only serve to shift the inconvenience between the parties. Thus, this factor weighs in favor of maintaining this action in Minnesota.

With respect to the convenience of witnesses, each side asserts that potential witnesses reside in their respective preferred forum. n1 The development, testing, research, and production of B&O's products occur in South San Francisco, California and witnesses connected to those processes may be called by B&O. However, as previously mentioned, potential witnesses for Sinco reside in Minnesota. Transferring **[*15]** venue from Minnesota to California would simply shift inconvenience from B&O's witnesses to the Sinco's witnesses. Additionally, B&O's potential witnesses appear to be B&O employees, to whom B&O has ready access. In

contrast, at least one of Sinco's potential witnesses who lives in Minnesota is not a Sinco employee. Thus, it may be important for the Court to have jurisdiction over this witness. The witness convenience factor does not support a transfer.

> n1 The Court notes, however, that B&O has not identified any particular witnesses who may be inconvenienced if this litigation proceeds in Minnesota rather than in California.

B&O relies on *Amersham Pharmacia Biotech, Inc. v. Perkin-Elmer Corp.*, in which the court granted a defendant's motion to transfer, despite the fact that 3.7 percent of the allegedly infringing devices were sold in the forum state and the defendant resided in the forum state. *11 F. Supp. 2d 729, 730 (S.D. N.Y. 1998).* The court in *Amersham*, however, premised much of its **[*16]** decision on the fact that no putative witnesses or documents were located in the original forum. *Id.* That fact is absent in the instant case.

### B. Interests of Justice

With respect to the interests of justice factor, B&O argues that naming DB as a plaintiff was wrongful conduct in that it was simply a strategic device to create the appearance of a connection between plaintiff Sinco and Minnesota. According to B&O, DB lacks any real interest in the instant case, and Minnesota venue is unimportant to Sinco. Thus, B&O contends, Sinco's choice of forum deserves "substantially less" deference. *See Cardiac Sci., Inc. v. Koninklijke Philips Elecs. N.V., 2003 U.S. Dist. LEXIS 16881, 2003 WL 22213116, \*2 (D. Minn. Sept. 20, 2003)* (forum-shopping or wrongful conduct may overcome deference to plaintiff's choice of forum); *see also Reiffin v. Microsoft Corp., 104 F. Supp. 2d 48, 52 (D. D.C. 2000).*

B&O's arguments are not persuasive. Initially, "that it is to plaintiff's advantage to adjudicate the dispute in the [forum state] does not militate against its right to have access to that court." *Beverly Hills Fan, 21 F.3d at 1568-69.* Further, in light of Sinco's **[*17]** decision to file in Minnesota, the fact that the infringement occurred in Minnesota, and that Minnesota is legitimately convenient for Sinco, Sinco obviously has an interest in keeping this litigation in Minnesota. Finally, despite the Court's conclusion that DB is not a proper plaintiff, DB maintains a plausible interest in the instant litigation. Namely, the alleged infringement occurred in DB's home state and involved its subsidiary. The Court is satisfied that plaintiff's choice of Minnesota as a forum and inclusion of DB as a plaintiff was not motivated by wrongful considerations and accordingly remains entitled to def-

2004 U.S. Dist. LEXIS 15208, *17

erence. n2

n2 B&O also insists that in applying § *1404(a)* in a patent infringement case, the "center of gravity test" trumps any remaining deference to the plaintiffs' choice of forum. This test, which provides a guideline for forum selection in patent infringement actions, considers "the location of a product's development, testing, research and production. Also relevant is the place where marketing and sales decisions are made, rather than where limited sales activity has occurred." *Osteotech, Inc. v. GenSci Regeneration Sciences, Inc., 6 F. Supp. 2d 349, 357-58 (D.N.J. 1998)* (citing *Beverly Hills Fan, 21 F.3d at 1558*). B&O provided no authority to show the three-prong test mandated by the language in § *1404(a)* and the law in this Circuit has been supplanted by this standard in patent infringement actions. In fact, this court has previously pointed out that the courts of this Circuit do not typically apply the center of gravity test. *See Radisson Hotels Intern., Inc. v. Westin Hotel Co., 931 F. Supp. 638, 642 n.4, (D. Minn. 1996)*. Moreover, this test also considers the location of the allegedly infringing activity, which in this case includes Minnesota. *Id.*

[*18]

In light of Sinco's choice of forum and the fact that transferring the case from Minnesota to California would, at best, simply shift the burden of party and witness inconvenience from B&O to Sinco, the Court finds that B&O has not met its burden of demonstrating that a transfer is necessary in this case. Therefore the Court denies B&O's motion for change of venue.

**ORDER**

Based on the foregoing, all the records, files, and proceedings herein, the Court **OVERRULES** defendant's objection [Docket No. 46] and **ADOPTS** the Magistrate Judge's Report and Recommendation [Docket No. 42]. Accordingly, **IT IS HEREBY ORDERED** that defendant's motion to dismiss plaintiff DB Industries, Inc., to dismiss plaintiffs' complaint, or to strike plaintiff's complaint, and for change of venue [Docket No. 22] is **GRANTED IN PART and DENIED IN PART.** The motion is **GRANTED** with respect to the dismissal of plaintiff DB Industries, Inc. and is **DENIED** in all other respects.

**IT IS FURTHER ORDERED** that plaintiff DB Industries, Inc. is **DISMISSED** from the case.

DATED: August 4, 2004
at Minneapolis, Minnesota.

s/

JOHN R. TUNHEIM

United States District [*19] Judge

LEXSEE 1998 U.S. DIST. LEXIS 16859

**Imation Corp., Plaintiff, v. Sterling Diagnostic Imaging, Inc., Defendants, v. E.I. DuPont De Nemours & Company, Inc., Third-Party Defendants.**

Civil File No. 97-2475 (PAM/JGL)

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MINNESOTA**

*1998 U.S. Dist. LEXIS 16859; 47 U.S.P.Q.2D (BNA) 1745*

**April 21, 1998, Decided
April 21, 1998, Filed**

**DISPOSITION: [*1]** Plaintiff Imation Corp.'s Motion To Enjoin Defendant's Prosecution Of Later-Filed Declaratory Judgment Action In Delaware (Clerk Doc. No. 22) DENIED WITHOUT PREJUDICE WITH LEAVE TO RENEW; and Defendant Sterling Diagnostic Imaging, Inc.'s Motion To Transfer Venue (Clerk Doc. No. 7) DENIED.

**LexisNexis(R) Headnotes**

**COUNSEL:** For IMATION CORP., plaintiff: Carolyn A Bates, 3M Company, St Paul, MN.

For IMATION CORP., plaintiff: Gregory A Madera, Fish & Richardson, Boston, MA.

For IMATION CORP., plaintiff: Michael Eugene Florey, Fish & Richardson, Mpls, MN.

For STERLING DIAGNOSTIC IMAGING, INC., defendant: Gerald Eugene Helget, Joanne Horwood Turner, Mackall Crounse & Moore, Mpls, MN.

For STERLING DIAGNOSTIC IMAGING, INC., defendant: Raymond P Niro, David J Sheikh, Niro Scavone Haller & Niro, Chicago, IL.

For STERLING DIAGNOSTIC IMAGING, INC., counter-claimant: Gerald Eugene Helget, Mackall Crounse & Moore, Mpls, MN.

For STERLING DIAGNOSTIC IMAGING, INC., counter-claimant: Raymond P Niro, David J Sheikh, Niro Scavone Haller & Niro, Chicago, IL.

For IMATION CORP., counter-defendant: Carolyn A Bates, 3M Company, St Paul, MN.

For IMATION CORP., counter-defendant: Gregory A Madera, Fish & Richardson, Boston, MA.

For IMATION CORP., counter-defendant: Michael Eugene Florey, Fish & Richardson, Mpls, MN.

For STERLING DIAGNOSTIC IMAGING, INC., third-party plaintiff: Gerald Eugene Helget, Mackall Crounse & Moore, Mpls, MN.

For STERLING DIAGNOSTIC IMAGING, INC., third-party plaintiff: Raymond P Niro, David J Sheikh, Niro Scavone Haller & Niro, Chicago, IL.

For E.I. DUPONT DE NEMOURS & COMPANY, INC., third-party defendant: Brian Boru O'Neill, Jonathan William Dettmann, William L Underwood, Faegre & Benson, Mpls, MN.

**JUDGES:** Paul A. Magnuson, United States District Court Judge.

**OPINIONBY:** Paul A. Magnuson

**OPINION:**

**MEMORANDUM AND ORDER**

This matter is before the Court upon Plaintiff Imation Corp.'s Motion To Enjoin Defendant's Prosecution Of Later-Filed Declaratory Judgment Action In Delaware, and upon Defendant Sterling Diagnostic Imaging, Inc.'s Motion To Transfer Venue. For the following reasons, the Court determines that Plaintiff's motion should be denied without prejudice with leave to renew the motion in the future and that Defendant's motion should be denied.

**BACKGROUND**

Plaintiff Imation Corp. ("Imation") is a Delaware corporation with its principal place of business in



EXHIBIT

N

Decl of Doscotch

Oakdale, Minnesota. Defendant Sterling Diagnostic Imaging, Inc. ("Sterling") is also a Delaware corporation that, while operating in Delaware, has its principal place of business in Greenville, South Carolina. Both Imation and Sterling [*2] are technology companies engaged in the medical x-ray business.

According to the parties' pleadings and submissions, Imation is the owner of two United States Patents, No. 5,254,480 (the " '480 Patent") and No. 5,525,527 (the " '527 Patent"). In general, the '480 and the '527 Patents relate to processes for manufacturing x-ray detectors that receive, produce, and store x-ray images in a digital format. Specifically, the '480 Patent concerns a process for producing a large-area radiation detector. The '527 Patent concerns a process for manufacturing a radiation detector and an array of radiation detectors, comprising a thin film transistor and a radiation detector element. Ownership of both patents was assigned to Imation by Minnesota Mining and Manufacturing Co. ("3M") of St. Paul, Minnesota.

Through various means, Imation became aware of Sterling's marketing efforts regarding digital radiographic detector products, which Sterling was preparing for commercial sale in the near future. Imation sent Sterling a letter, dated May 19, 1997, notifying Sterling of the existence of Imation's patents. The letter provided Sterling with copies of the '480 and the '527 Patents and suggested that [*3] Sterling enter into a license agreement with respect to them. Some months later, Sterling responded by letter, dated October 31, informing Imation that it had no need for a license because its process did not come within the scope of either patent.

