**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| AMAZIN' RAISINS INTERNATIONAL, INC., <br><br> Plaintiff, <br><br> v. <br><br> OCEAN SPRAY CRANBERRIES, INC., <br><br> Defendant. | Civil Action No. 1:04-cv-12679-MLW |

**SUPPLEMENTAL DECLARATION OF WILLIAM R. WOODFORD IN SUPPORT OF OCEAN SPRAY'S MOTION FOR SUMMARY JUDGMENT OF NONINFRINGEMENT**

I, William R. Woodford, declare as follows:

1. I am an attorney in the law firm of Fish & Richardson P.C., P.A. and I am counsel for Defendant Ocean Spray Cranberries, Inc.

2. Attached hereto as **Exhibit 9** is a true and correct copy of excerpts from the deposition of Mr. Harold Mantius, taken February 7, 2006.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  February 24, 2006                          s/William R. Woodford
                                                                    William R. Woodford

60342455.doc

9

Page 1

```
 1                                          Volume: I
                    CONFIDENTIAL            Pages: 1-207
 2                                          Exhibits: 25-33
 3          UNITED STATES DISTRICT COURT
 4            DISTRICT OF MASSACHUSETTS
 5
 6  AMAZIN' RAISINS INTERNATIONAL,
     INC., AN ONTARIO, CANADA
 7  CORPORATION,
                    Plaintiff        Docket No.
 8                                   CA 04-12679-MLW
            vs.
 9
    OCEAN SPRAY CRANBERRIES, INC.,
10  A DELAWARE CORPORATION
                    Defendant
11
12
13
            DEPOSITION of HAROLD L. MANTIUS, a
14  witness called by and on behalf of the Plaintiff,
    taken pursuant to the Federal Rules of Civil
15  Procedure, before Heidi B. Stutz, Certified
    Shorthand Reporter No. 146599S and Notary Public in
16  and for the Commonwealth of Massachusetts,
    videotaped by Craig Newman, at the offices of Fish &
17  Richardson, 225 Franklin Street, Boston,
    Massachusetts, on Tuesday, February 7, 2006,
18  commencing at 8:54 a.m.
19
20          PRO-SYSTEMS COURT REPORTING
            327 Blake Road North
21          Minneapolis, Minnesota 55343
            (952) 939-0091
22
23
24
25
```

