**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

AMAZIN' RAISINS INTERNATIONAL, INC.,

            Plaintiff,

    v.

OCEAN SPRAY CRANBERRIES, INC.,

            Defendant.

Civil Action No. 1:04-cv-12679-MLW

---

**SECOND SUPPLEMENTAL DECLARATION OF WILLIAM R. WOODFORD
IN SUPPORT OF OCEAN SPRAY'S MOTION FOR SUMMARY JUDGMENT
OF NONINFRINGEMENT**

---

I, William R. Woodford, declare as follows:

1.      I am an attorney in the law firm of Fish & Richardson P.C. and I am counsel for Defendant Ocean Spray Cranberries, Inc.

2.      Attached hereto as **Exhibit 10** is a true and correct copy of excerpts from the deposition of Dr. Keith Cadwallader, taken April 10, 2006.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: May 1, 2006

            s/William R. Woodford
            William R. Woodford

60354236.doc

# Exhibit 10

Page 1

1            UNITED STATES DISTRICT COURT

2              DISTRICT OF MASSACHUSETTS

3

4    CASE NUMBER:  O4-12679-MLW

5    ----------------------------------------------------

6    Amazin' Raisins International, Inc.,

7            Plaintiff,

8    versus

9    Ocean Spray Cranberries, Inc.,

10           Defendant.

11   ----------------------------------------------------

12

13

14

15

16            VIDEOTAPED DEPOSITION OF

17                EXPERT WITNESS

18              KEITH CADWALLADER

19

20

21

22

23

24

25   TAKEN: 10 April 2006      BY: Jacqueline McKone

**COPY**

Case 1:04-cv-12679-MLW    Document 91-2    Filed 05/01/2006    Page 3 of 41

Keith Cadwallader - 4/10/2006
Amazin' Raisins International, Inc. v. Ocean Spray Cranberries, Inc.

2 (Pages 2 to 5)

**Page 2**

1  APPEARANCES:
2  MERCHANT and GOULD
   80 South Eighth Street Suite 3200
3  Minneapolis, Minnesota 55402
   PHONE: (612) 332-5300
4  FAX:   (612) 332-9081
   E MAIL: twerner@merchant-gould.com
5
   BY:   Todd Werner
6         Christopher Sorenson
   For the Plaintiff
7
8  FISH and RICHARDSON
   60 South Sixth Street Suite 3300
9  Minneapolis, Minnesota 55402
   PHONE: (612) 335-5070
10 FAX:   (612) 335-9696
   E MAIL: woodford@fr.com
11
   BY:   William Woodford
12 For the Defendant
13
14
15
16
17 Videographer:   Pat Curto, Benchmark Reporting
18
19
20
21
22
23
24
25

**Page 4**

1  NOTES
2  _____
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

**Page 3**

1          I N D E X
2  Examination by Mr. Woodford, Page 5
   Examination by Mr. Werner, Page 242
3
4        E X H I B I T S
5  1   Cadwallader declaration, Page 44
6  2   Scott declaration, Page 90
7  3   US Patent 5,188,861, Page 54
8  4   Patent examiner's rejection, Page 161
9  5   Lalji declaration, Page 141
10 6   US Patent 5,320,861, Page 235
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 5**

1          P R O C E E D I N G S
2       The following is the videotaped deposition
3  of expert witness Keith Cadwallader taken at
4  Merchant Gould, 80 South Eighth Street in
5  Minneapolis, Minnesota commencing at 9:06 a.m.
6  on 10 April 2006 pursuant to notice.
7              * * *
8          KEITH CADWALLADER
9    after having been first duly sworn deposes
10 and says under oath as follows:
11             * * *
12           EXAMINATION
13 BY MR. WOODFORD:
14 Q. Good morning.
15 A. Hi.
16 Q. Would you please state your name and spell your
17    last name.
18 A. Okay. Keith R Cadwallader,
19    C-A-D-W-A-L-L-A-D-E-R.
20 Q. Would you also provide your business address.
21 A. Business address is the University of Illinois.
22    Street address too?
23 Q. Sure.
24 A. 1302 West Pennsylvania Avenue, Urbana, Illinois
25    61801.

Page 6

1  Q. You're an Illinois resident?
2  A. Yes.
3  Q. Have you ever been deposed before?
4  A. No.
5  Q. This is your first time?
6  A. Yes.
7  Q. Well, I guess I'll throw out some ground rules
8     here that hopefully we can both abide by. First
9     we should try to avoid talking over each other,
10    and I'll do my best to prevent that, and also
11    I'm going to assume by answering you've heard
12    and understood the question I've asked. Are we
13    okay with that?
14 A. Okay.
15 Q. When were you first contacted to work on this
16    case?
17 A. It was last year. My recollection is September,
18    but I'm not entirely sure exactly.
19 Q. September 2005?
20 A. Yes.
21 Q. Who contacted you?
22 A. I got initial contact from Chris Sorenson.
23 Q. That was the first time you had been contacted
24    by anybody regarding this case?
25 A. I believe so.

Page 7

1  Q. What were you asked to do?
2  A. To review two patents.
3  Q. What two patents?
4  A. The two patents in question; the Amazin' patent,
5     and the Ocean Spray patent.
6  Q. Were you asked to do anything else besides
7     reviewed two patents?
8  A. Not really.
9  Q. What happened next?
10 A. We discussed some of the specifics in those
11    patents, and I don't recall exactly what we
12    discussed.
13 Q. Do you recall generally what you discussed?
14 A. Yeah. The general processes, and how they might
15    compare.
16 Q. Did you discuss the claims at all of the Amazin'
17    patent?
18 A. The first time maybe not so much, but later we
19    did.
20 Q. Later when?
21 A. Maybe a month later or so. Just to my
22    recollection. I don't remember exactly when we
23    went to the plant tour. You were at the plant
24    tour also, but probably just prior to that.
25 Q. I'm trying to remember when that plant tour was.

Page 8

1  A. October.
2  Q. October sounds about right.
3  A. I'm sorry. I'm not so good with the dates.
4  Q. I assume you're being paid for your work in this
5     matter.
6  A. Paid for my time.
7  Q. How are you being paid?
8  A. By the hour.
9  Q. How much?
10 A. $100 an hour roughly.
11 Q. Who is paying your bills?
12 A. Merchant and Gould.
13 Q. You submit your bills directly to them?
14 A. I do.
15 Q. Have you ever been an expert before?
16 A. No.
17 Q. This is your first time?
18 A. Yes.
19 Q. Have you ever been involved in a patent case
20    before?
21 A. No.
22 Q. Have you ever read a patent before this case?
23 A. Yes.
24 Q. Do you have patents of your own?
25 A. No I don't.

Page 9

1  Q. What occasion caused you to read a patent?
2  A. Research. Background.
3  Q. So you're familiar with patents?
4  A. Yes. To some degree.
5  Q. Did you prepare for this deposition at all?
6  A. Yes.
7  Q. How did you prepare?
8  A. We, the three of us met briefly yesterday for
9     about two hours I think. Maybe a little over
10    two hours.
11 Q. You said you met yesterday?
12 A. Yes.
13 Q. On Sunday?
14 A. Yeah.
15 Q. That's the only time you met in preparation for
16    this deposition?
17 A. Yes.
18 Q. Did you review any documents?
19 A. Yes we did.
20 Q. What documents were those?
21 A. Some of the patents, my -- and some of the claim
22    history documents.
23 Q. So when you say some of the patents, what --
24 A. Two -- there's several patents. There's the two
25    main patents; Ocean Spray, the Amazin' patent,

**Keith Cadwallader - 4/10/2006**

**Amazin' Raisins International, Inc. v. Ocean Spray Cranberries, Inc.**

5 (Pages 14 to 17)

Page 14

1  Q. The patent clearly distinguishes these --
2  A. In my opinion, yes.
3  Q. Did you talk about the removal of flavor natural
4     flavor?
5  A. Yes.
6  Q. What did you talk about with respect to that?
7  A. What exactly that means possibly.
8  Q. What --
9  A. What does removal mean?
10 Q. Right.
11 A. Well, it really depends on the context of the
12    process or the process itself; and in the case
13    of the Amazin' patent, my understanding based on
14    reading it is that removal is a process in which
15    the flavor, the original material, the feed
16    stock is sufficiently changed so that it's no
17    longer recognized as such because -- well,
18    that's my understanding of that.
19 Q. What about acidulants; did you talk about those
20    during your meeting with counsel?
21 A. We have talked about acidulant.
22 Q. What about the term non-sticky; did you discuss
23    that at all?
24 A. Not really.  Not much.
25 Q. When you talk about your understanding of the

Page 15

1     patents, is that an understanding that you came
2     to on your own?
3  A. Yes.
4  Q. So did counsel for AIR have a different opinion?
5  A. No.  I essentially was given full freedom to
6     some up with my own conclusion.
7  Q. All the conclusions you made so far in this case
8     have been your own?
9  A. Yes.
10 Q. 100 percent?
11 A. 100 percent.
12 Q. We're going to get into all this again later.
13    So I guess I'll -- rather than diving right in,
14    I want to ask you a few things about your
15    background.
16 A. Okay.
17 Q. Could you describe your educational background
18    for me please.
19 A. Starting with college I assume.
20 Q. Yes.  That's a good place to start.
21 A. Let's see.  I began I received my bachelor's
22    degree at the University of Georgia in food
23    science in 1985 and went from there to pursue
24    graduate studies at the University of Florida,
25    and at Florida I received both a master's and

Page 16

1     PhD graduating in 1990 finally with a PhD.
2  Q. So what is food science?
3  A. What is food science?  Well, it's a
4     multidisciplinary field, study of food
5     particularly looking at various disciplines of
6     chemistries, microbiology, chemistry, some
7     psychology if you look at sensory for example.
8     So pretty much it could be the application of
9     various sciences to the study of food.
10 Q. Does this have to do more with flavoring, or
11    what aspect of food?
12 A. No.  All aspects of food.
13 Q. What are the various aspects of food?
14 A. From harvest to processing to canning operations
15    to drying operations to all sorts of operations.
16    Flavor is one aspect of course.  It's important,
17    but it's just one -- might even be considered a
18    small aspect in relation to overall scheme of
19    things in food science.
20 Q. What about -- I thought you mentioned food
21    chemistry.
22 A. Right.  It would be a discipline, a
23    sub-discipline under the area, subject of food
24    science.
25 Q. Could you explain what exactly food chemistry

Page 17

1     is.
2  A. It could be broken down into various aspects.
3     As you get further in your education, you tend
4     to specialize.  So for example, under food
5     chemistry, one could be a protein chemist, or a
6     lipid chemist, carbohydrate chemist.  Some
7     people study strictly water relations in foods,
8     and my area is flavor chemistry primarily is my
9     specialty.
10 Q. I guess I'm more concerned about your area which
11    is flavor chemistry.  What exactly is that?
12 A. Well, it's a lot of things, but it's the study
13    of the -- in my particular field, it's the study
14    of chemical components in foods that are
15    responsible for flavor and the processes that
16    can influence them.  Also related to the sensory
17    perception of those chemicals in foods and how
18    various processes may influence those as well.
19 Q. So would it be fair to say your specialty is in
20    the flavor aspect of food?
21 A. That's true.  Yes.  That would be fair.
22 Q. Do you have any experience in food processing?
23 A. Yes.
24 Q. What kinds of experience?
25 A. Well, extensive course work and also

**Keith Cadwallader - 4/10/2006**
**Amazin' Raisins International, Inc. v. Ocean Spray Cranberries, Inc.**

6 (Pages 18 to 21)

Page 18

1 research-wise. We do some processing in order
2 to study for example the influence on flavor.
3 So we would study the process as well.
4 Q. So go back to your course work. Are you
5 referring to your college course work?
6 A. Yes.
7 Q. With respect to your research, what type of
8 research were you referring to?
9 A. I've done a lot of research involving processes.
10 We have done some dehydration research
11 influencing on the -- on the influence of a
12 process for example either dehydration, or
13 pasteurization, or something of that nature on
14 the changes in the flavor or an added flavoring.
15 Q. By dehydration, you're talking about removing
16 moisture from product?
17 A. Yes.
18 Q. Have you ever worked with -- I think I cut you
19 off there. Were you going to go onto something
20 else besides --
21 A. No.
22 Q. To sum up your food processing research
23 experience, it relates to how dehydration
24 affects flavor?
25 A. Would you repeat that again.

Page 19

1      MR. WOODFORD: Read that back.
2      (Whereupon the material was read by the
3 shorthand reporter.)
4      THE WITNESS: Not exactly. I have some --
5 some of my experience would involve that. My
6 experience is much more broad than that, but I
7 have done some research in that area.
8 BY MR. WOODFORD:
9 Q. Let's go into the broader experience you're
10 talking about. What exactly is that?
11 A. It's quite broad. We've gone from reaction
12 systems where we can create flavor in products.
13 So for example, what we call reaction flavors to
14 most recently looked at the effects of ultra
15 high-temperature processing flavor changes in
16 soy milk for example. In the past, we've done
17 work with flavor changes in herbs as influenced
18 by drying technique. Those are just three
19 examples.
20 Q. What do you mean by drying technique?
21 A. Freeze drying versus air drying.
22 Q. That involves the removal of moisture?
23 A. Drying involves the removal of moisture. Yes.
24 Q. What about fruit products; do you have any
25 experience with fruit products?

Page 20

1 A. Yes.
2 Q. What experience would that be?
3 A. Well, my research was conducted at a citrus
4 experiment station at the University of Florida
5 called the Citrus Research and Education Center
6 is the name of the place, and so I had -- I have
7 a good deal of experience working with that
8 product. Not so much in the research field, but
9 as a student I was often asked to help out on
10 projects, but my area in fruits specifically I
11 worked with students who have done special
12 projects with fruit products to look at
13 influence on flavor of a process for example.
14 Q. So let's go back to your work at the citrus
15 experiment station. You're talking about the
16 product. What product are you talking about?
17 A. Juices primarily.
18 Q. Like what kind of juices?
19 A. Orange juices in particular.
20 Q. What were you doing with the orange juices?
21 A. We often looked at concentration technologies
22 for -- well, for example, reverse osmosis versus
23 vacuum distillation versus freeze concentration.
24 Q. Why were you looking into those various
25 technologies?

Page 21

1 A. Flavor quality primarily.
2 Q. How each of those affects the flavor of the
3 juice?
4 A. That's correct.
5 Q. What did you find? Which is the best for
6 flavor?
7 A. Well, both. It depends on what your criteria
8 is. If it's cost benefit ratio, it's difficult.
9 I would say freeze concentration is probably an
10 excellent way to do it. Reverse osmosis is
11 excellent too, but it has some limitations.
12 Q. What are the limitations?
13 A. Concentration. The concentration you can
14 achieve in the process.
15 Q. What about the concentration?
16 A. Somewhat limited because of osmotic problems you
17 get up to -- and viscosity problems.
18 Q. Explain those. What are osmotic and viscosity
19 problems?
20 A. Primarily viscosity. When you get to a high
21 brix solution, it's hard to pump, it's hard to
22 flow, and reverse osmosis requires that the
23 material is flowable through the membranes.
24 Q. You're aware --
25 A. Across the membranes that is.

Keith Cadwallader - 4/10/2006
Amazin' Raisins International, Inc. v. Ocean Spray Cranberries, Inc.

7 (Pages 22 to 25)

Page 22

1  Q. You're aware that Ocean Spray uses reverse
2     osmosis?
3  A. I'm aware of that.
4  Q. You saw that when --
5  A. Excellent technique. A little bit expensive.
6  Q. I'll pass that along.
7  A. I'm not going to ask them that change that.
8     It's excellent. If they can make it work,
9     wonderful.
10 Q. You also talked about another type of fruit
11    product. You talked about work with other fruit
12    products involves students. I don't remember
13    what you said. Elaborate more on what you were
14    talking about.
15 A. Well, we have -- I had one student was
16    interested in flavor of a dehydrated peach.
17 Q. What specifically about -- anything specific
18    about the dehydrated peach or --
19 A. It's a unique flavor created during the process.
20 Q. So so far, we've gone through your experience
21    with orange, orange juice --
22 A. Some examples.
23 Q. What are some other fruits you've worked with?
24 A. Well, it's hard to -- I'm not sure this is
25    actually a fruit, but we worked with just

Page 23

1     generally profiling of some fruit products.
2     Like, we worked with one product called Ioroco,
3     L-O-R-O-C-O. It's a flowering -- it's actually
4     a bud. These are some examples. There's so
5     much we've done. We looked at what constitutes
6     typical -- what chemical components constitute
7     its typical flavor. So we analyze -- we do a
8     lot of analyses to determine which compounds are
9     responsible for flavors in various products.
10    We're not so much product specific in our
11    research. Our techniques are applicable to a
12    wide range of products.
13 Q. What about -- why don't we cut to the chase
14    here. What about cranberry products; have you
15    ever worked with cranberry products?
16 A. No. Very interesting product, but I have never
17    had a chance to work with them.
18 Q. What about raisin or grape products; have you
19    ever worked with those?
20 A. Some grape products. Depends on what you define
21    as a grape product I suppose.
22 Q. Why don't you tell me what grape products have
23    you worked with.
24 A. I've worked with wine. I have worked with some
25    juice. Worked with muscadine juice. Are you

Page 24

1     familiar with the muscadine?
2  Q. I can't say I am.
3  A. It's almost not a grape, but it's a southern
4     wild type of grape.
5  Q. We have wine and the juice of the muscadine.
6     Anything else with respect to grape products?
7  A. No. Not to my recollection.
8  Q. Have you ever worked with dried fruit?
9  A. Other than that particular -- well, let me ask
10    you what you mean by dried fruit first.
11 Q. That's an interesting question, and obviously
12    it's a question that's at issue in this case.
13    Why don't you just tell me your experience with
14    dried fruit, and I guess we'll -- by whatever
15    you think it means, and we'll sort it out as we
16    go.
17    MR. WERNER: Objection. Vague.
18    THE WITNESS: Okay. I think it has a
19    meaning in context -- the problem is it has been
20    defined three ways in the Amazin' patent. If
21    you would like to use the term dried fruit
22    product, then that may be satisfactory for me,
23    but the problem is the dried fruit as such is
24    dependent upon -- what constitutes a dried fruit
25    is dependent upon a lot of different variables

Page 25

1     in my experience, and also especially experience
2     with the Amazin' patent.
3     BY MR. WOODFORD:
4  Q. Why don't you just identify a certain product.
5     We've been going through and you've identified
6     various projects you've worked on. Could you
7     identify a project you worked on involving
8     fruit?
9     MR. WERNER: Objection. Vague.
10    THE WITNESS: I could identify a project
11    that involves a very narrowly defined dried
12    fruit product.
13    BY MR. WOODFORD:
14 Q. What would that be?
15 A. What would that dried fruit product be?
16 Q. Yes.
17 A. It would be peach.
18 Q. Is this the dehydrated peach we were talking
19    about?
20 A. Yes.
21 Q. That's an example of a dried fruit product?
22 A. Well, actually we dealt with dehydrated as well
23    as a dried fruit product. Peach. They are
24    defined differently. Dehydrated product is
25    defined as a product with moisture less than 2

Page 26

1    and a half percent, and you can find those
2    products, but the USDA would define a dried
3    peach product as one containing approximately 25
4    percent moisture.
5    Q. What's your source for that?
6    A. You can find that in the USDA. It depends upon
7       the grade, but that's to my recollection. It's
8       going to be in that range. It's not strictly 25
9       percent, but it's approximately 25 percent
10      because there's some variation. It could be
11      below that.
12   Q. So you worked with -- your experience with dried
13      fruits are the dehydrated peach with less than 2
14      and a half percent moisture content --
15   A. No.
16         MR. WERNER: Objection. Vague.
17         THE WITNESS: That's not correct. It
18      ranged below 25 percent, and I don't recall
19      exactly the products' moisture ranges we were
20      dealing with, but we had examined in addition to
21      the dried peach product a dehydrated product as
22      well.
23         BY MR. WOODFORD:
24   Q. How would you characterize the moisture range of
25      the peach product we've been discussing here?