On November 7, 1997, Imation filed this lawsuit (the "Minnesota Action") alleging that Sterling has infringed both the '480 and the '527 Patents. n1 Imation claims, among other things, that Sterling advertised its infringing technology (the Direct Radiography Detector System) in Minnesota, that it demonstrated the system at a trade show in Minnesota, and that it has sold infringing products to Minnesota hospitals. Imation seeks both injunctive relief and damages.

n1 Imation did not immediately serve the initial complaint on Sterling. Instead, Imation sent a courtesy copy of the complaint to Sterling in an effort to foster settlement. The initial complaint charged Sterling with infringement of the '480 Patent only. The complaint was amended as a matter of course four days after it was served on Sterling on December 5, 1997. The amended complaint charges Sterling with infringement of the '527 Patent, in addition to the '480 Patent.

[*4]

On December 4, 1997, Sterling and Direct Radiography Corp. ("DRC") jointly filed a declaratory judgment action against Imation in Delaware federal court (the "Delaware Action"). DRC, a wholly-owned subsidiary of Sterling, allegedly developed and manufactured the "tiled" solid state digital arrays for use in the Sterling system. DRC is a Delaware corporation with its principal and only place of business in Glasgow, Delaware. In their Delaware pleadings, Sterling and DRC seek a declaration that they do not infringe either the '480 or the '527 Patents, and that both patents are invalid.

Sterling also filed an answer and counterclaim in the Minnesota Action. Therein, Sterling denies Imation's infringement claims and seeks a declaratory judgment identical to that requested in the Delaware Action. Moreover, Sterling filed a third-party complaint against E.I. DuPont De Nemours & Company, Inc. ("DuPont") on April 9, 1998. Sterling asserts that it is the successor in interest to DuPont in the technology at issue in this case. Accordingly, Sterling claims that DuPont is liable to Sterling in indemnity and breach of warranty for all or part of Imation's claims for infringement of the '480 and [*5] '527 Patents. n2

n2 Though DuPont was not directly involved in the pending motions, counsel for DuPont was present at the April 17, 1998, motion hearing. At that time, counsel advised the Court of an additional, related proceeding that DuPont had filed in Delaware state district court against Sterling. In that action, DuPont seeks a declaratory judgment on the very claims that constitute Sterling's recently filed third-party complaint.

Sterling filed its motion to transfer venue on March 2, 1998. Sterling contends that the convenience of the parties and witnesses, as well as the interests of justice, make Delaware the more appropriate forum for resolving the parties' dispute. On March 31, Imation filed its present motion to enjoin the later-filed Delaware Action. Therein, Imation argues that this Court should enjoin the Delaware declaratory judgment action because of the well-recognized rule favoring first-filed lawsuits. Sterling's opposition to Imation's motion is based on the same considerations presented [*6] in its motion to transfer. The Court now turns to resolving the issues raised by the parties.

1998 U.S. Dist. LEXIS 16859, *6; 47 U.S.P.Q.2D (BNA) 1745

## DISCUSSION

It is a well-established rule that in cases of parallel litigation, "the first court in which jurisdiction attaches has priority to consider the case." *Orthmann v. Apple River Campground, Inc., 765 F.2d 119, 121 (8th Cir. 1985);* see also *Upchurch v. Piper Aircraft Corp., 736 F.2d 439, 440 (8th Cir. 1984).* The "first to file" rule exists to promote judicial economy and to avoid the potential for conflicting rulings as to the same controversy. See *Northwest Airlines, Inc. v. American Airlines, Inc., 989 F.2d 1002, 1006 (8th Cir. 1993).* Application of the rule "is not intended to be rigid, mechanical, or inflexible," *Orthmann, 765 F.2d at 121,* but instead to best serve the interests of justice. The prevailing standard is that "in the absence of compelling circumstances," *Merrill Lynch v. Haydu, 675 F.2d 1169, 1174 (11th Cir. 1982),* the first to file rule should apply. See *Orthmann, 765 F.2d at 121.* The actions need not be identical as to issues, see *Fat Possum Records, Ltd. v. Capricorn Records, Inc., 909 F. Supp. 442, 445 (N.D. Miss. 1995),* [*7] or parties, see *Williams v. National Housing Exch. Inc., 898 F. Supp. 157, 159 (S.D.N.Y. 1995),* for them to be found duplicative. In the circumstances before this Court, application of the first to file rule is proper.

First, the timing of the two actions at issue is undisputed. The parties do not contest that Imation filed its original complaint in federal court in Minnesota on November 7, 1997, and that Sterling received immediate notice of that action. Sterling and DRC then filed their declaratory judgment action approximately one month later, on December 4, in Delaware federal court. As such, the Minnesota Action was filed first.

Second, the factual and legal issues in both actions are identical. Resolution of the Minnesota litigation and the Delaware litigation turns on the same two patents—the '480 and '527 Patents. Moreover, the same circumstances surrounding the alleged infringement are central to both actions. In order for Sterling and DRC to prevail on their Delaware Complaint, they would have to disprove the very same infringement allegations in Imation's Minnesota Complaint.

Finally, the parties to the two actions are substantially similar. Sterling is Defendant [*8] in the first-filed Minnesota Action and Plaintiff in the later-filed Delaware Action. In addition, Imation is both a defendant in Delaware and a plaintiff in Minnesota. Furthermore, DRC's current absence from the Minnesota action is not fatal to the application of the first-filed rule. It is apparent from the pleadings that Sterling is a proper party to the Minnesota Action. This is further corroborated by the Delaware Complaint, wherein Sterling and DRC state that "Sterling et al. has

developed and demonstrated a system which is the apparent basis for Imation's Complaint [in Minnesota]." (Del. Compl. P 12) (Singer Decl. Ex. 1). Moreover, Sterling does not dispute that DRC is its wholly-owned subsidiary.

In response, Sterling provides no support for its contention that DRC is a necessary party apart from mere argumentation and repeated question-raising regarding whether this Court may exercise personal jurisdiction over DRC. With this dearth of evidence, there is no reason why the Minnesota Action must not go forward without DRC as a party. If it so chooses, DRC could attempt to be a co-Plaintiff with Sterling in Sterling's counterclaims for declaratory judgment in the Minnesota [*9] Action. In summary, the Court concludes that the first-filed rule should apply to this case absent a showing of compelling circumstances.

Sterling asserts that this case does present "compelling circumstances" for departing from the first-filed rule because Delaware is the appropriate forum for adjudication of all the parties' claims and defenses. In essence, the same considerations that Sterling raises in its opposition to Imation's motion are those that Sterling offers in support of its motion to transfer venue under *28 U.S.C.* § *1404*(a). Therefore, since resolution of both motions turns on the same considerations, the Court directs its attention to the "transfer" analysis under section 1404. See *Terra Int'l, Inc. v. Mississippi Chem. Corp., 922 F. Supp. 1334, 1354-55 (N.D. Iowa 1996),* aff'd, *119 F.3d 688* (8th Cir.), cert. denied, *139 L. Ed. 2d 609, 118 S. Ct. 629 (1997).*

The applicable federal transfer statute provides as follows: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." *28 U.S.C.* § *1404*(a). As is clear from the statute, [*10] the decision to transfer rests within the discretion of the court and must be made "according to an individualized, case-by-case consideration of convenience and fairness." *Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29, 101 L. Ed. 2d 22, 108 S. Ct. 2239 (1988)* (quotations omitted). While section 1404(a) provides the avenue for transfer, it "was not intended to change the balance of power between the parties." *Terra, 922 F. Supp. at 1356.* As one court has observed: "In any determination of a motion to transfer under § 1404(a), the plaintiff's choice of a proper forum is entitled to great weight, and will not be lightly disturbed, especially where the plaintiff is a resident of the judicial district in which the suit is brought." Id. (quotations omitted).

One of the fundamental considerations to the transfer

Case 0:04-cv-02678-MDW-AJB Document 27-1 94    Filed 12/26/2004    Page 34 of 36

Page 4

1998 U.S. Dist. LEXIS 16859, *10; 47 U.S.P.Q.2D (BNA) 1745

analysis is the "balance of convenience" of the parties and witnesses. To meet its burden as to the convenience of the parties, Sterling must show that its "inconvenience 'strongly' outweighs the inconvenience [Imation] would suffer if venue" were in the District of Delaware. *Nelson v. Bekins Van Lines Co., 747 F. Supp. 532, 535 (D. Minn. 1990).* At the present [*11] time, the parties to this suit are Imation (which is principally located in Minnesota) Sterling (which is principally located in South Carolina), and DuPont (which is principally located in Delaware). Considering these locales, as well as the three companies' business activities in Minnesota, Sterling has not shown that its inconvenience sufficiently outweighs that of Imation. In essence, transferring this action to Delaware would merely shift the inconvenience.

A related consideration is the convenience of the witnesses. In its motion memoranda, Sterling provides a laundry list of potential witnesses in this lawsuit. Consideration of witness convenience, however, is "more than the number of witnesses who might be inconvenienced by one forum or the other." *Terra, 922 F. Supp. at 1359.* The Court must also weigh considerations such as the quality of the testimony, the willingness of the witness to appear, whether deposition testimony would be unsatisfactory, and whether compulsory process would be necessary or possible. See id. Sterling fails to provide any supporting exhibits, affidavits, or declarations that clarify these issues. Therefore, the Court concludes that Sterling [*12] has not meet its burden with respect to the balance of convenience.

A separate factor to be considered is the "interest of justice." Under this component of the transfer analysis, courts evaluate such items as the plaintiff's choice of forum, the cost of making the necessary proof, questions regarding the enforceability of a judgment, whether a fair trial could be had, and whether a local court should determine issues of local law. See *Terra, 922 F. Supp. at 1363* (quoting *Chrysler Credit Corp. v. Country Chrysler, Inc., 928 F.2d 1509, 1516 (10th Cir. 1991)).* This case does not involve any issues of local law. Moreover, the parties' resources appear adequate to litigate in the Minnesota forum.