Page 2

```
 1   APPEARANCES:
 2        ANTHONY R. ZEULI, ESQ.
          TODD S. WERNER, ESQ.
 3        Merchant & Gould
          3200 IDS Center
 4        80 South Eighth Street
          Minneapolis, Minnesota 55402-2215
 5             on behalf of the Plaintiff
 6        MICHAEL E. ZELIGER, ESQ.
          Fish & Richardson, P.C.
 7        225 Franklin Street
          Boston, Massachusetts 02110-2804
 8             on behalf of the Defendant
 9   ALSO PRESENT:  Alana Sharenow, Esq.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1    Q.    And do those mechanisms ease in the
2  handling of the treated fruit product?
3              MR. ZELIGER: Objection to the form
4  of the question, but you may answer.
5    A.    Yes.
6    Q.    Have you ever tried the process without
7  the oiling tumbler?
8    A.    No. I say yes and no. In Tomah we
9  wouldn't dare try it without the oiling tumbler.
10 The product is, even an oiled product, even an oiled
11 product is still sticky and the results of that
12 stickiness are visually apparent when you run a
13 process 24/7. You start to see abraded material on
14 all the conveying surfaces. It's tacky and the oil
15 is there to minimize it, but it doesn't eliminate
16 it. Non-oiled product would just be a nightmare, it
17 would just be a nightmare.
18             When I said yes and no, we did try
19 putting some product in Middleborough on the
20 conveyor that we needed to rework at a time when we
21 didn't have oiling capability. It was part of the
22 shakedown of the process. That was, the conveyor
23 surfaces were very quickly covered with product.
24   Q.    Meaning that the conveyor was actually
25 tearing part of the fruit product?

1    Q.    The moisture content of the cranberries in
2  their pre-frozen state could be measured, correct?
3    A.    That is correct.
4    Q.    And the moisture content of the sliced,
5  thawed cranberries could be measured, correct?
6    A.    That is correct.
7    Q.    Did you call the small portion of the raw
8  cranberries that are lost due to slicing fines,
9  F-I-N-E-S?
10         MR. ZELIGER:  Objection.  That's
11  contrary to his testimony.  He said nothing was
12  lost.
13   A.    Fines are an inherent aspect of slicing
14  through, to your point.  You've got frozen fruit.
15  You're going to get some shattering at the point of
16  impact.  It's not excessive, by no means.  Residual,
17  some residual artifact of that unit operation.  But
18  all the fruit finds its way into the extractor.  And
19  all the fruit finds its way out of the extractor
20  either as a decharacterized fruit slice or as juice
21  or as another potential byproduct stream.
22   Q.    Those fines would have some moisture
23  relative to the natural state of the cranberry,
24  correct?
25   A.    That is correct.

Page 101

1   Q.   Is the moisture of the fines that is lost,
2   is that somehow imparted back into the
3   decharacterized fruit piece?
4         MR. ZELIGER: Objection. Again,
5   contrary to prior testimony to the extent that
6   anything has been lost. You may answer.
7   A.   The moisture content of all the fruit is
8   roughly, whether it's fines or slices, is roughly
9   the same as it was when it came in because basically
10  you've only affected an osmotic exchange of leaching
11  out the sugar and acid and phytochemical solids and
12  replacing them by infusing in, if you will, water.
13  So the slice itself is structurally intact and very,
14  very moist. I mean, it's wet.
15  Q.   Let's talk about what you described as the
16  osmotic process.
17  A.   Yes.
18  Q.   How much time occurs between when, say,
19  the natural liquid of the cranberry exits and the
20  water of the osmotic process replaces it?
21        MR. ZELIGER: Objection. Lack of
22  foundation.
23  A.   You're asking for the residence time in
24  the extractor in effect?
25  Q.   No. I'm asking how much time occurs

1    Q.   And why not?

2    A.   Well, because my recollection was there
3  were four independent claims, three of which
4  referred specifically to raisins, and the one that
5  did not refer to raisins described the process that
6  the steps of which we do not follow.

7    Q.   Why don't you go ahead and turn to Claim
8  I, which is in column 10 of Exhibit 33?

9    A.   Yes.

10   Q.   Do you see Claim I up there?

11   A.   Yes.

12   Q.   Why don't you let me know what steps you
13 believe are not being followed at Ocean Spray with
14 respect to the accused products?

15            MR. ZELIGER:  And in answering this
16 question, again, I instruct you not to disclose the
17 content of communications that you've had with
18 counsel.  If you had an independent view prior to
19 discussing this with counsel, you may respond.

20            THE WITNESS:  Right.

21   A.   My view at the time and which is
22 consistent with my view now is that step A clearly
23 is not something we do.  We do not treat a dried
24 fruit with an acidulant.  So that was clearly
25 foundational.  Step B, dehydrating the treated dried

1  fruit, that would imply a second dehydration on our
2  part. We do not do that. And let me see, step C,
3  treating the dried fruit during step A or step B
4  with a flavoring agent, yeah, this whole claim is
5  outside the scope of what we do.
6      Q.   Are you saying more than just steps A and
7  B?
8      A.   Well --
9      Q.   Is there something in step C that you
10 don't believe Ocean Spray practices?
11           MR. ZELIGER: Again, you can answer
12 to the extent that you're referring back to your
13 original recollection.
14           THE WITNESS: Correct.
15           MR. ZELIGER: But I don't want you
16 to disclose any communications that you've since had
17 with counsel.
18           THE WITNESS: Correct.
19     A.   Let me just read this carefully now,
20 because I have to reconstruct. But I know step A
21 and B. Treating the dried fruit during step A,
22 okay, we don't do step A, or step B, which we don't
23 do. Yes, yes. I would say that neither A, B or C
24 apply.
25     Q.   Okay. Let's take them in reverse order.

1              We have instructed him not to answer
2    with respect to any opinions that have since been
3    formed in consultation with counsel and we
4    understand the plaintiff's position that we would be
5    prohibited from offering trial testimony on the
6    basis of information that we said was covered by the
7    privilege and prevented him from answering.  If the
8    plaintiff opens the door on such issues, that's a
9    different point.  But we agree that we will not
10   offer affirmative testimony to the extent that we
11   have asserted the privilege here.
12             MR. ZEULI:  And that would be with
13   respect to step C, correct?
14             MR. ZELIGER:  That's correct.
15             MR. ZEULI:  And, Mike, are you
16   including the paragraph that begins with "And so
17   forming"?
18             MR. ZELIGER:  Yes.
19             MR. ZEULI:  Okay.
20             MR. ZELIGER:  I believe -- you can
21   revisit with Mr. Mantius if you want, but I believe
22   he's told you what his reaction was and his opinions
23   that he formed and those were limited to A and B.
24        Q.   Correct, A and B?
25        A.   Correct.

Page 147