Page 27

1    A. Below 25 percent.
2    Q. With respect to food processing, have you had
3       any experience with the flowability of products
4       during manufacture?
5         MR. WERNER: Objection. Outside the scope
6       of his testimony.
7         THE WITNESS: Not research-wise. No.
8         BY MR. WOODFORD:
9    Q. Do you know what I mean by flowability of a
10      product during the manufacturing process?
11   A. Yes.
12   Q. What is your understanding of that?
13   A. Flowability?
14   Q. Yes.
15   A. Well, I was fortunate to have course work as a
16      graduate student in a product. I forget the
17      name of the course, but it was a food
18      engineering course in which one of the areas
19      would have been characterization of various food
20      products including solid food products, and
21      flowability, and so forth, however I've never
22      done any research in that field, and I'm not an
23      engineer.
24   Q. Do you have an understanding of what for example
25      the term flowability means?

Page 28

1    A. Well, not really. Not as defined as such in
2       textbook. I couldn't come up with a textbook
3       definition. I think it's possibly a fairly
4       vague term without clearly being defined.
5       Flowability.
6    Q. How does it relate to the stickiness of a
7       product? Do you have any understanding of how
8       those two go together?
9    A. I really didn't examine stickiness in relation
10      to this process. I would -- I guess it depends
11      on what you mean by stickiness. I mean, there
12      are various -- it's not a quantifiable term.
13   Q. You said you never examined stickiness with
14      regard to this process. What process are you
15      talking about?
16         MR. WERNER: Objection to the whole line as
17      outside the scope of this testimony.
18         THE WITNESS: In relation to the material
19      that I reviewed for this.
20         BY MR. WOODFORD:
21   Q. You're talking about Ocean Spray's process?
22   A. Well, more than that. I reviewed several
23      documents.
24   Q. Let's just back up a step. You reviewed Ocean
25      Spray's process?

Page 29

1    A. Yes.
2    Q. And you understand --
3    A. I've seen the process.
4    Q. You don't have any opinions with respect to the
5       stickiness of the product in Ocean Spray's
6       process?
7    A. No. My -- I have seen the final product as
8       well, and I don't have any concerns about
9       stickiness. No.
10   Q. What do you mean by don't have any concerns?
11   A. I don't have any specific comments about it
12      because I think that may be something that they
13      deal with, but I don't know if it's a problem or
14      not.
15   Q. So you don't have any opinions regarding whether
16      something is sticky or not sticky in Ocean
17      Spray's process; is that fair?
18   A. That's fair.
19   Q. You haven't considered that at all in your work
20      here on this case?
21   A. I'm aware of some documents that have contained
22      some discussion about stickiness, but I didn't
23      review them very carefully.
24   Q. Do you expect to get involved with the
25      stickiness issue at some point --

Case 1:04-cv-12679-MLW    Document 91-2    Filed 05/01/2006    Page 9 of 41
**Keith Cadwallader - 4/10/2006**
**Amazin' Raisins International, Inc. v. Ocean Spray Cranberries, Inc.**

9 (Pages 30 to 33)

Page 30

1   A. Not really.
2       MR. WERNER: Objection. Calls for
3   speculation.
4       THE WITNESS: I don't know. I didn't
5   consider it much.
6       BY MR. WOODFORD:
7   Q. At this point, you haven't considered it at all?
8   A. No. Not really.
9   Q. Do you have any experience with the use of
10  acidulants to remove flavor?
11      MR. WERNER: Objection. Vague.
12      THE WITNESS: We're going to have to define
13  remove flavor. In my experience, this includes
14  sensory evaluation as well because sensory is a
15  physiological and psychological study of how
16  people perceive and understand what they are
17  perceiving, that is their perception, and in the
18  flavor -- in flavoring materials, one can remove
19  flavor essentially, remove flavor in quotes, by
20  masking. It's providing an alternative
21  flavoring that substantially causes the consumer
22  to not recognize the original flavor of the
23  material. That would be an instance where the
24  flavor is removed, and it is used in that way
25  often, and then there are other processes

Page 31

1   perhaps that are more direct in what they do
2   such as in a distillation process where the
3   component is actually physically removed from
4   the product. Two different instances.
5       BY MR. WOODFORD:
6   Q. So removal of a flavor component is different
7   from masking a flavor component; would you agree
8   with that?
9       MR. WERNER: Objection. Mischaracterizes
10  his testimony.
11      THE WITNESS: Again, removal is going back
12  to the -- removal can be a component of masking,
13  or they can be intertwined. It depends on the
14  actual process itself on whether that is
15  occurring. So in the case -- as an example, in
16  the case of the Amazin' process, removal -- I
17  believe after reading that very carefully what
18  they mean by removal, substantially remove is to
19  make the product such that it's no longer
20  recognizable as being whatever the original
21  material -- whatever its properties were are no
22  longer recognized, but it now contains the
23  flavor or is recognized as having the flavor of
24  whatever flavoring agent they apply.
25      BY MR. WOODFORD:

Page 32

1   Q. So you're saying in the Amazin' process the
2   flavor is not physically removed from the fruit
3   piece?
4   A. I don't know that.
5   Q. What are you saying then?
6   A. I'm saying that it might possibly be physically
7   removed, but it probably is being removed in the
8   context or the sense that the person that is
9   consuming the product doesn't recognize it as
10  being whatever the original material was, once
11  was.
12  Q. Why is it that you can't tell if it's being
13  physically removed?
14  A. I can only gauge by what I read in the patent,
15  and there's not enough information for me to
16  make that statement.
17  Q. In the patent, it's unclear whether any flavor
18  is being removed at all?
19      MR. WERNER: Objection. Vague.
20      THE WITNESS: We go back to remove again.
21      BY MR. WOODFORD:
22  Q. Physically remove. Let me just clarify this --
23  A. If you would define remove for me, I could
24  probably answer that question if you use a
25  different terminology maybe.

Page 33

1   Q. Why don't we do this. If you were to walk up to
2   someone on the street and say what does the word
3   remove mean, what do you think they would say?
4   A. It depends on what -- remove what? You're
5   talking about just the term remove?
6   Q. Right. Just the term remove. In a dictionary.
7   What does a dictionary say remove means? Do you
8   have any understanding of that?
9   A. Yes of course.
10  Q. What is your understanding?
11  A. I don't know what the dictionary would say, but
12  my understanding of that would be to physically
13  -- well, it's hard to come up with another
14  synonym for remove.
15  Q. What about take away? Take out, take away?
16  A. Take out I suppose.
17  Q. Should we call that the common meaning of
18  remove?
19      MR. WERNER: Objection. Vague.
20      BY MR. WOODFORD:
21  Q. So when we're talking about this we have some
22  sort of --
23  A. It's like anything else. It depends on the
24  context of the statement.
25  Q. I understand that's your view of the word

Keith Cadwallader - 4/10/2006
Amazin' Raisins International, Inc. v. Ocean Spray Cranberries, Inc.

Page 34

1  remove. I guess I'm --
2  A. Most words --
3  Q. So we can talk about this today, what I'm
4     getting at it perhaps we could say that --
5  A. Why don't we use the term physically remove.
6  Q. Okay. So let's go back to the Amazin' patent.
7     Can you tell if the flavor is being physically
8     removed from the fruit product by the acidulant
9     in the Amazin' patent?
10 A. There's not enough information to know that. I
11    do not know.
12 Q. What information is lacking?
13 A. What is lacking is there's not data -- there's
14    no data to tell me whether or not the component
15    has changed within the system -- within the --
16    let's say for example raisin product. There's
17    no table, there's no data to show that a
18    specific flavoring agent has exchanged from the
19    fruit to the treatment solution for example.
20 Q. So there's no -- is that a simple way of saying
21    that is there's no data to show that flavor has
22    been physically removed from the fruit product
23    by the acidulant; is that right?
24 A. That's correct.
25 Q. What do you believe is happening in the Amazin'

Page 35

1  process?
2      MR. WERNER: Objection. Calls for
3  speculation.
4      THE WITNESS: That does call for
5  speculation in the sense that I can speculate
6  based on some of the mask balances that are
7  given there.
8  BY MR. WOODFORD:
9  Q. Well, you're an expert in this field, or at
10    least you claim to be; right?
11 A. Right. Exactly. What I primarily see is that
12    -- of course they are using an acidulant in a
13    solution, and obviously based on the data that's
14    presented, the acidulant does make its way into
15    the product. It is infused, or perhaps by
16    osmosis transfers through the membrane of the
17    fruit into it. Whether or not there's an
18    exchange of solids from the interior part of the
19    raisin to the solution it's not known. So I
20    would expect that there would be some exchange.
21 Q. Expect there would be some exchange of what?
22 A. Of solids fruit solids.
23 Q. Of fruit solids where?
24 A. From the raisin into the treatment solution.
25 Q. Why would you expect that?

Page 36

1  A. It's just logical based on my experience. I
2     would expect -- I'm speculating here. I would
3     expect. My hypothesis would be that that would
4     happen to some degree, but I don't know how
5     much.
6  Q. So is that the removal of the flavor that the
7     patent teaches?
8  A. It's possible but doubtful.
9  Q. So the removal that the patent is teaching is a
10    masking type of removal?
11 A. I think in the context of removal the way and
12    they are using it and the way that many would
13    use it in the flavor field often times product
14    -- all flavors are removed not by physically
15    removing the off-flavored constituents from the
16    food but by masking them with additional flavor.
17 Q. That's what you believe is happening in the
18    Amazin' patent?
19 A. I believe so.
20 Q. Would you call that the acidulant becoming part
21    of the fruit's flavor profile? Would that be a
22    way to talk about that?
23 A. It modifies the flavor profile and thus probably
24    becomes part of the flavor profile. Yes.
25 Q. So it's fair to say in the Amazin' patent what's

Page 37

1  happening is the acidulant is becoming part of
2  the fruit's flavor profile; is that right?
3  A. It's definitely changing it. Yes. The
4     acidulant in addition to the flavoring agent
5     that they also use. Yes. Those combined of
6     course.
7  Q. So now let's go back to your experience in this
8     area. Why don't we start with physical removal
9     of flavor. Do you have any experience with
10    that?
11 A. I'm trying to think of a good example. Yes I
12    have, but mostly in distillation processes.
13 Q. Why don't you explain how distillation process
14    works.
15 A. In this case, we're talking about aroma
16    chemicals which are a component of flavor, and
17    the aroma chemicals are -- can be differentiated
18    from the matrix, the food matrix itself which
19    would be the nonvolatile material in that they
20    are volatile and can be removed fairly easily by
21    just either a vacuum distillation or regular
22    distillation process. This is often done in the
23    industry to make flavorings or to capture the
24    flavor materials from raw materials, raw
25    agricultural materials.

Case 1:04-cv-12679-MLW    Document 91-2    Filed 05/01/2006    Page 11 of 41
Keith Cadwallader - 4/10/2006
Amazin' Raisins International, Inc. v. Ocean Spray Cranberries, Inc.

11 (Pages 38 to 41)

Page 38

1  Q. In a distillation process, components of some
2     sort of material, flavor components are
3     physically removed and captured for use in other
4     --
5  A. That's true. Yes, and concentrated in the
6     process.
7  Q. That's an example of physical flavor removal in
8     your mind?
9  A. Yes.
10 Q. Did you have any other experience besides
11    distillation?
12 A. Well, not so much directly as a process, but we
13    have studied what we call scalping which is a
14    process in which packaging materials will tend
15    to remove flavoring from foods such as plastics,
16    use of plastic liners and such have some high
17    affinity for flavoring materials, and they will
18    actually absorb into them.
19 Q. What chemically happens there or physically
20    happens in that process?
21 A. That is a combination of several things, but
22    mostly there's a diffusion process. The
23    volatile diffuses freely through the matrix of
24    the food. It will diffuse, and since it prefers
25    to absorb into the packaging film, it will

Page 39

1     diffuse to the film and then absorb into the
2     film, and overtime it sufficiently will remove
3     enough of the flavoring from the food to cause a
4     flavor change.
5  Q. Do you have any experience using osmosis to
6     physically remove flavor?
7  A. No. Not really. Osmosis is a fairly generic
8     terminology. I'm trying to think of a case
9     where I've used osmosis. I suppose if one looks
10    at a washing step that would involve some
11    osmosis. So if one is washing flavoring
12    materials from a feed stock for example of raw
13    agricultural commodity, then osmosis is
14    involved. It's hard to answer that question
15    specifically. Not primarily osmosis mechanism.
16    Probably not.
17 Q. Okay. We talked about this a little bit. I'm
18    not sure if I asked you this specifically, but
19    physically removing -- we're on the physically
20    removing flavor. Have you ever worked with
21    acidulants to do that at any time?
22 A. Not specifically to do that. No. Not with that
23    intention.
24 Q. So if we go to your definition of removal which
25    includes the masking element, do you have

Page 40

1     experience using acidulants to mask flavor?
2  A. I have experience with the use of masking agents
3     that may or may not contain acidulants in their
4     composition, but acidulants alone as masking
5     agents no I don't. I don't recall ever doing
6     that sort of study.
7  Q. Is that a common way to refer to these things as
8     masking agents?
9        MR. WERNER: Objection. Vague.
10       THE WITNESS: No. Masking agents is a
11    fairly recent terminology used for various
12    products sold through the flavor industry, and
13    it depends on what you mean by those products,
14    but some flavoring agents are specifically
15    designed as masking agents.
16 BY MR. WOODFORD:
17 Q. Why don't I ask you what exactly is a masking
18    agent?
19 A. It's a very good question, and it really depends
20    on the company that is manufacturing it.
21 Q. Can you give me an example?
22 A. Sure. Let's say you wanted to manufacture a soy
23    milk beverage, and you have found that your
24    customers really don't appreciate the beanie or
25    grassy out flavor, typical soybean flavor. So

Page 41

1     you purchase a masking agent from a
2     manufacturer, and the masking agent does two
3     things typically; one, it will suppress but not
4     physically suppress necessarily, but at least
5     the impression will be that it suppresses the
6     off flavors and at the same time provide some
7     other kind of flavor that is more desirable.
8  Q. That's an example of a masking agent?
9  A. Yeah. That's an example. Yes.
10 Q. Would you call that the removal of flavor?
11       MR. WERNER: Objection. Vague.
12       THE WITNESS: In the context of how it's
13    used in the Amazin' process, yes.
14 BY MR. WOODFORD:
15 Q. So you're talking about the context of the
16    Amazin' patent. Let's set that aside for a
17    second what about --
18 A. Is that physically remove flavor?
19 Q. No. Just removing flavors. Outside the context
20    of the Amazin' patent, would you call the
21    masking agent -- what it's doing there would you
22    call that removal of flavor?
23 A. It's a tricky question, and it's a tricky answer
24    too I'm afraid. It has some -- they do
25    influence the distribution of the flavoring

Keith Cadwallader - 4/10/2006
**Amazin' Raisins International, Inc. v. Ocean Spray Cranberries, Inc.**

Page 42

1  agents in the product by either binding them in
2  some way so that they are not available for --
3  to produce whatever sensory response that they
4  usually do. Okay? So in that context, they do
5  remove flavor from participating in that as a
6  stimulus. At times. It really depends on the
7  product, but yeah. There's a physical
8  interaction that essentially removes -- does it
9  react with and does it actually remove as such,
10  physically remove or reactive way, or the
11  compound itself from the matrix? No. It puts
12  it in a form in which it's no longer available.
13  Q. So rather than taking it out, it changes it
14  somehow; right?
15  A. Yes. Well, yeah. I suppose. That's one way to
16  look at it.
17  Q. So if you were talking with your colleagues and
18  you were talking about masking agents, would you
19  say -- would you call that removing flavor?
20      MR. WERNER: Objection. Vague.
21      THE WITNESS: My colleagues probably would
22  not use that terminology per se. I think the
23  masking itself is a sufficient term for what the
24  process is.
25      BY MR. WOODFORD:

Page 43

1  Q. I'm sorry for interrupting you again. So the
2  masking -- you would call that masking if you're
3  talking to your colleagues?
4  A. Yeah.
5  Q. The Amazin' patent has a different use of
6  removal in your mind; right?
7      MR. WERNER: Objection. Mischaracterizes
8  his testimony.
9      THE WITNESS: I'm not sure the term masking
10  is something I'm comfortable with using in
11  Amazin' patent, to explain what's going on in
12  the Amazin' patent. I'm not entirely sure that
13  masking is the sole mechanism on the change of
14  flavor. There's more to it than that.
15      BY MR. WOODFORD:
16  Q. What's the more to it?
17  A. There may be physical removal.
18  Q. You can't tell from the patent?
19  A. I don't know. I'm uncomfortable in
20  characterizing it so narrowly at this point.
21      MR. WOODFORD: Why don't we take a break.
22  This is a decent stopping point, and by the way,
23  if you need a break, just let me know. Just
24  answer the question, and we'll take a break and
25  come back.

Page 44

1      (Whereupon a short break was taken from
2  9:58 a.m. to 10:27 a.m.)
3      BY MR. WOODFORD:
4  Q. You didn't talk about your testimony with
5  counsel at break did you?
6  A. I'm sorry?
7  Q. Did you talk with counsel about your testimony
8  at break?
9  A. Briefly.
10  Q. What did you talk about?
11  A. They just told me I was doing okay.
12  Q. Anything else?
13  A. Maybe slow down a little bit. Something like
14  that.
15  Q. Nothing specific about the substance of what we
16  were talking about?
17  A. No. I don't recall. No. There wasn't anything
18  like that. Just more, you know, listen to the
19  question or something like that.
20  Q. I've handed you what I've marked as Exhibit 1.
21  Do you recognize that document?
22  A. I do.
23  Q. It's your declaration you filed in support of
24  plaintiff's opposition which would be AIR's
25  opposition to Ocean Spray's motion for summary

Page 45

1  judgment. Do you see that Exhibit 1?
2  A. Okay.
3  Q. That's your declaration isn't it?
4  A. Yes.
5  Q. Do you recognize the document?
6  A. Yes.
7  Q. If you flip to Page 5, do you see where it says
8  S/ and your name?
9  A. Um-hm.
10  Q. Did you authorize that signature?
11  A. Yes. There was an original with my signature
12  actually on it somewhere. So yes. I assume I
13  authorized that.
14  Q. Was it your idea to file a declaration on behalf
15  of AIR?
16  A. My idea?
17  Q. Yes.
18  A. No. I was requested to do so.
19  Q. Explain how this came to be.
20  A. Well, I was requested to do so, and I asked --
21  we had a very lengthy telephone conversation
22  regarding the content, and I asked them to based
23  on that content draft this document -- not this
24  document, but something that was a rough draft.
25  I received that, and I made considerable change

Case 1:04-cv-12679-MLW    Document 91-2    Filed 05/01/2006    Page 13 of 41

Keith Cadwallader - 4/10/2006
Amazin' Raisins International, Inc. v. Ocean Spray Cranberries, Inc.