In addition, Sterling raises two other items for consideration. First, Sterling argues that the location of relevant documents, records, and other significant proof favors the Delaware venue. Specifically, Sterling notes that much of the documentation regarding development of the tiled digital arrays are located at DuPont headquarters and are used in the system located at DRC's facility in Delaware. Again, however, Sterling fails to recognize

that pertinent documentation is located in [*13] various locales, including but not limited to, Minnesota. Second, Sterling contends that a Delaware venue would permit inspection of the allegedly infringing process at the DRC facility. Clearly, permitting the jury to view the process would be impossible if the trial were held in Minnesota. In this case, however, the Court is not inclined to give considerable weight to this possibility as the process at issue takes place at a sub-atomic level. Sterling has offered no arguments as to the benefit that would be derived from on-site inspection.

In short, the Court finds that none of these considerations decisively favors Sterling. As such, the Court concludes that Sterling has not met its burden to show that transfer is appropriate. Therefore, the Court denies Sterling's motion to transfer venue to the District of Delaware and retains jurisdiction over these proceedings.

## CONCLUSION

The Court finds that the first-filed rule applies to the action at bar and that transfer of this action to the District of Delaware is not appropriate under these circumstances. Therefore, the Court denies Sterling's motion to transfer venue to the District of Delaware. Imation currently has pending [*14] before the Delaware Court a motion to dismiss the later-filed Delaware Action. This motion is based, in part, on the first-filed rule. If the Delaware Court grants the motion to dismiss, it would moot Imation's present request for a stay of the Delaware Action. To avoid unnecessary pronouncements, at this time, this Court denies without prejudice Imation's motion to stay the Delaware Action, but leaves open the door for refiling the motion should it become necessary.

Accordingly, **IT IS HEREBY ORDERED** THAT:

1. Plaintiff Imation Corp.'s Motion To Enjoin Defendant's Prosecution Of Later-Filed Declaratory Judgment Action In Delaware (Clerk Doc. No. 22) is DENIED WITHOUT PREJUDICE WITH LEAVE TO RENEW; and

2. Defendant Sterling Diagnostic Imaging, Inc.'s Motion To Transfer Venue (Clerk Doc. No. 7) is DENIED.

Dated: April 21, 1998

Paul A. Magnuson

United States District Court Judge

LEXSEE 1997 U.S. DIST. LEXIS 21578

**AMERICAN DENTAL TECHNOLOGIES, INC., Plaintiff, vs. KREATIV, INC., Defendant.**

CIVIL ACTION NO. C-97-374

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, CORPUS CHRISTI DIVISION

*1997 U.S. Dist. LEXIS 21578; 45 U.S.P.Q.2D (BNA) 1221*

September 17, 1997, Decided
September 19, 1997, Entered

**DISPOSITION:** [*1] Kreativ's Motion to Transfer Venue DENIED.

**COUNSEL:** For AMERICAN DENTAL TECHNOLOGIES, INC., plaintiff: Paula S Waddle, Attorney at Law, Corpus Christi, TX.

For AMERICAN DENTAL TECHNOLOGIES, INC., plaintiff: Joseph F Posillico, Stephen J Driscoll, Synnestvedt and Lechner, Philadelphia, PA.

For KREATIV, INC., defendant: Tom Hermansen, Hunt Hermansen et al, Corpus Christi, TX.

For KREATIV, INC., defendant: Michelle Greer Galloway, Cooley Godward, Palo Alto, CA.

For KREATIV, INC., counter–claimant: Tom Hermansen, Hunt Hermansen et al, Corpus Christi, TX.

For KREATIV, INC., counter–defendant: Tom Hermansen, Hunt Hermansen et al, Corpus Christi, TX.

**JUDGES:** JANIS GRAHAM JACK, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** JANIS GRAHAM JACK

**OPINION:**

**ORDER DENYING DEFENDANT'S MOTION TO TRANSFER VENUE**

On this day came on to be considered Defendant Kreativ, Inc.'s ("Kreativ") Motion to Transfer Venue pursuant to *28 U.S.C. § 1404*(a) against Plaintiff American Dental Technologies, Inc. ("ADT"). For the reasons stated herein, the Motion is DENIED.

**I. JURISDICTION**

This action is based on allegations of patent violations which arise under the laws of the United States and [*2] over which this district court has original jurisdiction pursuant to *28 U.S.C. § 1338*.

**II. FACTS AND PROCEEDINGS**

On July 7, 1997, ADT filed the present action alleging that Kreativ infringed and induced others to infringe ADT's patented devices. Specifically, ADT alleges that it is the owner of the entire right and title to (1) United States Letter Patent No. *5,275,561* entitled "Method for Preparing Tooth Structure for Bonding ("Patent 561"); (2) United States Letter Patent No. *5,350,299* entitled "Dental Treatment System" ("Patent 299"); and (3) United States Letter Patent No. *5,525,058* entitled "Dental Treatment System" ("Patent 058"). ADT further alleges that Kreativ has (1) induced others to infringe claims 10 and 19 of Patent 561; (2) infringed claim 1 of Patent 299; and (3) infringed claims 1 through 4 of Patent 058.

On August 27, 1997, Kreativ filed the instant Motion to Transfer Venue to the District of Oregon, or in the alternative, to the Eastern District of Michigan. Kreativ admits that venue pursuant to *28 U.S.C. § 1400*(b) is proper in this Court, but asserts that this action should be transferred pursuant to *28 U.S.C. § 1404*(a) for the convenience of [*3] the parties and in the interest of justice. On September 16, 1997, ADT filed its Response to Kreativ's Motion. On September 17, 1997, the Initial Pretrial Conference was held at which time the Court heard arguments as to the Motion. After consideration of the arguments of counsel and the documents of record, the Court entered an oral Order denying the Motion. The Court now enters a written Order denying the Motion.



EXHIBIT
O
Decl. of Driscoll

1997 U.S. Dist. LEXIS 21578, *3; 45 U.S.P.Q.2D (BNA) 1221

## III. DISCUSSION

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." *28 U.S.C. § 1404*(a). It is well settled that the defendant bears the burden of demonstrating to the trial court that, in its sound discretion, the court should transfer the action. *Peteet v. Dow Chemical Co., 868 F.2d 1428, 1436 (5th Cir. 1989); Hupp v. Siroflex of America, Inc., 848 F. Supp. 744, 749 (S.D. Tex. 1994)* (party moving for a change of venue pursuant to § 1404(a) has the burden of demonstrating why the forum should be changed).

The decision to transfer is made to prevent waste of time, energy, and money and to protect litigants, [*4] witnesses, and the public against unnecessary inconvenience and expense. *Stabler v. New York Times Co., 569 F. Supp. 1131, 1137 (S.D. Tex. 1983)*. To decide whether a case should be transferred pursuant to § 1404(a), the court should consider factors such as: (1) plaintiff's choice of forum; (2) the availability of compulsory process for the attendance of unwilling witnesses; (3) the cost of obtaining the attendance of willing witnesses; (4) the accessibility and location of sources of proof; (5) the location of counsel; (6) trial expenses; (7) place of the alleged wrong; (8) possibility of delay and prejudice if transfer is granted; and (9) all other practical considerations relative to the trial. See, *Carlile v. Continental Airlines, Inc., 953 F. Supp. 169, 170 (S.D. Tex. 1997)* (emphasizing the importance of convenience of the witnesses); *Lindloff v. Schenectady Internat'l, 950 F. Supp. 183, 185 (E.D. Tex. 1996); Continental Airlines v. American Airlines, 805 F. Supp. 1392, 1395–96 (S.D. Tex. 1992)* (discussing the importance of plaintiff's choice of forum in light of the policies underlying § 1404(a)). However, the decision to transfer a case under

§ 1404(a) always [*5] rests within the sound discretion of the trial court. See *Jarvis Christian College v. Exxon Corp., 845 F.2d 523 (5th Cir. 1988); Hupp, 848 F. Supp. at 749*.

Here, Kreativ admits that venue is proper in this Court since Kreativ has sold and/or marketed the accused device in this District and Kreativ asserts that the Corpus Christi Division of the Southern District of Texas is not a convenient forum for the litigation. However, Kreativ has not borne its burden of establishing that the convenience of the parties would be served by a transfer of this action to another district. Kreativ has named no specific witnesses nor presented any evidence that any of their potential witnesses will be inconvenienced by a trial of this case in Corpus Christi. Kreativ has made no showing that the parties would incur greater trial expenses if the action remains in the Southern District of Texas. Further, the Court is not persuaded that the accessibility and location of evidence in this case warrants a transfer. Thus, the Court declines to disturb the forum chosen by the Plaintiff and introduce the likelihood of delay inherent in any transfer simply to avoid the insignificant inconvenience that [*6] Kreativ may suffer by litigating this matter before this Court.

## IV. CONCLUSION

For the foregoing reasons, the Court is not persuaded that the convenience of the parties and witnesses and the interests of justice warrant a transfer of this case to another district. Accordingly, the Court DENIES Kreativ's Motion to Transfer Venue.

ENTERED on this the 17th day of September, 1997.

JANIS GRAHAM JACK

UNITED STATES DISTRICT JUDGE

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

_____

AMAZIN' RAISINS INTERNATIONAL, INC.    )
an Ontario, Canada corporation,    )

               )
        Plaintiff/Counterclaim Defendant,    )

               )
v.    )    Civ. No. 04-3358 (ADM/AJB)

               )
OCEAN SPRAY CRANBERRIES, INC.,    )
a Delaware corporation,    )

               )
        Defendant/Counterclaim Plaintiff.    )
_____)

## DECLARATION OF JACK MAZIN IN SUPPORT OF PLAINTIFF'S MOTION IN OPPOSITION TO DEFENDANT OCEAN SPRAY'S MOTION TO TRANSFER VENUE

I, Jack Mazin, declare as follows:

1.     I am the President, Chief Executive Officer and owner of Amazin' Raisins International, Inc. ("ARI"), an Ontario, Canada corporation.  I make this declaration on my own information, knowledge and belief.

2.     I am one of the named inventors of United States Patent No. 5,188,861 ("the '861 patent").

3.     I currently reside near Toronto, Canada at 36 German Mills Road, Thornhill, Ontario, L3T 4H5.

4.     On October 6, 2004, I contacted Amir Lalji, the other named inventor of the '861 patent, and confirmed that Mr. Lalji also currently resides in the Toronto area.