```
 1        Q.   Let's just focus on A and B for a minute.
 2   Let's start with B then.  This is the dehydrating
 3   step.
 4        A.   Right.
 5        Q.   Now, Ocean Spray does dehydrate its fruit
 6   products, correct?
 7        A.   That is correct.
 8        Q.   And it dehydrates them to a desired
 9   moisture content, correct?
10        A.   That is correct.
11        Q.   So is the only point of distinction that
12   you have with B and the Ocean Spray process is that
13   it's not a dried fruit?
14        A.   Yes.  Basically what you're inferring in
15   step A is a rehydration of a dried fruit, so
16   therefore you need to dry it, you need to dehydrate
17   it.
18        Q.   Well, let me ask you, it doesn't say
19   rehydrate in step A, does it?
20        A.   Well, you're treating with a -- excuse me.
21   It doesn't say that.  But if you're starting with a
22   dried fruit, then there would be no reason to
23   dehydrate.  At least that was my opinion at that
24   time.
25        Q.   And has your opinion changed?
```

Page 148

1      A.   Well, if --
2           MR. ZELIGER:   I have to --
3           THE WITNESS:   Yeah.
4           MR. ZELIGER:   In answering that
5  question, again, I instruct you not to disclose the
6  content of any communications that you've had with
7  counsel.  If you've had your own independent view,
8  you may answer.
9           THE WITNESS:   Right.
10     A.   Well, my view at the time was that the
11 reason that they put this step B in there is because
12 in the process of treating the dried fruit they
13 necessitated a dehydration.
14     Q.   Okay.  If the, let's just focus in again
15 on part B.  Regardless of how the fruit came to be
16 in need of dehydrating, would you agree with me that
17 Ocean Spray does in fact dehydrate its fruit
18 products to a desired moisture content, correct?
19     A.   Yes.
20     Q.   All right.  Let's go up to step A.
21     A.   Yes.
22     Q.   Now, again, it doesn't say hydrating, does
23 it?
24     A.   No.
25     Q.   It just says adding -- pardon me.  It just

Page 152

1  also don't have to form opinions on the spot.
2              THE WITNESS:  Right.
3       A.   That's a farfetched assumption.
4       Q.   I understand that probably is a hard
5  assumption for you to -- I'm just asking you to make
6  the farfetched assumption.
7       A.   Let me answer it this way.  Do we dry
8  fruit?  Yes.  We dry infused fruit to a
9  specification.  That's what we do.
10      Q.   I'll ask you one more time and see if
11 you'll answer it.
12               I want you to assume that the
13 infused fruit is considered dried fruit.  Then do
14 you agree with me that the Ocean Spray process
15 performs step B?
16              MR. ZELIGER:  And again, I object to
17 this question as calling for speculation, opinion
18 and a legal conclusion.
19              THE WITNESS:  Right.
20      A.   I would prefer not to answer that, quite
21 frankly.  I would need to talk to people here about
22 answering that question.  I mean, we dry infused
23 fruit.  The fruit is not dried, it's infused fruit.
24 And it's a drying operation that takes our infused
25 fruit which is very wet to a dry state.

1    Q.   Let's go to step A.  What do you recall
2 being the distinguishing points between step A and
3 the Ocean Spray process?
4    A.   First and foremost, the fact that this
5 process describes the treating of dried fruit.
6 Dried fruit is the feed stock to this process.
7 Frozen fruit is the feed stock to our process, or in
8 case of the infuser, decharacterized fruit is the
9 feed stock to the infuser.  We do not treat a dried
10 fruit.
11    Q.   Can I stop you there?  When you were
12 considering whether or not Ocean Spray had a problem
13 with Claim I did you consider whether the
14 decharacterized fruit pieces could possibly fall
15 within the definition of dried fruit?
16    A.   It's inconceivable that the
17 decharacterized fruit pieces fall within the
18 definition of dried fruit because that goes against
19 the laws of physics.
20    Q.   My question was a little different.
21    A.   I mean --
22    Q.   My question was did you consider it?
23    A.   No.  It's outside the realm of the
24 conceivable.
25    Q.   Is there anything else, other than the

Page 154

1  fact that you couldn't conceive of the
2  decharacterized fruit pieces being dried fruit, in
3  the claim that distinguishes the Ocean Spray process
4  from step A?
5      A.  That's the key feature, that you're
6  starting with dried fruit.  The other key aspect
7  here is that the use of acidulant is for a specific
8  purpose, to substantially removal natural flavor of
9  the dried fruit.  And from this is implied that
10 there's a reason to remove that natural flavor.  We
11 don't remove the natural flavor of cranberry save in
12 our extraction process.  So we don't employ an
13 acidulant to remove the natural flavor of cranberry.
14 We apply water to extract the juice.  When we do
15 apply an acidulant it's to intimate a cranberry
16 content and to formulate a finished product that has
17 a targeted acidity as part of its specification.  So
18 the fundamental purpose of using acid in our process
19 is completely and diametrically opposite of what's
20 being spelled out here.
21     Q.  Anything else other than the dried fruit
22 limitation and the purpose for using the citric acid
23 that distinguishes the Ocean Spray process from step
24 A?
25     A.  Well, I'm just going to say that that was

Page 163

1  A.  Only during that first 30 minutes or so or
2  less than 60-minute period.  Beyond that you've
3  reached a steady state operation whereby there's no
4  net extraction or infusion of cranberry component.
5  Q.  Now, let's be clear.  Earlier you had
6  testified that that original period before steady
7  state is reached is no more than 60 to 80 minutes,
8  correct?
9  A.  Correct.
10  Q.  You never mentioned 30 minutes earlier.
11       MR. ZELIGER:  I think he said less
12  than.
13  A.  I said less than.
14       MR. ZELIGER:  Not no more than.
15  A.  Less than, that's correct.
16  Q.  So what I'd like you to do is to assume,
17  and I know it's hard for you to make this
18  assumption, but I'm just asking you to make it.
19  Make the assumption that the decharacterized fruit
20  pieces are found to be a "dried fruit."  Is there
21  anything else in step A or does, pardon me, does
22  Ocean Spray carry out step A?
23       MR. ZELIGER:  I'm going to object to
24  this as calling for a legal conclusion, opinion
25  testimony and for you to speculate, and I'm not