14 (Pages 50 to 53)

Page 50

1   didn't really know the format, and I said I
2   could draft something but I don't know the
3   format. So based on our discussion would you,
4   you know, would you send me a draft or have your
5   secretary type this up, these notes up so I can
6   look at it, and I made a lot of changes.
7   Q. You were taking notes during the conversation?
8   A. Maybe not. I have considerable notes in the
9   margins of some of these papers that I have.
10  Q. You said have the secretary type the notes.
11  What notes --
12  A. Our discussion. I'm not sure if there were
13  notes or not. I don't know. Based on our
14  conversation, I asked there to be a draft. I
15  literally don't know if I said notes or not.
16  Q. How long was the conversation?
17  A. I don't remember. Could have been 45 minutes.
18  Q. So you had a 45 minute discussion, and then you
19  said please draft something up?
20  A. Something like that. That's my recollection.
21  It was some time ago. I'm not sure what I said.
22  I needed help getting the initial draft in the
23  format I needed so I could do it in a form that
24  they could use.
25  Q. What did you discuss during the conversation?

Page 51

1   A. Pretty much the content of this declaration as
2   far as especially the claim, the primary claim.
3   Amazin' Claim I.
4   Q. I think you said you were asked if you had any
5   opinions. What do you mean by that?
6   A. Not opinions. More like could you define these
7   terms possibly, or something of that nature.
8   Really wasn't asked for an opinion outside just
9   my expertise. I suppose more of as an expert.
10  Regarding any legal issues or anything of that
11  nature, I haven't been asked my opinion about
12  those things.
13  Q. Let's go back to the discussion. You were asked
14  about possible meanings of terms in the claim?
15  A. Right. According to the context of what is
16  taught in this patent. Yes. What would you
17  construe, or what would you believe this phrase
18  would mean.
19  Q. You answered those questions?
20  A. Yes.
21  Q. You provided your definition of what you think
22  those terms would mean?
23  A. As close as you could. If I could not find a
24  literature definition for such or a legal
25  definition for such -- not so much legal but

Page 52

1   regulatory.
2   Q. What do you mean by literature definition?
3   A. Literature being perhaps defined clearly in the
4   food science or food processing of food
5   chemistry literature that well defines what is
6   meant by a term.
7   Q. Did you find any of those definitions in the
8   literature?
9   A. Not too many. I was able to find a fairly clear
10  definition for dehydrated for example, but not
11  so much for dried.
12  Q. You didn't find any definitions for dried fruit?
13  A. No. I didn't say that. I would refer to it as
14  inadequate definition, or one that's not so
15  narrowly defined.
16  Q. What definition are you referring to?
17  A. The one that's in my declaration.
18  Q. Let's turn to it.
19  A. Paragraph 6.
20  Q. So the text that's referred it in Paragraph 6 of
21  your definition that's what you're talking about
22  as literature?
23  A. Yes.
24  Q. We can get to that later. I want to go into the
25  details. So you looked for definitions of

Page 53

1   dehydrated and dried, but it's incomplete which
2   we just talked about in Paragraph 7?
3   A. Not incomplete. I believe that the definition
4   is accurate. I just believe that based on the
5   products or the types of materials that are
6   represented under say dried fruit product for
7   example, the range, the definition is very
8   difficult to make a blanket definition for all
9   those products and still describe them to a --
10  describe them well enough where you have a good
11  concept of what they are.
12  Q. What products are you talking about?
13  A. Dried fruit products. The range of moisture
14  content for example is very broad. So it's
15  difficult to narrow a range and say that these
16  products would fall between this range and this
17  range, and that's why it's not done in this
18  text.
19  Q. Doesn't the patent provide that range?
20  A. For a dried fruit product?
21  Q. For just dried fruit?
22  A. No.
23  Q. It doesn't?
24  A. I don't remember actually. I have that in front
25  of me I suppose I can look at it.

**Keith Cadwallader - 4/10/2006**
**Amazin' Raisins International, Inc. v. Ocean Spray Cranberries, Inc.**

18 (Pages 66 to 69)

Page 66

1  of. I may have looked at some of my reference
2  books just to confirm some of my understanding,
3  but I don't remember specifically any other
4  terminology that -- any of my terminology -- any
5  other terminology that I specifically needed
6  definitions of.
7  Q. So what else did you discuss besides literature
8  definitions of terms?
9  A. The processes -- I'm sorry. Would you put that
10  back in a context, that question?
11  Q. We're talking about your declaration and when
12  you received a call from counsel and had those
13  discussions.
14  A. Thank you. I wasn't sure what we were talking
15  about here.
16  Q. What else did you talk about besides the
17  definitions of certain -- in the literature?
18  A. Well, I think I mentioned some of them. I can't
19  remember what I mentioned already. We talked
20  about the general -- we did not talk much on the
21  Amazin' patent beyond the claims. We talked
22  mostly about the Ocean Spray process, and in
23  fact that's been the primary concern; to
24  evaluate that process. At least certain aspects
25  of that process.

Page 67

1  Q. What specifically about the process?
2  A. Just understanding the basic principles behind
3  our process.
4  Q. Did you formulate any opinions -- let me ask you
5  this: Have you formulated opinions about
6  infringement in this case?
7  MR. WERNER: Objection. He's not a legal
8  expert. He doesn't know the rules about
9  infringement. He's here to provide testimony
10  about the terms in the patent.
11  MR. WOODFORD: I'll ask the question again.
12  BY MR. WOODFORD:
13  Q. Have you formulated any opinions whether Ocean
14  Spray infringes Claim I of the Amazin' patent?
15  A. I'm not sure if they do or don't.
16  Q. Why are you not sure?
17  A. Because it's going to take a higher authority to
18  make that decision.
19  Q. What higher authority would that be?
20  A. I have not physically seen the Amazin' process,
21  and I'm not prepared to make that infringement.
22  I've read -- I am not entirely sure -- it
23  depends on a lot of -- I just don't have enough
24  experience in infringement cases to really make
25  that conclusion. I just don't have the

Page 68

1  background.
2  MR. WERNER: I think his testimony
3  obviously demonstrates he doesn't understand
4  what a proper infringement analysis entails.
5  BY MR. WOODFORD:
6  Q. You're familiar with the claims of the Amazin'
7  patent; at least Claim I?
8  A. Yes.
9  Q. You've read that?
10  A. Yes.
11  Q. You understand the claim requires certain things
12  be present in Ocean Spray's process; right?
13  A. Yes. That's true.
14  Q. So essentially the question I have for you is:
15  Does Ocean Spray's process contain what's shown
16  in that claim?
17  MR. WERNER: Objection. Calls for legal
18  conclusion.
19  THE WITNESS: I don't really have an
20  opinion on whether the wording is such that --
21  the way I interpret this I'm not entirely sure
22  that's the way it will be interpreted legally.
23  BY MR. WOODFORD:
24  Q. Why don't we just talk about your
25  interpretation. Using your interpretation, does

Page 69

1  Ocean Spray --
2  A. I can only tell you this: I think that the two
3  processes are in a lot of ways very similar, but
4  whether there's enough for it infringement I
5  don't know, but the concepts, and the
6  methodologies, and the processes I think have
7  some similarities.
8  Q. What in the claims -- what part of the claim do
9  you think is unclear as to whether or not Ocean
10  Spray actually performs that step?
11  MR. WERNER: Objection. Mischaracterizes
12  his testimony.
13  THE WITNESS: I don't know. I can -- let
14  me look at that real quick. I'm not entirely
15  sure what specific element there is. The
16  problem is the two papers -- the two patents are
17  written by two different groups, and there's
18  some interpretation that needs to happen in both
19  cases, and I don't feel qualified to interpret
20  the language in these.
21  BY MR. WOODFORD:
22  Q. So you this there needs to be an interpretation
23  of Mantius patent, the Ocean Spray patent as
24  well?
25  A. I think there needs to be interpretation for

**Keith Cadwallader - 4/10/2006**
**Amazin' Raisins International, Inc. v. Ocean Spray Cranberries, Inc.**

19 (Pages 70 to 73)

Page 70

1    both in order to make that conclusion.
2    Q. I see you've turned to Claim I in the patent.
3    A. Yes.
4    Q. You've read Claim I?
5    A. I have.
6    Q. You've formed some meaning in your mind as to
7       what Claim I is saying haven't you?
8    A. Yes. I have a concept for the process. Yes.
9    Q. Why do you keep saying concept?
10   A. I haven't seen the process. So I have an
11      understanding of what the process is and how it
12      would work, but having not physically seen it
13      happen like I have with the Ocean Spray process,
14      it's a little different.
15   Q. So you don't think you can understand what the
16      claims mean until you see the process?
17   A. No. I don't even know if that would be enough.
18   Q. What do you mean?
19   A. Well, sometimes the process -- I would
20      understand the process, but the claims are
21      fairly narrowly focused, and there's always more
22      to a process than in the claims.
23   Q. Okay. So then how does that affect your ability
24      to understand the claims?
25   A. I don't know how it would affect it actually

Page 71

1    having not seen the process.
2    Q. Have you ever compared Ocean Spray's process to
3       what's recited in this claim?
4    A. I have attempted to do so.
5    Q. What was the result of that?
6       MR. WERNER: Objection. Vague.
7       THE WITNESS: That's a very difficult
8       question to answer. I think there's
9       considerable similarities in the two processes.
10      Are they identical? Not identical.
11      BY MR. WOODFORD:
12   Q. Have you went through this claim though and
13      tried to word for word make sure that each
14      limitation that's in here is satisfied by the --
15   A. No. Not really. I haven't been asked to do
16      that.
17   Q. You haven't been asked to do that?
18   A. No.
19   Q. You've formed no opinions on whether or not
20      Ocean Spray can satisfy the limitations of this
21      claim?
22   A. I'm not getting --
23      MR. WERNER: Look at his declaration. He's
24      given his testimony. Let's focus on the
25      testimony and get to his opinions.

Page 72

1       MR. WOODFORD: I'm asking what opinions
2       he's formed.
3       THE WITNESS: I was not asked to give an
4       opinion on whether or not infringement -- if I
5       had an opinion about infringement.
6       BY MR. WOODFORD:
7    Q. Is it fair to say --
8    A. Up until your question, I have not given a great
9       deal of depth of thought frankly.
10   Q. So then the question I have for you is:  What
11      have you on been asked to do?
12   A. Strictly interpret the language in the context
13      in which it's described in the patents.  Period.
14   Q. You've been asked to interpret this language in
15      the claim?
16   A. Yes, but not in relation to whether infringement
17      has occurred.
18   Q. What are you interpreting in relation to?
19   A. To the process as described in this patent.
20   Q. Have you been successful in interpreting these
21      claims?
22   A. It's difficult --
23      MR. WERNER: Objection. Vague as to
24      successful.
25      THE WITNESS: I don't know what you mean by

Page 73

1    successful. What would constitute success?
2    BY MR. WOODFORD:
3    Q. Have you been able to interpret the meaning of
4       this claim?
5    A. I believe so. I believe I understand it. I'm
6       not sure we would agree on my understanding of
7       it, but I believe that I understand it.
8    Q. Is that -- so your understanding of this claim
9       that is what your declaration is focused on?
10   A. More or less. Yes.
11   Q. What do you mean by more or less?
12   A. That's true, and also evaluated the Ocean Spray
13      process as well that's described to some degree
14      too.
15   Q. If you weren't going to compare the Ocean Spray
16      process to the claim, what was --
17   A. I didn't say I didn't compare. There's some
18      comparison, but I didn't compare with intent to
19      show whether or not there was infringement.
20   Q. What was your intent in comparing?
21   A. I do a lot of comparisons every day. It's
22      something I do as part of my job is to compare
23      one process to another to look at differences,
24      and look similarities, and compare and contrast,
25      and so forth. It's natural. I believe that

Page 74

1    it's natural for most people who are very good
2    at distinguishing and discriminating between two
3    things rather than describing them in general,
4    and that's just my nature.
5   Q. You compared the two processes?
6   A. Yes.
7   Q. What's the relevance of that to your
8    declaration?
9   A. That is my declaration.
10       MR. WERNER: Objection. Calls for legal
11    conclusion.
12   BY MR. WOODFORD:
13   Q. So rather than comparing Ocean Spray's process
14    to the claim, you are comparing Ocean Spray's
15    process to the Amazin' process disclosed in the
16    Amazin' patent?
17   A. No. It's hard to say I didn't do both of those
18    things actually because the process -- in order
19    to understand the claim, in my mind, you need to
20    read the entire patent, and it's difficult to
21    not use all the information that you know about
22    those claims that are described in making
23    comparisons.
24   Q. So you're now saying that you did compare Ocean
25    Spray's process to the claims?

Page 75

1   A. I'm not sure what you mean by that. These
2    claims -- the patents -- the two patents -- the
3    two processes were compared. The claims were
4    considered.
5   Q. How were the claims considered?
6   A. As part of the process. The claims describe
7    part of the process, and you can't get away from
8    one thing when evaluating the other. They are
9    not exclusive.
10       MR. SORENSON: I think you guys are talking
11    past each other a little bit.
12   BY MR. WOODFORD:
13   Q. So --
14       MR. SORENSON: Can we go off the record for
15    a second and let the witness leave the room, and
16    maybe you and I can have a discussion to try to
17    move this around.
18       MR. WOODFORD: No. We're fine.
19   BY MR. WOODFORD:
20   Q. Let me ask you one more time. In your
21    declaration, what were you attempting to do?
22   A. Define what was intended in -- define some of
23    the terminology that is in the claim and what
24    the intent -- what I believe would be the intent
25    of the wording is what -- because some of the

Page 76

1    terminology is not well defined. What would
2    constitute certain things, or what would be a
3    reasonable definition for certain terminologies
4    based on what I could find in the literature or
5    not find in the literature, but based on my
6    experience, and also based on what's in the
7    process.
8   Q. Is there anything else that your declaration was
9    intended to do?
10       MR. WERNER: Objection.
11       THE WITNESS: Not by me. I don't know what
12    it's entirely going to be used for. This is not
13    my area of expertise or field. So I don't --
14    strictly just to see if -- to gain an
15    understanding of both processes is in my minds
16    what I wanted to do.
17   BY MR. WOODFORD:
18   Q. So any other application of your declaration
19    beyond trying to figure out what the terms mean
20    is something you're unaware of?
21       MR. WERNER: Objection. Calls for
22    speculation. He's not the lawyer. He's here to
23    offer an opinion.
24       MR. WOODFORD: In the future, state your
25    objection. We don't need speaking objections.

Page 77

1   BY MR. WOODFORD:
2   Q. You can answer the question.
3   A. I honestly don't know what the next step is
4    after this.
5   Q. In your mind, your declaration was to help
6    figure out the terms?
7   A. To as an expert evaluate both patents, give my
8    judgment on their merits and on their comparison
9    in the process as well as other aspects perhaps
10    or terminologies, and I did that. Beyond that,
11    I don't have anything at stake aside from that.
12   Q. I understand that, but what I'm trying to do is
13    -- I've asked you a few times now what your
14    declaration -- what you're doing, what the point
15    of your declaration is, and you've answered in a
16    number of different ways. At one point, you
17    said you were trying to provide your view on
18    what the words of the claim means; right?
19   A. Not all -- no. On some of the terminology
20    that's used in the claims.
21   Q. You were trying to find -- providing your view
22    on some of the terms in the claims?
23   A. Yes.
24   Q. Is there anything else that you were intending
25    to do with your declaration?

Page 78

1     MR. WERNER: The declaration speaks for
2     itself.
3         MR. SORENSON: If you want to read your
4     declaration Mr. Cadwallader as to what your
5     recollection is as to what your declaration
6     says, you certainly may.
7         THE WITNESS: Let me have a chance to look
8     at it again.
9         MR. WOODFORD: Let's take a break while
10    he's reviewing the declaration.
11        (Whereupon a short break was taken from
12    11:08 a.m. to 11:17 a.m.)
13    BY MR. WOODFORD:
14    Q. So over the break, you had the opportunity to
15    review your declaration?
16    A. I did.
17    Q. I'm going to ask you some of the same questions
18    I've asked you before.
19    A. Okay.
20    Q. Before you said that one of the reasons for your
21    declaration was to provide meaning -- your view
22    of what the meaning of some terms are in the
23    claim; is that right?
24    A. Yes.
25    Q. As part of your declaration, have you compared

Page 79

1     Ocean Spray's process to any of the words in the
2     claims?
3     A. Which claims?
4     Q. Claim I.
5     A. Yes.
6     Q. What terms have you compared Ocean Spray as
7     process with?
8     A. The main -- I'm not sure that the terminology is
9     -- they use different terms in the two, and my
10    interpretation was to -- well, what I was asked
11    to do is interpret the two to see if the
12    terminologies -- although the words were
13    different whether the intention or the meaning
14    were similar or not, and it was not only the
15    patents, but some of the -- where other -- you
16    know, where other statements were made about
17    terminology whether those terminologies seemed
18    reasonable or not as made by others, other
19    declarations.
20    Q. So you're comparing terminology in the Ocean
21    Spray process with terminology in the Amazin'
22    patent?
23    A. Basically trying to clarify both sets of
24    terminology in relation to the food science
25    understanding, or food science literature, or

Page 80

1     what one skilled in the art what would be meant
2     by both terms, both sets of terms, if they are
3     not the same, if they are different, do they
4     mean the same thing, are they similar, or what.
5     Q. You've looked at the Ocean Spray process?
6     A. I have.
7     Q. You understand what actions are being performed
8     in that process; right?
9     A. Yes. The unit operations.
10    Q. Have you taken and compared any of those actions
11    or steps in the process to the words of Claim I
12    of the Amazin' patent?
13    A. I have considered them, yes, as whether or not
14    they are similar or not.
15    Q. What do you mean by whether they are similar?
16    A. Whether those -- the claims as described in the
17    Amazin' patent is the same as the unit operation
18    that I observed when I looked at the plant.
19    Q. What was your conclusion when you compared
20    those?
21    A. I think some of them are very -- are -- the main
22    processes are the same.
23    Q. Could you elaborate on that? What do you mean
24    by main processes?
25    A. Just looking at the process in general, not

Page 81

1     looking at the language because the language is
2     very specific, you can go word by word through
3     it but let's look at the general process which
4     is taking a feed stock and --
5     Q. Actually, before we get into the detail on the
6     process --
7         MR. SORENSON: Let him finishes his answer.
8     BY MR. WOODFORD:
9     Q. We're going to go through the process in detail
10    in about ten minutes.
11        MR. SORENSON: Are you going to let him
12    finish his answer? You interpreted him.
13        (Multiple parties talking over each other
14    cannot be taken down.)
15        THE WITNESS: Maybe you should reword the
16    question.
17    BY MR. WOODFORD:
18    Q. I'll ask you a question --
19    A. I seem to not be answering what you were
20    intending.
21    Q. We could talk for an hour on the process. Did
22    you compare the process to the words of the
23    claim?
24    A. I attempted to do that. Yes.
25    Q. What was the result?