5.     The '861 patent is currently assigned to ARI.

6.     In 2003, ARI's gross revenues totaled less than 500,000 dollars.

7.      Prior to Merchant & Gould sending its May 27, 2003 letter to Ocean Spray, I had observed flavored Craisin® products being sold within the State of Minnesota.

8.      If the above captioned matter is transferred to District of Massachusetts, ARI will continue to use Merchant & Gould as lead counsel on this matter.

I declare under penalty of perjury that the foregoing is true and correct.


Date: <u>October 6, 2004</u>                    **s/Jack Mazin**
                                        Jack Mazin

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

_____

AMAZIN' RAISINS INTERNATIONAL, INC.  )
an Ontario, Canada corporation,      )
                                     )
          Plaintiff/Counterclaim Defendant,  )
                                     )
v.                                   )  Civ. No. 04-3358 (ADM/AJB)
                                     )
OCEAN SPRAY CRANBERRIES, INC.,       )
a Delaware corporation,              )
                                     )
          Defendant/Counterclaim Plaintiff.  )
_____

## CERTIFICATE OF SERVICE

I hereby certify that on October 6, 2004, I caused the following documents:

> PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT OCEAN SPRAY'S MOTION TO TRANSFER VENUE;

> DECLARATION OF MATTHEW A. DOSCOTCH IN SUPPORT OF PLAINTIFF AMAZIN' RAISINS INTERNATIONAL'S MEMORANDUM IN OPPOSITION TO DEFENDANT OCEAN SPRAY'S MOTION TO TRANSFER VENUE;

> DECLARATION OF JACK MAZIN IN SUPPORT OF PLAINTIFF'S MOTION IN OPPOSITION TO DEFENDANT OCEAN SPRAY'S MOTION TO TRANSFER VENUE.

to be filed electronically with the Clerk of Court through ECF, and that ECF will send an e-notice of the electronic filing to the following:

William R Woodford      woodford@fr.com lindner@fr.com
John C Adkisson         adkisson@fr.com mla@fr.com


Dated:  October 6, 2004                    s/ Matthew A. Doscotch

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

AMAZIN' RAISINS INTERNATIONAL, INC.,
an Ontario, Canada corporation,

        Plaintiff/Counterclaim Defendant,

    v.                                         Civ. No. 04-3358 (ADM/AJB)

OCEAN SPRAY CRANBERRIES, INC., a
Delaware corporation,

        Defendant/Counterclaim Plaintiff.

## REPLY MEMORANDUM IN SUPPORT OF OCEAN SPRAY'S MOTION TO TRANSFER VENUE

In its opposition, Plaintiff Amazin' Raisins International, Inc. ("ARI") could not point to a single document or witness that supports venue in the District of Minnesota. Instead, ARI admits that its decision to file here was based on one factor alone—the location of ARI's Minnesota counsel. Yet the authority cited in Ocean Spray's opening brief clearly states that the location of Defendant's counsel is not to be considered in the transfer analysis, and ARI resorts to citing now-rejected authority from the Fifth Circuit in an effort to convince this Court otherwise.

Remarkably, ARI also fails to mention or address its offer to voluntarily transfer this case to Buffalo, New York before this motion was filed. A transfer to Buffalo—a venue that also has no connection to this case—would have required local counsel and created the same inconvenience and expense that ARI complains of in its opposition. Ocean Spray should not be penalized if ARI continues to use Minnesota counsel to pursue claims that should have been brought in Massachusetts in the first place.

The simple fact remains that Ocean Spray's witnesses and documents are located in Massachusetts, and no witnesses or documents are located in this district. Given that ARI has cited no other compelling factor that supports venue in this district, this case should be transferred to the District of Massachusetts consistent with the language and intent of Section 1404(a).

## I.   ARGUMENT

### A.   ARI Has Not Pointed To Any Relevant Fact that Makes It Convenient For the Parties and Witnesses to Litigate this Case in Minnesota.

In a motion to transfer venue under § 1404(a), the Court must consider both the convenience of the parties and the convenience of the witnesses. *Terra Int'l, Inc. v. Mississippi Chem. Corp.*, 119 F.3d 688, 691 (8th Cir. 1997). In its 14-page opposition brief, ARI fails to identify any relevant fact that would make the District of Minnesota a convenient forum for either party. ARI admits that it has no corporate presence anywhere in the United States, much less in this district. (ARI Mem. at 7.) Likewise, ARI fails to identify a single witness located in Minnesota. Because of this failure, ARI's opposition attempts to shift the focus from the real factors at issue—the parties and witnesses—to the location of its counsel. ARI makes nearly 20 references to its Minnesota counsel (*see* ARI Mem. at 2-4, 7-8, 12-13), and contends that its choice of counsel in this district creates a "presence in Minnesota."[1] (*Id.* at 2.) Not only is the

---

[1]   As part of its "convenience of counsel" argument, ARI attempts to connect Minnesota to this lawsuit by stating that "all pre-suit activity has occurred within Minnesota and plaintiff properly chose a convenient forum." (ARI Mem. at 7.) ARI's assertion is not only irrelevant, but it is false. The first pre-suit communications were conducted directly between ARI's C.E.O. and Ocean Spray's R&D Director, who is located in Massachusetts. (Supp. Woodford Decl. Ex. G, H.) About 16 months later, in May 2003, ARI's counsel initiated communications directly with Ocean Spray's Massachusetts headquarters. (Doscotch Decl. Ex. B.) A year later, after communications between the parties' counsel had ceased, ARI initiated direct communications between itself and Ocean Spray's Massachusetts headquarters. (Supp. Woodford Decl. Ex. I, J.)

location of ARI's counsel irrelevant to the convenience of the parties and witnesses, but this

Court long ago rejected arguments regarding the convenience of counsel that ARI now pursues.

The facts of this case demonstrate that the District of Massachusetts is the most

convenient forum for the parties and witnesses. Ocean Spray's headquarters and principal place

of business is located in Middleboro, Massachusetts. (Bryson Decl. ¶ 4.) In addition, the six

individuals from Ocean Spray who are likely to be called as witnesses in this case are all located

in Massachusetts. (*Id.* ¶ 7.) Finally, all of the relevant documents in this action are available at

Ocean Spray's Massachusetts headquarters. (*Id.* ¶ 8.) Faced with these facts, ARI contends,

without any support, that unnamed individuals in Ocean Spray's Tomah, Wisconsin

manufacturing facility render the District of Massachusetts an inconvenient forum. (*Id.* at 9.)

Contrary to ARI's assertions, Ocean Spray's initial list of six witnesses included the witness with

the most knowledge of Ocean Spray's Tomah, Wisconsin facility and its operations.

         **1.**    **The Convenience of ARI's Counsel is Not a Relevant Factor and Should Not Be Considered in the Transfer Analysis.**

On nearly every page of its opposition, ARI mentions that it has retained "Minnesota

counsel." ARI argues that a transfer of this case would inconvenience ARI because it would

require "the additional expense and efforts of using local counsel," and its current counsel, which

ARI will continue to use regardless of the outcome of this motion, "will have to travel to

Massachusetts for hearings … further adding to the inconvenience of ARI." (ARI Mem. at 8.)

ARI's arguments regarding the convenience of its counsel are irrelevant. This Court has

consistently held that the convenience of counsel should not be considered in deciding a motion

to transfer under § 1404(a). *E.g.*, *Nelson v. Soo Line R.R. Co.*, 58 F. Supp. 2d 1023, 1027 (D.

Minn. 1999) ("[I]t is axiomatic that convenience to plaintiff's counsel is not a factor to be

considered in deciding the propriety of transfer."); *Hoppe v. G.D. Searle & Co.*, 683 F. Supp.

1271 (D. Minn. 1988) ("[W]hile plaintiff's counsel is indeed experienced in this particular litigation, convenience to her current counsel is not a factor to be considered in deciding the propriety of transfer."); *Greyhound Computer Corp. v. Int'l Business Machines Corp.*, 342 F. Supp. 1143, 1146 (D. Minn. 1972) ("Convenience of counsel, however, as opposed to the parties themselves or their witnesses, is not a factor in deciding a Section 1404(a) motion."); *Charron v. Great N. Ry. Co.*, 309 F. Supp. 1386, 1387 (D. Minn. 1970) ("Section 1404(a) does not consider convenience of counsel as a factor … .").

ARI attempts to distinguish this clear precedent by arguing that "these cases are unlike this lawsuit, which involves a patent."[2]  (ARI Mem. at 8.)  However, the fact that this case involves a patent is no more relevant than the fact that this case involves cranberries.  Section 1404(a) sets forth three factors for consideration by the Court, and none of them have anything to do with the type of case involved.  Furthermore, several district courts have rejected arguments regarding the convenience of counsel in patent cases.  *E.g.*, *LG Electronics Inc. v. First Int'l Computer, Inc.*, 138 F. Supp. 2d 574, 591 n.12 (D.N.J. 2001) (rejecting the plaintiff's argument that its attorneys would be required to travel and that it would have to hire local counsel, stating "the convenience of counsel is not a factor that should be considered on a motion to transfer venue"); *Biometics, LLC v. New Womyn, Inc.*, 112 F. Supp. 2d 869, 876 (E.D. Mo. 2000) ("The convenience of plaintiff's counsel is not entitled to any weight in the analysis."); *Cognitronics Imaging Sys., Inc. v. Recognition Research Inc.*, 83 F. Supp. 2d 689, 698 (E.D. Va. 2000) ("The

---

[2]     ARI distinguishes these cases even further by arguing that "the cited cases do not involve a foreign plaintiff that files a lawsuit in a district in which the only United States representation with regard to its patent rights is located."  (ARI Mem. at 8.)  While Ocean Spray concedes the point, ARI's statement does nothing to change the clear precedent that the convenience of counsel is immaterial to the transfer analysis.

convenience to counsel is not an appropriate matter for consideration in resolving the appropriateness of a motion to transfer venue.").