```
 1   going to instruct you not to answer unless it
 2   requires you to disclose the content of
 3   communications you've had with your counsel.  You
 4   may otherwise respond if you can.
 5              THE WITNESS:  Right.
 6        A.    It's hard for me to respond to a question
 7   like that because it's really quite amazing that a
 8   question like that would be asked.  It's just so far
 9   outside the realm of the physical world to be
10   considering decharacterized fruit dry.  I mean, we
11   do not treat, infuse or whatever a dried fruit.  I
12   mean, a decharacterized fruit is by definition, I
13   mean, it is a wet fruit.  It is a hydrated fruit.
14   We hydrate the fruit in the extractor by treating it
15   with water.
16        Q.    You would agree with me, correct, I think
17   you did earlier, that the decharacterized fruit
18   pieces -- strike that for a minute.
19              Before I ask you that, can you, I'm
20   asking you to make, will you make the assumption
21   that the decharacterized fruit piece is a dried
22   fruit?  And if you will, does Ocean Spray perform
23   step A?
24              MR. ZELIGER:  Same objections and
25   instruction.  Do you have those in mind?
```

1   Q.   Okay.  And I think you just described
2 this, but the way in which the decharacterized fruit
3 pieces act as a carrier is you strip most of the
4 natural flavoring out of them and you replace it
5 with the infusion syrup, correct?
6   A.   You remove the juice, which strips out the
7 natural flavoring, and then you replace it with an
8 infusion syrup during an infusion step, that is
9 correct.
10   Q.   And then the result, as it states here on
11 Exhibit 29, is a sweetened dried cranberry that has
12 a cherry flavor in this particular example, right?
13   A.   That is correct.
14   Q.   So the result is a unique flavor that's
15 not the base fruit, cranberry, but that of the
16 flavor agent, correct?
17         MR. ZELIGER:  Objection.  Contrary
18 to prior testimony.
19   A.   Once again, this is a product whose
20 attributes reflect the composite of the flavoring
21 that you topically apply and the infusion syrup that
22 you formulate and whatever residual elements come
23 over from the fruit.  So it's a composite product
24 that's reflective of everything that went in.  So
25 even though it tastes like a cherry, it's not

Page 176

1  exclusively. Nobody would mistake a sweetened dried
2  cherry-flavored sweetened dried cranberry for a
3  cherry, for instance.
4      Q.   But the primary flavor would be cherry?
5      A.   The primary flavor is, topically is
6  cherry. We want a strong cherry flavor. But due to
7  the citric acid, we want to intimate a substantial
8  cranberry content.
9      Q.   And when you're saying "intimate," what
10 you mean is that because the citric acid in the
11 natural flavor of the decharacterized fruit piece
12 has been removed, you need to add some more of that
13 bite back in with the infusion syrup, correct?
14     A.   People that eat sweetened dried
15 cranberries expect acidity because acid defines
16 cranberries. Cranberries are a very acidic crop.
17 So by putting acid into our products, it intimates a
18 substantial cranberry content.
19     Q.   Now, how much acid is in the
20 decharacterized fruit piece before you infuse it
21 with the citric acid?
22     A.   Well, if we've extracted, say, for the
23 sake of argument, 90 percent of the juice, we've
24 extracted 90 percent of the acid, 10 percent of the
25 acid would be remaining. That would put us in an