Keith Cadwallader - 4/10/2006
**Amazin' Raisins International, Inc. v. Ocean Spray Cranberries, Inc.**

22 (Pages 82 to 85)

Page 82

1  A. I think that -- I'm not sure what you mean by
2     result of that. Each --
3  Q. You say you've attempted to do that. What do
4     you mean by that?
5  A. It's in my declaration; that is, comparing
6     aspects like for example the process itself of
7     decharacterization, drying, so forth. Each of
8     those. I looked at the comparison of two
9     processes. I'm not sure how to answer your
10    question exactly as to what is the overall
11    result of that.
12 Q. Again, you went back to comparing the processes.
13    What I'm asking you is: Did you compare Ocean
14    Spray's process to the words of the claim?
15 A. Yes.
16 Q. So when you compare -- because you realize
17    that's what relevant here is the words of the
18    claim; right?
19 A. Yes.
20 Q. So the words of the claim define what the
21    Amazin' process is doesn't it?
22 A. It's the words and how they are interpreted.
23    Yes.
24 Q. So when you read the words and you interpret
25    them, you understand what the Amazin' process --

Page 83

1     what this patent covers; right?
2  A. I do.
3  Q. Does the patent cover Ocean Spray's process?
4     MR. WERNER: Objection. Calls for legal
5     conclusion. Outside the scope of his testimony.
6     THE WITNESS: The process that Ocean Spray
7     uses is greater than what we're talking about.
8     It's more -- their process, and you'll have to
9     define what their process is because they have
10    several processes that are undergone in their
11    plant or that are undertaken in their plant, and
12    I don't think the entire process is what I
13    compared. I did not compare their entire
14    process.
15    BY MR. WOODFORD:
16 Q. So there are some words in this claim that you
17    compared Ocean Spray's process to?
18 A. To part of their process.
19 Q. As part of their process. When you did that
20    comparison, what was the conclusion of that
21    comparison?
22    MR. WERNER: Objection. Calls for legal
23    conclusion. Vague and ambiguous. You're
24    referring to a generality.
25    THE WITNESS: I did not record that

Page 84

1     conclusion in my --
2     BY MR. WOODFORD:
3  Q. Have you formed a conclusion?
4  A. I'm still -- I still think it needs some further
5     interpretation from someone other than one
6     skilled in the art to interpret some of the
7     language.
8  Q. You feel what needs interpretation?
9  A. The legal interpretation.
10 Q. Are you talking about the claim, the words in
11    the claim?
12 A. I think that in my opinion I have certain ideas
13    of what these words mean. I'm not entirely sure
14    that they are going to be interpreted that way
15    by somebody else.
16 Q. That's what I'm asking you. Right now I'm
17    asking you what you feel the words mean because
18    that's what your declaration talks about.
19 A. Essentially yes, but I haven't broken it down
20    into the entire process --
21    MR. WERNER: If you could pause for a
22    second so I can get an objection in.
23    THE WITNESS: I haven't broken it down into
24    the entire process.
25    BY MR. WOODFORD:

Page 85

1  Q. You haven't broken what down?
2  A. The entire process is what you're asking; right?
3  Q. I'm just asking about any comparison that you've
4     done. I understand that you haven't compared the
5     entire process. So you've done a limited
6     comparison --
7  A. Of steps.
8  Q. Which steps would those be? Can you identify
9     them in the claim?
10    MR. WERNER: If you need to look at your
11    declaration to answer that, you can.
12    THE WITNESS: Certainly. Well, there's the
13    initial material feed stock. There's the
14    initial step of we'll call it decharacterization
15    --
16    BY MR. WOODFORD:
17 Q. Let me ask you first I was referring to the
18    steps in the claim, the claim steps, the claims
19    in Column 10. Are you there?
20 A. I think they are the same in 2, but okay. Sure.
21 Q. What steps have you considered?
22 A. All of these.
23 Q. What steps did you consider in your declaration?
24 A. The treating of dried fruit with an acidulant.
25    I haven't really considered the dehydration

Keith Cadwallader - 4/10/2006
**Amazin' Raisins International, Inc. v. Ocean Spray Cranberries, Inc.**

Page 86

1  other than it's a -- I feel it's a standard
2  process. It's not one that's unique to either
3  patent, the dehydration step, and then there's
4  the treatment with the flavoring agent. So in
5  my opinion, both processes treat with an
6  acidulant, and both processes treat --
7  dehydrate, and both processes flavor the product
8  before and after dehydration, or I should say
9  before or after dehydration. Excuse me.
10  Correction.
11  Q. If you look at the steps here A, B, and C, they
12  have a lot more words than just treating within
13  an acidulant.
14  A. Absolutely.
15  Q. You've considered all those words?
16  A. Yes. I was just being a little more
17  abbreviated.
18  Q. When you considered all those words, have you
19  taken that and then compared it to Ocean Spray's
20  process --
21  MR. WERNER: Objection. Vague. Unclear as
22  to which part of the claim you're referring to,
23  or which portion.
24  THE WITNESS: I'm sorry. Would you repeat
25  that again.

Page 87

1  BY MR. WOODFORD:
2  Q. I'm talking about the words you just identified,
3  the things that you say you've considered, and
4  you've looked at those words, and you understood
5  what they meant, and I'm asking you: Did you
6  then take that and compare it to the Ocean Spray
7  process?
8  MR. WERNER: If you need to review your
9  declaration to familiarize yourself with your
10  opinions.
11  THE WITNESS: Not as a matter of -- in the
12  in the grand scheme of things, but individually
13  yes.
14  BY MR. WOODFORD:
15  Q. Not in the grand scheme of things?
16  A. That is not the entire process, but the portions
17  of the process, and not every word in the claim.
18  Q. So you just kind of looked at the claims more
19  generally?
20  A. No. There are -- for example, one lists in Part
21  A numerous acids which are not mentioned in my
22  declaration. Citric acid.
23  Q. I understand that. You understand what the
24  words mean, and you've compared Ocean Spray's
25  process to those words. Do those words describe

Page 88

1  Ocean Spray's process?
2  A. Do these --
3  MR. WERNER: Objection. Vague.
4  THE WITNESS: I'm not sure if you mean
5  literally or by interpretation.
6  BY MR. WOODFORD:
7  Q. Literally?
8  A. No.
9  Q. So back to the process of drafting this
10  declaration. You had this telephone conference
11  right with your attorneys?
12  A. Yes.
13  Q. Then you've had a discussion for about 45
14  minutes; is that right?
15  A. As I remember, it was about that length of time.
16  Q. Then you asked the attorneys to draft up
17  something along of lines of what the discussion
18  was about?
19  A. Yes.
20  Q. Then what happened?
21  A. Then I received a copy of that which I amended
22  or rewrote many parts of it.
23  Q. What parts did you rewrite?
24  A. I don't remember exactly. I added some
25  statements about flavoring in particular whereas

Page 89

1  -- that we did not discuss that I thought were
2  relevant about addition of WONF flavors I
3  remember specifically with the Duraromes I did
4  add that in, but I didn't have to add too much
5  more. I think we covered most of it in the
6  initial stages.
7  Q. Everything you saw in this declaration was
8  consistent with your discussion?
9  A. Yes. I believe so.
10  Q. We're finally going to get to the Ocean Spray
11  process.
12  A. Oh good.
13  Q. I think you testified before you understand the
14  Ocean Spray process?
15  A. As much as I can based on the information I've
16  seen.
17  Q. Tell me what information you've relied on for
18  that.
19  A. I've read the patent. I have read several
20  declarations about the process itself and have
21  seen the process.
22  Q. So based on the patent, declarations about the
23  process, and your physical tour, those are what
24  you've -- that's how you formed your
25  understanding of the process?

Keith Cadwallader - 4/10/2006
**Amazin' Raisins International, Inc. v. Ocean Spray Cranberries, Inc.**

24 (Pages 90 to 93)

Page 90

1    A. Yes.
2    Q. Anything else?
3    A. Nothing else comes to mind right now.
4        MR. SORENSON: You've also looked at
5    depositions; right?
6        THE WITNESS: Yes.
7        MR. SORENSON: When you said declarations,
8    did you also mean depositions?
9        THE WITNESS: I was thinking of both.
10       MR. SORENSON: Which depositions have you
11   read?
12       THE WITNESS: I read both Scott and
13   Mantius.
14   BY MR. WOODFORD:
15   Q. So you've reviewed two declarations in addition
16   to the other things we talked about --
17       MR. SORENSON: Two depositions.
18       THE WITNESS: Yes.
19   BY MR. WOODFORD:
20   Q. That was Mike Scott and Harold Mantius?
21   A. Yes. I don't believe -- I don't remember if it
22   was before my declaration or not. I don't
23   remember.
24   Q. Could we turn to Exhibit 2. It's titled the
25   Declaration of Michael Scott in Support of Ocean

Page 91

1    Spray's Motion for Summary Judgment of
2    Non-Infringement. Do you see that?
3    A. Yes.
4    Q. You just testified you reviewed this
5    declaration?
6    A. I believe so. Yes.
7    Q. If you flip through it, there's a bunch of
8    pictures at the back.
9    A. I will tell you I did not receive the pictures.
10   Q. You've never seen the pictures before?
11   A. No.
12   Q. We'll go through those today so you'll have an
13   opportunity.
14   A. Very good.
15   Q. Just briefly, you talk about the Mantius
16   declaration. You reviewed that as well?
17   A. Yes.
18   Q. Let's turn to Paragraph 3 of the Michael Scott
19   Deposition Exhibit 3 -- Michael Scott
20   declaration Exhibit 2, Paragraph 3. Sorry.
21   That was a very confusing way to talk about this
22   exhibit. Just so the record is clear, we're
23   talking about Exhibit 2, Michael Scott
24   declaration, Paragraph 3. Are you with me?
25   A. Yes.

Page 92

1    Q. Do you see there's a diagram shown in Paragraph
2    3? Do you see that?
3    A. Yes.
4    Q. Have you ever seen this diagram before?
5    A. Yes I have.
6    Q. Do you agree that it truly and accurately
7    describes Ocean Spray's manufacturing process?
8    A. It describes the process that they are currently
9    using to extract juice and make Craisins. Yes.
10   Q. Do you have any problems with this diagram?
11   A. Yes. There's a few steps omitted.
12   Q. What steps?
13   A. Slicing the cranberries.
14   Q. Anything else that you find is missing?
15   A. I think there's two more dryers involved and
16   some -- maybe some screening, but minor things.
17   Q. Do you think those things are relevant to the
18   claim for example?
19   A. Not at all.
20   Q. The relevant aspects of Ocean Spray's process
21   are shown in the diagram?
22       MR. WERNER: Objection. Legal conclusion.
23       THE WITNESS: Some of the relevant ones.
24   There may be minor components missing. I
25   haven't had a chance to really consider that.

Page 93

1    BY MR. WOODFORD:
2    Q. Can you think of any offhand that are missing?
3    A. The infusion syrup is not described, and there's
4    another step of, and I'm not sure it's totally
5    relevant, of where they reconstitute that
6    infusion syrup.
7    Q. You do see that infusion syrup is shown as being
8    added to what's called the CCI?
9    A. Yes.
10   Q. So you were just saying that there's more
11   detail --
12   A. There is. This is a fairly generic description.
13   Q. At this high level, it's true and accurate?
14   A. I believe so. Yeah.
15   Q. Let's go to Paragraph 4, and I'm going to ask
16   you to review that before I ask you any
17   questions about it. Let me know when you're
18   done.
19   A. Okay. I'm done.
20   Q. Do you agree with the statements in Paragraph 4?
21   A. I am unclear about the defrosting step as I was
22   seeing it at the plant whether this is exactly
23   what was happening, but seems like it's fairly
24   accurate.
25   Q. Let's step through it. You agree that the

Keith Cadwallader - 4/10/2006
**Amazin' Raisins International, Inc. v. Ocean Spray Cranberries, Inc.**

25 (Pages 94 to 97)

Page 94

1  manufacturing begins with frozen cranberries;
2  right?
3  **A. Yes.**
4  Q. I think you saw those in the plant.
5  **A. I did.**
6  Q. Next they are broken up, and they go through a
7  bunch of sorting and screening. I think you saw
8  that as well?
9  **A. Yes. Remove sticks and such.**
10 Q. Then you're aware that the cranberries are
11 sliced into 7 or 8 millimeter pieces?
12 **A. Yes.**
13 Q. This is the part you were talking about where
14 you weren't quite sure, and it relates to
15 defrosting the frozen cranberry pieces with
16 cranberry juice at 120 degrees Fahrenheit. Do
17 you see that?
18 **A. I see that.**
19 Q. Do you believe that's occurring?
20 **A. I don't know.**
21 Q. Do you have any reason to doubt that's what's
22 happening?
23 **A. I'm not entirely sure what state they are in**
24 **before they are sliced, if they are individually**
25 **frozen or whether they had to do some**

Page 95

1  **pre-thawing on those to get those to separate or**
2  **what was the situation. I don't think they are**
3  **fully frozen at that stage, but I don't know.**
4  **They have to break apart a large brick of these.**
5  Q. Those things are all -- they are not really
6  relevant to the --
7  **A. Yeah --**
8      MR. WERNER: Objection. Legal conclusion.
9      THE WITNESS: What is defined I don't know
10 if any of the -- I guess what is not well
11 defined is what is cranberry juice at this point
12 because it's -- they define it as cranberry
13 juice at this point. I'm comfortable with that.
14     BY MR. WOODFORD:
15 Q. Maybe I can refresh your recollection of the
16 tour. You recall as the water is going over the
17 cranberries the juice is extracted, right, from
18 --
19 **A. Yes. The cranberry juice is described here as a**
20 **very dilute solution in a lot of water. So**
21 **it's an extracted -- it's a juice extract more**
22 **than an actual juice.**
23 Q. So that's the issue here. It may not be pure
24 cranberry juice, it's diluted --
25 **A. Right.**

Page 96

1  Q. Flip over to Exhibit A, and I believe this shows
2  the berries as they are being defrosted and
3  dropped into the what we're going to call the
4  CCE, the counter current extraction unit. Do
5  you see that?
6  **A. Exhibit A?**
7  Q. Do you remember seeing this at all?
8  **A. I do, but what did you call these?**
9  Q. According to the declaration, I'm wondering if
10 this is going to refresh your memory. This is
11 the photograph of the fruit being defrosted
12 before it falls into the CCE?
13 **A. That doesn't look right.**
14 Q. What doesn't look right?
15     MR. WERNER: Can you identify where it is
16 described in Exhibit A?
17     MR. WOODFORD: The paragraph we were just
18 looking at. Paragraph 4.
19     THE WITNESS: This is the fresh frozen
20 cranberries entering the CCE?
21     BY MR. WOODFORD:
22 Q. Yes. After they have been sliced.
23 **A. After they have been sliced.**
24 Q. Yes.
25 **A. They don't look whole.**

Page 97

1  Q. They are actually not. Do you remember seeing
2  this when you were on the tour?
3  **A. It wasn't that easy to see because it's all**
4  **contained in the slicer and so forth, but yeah.**
5  **I recollect seeing this.**
6  Q. So why don't we move on to paragraph -- let me
7  ask you this: You're aware that at some point
8  those cranberry slices are dropped into the CCE?
9  **A. Correct.**
10 Q. Right. So why don't we turn to Exhibit D, and
11 you can see in Exhibit D there's a bag that is
12 labeled CCE In-Feed. Have you ever seen this
13 bag before?
14 **A. Other than just the picture, no.**
15 Q. You've seen this picture before?
16 **A. This -- I'm seeing it right now. I'm sorry.**
17 Q. You've never seen this picture before?
18 **A. It may exist in different documents possibly.**
19 **I'm not sure it's this picture.**
20 Q. You don't recall if you've ever seen the
21 picture?
22 **A. This particular picture I don't remember.**
23 Q. What about the physical bag; did you ever
24 receive this bag?
25 **A. No. I did not receive this bag.**

Keith Cadwallader - 4/10/2006
**Amazin' Raisins International, Inc. v. Ocean Spray Cranberries, Inc.**

26 (Pages 98 to 101)

Page 98

1  Q. This bag was provided to AIR's counsel. Do you
2     know that?
3  A. I don't believe I've seen it.
4  Q. This bag as it's labeled contains -- the picture
5     Exhibit A, the sliced cranberries that's what
6     this is a bag of the sliced cranberries.
7  A. Okay.
8  Q. If you look at Paragraph 8 of Mike Scott's
9     declaration, I think it states as much.
10 A. Okay.
11 Q. So did you ask counsel for AIR to obtain samples
12    from Ocean Spray's process?
13 A. No.
14 Q. You never asked them?
15 A. No.
16 Q. So it's fair to say then that you've never been
17    given the bag, you've never analyzed any of the
18    sample?
19 A. No. I've never been asked to analyze them.
20 Q. Never run any tests on it?
21 A. No.
22 Q. Never measured moisture content?
23 A. No.
24 Q. Brix, moisture content, nothing?
25 A. Nothing.

Page 99

1  Q. Do you know what the moisture content of the
2     sliced cranberries as they enter the CCE is?
3  A. No. Not specifically.
4  Q. Do you have any general idea?
5     MR. WERNER: Objection. Calls for
6     speculation. Outside the scope of his
7     testimony.
8     THE WITNESS: It would be entirely
9     speculation.
10    BY MR. WOODFORD:
11 Q. You have some understanding of what the moisture
12    content of a cranberry is; right?
13 A. Sure.
14 Q. What is that?
15 A. Based on -- and it will differ from season to
16    season and how the samples are pretreated, and
17    freeze, and thawed, and so forth; 87 to 90
18    percent. Something like that. Maybe as high as
19    92 percent. So it's a range.
20 Q. Somewhere 87 to 92?
21 A. Possibly. It seems reasonable.
22 Q. What about the brix level; do you have an
23    understanding what the brix level of a cranberry
24    is?
25 A. It also depends on the ripeness of the berry,

Page 100

1     the condition of the berry. Every berry is
2     different, a composite sample of ripe berries.
3     I think I've seen numbers in the eight brix
4     range possibly, you know, seven to six -- nine
5     to six brix probably.
6  Q. Look at Paragraph 6 of the Scott declaration.
7     If you look in the middle of Paragraph 6, it
8     says, "Typically cranberries have a brix level
9     of approximately 8.0 to 9.0 on average." Does
10    that sound about right?
11 A. I think so.
12 Q. It also says right after that that the
13    cranberries have an average acid content of
14    approximately 2.4 percent. Does that sound
15    about right?
16 A. It does.
17 Q. You don't disagree with that?
18 A. No.
19 Q. You agree that a cranberry has natural flavor;
20    right?
21 A. Yes.
22 Q. What would you say makes up the components of
23    this natural flavor?
24 A. You might want to change the tape.
25 Q. This is going to take a while?