Next, ARI argues that "district courts have considered trial counsel location in a patent venue dispute," and urges the Court to follow two decisions from the Southern District of Texas. (ARI Mem. at 8.) ARI, however, leaves out the fact that the Fifth Circuit recently *rejected* these cases, and held that "the factor of location of counsel is irrelevant and improper for consideration in determining the question of transfer of venue." *In re Horseshoe Entertainment*, 337 F.3d 429, 434 (5th Cir. 2003). In fact, the Fifth Circuit has held that the consideration of the location of counsel in the § 1404(a) analysis amounts to reversible error:

> We also conclude that the Eastern District Court reversibly erred in considering a factor that is not part of the § 1404(a) analysis. Specifically, in its order the district court considers that counsel for both parties are located in Dallas, Texas. The word "counsel" does not appear anywhere in § 1404(a), and the convenience of counsel is not a factor to be assessed in determining whether to transfer a case under § 1404(a). … As such, the Eastern District Court's reliance on the location of counsel as a factor to be considered in determining the propriety of a motion to transfer venue was an abuse of discretion.

*In re Volkswagen AG*, 371 F.3d 201, 206 (5th Cir. 2004). The Court should decline ARI's invitation to commit legal error.

In addition to being legally impermissible, ARI's actions in this case demonstrate that its arguments regarding the inconvenience of its counsel lack merit. ARI complains about the additional expense of local counsel if this case is transferred. (ARI Mem. at 8, 12.) Yet, in response to Ocean Spray's letter seeking information that would support litigating in this district, ARI stated, without explanation, that it would stipulate to a transfer to Buffalo, New York. (Woodford Decl. Ex. E.) Since ARI's chosen counsel does not have an office in Buffalo, the very transfer suggested by ARI would have required the use and expense of local counsel in Buffalo. For ARI to argue now that the use of local counsel presents a hardship is disingenuous.

Similarly, ARI argues that if the Court grants a transfer its counsel would have to travel to Massachusetts for hearings, adding further inconvenience. (ARI Mem. at 8.) Yet, two pages later in its brief, ARI states that "ARI's counsel will have to travel to Massachusetts to take the depositions of [Ocean Spray's] witnesses regardless of venue." (*Id.* at 10.) Thus, despite the fact that ARI knew Ocean Spray was located in Massachusetts—and that travel to Massachusetts for depositions would be necessary—ARI elected to accept the inconvenience and use "Minnesota counsel." Now, in opposition to a motion to transfer, ARI asks this Court to deny Ocean Spray's motion because its counsel may have to travel to Massachusetts for hearings. This argument is illogical and should be rejected.

As ARI's arguments suggest, the best course of action for ARI would be to retain counsel located closer to the witnesses. However, ARI has decided to retain its Minnesota counsel to pursue its claims, even if the Court transfers this case. (Mazin Decl. ¶ 8.) While ARI is free to choose any counsel that it wants, it may not then turn around, in the context of a motion to transfer, and complain about the costs associated with its decision. *Cognitronics Imaging Sys.*, 83 F. Supp. 2d at 698 (stating that because plaintiff chooses to retain New York counsel to litigate a case in California, "it cannot be heard to complain about the costs").

### 2. ARI Has Made False Arguments Regarding Ocean Spray's Tomah, Wisconsin Facility.

Ocean Spray has identified six current and former employees who have personal knowledge of facts relating to ARI's infringement allegations. All of these witnesses work or reside in Massachusetts. In its opposition, ARI argues that the District of Massachusetts is an inconvenient forum because Ocean Spray has a manufacturing facility in Tomah, Wisconsin—which is located some 180 miles from Minneapolis. (ARI Mem. at 9-10.) ARI admits that it was unaware of the Tomah, Wisconsin facility until Ocean Spray filed the instant motion and

supporting declarations (*Id.* at 5), yet it baldly asserts that the witnesses identified by Ocean Spray "do not have specific knowledge of the Tomah operation," and that "[n]one of the witnesses have worked at the Tomah facility."  (*Id.* at 9.)  ARI's claims are false.

In its list of six likely witnesses, Ocean Spray identified Harold Mantius, Ocean Spray's Senior Principal Process Engineer.  (Bryson Decl. ¶ 7.)  As ARI is well aware, Mr. Mantius developed and obtained a patent for the process that Ocean Spray uses to manufacture its sweetened dried cranberries.  (*Id.*; Mantius Decl. ¶ 3.)  Mr. Mantius has worked for Ocean Spray since 1999, and contrary to ARI's assertions, he is intimately familiar with the Tomah facility, its manufacturing processes, and its operations.  (Mantius Decl. ¶¶ 1, 5.)  In addition to the research and development of Ocean Spray's manufacturing process, Mr. Mantius was personally responsible for the implementation of his process in the Tomah, Wisconsin facility.  (*Id.* ¶ 5.)  Since the plant was constructed in 1993, Mr. Mantius has had an ongoing responsibility for all of the manufacturing processes in the Tomah plant, including the process used to make sweetened dried cranberries.  (*Id.* ¶ 6.)  Over the past ten years, he has spent approximately four months per year working on site at the Tomah plant, and an additional two months per year working on Tomah-related projects at Ocean Spray's Massachusetts headquarters.  (*Id.*)  Thus, as Ocean Spray indicated in its opening brief, Mr. Mantius is the most knowledgeable and appropriate witness to discuss Ocean Spray's manufacturing process and the operation of its manufacturing facilities.

ARI also disputes, without any support, the fact that all relevant documents in Ocean Spray's production facilities are also located in its Massachusetts headquarters.  (ARI Mem. at 9.)  According to ARI, "it seems absurd that all relevant documents are located in Massachusetts as well.  This simply cannot be the case."  (*Id.*)  ARI's speculation is again off base.  All

production records for the Tomah plant are added to Ocean Spray's computer system and are available at Ocean Spray's Massachusetts headquarters on a real-time basis. (Mantius Decl. ¶ 7.) Ocean Spray also maintains copies of all other relevant documents relating to its manufacturing process both in Tomah, Wisconsin and at its corporate headquarters in Massachusetts, including Hazard Analysis and Critical Control Point (HAACP) documents, product safety and process control documents, positive release program documents, quality operating guidelines (which govern the operation of the Tomah plant), documents relating to formulas for flavoring, and packaging specifications. (*Id.*) Thus, like the other relevant factors in this case, the location of documents favors a transfer.

Moreover, even if the Court accepts ARI's baseless statement that an individual at the Tomah, Wisconsin facility may have information relevant to the lawsuit, ARI still fails to explain how this makes the District of Minnesota a more convenient forum. As ARI points out, Tomah is located in another judicial district and is about 180 miles from the Twin Cities—nearly a three-hour drive. A drive from Tomah to the Twin Cities is no more convenient than a flight to Massachusetts, which is also about three hours. Furthermore, either trip would require an overnight stay and would disrupt the witness's regular work and home responsibilities. *See In re Volkswagen AG*, 371 F.3d at 204-05 ("The task of scheduling fact witnesses so as to minimize the time when they are removed from their regular work and home responsibilities gets increasingly difficult and complicated when the travel time from their home or work site to the court facility is [more than] 30 minutes or an hour.").

**B.      ARI's Arguments Regarding the Interests of Justice Actually Favor a Transfer.**

In its opposition, ARI contends that this case should stay in Minnesota because Ocean Spray has a greater ability to bear the costs of this litigation, Minnesota has a less congested

docket, and because its choice of forum should be given significant weight. (ARI Mem. at 11-13.) ARI's assertions lack merit and should be given no weight in the transfer analysis.

First, with respect to the parties' ability to bear the costs of litigation, the only financial hardship cited by ARI in a transfer to Massachusetts is the time, effort, and expense of finding local counsel. (*Id.* at 12.) This is simply a repeat of its earlier arguments regarding the convenience of its counsel, and does not take into account ARI's suggestion to transfer the case to Buffalo (where ARI would have been forced to hire local counsel). As set forth previously, this Court has repeatedly held that the convenience of counsel is not a factor to be considered in deciding the propriety of a transfer, *Nelson*, 58 F. Supp. 2d at 1027, and the cases cited by ARI in support of this proposition are no longer good law. *In re Volkswagen AG*, 371 F.3d at 206.

ARI's assertion that this district has a less congested docket than the District of Massachusetts is also meritless. ARI points out that in 2003 the median time from filing to trial in the District of Minnesota was four months less than in Massachusetts. (ARI Mem. at 13.) However, the time from filing to trial in any court is judge-dependent and varies greatly, as illustrated by the fact that these statistics cite the *median* time to trial rather than an average. (Doscotch Decl. Ex. I.) This variance is also shown by the fact that in 2002 the time to trial in Massachusetts was actually lower than in this district. (*Id.*) ARI's statistics also show that in 2003 the civil filings in Minnesota increased by 50% over 2002 levels, while the civil filings in Massachusetts remained the same over the identical period. (*Id.*) Moreover, on average, each judge in this district had over 1000 cases pending in 2003, compared to only 340 per judge in Massachusetts. (*Id.*) Thus, the statistics cited by ARI actually show that this district is more congested than the District of Massachusetts. And even if the District of Minnesota were faster,

9

"[t]his Court cannot stand as a willing repository for cases which have no real nexus to this district." *Cognitronics Imaging Sys.*, 83 F. Supp. 2d at 699.

With respect to ARI's choice to file suit in this district, courts generally give deference to a plaintiff's choice of forum. *Terra Int'l*, 199 F.3d at 695. However, when a plaintiff does not reside in the selected forum, its choice of forum should be given significantly less deference by the Court. *Nelson*, 58 F. Supp. 2d at 1026; *Ahlstrom v. Clarent Corp.*, No. 02-780, 2002 WL 31856386, at *4 (D. Minn. Dec. 19, 2002). Here, ARI admits that it has no presence in Minnesota. This admission, coupled with ARI's willingness to transfer this case to Buffalo for no reason at all, demonstrates that ARI has no preference where this case is located, so long as it is somewhere inconvenient for Ocean Spray. Accordingly, ARI's choice of forum should be given no weight.

Finally, ARI complains that "[b]ased upon Ocean Spray's logic, no foreign corporation would be able to choose its forum, in particular a forum in which its chosen counsel is located and known infringement has occurred." (ARI Mem. at 7.) ARI misses the point. As the Supreme Court has stated, "both the history and purposes of § 1404(a) indicate that it should be regarded as a federal judicial housekeeping measure, dealing with the placement of litigation in the federal courts and generally intended, on the basis of convenience and fairness, simply to authorize a change of courtrooms." *Van Dusen v. Barrack*, 376 U.S. 612, 636-37 (1964). Section 1404(a) requires that the Court consider the convenience of the parties and the witnesses—not the convenience of its chosen counsel. And for good reason—a party can choose counsel anywhere in the United States to pursue its claims, but the parties cannot change their location or the location of the witnesses. Here, ARI decided to use Minnesota counsel despite

the fact that Minnesota has no connection to the case.  ARI's choice of counsel cannot be used as a reason to keep this case in a district where no relevant documents or witnesses reside.