Page 101

1  A. It could.
2     MR. WOODFORD: Let's go on break and change
3     the tape.
4     (Whereupon a short break was taken from
5     11:43 a.m. to 11:49 a.m.)
6     BY MR. WOODFORD:
7  Q. Before the break, I asked you what -- you agreed
8     that a cranberry has natural flavor, and then I
9     asked you what makes up the flavor and --
10 A. That's correct. Cranberries are somewhat
11    interesting in that they would not generally be
12    considered something fit for human consumption
13    as such. Their flavor is comprised of several
14    different kinds of acids as well as tannins or
15    tannic acids, and then also some sugars. That's
16    your taste component. In my field, we have
17    taste and aroma. They are not the same.
18 Q. What would you say -- you know the patent talks
19    a lot about natural flavor. At least in the
20    claim it's listed at natural flavor. What do
21    you think is meant by natural flavor?
22 A. Natural flavor is a flavoring that is derived in
23    a natural way, and the -- it's regulated as
24    such. You cannot call any flavoring natural.
25    It has to be derived, and there are a lot of

Keith Cadwallader - 4/10/2006
**Amazin' Raisins International, Inc. v. Ocean Spray Cranberries, Inc.**

29 (Pages 110 to 113)

Page 110

1    efficiency of this process. If the cranberries
2    were whole, I would say the process would be
3    mostly osmosis. In this process, it's a
4    combination of osmosis and just simple rinsing.
5    The counter current process is quite efficient
6    in this way, and I'm not sure -- could you maybe
7    -- maybe you recall the residence time in here.
8    Do you know?
9    Q. I thought it was something like an hour and a
10   half, maybe 90 minutes.
11   A. It's long enough for osmosis to occur.
12   Q. It's a combination of osmosis and did you call
13   it washing?
14   A. Well, it's more like reaming -- like a sponge.
15   When you would press a sponge, and the juice --
16   in this process since you -- essentially the
17   berries are contacting -- it's mostly osmosis.
18   I just can't eliminate the other step which
19   would be some form of -- the fact that the
20   berries are continually hitting a new solution
21   that has less solids than they do, and so the
22   osmosis should continue up. It's not
23   exclusively osmosis, but primarily I would say
24   because by the time they exit they are
25   essentially contacted with fresh or pure water.

Page 111

1    Q. So what is your understanding of osmosis then?
2    How does osmosis actually work?
3    A. Well, by definition, it's the removal a solute
4    which would be a chemical that's dissolved in a
5    solution across usually a barrier of some sort
6    by -- the mechanism being that it is more -- if
7    a compound could prefer something, it would
8    prefer to be in a more diluted stage or diluted
9    solution which is higher affinity for
10   solubility. So it moves from concentrated to
11   more dilute until it reaches an equilibrium.
12   Q. Let's talk about this in the context of -- say
13   we have a sugar solution. So if you have a
14   highly concentrated sugar solution surrounded by
15   some sort of membrane and you put in a low
16   concentration sugar solution, what exactly
17   happens? The water is moving to --
18   A. Would you repeat that.
19   Q. If you have a high concentration sugar solution
20   like say for example a cranberry, it's higher
21   than water wouldn't you agree?
22   A. Yes.
23   Q. So you put a cranberry in water, what's
24   physically happening?
25   A. What's going to happen -- let's define some

Page 112

1    parameters. If you put a cranberry slice -- I
2    think it's going to be a really slow process if
3    it's a whole cranberry, but if it's a slice and
4    you drop it in a glass of water for example,
5    pure water eventually you're going to have an
6    equilibrium established between the contents
7    within the half of the berry and what is in the
8    water. The solids level will be the same
9    eventually.
10   Q. So if you wanted to remove sugars or solids from
11   the cranberry, you wouldn't put it in a sugar
12   solution would you?
13   A. It depends.
14   Q. Go ahead. What's it depend on?
15   A. If you're using the same solids against -- I
16   have to -- I want to make sure this is accurate,
17   but it depends. If I'm using different acids --
18   for example, let's say you have mostly citric
19   acid in your cranberry and you're using tartaric
20   acid in your solution then by osmosis and by
21   exchange you're going to calibrate both acids
22   equally within the solution and within the
23   fruit. So in essence, you're removing the
24   citric acid from the fruit to some degree even
25   though you are treating with an acid.

Page 113

1    Q. So if they are the same acid, that's not going
2    to happen?
3    A. They will exchange nonetheless.
4    Q. To get an equilibrium between the two
5    concentrations?
6    A. Yes, and an equal part of original fruit acid
7    will be distributed between the two phases.
8    Q. Let's go back to the sugar example. If you have
9    the same type of sugar in both the solution and
10   a fruit piece, if you have a higher
11   concentration of sugar in your solution, you're
12   going to get a higher concentration. You'll end
13   up adding sugar to the fruit piece; right?
14   A. Yes. It will have a higher sugar content.
15   Q. It's the same way if you have similar acids.
16   Say it's only citric acid and you put something
17   with citric acid into a solution of higher
18   concentration citric acid. You'll actually be
19   adding citric acid two the fruit piece; right?
20   A. Yes. On a concentration basis. That's true.
21   Q. During the CCE, counter current extraction
22   process that Ocean Spray uses, the whole time
23   these cranberry pieces are soaking in water;
24   right?
25   A. Essentially a -- it's not just pure water. When

**Keith Cadwallader - 4/10/2006**
**Amazin' Raisins International, Inc. v. Ocean Spray Cranberries, Inc.**

30 (Pages 114 to 117)

Page 114

1    they are soaking, they are a gradient of juice
2    content and water, but yes.
3    Q. I suppose as you get further along --
4    A. It's closer to pure water as you get further --
5    Q. Right, but the moisture content the whole time
6    -- I mean these things -- it's in a physical
7    pool of wet juice water mixture; right?
8    A. Okay. Yes.
9    Q. You've seen it haven't you?
10   A. Yes. You have to be careful about moisture
11   content though because it's not strictly
12   moisture we're talking about in these phases.
13   It's solids as well. So even though it's a
14   liquid, it contains considerable solids.
15   Q. But it's in a liquid the entire time?
16   A. Sure.
17   Q. You opened up the hatch and can see that; right?
18   A. Yes. It's in a liquid.
19   Q. You saw the pieces -- these pieces when they
20   come out of the CCE they are still wet aren't
21   they?
22       MR. WERNER: Objection. Vague.
23       THE WITNESS: You'll have to define wet for
24   me.
25       BY MR. WOODFORD:

Page 115

1    Q. I have to define wet? I can try. I'm not sure
2    I can to do that.
3    A. They contain considerable residual liquids on
4    them. Yes. I guess wet would be okay.
5    Q. If you had them in your hand, you would get a
6    puddle of liquid?
7    A. Yes. Liquid. I'm not sure what the content of
8    liquid is, but yes.
9    Q. It's presumably got water in it; right?
10   A. Has a lot of water in it.
11   Q. A lot of water?
12   A. Yes. Other things too.
13   Q. If you were to characterize the moisture content
14   of those pieces, we're talking about roughly 90
15   percent again aren't we?
16   A. I don't know.
17   Q. Why don't you know?
18   A. Because nobody knows.
19   Q. Nobody knows --
20   A. Never measured that as far as I can tell. I
21   have not seen that number in any of the
22   documents I've read.
23   Q. Do you have any reason to believe that they
24   somehow no longer have --
25   A. I can speculate.

Page 116

1    Q. What's your speculation?
2    A. I can speculate that may be a close number,
3    close to what it is, but I don't know for sure.
4    Q. They start out at 87 to 92 percent, right, these
5    sliced cranberry pieces?
6    A. That's correct.
7    Q. The whole time they are in the CCE they are
8    bombarded with water aren't they?
9    A. Yes, however I don't know if they stay in that
10   condition because I think the moisture content
11   might be somewhat dynamic as they move down the
12   conveyor. So it depends on what point. If they
13   come directly right out of the CCE, they
14   probably have more moisture in them than say 10
15   yards or 30 feet down on the conveyor where they
16   have been allowed to undergo a little bit of
17   drying.
18   Q. Let's talk about right when they come out of the
19   CCE. Is there any reason to doubt that they
20   would have roughly the same moisture content as
21   when they went in?
22   A. No. There's no reason to doubt that. It would
23   be close or maybe --
24   Q. Because sugars and acid is removed from the
25   cranberry pieces and replaced with water.

Page 117

1    Wouldn't it be safe to say they have a higher
2    water content than when they went in?
3        MR. WERNER: Objection. Vague.
4        THE WITNESS: I can speculate.
5    BY MR. WOODFORD:
6    Q. What would your speculation be?
7    A. That would be true.
8    Q. As a function of water anyway, they are more
9    water coming out --
10       MR. WERNER: Objection. Mischaracterizes
11   his testimony.
12       THE WITNESS: I'm sorry.
13       MR. WOODFORD: I can strike that.
14   BY MR. WOODFORD:
15   Q. Why don't we turn to Exhibit E of the Scott
16   declaration which is Exhibit 2. Do you see
17   there's a bag shown in Exhibit E?
18   A. Yes.
19   Q. It's labeled CCE Exit. Do you see that?
20   A. That looks like exit. Okay.
21   Q. Have you ever seen this bag before?
22   A. I have not seen the bag itself.
23   Q. Let me ask you this: Have you seen the photo
24   before?
25   A. I don't believe so.

**Keith Cadwallader - 4/10/2006**
**Amazin' Raisins International, Inc. v. Ocean Spray Cranberries, Inc.**

31 (Pages 118 to 121)

Page 118

1  Q. You've never seen the photo?
2  A. No. I did not receive -- did not review the
3     pictures that came with this declaration.
4  Q. Did you ever review the brief submitted by Ocean
5     Spray in support of its summary judgment motion?
6  A. I believe so.
7  Q. Because this picture is in there. It's right
8     next to the other bag in fact.
9  A. I know, but as Exhibit E, I may not have seen it
10    as such. It may be labeled something different.
11 Q. You have reviewed the brief?
12 A. Yes, and I may have seen a picture like this one
13    but not the particular way it's labeled.
14 Q. That's fair. I'm just curious if you read the
15    brief because in the brief this picture was
16    right next to the other one. Not a big deal.
17    What about the bag; you never received this bag?
18 A. I have not received this bag.
19 Q. You understand this was a sample taken by Ocean
20    Spray at the request of AIR's attorneys; right?
21 A. Yes. I understand that.
22 Q. You never asked for this bag?
23 A. No.
24 Q. They never gave it to you?
25 A. That's correct.

Page 119

1  Q. Do you think you could figure out the moisture
2     content of these pieces in the bag?
3  A. It would be very difficult.
4  Q. Why would it be very difficult?
5  A. Well, this is another -- unless there's standard
6     methodology for such products as this, and there
7     usually is, one would have to define what you're
8     going to measure the moisture content of; that
9     is, the single piece itself, you have to --
10    generally you would remove the excess surface
11    moisture, and then yes you could do the moisture
12    content of that.
13 Q. You recall that in the -- actually, you may not
14    recall. I don't know when you read the Mike
15    Scott declaration. If you turn to Paragraph 8,
16    he says that when he took the samples he
17    collected them with a perforated scoop and
18    drained off all the water. Do you see that?
19 A. Yeah. He says all.
20 Q. Then he put it in the bags, right, and then he
21    tried to vacuum seal it because so much water
22    continually comes out of those pieces. Says he
23    broke two vacuum seals. So when you say to
24    remove all the water, these things have 90
25    percent moisture. How would you do that to do

Page 120

1  this naturally?
2  A. It would still contain 90 percent moisture.
3     What you're looking at is juice that's in this
4     bag as well. This is a combination. As much
5     effort he put into removing all of the moisture,
6     he didn't do a good job at doing that.
7  Q. Isn't it true he can't do that because these
8     things are soaking wet when they come out of
9     this process?
10       MR. WERNER: Objection. Vague.
11       THE WITNESS: Yes -- well, I have some
12    difficulties in the terminology all of the
13    water.
14 BY MR. WOODFORD:
15 Q. You could never remove all the water because you
16    would have zero percent water --
17 A. Right. Exactly, but you would remove before the
18    analysis of such product -- in most
19    methodologies that you find for official methods
20    of measuring moisture, you would remove the
21    surface moisture just as if you have doing peas
22    that were frozen and there were ice chunks in
23    the bag. You don't include those with the
24    sample.
25 Q. I don't doubt that, but you can take a piece out

Page 121

1  of this bag --
2  A. Absolutely. Take a piece and remove as much
3     free moisture that is on the piece, and then you
4     could measure the moisture content.
5  Q. I wasn't implying --
6  A. No, but within the berry, or the berry itself,
7     or whatever this decharacterized fruit, you
8     could do that sure.
9  Q. So if you had this bag, you could have done
10    that?
11 A. I could have done that.
12 Q. Do you have any reason to doubt the moisture
13    content would be about 90 percent?
14 A. I'm speculating, but I'm going to bet that yes
15    it's going to be about 90 percent.
16 Q. You could also measure brix levels from these
17    pieces?
18 A. Certainly.
19 Q. You could also measure acid content?
20 A. Certainly.
21 Q. Why don't we turn to Paragraph 6 of the Scott
22    declaration. Again, it's Exhibit 2, Paragraph
23    6. If you go about halfway down the paragraph,
24    you'll see a sentence that talks about a brix
25    level of 8 to 9 and an acid content of 2.4

**Benchmark Reporting Agency**
**612.338.3376**

Page 122

1   percent that relates to the cranberry pieces as
2   they are going in the natural cranberry pieces.
3   Do you see that?
4   **A. Yes.**
5   Q. We discussed that already?
6   **A. Yes we have.**
7   Q. The next sentence says that after the extraction
8   process the cranberry pieces have a brix level
9   of approximately .54 and an acid content of
10  roughly .25 percent. Do you see that?
11  **A. Yes.**
12  Q. Do you have any reason to doubt those numbers?
13  **A. I don't have any reason to doubt them or to**
14  **think they are all that accurate. I don't know**
15  **how they are doing the measurement. I'm sorry.**
16  Q. Have you reviewed the documents provided by
17  Ocean Spray in this case?
18  **A. Yes, but I don't know the methods they used to**
19  **actually measure -- what methodology. It would**
20  **depend on how they pretreated the sample.**
21  Q. How they did what?
22  **A. Pretreated it. Do they use a whole berry, blend**
23  **it, do the analysis, or do they press out -- a**
24  **lot will do that, squeeze the juice out by hand**
25  **and then measure the brix and acid.**

Page 123

1   Q. You reviewed the Scott deposition and Mantius
2   deposition haven't you?
3   **A. Yes.**
4   Q. Was there anything in there --
5   **A. I don't remember any details about this**
6   **analysis. I'm talking about really detailed**
7   **which probably wouldn't be included in such**
8   **things.**
9   Q. Do you have any reason to believe that Ocean
10  Spray wouldn't perform the most accurate
11  analysis possible?
12  **A. I don't know. I would speculate. I would tell**
13  **you that one of my areas that I teach is food**
14  **analysis, and there are rapid ways to do things,**
15  **and then there are more what I call research and**
16  **development ways to do analyses, and the rapid**
17  **ways are -- they trade off a few things for**
18  **speed, and one is accuracy. So what I think**
19  **these measurements might represent is the free**
20  **juice within the berry at that point, the free**
21  **flowing juice.**
22      MR. WERNER: I'm going to object to all of
23  this. He has no idea what testing was done and
24  how they did it.
25      MR. WOODFORD: That's the point of me

Page 124

1   asking him so I know what he knows. That's why
2   I'm asking.
3       THE WITNESS: Nonetheless this would seem
4   like a reasonable number.
5   BY MR. WOODFORD:
6   Q. If they actually blended up the berry and did an
7   analysis, that would be the accurate way of
8   calculating the numbers?
9   **A. That could be the accurate way to determine acid**
10  **content. The brix is already a trade off**
11  **because a lot of things contribute to brix. Any**
12  **soluble solids will contribute to the brix**
13  **measurement not just the sugars. So it's a**
14  **fairly crude method to begin with.**
15  Q. In the end, you don't have any --
16  **A. They are within reasonable -- no. They are**
17  **reasonable.**
18  Q. Aren't these numbers consistent with what's in
19  the Mantius patent?
20  **A. That's true. Again, the methodology isn't**
21  **described on how they did the measurement.**
22  Q. So now if we look at these numbers, we have brix
23  of approximately .54. That's about a 94 percent
24  reduction of -- from the 8 to 9 level that the
25  cranberries started with; right?