## II.     CONCLUSION

For the foregoing reasons, Ocean Spray respectfully requests that this case be transferred to the District of Massachusetts.


Dated:  October 14, 2004                    FISH & RICHARDSON P.C., P.A.


                                            By:  s/William R. Woodford
                                                 John C. Adkisson (#266358)
                                                 William R. Woodford (#322593)
                                                 FISH & RICHARDSON P.C., P.A.
                                                 60 South Sixth Street
                                                 Suite 3300 Dain Rauscher Plaza
                                                 Minneapolis, MN 55402

                                                 Attorneys for Defendant
                                                 OCEAN SPRAY CRANBERRIES, INC.

60250578.doc

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

AMAZIN' RAISINS INTERNATIONAL, INC.,
an Ontario, Canada corporation,

        Plaintiff/Counterclaim Defendant,

    v.

OCEAN SPRAY CRANBERRIES, INC., a
Delaware corporation,

        Defendant/Counterclaim Plaintiff.

Civ. No. 04-3358 (ADM/AJB)

---

### SUPPLEMENTAL DECLARATION OF WILLIAM R. WOODFORD IN SUPPORT OF OCEAN SPRAY'S MOTION TO TRANSFER VENUE

I, William R. Woodford, declare as follows:

1.      I am an attorney in the law firm of Fish & Richardson P.C., P.A. and I am counsel for Defendant Ocean Spray Cranberries, Inc. in the above-captioned matter.

2.      Attached hereto has **Exhibit F** is the Exhibit Index.

3.      Attached hereto as **Exhibit G** is a true and correct copy of a facsimile cover page sent to Randy Papadellis from Jack Mazin dated January 21, 2002.

4.      Attached hereto as **Exhibit H** is a true and correct copy of a letter to Jack Mazin from Lenard E. Kasang of Ocean Spray dated January 23, 2002.

5.      Attached hereto as **Exhibit I** is a true and correct copy of a letter to Randy Papadellis from Jack Mazin dated May 4, 2004.

6.      Attached hereto as **Exhibit J** is a true and correct copy of a letter to Jack Mazin from Alana Sharenow in response to Jack Mazin's May 4, 2004 letter to Randy Papadellis.

I declare under penalty of perjury that the foregoing is true and correct.


Dated:  October 14, 2004                          s/William R. Woodford
                                                  William R. Woodford


60251857.doc

# EXHIBIT F

**EXHIBIT INDEX**

1. **Exhibit G** is a true and correct copy of a facsimile cover page sent to Randy Papadellis from Jack Mazin dated January 21, 2002.

2. **Exhibit H** is a true and correct copy of a letter to Jack Mazin from Lenard E. Kasang of Ocean Spray dated January 23, 2002.

3. **Exhibit I** is a true and correct copy of a letter to Randy Papadellis from Jack Mazin dated May 4, 2004.

4. **Exhibit J** is a true and correct copy of a letter to Jack Mazin from Alana Sharenow in response to Jack Mazin's May 4, 2004 letter to Randy Papadellis.

60251880.doc

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

AMAZIN' RAISINS INTERNATIONAL, INC.,
an Ontario, Canada corporation,

        Plaintiff/Counterclaim Defendant,

    v.

OCEAN SPRAY CRANBERRIES, INC., a
Delaware corporation,

        Defendant/Counterclaim Plaintiff.

Civ. No. 04-3358 (ADM/AJB)

---

## DECLARATION OF HAROLD MANTIUS IN SUPPORT OF OCEAN SPRAY'S MOTION TO TRANSFER

I, Harold Mantius, declare as follows:

1.      I am the Senior Principal Process Engineer for Defendant Ocean Spray Cranberries, Inc. ("Ocean Spray"), and have worked at Ocean Spray since 1989.  I have personal knowledge of the facts stated in this declaration, and if called upon, could testify thereto.

2.      I am advised that Amazin' Raisin International, Inc. ("ARI") has filed an action against Ocean Spray in the District of Minnesota alleging infringement of U.S. Patent No. 5,188,861 by Ocean Spray's method for making its Craisins® sweetened dried cranberry products.

3.      I developed the countercurrent extraction and infusion process that Ocean Spray uses to manufacture its sweetened dried cranberries.  On January 3, 1992, I filed a patent application that describes the countercurrent extraction process in detail.  The patent issued on January 14, 1994 as U.S. Patent No. 5,320,861.

4.      Ocean Spray manufactures its sweetened dried cranberries using its patented countercurrent extraction and infusion process in two different facilities.  One facility is located in Middleboro, Massachusetts, and the other is located in Tomah, Wisconsin.

5.      The Tomah manufacturing plant was built in 1993.  In 1994, Ocean Spray started a project at the Tomah facility to use its countercurrent extraction and infusion process to manufacture sweetened dried cranberries.  I was personally responsible for the research and development of Ocean Spray's manufacturing process, and the implementation of this process in Ocean Spray's Tomah plant.  I have specific knowledge of the Tomah facility, its manufacturing processes, and its operations.

6.      Since 1993, I have had an ongoing responsibility for all of the manufacturing processes at the Tomah plant, including the process used to make Ocean Spray's sweetened dried cranberries.  I have spent approximately 4 months per year on average working on site at the Tomah plant.  In addition to my time in Tomah, I spend approximately two months per year on average working on Tomah projects at Ocean Spray's Massachusetts headquarters.

7.      I also have knowledge of the documents generated and maintained by Ocean Spray, both in its manufacturing plants and at its corporate headquarters.  All production records for the Tomah plant are added to Ocean Spray's computer system and are available at Ocean Spray's Massachusetts headquarters on a real-time basis.  Ocean Spray also maintains copies of all other relevant documents relating to its manufacturing process both in Tomah and at its corporate headquarters, including Hazard Analysis and Critical Control Point (HAACP) documents, product safety and process control documents, positive release program documents, quality operating guidelines (which govern the operation of the Tomah plant), documents relating to formulas for flavoring, packaging specifications, etc.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  October 13, 2004

s/Harold Mantius
Harold Mantius

60251211.doc

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 14, 2004, I have caused the following documents:

1.    **REPLY MEMORANDUM IN SUPPORT OF OCEAN SPRAY'S MOTION TO TRANSFER VENUE;**

2.    **SUPPLEMENTAL DECLARATION OF WILLIAM R. WOODFORD IN SUPPORT OF OCEAN SPRAY'S MOTION TO TRANSFER VENUE;**

3.    **DECLARATION OF HAROLD MANTIUS IN SUPPORT OF OCEAN SPRAY'S MOTION TO TRANSFER; and**

4.    **CERTIFICATE OF SERVICE.**

to be filed electronically with the Clerk of Court through ECF, and ECF will send an e-notice of the electronic filing to the following:

Douglas J. Williams            dwilliams@merchant-gould.com
Merchant & Gould P.C.

Matthew A. Doscotch          mdoscotch@merchant-gould.com
Merchant & Gould P.C.

Date: October 14, 2004           s/William R. Woodford_____
                                  William R. Woodford

60251995.doc

612.371.5271
mdoscotch@merchant-gould.com

October 29, 2004

The Honorable Ann D. Montgomery                    VIA ECF
United States District Court Judge
13W U.S. Courthouse
300 South Fourth Street
Minneapolis, MN  55415

Re:     Amazin' Raisins International, Inc. v. Ocean Spray Cranberries, Inc..
        Civil Action No. 04-CV-3358 ADM/AJB
        M&G No. 14158.1-US-ZA

Dear Judge Montgomery:

        We have discussed the issue of venue with opposing counsel and have been unable to
reach an accord.  We have, however, reached an understanding as follows.  Ocean Spray wants
the case to be transferred to Massachusetts, primarily, but if not to Massachusetts then to remain
in Minnesota as a second choice.  Plaintiff's first choice, obviously, remains Minnesota.  Our
second choice would be Wisconsin.

        In sum, Plaintiff's first choice and Defendant's second choice is Minnesota.  Defendant's
first choice is Massachusetts and Plaintiff's second choice is Wisconsin.  We regret that we could
not finalize a choice but we have at least prioritized the options.

                                        Very truly yours,

                                        s/Matthew A. Doscotch

                                        Matthew A. Doscotch

MAD:lmb

cc:  William R. Woodford (via ECF)

# Fish & Richardson p.c.,p.a.

3300 Dain Rauscher Plaza
60 South Sixth Street
Minneapolis, Minnesota
55402

Telephone
612 335-5070

Facsimile
612 288-9696

Web Site
www.fr.com

Frederick P. Fish
1855-1930

W.K. Richardson
1859-1951

October 29, 2004

*Via Messenger*

Honorable Ann D. Montgomery
United States District Court Judge
United States Courthouse
300 South 4th Street, Suite 13W
Minneapolis, MN 55415

~

boston

dallas

delaware

new york

san diego

silicon valley

twin cities

washington, dc

Re:     *Amazin' Raisins Int'l, Inc. v. Ocean Spray Cranberries, Inc.*
        Case No. 04-3358

Dear Judge Montgomery:

At the hearing on Ocean Spray's motion to transfer on October 26, you asked counsel for both parties to consult with their clients and determine whether a venue other than the District of Minnesota or the District of Massachusetts would be a suitable location to litigate this dispute. After discussing the issue with my client, we continue to believe that the only convenient venue for Ocean Spray is the District of Massachusetts.

As set forth in Ocean Spray's filings, all of the individuals at Ocean Spray who are responsible for the development and implementation of its manufacturing process are located in Massachusetts. Likewise, the individuals responsible for the sales, marketing, and revenue of Ocean Spray's sweetened dried cranberries are also located in Massachusetts. Finally, to the extent any of the parties' pretrial communications will be relevant in this case, the individuals at Ocean Spray who are responsible for these communications are also located in Massachusetts.

Unfortunately, none of the alternative venues discussed at the hearing, such as the Western District of Wisconsin or the Western District of New York, are acceptable alternatives for my client. If this case were to be litigated in either of those jurisdictions, Ocean Spray's witnesses would face the same inconveniences they would face if this case were to stay in Minnesota. In fact, as I stated at the hearing, given that the case has already begun in this District, my client prefers the District of Minnesota to the two alternatives proposed by the Court.