Page 125

1   **A. Yes. I think so.**
2   Q. If you look at the acid level, it's .25 percent.
3   That's about 90 percent of the 2.4 percent that
4   the cranberries started with; right?
5   **A. Yes.**
6   Q. So with respect to sugars, we have 94 percent
7   approximately and acid 90 percent reduction
8   through this counter current extraction --
9   **A. With the data provided.**
10  Q. You would agree with that?
11  **A. Yes.**
12      MR. WOODFORD: I'm about ready to dive into
13  something different so I think this might be a
14  decent time for a lunch break.
15      (Whereupon a lunch break was taken from
16  12:17 p.m. to 12:59 p.m.)
17  BY MR. WOODFORD:
18  Q. Could you turn to Claim I of the Amazin' patent
19  please. If you look at Step A of Claim I --
20      MR. WERNER: Look at the claim.
21  BY MR. WOODFORD:
22  Q. It's on Column 10.
23  **A. I'm sorry.**
24  Q. If you look at Step A, the first four words are
25  treating a dried fruit. Do see that?

| Page 130 | Page 132 |
|---|---|
| 1  Q. So there's a distinction in your mind between | 1  Q. So what if you told them by the way this isn't |
| 2     dried fruit that's sold and dried fruit that's | 2     glycerin in the bag? |
| 3     not sold? | 3  **A. Okay.** |
| 4  **A. Not so clear. What I mean is that in a process** | 4  Q. Wouldn't they think you were crazy if you tried |
| 5  **if you treat a dried fruit to reduce its native** | 5     to tell them here's a bag of dried fruit? |
| 6  **moisture content you have thus dried it to some** | 6        MR. WERNER: Objection. Vague and |
| 7  **degree prior to the next step, and all we're** | 7     ambiguous. |
| 8  **looking at here is a raw material that goes into** | 8        THE WITNESS: They would probably doubt |
| 9  **this process, and they call it dried fruit.** | 9     that it's -- well again, they don't know the |
| 10 **They give some examples of what that range might** | 10    definition of dried fruit, but if they have seen |
| 11 **be for raisins, but in this particular process** | 11    dried fruit before, dried fruit product before. |
| 12 **claim, they don't give a range.** | 12 BY MR. WOODFORD: |
| 13 Q. So because the claim doesn't include a range -- | 13 Q. Do you think people generally understand when |
| 14 **A. It could be anything in this process in my mind** | 14    someone says dried fruit do you think they know |
| 15 **work.** | 15    what that is? |
| 16    MR. WERNER: If you could let him finish | 16       MR. WERNER: Objection. Outside the scope |
| 17    his question. | 17    of his testimony. |
| 18 BY MR. WOODFORD: | 18       THE WITNESS: Depends. |
| 19 Q. Let's do this. Let's step outside of this | 19 BY MR. WOODFORD: |
| 20    claim, and let's just talk about dried fruit | 20 Q. Do you think that has a common meaning, the word |
| 21    like you would talk about just say to your | 21    dried fruit, don't you think it has a common |
| 22    grandmother, or mother, or something. If you | 22    meaning in society? |
| 23    went to your -- or someone on the street. Let's | 23       MR. WERNER: How is this relevant? |
| 24    use someone on the street. I don't want to | 24       MR. WOODFORD: He defined the word dried |
| 25    implicate your mother in this case. So here is | 25    fruit. It's 100 percent relevant. |

| Page 131 | Page 133 |
|---|---|
| 1     the example. You go to someone on the street, | 1        MR. WERNER: (Unintelligible. Talking over |
| 2     and you show them this bag, Exhibit E of the | 2     Mr. Woodford.) -- not one of a lay person -- |
| 3     Scott declaration, and you say here's some dried | 3        MR. WOODFORD: Are you instructing him not |
| 4     fruit. They would think you're crazy wouldn't | 4     to answer what the ordinary meaning of dried |
| 5     they? | 5     fruit is? |
| 6        MR. WERNER: Objection. | 6        MR. WERNER: I'm not instructing him not to |
| 7        THE WITNESS: They wouldn't have enough | 7     answer. I'm saying he's not here to talk about |
| 8     information to make that judgment. | 8     what somebody not skilled in the art would |
| 9  BY MR. WOODFORD: | 9     understand who hasn't read the patent what dried |
| 10 Q. You're saying if you handed them this bag of | 10    fruit means. That's not what he's here for. |
| 11    soaking wet pieces of cranberry and said here's | 11       MR. WOODFORD: It's certainly relevant to |
| 12    some dried fruit they would say I don't have | 12    the inquiry. You would have to agree with that. |
| 13    enough information? | 13       MR. WERNER: I do not feel it's relevant. |
| 14       MR. WERNER: Objection. Vague and | 14    The relevant inquiry -- |
| 15    ambiguous. Are you referred to dried fruit in | 15       MR. WOODFORD: Are you instructing him not |
| 16    the claim or the dried fruit in the abstract. | 16    to answer? |
| 17       MR. WOODFORD: In this bag here. | 17       MR. WERNER: I'm not instructing him not to |
| 18       THE WITNESS: Well, the problem is you're | 18    answer |
| 19    asking for an off-the-street definition for this | 19 BY MR. WOODFORD: |
| 20    product. It's possible that this liquid could | 20 Q. Let's continue with our discussion of dried |
| 21    be glycerin, and this product could contain 5 | 21    fruit. We're at the grocery store, and you say |
| 22    percent, 10 percent moisture. They wouldn't | 22    to someone -- they ask for dried fruit. You |
| 23    know. It's a visual inspection. They are | 23    give them the bag Exhibit E that is full of |
| 24    making a conclusion. | 24    water with cranberry pieces in there. They |
| 25 BY MR. WOODFORD: | 25    would think you're crazy wouldn't they? |

**Keith Cadwallader - 4/10/2006**
**Amazin' Raisins International, Inc. v. Ocean Spray Cranberries, Inc.**

35 (Pages 134 to 137)

Page 134

1 A. They have an expectation based on their
2 experience and what they have eaten as dried
3 fruit products in the past, and this would
4 probably not resemble that much.
5 Q. Right. They would look at you like what are you
6 giving me wouldn't they?
7 A. Probably.
8 Q. In fact, I notice when we came in here that our
9 videographer has a bag of snacks (handing).
10 Those are dried fruits aren't they?
11     MR. WERNER: Objection. Vague and
12 ambiguous.
13     THE WITNESS: They are some dried fruits in
14 here.
15 BY MR. WOODFORD:
16 Q. That's what people understand when you say dried
17 fruit they are thinking of something that's
18 actually dried?
19     MR. WERNER: Objection. Vague and
20 ambiguous.
21     THE WITNESS: The problem is the word dry.
22 These are not dry.
23 BY MR. WOODFORD:
24 Q. Those are dried fruits?
25 A. I didn't say that. They are not dry. So you

Page 135

1 just used the terminology dry. It's -- dried
2 fruit -- there's an expectation that people
3 would have based on their experience, and if
4 their experience is these types of products,
5 yeah, I would say that's true.
6 Q. If you look at Exhibit E, if you ask the
7 ordinary person if that's a dried fruit, they
8 would say no?
9     MR. WERNER: Objection. Misleading and
10 vague. Ordinary person.
11     MR. WOODFORD: Please Counsel. Just note
12 your objection. You don't need to speak.
13     THE WITNESS: I would say a common person
14 would not consider this to be a dried fruit.
15 BY MR. WOODFORD:
16 Q. So we have established the common meaning at
17 least with respect to Exhibit E of dried fruit.
18 Now let's go back into the Amazin' patent. So
19 the Amazin' patent you say has a different
20 meaning of dried fruit?
21 A. My belief is their intention -- if they didn't
22 intend -- if they intended to mean the same
23 thing every time they mentioned dried fruit,
24 they would have used only the dried fruit as
25 their defining term, but instead they clearly

Page 136

1 differentiate the dried fruit from the --
2 treated dried fruit from the dried fruit
3 product.
4 Q. You're saying that because first it says
5 treating a dried fruit and then it refers back
6 to the dried fruit as the treated dried fruit?
7 Is that the basis for your statement?
8 A. Yes.
9 Q. Are you aware -- have you ever heard of the word
10 antecedent basis in a claim?
11 A. No.
12 Q. Do you have any idea what that is?
13 A. No.
14 Q. Your counsel has never explained that to you?
15 A. No.
16 Q. You've had this discussion with counsel about
17 your version -- your meaning for treated dried
18 fruit and dried fruit and how they are
19 different; right? You've had that discussion
20 with counsel?
21 A. I can't remember if I ever have.
22 Q. You've never discussed that with counsel?
23 A. Probably, but not to any great degree.
24 Q. After discussing that, they never informed you
25 what antecedent basis is in a claim?

Page 137

1 A. I don't believe so.
2 Q. They never mentioned the word?
3 A. Not to my recollection.
4 Q. Why don't we go to your definition. Let's turn
5 to your declaration. Let's look at Paragraph 5.
6 It states -- are you with me here on Paragraph
7 5?
8 A. Yes.
9 Q. You provided a definition of the term dried
10 fruit haven't you?
11 A. Yes.
12 Q. That definition is a fruit or fruit piece that
13 has had a portion of its naturally occurring
14 moist to your content removed. Do you see that?
15 A. Yes.
16 Q. I read that correctly?
17 A. Yes.
18 Q. What is this definition based on?
19 A. It's based on the lack of a clear range for all
20 dried fruit -- a clearer definition for all
21 dried fruit. In other words, according to
22 Paragraph 6 in that reference, it's justified as
23 a fruit product that contains -- has been
24 exposed to some water removal process which has
25 more than 2.5 percent water dried basis.

Keith Cadwallader - 4/10/2006
Amazin' Raisins International, Inc. v. Ocean Spray Cranberries, Inc.

36 (Pages 138 to 141)

Page 138

1  Q. So this definition is based on the article
2     that's referenced in paragraph --
3  A. Partially.
4  Q. Why don't we identify everything that this
5     definition is based on.
6  A. Well, it's based on the fact that many dried
7     fruits have various ranges or have fairly
8     different moisture contents in their final form
9     and whether it's -- well, and also that there
10    may be intermediate steps in process that
11    produces what might be considered a fairly high
12    moisture for that -- for the product but yet it
13    still is considerably drier than its original
14    form. So dried fruit is not a product per se.
15    Dried fruit is a condition of the fruit.
16 Q. Let's just say that's true. Let's say the dried
17    fruit is a condition of the fruit. It still has
18    to be dried?
19 A. Yes it does.
20 Q. How could the decharacterized Ocean Spray
21    cranberry fruit pieces be considered dried?
22    They are soaking wet.
23 A. The only way --
24    MR. WERNER: Objection. Argumentative.
25    THE WITNESS: By definition, if one is --

Page 139

1     you're basically removing the natural content of
2     that fruit in that way in that process. So it's
3     an equivalent -- what's the term I'm using?
4     It's interchangeable with a dried fruit in the
5     process. Strictly in the process. It would not
6     be construed as a dried fruit by somebody on the
7     street. I will give you that.
8     BY MR. WOODFORD:
9  Q. You're saying it's not a dried fruit, but it's
10    interchangeable with a dried fruit?
11 A. Yes.
12 Q. So --
13    MR. WERNER: I think that mischaracterizes
14    his testimony.
15    BY MR. WOODFORD:
16 Q. So let's go back to this definition of ordinary
17    skill in the art. You're saying this as an
18    opinion of someone of ordinary skill in the art.
19    Who is someone of ordinary skill in the art?
20 A. Ordinary skill in the art would be a food
21    scientist, in particular someone with processing
22    experience, someone who about be able to
23    understand the two processes.
24 Q. Would it require some sort of education level or
25    experience level?

Page 140

1  A. Mostly experience, but also education, but again
2     experience can be a replacement or certainly
3     suitable replacement for education, but I think
4     they are -- kind of go together.
5  Q. So is your definition what someone would think
6     today reading this patent? That's how they
7     would determine what dried fruit is?
8  A. This definition is suitable as a -- it's as
9     suitable as the definition by the reference I
10    provide here on dehydration of foods. It's not
11    inaccurate.
12 Q. This reference is dated 1996, right, that you
13    keep talking about?
14 A. Yes.
15 Q. The patent is dated 1990; is that right?
16 A. Yes.
17 Q. So is your definition here based on what someone
18    would understand 1996 and after?
19 A. No. I don't think so. I think it -- I think
20    over the last century I think the definition has
21    been -- well again, sophistication of
22    technologies and so forth may have caused or
23    also regulations may have caused a narrowing of
24    the definition or more specific definition, but
25    I think the general definition of a dried fruit

Page 141

1     is a fruit piece or fruit that contains less
2     than its natural moisture content is totally
3     accurate no matter what decade you're talking
4     about.
5  Q. Looking at your definition here -- let me ask
6     you this: Is this a definition you came up with
7     yourself?
8  A. Sure.
9  Q. This is -- you wrote out these exact words of
10    this definition?
11 A. We have over the past bounced this around, but
12    yeah. These are my words.
13 Q. So every single word here is your exact -- this
14    is your definition?
15 A. It's based on some literature as well. Fruits,
16    and fruit pieces, and so forth.
17 Q. Nobody has changed this definition; your
18    attorneys didn't mess with this or anyone else?
19 A. No. I wrote this down.
20 Q. This is the definition that you provided?
21 A. Yes I believe so.
22 Q. Showing you what has been marked Exhibit 5, it's
23    the declaration of Amir Lalji in support of
24    plaintiff's opposition to defendant's motion for
25    summary judgment of non-infringement. Do you

Case 1:04-cv-12679-MLW    Document 91-2    Filed 05/01/2006    Page 30 of 41

Keith Cadwallader - 4/10/2006
Amazin' Raisins International, Inc. v. Ocean Spray Cranberries, Inc.

37 (Pages 142 to 145)

Page 142

1    see that?
2    **A. Yes.**
3    Q. Have you ever seen this document before?
4    **A. Never.**
5    Q. Do you know who Amir Lalji is?
6    **A. I think he's a co-inventor perhaps.**
7    Q. Yes. He's an inventor on the patent.
8    **A. Yes.**
9    Q. Why don't we turn to Page 2, Paragraph 6. Do
10   you see that?
11   **A. Yes.**
12   Q. It says, "The term dried fruit recited in Claim
13   I refers to a fruit or fruit piece that has had
14   a portion of its naturally occurring moisture
15   content removed."
16   **A. It's very similar.**
17   Q. It's word for word isn't it?
18   **A. Yeah, but I can't understand that personally.**
19   Q. Who came up with the definition; was it you or
20   Mr. Lalji?
21       MR. WERNER: Objection. Asked and
22   answered. He also has no foundation for this
23   document.
24   BY MR. WOODFORD:
25   Q. Go ahead and answer.

Page 143

1    **A. Honestly I believe I came up with it.**
2    Q. How did Mr. Lalji come up with a word for word
3    definition that's exactly the same as the one
4    that you developed? Do you have any idea how
5    that could be?
6        MR. WERNER: Objection. Lack of
7    foundation.
8        THE WITNESS: I don't know. I have been
9    working on this for a long time. So I don't
10   know. I'm sorry.
11   BY MR. WOODFORD:
12   Q. Don't know?
13       MR. WERNER: Asked and answered.
14       THE WITNESS: It's a very good definition.
15   I think it's mine.
16   BY MR. WOODFORD:
17   Q. Okay.
18   **A. I'm sorry.**
19   Q. Nothing to be sorry about. I'm just asking. Do
20   you think it's odd that he had the same
21   definition as --
22       MR. WERNER: Objection.
23       THE WITNESS: I think it's impossible but
24   -- it's not impossible obviously, but maybe he
25   read my definition first.

Page 144

1    BY MR. WOODFORD:
2    Q. It's certainly a possibility.
3    **A. That would be my guess.**
4    Q. Have you ever spoken with Jack Mazin?
5    **A. Never.**
6    Q. Have you ever spoken with Amir Lalji? I don't
7    know if I asked you that or not.
8    **A. No. I'm not sure who we met on the tour.**
9    Q. Amir Lalji is the inventor on the Amazin'
10   patent. I don't think he's employed by Ocean
11   Spray.
12       MR. WERNER: That would be interesting.
13       THE WITNESS: I got a little confused
14   there. I'm sorry about that.
15   BY MR. WOODFORD:
16   Q. Let's go back to your definition now. Do you
17   understand how you go about defining claim
18   terms?
19   **A. I'm sorry. Could you repeat that?**
20   Q. Do you understand the process that's involved
21   with defining terms in claims?
22   **A. Not really.**
23   Q. Has anyone ever explained that to you?
24   **A. Well, only from the history that I've read on**
25   **this patent I get kind of an idea how that might**

Page 145

1    **be done.**
2    Q. What is your understanding of how that's done?
3    **A. Well, it's very limited, but my understanding**
4    **would be you cover as much ground as you can**
5    **with your terms so that you can protect your**
6    **claims so that you make them as broad as you can**
7    **get by with. That's my understanding. Beyond**
8    **that -- and you may have to change those terms**
9    **in subsequent -- if you're rejected a claim for**
10   **example.**
11   Q. The patent is done, the patent is issued, and
12   now we have the task of figuring what the terms
13   mean. Do you have any understanding how you do
14   that?
15   **A. Basically by my going through just as an expert**
16   **trying to understand what they mean. Getting**
17   **inside the inventor's brain to try to figure out**
18   **what they meant by these terms.**
19   Q. Did anyone ever explain to you what process to
20   use, or how to view the claims, or anything of
21   that nature?
22   **A. I'm not sure what you mean by that.**
23   Q. For example, what types of documents to look at,
24   or what to consider, and what order to consider
25   them. Anything like that?

Page 146

1  A. No. Not really.
2  Q. So what process did you use to figure out as you
3     call it getting into the mind of the inventor?
4  A. Well, I look at the process, and I look at the
5     -- I did compare the two processes and -- to
6     look at -- well, it helps to look at some of the
7     other materials that go with the patents, the
8     prosecution history and so forth to find out
9     what the terms mean because they are generally
10    described in some more detail in rebuttals and
11    so forth.
12 Q. So if you were to describe the documents or what
13    we call evidence, what would you say you've
14    looked at to formulate your definition of dried
15    fruit?
16 A. Okay. I'm sorry. Repeat that please.
17 Q. You have this definition of dried fruit that you
18    developed; right?
19 A. Yes.
20 Q. What documents did you look at to determine --
21    to support that definition?
22 A. Okay. I first looked at the reference that I
23    have listed here. I have looked at some of the
24    requirements for what is -- constitutes a dried
25    fruit product, and chemical -- my chemical

Page 147

1  background and common sense tells me that if you
2  remove any moisture from a food product it's in
3  a dried state or a drier state than it was when
4  it was original harvested or whatever.
5  Q. So let me see if I followed you there. You
6     relied on your own expertise?
7  A. Yes.
8  Q. You relied on the article identified in
9     Paragraph 6?
10 A. I'm sorry. I don't mean to --
11 Q. Was there anything else? I thought you
12    mentioned something first.
13    MR. WERNER: Are you talking about the
14    patent in the prosecution history?
15    THE WITNESS: Yes.
16    MR. WOODFORD: Thank you Counsel.
17    THE WITNESS: One more thing I'll add is
18    the lack of a suitable -- it would be wonderful
19    to go to the literature and find an absolute
20    reference for it to just tell me this is what it
21    is, but it doesn't really exist, that is a --
22    and it can't based on the nature of the product.
23    It's fairly varied. Whether it's prunes and so
24    forth.
25    BY MR. WOODFORD:

Page 148

1  Q. Isn't that why --
2  A. Those are --
3  Q. Isn't that why the inventor provided the range
4     in the patent so --
5     MR. WERNER: Objection. Lack of
6     foundation.
7     THE WITNESS: I think the range is provided
8     as an example because raisins were used for the
9     examples that are provided here with the
10    technology of the samples of the technology and
11    its application.
12    BY MR. WOODFORD:
13 Q. Of the examples in the patent, we've got a
14    moisture range of 10 to 18 percent; right?
15 A. That would be suitable for raisins.
16 Q. The 90 percent moisture concentration for
17    decharacterized fruit that's nowhere near the 10
18    percent range is it?
19 A. I would have to agree with that.
20 Q. Let's dive into this definition a little bit. I
21    want to understand what exactly it's saying. If
22    you'll notice -- are you with me here on
23    Paragraph 5 of your declaration?
24 A. Yes.
25 Q. A fruit piece that has had a portion of its

Page 149

1  naturally occurring moisture content removed
2  what do you mean by portion?
3  A. Some. Some of it.
4  Q. How much is some?
5  A. It's unquantifiable. It doesn't matter how
6     much. If it has undergone any moisture loss
7     whatsoever or moisture exchange, it has -- now
8     it's in a dried fruit form, or is
9     interchangeable, or equivalent to a dried fruit,
10    and I use the quotes here on intentionally.
11 Q. So let's take this for example. Say you pick a
12    fruit off the vine. At that point, on some
13    level, it starts losing moisture content doesn't
14    it?
15 A. Most likely.
16 Q. That would technically fall within your
17    definition; right?
18 A. Only for a dried fruit that is suitable for the
19    process claim.
20 Q. Where does it say that in your definition? I
21    don't see anything --
22 A. That's true.
23 Q. So technically by picking a fruit off the vine
24    you've satisfied your --
25    MR. WERNER: Objection. Mischaracterizes