In sum, the District of Massachusetts is the most convenient forum for the parties in this case, and a transfer to that District furthers the objectives of § 1404. We respectfully request that the Court grant Ocean Spray's Motion to Transfer.

F i s h  &  R i c h a r d s o n  p.c.,p.a.

Honorable Ann D. Montgomery
October 29, 2004
Page 2


I thank the Court for its attention to this matter.

Very truly yours,

s/William R. Woodford

William R. Woodford

WRW/jal

cc:     Douglas J. Williams

60254805.doc

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Amazin' Raisins International, Inc.,

       Plaintiff/Counterclaim
       Defendant,

                        **MEMORANDUM OPINION**
   v.                  **AND ORDER**
                        Civil No. 04-3358 ADM/AJB

Ocean Spray Cranberries, Inc.,

       Defendant/Counterclaim
       Plaintiff.

---

Matthew A. Doscotch, Esq., Merchant & Gould, Minneapolis, MN, appeared for and on behalf of Amazin' Raisins International, Inc.

John C. Adkisson, Esq., Fish & Richardson, Minneapolis, MN, appeared for and on behalf of Ocean Spray Cranberries, Inc.

---

# I. INTRODUCTION

On October 26, 2004, oral argument before the undersigned United States District Judge was heard on Defendant Ocean Spray Cranberries, Inc.'s ("Ocean Spray" or "Defendant") Motion to Transfer Venue [Docket No. 7], pursuant to 28 U.S.C. § 1404(a). In its complaint [Docket No. 1], Plaintiff Amazin' Raisins International, Inc. ("ARI" or "Plaintiff") alleges Ocean Spray's process for manufacturing its dried fruit product infringes its United States Patent No. 5,188,861 ("861 Patent"). Ocean Spray filed a counterclaim [Docket No. 4] seeking a declaratory judgment of non-infringement. Ocean Spray seeks to transfer venue for this case from the District of Minnesota to the District of Massachusetts. For the reasons set forth below, Defendant's Motion to Transfer Venue is granted.

## II. BACKGROUND

ARI is a small corporation based in Ontario, Canada.  Mazin Decl. ¶¶ 1, 6 [Docket No. 15].

Ocean Spray is a large United States corporation whose headquarters and principal place of business

are located in Lakeville-Middleboro, Massachusetts. Ocean Spray: About Us (Doscotch Decl.

[Docket No. 14] Ex. K).  On February 23, 1993, Jack Mazin, the Chief Executive Officer and owner

of ARI, and Amir Lalji received the 861 patent for their process for manufacturing dried fruit.  Mazin

Decl. ¶¶ 2, 4; Patent No. 861 (Doscotch Decl. Ex. A).  Through its Minnesota counsel, in May 2003,

ARI notified Ocean Spray that it believed Ocean Spray's process for manufacturing Craisins® violated

its 861 Patent.  May 27, 2003 letter (Doscotch Decl. Ex. B).  Ocean Spray denied the charge, claiming

Craisins® were manufactured according to its own patented process.[1]  June 19, 2003 letter (Doscotch

Decl. Ex. C).  ARI subsequently made three requests for samples of Ocean Spray's decharacterized

cranberry pieces to determine whether the process infringed the 861 Patent.  Sept. 8, 2003 letter

(Doscotch Decl. Ex. D); Nov. 11, 2003 letter (Doscotch Decl. Ex. E); Feb. 26, 2004 letter (Doscotch

Decl. Ex. F).  Ocean Spray refused these requests. Dec. 17, 2003 letter (Doscotch Decl. Ex. G);

March 5, 2004 letter (Doscotch Decl. Ex. H).  All communications by both ARI and Ocean Spray

were conducted by their respective Minnesota counsel.[2]

On July 22, 2004, ARI filed the current action against Ocean Spray in the United States District

---

[1] United States Patent No. 5,320,861 was issued to Harold Mantius, an Ocean Spay employee on January 14, 1994.  Mantius Decl. ¶¶ 1, 3 [Docket No. 19].

[2] Other than ARI's initial letter to Ocean Spray, which was addressed to an employee at Defendant's corporate headquarters, all other correspondence was also directed to the parties' respective attorneys.

Court in Minnesota.  On September 2, 2004, Ocean Spray submitted its answer denying infringement

and filing a counterclaim.  On the same day, Ocean Spray sent a letter notifying ARI of its intent to seek

transfer and asking for any reasons why the case was venued in the District of Minnesota.  Sept. 2,

2004 letter (Woodford Decl. [Docket No. 11] Ex. D).  ARI responded by indicating it believed venue

in Minnesota was proper but noted it would stipulate to a transfer to Buffalo, New York.  Sept. 7,

2004 letter (Woodford Decl. Ex. E).  At oral argument, ARI explained that it proposed Buffalo

because it is close to the Ontario, Canada residence of Jack Mazin, the inventor of the 861 Patent.

Ocean Spray moved to transfer venue on September 10, 2004.  ARI claims Minnesota is the

appropriate venue for this matter because it learned of Ocean Spray's alleged patent infringement

through the sale of Craisins® in Minnesota and because the parties had communicated solely through

counsel in Minnesota.  In addition, ARI notes that Ocean Spray manufactures Craisins® in a facility

located in Tomah, Wisconsin.  Bryson Decl. ¶ 5 [Docket No. 10].  Ocean Spray argues that transfer of

venue is appropriate because neither ARI nor Ocean Spray have facilities or employees in Minnesota.

Furthermore, Ocean Spray contends all of the witnesses to the case are located in Massachusetts.

### III. DISCUSSION

Section 1404(a) grants a district court the authority to transfer a civil matter to another district

in which the suit might have been brought.[3]  In evaluating whether transfer is proper, the Court should

---

[3] 28 U.S.C. 1404(a) provides:

> "For the convenience of the parties and witnesses, in the interest of justice, a district
> court may transfer any civil action to any other district or division where it might have
> been brought."

3

consider the convenience of the parties, the convenience of the witnesses and the interests of justice.

28 U.S.C. § 1404(a). The Court also has the discretion to take into account, on a case-by-case basis,

any other factors or circumstances that may be relevant. Terra Int'l Inc. v. Mississippi Chem. Corp.,

119 F.3d 688, 691 (8th Cir. 1997). Federal courts generally "give considerable deference to a

plaintiff's choice of forum and thus the party seeking transfer . . . typically bears the burden of showing

that the transfer is warranted." Id. at 695. However, courts afford plaintiff's choice of forum

"significantly less deference when (1) plaintiff does not reside in the selected forum or (2) the

transaction or underlying facts did not occur in the chosen forum." Nelson v. Soo Line R.R. Co., 58 F.

Supp. 2d 1023, 1026 (D. Minn. 1999) (citations omitted).

A.      **Appropriate Venue**

As an initial matter, the Court must determine whether it would have been possible for ARI to

originally bring its patent infringement claim in the District of Massachusetts. 28 U.S.C. 1404(a). It is

uncontested that Ocean Spray's corporate headquarters is located in Massachusetts. As a result,

Plaintiff could have filed the instant matter in the District of Massachusetts, pursuant to 28 U.S.C. §

1400(b).[4] Having determined that the District of Massachusetts would have been a proper venue to file

suit, it is necessary to evaluate the convenience of the parties and the witnesses as well as the interests

of justice to determine whether transfer is appropriate.

---

[4] 28 U.S.C. § 1440(b), in pertinent part, provides:

"Any civil action for patent infringement may be brought in the judicial district where the
defendant resides. . . ."

4

**B.      Convenience of the Parties**

Ocean Spray argues that Massachusetts is a more convenient forum for the parties because neither ARI nor Ocean Spray have offices, facilities or employees in Minnesota.  It also notes that Massachusetts is geographically closer to Ontario, Canada, ARI's corporate headquarters, than Minnesota.  Conversely, ARI argues that its counsel is located in Minnesota and that the parties, through their attorneys, engaged in a nine-month string of pre-trial negotiations in this District.  ARI also notes that Ocean Spray manufactures Craisins® in a facility in Tomah, Wisconsin.

In assessing the relative convenience of the parties, courts begin by analyzing the location of "their residences in relation to the district court chosen by the plaintiff and the proposed transferee district."  Facilitec Corp. v. Omni Containment Sys., 2003 U.S. Dist. LEXIS 13250, *3 (D. Minn. July 31, 2003) (citations omitted).  It is uncontested that neither party maintains offices, facilities or employees in Minnesota.  It is obviously more convenient for Ocean Spray to litigate in the District in which its corporate headquarters is located than in one in which it merely sells its products.[5] Furthermore, transferring the case from Minnesota to Massachusetts does not demonstrably inconvenience ARI.  ARI's corporate headquarters in Ontario, Canada is closer to Massachusetts than Minnesota.  ARI can demonstrate no tie to justify venue in the District of Minnesota except that Craisins® are sold in the state and it chose to retain counsel in Minnesota.

ARI attempts to argue that the District of Minnesota is more convenient to Ocean Spray's Tomah, Wisconsin plant than the District of Massachusetts.  This argument would be more persuasive if

_____

[5] Ocean Spray apparently sells its products in all judicial districts in the United States.

5

ARI had originally filed suit in the District of Wisconsin rather than the District of Minnesota. Tomah is approximately 170 miles, or a two hour and forty minute drive, from this Courthouse. Mapquest Driving Directions (Doscotch Decl. Ex. J). When this Court suggested at oral argument that the District of Wisconsin might be a more appropriate venue and closer to "neutral turf", both ARI and Ocean Spray indicated little interest in litigating in Wisconsin.

Ultimately, ARI attempts to argue that a transfer to Massachusetts would be inconvenient because its counsel is located in Minneapolis. However, "it is axiomatic that convenience to plaintiff's counsel is not a factor to be considered in deciding the propriety of transfer." Nelson, 58 F. Supp. 2d at 1027 (citations omitted). ARI claims that venue in Minnesota is appropriate because of negotiations which took place in Minnesota between the respective parties' counsel over a nine-month period prior to the complaint being filed. Accepting ARI's argument, however, would allow plaintiffs to engage in an end run around § 1404(a) by entering into pre-trial negotiations and thereby eviscerate the purpose of the transfer provision. For the aforementioned reasons, the Court finds that the convenience of the parties strongly supports transfer.