Keith Cadwallader - 4/10/2006
**Amazin' Raisins International, Inc. v. Ocean Spray Cranberries, Inc.**

39 (Pages 150 to 153)

Page 150

1 testimony.
2    THE WITNESS: It's not a dried fruit
3 product.
4 BY MR. WOODFORD:
5 Q. We're talking about dried fruit here. Paragraph
6 5 says dried fruit; right?
7 **A. Yes. That's the definition of dried fruit.**
8 **Other than that, there's no other definition of**
9 **dried fruit.**
10 Q. Just so you understand, that's what I'm talking
11 about. Dried fruit. Under your definition of
12 dried fruit, picking something off the vine
13 would fall --
14    MR. WERNER: Objection. Mischaracterizes
15 his testimony.
16    THE WITNESS: That was not my intention.
17 That would be -- technically it would fall under
18 that category. Yes.
19 BY MR. WOODFORD:
20 Q. Let's try something else for example. This
21 patent says a lot about grapes doesn't it?
22 Raisins. It's a grape, right? Dried grape is a
23 raisin?
24 **A. Yes.**
25 Q. So if you were to take a grape and squeeze it a

Page 151

1 little bit and some juice fell out of it, that
2 would fall under your definition wouldn't it?
3 **A. Not really. It depends, and we could get into**
4 **the semantics. This would also be true of the**
5 **decharacterized pieces or even the slices for**
6 **that matter because the weight of the combined**
7 **halves of the decharacterized halves would not**
8 **equal the weight of the original fruit piece**
9 **that was sliced.**
10 Q. Right because anytime you slice something you
11 lose moisture?
12 **A. Depends on how you define moisture. Moisture**
13 **content of the whole piece will change.**
14 Q. Say I slice an apple. I slice an apple. You've
15 got moisture on the knife; right? So you've
16 lost a portion of the naturally occurring
17 moisture content?
18 **A. You've also lost sugars, and acids, and probably**
19 **you've loss a minute amount of moisture.**
20 Q. So under your definition, slicing an apple would
21 be -- once you slice an apple --
22 **A. This definition which is based on the patent**
23 **claim and the way they use dried fruit yes.**
24 Q. The same for squeezing a grape; right?
25 **A. Yes. A squeezed grape would fall perfectly**

Page 152

1 **within this patent. This treatment step**
2 **certainly is a dried fruit.**
3 Q. The same thing for -- cherry is used in this
4 patent. The same thing for squeezing a cherry?
5 **A. I suppose.**
6 Q. Slicing a peach. The peach is in here too. If
7 you slice a peach, you get juice all over
8 yourself?
9 **A. That's an extreme example, but I guess my**
10 **intention here is -- and I didn't put a certain**
11 **percentage here --**
12    MR. WERNER: Is there a question pending?
13    MR. WOODFORD: He's answering the previous
14 question.
15    MR. WERNER: He's not answering the
16 question. There's no question pending.
17    THE WITNESS: I'll wait for a question.
18 BY MR. WOODFORD:
19 Q. What were you about to explain?
20 **A. I was saying that this intention was this**
21 **definition is to apply to the dried fruit**
22 **(indicating) as mentioned in this claim, and**
23 **under those conditions you're correct.**
24 Q. You agree that in order to define something
25 under this claim that has to be supported by the

Page 153

1 patent; right? Are you aware of that rule?
2 **A. Yes.**
3 Q. So --
4 **A. I would agree with that anyway.**
5 Q. You're saying things like slicing an apple, and
6 squeezing a grape, and picking something from a
7 vine the patent contemplates that that's a dried
8 fruit?
9    MR. WERNER: Objection. Mischaracterizes
10 testimony.
11    THE WITNESS: I don't think so.
12 BY MR. WOODFORD:
13 Q. So then isn't it true that your definition isn't
14 supported by the patent?
15    MR. WERNER: Objection. Mischaracterizes
16 testimony.
17    THE WITNESS: It's supported by basically
18 my opinion, and also based on the literature and
19 supporting documentation.
20 BY MR. WOODFORD:
21 Q. What about the patent? Is it supported by the
22 patent?
23 **A. I haven't had a chance to consider that very**
24 **much.**
25 Q. You have an definition here, but you don't know

Keith Cadwallader - 4/10/2006
**Amazin' Raisins International, Inc. v. Ocean Spray Cranberries, Inc.**

40 (Pages 154 to 157)

Page 154

1  if it's supported by the patent? Is that what
2  you're saying?
3       MR. WERNER: Objection. Mischaracterizes
4  his testimony.
5       THE WITNESS: Supported by -- well, I'm
6  sorry. I'm just not sure.
7  BY MR. WOODFORD:
8  Q. You're not sure if it's supported by the patent?
9  A. That definition is -- I'm not sure.
10 Q. Well, why don't you tell me this: Does the
11    patent disclose a dried fruit being something
12    that's picked off the vine?
13 A. Not literally.
14 Q. Or squeezing a grape?
15 A. No.
16 Q. Squeezing any fruits at all?
17 A. No.
18 Q. So isn't it fair to say that your definition
19    isn't supported by the patent?
20       MR. WERNER: Objection. Mischaracterizes
21    testimony.
22       THE WITNESS: It's not fair to say.
23    BY MR. WOODFORD:
24 Q. Why don't we do this. Why don't we go through
25    the patent, and you can identify the places in

Page 155

1  the patent that support your definition.
2  A. Okay. Why don't we do that. Example 9. It's
3     Column 8, Row 11 approximately. Here they are
4     using raisins, and they are doing a pre-wash
5     step.
6  Q. Hold on a second. Did you say they are using
7     raisins?
8  A. Yes.
9  Q. Isn't a raisin a dried fruit?
10 A. As an example, but it hasn't undergone the
11    process yet.
12 Q. We're talking about dried fruit that hasn't
13    undergone the process yet; right? That's the
14    whole point of this dried fruit definition;
15    right?
16 A. I'm not finished.
17 Q. Continue.
18 A. This product is washed prior to the step in
19    Claim A, Step 1 A which has increased its
20    moisture content above the range -- probably
21    above the range in which they are mentioning
22    here.
23 Q. How do you know that?
24 A. Well, I don't know that. It's increased its
25    moisture content.

Page 156

1  Q. How do you know that?
2  A. I do know that because the weight has increased.
3  Q. Let's look at the weight. What weight are we
4     talking about here?
5  A. It's -- they start with 200 grams, and after
6     washing it's now -- they start with 2000 grams,
7     and after washing it's 2060 grams.
8  Q. So 60 grams?
9  A. I didn't say it was a lot.
10 Q. Can you even feel 60 grams in your hand?
11 A. Yes you can.
12 Q. You can?
13 A. 60 grams is not insignificant.
14 Q. How does this -- what does this have to do with
15    dried fruit?
16 A. As you define it or as you -- I believe that
17    because the ranges are somewhat liberal in what
18    can be the moisture content of the in-feed that
19    the dried fruit as they intend is a broad range
20    of moisture contents.
21 Q. What I was asking before is we were talking
22    about the squeezing of the grapes and the
23    slicing of the apples and peaches, and all these
24    fall in your definition. So what I was asking
25    is: Where in the patent does it support that,

Page 157

1  something to broad as to include all that?
2       MR. WERNER: He just gave you that.
3       MR. WOODFORD: Counsel, I'm asking the
4  witness.
5       MR. WERNER: Asked and answered.
6       THE WITNESS: This is the example I have to
7  provide in the patent.
8  BY MR. WOODFORD:
9  Q. Is there anything else that you can point to in
10    the patent besides this example?
11 A. No.
12 Q. In this example, they start with a raisin don't
13    they?
14 A. They start with a washed raisin in the process.
15 Q. A raisin is a dried fruit by anybody's sense of
16    the imagination; right?
17 A. Once washed, it may not fall within its category
18    as being a dried fruit product anymore.
19 Q. We're talking about dried fruit again. You keep
20    switching over to dried fruit product, and I'm
21    not sure why. We're going back to dried fruit.
22 A. They are not the same thing. Dried fruit and
23    dried fruit product are not the same thing. The
24    raisin in a sense -- I don't have any idea of
25    the moisture content of this raisin, but by

**Keith Cadwallader - 4/10/2006**
**Amazin' Raisins International, Inc. v. Ocean Spray Cranberries, Inc.**

41 (Pages 158 to 161)

Page 158

1  washing it, they raised the moisture content.
2  Q. In your view, that supports the squeezing of the
3     grape --
4  A. No. I think you're misconstruing what I mean.
5     What I mean is that I believe that you can't be
6     too restrictive in your definition of what a
7     dried fruit is. Yes you can be ridiculous in
8     calling a sliced fruit a dried fruit, but it has
9     to fall within this category because the
10    definition -- there are so many outliers -- if
11    you give me a range, I can find so many outliers
12    that it's difficult to narrow it down into a
13    range, and so by this definition, although there
14    seems to be some examples where, you know, like
15    a sliced fruit certainly there are -- that's
16    part of the problem with the definition perhaps.
17 Q. So it's a problem with the definition?
18 A. Not a problem with the definition. The
19    definition is accurate. The definition is --
20    has -- based on the patent and on the lack of
21    suitable definition in the literature, this
22    definition is accurate but --
23 Q. In your opinion, it's supported by the patent?
24 A. No. It's -- but it's allowable by the patent.
25    MR. WERNER: What do you mean by supported?

Page 159

1  Are you talking about the legal requirements?
2     MR. WOODFORD: Hold on a second. This is
3  not a forum for us to communicate. If you have
4  an objection, you can note it.
5     MR. WERNER: Objection. Calls for legal
6  conclusion. He doesn't know patent
7  requirements. I'm stating my objection just
8  like Zeliger states his objections in our
9  depositions.
10 BY MR. WOODFORD:
11 Q. We're talked about squeezing grapes and picking
12    things off the vine, and you agreed to that?
13 A. That's not true. I have not agreed to that.
14    That is not within my definition. My definition
15    is as such as written. It doesn't describe
16    those products per se in that definition.
17 Q. Of course not. It's not going to describe every
18    variation of dried fruit in the world, but if
19    you were to take your definition and apply it to
20    those things, all those things fall in your
21    definition; right? You've already testified yes
22    three times to this.
23    MR. WERNER: What are we talking about?
24 BY MR. WOODFORD:
25 Q. What I'm asking is: Does the patent support

Page 160

1  that?
2     MR. WERNER: Objection. Lack of
3  foundation. Doesn't know the legal requirements
4  of the patent.
5     THE WITNESS: I gave you my example of
6  Example 9, and that's what I believe supports
7  that.
8  BY MR. WOODFORD:
9  Q. Can you answer it yes or no?
10    MR. WERNER: He just did.
11    THE WITNESS: Example 9 does support my
12    definition as written here.
13 BY MR. WOODFORD:
14 Q. Can you point to anything else in the patent
15    besides Example 9?
16 A. No. Not right offhand. No.
17 Q. Do you want time to review the patent?
18    MR. WERNER: Take your time.
19    THE WITNESS: I think Example 9 might be
20    the only example that I would point to at this
21    time.
22 BY MR. WOODFORD:
23 Q. What about the prosecution history? Do you have
24    that in front of you?
25 A. No. I don't recall anything in the prosecution

Page 161

1  history.
2  Q. It's been marked as Exhibit 4 (handing). Do you
3     recognize what's in Exhibit 4? I'll give you a
4     second to page through it.
5  A. Yes. I've seen it before.
6  Q. Basically what this is is the -- an examiner's
7     rejection of the claims and the response by the
8     applicants to the patent; right?
9     MR. WERNER: Take your time to look at it
10    so you know what it is.
11    THE WITNESS: Yes.
12 BY MR. WOODFORD:
13 Q. Is there anything in this document that supports
14    your definition?
15 A. This document? I don't recall.
16 Q. What about in the prosecution at all? Do you
17    recall anything in the prosecution history that
18    supports your definition of dried fruit?
19    MR. WERNER: I'm objecting to the questions
20    as misleading. If it supports it or goes
21    against it, I don't know if there's a clear part
22    you're asking.
23    THE WITNESS: I don't recall. I'm sorry.
24 BY MR. WOODFORD:
25 Q. Sitting here today, you can't identify anything?

Page 162

1  A. I don't recall. No. Not in this -- I can't
2     identify anything right offhand.
3  Q. Let's look back at your definition. So we've
4     already talked about what -- about the term
5     portion, but I also notice in here it says
6     naturally occurring moisture content. You're
7     trying to distinguish between naturally
8     occurring moisture and some other type of
9     moisture?
10 A. Yes.
11 Q. Why are you distinguishing between those?
12 A. Well, I guess it goes back to the terminology of
13    adulteration, and I think naturally is a logical
14    way to do that. I'm not sure how it applies
15    here exactly, but when you replace for example a
16    naturally occurring acid or citric acid in
17    cranberry, right, with a synthetic citric acid,
18    you no longer have a natural product per se. So
19    water would be -- although difficult to trace,
20    it would be -- what you're doing is removing
21    moisture in one step and replacing it with a
22    different --
23 Q. Why does it matter if it's natural moisture or
24    some other kind of moisture? Isn't moisture
25    moisture?

Page 163

1  A. Not necessarily. Plants -- the isotope ratios
2     of materials are different, but that's just
3     getting specific. You're not wrong. Water is
4     -- to the street person, water is water.
5  Q. So if water is water, why would dried fruit that
6     contains naturally occurring moisture be
7     distinguished somehow by fruit that contains
8     moisture that's maybe put there later?
9  A. Do you want to define moisture for me?
10 Q. Water.
11 A. In the field of food science, moisture is not so
12    clearly defined. It's usually what is removed
13    in a particular process. Like evaporation.
14    It's not always just water. It can be other
15    things. So if it contains a natural oil or
16    something like that that's volatile, that can be
17    removed too and included in that so-called
18    moisture definition, and that's all natural.
19    It's not just water. If I wanted to say water,
20    I would have said water.
21 Q. Well, what do you mean by moisture then?
22 A. Moisture is anything that evaporates in this
23    case.
24 Q. So then why do you distinguish between --
25 A. Or is removed in a dehydration step. Excuse me.

Page 164

1  Q. Why do you distinguish between naturally and
2     non-naturally occurring moisture?
3  A. I think in a natural product you need to -- it's
4     not -- I have to see if it changes the
5     definition if I take it out. I don't know if
6     those words are necessary. If it had its
7     moisture content, it's just moisture of the
8     product itself.
9  Q. Put it in the context of the decharacterized
10    fruit pieces. Those pieces have a higher
11    moisture content than when they were
12    decharacterized than when --
13        MR. WERNER: Objection. Mischaracterizes
14    prior to testimony.
15    BY MR. WOODFORD:
16 Q. You've already agreed to that. You said that a
17    long time ago that you suspect that they do. Do
18    you remember that?
19 A. Yes.
20 Q. So in fact, if you take out naturally occurring
21    out of this definition, it wouldn't cover the
22    decharacterized fruit piece would it?
23 A. I'm sorry. Would you repeat that.
24 Q. If you removed naturally occurring from this
25    definition, it wouldn't cover the

Page 165

1     decharacterized fruit piece would it?
2  A. It would have its moisture content removed. It
3     possibly could cover it.
4  Q. Without the clarification of its, if it's just
5     saying moisture content removed, it doesn't have
6     the moisture content removed does it?
7  A. If you change the definition, I would agree with
8     that.
9  Q. Isn't that the reason that naturally occurring
10    is in this definition; to cover Ocean Spray's
11    decharacterized fruit pieces?
12 A. I think in the content of the products being
13    interchangeable with dried fruit. Yes. I think
14    -- but not necessarily just those products but
15    any product that has a modification of its
16    moisture content. Let me explain briefly.
17    Raisins are a good example. The raisins have
18    had some moisture put back in them. Doesn't
19    change them from being a dried product when they
20    were received. So example -- go back to Example
21    9 again.
22 Q. Let's talk about Example 9. Example 9 the water
23    that's being added that's not naturally
24    occurring is it when they are being
25    washed?

Page 166

1   **A. That's right.**
2   Q. How does Example 9 support your definition when
3      it's not even using -- there's no naturally
4      occurring moisture there?
5   **A. Because they met the definition prior to the**
6      **step.**
7   Q. So the washing has nothing to do with it?
8      MR. WERNER: Objection. Mischaracterizes
9      testimony.
10      THE WITNESS: This example -- it has
11      something to do with the understanding of the
12      definition. It has nothing to do with changing
13      the status of the fruit from dried.
14      BY MR. WOODFORD:
15   Q. So it was already dried fruit, the raisin;
16      right?
17   **A. Yes.**
18   Q. So the washing doesn't have anything to do with
19      changing its status as dried fruit does it?
20   **A. I don't believe so.**
21   Q. So on this distinction between naturally
22      occurring moisture and non-naturally, for the
23      sake of defining it here, occurring moisture
24      content, where does the patent ever distinguish
25      between those two types of moisture content?

Page 167

1   **A. I don't believe it does.**
2   Q. So the patent doesn't say anything about
3      naturally occurring moisture?
4   **A. To my recollection, I don't believe it does.**
5   Q. What about the prosecution history; is there
6      anything in there that would support a
7      distinction of naturally versus non-naturally
8      occurring moisture?
9   **A. I don't think so.**
10   Q. Anything else that you've relied on that would
11      support the distinction between naturally
12      occurring moisture and --
13   **A. Yes. My experience with many products, and the**
14      **fact that the food world -- food science world**
15      **and food science industry is very sensitive to**
16      **product adulteration and the placement of**
17      **ingredients with natural or non-natural**
18      **ingredients. So that's why the definition is as**
19      **such.**
20   Q. Have you provided anything that would support
21      that statement?
22   **A. No I have not.**
23      MR. WOODFORD: Let's take a break.
24      (Whereupon a short break was taken from
25      1:49 p.m. to 1:55 p.m.)