## C.     Convenience of the Witnesses

The parties contest what witnesses will be necessary to try the present claim. Ocean Spray contends that only six persons have personal knowledge of facts relating to the infringement allegation. Bryson Decl. ¶ 7. All of these potential witnesses are located in Massachusetts; five are current employees who work at Ocean Spray's corporate headquarters, while one is a retired employee now residing in Plymouth, Massachusetts. Id. ARI contends discovery will show employees at the Tomah, Wisconsin facility have knowledge of information relevant to the lawsuit. ARI further claims that

pertinent documents are housed at the Tomah, Wisconsin plant.  Although Ocean Spray acknowledges

that the Tomah facility contains relevant documents, it argues that copies of all such documents are also

kept at its Middleboro, Massachusetts corporate headquarters.

The convenience of the witnesses also supports transfer.  In assessing this factor, the party

seeking transfer must clearly specify the essential witnesses and provide a general statement of their

testimony.  Facilitec Corp., 2003 U.S. Dist. LEXIS at *4.  The court then evaluates the materiality and

importance of the anticipated witnesses' testimony, as well as their accessibility to the forum.  Reid-

Walen v. Hansen, 933 F.2d 1390, 1396 (8th Cir. 1991).  Ocean Spray has provided a list of the

anticipated relevant witnesses in this case, all of whom reside in the District of Massachusetts.  ARI

relies on the possibility that discovery will reveal relevant witnesses at the Tomah, Wisconsin plant.

Although ARI correctly notes that five of the six witnesses are current Ocean Spray employees, and

Ocean Spray can secure their attendance at trial, it is nevertheless true that these witnesses reside in

Massachusetts, rather than Minnesota.  See Kleinerman v. Luxtron Corp., 107 F. Supp. 2d 122, 125

(D. Mass. 2000).  Furthermore, ARI's counsel will be forced to depose Ocean Spray's witnesses in

Massachusetts whether the trial is held in Minnesota or Massachusetts.

Finally, ARI argues that the relevant documents are located in the Tomah, Wisconsin

manufacturing facility.  Conversely, Ocean Spray argues that copies of the documents are uploaded in

real time and available at its Middleboro, Massachusetts headquarters.  As the instant case pointedly

illustrates, the actual physical location of voluminous documents "is not a particularly salient factor in a

section 1404(a) determination" in present day litigation.  American Standard, Inc. v. Bendix Corp., 480

F. Supp. 254, 261 (W.D. Mo. 1980).  Relevant documents will have to be gathered for ARI's counsel

in Minnesota whether they are housed in Wisconsin or Massachusetts. As a result, this Court finds that the convenience of the witnesses also militates in favor of transfer.

**D.     Interests of Justice**

When evaluating whether the interests of justice warrant transfer, courts typically consider such factors as "(1) judicial economy, (2) the plaintiff's choice of forum, (3) the comparative costs to the parties of litigating in each forum, (4) each party's ability to enforce a judgment, (5) obstacles to a fair trial, (6) conflict of law issues, and (7) advantages of having a local court determine questions of local law." Terra, 119 F.3d at 696. Specifically, in the instant case, ARI argues that the interests of justice disfavor transferring venue because plaintiff's choice of forum should be given significant weight, Ocean Spray is better able to bear the costs of the litigation, and the District of Minnesota has a less congested docket than the District of Massachusetts. For its part, Ocean Spray argues the interests of justice favor transfer because ARI's status as a foreign plaintiff, coupled with its willingness to transfer the suit to Buffalo, New York, diminishes the deference that should be given to plaintiff's choice of forum and because the comparative costs of litigation will be reduced by a transfer to the District of Massachusetts.

ARI vigorously contends its choice of forum should be granted substantial deference. ARI notes it is a foreign plaintiff who, under United States law, must retain U.S. counsel to litigate its patent infringement claim. ARI argues that, were this Court to transfer venue to Massachusetts, it would effectively signal foreign corporations cannot choose their forum and must litigate in a defendant corporation's home state. This argument is flawed because it is well-established that significantly less deference is granted when the plaintiff does not reside in the forum. Nelson, 58 F. Supp. 2d at 1026.

8

Further, ARI could have brought the present action in the District of Wisconsin, where the Tomah manufacturing plant is located, or in Buffalo, New York, as the closest venue to Jack Mazin's residence, and thus ensured some significant connection to the forum.

Both parties argue the expense of litigation supports their respective positions for transfer. This factor does not significantly favor one party's position over the other. The costs of depositions, document review and the resulting litigation will be much the same whether the matter is tried in Minnesota or Massachusetts. ARI does argue transfer will force it to endure the additional expense and inconvenience of finding local counsel. Although ARI has every right to retain Minnesota-based counsel to represent its interests, it cannot use its selection of counsel to dictate venue. Furthermore, ARI's willingness to transfer this matter to Buffalo, New York, where it would also need to retain local counsel, indicates that this additional expense was not preeminent in the choice of venue.

Finally, both parties seek to show docket congestion (or the lack thereof) supports their respective positions for venue choice. Dockets vary by judge and by time period. Even similar cases filed at the same time are often resolved in different amounts of time, depending on the vagaries of court calendars. Thus, this argument does not weigh in favor of one party over the other.

In summary, after weighing the convenience of the parties, the convenience of the witnesses and the interests of justice, this Court finds that Ocean Spray has carried its burden of showing a transfer of venue to the District of Massachusetts is appropriate.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

9

1.   Defendant/Counterclaim Plaintiff's Motion to Transfer Venue [Docket No. 7] is

**GRANTED**, and

2.   Venue shall be transferred to the United States District Court for the District of

Massachusetts.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  November 15, 2004.

10

# UNITED STATES DISTRICT COURT

## District of Minnesota

*RESPOND TO:*

9 U.S. District Court, 700 Federal Building, 316 N. Robert St., St. Paul, MN  55101          Phone (651) 848-1100

9 U.S. District Court, 202 U. S. Courthouse, 300 S. Fourth St., Minneapolis., MN  55415          Phone (612) 664-5000

9 U.S. District Court, 417 Federal Building, 515 W. First St., Duluth, MN  55802          Phone (218) 529-3500

---

**DATE:**   December 14, 2004          **CIVIL FILE NUMBER:**          04-3358 ADM/AJB

**CASE TITLE:**          Amazin' Raisins Intl. Inc.     VS  Ocean Spray Cranberries, Inc.

9 The above entitled action was: 9 removed from county court, 9 transferred from another district, and filed in 9 Minneapolis  9 St. Paul  9 Duluth, on _____ , and assigned to Judge _____ and to Magistrate Judge          *Please direct future filings to the office indicated at the top of this form.*

9 The above entitled action was filed in this court on _____, and assigned to Judge _____ and referred to Magistrate Judge _____ The file will be maintained at the Clerk's office in the District of Minnesota in _____ *Please note for future reference.* cc to:

9 Discovery documents are returned pursuant to Federal Rule of Civil Procedure 5(d).

9 A certified copy of the Order of Remand is enclosed.

: The above entitled action is being transferred to your court pursuant to Order of Judge  Ann D. Montgomery filed on 11/15/04 _____          A certified copy of the order and docket entries are included, along with the original court file.  Please acknowledge receipt of this file by returning a date-stamped copy of this notice indicating the filing date and civil case number assigned in your court.

9 A Bill of Costs is to be submitted on Form AO133.  The form, and a guide entitled "Taxation of Costs in a Civil Case in the United States District Court for the District of Minnesota" for use by attorneys and legal staff are available on our website: www.mnd.uscourts.gov.

9 Your original documents are returned as <u>copies</u> of state court documents were submitted upon removal of the action to federal court.

9 Your in forma pauperis application was approved.  Please complete the enclosed Marshal Service Form(s) (one per defendant) and return to the office indicated at the top of this form.  Service cannot be performed until these completed forms have been received by the clerk's office.

9 OTHER:

---

Deputy Clerk:  s/G. Schneider

Gloria Schneider

# UNITED STATES DISTRICT COURT

## District of Minnesota

***RESPOND TO:***

9  U.S. District Court, 700 Federal Building, 316 N. Robert St., St. Paul, MN 55101     Phone (651) 848-1100

9  U.S. District Court, 202 U. S. Courthouse, 300 S. Fourth St., Minneapolis., MN 55415     Phone (612) 664-5000

9  U.S. District Court, 417 Federal Building, 515 W. First St., Duluth, MN 55802     Phone (218) 529-3500

---

**DATE:**   December 14, 2004     **CIVIL FILE NUMBER:**     04-3358 ADM/AJB

**CASE TITLE:**     Amazin' Raisins Intl. Inc.     VS  Ocean Spray Cranberries, Inc.

9  The above entitled action was: 9 removed from county court, 9 transferred from another district, and filed in 9 Minneapolis 9 St. Paul 9 Duluth, on _____ , and assigned to Judge _____ and to Magistrate Judge     Please direct future filings to the office indicated at the top of this form.

9  The above entitled action was filed in this court on _____, and assigned to Judge _____ and referred to Magistrate Judge _____ The file will be maintained at the Clerk's office in the District of Minnesota in _____ Please note for future reference. cc to:

9  Discovery documents are returned pursuant to Federal Rule of Civil Procedure 5(d).

9  A certified copy of the Order of Remand is enclosed.

:  The above entitled action is being transferred to your court pursuant to Order of Judge _Ann D. Montgomery_ filed on 11/15/04 _____ A certified copy of the order and docket entries are included, along with the original court file. Please acknowledge receipt of this file by returning a date-stamped copy of this notice indicating the filing date and civil case number assigned in your court.

9  A Bill of Costs is to be submitted on Form AO133. The form, and a guide entitled "Taxation of Costs in a Civil Case in the United States District Court for the District of Minnesota" for use by attorneys and legal staff are available on our website: www.mnd.uscourts.gov.

9  Your original documents are returned as <u>copies</u> of state court documents were submitted upon removal of the action to federal court.

9  Your in forma pauperis application was approved. Please complete the enclosed Marshal Service Form(s) (one per defendant) and return to the office indicated at the top of this form. Service cannot be performed until these completed forms have been received by the clerk's office.

9  OTHER:

---

Deputy Clerk:  s/G. Schneider

Gloria Schneider