Page 168

1      BY MR. WOODFORD:
2   Q. Why don't we turn again to Claim I of the
3      Amazin' patent. Are you there?
4   **A. Yes.**
5   Q. If you look under Step A, toward the bottom of
6      Step A, it says, "To substantially remove the
7      natural flavor of the dried fruit." Do you see
8      that?
9   **A. Yes.**
10   Q. Earlier today we talked about the meaning of the
11      word remove; right?
12   **A. Yes.**
13   Q. In terms of physically removing natural flavor,
14      that's something that the Ocean Spray CCE
15      process does; right?
16   **A. Yes.**
17   Q. I think we talked about before that the --
18      there's a reduction of sugars about by about 94
19      percent and acid by about 90 --
20      MR. WERNER: Objection. Lack of
21      foundation. That was addressed previously.
22      THE WITNESS: I'll stick with my previous
23      answer I guess, or I don't know if those data
24      are accurate.
25      BY MR. WOODFORD:

Page 169

1   Q. Those are the numbers we talked about before?
2   **A. The range is reasonable.**
3   Q. A reduction of sugars by 94 percent and acid by
4      90 percent that's a substantial removal of
5      natural flavor isn't it?
6      MR. WERNER: Same objection.
7      THE WITNESS: I don't know what substantial
8      means.
9      BY MR. WOODFORD:
10   Q. In your view, would you say that's a substantial
11      removal of natural flavor?
12   **A. In my expertise, I would say that -- again, it's**
13      **a non-quantifiable term, but I would say that**
14      **it's considerable flavor decrease.**
15   Q. Would you say it's substantial or not?
16   **A. It's a non-quantifiable term. It's difficult to**
17      **say what substantial is. I don't know what the**
18      **sensory effect is by removing so much -- you**
19      **have so much acid there, and you still have a**
20      **significant amount left. I don't know what the**
21      **response would be, but from a chemical**
22      **standpoint, from a purely chemical standpoint**
23      **not considering the flavor of the product**
24      **itself, it's a substantial reduction in the**
25      **chemical component; 94 percent certainly should**

Case 1:04-cv-12679-MLW    Document 91-2    Filed 05/01/2006    Page 37 of 41
**Keith Cadwallader - 4/10/2006**
**Amazin' Raisins International, Inc. v. Ocean Spray Cranberries, Inc.**

44 (Pages 170 to 173)

Page 170

1    be considered substantial.
2  Q. So let's look at Paragraph 7.
3       MR. WERNER: His declaration?
4    BY MR. WOODFORD:
5  Q. Of your declaration. I'm sorry. In Paragraph
6    7, you defined to substantially remove the
7    natural flavor of the dried fruit don't you?
8  A. Yes -- well, it's not actually defined. It
9    would be my understanding in the context in
10   which it's used its meaning in that context
11   because it depends on the context on the process
12   on what substantially remove means. We talked
13   about -- we just had an example just a minute
14   ago. This is -- within this context, yes.
15 Q. Here you're talking -- this is where you're
16   getting into the modification of flavor
17   components. Is that what we were talking about
18   before; masking?
19 A. It's not entirely modification of flavor
20   components. It's a balancing of flavor
21   components possibly modification such that the
22   sensory effect is one where the consumer of the
23   product no longer recognizes the initial flavor
24   of the product and has been thus changed in a
25   way that's no longer recognizable.

Page 171

1  Q. What part of Ocean Spray's process do you
2    consider the step of naturally removing the
3    flavor occurs?
4  A. In the infusion step. CCI.
5  Q. Explain to me how the flavor is substantially
6    removed in the CCI.
7  A. The syrup contains a number of components that
8    will substantially remove in this context the
9    residual flavor of the cranberry pieces.
10   There's still some residual flavor in those
11   cranberry pieces. So the addition of a syrup
12   and other processes that come after that will
13   result in a product that is not recognizable as
14   cranberry.
15 Q. Didn't you say before that the flavor was
16   already substantially removed?
17      MR. WERNER: Objection. Mischaracterizes
18   his testimony.
19      THE WITNESS: I did not say that. I said
20   the chemical components are substantially
21   removed. I don't know about the flavor.
22   BY MR. WOODFORD:
23 Q. How are the chemical components different from
24   the flavor?
25 A. It's complicated. It's not a necessarily linear

Page 172

1    relationship between the amount of chemical
2    component and sensory impact. So just by
3    doubling something doesn't always double the
4    sensory impact on the sensory strength. It's
5    not that quantitative. So I don't know the
6    impact on flavor. I haven't tasted the product.
7    So I don't know if you see a 90-95 percent
8    reduction in cranberry-like flavor. I don't
9    know that.
10 Q. You could have tasted the product couldn't you?
11 A. I don't know if I would.
12 Q. You don't know if you would?
13 A. Yes.
14 Q. What do you mean by that?
15 A. Well, it's a fairly raw material. I don't know
16   how clean it is at that point. It's not been
17   pasteurized or sanitized to any degree. I could
18   have. I don't know if I had that option or not.
19   I don't know if they would allow me to do that.
20 Q. They would have allowed you to do that. If you
21   were dying to taste a cranberry, you certainly
22   could have. So this term substantial removal of
23   flavor do you know what that means then?
24      MR. WERNER: Asked and answered.
25      THE WITNESS: I believe I've answered that

Page 173

1    in my deposition.
2    BY MR. WOODFORD:
3  Q. How would you satisfy that requirement? How
4    would you know if you've satisfied it?
5  A. How would you know?
6  Q. Yes.
7  A. You would have to do some testing, and you would
8    have to generally test with a panel perhaps of
9    consumers or of trained panelists but preferably
10   consumers, and if they are convinced when you
11   label that product as orange or whatever,
12   raspberry or whatever flavor you're talking
13   about, that's what it is. That's convincingly
14   raspberry-like then you have succeeded in
15   substantially removing that flavor.
16 Q. Let's go back to the CCE process. During that
17   process, a lot of the cranberry's natural flavor
18   is taken out isn't it?
19 A. I don't know.
20 Q. What do you mean you don't know? I don't
21   understand.
22      MR. WERNER: Objection. Argumentative.
23   Asked and answered.
24      THE WITNESS: All I have are chemical data.
25   I don't have any sensory data. I don't have any

Case 1:04-cv-12679-MLW    Document 91-2    Filed 05/01/2006    Page 38 of 41
Keith Cadwallader - 4/10/2006
Amazin' Raisins International, Inc. v. Ocean Spray Cranberries, Inc.

50 (Pages 194 to 197)

Page 194

1 Q. Because the CCI is still a wet cranberry?
2 A. Wetter. Yes. So I don't know what that range
3    is. This data --
4 Q. In order to do that, in order to raise the acid
5    content of the cranberries, isn't is true that
6    Ocean Spray adds citric acids to the infusion
7    syrups?
8       MR. WOODFORD: Read that back.
9       (Whereupon the material was read by the
10   shorthand reporter.)
11      THE WITNESS: This is the decharacterized
12   slices you're speaking of?
13 BY MR. WOODFORD:
14 Q. Yes. The decharacterized cranberry pieces.
15   Yes.
16 A. I'm not clear how much citric acid they have.
17   It would seem that's part of it to provide the
18   final product.
19 Q. Citric acid is a common additive in the food
20   industry?
21 A. Common.
22 Q. It's used by a lot of people in a lot of
23   different products?
24      MR. WERNER: Objection. Vague.
25      THE WITNESS: (Witness nodded head in the

Page 195

1    affirmative.)
2    BY MR. WOODFORD:
3 Q. Citric acid has a tart taste; right?
4 A. It does.
5 Q. Let's go into the CCI process. If you put a
6    solution with citric acid into the CCI, what
7    would happen to the decharacterized fruit
8    pieces? Wouldn't the acid be drawn into those
9    pieces?
10 A. Can you rephrase that?
11 Q. I'm just talking -- you're familiar with the
12   counter current infusion process of Ocean Spray;
13   right?
14 A. Yes.
15 Q. What's fed into that are the decharacterized
16   fruit pieces we've been talking about; right?
17 A. Yes.
18 Q. There's what's -- also what's fed into the
19   counter current infusion unit is the infusion
20   syrup; right?
21 A. Yes.
22 Q. It's the same type of process with respect to
23   the CCE, the fruit is pushed up the helical
24   screw against the infusion syrups flowing
25   against it; right?

Page 196

1 A. Yes.
2 Q. If the infusion syrup -- there's a citric acid
3    added to the infusion syrups. Would you agree
4    with that?
5 A. Yes.
6 Q. So as the decharacterized fruit pieces come in
7    contact with the infusion syrup, that citric
8    acid is drawn into the decharacterized fruit
9    pieces; right?
10 A. If it was an osmotic effect, yes. It's drawn
11   in.
12 Q. Through osmosis, the citric acid is drawn into
13   the decharacterized fruit pieces, and therefore
14   the acid content of those pieces increases;
15   right?
16 A. I believe so.
17 Q. So whatever acid content was in there, this is
18   adding to it; isn't it?
19 A. Yes.
20      MR. WOODFORD: Maybe this is a good time
21   for a break. We have a tape change coming up
22   here.
23      (Whereupon a short break was taken from
24   2:35 p.m. to 2:47 p.m.)
25 BY MR. WOODFORD:

Page 197

1 Q. When you were -- when we left at the break, we
2    were talking about the counter current infusion
3    process. Do you remember that?
4 A. Yes.
5 Q. Is it your opinion that at the end of the
6    counter current infusion process the natural
7    flavor of the cranberry pieces has been
8    substantially removed?
9 A. Based on -- yes. I would say from a sensory
10   standpoint, from practical standpoint, the
11   product attributes, yes, that's true.
12 Q. You said from a sensory standpoint?
13 A. From a consumer standpoint. If they tasted the
14   product, but I don't know that at that point as
15   they are exiting the counter current infusion
16   process, and I don't have any basis, but I would
17   just have to speculate that the product would be
18   overwhelming flavored by the infusion syrup you
19   have.
20 Q. Is it your view that the citric acid is what's
21   removing flavor?
22 A. It contributes to that process. The degree I
23   don't know, but it definitely contributes to
24   that process.
25 Q. How do you know it contributes to the process?

Keith Cadwallader - 4/10/2006
**Amazin' Raisins International, Inc. v. Ocean Spray Cranberries, Inc.**

60 (Pages 234 to 237)

Page 234

1  have succeeded in that.
2  Q. What do you mean in relation to their concept of
3  orange?
4  A. It's all concept. Your experience of orange is
5  different from mine. You have a concept of what
6  a good orange is.
7  Q. It would matter on whether or not the final
8  product tasted like an orange?
9  A. Basically.
10 Q. Have you ever -- have you considered at all the
11 non-sticky -- the end of this claim --
12     MR. WERNER: Objection as to scope.
13 BY MR. WOODFORD:
14 Q. Whereby the food product may be easily handled?
15 A. Not really.
16 Q. What you do you mean not really?
17 A. I've read through it, but it's not -- I've read
18 what it relates to, but it's not my area of
19 expertise. I don't work with texture.
20     MR. WERNER: Do you have a couple of
21 minutes?
22     MR. WOODFORD: No. I have a couple things,
23 and then we'll take a quick break.
24 BY MR. WOODFORD:
25 Q. Let's look at the Mantius patent.

Page 235

1     MR. WOODFORD: Have I marked that yet?
2     MR. WERNER: That hasn't been marked yet.
3     MR. WOODFORD: I'll mark that.
4     (Whereupon the material was marked for
5  identification as Exhibit Number 6.)
6  BY MR. WOODFORD:
7  Q. What's been marked as Exhibit 6 is the Mantius
8  patent which is the patent on Ocean Spray's
9  process. Do you see that?
10 A. Yes.
11 Q. For the record, it's Patent Number 5,320,861.
12 If you turn to -- have you reviewed this patent?
13 A. I've read it. Yes.
14 Q. You recognize this document, and you've been
15 through it?
16 A. I do.
17 Q. Is it fair to say that this document describes
18 Ocean Spray's manufacturing process?
19 A. Pretty fair.
20 Q. Why don't you turn to Table 3. Have you ever
21 looked at Table 3 before?
22 A. Yes I have.
23 Q. Before we were talking about the weight of
24 raisins when they are being washed with water
25 and whatnot, and this is kind of the same thing.

Page 236

1  So let's just look at the table, and if you look
2  on the left of Table 3, it has the heading
3  Process Stage. Do you see that?
4  A. (Witness nodded head in the affirmative.)
5  Q. The process stage relates to Figure 3 of the
6  patent?
7  A. Okay.
8  Q. You see how Figure 3 has a bunch of numbers that
9  correlate to different steps in the process. Do
10 you see that?
11 A. Yes.
12 Q. Those numbers are listed here in Table 3 to help
13 identify where in the process the data comes
14 from. Do you see that?
15 A. Yes.
16 Q. If you look at the process that starts out with
17 frozen sorted cranberries, it's the top line on
18 the table. Do you see that?
19 A. Yes.
20 Q. It's 100 pounds, and the concentration is eight
21 brix; right?
22 A. (Witness nodded head in the affirmative.)
23 Q. Then if you look at the end of this, as these
24 berries go into the extraction process which is
25 Step 51 on Figure 3, are you with me?

Page 237

1  A. Yes.
2  Q. The cranberries have been sliced, and they now
3  weigh 99.7 pounds. Do you see that? Because .3
4  pounds went to seeds and were discarded. To
5  summarize, we have 100 pounds that have been
6  sliced, and now we have .3 pounds of seeds, and
7  99.7 pounds of sliced cranberries. Do you agree
8  with that?
9  A. Seems reasonable.
10 Q. In addition, of you look back to Figure 3, the
11 extractor is shown, and Number 53 there that's
12 where water is added to the extraction process.
13 Do you see that?
14 A. Yes.
15 Q. It says 250 pounds of water was added. Do you
16 follow?
17 A. Yes.
18 Q. Do you agree with what I've said so far?
19     MR. WERNER: Objection. Lack of
20 foundation.
21     THE WITNESS: It's there in the table.
22 BY MR. WOODFORD:
23 Q. I'm just wondering --
24 A. Without a lot of analyses, I don't know if those
25 number seem okay.

**Keith Cadwallader - 4/10/2006**
**Amazin' Raisins International, Inc. v. Ocean Spray Cranberries, Inc.**

61 (Pages 238 to 241)

Page 238

1  Q. Then it says that the juice extract and the
2     water -- remember during the extraction process
3     the juice is pulled out and it's diluted like
4     you said with water. Do you remember that?
5  **A. That's correct.**
6  Q. It says that the water now weighs 257.7 pounds.
7     Do you see that?
8  **A. Yes.**
9  Q. The water has a concentration of three brix.
10    That's right next to it in the column?
11 **A. Yes.**
12 Q. If you flip the page, you'll see that the
13    cranberries, and that's down in Process Stage
14    71, the extracted decharacterized cranberry
15    slices, do you see that?
16 **A. Yes.**
17 Q. Says they now weigh only 92 pounds. So if we go
18    back to the beginning of the table and compare
19    99.7 pounds to 92 pounds, you'll see that they
20    have lost 7.7 pounds. Do you see that?
21 **A. Yes.**
22 Q. The water has taken on 7.7 pounds?
23 **A. Okay.**
24 Q. You also notice the brix content. The
25    cranberries went from 8 brix down to .3 brix.

Page 239

1     Do you see that?
2  **A. Yes.**
3  Q. The water went from zero brix because it was
4     pure water to three brix. Do you see that?
5  **A. Yes.**
6     MR. WERNER: Objection. Foundation.
7     BY MR. WOODFORD:
8  Q. Now, doesn't that indicate that the weight
9     change that we see, the addition of weight to
10    the water and the reduction of weight in the
11    cranberry slices doesn't that indicate that that
12    weight change is caused by the sugar levels in
13    those --
14    MR. WERNER: Objection. Lack of
15    foundation. Doesn't know how this data was
16    obtained or is familiar.
17    THE WITNESS: I would have to agree with
18    that. I also have to agree that there's going
19    to be considerable weight loss due to the solids
20    that are suspended in water.
21    BY MR. WOODFORD:
22 Q. Solids and sugars --
23 **A. Not soluble solids but insoluble solids,**
24    **additional seeds that might come out. The juice**
25    **probably is exiting -- this extractor is**

Page 240

1     **probably not clear and has some insoluble solids**
2     **in it too.**
3  Q. So would you attribute that -- you wouldn't
4     attributable that to water loss in the cranberry
5     --
6     MR. WERNER: Objection. Foundation.
7     BY MR. WOODFORD:
8  Q. The weight change?
9  **A. I would attribute it to juice loss.**
10 Q. Juice loss which includes sugars and maybe some
11    fruit solids; right?
12 **A. That's true, but juice.**
13 Q. You wouldn't say it's caused because somehow
14    there's less water in the cranberries would you?
15    MR. WERNER: Objection. Foundation.
16    THE WITNESS: I don't know how much water
17    -- I can't remember if that data has been
18    provided, but based on the analysis before and
19    after on the moisture content of those fruit, it
20    would seem like the weight loss was probably due
21    to solids loss whether juice loss.
22    MR. WOODFORD: Let me take a quick break.
23    (Whereupon a short break was taken from
24    3:42 p.m. to 3:57 p.m.)
25    BY MR. WOODFORD:

Page 241

1  Q. Have you ever heard of the word or the phrase
2     doctrine of equivalents?
3  **A. I've heard the phrase. I'm not sure what it**
4     **means.**
5  Q. Do you have any understanding of what doctrine
6     of equivalents means?
7  **A. Not enough to try to define it.**
8  Q. What is your understanding of it?
9  **A. Well, just by the language equivalent, I guess**
10    **you're talking about possible two different**
11    **terms meaning essentially the same thing or**
12    **being relative to one another. That's the best**
13    **I can do.**
14 Q. Is that your complete understanding of --
15 **A. It's pretty limited.**
16 Q. Have you ever spoken to counsel about the
17    doctrine of equivalents?
18 **A. No. I haven't asked for a full definition of**
19    **it.**
20 Q. Has it ever come up?
21 **A. I've heard the word.**
22 Q. It has come up in conversation?
23 **A. Possibly.**
24 Q. You were never told --
25 **A. No. Not really.**

**Keith Cadwallader - 4/10/2006**
Amazin' Raisins International, Inc. v. Ocean Spray Cranberries, Inc.

62 (Pages 242 to 245)

Page 242

1  Q. Do you have any opinions relating to the
2     doctrine of equivalents?
3        MR. WERNER: Objection. Scope.
4        THE WITNESS: Without thoroughly
5     understanding it, I guess I would be hesitant to
6     give an opinion on a term I don't know clearly
7     understand.
8     BY MR. WOODFORD:
9  Q. The answer to that question is no you don't have
10     any opinions?
11 A. It's true.
12        MR. WOODFORD: I think that's all I have.
13     Unless you guys want to ask any questions.
14        MR. WERNER: I have one.
15            EXAMINATION
16     BY MR. WERNER:
17 Q. Prior to today, did you formulate or perform --
18     formulate any opinions or perform any analysis
19     on the meaning of flavoring agent as that term
20     is used in Claim I?
21 A. No.
22        MR. SORENSON: Let's go chat for just a
23     minute. Can we take a quick break?
24        MR. WOODFORD: Sure.
25        (Whereupon a short break was taken from

Page 244

ERRATA SHEET
PAGE  LINE   CORRECTION  REASON

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 243

1     3:59 p.m. to 4:01 p.m.)
2        MR. WERNER: We'll withhold any further
3     questions and reserve the right to read and
4     sign. So we're done.
5        (Whereupon the deposition adjourned at 4:01
6     p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 245

1        I KEITH CADWALLADER have read this
2     deposition of expert witness transcript Pages
3     1-246 and acknowledge herein its accuracy except
4     as noted on the errata sheet.
5
6
7
8
9
10     _____
11     Witness
12
13
14
15
16
17
18
19
20
21     _____
22     Notary Public
23
24
25