IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

AMAZIN' RAISINS INTERNATIONAL, INC.,

Plaintiffs,

v.

OCEAN SPRAY CRANBERRIES, INC.,

Defendants.

Civil Action
No. 1:04-CV-12679-MLW

**DECLARATION OF ELIZABETH LAI FEATHERMAN IN SUPPORT OF
MOTION TO AMEND JUDGMENT AND AWARD ATTORNEYS' FEES**

I, Elizabeth Lai Featherman, declare:

1.     I am a member in good standing of the bar of the State of Massachusetts, and associated with the firm of Kirkpatrick & Lockhart Preston Gates Ellis LLP.  I make this declaration in support of Defendants' Memorandum of Law in Support of Motion to Amend Judgment and Award Attorneys' Fee ("Motion").  These exhibits are cited in that Motion.  I have personal knowledge and, if called as a witness, would testify competently about the following facts.

<u>EXHIBITS</u>

2.     Attached as Exhibit 1 is a true and correct copy of United States Patent No. 5,188,861.

3.      Attached as Exhibit 2 is a true and correct copy of a fax cover sheet from Jack Mazin to Randy Papadellis dated January 21, 2002.

4.      Attached as Exhibit 3 is a true and correct copy of a letter from Lenard Kasang to Jack Mazin dated January 23, 2002.

5.      Attached as Exhibit 4 is a true and correct copy of United States Patent No. 5,320,861.

6.      Attached as Exhibit 5 is a true and correct copy of a letter from Dorothy Whelan to Douglas Williams dated June 19, 2003.

7.      Attached as Exhibit 6 is a true and correct copy of a letter from Douglas Williams to Dorothy Whelan dated September 8, 2003.

8.      Attached as Exhibit 7 are true and correct copies of letters from Douglas Williams to Dorothy Whelan and Randy Papadellis dated from November 2003, February 2004 and May 2004.

9.      Attached as Exhibit 8 is a true and correct copy of a letter from John Adkisson to Douglas Williams dated September 2, 2004.

10.     Attached as Exhibit 9 are true and correct copies of excerpts from the deposition transcript of Harold Mantius.

11.     Attached as Exhibit 10 is a true and correct copy of United States Patent No. 4,364,968.

12.     Attached as Exhibit 11 are true and correct copies of excerpts from the deposition transcript of Professor Cadwallader.

13.    Attached as Exhibit 12 are true and correct copies of excerpts from the deposition transcript of Amir Lalji.

14.    Attached as Exhibit 13 are true and correct copies of excerpts from the deposition transcript of Jack Mazin.

15.    Attached as Exhibit 14 is a true and correct copy of a letter from Michael Zeliger to Christopher Sorenson dated August 7, 2006.

16.    Attached as Exhibit 15 is a true and correct copy of a letter from Christopher Sorenson to Michael Zeliger dated August 23, 2006.

17.    Attached as Exhibit 16 is a true and correct copy of the Asset Purchase Agreement between Pacific Standard Financial Group and Amazin Raisins International Inc.

18.    Attached as Exhibit 17 is a true and correct copy of a purported patent assignment from Jack Mazin and Amir Lalji to Amazin Raisins International Inc. dated January 31, 2005.

19.    Attached as Exhibit 18 is a true and correct copy of the Findings of Fact and Conclusions of Law after Bench Trial (Docket No. 518) from the Matter of Salter v. Phelan, Civil Action No. 99-912 AHS, C.D. Cal.

20.    Attached as Exhibit 19 is a true and correct copy of a purported patent assignment from Jack Mazin and Amir Lalji to Amazin Raisins International Inc. dated April 28, 2005

21.    Attached as Exhibit 20 is a true and correct copy of Ocean Spray's First Set of Requests for Production of Documents and Things (Nos. 1-60) dated April 21, 2005.

22.    Attached as Exhibit 21 is a true and correct copy of a summary of purported assignments and a collection of the same.

23.    Attached as Exhibit 22 is a true and correct copy of a letter from Matthew Doscotch to Michael Zeliger dated April 12, 2005.

24.    Attached as Exhibit 23 is a true and correct copy of e-mail correspondence from Christopher Sorenson to Michael Zeliger dated October 19, 2006.

I declare under penalty of perjury that the foregoing statements are true and correct.


Dated: September 14, 2007                    /s/ Elizabeth Lai Featherman
                                             Elizabeth Lai Featherman


BOS-1122562 v1

# EXHIBIT 1



US005188861A

# United States Patent [19]

Mazin et al.

[11] Patent Number: 5,188,861

[45] Date of Patent: Feb. 23, 1993

[54] **PROCESS FOR PREPARING A DRIED FRUIT PRODUCT**

[75] Inventors: **Jack G. Mazin**, Maple; **Amir Lalji,** Weston, both of Canada

[73] Assignee: **Royal Domaine Inc.,** Concord, Canada

[21] Appl. No.: **530,863**

[22] Filed: **May 31, 1990**

[51] Int. Cl.$^5$ ............................................. **A23L 1/212**
[52] U.S. Cl. ...................................... **426/640;** 426/639
[58] Field of Search ................................. 426/640, 639

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,609,720 | 12/1926 | Humphrey | 426/640 |
| 1,717,489 | 6/1929 | Barlow | 426/640 |
| 4,542,033 | 9/1985 | Agarwala | 426/640 X |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 61-216641 | 9/1986 | Japan | 426/640 |

### OTHER PUBLICATIONS

Furia, CRC Handbook of Food Additives, vol. I, 1972, CRC Press Inc.: Cleveland, pp. 225–253.

*Primary Examiner*—Joseph Golian
*Attorney, Agent, or Firm*—Bereskin & Parr

[57] **ABSTRACT**

A process for preparing a flavored dried fruit product having a flavor which does not substantially correspond to the natural flavor of the dried fruit is provided. As a first step, a dried fruit is treated with an acidulant being selected from the group consisting of tartaric acid, malic acid, citric acid, ascorbic acid, phosphoric acid, and fumaric acid in an amount and for a period of time which is sufficient to substantially remove the natural flavor of the dried fruit. As a second step, the treated dried fruit is then dehydrated to the desired moisture content. The dried fruit is treated during the first step or after the second step with a flavoring agent having a flavor which does not correspond to the natural flavor of the dried fruit. The flavoring agent is employed in an amount and for a period of time which is sufficient to impart to the dried fruit a flavor which is substantially the same as the flavoring agent.

**7 Claims, No Drawings**

5,188,861

1

## PROCESS FOR PREPARING A DRIED FRUIT PRODUCT

### BACKGROUND OF THE INVENTION

The invention relates to the field of dry fruits, and particularly, to a new dried fruit product having a flavor which does not substantially correspond to the natural flavor of the dried fruit, and a process for preparing the product.

Dried fruits such as raisins, prunes, apples, apricots, and peaches are recognized as highly nutritious food products. Raisins, for example, are a good source of iron, and they supply calcium, magnesium, potassium, phosphorous, B vitamins, protein and dietary fibre. (Foods and Food Production Encyclopedia, Considine, D.M. ed., Van Nostrand Reinhold Company, New York 1982, pages 1639–1942). Dried fruits are utilized as snack foods, confectionaries, etc., and as ingredients in foods such as snack foods, confectionaries, biscuits, cookies, cakes, dairy products, cereals, etc.

There is a need for dried fruit products which are inexpensive, have an appealing taste, aroma and texture, and are nutritious. Fruit leather products which are commercially available are expensive and contain ingredients such as sweeteners which make them nutritionally less desirable. Many of the sun dried or artificially dried fruits commercially available do not have an appealing taste, aroma or texture and therefore are not readily consumable as snack foods or readily incorporated into foods such as confectionaries, biscuits, cereals, etc.

There is also a need for a new and useful process which is capable of producing dried fruit products which retain more of their shape, size and natural nutrients, while imparting desirable taste, texture and aroma qualities to the dried fruit products.

U.S. Pat. No. 1,717,489 (issued Jun. 18, 1929 to Barlow) discloses a method of changing the flavor of dried fruits comprising combining the expressed juice of one fruit with another fruit which has been sun-dried or evaporated or which is in the process of drying. In one method disclosed a dry or drying fruit is immersed in the fruit juice of another fruit for a short time and then put again to dry; the process being repeated until the desired result is fully obtained. The method disclosed in the reference leaves much to be desired in terms of processing efficiency and processing costs and the tendency of the fruit juice to ferment over time may result in a product having an alcoholic taste. In addition, the absence of preservatives in the fruit juice and/or repeated applications of the fruit juice to the dry or drying fruit may introduce undesirable microorganisms into the dried fruit product shortening the shelf life of the product and more importantly, rendering the product harmful to consumers. Further, the repeated application of the fruit juice to the dry or drying fruit increases the sugar content resulting in a sticky product which is nutritionally less desirable. Repeated drying of the fruit also reduces the content of nutrients and volatiles in the fruit which effects the nutritional, and aroma and flavor qualities, respectively, of the product.

### SUMMARY OF THE INVENTION

The present invention provides dried fruit products, particularly raisins, having flavors which do not correspond to the natural flavor of the dried fruits and having desirable nutritional, texture and aroma qualities; and a

2

process for preparing the dried fruit products. The improvements in the product attributes provided by the dried fruit products of the invention compared to prior art products is in texture, flavor, nutrition and aroma. The improvements are realized using the easily carried out process of the present invention.

Broadly stated, the present invention provides a process for preparing a flavored dried fruit product said process comprising:

(a) treating a dried fruit with an acidulant being selected from the group consisting of tartaric acid, malic acid, citric acid, ascorbic acid, phosphoric acid and fumaric acid, in an amount and for a period of time which is sufficient to substantially remove the natural flavor of the dried fruit;

(b) dehydrating the treated dried fruit to obtain a desired moisture content; and,

(c) treating the dried fruit during step (a) or after step (b) with a flavoring agent having a flavor which does not substantially correspond to the natural flavor of the dried fruit, said flavoring agent being employed in an amount and for a period of time which is sufficient to impart to the dried fruit a flavor which is substantially the same as the flavoring agent; and so forming a flavored dried fruit product having a flavor which is substantially the same as the flavor of said flavoring agent and having an outer surface which is substantially non-sticky whereby the flavored dried fruit product may be easily handled.

In one embodiment of the invention, a process for preparing a flavored raisin product is provided which process comprises a one step rehydration of raisins in a flavor solution comprising water, an acidulant, and a flavoring agent, and optionally comprising one or both of a sweetening agent and a colouring agent, said flavor solution being employed in an amount of about 10 to 100% by weight of final product, said acidulant being selected from the group consisting of tartaric acid, malic acid, citric acid, ascorbic acid, phosphoric acid and fumaric acid and being employed in an amount of 0.1 to 2.5% by weight of final product, said flavoring agent having a flavor which does not substantially correspond to the natural flavor of the raisins, said rehydration step being employed for a period of time to permit the flavor solution to stabilize in the raisins and to impart to the raisins a flavor which is substantially the same as the flavoring agent, and washing the rehydrated raisins to substantially remove any residual of the flavor solution on the outer surface or skin of the raisins, and a one step dehydration of the washed rehydrated raisins to obtain a desired moisture content, and so forming a flavored raisin product having a flavored meat comprising the flavor of the flavoring agent, and having an outer surface which is substantially non-sticky whereby the raisin product may be easily handled.

In a second preferred embodiment of the invention, a process for preparing a flavored raisin product is provided which process comprises treating raisins with an acidulant being selected from the group consisting of tartaric acid, malic acid, citric acid, ascorbic acid, phosphoric acid and fumaric acid, said acidulant being employed in an amount and for a period of time sufficient to provide raisins wherein the natural flavor of the raisins is substantially removed; dehydrating the so treated raisins to obtain a desired moisture content in the raisins, and treating the dehydrated raisins with a

5,188,861

3

flavoring agent having a flavor which does not substantially correspond to the natural flavor of the raisins, said flavoring agent being employed in an amount and for a period of time which is sufficient to impart to the raisins a flavor which is substantially the same as the flavoring agent; and so forming a flavored raisin product having a flavor which is substantially the same as the flavor of the flavoring agent and having an outer surface which is substantially non-sticky whereby the flavored raisin product may be easily handled.

The process of the invention, by employing minimal steps, economically decreases the time and ingredients required to obtain a dried fruit product with a desired taste, aroma and texture. The processing temperatures and times also make it possible to produce flavored dried fruit products having little or no loss of natural nutrients. Another feature of the present invention is the improved flow properties attained when the process is employed. Using conventional methods such as Barlow, the dried fruit products may form lumps which cause difficulties in handling, packaging, obtaining exact product weights, and incorporating into other food stuffs. It is also possible using the present invention to obtain a flavored dried fruit product which is more uniform in size and shape when compared to the prior art. In addition, the presence of the acidulant, significantly decreases the possibility of contamination and fermentation occurring.

The preferred process of the invention has a number of additional advantages. There is no heating of the flavoring agent so there is little or no loss of the volatile constituents of the flavoring agent which contribute to the flavor and aroma of the final product. Thus, the flavor and aroma of the flavoring agent is more readily retained in the flavored dried fruit product. The flavor and aroma will also penetrate the dried fruit on storage and provide the flavored dried fruit with a more well-developed flavor and aroma. In the preferred process of the invention, no flavoring agent is contacted with or applied to the dried fruit providing a more nutritionally desirable product. The absence of added sweetening agent in the preferred process also provides a product with superior flow properties which makes the product easy to handle, facilitating its use as a consumer product or in further processing as an ingredient in other food stuffs.

The invention also relates to flavored dried fruit products, particularly flavored raisin products produced by the processes of the invention. The flavored dried fruit products of the invention have a more appealing taste, aroma and texture than conventional dried fruit products and thus may be more readily consumable as snack foods or more readily incorporated into foods such as confectionaries, biscuits, cereals, etc.

## DETAILED DESCRIPTION OF THE INVENTION

The dried fruits which may be flavored employing the processes of the invention include peach, apple, pear, raisins, prunes, apricots and cherries. Any dried fruit which contains between about 10% to 18% moisture may be employed. The process can be employed on whole or sectioned pieces of dried fruit.

Preferably the dried fruit is a raisin including Thompson seedless raisins, golden seedless raisins, muscat raisins or sultana raisins. The variety of raisin to be used in the processes of the invention will be determined by the desired end product color. Particularly preferred raisins

4

to be used in the processes of the invention are Australian sultanas, VISTA ™ raisins from California, seeded raisins from Australia and Dunas seedless raisins from Mexico.

The processing of many of the different dried fruits will require conditions specifically adapted to the dried fruit. The following description will be restricted to the conditions which are particularly suitable for preparing raisin products but it will be understood that persons skilled in the art, given the particular process conditions and steps set forth in this general description as well as in the Examples, could readily adapt the processes of the invention to other dried fruits.

As hereinbefore mentioned, in one embodiment of the invention, a process is provided for preparing a flavored raisin product which includes a one step rehydration of the raisins in a flavor solution. The amount of flavor solution employed is about 10 to 100% by weight of the final product, preferably about 15 to 20% by weight of the final product. The raisins and flavor solution may be mixed, without breaking up the raisins, in a mixer, for example a Hobart. The raisins are rehydrated in the flavor solution for a sufficient time to permit the flavor to stabilize in the raisins; in general, about 3 to 48 hours, preferably 4 to 6 hours, at about 70° to 120° F. The raisins and flavor solution may also be mixed in a steam kettle with a vacuum pump. The raisins and flavor solution are mixed without breaking up the raisins for 5 to 10 minutes, preferably 7 minutes, and then a vacuum of about 15″ to 30″, preferably 21″ to 28″ of mercury is applied for about 2 to 4 minutes.

The flavor solution contains water, an acidulant, a flavoring agent and, if desired, it may contain one or both of a sweetening agent or a colouring agent. As discussed above, the acidulant lowers the pH of the flavor solution, significantly decreasing possible contamination by undesirable microorganisms and fermentation. The acidulant also substantially removes the natural flavor of the dried fruit. In addition, the acidulant may also give the dried fruit product a tart taste and assist in breaking down any alkali film that may be on the outer surface of the raisins due to prior processing of the raisin which may inhibit absorption of the flavoring agent. Among the suitable acidulants which may be used in the processes of the invention are tartaric acid, malic acid, citric acid, ascorbic acid, phosphoric acid, or fumaric acid. The selection of a particular acidulant will be made with knowledge of the flavor compatibility of the acidulant with the particular dried fruit to be flavored and the flavoring agent. Thus, flavoring of a particular dried fruit or even a particular raisin using the processes of the invention will require a balancing of the flavoring agent and acidulant to achieve a desired result. For example, the preferred acidulant in the case of flavoring seeded raisins from Australia with cherry flavor is malic acid. Generally, the acidulant is present in an amount of 0.1 to 2.5% by weight of final product. The desired result as well as the nature of the acidulant will determine the actual amount used in any particular incident.

The flavoring agent used in the processes of the invention has a flavor which does not substantially correspond to the flavor of the fruit which is to be flavored in accordance with the processes of the invention. The flavoring agent may be one or more of a natural flavor or an artificial flavor or a combination of natural and artificial flavors. Natural flavors include fruit juices, concentrates and commercially available natural fla-

5,188,861

vors, for example Fries & Cino, Cherry Flavor No. 96243; Naarden's Natural Banana Flavor No. D014654; and BBA's Natural Lemon/Lime Flavor No. 5-9591. Among the artificial flavors that may be used in the process of the invention are Florasynth's Artificial Raspberry Flavor No. W388076, IFF Artificial Pineapple Flavor No. IC578122, BBA's Artificial Coconut Flavor No. M5, IFF's Artificial Pineapple Flavor No. IC578122 combined with BBA's Artificial Coconut Flavor M5 (Pina Colada), and FDO Artificial Passion Fruit Flavor No. 987114. Other natural or artificial fruit flavors that may be used in the process of the invention are orange, grapefruit, tangerine, guava and kiwi. Non-fruit flavors such as peanut butter and cinnamon, may also be used in the process of the invention. The flavoring agent when employed in the first embodiment of the process of the invention should be heat stable at the temperatures at which the process of the invention is carried out. Generally the flavoring agent is present in an amount of about 0.05 to 3% by weight of final product. The desired result as well as the nature of the flavoring agent will determine the actual amount used in any particular incident. The flavoring agent may additionally include vitamin and mineral premixes such as vitamin A, vitamin C, calcium, sodium, thiamine, riboflavin, vitamin B, vitamin $B_2$, etc.

If desired, the flavor solution may contain one or both of a sweetening agent or a coloring agent. The sweetening agent may be a natural sweetener such as sucrose, fructose or glucose or an artificial sweetening agent such as aspartame. Generally, for a natural sweetening agent an amount of about 0 to 15% by weight of the final product is employed. The coloring agent may be a natural or artificial coloring agent. The amount of coloring agent to be added can be determined by visual requirements.

The flavor solution may additionally contain a humectant such as glycerol and sorbitol. Sodium citrate may also be added to the flavor solution to provide a more tart taste, for example when preparing a lemon/-lime flavored dried fruit product.

The treated raisins in the first embodiment of the process of the invention are dehydrated using methods known in the art such as air-oven drying and vacuum drying. In particular, the treated raisins may be dehydrated in a home dehydrator, with adequate ventilation of about 20 m.p.h. wind velocity for a period of about 4 to 6 hours at about 125° to 175° F, preferably 5 to 6 hours at 145° to 150° F, till about 12% moisture remains in the product. The treated raisins prior to drying may also be subjected to a vacuum of about 15″ to 30″, preferably 21″ to 28″ of mercury for about 2 to 4 minutes to hasten the absorption of the flavor solution. If the flavor solution contains a sweetening agent it is advantageous to wash the treated raisins prior to drying.

In accordance with a preferred embodiment of the invention, a process is provided for preparing a flavored raisin product which comprises treating raisins with an acidulant being selected from the group consisting of tartaric acid, malic acid, citric acid, ascorbic acid, phosphoric acid and fumaric acid said acidulants being employed in an amount and for a period of time sufficient to provide raisins wherein the natural flavor of the raisin is substantially removed; dehydrating the so treated raisins to obtain a desired moisture content in the raisins, and treating the dehydrated treated raisins with a flavoring agent having a flavor which does not substantially correspond to the natural flavor of the raisins, said flavoring agent being employed in an amount and for a period of time which is sufficient to impart to the raisins a flavor which is substantially the same as the flavoring agent; and so forming a flavored raisin product having a flavor which is substantially the same as the flavor of the flavoring agent and having an outer surface which is substantially non-sticky whereby the flavored raisin product may be easily handled.

As a first step in the second preferred embodiment of the invention, the raisins are treated with an acidulant. The starting raisins are mixed with an aqueous solution containing the acidulant, in a mixer such as a Hobart mixer. The acidulant is employed in an amount, preferably 0.1 to 2.5% by weight of final product, and for a sufficient time to substantially remove the natural flavor of the raisins; in general about 2 to 3 hours, preferably 2.5 hours. The mixing is carried out at a temperature of about 20° C. to 50° C., preferably 20° C. If the starting raisins are coated with oil it is advantageous to wash the raisins prior to mixing to remove the oil coat. The acidulant treated raisins are then dehydrated to obtain a desired moisture content in the treated raisins. In particular, the raisins may be dehydrated in a home dehydrator, with adequate ventilation of about 20 m.p.h. wind velocity for a period of about 1 to 3 hours, preferably 2 hours, at 145° F. to 150° F., preferably about 145° F., until about 12 to 18% moisture, preferably 15% remains in the product. The raisins may be vacuum dried by subjecting to a vacuum of about 18″ to 30″, preferably 28″ of mercury for about 1 to 3 hours, preferably 2 hours, to provide an internal product temperature of 110 to 160° F., preferably 110 to 120° F., until about 12 to 18% moisture, preferably 15% remains in the product. The acidulant treatment step and dehydration step may also be carried out in an apparatus such as a Rota-Cone Dryer and Processor (Paul 0. Abb Inc., Little Falls, N.J.)

The dehydrated treated raisins are mixed with a flavoring agent. The flavoring agent is employed in an amount and for a period of time sufficient to impart to the dehydrated raisins a flavor which is substantially the same as the flavoring agent. Generally, the dehydrated raisins and flavoring agent are mixed in a mixer such as a tumble mixer, to uniformly coat the dehydrated raisins. Generally an amount of flavoring agent which substantially coats the raisins is employed and in particular the flavoring agent may be present in an amount of about 0.5 to 3% by weight of the final product. In the preferred process, of the invention no sweetening agents are contacted or applied to the raisins.

The nature of the acidulants and flavoring agents which may be used in the preferred process of the invention are the same as the acidulants and flavoring agents hereinbefore described for the first embodiment of the process of the invention.

The dried raisins prepared according to the process of the invention can be used as a snack food or confectionery or an ingredient in products such as cakes, cookies, snack foods, confectioneries, dairy products, etc. The dried raisins may also be coated with chocolate.

The following non-limiting examples are illustrative of the present invention:

EXAMPLE 1

A cherry flavor solution containing 4.0g malic acid, 3.0g Fries & Cino Natural Cherry Flavor No. 96243 and 73.0g water was added to 400g of seeded raisins from Australia. The mixture was allowed to stand with inter-

5,188,861

7

mittent mixing, for 6 hours at room temperature (70° F.) to allow the solution to be absorbed into the raisins. The treated raisins were then dehydrated in a home hydrator at 145° F. with adequate ventilation of about 20 m.p.h. wind velocity for a period of 5- to 6 hours to 12% moisture remaining in the product. The dried treated raisins were then cooled. The resultant product had a desirable cherry flavor.

### EXAMPLE 2

The cherry flavor solution as described in Example 1 was added to 400g of seeded raisins from Australia and mixed in a Hobart mixer for about 10 minutes to allow uniform dispersion of the solution into the raisins. The mixture was then subjected to a vacuum of 21″ to 28″ of mercury for about 4 minutes to hasten the absorption of the solution. The treated raisins were then dehydrated as described in Example 1. The resultant product had a desirable cherry taste which was similar to the product prepared in accordance with the procedure as described in Example 1.

### EXAMPLE 3

A strawberry flavor solution containing 1.20g of citric acid, 0.80g Florasynth Artificial Strawberry Flavor No. WL16103 and 78.0g of water was added to 400g of seeded raisins from Australia. Subsequent processing was carried out as described in Example 1 or Example 2 and the raisin products resulting for each process had a similar desirable strawberry taste.

### EXAMPLE 4

A raspberry flavor solution containing 2.25g citric acid, 2.50g Florasynth Artificial Raspberry Flavor No. W388076 and 75.25g of water was added to 400g of seeded raisins from Australia. Subsequent processing was carried out as described in Example 1 or Example 2 and the raisin products resulting from each process had a similar desirable raspberry taste.

### EXAMPLE 5

A banana flavor solution containing 1.00g citric acid, 7.00g Naarden Natural Banana Flavor No. DQ14654 and 72.00g of water was added to 400g of VISTA raisins from California. Subsequent processing was carried out as described in Example 1 or 2 and the raisin products resulting from each process had a similar desirable banana taste.

### EXAMPLE 6

A pina colada flavor solution containing 3.0g citric acid, 4.0g IFF Artificial Pineapple Flavor No. IC5788122 o.4g BBA Artificial Coconut Flavor No. M%, and 72.6g of water was added to 400g of VISTA raisins from California. Subsequent processing was carried out as described in Example 1 or 2 and the raisin products resulting from each process had a similar desirable pineapple taste.

### EXAMPLE 7

A lemon./lime flavor solution containing 5.0g citric acid, 0.5g sodium citrate, 1.5g BBA Natural Lemon/-Lime Flavor No. 5-9591 and 73.0g of water was added to 400g of Australian sultana raisins. Subsequent processing was carried out as described in Example 1 or 2 and the raisin products resulting from each process had a similar desirable lemon/lime taste.

### EXAMPLE 8

8

A passion fruit flavor solution containing 3.0g citric acid, 0.8g F.D. & 0 Artificial Passion Fruit Flavor No. 987114, 8.0g passion juice concentrate and 68.2g of water was added to 400g of VISTA raisins from California. Subsequent processing was carried out as described in Example 1 or 2 and the raisin products resulting from each process had a similar desirable passion fruit taste.

### EXAMPLE 9

A 2000g sample of Australian sultana raisins was treated with hydrogenated vegetable oil (0.5%) and then washed with hot water and dried. The washed raisins (2060g) were treated with 250ml of a 10% anhydrous citric acid solution for 2 hours and the resulting acidified raisins (2310g) were then dehydrated in a home dehydrator at 145° F. with adequate ventilation of about 20 m.p.h. wind velocity for a period of 3 hours. The resulting dehydrated raisin product (1970-1980g) was substantially free of any natural raisin flavor. A 0.4% flavor solution of Bush Brooke Allen Flavor #5-9591 was added to coat the dehydrated raisin product. The process was repeated using a 2000g sample of Thompson seedless raisins. An Orange Flavored raisin product was prepared employing the described process, using 2000g samples of each of Australian sultana raisins and Thompson seedless raisins and 250ml of an 8% anhydrous citric acid solution and a 0.7% flavor solution of cold pressed California orange oil (Seeley).

As a comparison, the process described in U.S. Pat. No. 1,717,489 to Barlow was also used to prepare lemon flavored and orange flavored raisins. In particular, 2000g samples of Australian sultana raisins and Thompson seedless raisins were washed with hot water and dried. The washed raisin samples (2060g) were then soaked in 250ml of either fresh lemon juice squeezed form Florida lemons or fresh orange juice squeezed from Swaziland oranges and then dehydrated in a home dehydrator at 145° F with adequate ventilation of about 20 m.p.h. wind velocity for a period of 3 hours. The resulting raisins retained their natural flavor characteristics.

The raisin product produced by the process of the invention had a superior orange or lemon flavor when compared to the raisins produced by the process disclosed in Barlow. No difference in the color of the raisin product of the invention and the raisins produced by the Barlow process was observed.

In the case of the orange flavored raisin product of the invention, it had a less sticky texture than the raisins produced using the Barlow process.

The sugar and acid content of the raisin products of the invention and the raisins produced using the Barlow process were calculated.

As shown in Table 1, the orange and lemon flavored raisins produced using the Barlow process have a lower acid content and a higher sugar content when compared to the orange and lemon flavored raisin product of the present invention. If the acid content of the Barlow raisins were increased by soaking the raisins in additional orange or lemon juice, this would necessarily substantially increase the sugar content of the raisins, which is not desirable.

#### TABLE 1

|  | Acid Content (%) | Sugar Content (%) |
| --- | --- | --- |
| Invention |  |  |
| Orange raisin product | 1 | 71.2%* |

5,188,861

| 9 | | |
|---|---|---|

TABLE 1-continued

| | Acid Content (%) | Sugar Content (%) |
|---|---|---|
| Lemon raisin product Barlow | 1.4 | 71.2% |
| Orange Raisins | 0.08–0.28** | 72%* |
| Lemon Raisins | 0.72–1.05*** | 71.35–71.65 |

*71.2% is total sugar content of raisins from General Foods Specifications. Minimum sugar content of orange juice is 6.4%. (The Structure and Composition of Foods, details re publication p. 690).

$$250 \text{ g} \times \frac{.64}{100} = 0.8\%$$

**Minimum Citric Acid Content of Orange Juice is 0.64%. (The Structure and Composition of Foods, p. 690)

$$250 \text{ g} \times \frac{.64}{100} = 1.6/2000 = 0.08\% \text{ acidity}$$

***Minimum Citric Acid Content of Lemon Juice is 5.74%. (The Structure and Composition of Foods, Vegetables, Legumes and Fruits, Vol. II, Winton, A.L., and K. B. Winton, John Wiley & Sons, Inc., London, p. 704).

$$250 \text{ g} \times \frac{5.74}{100} = 14.35/2000 = .007175 = 0.72\%$$

## EXAMPLE 10

A 2000g sample of Australian sultana raisins with hydrogenated vegetable oil coating (0.5%) were washed with hot water and dried. The washed raisins were treated with 250ml of an 8% malic acid solution for 2 hours and then dehydrated in a home dehydrator at approximately 145° F. with adequate ventilation of about 20 m.p.h. wind velocity for a period of 3 hours. The raisins may alternatively be dehydrated by vacuum drying by subjecting to a vacuum of about 28" of mercury for a period of 2 hours to provide an internal raisin temperature of approximately 110 to 160° F. The resulting dehydrated raisin product was substantially free of any natural raisin flavor. A 1.0% solution of Natural Cherry Flavor #77742 from F & C International was added to coat the dehydrated raisin product.

## EXAMPLE 11

A passion fruit raisin product was prepared employing the process described in Example 10 using 250ml of an 8% citric acid solution and a 0.6% solution of Artificial Flavor #987114 from Fritzsche, Dodge & Olcott.

## EXAMPLE 12

A pina colada raisin product was prepared employing the process described in Example 10 using 250ml of 0.8% citric acid and a solution containing 1.0% Artificial Pineapple #1C5-78122 from International Flavor & Fragrances and 0.1% Artificial Coconut #M5 from Bush Brooke Allen.

## EXAMPLE 13

A banana flavored raisin product was prepared employing the process described in Example 10 using 250ml of 0.8% citric acid and a 0.5% solution of Natural Banana Flavor #82641 from F & C International.

## EXAMPLE 14

A strawberry flavored raisin product was prepared employing the process described in Example 10 using 250ml of 1% malic acid and a solution of Strawberry No. 987148 from FD & 0 International.

While certain representative embodiments of the invention have been described herein for the purpose of illustration, it will be apparent to those skilled in the art that modifications therein may be made without departing from the spirit and scope of the invention.

We claim:

| 10 | |
|---|---|

1. A process for preparing a flavored dried fruit product said process comprising:

(a) treating a dried fruit with an acidulant being selected from the group consisting of tartaric acid, malic acid, citric acid, ascorbic acid, phosphoric acid and fumaric acid, in an amount and for a period of time which is sufficient to substantially remove the natural flavor of the dried fruit;

(b) dehydrating the treated dried fruit to obtain a desired moisture content; and,

(c) treating the dried fruit during step (a) or after step (b) with a flavoring agent having a flavor which does not substantially correspond to the natural flavor of the dried fruit, said flavoring agent being employed in an amount and for a period of time which is sufficient to impart to the dried fruit a flavor which is substantially the same as the flavoring agent;

and so forming a flavored dried fruit product having a flavor which is substantially the same as the flavor of the flavoring agent and having an outer surface which is substantially non-sticky whereby the flavored dried fruit product may be easily handled.

2. A process for preparing a flavored raisin product comprising a one step rehydration of raisins in a flavor solution comprising water, an acidulant, and a flavoring agent, and optionally comprising one or both of a sweetening agent and a colouring agent, said flavor solution being employed in an amount of about 10 to 100% by weight of final product, said acidulant being selected from the group consisting of tartaric acid, malic acid, citric acid, ascorbic acid, phosphoric acid and fumaric acid and being employed in an amount of 0.1 to 2.5% by weight of final product, said flavoring agent having a flavor which does not substantially correspond to the natural flavor of the raisins, said rehydration step being employed for a period of time to permit the flavor solution to stabilize in the raisins and to impart to the raisins a flavor which is substantially the same as the flavoring agent, washing the rehydrated raisins to substantially remove any residual of the flavor solution on the outer surface or skin of the raisins, and a one step dehydration of the washed rehydrated raisins to obtain a desired moisture content, and so forming a flavored raisin product having a flavored meat comprising the flavor of the flavoring agent, and having an outer surface which is substantially non-sticky whereby the raisin product may be easily handled.

3. A process for preparing a flavored raisin product, said process comprising treating raisins with an acidulant being selected from the group consisting of tartaric acid, malic acid, citric acid, ascorbic acid, phosphoric acid and fumaric acid, said acidulant being employed in an amount and for a period of time sufficient to provide raisins wherein the natural flavor of the raisins is substantially removed; dehydrating the so treated raisins to obtain a desired moisture content in the raisins, and treating the dehydrated raisins with a flavoring agent having a flavor which does not substantially correspond to the natural flavor of the raisins, said flavoring agent being employed in an amount and for a period of time which is sufficient to impart to the raisins a flavor which is substantially the same as the flavoring agent; and so forming a flavored raisin product having a flavor which is substantially the same as the flavor of the flavoring agent and having an outer surface which is substantially

5,188,861

**11**

non-sticky whereby the flavored raisin product may be easily handled.

4. A process as claimed in claim 3, wherein the acidulant is employed in an amount of 0.1 to 2.5% by weight of final product and the flavoring agent is employed in an amount of .05 to 3% by weight of final product.

5. A process as claimed in claim 3 or 4 wherein the flavoring agent is one or more of a natural and an artificial cherry, strawberry, raspberry, banana, pineapple, coconut, lemon/lime, orange, grapefruit, tangerine, guava, kiwi, or passion fruit flavor.

6. A flavored raisin product produced by a process comprising treating raisins with an acidulant being selected from the group consisting of tartaric acid, malic acid, citric acid, ascorbic acid, phosphoric acid and fumaric acid, said acidulant being employed in an amount and for a period of time sufficient to provide so treated raisins wherein the natural flavor of the raisins is

**12**

substantially removed; dehydrating the so treated raisins to obtain a desired moisture content in the raisins, and treating the dehydrated raisins with a flavoring agent having a flavor which does not substantially correspond to the natural flavor of the raisins, said flavoring agent being employed in an amount and for a period of time which is sufficient to impart to the raisins a flavor which is substantially the same as the flavoring agent; and so forming a flavored raisin product having a flavor which is substantially the same as the flavor of the flavoring agent and having an outer surface which is substantially non-sticky whereby the flavored raisin product may be easily handled.

7. A process as claimed in claim 1, wherein no sweetening agent is contacted with or applied to the dried fruit.

*     *     *     *     *

# EXHIBIT 2

# Amazin' Raisin®

## Amazin' Raisin International Inc.

**FROM :**

## FAX COVER SHEET

TO: _OCEAN SPRAY CRANBERRIES, INC._

ATTN: _MR. RANDY PAPADELLIS, PRESIDENT_

FAX No: _508 · 946- 7714_

TEL. No: _508 · 923- 3228_

No. OF PAGES TO FOLLOW: _8_

DATE: _JAN. 21. 02_

TIME SENT: _____

CONFIRMATION #: _____

SENT BY: _JACK MAZIN_

SUBJECT : _U.S. PATENT NUMBER   5,188-861_

_AS DISCUSSED + AS PER YOUR REQUEST_
_PLEASE FIND ENCLOSED_

_PATENT NO. # 5,188,861_

_YOURS TRULY_

_JACK MAZIN, PRES.+C.E.O._
_AMAZIN' RAISIN INC._
_36 GERMAN MILLS ROAD_
_THORNHILL, ONTARIO, L3T 4H5_
_CANADA   (905· 707-8425)_

**<u>EXHIBIT 3</u>**



**INGREDIENT
TECHNOLOGY
GROUP**

January 23, 2002

**RECEIVED**
FEB 1 1 2001
ANITA L. MEIKLEJOHN

Mr. Jack Mazin
President and C.E.O.
Amazin' Raisin Inc.
36 German Mills Road
Thornhill, Ontario L3T4H5
Canada

Re: U.S. Patent No. 5,188,861

Dear Mr. Mazin:

Mr. Papadellis, President of Ocean Spray, has forwarded to me copies of your facsimile message of January 21 and Patent Number 5,188,861 for review and response.

I reviewed the wording of the patent document and more specifically the claims set forth in Patent No. 5,188,861 with one of our scientists, Harold Mantius, who is also the inventor of a process that we use to produce our sweetened dried cranberries and other sweetened dried fruits. I am enclosing a copy of Mr. Mantius' patent (U.S. Patent No. 5,320,861). This patent was assigned to Ocean Spray and describes a process and methodology for producing sweetened dried fruits which is clearly distinguishable and different from the process described in Patent No. 5,188,861, which Amazin' Raisin uses to produce its products.

If you have any questions please feel free to contact me.

Very truly yours,

*Len Kasang*

Lenard E. Kasang, Ph.D.
R&D Director, Ingredient Technology Group
Ocean Spray Cranberries, Inc.
Phone: (508) 946-7605
E-mail: lkasang@oceanspray.com

Attachment
cc.   R. Papadellis
bcc.  N. Bryson
      H. Mantius

**Ocean Spray Cranberries Ingredient Technology Group**
One Ocean Spray Drive, Lakeville/Middleboro, MA  02349
Telephone: 508-946-7605  Fax: 508-946-7712

# EXHIBIT 4

US005320861A

# United States Patent [19]

## Mantius et al.

[11] Patent Number: 5,320,861

[45] Date of Patent: Jun. 14, 1994

[54] **FRUIT EXTRACTION AND INFUSION**

[75] Inventors: **Harold L. Mantius**, Raynham; **Peter R. Peterson**, Taunton, both of Mass.

[73] Assignee: **Ocean Spray Cranberries, Inc.,** Lakeville-Middleboro, Mass.

[21] Appl. No.: **816,803**

[22] Filed: **Jan. 3, 1992**

[51] Int. Cl.5 .......................... **A23L 2/04; A23L 3/40**

[52] U.S. Cl. .................................. **426/599; 426/640;** 426/655; 99/495

[58] Field of Search ................ 426/639, 655, 640, 599

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 19,421 | 2/1858 | Helton . |
| 1,704,367 | 3/1929 | Moore . |
| 1,763,121 | 6/1930 | Bailey . |
| 1,858,796 | 5/1932 | Wilcoxson . |
| 2,080,542 | 5/1937 | Kuss et al. . |
| 2,139,585 | 12/1938 | Hunter ............................. 134/60 |
| 2,491,115 | 12/1949 | Kincaide . |
| 2,509,543 | 5/1950 | Truax et al. ..................... 259/6 |
| 2,554,769 | 5/1951 | Arnold ......................... 259/109 |
| 2,571,300 | 10/1951 | Simpson . |
| 2,626,856 | 1/1953 | Alles ............................. 23/284 |
| 2,692,831 | 10/1954 | Weckel et al. . |
| 2,746,730 | 5/1956 | Swenson et al. ................... 259/9 |
| 2,785,071 | 3/1957 | Matthews ....................... 99/102 |
| 2,847,282 | 8/1958 | Dunning et al. . |
| 2,865,758 | 12/1958 | Weckel ......................... 99/102 |
| 3,057,736 | 2/1960 | Forkner ......................... 99/204 |
| 3,142,574 | 7/1964 | Anderson ....................... 99/102 |
| 3,723,487 | 3/1973 | Couche ....................... 260/412.4 |
| 3,800,055 | 3/1974 | Gallagher ..................... 426/432 |
| 4,048,343 | 9/1977 | Levine . |
| 4,205,919 | 6/1980 | Attwell ......................... 366/34 |
| 4,225,628 | 9/1980 | Lynn . |
| 4,326,926 | 4/1982 | Gerow . |
| 4,363,264 | 12/1982 | Lang et al. . |
| 4,390,550 | 6/1983 | Kahn et al. ..................... 426/102 |
| 4,497,838 | 2/1985 | Bonnell ......................... 426/429 |
| 4,551,348 | 11/1985 | O'Mahoney et al. ............. 426/639 |
| 4,647,466 | 3/1987 | Japikse et al. ................. 426/639 |
| 4,693,905 | 9/1987 | Japikse et al. ................. 426/387 |
| 4,775,545 | 10/1988 | Augustine et al. ............. 426/639 |
| 4,789,558 | 12/1988 | Winkler et al. . |
| 4,814,190 | 3/1989 | Ismail ........................... 426/102 |
| 4,818,555 | 4/1989 | Piotrowski et al. ............. 426/599 |
| 4,873,095 | 10/1989 | Rundle ........................... 426/50 |
| 4,889,739 | 12/1989 | Powers et al. ................. 426/599 |
| 4,902,518 | 2/1990 | Lang et al. ..................... 426/14 |
| 4,938,985 | 7/1990 | Swaine, Jr. et al. ............. 426/599 |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 69835/87 | 3/1987 | Australia . |
| 878427 | 8/1971 | Canada . |
| 0130660 | 1/1985 | European Pat. Off. . |
| 1179183 | 10/1964 | Fed. Rep. of Germany . |
| 2459407 | 11/1976 | Fed. Rep. of Germany . |
| 8604126 | 2/1986 | Fed. Rep. of Germany . |
| 400678/A1 | 9/1991 | Fed. Rep. of Germany . |
| WO87/05255 | 9/1987 | PCT Int'l Appl. . |
| WO90/05463 | 5/1990 | PCT Int'l Appl. . |

### OTHER PUBLICATIONS

Commercial Fruit Processing, Edition 2, Edited by Woodruff, J. G.; Bor Shiun Luh, USA, 1986, pp. 191–198, 321, 433–436.

Shukla, "Osmotic Dehydration", Cereal Foods World, p. 687.

*Primary Examiner*—Carolyn Paden
*Attorney, Agent, or Firm*—Fish & Richardson

[57] **ABSTRACT**

Extraction, especially of firm fruit such as cranberries, with improved yields of high quality, low tannin juices by using an improved countercurrent extractor employing longitudinal members positioned between adjacent flights and reinfusion of decharacterized, extracted fruit pieces with infusion syrups, such as juices from fruits other than that extracted, to produce a fruit food product of various flavors having a desired level of inherent soluble fruit component, without the need to bleed off spent syrup as a byproduct.

**41 Claims, 3 Drawing Sheets**



Case 1:04-cv-12679-MLW    Document 107-5    Filed 09/14/2007    Page 3 of 14



FIG. 1



FIG. 2

FIG. 2a

FIG. 4



FRUIT EXTRACTION/INFUSION PROCESS

FIG. 3

5,320,861

1

## FRUIT EXTRACTION AND INFUSION

### FRUIT EXTRACTION AND INFUSION

Field of the Invention

This invention relates to the extraction and infusion of fruits, especially cranberries, for producing various food products.

## BACKGROUND OF THE INVENTION

Countercurrent extractors are used in the fruit processing industry for extraction of juices from solid fruit matter. The extractor includes a screw conveyor which urges fruit solids in a first direction, while extraction fluid flows in the opposite direction, extracting juice from the solids by osmosis. Other juice extraction methods used in the processing of cranberries include processes which utilize presses in conjunction with pressing aids (e.g., rice hulls) to produce a high quality single strength juice. Higher yield processes often utilize enzymatic treatment at elevated temperature to break down pectin in raw fruit prior to extraction and may result in a juice of substantially lower quality.

## SUMMARY OF THE INVENTION

In aspects of the invention, fruits, especially firm berry fruits such as cranberries, are extracted by an improved countercurrent extraction apparatus resulting in improved and surprising yields of high quality juice, without the need for pressing aids, enzymatic treatments, non excessive heating of extraction liquid or extracted juice mixtures or the fruit itself. Further, because enzymes and high temperatures need not be used, the fruit maintains substantial physical integrity in a decharacterized form post extraction. The decharacterized fruit, a product of the juice extraction process, may be used as a carrier for various flavorings by infusing the decharacterized fruit with a flavored liquid infusion syrup. Particularly, infusion may be achieved with a countercurrent apparatus similar to that used for extraction with the decharacterized fruit being loaded as a solid and the infusion syrup, carrying the flavoring, introduced in a countercurrent fashion. The resulting infused food product, still maintaining substantial physical integrity of the original raw fruit, provides unique flavors by virtue of the various infusion fluids possible, such as fruit juices from fruits other than the fruit decharacterized. The infused fruit product may also maintain the characteristic flavor of the fruit itself to a desired degree.

In various aspects, a sequential, two-step process, extraction followed by infusion is taught herein, that provides particular advantages, especially over processes which simultaneously extract and infuse by soaking fruit in a liquid infusion syrup. In the latter processes, control over the level of natural or inherent soluble fruit component (the composition of materials that contribute to characteristic fruit flavor, including soluble solids such as combinations of sugars and other components, present in the fruit at natural relative levels) in the infused fruit product can be achieved by adjusting the ratio of infusion syrup to fruit, in order to extract the requisite amount of inherent soluble fruit component into the infusion medium, discharging a fraction of the medium as a relatively low value spent syrup byproduct and recycling the remaining fraction to infuse and extract more fruit. Recycling the spent syrup in its entirety causes the level of inherent soluble

2

fruit component in the infusion syrup feed to asymptotically approach that of the fruit feed over time as the syrup is cycled through successive batches or a continuous flow of fruit and renders control over the formulation of the infused fruit product at any target level of inherent soluble fruit component below that characteristic of the fruit virtually impossible.

In the two-step process, on the other hand, the level of inherent soluble fruit component in the infused product can be controlled by the degree of extraction achieved in the extraction step and the degree of infusion of formulated infusion syrup achieved in the infusion step. Preferably, most of the inherent soluble fruit component is extracted from raw fruit to produce a large volume of high quality juice of high commercial value, with a predetermined amount of inherent soluble fruit component retained in the decharacterized fruit so that it maintains partially the natural fruit flavor. In the infusion step, the infusion syrup is formulated with inherent soluble fruit component (e.g. by using juice or juice concentrate) and non-inherent components (e.g. sugars, acids and/or other flavorings and components not present in the natural fruit or not present at the same relative levels as in the natural fruit) in such a manner as to control the formulation of the infused fruit product with respect to its inherent soluble fruit component without the need to bleed off spent syrup as a byproduct of the process. Preferably, there is no net extraction of the inherent component into the infusion media in the infusion step, i.e., the infusion syrup is formulated such that the level of inherent fruit component is equal to or greater than that in the decharacterized fruit. In preferred embodiments, the infusion is carried out with a countercurrent apparatus, and the spent syrup is Concentrated to remove excess water and recycled in its entirety.

For example, raw fruit is extracted such that post extraction the decharacterized fruit contains a small amount, e.g. 1% by weight, of inherent soluble fruit component and a large amount of the extraction fluid, typically pure water. The infusion syrup is formulated such that the level of inherent soluble fruit component in the infusion syrup is approximately 1% by weight; equal in concentration to the level in the decharacterized fruit. During infusion, no net infusion or extraction of inherent soluble fruit component occurs. The spent syrup exiting the infuser is a blend of inherent and noninherent soluble components diluted by water extracted from the fruit. This spent syrup, comprising a higher relative proportion of inherent fruit component when compared to the target infusion syrup formulation, can be recovered and recycled in its entirety by concentrating to remove the excess water and adding the requisite amount of non-inherent components to adjust the formulation in line with the desired infusion syrup feed. If the syrup is formulated to comprise a higher concentration of inherent fruit component than in the extracted fruit, there will be a net infusion of the inherent fruit components into the decharacterized fruit. In this case, the spent syrup can be recycled in its entirety by concentrating to remove the excess water and adding the requisite amount of inherent fruit components (e.g., by adding juice or juice concentrate) to adjust the formulation in line with the desired infusion syrup feed. In either case, the syrup can be concentrated without the aid of enzymes to a level appropriate for subsequent formulation in infusion syrup. Thus, there is no need to

5,320,861

**3**

bleed off spent syrup as a low value byproduct, since it can be concentrated and then recycled in its entirety without adversely effecting the formulation of the infused fruit product.

By contrast, in processes which simultaneously extract and infuse by soaking fruit in an infusion syrup (as previously discussed), to produce an infused product having a low inherent fruit component level only a fraction of the spent syrup generated can be recycled. In effect, the level of inherent soluble fruit component in the infused product can only be controlled by removing the requisite amount of inherent soluble fruit component in spent syrup as a low value byproduct.

The invention is therefore of a particular economic advantage since the inherent fruit component which needs to be removed from the fruit (in order to control the formulation of the infused product) is removed up front, prior to infusion, as a high value high quality fruit juice. Process costs are also significantly reduced by the more efficient handling of spent infusion syrup. Further, this feature is of particular importance for infusion of high-acid fruits, such as cranberries, which require low controlled amounts of inherent soluble fruit component to enhance sweetness and make the infused fruit product more palatable but still reminiscent of cranberry flavor.

"Decharacterized fruit" as used herein refers to whole fruit or fruit pieces that have been subjected to extraction such that at least 50% of soluble solids have been removed. "Firm fruit" as used herein are those which resist structural collapse under substantial compression and typically are extracted in prior processes with the aid of pectinase enzymes and/or high temperature to increase yield. Examples include, apples, cranberries, cherries and grapes. On the other hand, "soft fruits" are easily collapsed. Examples include raspberries, blackberry and the meat of various fruits especially tropical fruits, e.g., kiwi, guava, mango and passion. (Fruits of this type are also typically extracted in prior processes with the aid of enzymes and/or high temperatures to increase yield.) It will be understood that processes of the invention may achieve advantages such as improved yield, quality and lower cost with many fruits. All percentages herein are by weight unless otherwise indicated or apparent.

In a first aspect, the invention features a countercurrent apparatus for use with fruit solids that has an elongate housing in the form of a trough or tube with an inlet at or adjacent one end and an outlet at or adjacent the other end. A screw conveyor with a substantially helical flight is disposed within the housing. The flight is rotatable about its longitudinal axis for moving fruit solids which have been introduced into the housing through the inlet from the one end to the other end of the housing. Means are provided for introducing liquid into the other end of the housing in a manner such that introduced liquid will flow along the housing to the one end thereof and counter current to the fruit solids. A drive means causes the screw conveyor to rotate for providing a net forward motion of the fruit solids from the one end to the other end. Means are also provided for withdrawing liquid from the housing at a point at or adjacent the one end thereof. The apparatus is characterized by a screw conveyor that includes a series of narrow longitudinal members parallel to the conveyor axis positioned between adjacent flights.

Various embodiments include the following features. The longitudinal members are radially positioned from

**4**

the periphery, preferably, about 10% to 70% the distance from the periphery to the axis of the flights. There are 1 to 12 longitudinal members per square foot of flight area. The longitudinal members are positioned in a circumferential pattern about the axis of the flights. Two sets of members are provided at different radii from the axis. One set of longitudinal members are provided at a radius of about 25% the distance from the periphery of said flight to the axis and a second set of longitudinal members at a radius about 50% the distance from the periphery to the axis of said flight. The longitudinal members may be relatively rigid wires or rods with a diameter in the range of 0.032 to 0.500 inches. The direction of rotation of the screw conveyor is intermittently reversed.

In another aspect, the invention features extracting juice from fruit by providing raw fruit in a dimensionally stable form, penetrating the skin of the fruit to expose the inside of the fruit, unprotected by skin, and treating the fruit with a liquid in a countercurrent apparatus by advancing the fruit along a path while flowing the liquid countercurrently to the advancing fruit and uniformly, continuously tumbling the fruit while treating the fruit with the liquid and maintaining a process temperature of about 75° F. or less during extraction, and collecting the extract from the fruit.

In another aspect, the invention features treating fruit by providing raw fruit, penetrating the fruit to expose the inside of the fruit, unprotected by the skin, countercurrently extracting juice from the fruit with an extraction liquid to provide extracted fruit, collecting the extract from the fruit, collecting the extracted fruit, subjecting the extracted fruit to countercurrent infusion with an infusion liquid to provide an infused fruit, and collecting the infused fruit.

In another aspect, the invention features a method for processing fruit by providing raw fruit, penetrating the fruit to expose the inside of the fruit, unprotected by the skin, extracting the fruit with an extraction liquid to provide decharacterized fruit having a desired level of inherent soluble fruit component, collecting the extract from the fruit, collecting the decharacterized fruit, formulating an infusion liquid having inherent soluble fruit component at a level equal to or greater than the decharacterized fruit, infusing the decharacterized fruit with the infusion liquid without net extraction of the inherent soluble fruit component from the decharacterized fruit, collecting the spent infusion liquid after infusion, concentrating the spent liquid, recycling the concentrated spent liquid in its entirety for subsequent infusion, and collecting the infused fruit.

The features of these aspects may be combined. In addition, various embodiments may include one or more of the following features. The raw fruit is frozen prior to extraction. The residence time of fruit for extraction is greater than about 90 minutes, such as about 120 to 150 minutes. The extraction liquid is substantially free of pectinase enzymes, e.g. the extraction liquid is water. Uniformly tumbling is achieved between the flights of a screw conveyer by passing narrow longitudinal members positioned parallel to the axis of the screw through the fruit. A temperature of about 100° to 130° F. is maintained during the infusion step. The residence time of the fruit is about 120 to 300 minutes during the infusion. The fruit is cranberry. The method includes concentrating the spent liquid by removing excess water, reformulating the infusion liquid by adding a desired amount of inherent and/or non-inherent

5,320,861

**5**

soluble components to concentrated, spent liquid, and recycling the reformulated liquid in its entirety for subsequent infusion. The infusion liquid is selected from fruit juice, fruit juice concentrate, corn syrup, sugarwater solutions, artificial sweeteners or any combination of the above, and may be fortified with flavorings, vitamins, and/or minerals. The infusion liquid has 60 to 80 brix. The decharacterized fruit has been extracted of about 94 to 98% of soluble solids. The decharacterized fruit is infused to about 40 to 55 brix. The infused fruit is dried to remove excess water to a water activity of 0.5 to 0.55.

In another aspect, the invention features food products made by method aspects of the invention. The food product may be a decharacterized cranberry having removed therefrom at least about 90% of its inherent soluble solids and including therein a flavor syrup.

Embodiments may include the following. The decharacterized fruit piece has about 94 to 98% of the inherent soluble solids removed. The syrup is a fruit flavor different from the fruit piece. The food product has brix of about 40 or greater. The fruit is a cranberry. The decharacterized fruit is free from enzyme degradation and substantially maintains the structural integrity of raw fruit, being untreated by pectinase enzymes. The decharacterized fruit has been extracted of about 50% or more of its original color (total anthrocyanine content measured by alcohol extraction).

Other aspects, features and advantages follow.

## DETAILED DESCRIPTION

We first briefly describe the drawings.
Drawings
FIG. 1 is a side view schematic of a countercurrent extractor;

FIG. 2 is a perspective schematic of a screw conveyor;

FIG. 2a is an end-on view of the screw conveyor of FIG. 2, taken along the lines a—a;

FIG. 3 is a flow diagram of a fruit extraction/infusion process;

FIG. 4 is a perspective illustration of a dried infused fruit product;

## EXTRACTOR/INFUSER

Referring to FIG. 1, a countercurrent apparatus 10 for use, e.g., as an extractor, includes an elongate troughshaped housing 11 with a helical screw conveyor 2 intermittently rotated by a motor means 20, connected to a shaft 4 on its longitudinal axis. Housing 11 has an inlet hopper 14 for the introduction of material to be extracted, particularly raw cranberries, and an outlet 15 at the other end of the trough housing is provided for removal of extracted fruit pieces. The hopper 14 is disposed above the lower end of the screw which is inclined slightly upwardly at angle Θ. A charging line 17 is provided for charging extraction liquid, typically pure water, into the housing 11 and a discharge line 16 for the discharge of liquid extract, a mixture of extraction liquid and juice. The trough temperature may be controlled (e.g., by heating or cooling with a circulating water jacket (not shown) positioned about the trough) to control the process temperature. Alternatively or in addition the temperature of the fruit or extraction liquid may be preselected prior to introduction to the extractor. The screw conveyor is operated by intermittently reversing the direction of rotation of the screw. The reversal helps the relatively compacted mass of matter

**6**

being extracted to be opened up enhancing the penetration of extracting liquid. Other details of a suitable countercurrent extractor are described in U.S. Pat. No. 4,363,264, the entire contents of which are hereby incorporated by reference. Commercially available fruit extractor units (e.g., CCE Model 275, Howden Equipment Services Pty, Ltd., Sydney, Australia) may be modified and operated with beneficial results as described further below.

Referring to FIGS. 2 and 2a, the screw conveyor 2 includes a series of vertical, helical flights 5, having wire or rod longitudinal members 8 positioned between adjacent flights and extending longitudinally generally parallel to the conveyor shaft 4 which has an axis A (corresponding to the axis of the flight). As shown particularly in FIG. 2a, the wire members 8, may be tied to slits 7 of the flights 5. Typically, the wires are positioned at least about 10 percent and preferably no more than about 70 percent the distance from the outer periphery of each flight to the axis A and equidistantly in a circumferential pattern. The wires must be stiff enough to pass through the fruit mass without excessive bending to cause the fruit to uniformly tumble along the length between the flights of the conveyor as the shaft rotates. In particular embodiments, (employing CCE Model 275), a set of wires is positioned at $d_5$, about 1.5 inch from the periphery for flights of 10.8 inch diameter (wires positioned about 25% of the distance from the periphery to the axis), and three wires are used of a diameter with approximately 0.06 inch. (The diameter of shaft 4 is about 2.9 inches.) An optional second set of wires 8' (FIG. 2a only) may be provided at a distance of about 3 inch from the periphery (about 50% of the distance from the periphery to the axis). In some embodiments, especially with larger flights, multiple circumferential sets of wires may be provided at various radii between the axis and periphery. In some embodiments, the wires might be positioned closer to the axis between flights near the raw fruit inlet 14 than between flights near the extracted fruit outlet 15. Positioning the wires further from the axis within the specified range has a greater tumbling effect near the decharacterized fruit outlet 15 where the fruit is usually more compacted. Typically, about 1 to 12 wires per square foot of flight area are provided. Preferably, the longitudinal members are positioned equi-distantly radially and circumferentially. Preferably, longitudinal members are provided between adjacent flights for the entire length of the conveyor.

As further described in the Examples below, it has been found that, by employing longitudinally extending members, such as wires 8, improved efficiency in extraction of juices from fruit may be achieved, even in the case of firm berry fruits such as cranberries. In addition, it has been found that a countercurrent apparatus, as described, can be used for the infusion of fruit decharacterized by extraction to provide new food products. In this case, extracted, decharacterized fruit is placed in the inlet hopper 14 and an infusion liquid carrying a desired flavor is introduced through charging line 17. The infused fruit product exits outlet spout 15. The use of members 8 also improves efficiency of the infusion.

Preferred and typical parameters for operation of a countercurrent apparatus with the improved conveyor for extraction of cranberries are given in Table I below and parameters for infusion of decharacterized cranberries with an improved conveyor are given in Table II

5,320,861

| 7 | 8 |

below. "Extract level" and "infusion liquid level" refers to the depth of these liquids compared to the screw flight nearest the discharge line 16. The "process temperature" is the temperature of the liquid in the trough. (The temperature of liquid in the trough is typically measured about one half the length of the trough from the fruit inlet and is generally the highest temperature along the trough in cases where unheated fruit and liquid are introduced at either end.) The screw rotation is the speed at which the screw rotates in any direction (e.g. during intermittent rotation). The water/fruit and infusion syrup/fruit feed rate ratio are the weight ratios of the rates at which these components are fed to the trough. For operation with a preferred countercurrent apparatus, CCE model 275 modified as discussed, the berry weight in the trough and berry feed rate are also given. (It will be understood that desired feed rates for liquid and fruit for an infusion or extraction apparatus of any size may be calculated from the tables below, knowing the trough capacity of the particular unit used and the range of feed ratios specified below.)

TABLE I

| Process Variable | Range | Typically |
|---|---|---|
| inclined ange Θ (degrees) | 2 to 6 | 4 |
| process temperature (deg. F.) | 45 to 75 | 65 |
| fruit residence time (minutes) | 30 to 180 | 135 |
| screw rotation (rpm) | 1 to 4 | 2 |
| water/fruit feed rate ratio (weight ratio) | 1:1 to 4:1 | 2.5:1 |
| extract level (% of flight diameter at discharge) | 50 to 70% | 60% |
| For CCE Model 275 | | |
| Berry weight in Trough (lbs) | 70–80 | 75 |
| Berry feed rate (lbs/hr) | 23–160 | 33 |

For infusion of cranberries, the countercurrent apparatus is preferably operated with the parameters in Table II below.

TABLE II

| Process Variable | Range | Typically |
|---|---|---|
| inclined angle θ (degrees) | 2 to 6 | 4 |
| process temperature (°F.) | 100 to 130 | 110 |
| fruit residence time (minutes) | 120 to 300 | 240 |
| screw rotation (rpm) | 1 to 4 | 2 |
| infusion liquid/fruit feed rate ratio (weight ratio) | 2:1 to 6:1 | 3:1 |
| infusion liquid level (% of flight diameter at discharge) | 50 to 70% | 60% |
| For CCE Model 275 | | |
| dicharacterized fruit weight in Trough (lbs.) | 65–75 | 70 |
| decharacterized fruit feed rate (lbs/hr.) | 13–38 | 17.5 |

Process

Referring now to FIG. 3, a flow diagram is shown of a preferred process employing extraction followed by infusion and preferably using countercurrent apparatus as described above with respect to FIGS. 1–2a. (It will be understood that other extractors and infusers may be used in the process.) The process will be described for use with cranberries, although it may be adapted for use with other fruit, especially firm fruit.

Whole raw fruit which has been bulk frozen is provided to a cleaning stage 40 to remove debris such as twigs, leaves, soil, etc. and then conveyed to a sorting stage 42 which sorts fruit of a selected size, within a selected deviation, and removes rotten or damaged fruit. The freezing of the fruit prior to further processing is believed to be an important aspect of the invention, in that, upon rethawing, the fruit is structurally more susceptible to juice extraction. Again, the deleterious effect on juice quality associated with high temperature treatment (or the use of enzymes) is avoided. The frozen fruit is in the raw state, without having been boiled or otherwise cooked prior to processing. The frozen fruit (e.g., initially at about 25° F.) thaws naturally upon exposure to the flume water (e.g., about 55° F.) and the extraction trough (e.g., about 65° F.) without any substantial heating. As discussed above, generally, exposure to heat is avoided especially prior to and during extraction, so that the fruit is not exposed to average process temperatures above about 75° F.

Control over the average size and standard deviation of the raw fruit is also believed an important attribute of the present process whereas a uniformly sized infused product ultimately results. In the case of cranberries, preferably the sorted berries are 16 to 20 millimeters (mm) in diameter with a standard deviation of about 1 mm. The size-selected fruit is later passed to a dicer stage 44 (Model RG-6, A. B. Hallde Maskiner, Kista, Sweden) which slices the berries to expose the inner pulp of the fruit unprotected by the skin. The whole cranberries are preferably cut in half to provide slices between 8 to 10 millimeters in width, although other skin penetrating treatments such as scarifying may also be used.

The sliced fruit is transported by means of a flume to a separation stage 46, including a vibrating screen separation apparatus (Model LS24S444, Sweco, Inc., Florence, Ky.) which separates the sliced fruit from the flume water, recycling water back to the flume, and removes seeds at a seed collection stage 48. The sliced fruit is then provided to the solid input 51 of an extractor stage 50 which employs a countercurrent extractor which may be as previously described with respect to FIGS. 1–2a and operated within the limits of Table I. The liquid input 53 to the extractor is the extraction liquid, typically pure water without added enzyme, from a supply 52. The liquid output 54 of the extractor stage is an enzyme-free, high-quality extract mixture of extraction liquid and fruit juice which exhibits desirable qualities such as low tannin content. The extractor, preferably operating at low temperatures, but at high efficiency, avoids the detrimental effects on juice quality normally associated with high temperature extraction, such as reduced shelf-life characteristics, burnt notes in the juice flavor and higher tannin levels. The raw juice extract from the extractor stage liquid output 54 is further treated, first in a separation stage 56, using a vibrating screen separator (Model LS24S444, Sweco, Inc., Florence, Ky.) which collects in collection stage 66 any remaining seeds and solids. The juice extract is further treated in a depectinization stage 58 in which pectinase enzyme is provided from a supply 60 and mixed with the juice extract. The enzyme, in small amounts (between about 0.01 and 0.1 percent) clears the juice extract of pectin in preparation for a filtration stage 62. Whereas the juice has already been extracted from the fruit, the enzyme plays no substantial role in the overall extraction process and thereby only small amounts of the enzyme, known to be an expensive process ingredient, need be used. Filtration at stage 62 is

5,320,861

9

achieved by means of a microfilter of 0.1–0.5 micron pore size. The filtered juice extract is further treated at a reverse osmosis stage 64, (Model BRO, Paterson Candy, Inc.) where the juice extract is passed through a membrane system under pressure to concentrate the final juice product, which is collected at stage 65 as is the excess water at stage 68. Typically, the final juice product is of about 18 brix. The cranberry juices produced by the process typically have a tannin content less than about 1900 mg/L, e.g. about 1700 mg/L (measured at 7.5 brix).

Decharacterized cranberry pieces, exiting the solid output 71 of extraction stage 50, are typically characterized by the removal of about 96 percent of the soluble solids and about 80 to 96 percent of the color. At higher temperatures, for example, at 85° to 105° F. virtually all of the color can be removed from the decharacterized fruit, if desired. Extraction time can be extended to achieve the same end. Decharacterized fruit lacking all of its original color may be advantageous for producing infused fruit products that are to take on a color other than that of the original fruit. Similarly, for producing an infused product that is characteristic, in appearance, of a cranberry, an amount of the color suggestive of the cranberry is maintained in the decharacterized fruit.

The decharacterized fruit is supplied to an infusion stage 72 including a countercurrent apparatus similar to that used at the extraction stage 50 and as discussed with respect to FIGS. 1–2a, operated in the ranges given in Table II. Liquid input at the infusion stage 72 is the desired infusion liquid such as sugar-water (e.g., fructose) solution, high fructose corn syrup, white grape juice, strawberry juice, raspberry juice, blueberry juice, apple juice and their concentrates. These infusion liquids may include flavoring, e.g., spices such as cinnamon and may be fortified with vitamins, e.g. ascorbic acid, and/or minerals, e.g. iron. The infusion liquid typically has a sugar level of about 72 brix and is provided from a continuous process loop which mixes the spent infusion liquid from the liquid output 74 from infusion stage 72 with syrup from a supply 76 which is then treated in a vibrating screen separator 78 (Model LS24S444, Sweco, Inc., Florence, Ky.) to remove and collect seeds and fines at a collection state 80. The spent infusion mixture is then concentrated at concentration stage 82 including a water collection stage 84 and finally, the liquid is treated at a blend stage 86 which may include input from an infusion sugar supply 88, before being recycled to the liquid input 90 of infuser 72 as the infusion liquid. As discussed above, the infusion liquid can be formulated to include a desired amount of natural or inherent soluble fruit component, equal to or greater than present in the decharacterized fruit so that no net extraction of inherent soluble fruit component into the infusion media occurs during infusion. The infused fruit product has the desired level of inherent soluble fruit component and the spent infusion liquid is concentrated and recycled in its entirety.

10

The infused fruit product exiting the infusion stage at the solid output 92 is passed to a screening stage 94 at which the infused fruit product is separated from excess infusion liquid coating the solid product, which is collected at collection stage 96. The excess syrup may be provided to syrup supply 76 for recycling to the infuser 72. The infused fruit product is then provided to a dryer stage 98 which passes forced air through the infused fruit product to remove water at stage 100. Drying temperature is typically in the range of about 180° to 200° F. for about 120 minutes using a conventional forced air fruit dryer. The dried, infused fruit product is next passed to an oiler stage 102 which includes an oil supply 104 from which vegetable oil or the like is applied to the fruit product to enhance flowability. A screen separator (Model LS24S444, Sweco, Inc., Florence, Ky.) 106 with a stage 108 is used for collection of any fines and waste. The final dried infused product, maintaining substantial physical integrity of the original fruit, is collected in a collection stage 110 from which it may be bulk packaged. The dried product preferably has a sugar level of about 88 brix.

Referring to FIG. 4, a dried infused cranberry fruit product according to the invention is illustrated. The fruit product maintains substantial structural integrity of the original cranberry including the skin 114 and typically a portion of the original color of the cranberry. The flavor of the fruit product however is that of the infusion syrup which may be of many varieties including a controlled amount of flavor of the original fruit. A coating may be applied which also contributes to flavor and/or nutrient value.

The invention will be further described by way of the following examples.

### EXAMPLE 1

The process described in FIG. 3 can be operated using raw frozen cranberries as the fruit input. In the extraction stage (referring as well to Table I) the process temperature is about 65° F., with a residence time of about 135 min., a screw rotation of 2 rpm, a water/berry weight ratio of 2.5:1 and extraction liquid (water) level of 60%. The extraction stage produces a decharacterized fruit with 0.3% inherent soluble fruit component. The infusion stage (referring as well to Table II) can employ an aqueous blend of sucrose (68.0%) and cranberry fruit components (4.0%) as the infusion syrup and a countercurrent apparatus identical to that in the extraction stage, operated at a temperature of about 110° F., residence time of about 180 min., screw rotation of about 2 rpm, infusion liquid to berry weight ratio of about 4:1. The spent infusion syrup can then be collected to be concentrated and reformulated as discussed herein. Target inputs and outputs from the various stages are summarized in Table III, below. All calculations are normalized to 8 lbs. of fruit soluble solids per 100 lbs. of cranberries.

### TABLE III

| PROCESS STAGE (FIG. 3) | MATERIAL | AMOUNT | CONCENTRATION (WATER PHASE) |
|---|---|---|---|
| 40/42 | FROZEN SORTED CRANBERRIES | 100.0 LBS | 8 brix |
| 44 | FLUME RECYCLE (WATER) | 900.0 LBS | |
| 48 | CRANBERRY SEEDS | 0.3 LBS | |
| 51 | SLICED CRANBERRIES | 99.7 LBS | |
| 53 | WATER | 250.0 LBS | |
| 54/56 | JUICE EXTRACT/WATER | 257.7 LBS | 3 brix |

5,320,861

TABLE III-continued

| PROCESS STAGE (FIG. 3) | MATERIAL | AMOUNT | CONCENTRATION (WATER PHASE) |
|---|---|---|---|
| 60 | ENZYME | 0.1 LBS | |
| 65 | CRANBERRY JUICE/WATER | 43.0 LBS | 18 brix |
| 66 | TRASH (SEEDS/FINES) | 0.1 LBS | |
| 68 | WATER | 214.7 LBS | |
| 71 | EXTRACTED DECHARACTERIZED SLICES | 92.0 LBS | 0.3 brix |
| 74 | SPENT SYRUP | 256.0 LBS | 55 brix |
| 80 | TRASH (SEEDS/FINES) | 0.1 LBS | |
| 84 | WATER | 37.9 LBS | |
| 88 | INFUSION SUGAR | 61.0 LBS | |
| 90 | INFUSION SYRUP | 284.0 LBS | 72 brix |
| 92/94 | INFUSED FRUIT PIECES | 120.0 LBS | 55 brix |
| 96 | EXCESS SYRUP | 5.0 LBS | 55 brix |
| 100 | WATER | 41.6 LBS | |
| 104 | OIL | 0.1 LBS | |
| 108 | FINES | 17.5 LBS | |
| 110 | DRIED INFUSED FRUIT SLICES | 56.0 LBS | 88 brix |

The cranberry juice product provided by the process at stage 65 typically has a tannin content less than about 1900 mg/L (at 7.5 brix), and has no noticeable off-flavors associated with heat abuse. As the table indicates, the process is highly efficient for the production of cranberry juice with 43 lbs. of juice (at 18 brix) being produced from 100 pounds of cranberries. This corresponds to 96% recovery on a weight basis (FSP, fruit soluble solid pounds, i.e., percent fruit soluble solid recovery based on weight of fruit soluble solid in raw fruit compared to that recovered in the extract). In addition, the process provided a new fruit product in the way of infused cranberry slices having the sweetened flavor of the infusion syrup.

EXAMPLE 2

The efficiency of juice recovery employing an improved extractor was illustrated by a series of comparative experiments (experiments 1 to 6) in which process parameters for extraction were varied, as summarized in Table IV below.

able FSP with a relatively high (2146 mg/L, measured at 7.5° brix) tannin content.

In Experiment 2, similar process conditions were employed, with the exception that no enzyme was introduced to the extraction liquid. The efficiency of extraction dropped to about 67% of available FSP.

In Experiment 3, the extractor unit was modified as described with respect to FIGS. 1-2a; a series of longitudinally extending wires were provided between adjacent flights of the extractor screw. Surprisingly, by employing the improved countercurrent unit, extraction efficiency increased to about 84% of available FSP recovery without the use of enzymes, representing a significant improvement over operation of the conventional extractor (even with the use of enzymes).

In Experiment 4, the improved countercurrent apparatus was operated with extended residence time (135 minutes) compared to Experiment 3 (90 minutes). Under these conditions, extraction efficiency increased to about 96% of available FSP recovery.

In Experiment 5, the extraction temperature was

TABLE IV

| Process parameter | Experiment | | | | | |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| Unit Size | pilot | pilot | pilot | pilot | pilot | commercial |
| Enzymes in Extraction Liquid | Yes | No | No | No | No | No |
| Improved Extractor (FIGS. 1-2a) | No | No | Yes | Yes | Yes | Yes |
| Residence Time (min) | 90 | 90 | 90 | 135 | 160 | 135 |
| Extraction Temperature (°F.) | 85–115 | 85–115 | 85–115 | 85–115 | 69–75 | 65 |
| Efficiency % FSP recovery | 75 | 67 | 84 | 96 | 96 | 96 |
| Relative Tannin Content mg/L | 2146 | 1950 | 2381 | 2292 | 1734 | 1273 |

In Experiment 1, a pilot sized extractor unit (nominal capacity = 30 kilograms per hour) was used to extract juice from cranberries, employing in the extraction liquid enzymes effective in pectin breakdown (about 0.07–0.15 lbs./100 lbs. feed). The extractor was of a commercially available type (CCE Model 275, Howden Equipment Services Pty, Sydney, Australia). The efficiency of extraction was approximately 75% of avail-

reduced to about 69°–75° F., compared to about 85° to 115° F. used in Experiments 1 to 4 (with the residence time marginally increased). Surprisingly, the extraction efficiency remained at about 96% of available FSP recovery and the resulting juice product was of improved quality over that of experiments 1 to 4, in that the juice exhibited significantly lower tannin levels.

5,320,861

13

In Experiment 6, the extraction efficiency of a much larger commercial scale extraction unit (CCE model 500, nominal capacity=500 kilograms per hour) was investigated and the results compared to that obtained with the smaller pilot scale unit used in the previous experiments. The unit employed an extractor screw modified to include longitudinally extending wires between adjacent flights and was operated at an extraction temperature of 65° F., with residence times of about 135 minutes. The extraction efficiency was similar to that obtained in the smaller unit.

Other embodiments are within the following claims.

We claim:

1. A method for efficiently extracting from fruit a juice that has not been exposed to high temperatures, comprising:

providing raw fruit in a dimensionally stable form,

penetrating the skin of said fruit to expose the inside of said fruit, unprotected by skin,

treating said fruit with an extraction liquid in a countercurrent apparatus by advancing said fruit along a path while flowing said liquid countercurrently to said advancing fruit and uniformly, continuously tumbling said fruit while treating said fruit with said liquid,

maintaining a process temperature of about 75° F. or less during said extracting and,

collecting said liquid extracted from said fruit to provide said juice that has not been exposed to high temperatures.

2. The method of claim 1 wherein the residence time of said fruit during said extracting in said countercurrent apparatus is greater than about 90 minutes.

3. The method of claim 2 wherein the residence time is about 120 to 150 minutes.

4. The method of claim 3 further comprising freezing said raw fruit prior to said providing step.

5. The method of claim 4 wherein said extraction liquid is water substantially free of pectinase enzymes.

6. The method of claim 1 or 5 wherein said uniformly tumbling includes tumbling between flights of a screw conveyer by passing narrow longitudinal members positioned parallel to the axis of said screw conveyer through said fruit.

7. The method of claim 6 wherein said fruit is cranberry.

8. A method for processing fruit, comprising:

providing raw fruit,

penetrating said fruit to expose the inside of said fruit, unprotected by the skin,

countercurrently extracting said fruit with an extraction liquid while maintaining conditions, including a low temperature, that provide extracted fruit with substantially the structural integrity of the raw fruit, and a fruit extract that has not been exposed to high temperatures,

collecting the extract from said fruit,

collecting the extracted fruit, and

countercurrently infusing said extracted fruit with an infusion liquid while maintaining conditions that provide an infused fruit with substantially the structural integrity of the raw fruit, and

collecting said infused fruit.

9. The method of claim 8 comprising freezing said raw fruit prior to said providing step.

10. The method of claim 8 further comprising collecting spent infusion liquid after said countercurrent infusion, concentrating said spent liquid and recycling said

14

concentrated liquid in its entirety for subsequent infusion.

11. The method of claim 10 comprising:

extracting said fruit to provide a decharacterized fruit having a selected level of inherent soluble fruit component, and

formulating said infusion liquid to have a level of inherent soluble fruit component substantially equal to or greater than said level in said decharacterized fruit.

12. The method of claim 8 wherein said decharacterized fruit has been extracted of about 94 to 98% of soluble solids.

13. The method of claim 8 wherein said infusion liquid includes a liquid selected from fruit juice or fruit juice concentrate, corn syrup, sugar-water solutions, and artificial sweeteners or combination thereof.

14. The method of claim 13 wherein the infusion liquid is fortified with a material selected from the group consisting of vitamins, flavorings, minerals, and combinations thereof.

15. The method of claim 8 wherein said infusion fruit to about 60 to 80 brix.

16. The method of claim 8 comprising infusing said fruit to about 40 to 55 brix.

17. The method of claim 16 further comprising drying said infused fruit to remove water.

18. The method of claim 17 comprising drying said infused fruit to about 40 brix or greater.

19. The method of claim 17 comprising drying said infused fruit to a water activity of about 0.5 to 0.55.

20. The method of claim 8 wherein the extraction liquid is water substantially free of pectinase enzymes.

21. The method of claim 20 comprising extracting said fruit by advancing said fruit and flowing an extracting liquid countercurrently to said advancing fruit, while continuously uniformly tumbling said fruit between the flights of a screw conveyer by passing narrow longitudinal members parallel to the axis of said conveyer through said fruit.

22. The method of claim 21 further comprising infusing said decharacterized fruit by advancing said fruit and flowing an infusing liquid countercurrently to said advancing fruit, while continuously uniformly tumbling said fruit between the flights of a screw conveyor by passing narrow longitudinal members parallel to the axis of said conveyer through said fruit.

23. The method of claim 22 further comprising maintaining the temperature at about 75° F. or less during said extracting step.

24. The method of claim 23 comprising maintaining a residence time of said fruit of greater than about 90 minutes during said extraction.

25. The method of claim 24 wherein the residence time of said fruit is about 120 to 150 minutes.

26. The method of claim 25 comprising maintaining a process temperature of about 100° to 130° F. during said infusing.

27. The method of claim 26 comprising maintaining a residence time of said fruit of about 120 to 300 minutes during said infusing.

28. The method of any one of claims 8, 20 or 23 wherein said fruit is cranberry.

29. A method for processing fruit, comprising:

providing raw fruit,

penetrating said fruit to expose the inside of said fruit, unprotected by the skin,

5,320,861

15

extracting said fruit with an extraction liquid to pro-
vide decharacterized fruit having a desired level of
inherent soluble fruit component,

collecting the extract from said fruit,

collecting the decharacterized fruit,

formulating an infusion liquid having inherent soluble
fruit component at a level equal to or greater than
said decharacterized fruit,

infusing said decharacterized fruit with said infusion
liquid without net extraction of said inherent solu-
ble fruit component from said decharacterized
fruit,

collecting a spent infusion liquid after said infusing,

concentrating said spent liquid,

recycling said concentrated spent infusion liquid for
subsequent infusion, and

collecting said infused fruit.

30. The method of claim 29 including reformulating
said infusion liquid by the addition of non-inherent solu-
ble component to said concentrated spent syrup.

31. The method of claim 30 including reformulating
said infusion liquid by the addition of inherent soluble
fruit component to said concentrated spent liquid.

32. The method of claim 31 wherein said infusing
includes countercurrently infusing.

16

33. The method of claim 32 wherein said extraction
liquid is water-free of pectinase enzymes.

34. The method of claim 29 or 33 comprising freezing
said raw fruit prior to said providing step.

35. The method of claim 34 comprising maintaining a
process temperature of about 75° F. or less during said
extracting step.

36. The method of any one of claims 1, 5, 7, 23, 29 or
35 wherein said fruit is cranberry and said extract has a
tannin content of less than about 1900 mg/L measured
at 7.5 brix.

37. A raw cranberry fruit food product, comprising:
a decharacterized cranberry fruit piece having re-
moved therefrom at least about 90% of its inherent
soluble solids and including therein a flavor liquid,
said product having a brix of about 40 or greater.

38. The food product of claim 37 wherein about 94 to
98% of the soluble solids have been removed.

39. The food product of claim 37 wherein the syrup is
a fruit flavor different from the fruit piece.

40. The food product of claim 37 wherein said de-
characterized fruit is free from added enzyme degrada-
tion, substantially maintaining the structural integrity of
the raw fruit, being untreated by pectinase enzymes.

41. The food products of claim 37 wherein said de-
characterized fruit has been extracted of about 50% or
more of its original color.

* * * * *

# UNITED STATES PATENT AND TRADEMARK OFFICE
## CERTIFICATE OF CORRECTION

PATENT NO.   : 5,320,861

DATED        : Jun. 14, 1994

INVENTOR(S)  : Harold L. Mantius et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 1, line 31, delete "non", insert therefor --nor--.

Column 2, line 34, delete "C" in the word concentrated, insert therefor lower case --c--.

Column 14, claim 15, delete "fruit to about", insert therefor --liquid has--.

Signed and Sealed this

Tenth Day of September, 1996

*Attest:*

Bruce Lehman

**BRUCE LEHMAN**

*Attesting Officer*                *Commissioner of Patents and Trademarks*

# **EXHIBIT 5**

# FISH & RICHARDSON P.C.,P.A.

3300 Dain Rauscher Plaza
60 South Sixth Street
Minneapolis, Minnesota
55402

Telephone
612 335-5070

Facsimile
612 288-9696

Web Site
www.fr.com

Frederick P. Fish
1855-1930

W.K. Richardson
1859-1951

June 19, 2003

Douglas J. Williams., Esq.
Merchant & Gould
3200 IDS Center
Minneapolis, MN 55402-2215

Re:        Ocean Spray Cranberries, Inc.
Our Ref.:    00414-075001



BOSTON

DALLAS

DELAWARE

NEW YORK

SAN DIEGO

SILICON VALLEY

TWIN CITIES

WASHINGTON, DC

Dear Mr. Williams:

We represent Ocean Spray Cranberries, Inc. and are writing in response to your letter of May 27, 2003 to Randy Papadellis in which you allege that "at least two" of Ocean Spray's flavored craisin products "relate" to U.S. Patent No. 5,188,861 assigned to Amazin Raisin Inc. The '861 patent contains 7 claims. None of these claims covers the process Ocean Spray uses to prepare its products, or the products themselves, for at least the following reasons.

Claims 1 and 7 of the '861 patent require treating a "dried fruit" with a certain acidulant "in an amount and for a period to time which is sufficient to substantially remove the natural flavor of the dried fruit." Ocean Spray's process does not involve treating "dried fruit," nor does it involve treating fruit with an acidulant to remove the natural flavor of the fruit.

Ocean Spray's process is described in Mantius et al., U.S. Patent No. 5,320,861 ("the Mantius patent"), a copy of which we enclose. Mr. Len Kasang of Ocean Spray also furnished a copy of the Mantius patent to Jack Mazin in a letter dated January 23, 2002. As discussed in the Mantius patent, Ocean Spray starts with frozen, whole cranberries, rather than dried cranberries. It subjects the frozen, whole cranberries to an acid-free, water-based, countercurrent extraction process that removes substantially all of the natural flavoring and juices from the cranberries, and replaces these liquids with water.

Following the extraction, Ocean Spray treats the cranberries with an infusion syrup. At this point, the cranberries contain a substantial amount of water, rather than being in dried form. Most of the infusion syrups that Ocean Spray uses lack any acid whatsoever. However, in the case of citric acid-containing syrups, the acid does not remove the natural flavor of the fruit. The purpose of the acid is to act as a flavorant to provide an acid "bite," and/or to replace natural cranberry juices removed during the initial extraction. It is the extraction that removes the natural flavoring and juices from the cranberries. Thus, at the point where the infusion syrup is applied, the

FISH & RICHARDSON P.C., P.A.

Douglas J. Williams., Esq.
June 19, 2003
Page 2

natural flavoring and juices have already been removed. Moreover, as discussed in the Mantius patent, the composition of the infusion syrup is adjusted to maintain or increase the level of natural flavoring and juices of the cranberry. The infusion syrup, therefore, adds natural flavoring and juices to the cranberries, rather than removing them, as claims 1 and 7 of the '861 patent require.

Because Ocean Spray neither treats dried fruit, nor removes natural flavoring by means of an acidulant, claims 1 and 7 do not cover Ocean Spray's process and products. Claims 2-6 are limited to treating raisins, and likewise do not cover Ocean Spray's process and products, which use cranberries.

We also observed, upon reading the prosecution history of the '861 patent, that the patent application was abandoned for failure to pay the issue fee. The applicant revived the application, claiming he unintentionally abandoned it due to lack of funds. A decision to abandon an application due to lack of funds is not unintentional abandonment. Therefore, we question whether the '861 patent is valid and enforceable.

We trust our remarks address and eliminate any concerns you may have had regarding Ocean Spray's craisin products. Nevertheless, please contact me if you would like to discuss this matter further.

Very truly yours,

Dorothy P. Whelan

DPW/jxw

60147217.doc

# **EXHIBIT 6**

# Merchant & Gould

An Intellectual Property Law Firm

3200 IDS Center
80 South Eighth Street
Minneapolis, Minnesota
55402-2215 USA
TEL 612.332.5300
FAX 612.332.9081
www.merchant-gould.com

A Professional Corporation

Direct Contact | **612.336.4632**
**dwilliams@merchant-gould.com**



September 8, 2003

Dorothy P. Whelan, Esq.
Fish & Richardson, P.C., P.A.
3300 Dain Rauscher Plaza
60 South Sixth Street
Minneapolis, MN 55402

Dear Ms. Whelan:

After review of your letter of June 19, 2003, we have determined that we need additional information from Ocean Spray to be ensured that its process for treating its fruit does not infringe the '861 patent. In particular, Ocean Spray claims that its "countercurrent extraction process . . . removes substantially all of the natural flavoring and juices from the cranberries, and replaces these liquids with water." However, we cannot exactly replicate the conditions that Ocean Spray uses during this process because neither the patent or your June 19 letter provides sufficient detail of the countercurrent extraction process. We propose that Ocean Spray provide samples of Ocean Spray's pre-processed cranberries and "decharacterized cranberry pieces" for our analysis. This will facilitate our evaluation of your position and may provide the basis for an early resolution. We look forward to your response.

Very truly yours

Douglas J. Williams

DJW:lmb

Minneapolis/St. Paul
Denver
Seattle
Atlanta
Washington, DC

# EXHIBIT 7

# Merchant & Gould

an Intellectual Property Law Firm

3200 IDS Center

80 South Eighth Street

Minneapolis, Minnesota

55402-2215 USA

TEL 612.332.5300

FAX 612.332.9081

www.merchant-gould.com

A Professional Corporation

Direct Contact    **612.336.4632**
**dwilliams@merchant-gould.com**

November 11, 2003

Dorothy P. Whelan, Esq.
Fish & Richardson, P.C., P.A.
3300 Dain Rauscher Plaza
60 South Sixth Street
Minneapolis, MN 55402

Dear Ms. Whelan:

    It has been two months since we responded to your letter of June 19, 2003 requesting samples for evaluation. We again make that request for the decharacterized fruit pieces prior to your claim of further treatment for our evaluation. If you have now found that you agree with our analysis, please contact us regarding further discussions about licensing.

    We look forward to your prompt response.

Very truly yours

Douglas J. Williams

DJW:lmb

# Merchant & Gould

An Intellectual Property Law Firm

3200 IDS Center
80 South Eighth Street
Minneapolis, Minnesota
55402-2215 USA
TEL 612.332.5300
FAX 612.332.9081
www.merchant-gould.com

A Professional Corporation

Direct Contact | **612.336.4632**
**dwilliams@merchant-gould.com**

February 26, 2004

Dorothy P. Whelan, Esq.                    **VIA FACSIMILE**
Fish & Richardson, P.C., P.A.
3300 Dain Rauscher Plaza
60 South Sixth Street
Minneapolis, MN 55402

Dear Ms. Whelan:

In response to your correspondence of December 17, 2003, we can only consider Ocean Spray's decision not to provide a sample of its decharacterized fruit pieces as an admission that it believes that the production of such a sample supports my client's infringement claim. Certainly, Ocean Spray can obtain a sample and produce it to us for our review and testing. We believe that production of a decharacterized fruit piece sample, which is discoverable, may prove useful in resolving this dispute short of filing a lawsuit. Therefore, we renew our request for the production of a sample referred to in our earlier correspondence. We are willing to cover any expenses related to providing the requested sample. Thank you in advance for your cooperation.

Very truly yours

Douglas J. Williams

DJW:lmb

Minneapolis/St. Paul
Denver
Seattle
Atlanta
Washington, DC

*Alana*

# Amazin' Raisin International, Inc.

36 German Mills Rd.
Thornhill, Ontario, Canada
L3T 4H5

May 4, 2004                               Sent by facsimile:  508-946-7714

Mr. Randy Papadellis
President & CEO
Ocean Spray Cranberries, Inc.
Corporate Headquarters
One Ocean Spray Dr.
Lakeville-Middleboro, MA 02349
U.S.A.


Dear Mr. Papadellis:

As you may be aware, my company, Amazin' Raisin International, Inc. is the owner of
United States Patent No. 5,188,861. The '861 patent is directed to a process for flavoring
fruit pieces. Amazin' Raisin International, Inc. believes that Ocean Spray is currently
using a method that may infringe one or more claims of the '861 patent.

For some time now, I have been attempting to obtain a sample of Ocean Spray's
decharacterized cranberry pieces that are used to make flavored Craisins in order to
determine if Ocean Spray is infringing the '861 patent. In response to my prior efforts to
obtain a decharacterized cranberry pieces sample, Ocean Spray, through its counsel, has
claimed that providing such a sample in neither practical or necessary. My request for
this sample is not burdensome. In fact, providing the sample may result in early
resolution of this matter without having resorting to litigation that will be costly for both
parties. Should Ocean Spray continue to refuse to provide the requested sample, we will
take that refusal as an indication that Ocean Spray believes that providing the sample will
demonstrate infringment of my patent. I look forward to your prompt response.

Sincerely,

Jack Mazin
President & CEO

# **<u>EXHIBIT 8</u>**

# FISH & RICHARDSON P.C., P.A.

3300 Dain Rauscher Plaza
60 South Sixth Street
Minneapolis, Minnesota
55402

Telephone
612 335-5070

Facsimile
612 288-9696

Web Site
www.fr.com

Frederick P. Fish
1855-1930

W.K. Richardson
1859-1951

September 2, 2004

**VIA FACSIMILE**

Douglas J. Williams, Esq.
Merchant & Gould P.C.
3200 IDS Center
80 South Seventh Street
Minneapolis, Minnesota 55402-2215

**FR**

BOSTON

DALLAS

DELAWARE

NEW YORK

SAN DIEGO

SILICON VALLEY

TWIN CITIES

WASHINGTON, DC

Re:     *Amazin' Raisins International v. Ocean Spray Cranberries, Inc.*
        Civ. No. 04-3358 (ADM/AJB)

Dear Mr. Williams:

We represent Defendant Ocean Spray Cranberries, Inc. in the above-captioned action.
I write to inform you that we have scheduled a hearing before Judge Montgomery on
October 26, 2004, at 9:00 a.m. and will be seeking an order transferring this case to
the District of Massachusetts.

Based on our review of publicly-available documents, we are not aware of any factor
that would make it convenient for either party to litigate in this District aside from
your client's choice of counsel, which is irrelevant in the Court's determination of the
most convenient forum. *See, e.g., Nelson v. Soo Line R.R. Co.,* 58 F. Supp. 2d 1023,
1027 (D. Minn. 1999) ("[I]t is axiomatic that convenience to plaintiff's counsel is not
a factor to be considered in deciding the propriety of transfer."). If you are aware of
any information that supports litigating this case in the District of Minnesota, please
advise us immediately. We plan on filing our motion to transfer on September 10,
and would like to avoid wasting the Court's time if you are aware of significant
factors that weigh against the transfer of this case.

I look forward to your response.

Sincerely,

John C. Adkisson

60242286.doc

# EXHIBIT 9

Volume: I

CONFIDENTIAL

Pages: 1-207

Exhibits: 25-33

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

AMAZIN' RAISINS INTERNATIONAL,
INC., AN ONTARIO, CANADA
CORPORATION,

                Plaintiff       Docket No.
                                CA 04-12679-MLW

      vs.

OCEAN SPRAY CRANBERRIES, INC.,
A DELAWARE CORPORATION
                Defendant

              DEPOSITION of HAROLD L. MANTIUS, a
witness called by and on behalf of the Plaintiff,
taken pursuant to the Federal Rules of Civil
Procedure, before Heidi B. Stutz, Certified
Shorthand Reporter No. 146599S and Notary Public in
and for the Commonwealth of Massachusetts,
videotaped by Craig Newman, at the offices of Fish &
Richardson, 225 Franklin Street, Boston,
Massachusetts, on Tuesday, February 7, 2006,
commencing at 8:54 a.m.

             PRO-SYSTEMS COURT REPORTING
             327 Blake Road North
             Minneapolis, Minnesota 55343
             (952) 939-0091

1 Heidi Stutz, from Pro-Systems will swear the

2 deponent.

3                    MR. ZEULI:  Tony Zeuli for

4 plaintiff.  With me today is Todd Werner.

5                    MR. ZELIGER:  This is Michael

6 Zeliger, Fish & Richardson, for the defendant Ocean

7 Spray and the witness, and with me is Alana

8 Sharenow, a representative of Ocean Spray.

9 Whereupon:

10                   HAROLD L. MANTIUS,

11 having been satisfactorily identified and duly sworn

12 by the Notary Public, was examined and testified as

13 follows:

14                   DIRECT EXAMINATION

15     BY MR. ZEULI:

16     Q.   Good morning, Mr. Mantius.

17     A.   Good morning.

18     Q.   Decharacterized fruit pieces is what Ocean

19 Spray calls the dried fruit pieces that enter the

20 countercurrent infuser, correct?

21                   MR. ZELIGER:  Objection to the form

22 of the question.  You may answer.

23     A.   That is correct.

24     Q.   The decharacterized fruit pieces having a

25 reduced liquid content are used as a carrier for the

1    Q.   Let's go to step A.  What do you recall

2 being the distinguishing points between step A and

3 the Ocean Spray process?

4    A.   First and foremost, the fact that this

5 process describes the treating of dried fruit.

6 Dried fruit is the feed stock to this process.

7 Frozen fruit is the feed stock to our process, or in

8 case of the infuser, decharacterized fruit is the

9 feed stock to the infuser.  We do not treat a dried

10 fruit.

11    Q.   Can I stop you there?  When you were

12 considering whether or not Ocean Spray had a problem

13 with Claim I did you consider whether the

14 decharacterized fruit pieces could possibly fall

15 within the definition of dried fruit?

16    A.   It's inconceivable that the

17 decharacterized fruit pieces fall within the

18 definition of dried fruit because that goes against

19 the laws of physics.

20    Q.   My question was a little different.

21    A.   I mean --

22    Q.   My question was did you consider it?

23    A.   No.  It's outside the realm of the

24 conceivable.

25    Q.   Is there anything else, other than the

1     A.   Only during that first 30 minutes or so or

2 less than 60-minute period.  Beyond that you've

3 reached a steady state operation whereby there's no

4 net extraction or infusion of cranberry component.

5     Q.   Now, let's be clear.  Earlier you had

6 testified that that original period before steady

7 state is reached is no more than 60 to 80 minutes,

8 correct?

9     A.   Correct.

10    Q.   You never mentioned 30 minutes earlier.

11         MR. ZELIGER:  I think he said less

12 than.

13    A.   I said less than.

14         MR. ZELIGER:  Not no more than.

15    A.   Less than, that's correct.

16    Q.   So what I'd like you to do is to assume,

17 and I know it's hard for you to make this

18 assumption, but I'm just asking you to make it.

19 Make the assumption that the decharacterized fruit

20 pieces are found to be a "dried fruit."  Is there

21 anything else in step A or does, pardon me, does

22 Ocean Spray carry out step A?

23         MR. ZELIGER:  I'm going to object to

24 this as calling for a legal conclusion, opinion

25 testimony and for you to speculate, and I'm not

Page 164

1  going to instruct you not to answer unless it

2  requires you to disclose the content of

3  communications you've had with your counsel.  You

4  may otherwise respond if you can.

5              THE WITNESS:  Right.

6      A.   It's hard for me to respond to a question

7  like that because it's really quite amazing that a

8  question like that would be asked.  It's just so far

9  outside the realm of the physical world to be

10 considering decharacterized fruit dry.  I mean, we

11 do not treat, infuse or whatever a dried fruit.  I

12 mean, a decharacterized fruit is by definition, I

13 mean, it is a wet fruit.  It is a hydrated fruit.

14 We hydrate the fruit in the extractor by treating it

15 with water.

16     Q.   You would agree with me, correct, I think

17 you did earlier, that the decharacterized fruit

18 pieces -- strike that for a minute.

19              Before I ask you that, can you, I'm

20 asking you to make, will you make the assumption

21 that the decharacterized fruit piece is a dried

22 fruit?  And if you will, does Ocean Spray perform

23 step A?

24              MR. ZELIGER:  Same objections and

25 instruction.  Do you have those in mind?

**EXHIBIT 10**

# United States Patent [19]

**Waitman et al.**

[11]    **4,364,968**

[45]    **Dec. 21, 1982**

[54]    **PROCESS FOR PREPARING A DRIED GRAPE PRODUCT**

[75]    Inventors:    **Reuben H. Waitman,** Pearl River, N.Y.; **Bettie M. Frank,** West Orange, N.J.

[73]    Assignee:    **General Foods Corporation,** White Plains, N.Y.

[21]    Appl. No.:    **249,544**

[22]    Filed:    **Mar. 31, 1981**

[51]    Int. Cl.³ .......................... **A23L 1/212; A23B 7/08**

[52]    U.S. Cl. .................................... **426/639;** 426/640; 426/658; 426/426

[58]    Field of Search ............... 426/302, 321, 331, 639, 426/640, 615, 426, 456, 102, 103, 658

[56]    **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 3,365,309 | 1/1968 | Pader et al. | 426/465 |
| 3,800,049 | 3/1974 | Larroche et al. | 426/639 |
| 3,857,983 | 12/1974 | Roth | 426/481 |
| 3,904,774 | 9/1975 | Dymsza | 426/321 |
| 3,952,112 | 4/1976 | Fulger et al. | 426/615 |

## FOREIGN PATENT DOCUMENTS

1021990   12/1977   Canada ................................. 426/302

*Primary Examiner*—Raymond N. Jones
*Assistant Examiner*—George C. Yeung
*Attorney, Agent, or Firm*—Joseph T. Harcarik; Daniel J. Donovan; Thomas R. Savoie

[57]    **ABSTRACT**

A process for preparing dried grapes which are further processed to remain desireably soft with minimal color, flavor, or textural changes over extended periods of time. The process combines the use of enzyme inactivation and a hydrophillic carbohydrate infusion into fresh grapes, followed by drying the grapes to a moisture content of less than 30%. The dry grapes are then converted into simulated raisins by storing the dry grapes for a period of time under controlled humidity and at an elevated temperature effective to provide a darkening in color and to develop a natural raisin-like flavor within the grapes without further drying of the grapes.

**4 Claims, No Drawings**

4,364,968

1

## PROCESS FOR PREPARING A DRIED GRAPE PRODUCT

### DESCRIPTION

#### Technical Field

The present invention relates to the field of dried fruits, and particularly, to new dried fruit products having improved properties initially and upon storage. More particularly, the invention pertains to new simulated raisin products and process for obtaining the product.

There is a long history of the desirability of and necessity for dried fruit products. Many of these products are simply dried under naturally occurring sunny conditions, such as raisins, and other fruits are dried under controlled industrial conditions to protect the color, flavor and texture of the products. The known commercial processes, however, leave much to be desired in terms of processing and the ability of the products so dried to remain desirably soft over extended periods of time with minimal changes in color and flavor.

The prior art references show techniques for maintaining the softness of raisins by the infusion thereof with humectants such as glycerol. Basically, these references teach that long periods of soaking or cooking at elevated temperature conditions will cause the raisins to be moistened by the glycerol so that the known humectant properties of glycerol can be taken advantage of. Typical of these teachings are U.S. Pat. Nos. 3,952,112; 4,103,035; 4,256,772; 3,595,681; and 2,909,435. Other references teach the retention of softness by various coatings such as fat, humectants like glycerol, and other treatments. Also in the area of treating raisins, a publication by H. R. Bolian appearing in Volume One of the *Journal of Food Science* at page 1316, indicates that heat treatment of raisins can have some effect on the softness of raisins. In the area of treating fresh fruits and vegetables, Food Processing Review No. 2, Dehydration Process for Convenience Foods, by Robert Noyes, pages 174–177 and 255–260 is applicable. Therein, U.S. Pat. No. 3,365,309 discloses treating apples and grapes with a sugar solution. In Volume 9 of the Encyclopedia Britannica, Copyrighted 1957, pages 877–880, a fruit classification system to which this invention is applicable is provided which herein incorporated by reference.

There remains, however, a present need for a process capable of treating fresh fruits so that the dried fruit products retain more of their natural flavor and in the dried condition, remain soft, flavorful and of good color for longer periods of time. There also remains a need in the art for a process which will enable the control of product flavor and texture so that unique variations in the nature of the dried fruit product can be made as desired. And, the resultant product needs to be readily consumable.

### SUMMARY OF THE INVENTION

The present invention provides an improved process for preparing dried fruit products and the resulting product of that process. The process comprises the steps of providing a whole or sectioned fruit; immersing the fruit in a solution of a hydrophillic carbohydrate, said solution being of a concentration effective to provide significant osmotic withdrawal of water from the fruit and deposition of the carbohydrate within the cellular structure of the fruit; heating the fruit and carbohydrate for a period of time and at a temperature

2

effective to melt any surface wax and to cause inactivation of any normally-degrading natural enzyme systems present in the fruit; removing excess carbohydrate solution from the fruit; and, drying the fruit to a moisture content of less than 30%. According to a preferred embodiment of the process, fresh grapes are treated in this manner and then further treated by storing at elevated temperatures and controlled humidity for an extended period of time to develop a flavor and color which closely approximates that of a natural raisin.

### DISCLOSURE OF THE INVENTION

Currently, fruits are stabilized with acid, sulfur dioxide or sulfite treatments to minimize color change and then allowed to sun dry, air-oven dry, vacuum or freeze dry. Despite these treatments, currently processed fruits still become brown and otherwise lose color, as well as losing their natural fruit flavor, softness and desirable turgidity. The commercially available dried fruits present a undesirable combination of flavor, color, hardness and shriveled appearance after extended periods of storage.

The present invention, on the other hand, can be employed to provide dried fruits of improved storage quality in terms of texture, turgidity, flavor and color. The process can be employed on whole or otherwise sectioned pieces of fruit classified in the dry-fleshy and fleshy fruit types having one or more carpels and within the drupe, pome, berry, inferior berry, and multiple carpel forms. Examples of these include the plum, peach, cherry, apple, pear, quince, tomato, grape, blueberry and pineapple. The aggregate, multiple, Hesperidium, Pepo forms are not suitable for this invention. Examples of these unsuitable fruits are raspberries, strawberries, figs, mulberries, oranges, limes, squash, cucumber, pumpkin and watermelon. Fruits that have already been dried having a moisture content of less than 40%, are not suitable for use in this process. An example to which this invention will not work is raisins.

The processing of many of these different fruits will require conditions specially adapted to the particular flavors and colors associated with these products so that maintenance of the most desirable of these properties can best be obtained and retained over the extended period of time. The following description will be restricted to discussion of those conditions which are particularly suitable for the production of dried grapes. Those of ordinary skill in the art, given the particular conditions and processing steps set forth in this general description as well as in the Examples, will be able to readily adapt the techniques of this invention to the other fruits.

The process of this invention will be less energy intensive than current commercial drying where large energy inputs are required. The present process will preferably be used by fruit processors on fresh fruit and eliminate the need now seen in the prior art for a first drying step prior to a infusion step with a humectant which is often also followed by a drying step, depending upon the particular end use of the dried fruit.

The initial stages of moisture removal, according to this invention, are through osmotic transfer of moisture and solids. The inactivation of enzymes capable of degrading fruit tissue as well as flavor and color, according to this invention, assures better retention of natural properties in the final product. The fact that this particular advantage can be combined within one basic step of

4,364,968

3

heating in the infusion solution, highlights the simplicity and efficiency of the present process. The solids which are added to the inside of the fruit pieces not only make the simulated raisins retain their moisture content better over long periods of storage, but also protect the fruit visually and texturally to more closely approximate the appearance of freshly dried fruit pieces.

As a first step in the process of the present invention, grapes are prepared for processing by stemming, sizing, washing etc., as is desired. One aspect of this invention is that the fruit to be processed does not have to be sectioned or peeled prior to processing where it is of suitable size to assure efficient processing. However, it has been found that when processing fruits that have not been peeled, the resultant product is more wrinkled in appearance. In the particularly preferred embodiment of grapes, the grapes are employed whole and are processed with remarkably good results.

The grapes are then immersed in a solution of a suitable hydrophyllic carbohydrate of sufficient concentration to provide a significant osmotic withdrawal of water from the grape during heating, with deposition of the carbohydrate within the fruit in place of the water which is withdrawn. Among the suitable carbohydrates are those of the polyhydroxy family, such as glycerol, propylene glycol, butylene glycol, corn syrup, dextrose, honey, fructose, high fructose corn syrup, mixtures of these, and the like. Excluded from the group of carbohydrates that are expected to work are the class of crystallizing sugars such as sucrose. Crystallizing sugars are undesirable for this invention because they usually recrystallize within the fruit which destroys the texture, as well, as tends to dry the fruit.

It is noted that for any given application, the selection of carbohydrate must be made with a knowledge of the particular flavor compatibility of the carbohydrate with the product and the knowledge that the osmotic dehydration capabilities of the carbohydrates varies markedly, depending upon the particular combination of conditions, substrate and end use requirements. Thus, the infusing of a particular fruit or even particular type of grape for a particular end use will require a balancing of flavor and functionality to achieve the final selection of the carbohydrate. The preferred carbohydrate for use in the case of Thompson seedless grapes are glycerol, high fructose corn syrups and honey, and combinations of glycerol and high fructose corn syrup or honey.

The concentration of the carbohydrate solution should be as high as economically practical to increase the rate of osmotic dehydration of the grapes, as well as enhance the transfer of carbohydrate as a replacement for the water. Obviously, the greater the concentration difference between the carbohydrate solution and the internal grape carbohydrate content, the greater the rate at which dehydration and infusion will occur. In addition, heating the carbohydrate-grape mixture increase the rate of osmotic dehydration and carbohydrate infusion while shortens the process time. Thus, it is fully within the scope of the present invention to provide a stage-wise or continuous counter-current processing of the grapes.

As with the concentration of the solution of carbohydrate, the particular time and temperature of heating is also largely within the determination of the worker for a particular type of fruit based on the final properties desired. Typical processing conditions for the case of approximately 200 pounds of average sized Thompson

4

seedless grapes, and approximately 200 pounds of a solution of 99% of glycerol and 1% citric acid at a temperature of approximately 200° F. is heating the glycerol mixture and grapes for a period of time necessary in a steam jacketed kettle to bring the temperature from ambient to slightly over approximately 200° F. (approximately 93° C.) as being effective to provide the requisite carbohydrate infusion. This requires approximately five minutes time. This combination of temperature and time can, however, be varied depending upon the final moisture content and carbohydrate content desired in the final product. These concentrations, temperatures and times can be determined by those of ordinary skill in the art, by known techniques.

If desired, the infusion solution of carbohydrate may also bear flavors for simultaneous infusion of these into the fruit structures. These flavors can be employed to either fortify, enhance, or change the nature of the particular fruit flavor involved. For example, where glycerol is employed to infuse grapes, it may be desirable to employ a small percentage, say about 1%, of a food acid such as citric acid, in the infusion solution to provide a somewhat more tart taste to offset the glycerol sweetness. It is thought that the addition of any acidulant would adversely affect the browning reaction occurring between the enzymes and carbohydrates. Also, concentrated raisin juice can be employed if desired as a part of the infusion solution. Thus, the raisin flavor later developed will be more pronounced.

The temperature and the time of heating must be sufficient to cause inactivation of the normally degrading natural enzyme systems, and the like, such as pectinases and the like which could later affect product quality were they not dealt with. It is critical to this invention that the enzymes are inactivated. Otherwise, the enzymes might react with the pectins of the cell walls to produce additional sugars which would enhance the browning reaction and tend to make such reaction uncontrollable. Heating may be employed to provide a controlled degree of Maillard browning and flavor development, but the heating should not be so severe as to cause undesirable product changes. The moisture reduction of the fruit during this phase of processing will typically be in the range of from about 80% to about 50%, preferably less than 40% based on the weight of the wet grapes. This water is replaced in part with the infusion carbohydrate. It is desired that the carbohydrate infused into the fruit be in the range of from about 1:1 to less than 2:1, carbohydrate to moisture present after drying. For example, in the case of grapes processed by this invention, the final moisture will be in the range of from about 5% to 20% and the glycerol content will be from about 10 to 30%, and preferably 10% to 20%.

Such infusions of carbohydrates within the grapes or other fruit add substantially to non-water weight of solids of the fruit. Subsequently, because the fruit cell wall structure changes during the heating step, the water content of the fruits is more readily removed by low or high temperature air or oven drying or by vacuum or freeze-drying processes. This is a distinct advantage of the present invention when it is seen that it can replace the two-stage process for preparing soft-moist raisins as is known in the art: that is, first drying to form the raisins and then infusing and using the infused raisins. By employing the procedure of the present invention, only one overt drying process is necessary, and its efficiency is increased significantly. By

5

proper attention to temperatures attained during drying, manipulation of the pH within the fruit, addition or withholding of anti-browning and anti-oxidant materials such as ascorbic acid, citric acid, sulfites and the like, fruits may be selectively held close to their natural colors or allowed to brown and take on other flavor changes. In the preferred embodiment of the invention for the conversion of grapes into simulated raisins, an additional storage or tempering will be required to more fully allow color and flavor development.

The simulated raisins, after being infusion treated, are allowed to temper under conditions effective to establish equilibrium of the solids and solute with the natural cellular constituents. This may desirably be done in a closed vessel. Tempering times of 0 to 10 hours are typically employed with times of up to 48 hours being effective. Preferably 4 to 8 hours will be employed. Tempering is used to allow the carbohydrate to equilibrate throughout the fruit. In the preferred embodiment of grapes, this time allows the water present at the core of the grape to equilibrate throughout the grape with the glycerol. This equilibration subsequently facilitates drying of the grape. If the grapes are not tempered, longer drying times will be required. After tempering, the grapes are desirably drained again of any free infusion solution and surface rinsed with water.

The water washed carbohydrate drained off may be reconcentrated in single or multiple effect evaporators for reuse, with the initial infusion medium as desired. Additional carbohydrates will be required to replace the amount infused into the grapes. One would usually rinse the infused grapes with water before drying. This would facilitate handling of the infused grape. However, if the grapes are to be turned during drying, the rinse may be deleted.

Thereafter, the grapes are preferably dried to reduce their moisture content to the ultimate low level desired. Any of the known conventional drying methods can be employed, such as oven drying, vacuum drying, and the like. Air drying in a warm air oven at a temperature of from about 130° F. to about 180° F. (approximately 54° C. to 82° C.) for a period of time of from about three hours to about 24 hours is effective in reducing the moisture content to a suitable level. Typically, the moisture should be reduced to about less than 30% and, preferably less than 20%. It is noted that while moisture contents of much less than 10% ordinarily provide fruit products which are too hard and chewy to be considered fruitlike in texture, those of the present invention are desirably soft.

The dried grapes are then further treated to develop a raisin color and flavor therein. These simulated raisins can thereafter be employed as substantial equivalents for raisins in products such as raisin bran and granola-type cereals which place heavy demands upon the textural properties of both the cereal and the raisins. To develop this raisin color and flavor, the grapes are stored under controlled humidity at elevated temperatures for extended periods of time which are effective to provide a darkening in color and the development of a natural raisin flavor. The soluble protein of the simulated raisins react with the reducing sugars present within the fruit under conditions effective to cause browning and flavor development. This is typically a Maillard reaction which occurs. Proper humidity control is necessary to effectively control color development. It is preferred that the humidity be saturated. This also enables the prevention of moisture loss during stor-

6

age. If proper humidity control is not exercised, then the simulated raisins would darken quite rapidly.

The addition of flavors during infusion as discussed previously, such as concentrated raisin juice, can aid in this flavor development. Likewise, the addition of a small amount of food acid also provides a more raisin-like flavor. Typically, to produce the flavor development, the dried grapes are stored under controlled humidity to prevent moisture loss and to control browning reaction by maintaining a temperature of from about 130° F. to about 180° F. (approximately 54° C. to 82° C.) for a period of time necessary to effect the desired developement. Typically at the higher temperatures it can be performed in several hours but at lower temperatures, such development may require several days. These conditions will vary with the level of flavor and color developing materials, e.g., reducing sugars, present in the grapes.

At the end of this processing, the simulated raisins may be treated by coating with vegetable oil, sugar, or other like materials to prevent undue clustering or clumping where the simulated raisins or other dried fruit will be maintained in direct contact with each other for extended periods of time.

It is an advantage of the present invention that the production of a color, texture and flavor controlled simulated raisin is possible from this processing and can be done with free moisture contents as low as 1 to 2% and with water activities between 0.6 and 0.3. It has been found that $A_w$ below 0.6 produces desireable retention of soft moist properties for inclusion into breakfast cereals. Even at these low moistures and water activities, the simulated raisins or other fruits are pleasantly soft. Fruit and fruit pieces processed in this manner can impart desirable flavor and texture contrast when added to processed cereals in ready-to-eat blends or ready-to-cook mixtures as well as offer new potential for admixture to cake, cookie, and pudding mixes, and the like.

Another advantage of the present invention is that fruits prepared by this process may be consumed with no further preparation such as boiling the prepared fruit pieces in water. This provides added convenience to the consumer.

The following examples are presented for the purpose of further illustrating and explaining the present invention and are not to be taken as limiting in any regard. Unless otherwise indicated, all parts and percentages are by weight.

EXAMPLE I

One part of stemmed and graded Thompson seedless grapes containing between 20 and 24% soluble solids are added to a preheated solution of one part of 99% U.S.P. glycerol and 1% citric acid based on the weight of the glycerol. The citric acid is added to reduce the sweet glycerol flavor. The mixture of grapes and glycerol solution is heated in a steam-jacketed kettle to approximately 200° F. (approximately 93° C.), the total heating time taking a period of about 5 minutes. After this time, the glycerol solution is drained from the grapes and the grapes are allowed to equilibrate for a period of about 7 hours in a closed vessel. After the period of equilibration, the grapes are then spread out over screen trays and allowed to drain and are surface rinsed with water at this time. The resulting infused grapes are then air dried in a high velocity air oven for about six hours at a temperature of about 150° F. (approximately 66° C.). At this point, the resultant product

4,364,968

7

had a dried grape flavor and a color and texture of a golden seedless raisin.

### EXAMPLE II

According to the preferred embodiment of the invention, dried grapes as prepared in Example I are further treated to produce a fruit product simulating common brown sun dried raisins. The dried grapes are placed into polyethylene bags and sealed. The sealed bags are then stored at a temperature of about 150° F. (approximately 66° C.) for a period of six hours. Heating in the sealed bags or other sealed container in this manner permits effective temperatures for browning and flavor development to be achieved without undue further dehydration. Upon completion of the storage, the grapes have become brown and have a well-developed, natural raisin flavor. The moisture content of the grapes is approximately 16%.

### EXAMPLE III

This Example describes the use of the simulated raisins prepared in Example II in preparing an improved raisin bran product by packaging them with bran flakes of conventional formulation. To prevent sticking of the simulated raisins, they are washed with glycerol and centrifuged to remove excess glycerol. The simulated raisins are then coated with 15% fat-coated sugar in a bell reel. The fat-coated sugar was previously prepared by coating granular sucrose with 5% of a hydrogenated vegetable oil. To complete the product, the simulated raisins prepared in this manner are simply added to bran flakes, which were dried to about 3% moisture, by first layering the bran flakes and then sprinkling the simulated raisins thereover prior to conveying the mixture of the two into wax paper lined packages.

### EXAMPLE IV

The procedures of Example II was repeated, but 90% high fructose corn syrup was employed in place of the glycerol. After a period of storage of six hours at a temperature of about 150° F. (approximately 66° C.) the resultant product was not as brown in color as those prepared in accordance with Example II, although flavor development was adequate.

The above description has been presented for the purpose of describing the invention to those of ordinary

8

skill in the art. It is not intended that each and every obvious modification and variation of the invention be described in detail. It is intended, however, that all obvious modifications and variations be included within the scope of the invention which is defined by the following claims.

What is claimed is:

1. A process for preparing a dried grape product comprising:
   (a) providing whole or sectioned grapes;
   (b) immersing the grapes into an aqueous hydrophillic carbohydrate solution having a concentration effective to provide significant osmotic withdrawal of water from the grapes and deposition of carbohydrate into the grapes in place of the water said hydrophillic carbohydrate is a member selected from the group consisting of glycerol, propylene glycol, fructose, sorbitol, mannitol, high fructose corn syrup, honey corn syrup, and combinations of these;
   (c) heating the grapes and carbohydrate for a period of time and at a temperature effective to melt surface wax and to cause inactivation of any normally-degrading natural enzymes present in the grapes and to increase the rate of osmotic dehydration and carbohydrate infusion;
   (d) removing excess solution from the surface of the grape;
   (e) drying the grapes to a moisture content of less than 30%; and,
   (f) converting the dry grapes into simulated raisins by storing the grapes obtained after step (e) for a period of time under controlled humidity and at an elevated temperature effective to provide a darkening in color and to develop a natural raisin-like flavor within the grapes without further drying of the grapes.

2. A process according to claim 1 wherein the drying is achieved in a convection oven operated at a temperature of from around 130° F. to about 180° F.

3. A process according to claim 1 wherein the carbohydrate comprises glycerol and the infusion solution contains an amount of an acid effective to reduce the sweet taste imparted by the glycerol.

4. The product produced by the process of claim 1.

* * * * *

# EXHIBIT 11

Keith Cadwallader - 4/10/2006
**Amazin' Raisins International, Inc. v. Ocean Spray Cranberries, Inc.**

Page 1

1              UNITED STATES DISTRICT COURT

2                DISTRICT OF MASSACHUSETTS

3

4     CASE NUMBER:  O4-12679-MLW

5     ------------------------------------------------------

6     Amazin' Raisins International, Inc.,

7            Plaintiff,

8     versus

9     Ocean Spray Cranberries, Inc.,

10            Defendant.

11    ------------------------------------------------------

12

13

14

15

16              VIDEOTAPED DEPOSITION OF

17                  EXPERT WITNESS

18                KEITH CADWALLADER

19

20

21

22

23

24

25    TAKEN: 10 April 2006       BY: Jacqueline McKone

COPY

Keith Cadwallader - 4/10/2006
**Amazin' Raisins International, Inc. v. Ocean Spray Cranberries, Inc.**

38 (Pages 146 to 149)

Page 146

1  **A. No. Not really.**
2  Q. So what process did you use to figure out as you
3     call it getting into the mind of the inventor?
4  **A. Well, I look at the process, and I look at the**
5     **-- I did compare the two processes and -- to**
6     **look at -- well, it helps to look at some of the**
7     **other materials that go with the patents, the**
8     **prosecution history and so forth to find out**
9     **what the terms mean because they are generally**
10    **described in some more detail in rebuttals and**
11    **so forth.**
12 Q. So if you were to describe the documents or what
13    we call evidence, what would you say you've
14    looked at to formulate your definition of dried
15    fruit?
16 **A. Okay. I'm sorry. Repeat that please.**
17 Q. You have this definition of dried fruit that you
18    developed; right?
19 **A. Yes.**
20 Q. What documents did you look at to determine --
21    to support that definition?
22 **A. Okay. I first looked at the reference that I**
23    **have listed here. I have looked at some of the**
24    **requirements for what is -- constitutes a dried**
25    **fruit product, and chemical -- my chemical**

Page 147

1  **background and common sense tells me that if you**
2  **remove any moisture from a food product it's in**
3  **a dried state or a drier state than it was when**
4  **it was original harvested or whatever.**
5  Q. So let me see if I followed you there. You
6     relied on your own expertise?
7  **A. Yes.**
8  Q. You relied on the article identified in
9     Paragraph 6?
10 **A. I'm sorry. I don't mean to --**
11 Q. Was there anything else? I thought you
12    mentioned something first.
13    MR. WERNER: Are you talking about the
14    patent in the prosecution history?
15    THE WITNESS: Yes.
16    MR. WOODFORD: Thank you Counsel.
17    THE WITNESS: One more thing I'll add is
18    the lack of a suitable -- it would be wonderful
19    to go to the literature and find an absolute
20    reference for it to just tell me this is what it
21    is, but it doesn't really exist, that is a --
22    and it can't based on the nature of the product.
23    It's fairly varied. Whether it's prunes and so
24    forth.
25    BY MR. WOODFORD:

Page 148

1  Q. Isn't that why --
2  **A. Those are --**
3  Q. Isn't that why the inventor provided the range
4     in the patent so --
5     MR. WERNER: Objection. Lack of
6     foundation.
7     THE WITNESS: I think the range is provided
8     as an example because raisins were used for the
9     examples that are provided here with the
10    technology of the samples of the technology and
11    its application.
12    BY MR. WOODFORD:
13 Q. Of the examples in the patent, we've got a
14    moisture range of 10 to 18 percent; right?
15 **A. That would be suitable for raisins.**
16 Q. The 90 percent moisture concentration for
17    decharacterized fruit that's nowhere near the 10
18    percent range is it?
19 **A. I would have to agree with that.**
20 Q. Let's dive into this definition a little bit. I
21    want to understand what exactly it's saying. If
22    you'll notice -- are you with me here on
23    Paragraph 5 of your declaration?
24 **A. Yes.**
25 Q. A fruit piece that has had a portion of its

Page 149

1  naturally occurring moisture content removed
2  what do you mean by portion?
3  **A. Some. Some of it.**
4  Q. How much is some?
5  **A. It's unquantifiable. It doesn't matter how**
6  **much. If it has undergone any moisture loss**
7  **whatsoever or moisture exchange, it has -- now**
8  **it's in a dried fruit form, or is**
9  **interchangeable, or equivalent to a dried fruit,**
10 **and I use the quotes here on intentionally.**
11 Q. So let's take this for example. Say you pick a
12    fruit off the vine. At that point, on some
13    level, it starts losing moisture content doesn't
14    it?
15 **A. Most likely.**
16 Q. That would technically fall within your
17    definition; right?
18 **A. Only for a dried fruit that is suitable for the**
19    **process claim.**
20 Q. Where does it say that in your definition? I
21    don't see anything --
22 **A. That's true.**
23 Q. So technically by picking a fruit off the vine
24    you've satisfied your --
25    MR. WERNER: Objection. Mischaracterizes

**EXHIBIT 12**

```
 1              UNITED STATES DISTRICT COURT

 2           FOR THE DISTRICT OF MASSACHUSETTS

 3

 4      - - - - - - - - - - - - - - - - x

 5   AMAZIN' RAISINS INTERNATIONAL INC.:

 6   an Ontario, Canada corporation,    :

 7                        Plaintiff, :   Civil Action No.

 8              vs.                   :   04-12679-MLW

 9   OCEAN SPRAY CRANBERRIES, INC.,    :

10   a Delaware corporation,           :

11                        Defendant. :

12      - - - - - - - - - - - - - - - - x

13

14                      Toronto, Ontario, Canada

15                      Thursday, June 1, 2006

16

17   Videotaped Deposition of:

18                      AMIR LALJI

19   the witness, called for examination by counsel

20   for the Defendant, pursuant to notice and

21   agreement, commencing at 1:04 p.m., at

22   Sheraton Four Points Hotel, 6257 Airport Road,

23   Mississauga, Ontario, before Virlana Kardash, RPR,

24   CSR, Commissioner of Oaths, when were present on

25   behalf of the respective parties:
```

Amir Lalji

06/01/2006

Page 38

1    THE WITNESS: Dried fruit in what context?
2    BY MR. ZELIGER:
3    Q   The context we've just been discussing.
4 You didn't have a problem with that until your counsel
5 prompted that.
6    MR. SORENSON: We've discussed it in two
7 contexts, Mike. You are being misleading to this
8 witness.
9    MR. ZELIGER: I don't want any speaking
10 objections.
11    MR. SORENSON: Well, then fine. The
12 witness can leave the room if you want, but you --
13    MR. ZELIGER: No. You can just stop
14 because you are coaching the witness.
15    MR. SORENSON: No, I'm not. You have --
16    MR. ZELIGER: And that's improper. You
17 know the rules.
18    MR. SORENSON: If you are not going to let
19 me finish my sentence, we are going to stop the
20 deposition, and we are going to leave. You have
21 referred to --
22    MR. ZELIGER: Go ahead. Go ahead. You
23 don't get to make your speaking objections in a manner
24 that coaches the witness, and that's what you're
25 doing. If you feel that means you need to stop, go

Page 39

1 ahead.
2    This is a fair question. The witness understood
3 it the previous time and answered -- and didn't
4 provide that answer until the prompted it with your
5 speaking objection, which is improper.
6    MR. SORENSON: The context of dried fruit
7 that you have spoken of in two contexts, both in the
8 context of the patent and in the context of everyday,
9 normal, non-patent parlance, your question now says of
10 what we've been speaking of before.
11    You have to say which one of those versions
12 we've been speaking of before.
13    MR. ZELIGER: There was a previous question
14 and answer. It's going in sequence.
15    MR. SORENSON: No.
16    MR. ZELIGER: I don't have to stop and
17 define it. I don't have to define it at all. You
18 make your objection if you think it's objectionable.
19 The record will so indicate. I don't have to make any
20 clarification.
21    MR. SORENSON: The objection is that the
22 question is vague and ambiguous.
23    MR. ZELIGER: Fine.
24    BY MR. ZELIGER:
25    Q   If I take 100 pounds of cranberry and I

Page 40

1 subject it to a process and it comes out on the other
2 end with the same moisture content, have we dried the
3 cranberries?
4    A   Okay. You start with 100 pounds and you
5 end up with 100 pounds at the end?
6    Q   Yes.
7    A   No, you haven't dried it.
8    Q   And does the answer to that question matter
9 whether we are talking about the patent or the general
10 understanding of the word "dried"?
11    A   To me, it doesn't matter.
12    Q   Is there something about the patent that
13 uses the word "dried" in a manner that's different
14 from other contexts? Let me ask you a better
15 question. The term "dried fruit" as used in the Mazin
16 patent, does that have some special definition that
17 should be used as opposed to how the term "dried
18 fruit" should be used in the other contexts?
19    A   Well, we have done -- most of our work
20 we've done is with raisins. So as far as I can
21 remember, it's the raisins I'm talking about.
22    Q   But you've asked me to separate whether,
23 when I'm talking about dried fruit, whether it's in
24 the context of the patent or some other context?
25    A   Right.

Page 41

1    Q   Why is that?
2    A   Well, because I mean, as a layman, I may
3 have a different understanding of dried fruit. As a
4 technical person, when I look at absolute sort of
5 like -- you talked about the apple a few minutes back.
6 If that apple was left in the room, cut up and left in
7 the room for just a second, and if we had some means
8 of weighing that fruit and we found out that it lost a
9 minuscule scale of gram of that apple just because of
10 the exposure to the air, then in absolute science, it
11 is dried.
12    Q   I understand that explanation. I
13 appreciate that.
14    A   Right.
15    Q   My question to you is whether we should
16 understand the term "dried fruit" differently as used
17 in the patent from the technical answer that you just
18 provided?
19    A   In the patent, because we have been dealing
20 with the raisins, I'm talking about raisins. So to
21 me, dried fruit means anything that has lost water or
22 liquid.
23    Q   That's what it means to you in the patent?
24    A   Right.
25    Q   Okay.

11 (Pages 38 to 41)

Amir Lalji                                                                06/01/2006

1    A   It doesn't matter how many percent.
2    Q   I'd like to direct your attention back to
3  claim 1 which is at column 10. It's the
4  second-to-last page of the Mazin patent. This claim
5  is broken down into several subparts. The first thing
6  I'd like to ask you about is in subpart A where it
7  says that acidulent is used to substantially remove
8  the natural flavor of the dried fruit.
9        Do you see that?
10   A   Yes.
11   Q   What does it mean to substantially remove
12 the natural flavor of the dried fruit?
13   A   As I explained before, it is to balance the
14 flavor. Like, raisins are naturally sweet, and by
15 removing the flavor, we are really -- by adding the
16 acid, what I call "removing the flavor" is really
17 sensory perception, is to destroy that flavor by
18 making it tart. So the sugar flavor is reduced.
19   Q   So the sugar flavor is hidden by the
20 addition of --
21   A   Masked.
22   Q   Masked by the addition of acid?
23   A   Yes.
24   Q   So what you're describing is the acid's
25 contribution to the total flavor profile; correct?

1    A   Okay. Depends on the acid we're using or
2  what flavor we're going to make out of it.
3    Q   How does the acid mask the sweet flavor of
4  the --
5    A   I don't know. I don't know the chemistry.
6        MR. SORENSON: Amir, you're cutting him off
7  before he finishes his question. So let him finish
8  his question and then answer.
9        THE WITNESS: Oh. Sorry.
10       MR. SORENSON: That's fine. Do you want to
11 re-ask that question? Did you have another word at
12 the end of it?
13       BY MR. ZELIGER:
14   Q   Yes. My question is does the acid just
15 influence the flavor profile of the fruit and that's
16 how it masks the sweet flavor?
17   A   What we have in chemistry is that -- let's
18 say that you started with sugar and -- sugar and
19 water. You get 50 percent sugar and 50 percent water.
20 It's sweet. Now, you can still have 50 percent sugar,
21 and if you added some acid to it, the sweetness
22 perception is reduced.
23   Q   We can also, however, do some reverse
24 osmosis or some other process and actually remove the
25 sugar; correct?

1    A   Yes.
2    Q   And in that sense, the word "remove" means
3  to actually take out?
4    A   Right.
5    Q   Why did you choose the word "remove" in
6  claim 1 if what you were talking about was masking?
7    A   At that time -- remember, 15, 16 years back
8  I was a technical -- I'm still a technical person.
9  And that was the best way to describe what the effect
10 of that acid was on the raisin flavor. So it -- like,
11 we say "eliminate" or "remove."
12       It only means that it is either masking or
13 balancing the flavor. The reason we add acid is to
14 create new balance of sugar and acid for the new food
15 flavor that we're replacing with.
16   Q   Is the invention that's in the '861
17 patent --
18       MR. SORENSON: The Mazin patent?
19       MR. ZELIGER: Thank you.
20       BY MR. ZELIGER:
21   Q   Does the invention of '861 Mazin patent use
22 acid to remove flavor?
23   A   Remove in the term that I explained to you
24 now.
25   Q   If we set aside the '861 patent and I talk

1  about "removing flavor," what does that mean to you?
2    A   Have less perception of that flavor.
3    Q   If we talk about removing moisture from the
4  fruit, what does that mean?
5    A   Drier product.
6    Q   Taking moisture out?
7    A   Yes.
8    Q   If we talk about removing color from the
9  product, what does that mean?
10   A   Removing color? You're removing the color.
11   Q   Taking it out?
12   A   Yes.
13   Q   If we talk about --
14   A   No. I have one exception here. In one of
15 the phrases, either in the patent or somewhere in the
16 cranberry, they said you can remove the color by
17 either prolonged heating or by actual extraction.
18 Now, on prolonged heating, it's not removing the
19 color; it is destroying the color.
20       There is a breakdown of the color. And that's
21 why you get less color. So that's what I think is
22 happening. I mean, correct me if I am wrong.
23   Q   Could you show me where in the Mazin '861
24 patent it says or explains that removing flavor refers
25 to masking flavor?

12 (Pages 42 to 45)

**EXHIBIT 13**

```
 1              UNITED STATES DISTRICT COURT

 2           FOR THE DISTRICT OF MASSACHUSETTS

 3

 4   - - - - - - - - - - - - - - - - - - x

 5   AMAZIN' RAISINS INTERNATIONAL INC.,:

 6   an Ontario, Canada corporation,    :

 7                    Plaintiff,  :  Civil Action No.

 8          vs.                   :  04-12679-MLW

 9   OCEAN SPRAY CRANBERRIES, INC.,     :

10   a Delaware corporation,            :

11                    Defendant.  :

12   - - - - - - - - - - - - - - - - - - x

13

14                    Toronto, Ontario, Canada

15                    Friday, June 2, 2006

16

17   Videotaped Deposition of:

18                    JACK MAZIN

19   the witness, called for examination by counsel

20   for the Defendant, pursuant to notice and

21   agreement, commencing at 8:30 a.m., at

22   Sheraton Four Points Hotel, 6257 Airport Road,

23   Mississauga, Ontario, before Virlana Kardash, RPR,

24   CSR, Commissioner of Oaths, when were present on

25   behalf of the respective parties:
```

Page 46

1   a concept or a business opportunity that you felt you

2   could fill?

3       A    I don't think it's fair -- it's not fair to

4   say a "business opportunity."  I commissioned

5   Diversified Research to find a way of incorporating

6   flavors into raisins.  That was my direction.  So I

7   was a client.

8       And I was a client of Diversified Research, and

9   Amir worked for Diversified Research.  I asked them to

10  do this for me.  The specific details, as far as

11  adding whether it be citric acid or malic acid, et

12  cetera, it was not something that I gave direction to.

13      The direction that I think I worked with Amir

14  was in terms of balance, balancing the flavors of the

15  dried fruit.  So I was involved with that specifically

16  on the raisins.  But I don't pretend to be a

17  scientist.  I'm certainly not.

18      Q    Are you familiar with the term "dried

19  fruit"?

20      A    In what context?

21      Q    In any context.

22      A    Certainly.  I've heard of the word.  I live

23  it every day, dried fruit.

24      Q    What does "dried fruit" mean?

25      A    Dried fruit really is anything that has

Page 47

1   less moisture than the original fruit.  That's how I

2   look at dried fruit.  It's a relative term.  I believe

3   that dried fruit is really a whole fruit that some of

4   it is gone.

5          Some of that moisture, whatever, is no longer

6   there.

7          Q    If I take a fresh grape and squeeze it and

8   a drop of juice falls out, is that then a dried fruit?

9          A    In what context?

10         Q    In the context I just described.  I pick up

11  a fresh grape and pinch it a little bit and a drop of

12  juice falls out.  Am I now holding a dried fruit?

13         A    In certain concept, yes, you would be

14  holding a dried fruit because you're altering that

15  grape.  You're doing something to that.  You're taking

16  away, removing something from that natural grape, then

17  yes, Mike, I have to say you have a dried fruit in

18  your hands.

19         Q    If in harvesting a grape and I pull it off

20  the vine and the tiniest bit of moisture falls out, do

21  I have a dried fruit?

22         A    Technically, when you say the moisture

23  drops out, what do you mean?  It evaporates?

24         Q    It evaporates, yes.

25         A    If it evaporates, then again, the term

# EXHIBIT 14



**Kirkpatrick & Lockhart Nicholson Graham LLP**

State Street Financial Center
One Lincoln Street
Boston, MA  02111-2950
617.261.3100
Fax 617.261.3175
www.klng.com

August 7, 2006

Michael E. Zeliger

617.951.9153
Fax: 617.261.3175
mzeliger@klng.com

**Via Fax (612) 332-9081 and First Class Mail**

Christopher Sorenson
Merchant & Gould
3200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402

Dear Chris,

We write concerning recent developments in the case and to insist that ARI immediately dismiss its claims with prejudice. On July 6th we advised Mr. Werner by letter that a gentleman named Mr. Brett Salter contends that he and his company Internet Culinary Corporation own ARI and the patent-in-suit, and we asked you to respond to this contention. ARI provided no substantive response to our inquiry, but instead merely provided a limited number of documents. These documents refer to agreements concerning the ownership of ARI and the Mazin patent, which have never been produced in this litigation. Moreover, we have discovered documents filed with the United States Patent and Trademark Office – but not produced in this litigation that show ARI purportedly assigned the patent in suit to a different entity during this litigation. We have asked for a more complete explanation concerning who owns the Mazin patent, but none has been forthcoming. Thus, while ARI bears the burden of proving ownership, it is has been unwilling to clarify that issue. This leaves Ocean Spray with no alternative but to seek the Court's assistance in compelling further discovery and perhaps seeking such information from third parties. Accordingly, we request a meet and confer to discuss a motion to compel the requested information. Be advised that if it is ultimately proven that ARI does not actually own the patent in suit, Ocean Spray will seek its fees and other sanctions associated with obtaining the relevant discovery and more generally associated with defending this action.

We also wish to make you aware of a prior-art patent that we have recently discovered. Enclosed please find a copy of U.S. Patent No. 4,364,698, entitled, "Process for Preparing a Dried Grape Product," which issued on May 21, 1982. The '698 patent was not considered during the prosecution of the Mazin patent. It describes a process for removing moisture from fruit, using acid (including citric acid) to alter (or balance) the flavor of the fruit, using an infusion solution to impart different flavors to the fruit, dehydrating the infused fruit and then treating the dehydrated fruit with oil to make it less sticky. As illustrated in the chart below, this reference unquestionably anticipates claim 1 of the Mazin patent under ARI's proposed claim construction.



**Kirkpatrick & Lockhart Nicholson Graham LLP**

Christopher Sorenson
August 7, 2006
Page 2

| Claim Language | '698 Disclosure |
|---|---|
| 1.  A process for preparing a flavored dried fruit product said process comprising: | The present invention provides an improved process for preparing dried fruit products and the resulting product of that process.  (Col. 1, lines 59-61). |
| (a) treating a dried fruit[1] with an acidulant being selected from the group consisting of tartaric acid, malic acid, citric acid, ascorbic acid, phosphoric acid, and fumaric acid, in an amount and for a period of time which is sufficient to substantially remove the natural flavor[2] of the dried fruit | "The initial stages of moisture removal are through osmotic transfer of moisture and solids."  (Col. 2, lines 62-64).<br><br>"The grapes are then immersed in a solution of a suitable hydrophilic carbohydrate of sufficient concentration to provide a significant osmotic withdrawal of water from the grape during heating, with deposition of the carbohydrate within the fruit in place of the water which is withdrawn."  (Col. 3, lines 19-24).<br><br>The carbohydrate solution contains, for example, "200 pounds of a solution of 99% of glycerol and 1% citric |

---

[1] In claim construction briefing, ARI argued that "dried fruit" was "a fruit piece that has had a portion of its naturally occurring moisture content removed." (ARI's Opposition to Ocean Spray's Motion for Summary Judgment, pg. 15).  On this point, ARI's expert testified, "It doesn't matter how much.  If it has undergone any moisture loss whatsoever or moisture exchange, it has – now it's in a dried fruit form…" (Cadwallader Deposition, pg. 149, lines 5-8).  Likewise, Amir Lalji opined, "So to me, dried fruit means anything that has lost water or liquid…it doesn't matter how many percent." (Lalji Deposition, pg. 41, line 20 – pg. 42, line 2).  Similarly, Jack Mazin testified, "Dried fruit is really anything that has less moisture than the original fruit." (Mazin Deposition, pg. 46, line 25 – pg. 47, line 1).

ARI argued in claim construction briefing that removing flavor with an acidulant was "Much like a foul odor is said to be 'removed' by the introduction of an air-freshening spray, here the natural flavor of the [dried fruit] is removed by the introduction of [a] dominant syrup having citric acid." (ARI's Opposition to Ocean Spray's Motion for Summary Judgment, pg. 20).  ARI's expert opined "I think in the context of removal the way and they are using it and the way that many would use it in the flavor field often times product – all flavors are removed not by physically removing the off-flavored constituents from the food but by masking them with additional flavor." (Cadwallader Deposition, pg. 36, lines 11-16).  Lalji testified, "It only means that it is either masking or balancing the flavor.  The reason we use acid to create new balance of sugar and acid for the new food flavor that we're replacing with." (Lalji Deposition, pg. 44, lines 12-15).  Similarly, Jack Mazin testified "What they mean – and again in my opinion – is that they are balancing.  And that's the word.  They're balancing… What you're basically doing is by balancing the right ratio of acid to the fruit, minimized or masks or balances the raisin flavor so that the sensual, the taste factor is not really there anymore.  And that's really the attempt of our patent." (Mazin Deposition, pg. 55, lines 8-18.)



**Kirkpatrick & Lockhart Nicholson Graham** LLP

Christopher Sorenson
August 7, 2006
Page 3

| | |
|---|---|
| | acid…" (Col. 3, line 63 – Col. 4, line 3). The use of ascorbic acid is also disclosed. (Col. 5, line 4).<br><br>"[M]anipulation of the pH within the fruit, addition or withholding of anti-browning and anti-oxidant materials such as ascorbic acid, citric acid, sulfites and the like, fruits may be selectively held close to their natural colors or allowed to brown and take on other flavor changes." (Col. 5, lines 2-7). |
| (b) dehydrating the treated dried fruit to obtain a desired moisture content; and, | "Thereafter, the grapes are preferably dried to reduce their moisture content to the ultimate low level desired…Typically the moisture should be reduced to about less than 30% and, preferably less than 20%." (Col. 5, lines 36-37, 44-47). |
| (c) treating the dried fruit during step (a) or after step (b) with a flavoring agent having a flavor which does not substantially correspond to the natural flavor of the dried fruit, said flavoring agent being employed in an amount for a period of time which is sufficient to impart to the dried fruit a flavor which is substantially the same as the flavoring agent; | "If desired, the infusion solution of carbohydrate may also bear flavors for simultaneous infusion of these into the fruit structures." (Col. 4, lines 15-18).<br><br>"These flavors can be employed to either fortify, enhance or change the nature of the fruit flavor involved." (Col. 4, lines 17-19). |
| and so forming a flavored dried fruit product having a flavor which is substantially the same as the flavor of the flavoring agent and having an outer surface which is substantially non-sticky[3] | "If desired, the infusion solution of carbohydrate may also bear flavors for simultaneous infusion of these into the fruit structures." (Col. 4, lines 15-18).<br><br>"These flavors can be employed to either fortify, enhance or change the nature of the fruit flavor involved." (Col. 4, |

---

[3] ARI argued during claim construction briefing that "Claim 1 of the Mazin patent requires that the *final* dried fruit product have 'an outer surface which is substantially non-sticky whereby the flavored dried fruit product may be easily handled.' The claim is clear that 'substantially non-sticky' is describing the end product – or the natural result of the process – the 'flavored dried fruit product.'" (ARI's Supplemental Claim Construction Brief, pg. 2, emphasis in original).



**Kirkpatrick & Lockhart Nicholson Graham LLP**

Christopher Sorenson
August 7, 2006
Page 4

| whereby the flavored dried fruit product may be easily handled. | lines 17-19). "At the end of this processing, the simulated raisins may be treated by coating with vegetable oil, sugar, or other like materials to prevent undue clustering or clumping where the simulated raisins or other dried fruit will be maintained in direct contact with each other for extended periods of time." (Col. 6, lines 19-24). |
| --- | --- |

These developments counsel in favor of ARI reconsidering its position in this case, especially in view of Rule 11 of the Federal Rules of Civil Procedure and 35 U.S.C. §285. If the Court adopts Ocean Spray's claim construction, then the accused products do not infringe. If the Court adopts ARI's claim construction, then the asserted claim is anticipated. In either event, if ARI does not own the Mazin patent, it lacks standing as a litigant. For these reasons, continuing with the case is not only pointless, but expensive. Therefore, Ocean Spray demands that ARI immediately dismiss its claims with prejudice. If ARI does so now, Ocean Spray will be willing to discount its claims for costs and fees.

If ARI continues to pursue this matter, be advised that Ocean Spray will not only continue to litigate this matter and seeks all of its fees and costs, but will also consider requesting reexamination of the patent in suit at the United States Patent and Trademark Office. As I am sure you are aware, if reexamination changes or invalidates the asserted claim, ARI will lose any claim for past damages.

Please advise us no later than August 15, 2006 of ARI's intentions. If ARI elects to continue with this litigation, please propose dates for a meet and confer.

Very truly yours,

Michael E. Zeliger

991763_1

# EXHIBIT 15

# Merchant & Gould

An Intellectual Property Law Firm

3200 IDS Center
80 South Eighth Street
Minneapolis, Minnesota
55402-2215 USA
TEL 612.332.5300
FAX 612.332.9081
www.merchant-gould.com

A Professional Corporation

Direct Contact | 612.336.4645
csorenosn@merchantgould.com

August 23, 2006

**By Facsimile**

Michael Zeliger
Kirkpatrick & Lockhart Nicholson Graham, LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111

Re:   Amazin' Raisins International, Inc. v. Ocean Spray Cranberries, Inc.
      Civil Action No. 04-12679-MLW
      M&G No. 14158.1USZA

Dear Mr. Zeliger:

This letter responds to yours of August 7, 2006.

As you might expect, we do not hold the same view as you do with respect to the '698 patent, disclosed to ARI for the first time in your letter. It will take some time for us to fully analyze your arguments, but it is clear to us that no definitive conclusion can be made until the Court has construed the claims of the Mazin patent. We are also considering whether supplemental briefing relating to claim construction is necessary, in light of this late disclosure. Regardless, while we appreciate your efforts to resolve this matter in an expeditious and cost-effective manner, we believe that a response to your request to dismiss this matter is premature.

Concerning documents related to the ownership of the Mazin patent, we have produced all documents within Mr. Mazin's possession and control on the issue, despite the fact that there appears to be no document request seeking this information. It appears clear to us that ARI, Inc. is the owner of the Mazin patent. Also, the documents that have been produced make it clear that the Internet Culinary Corporation never owned the patent-in-suit, and does not own the patent-in-suit now. Given Ocean Spray's responses to Plaintiff's Fourth Set of Document Requests, it appears you have no evidence to the contrary that you are willing to produce to ARI. If I am wrong in this regard, please advise.

As I mentioned in our telephone conference on this topic, you are free to pursue further discovery on the issue if you would like. As things stand, we have complied with all discovery

August 23, 2006
Page 2

requests to date. If I am mistaken in this regard, please point to an interrogatory or document
request that you believe should be supplemented. Given the fact that you have not plead, as an
affirmative defense or otherwise, any lack of ownership of the Mazin patent, I doubt any such
request is pending.

    I look forward to discussing these issues with you during our scheduled conference on
August 24, 2006 at 2:00 p.m.

                Very truly yours,

                Christopher J. Sorenson

CJS:ajm

cc:    William Woodford, Esq.

# EXHIBIT 16
## (Part 1 of 2)

APR 23 '99  11:27AM FEZ NY 2129862399

P.2/28

ASSET PURCHASE AGREEMENT

BETWEEN

PACIFIC STANDARD FINANCIAL GROUP, INC.

AND

AMAZIN RAISINS INTERNATIONAL INC.

DECEMBER 7, 1998

000227

APR-23 '99 11:28AM FEZ NY 2129862399

P.3/28

## TABLE OF CONTENTS

1.    Definitions
2.    Basic Transaction
      (a)    Purchase and Sale of Assets
      (b)    Assumption of Liabilities
      (c)    Purchase Price
      (d)    The Closing
      (e)    Deliveries at the Closing
      (f)    Allocation
3.    Representations and Warranties of the Target
      (a)    Organization of the Target
      (b)    Authorization of Transaction
      (c)    Noncontravention
      (d)    Brokers' Fees
      (e)    Title to Assets
      (f)    Subsidiaries
      (g)    Financial Statements
      (h)    Events Subsequent to Most Recent Fiscal Year End
      (i)    Undisclosed Liabilities
      (j)    Legal Compliance
      (k)    Tax Matters
      (l)    Real Property
      (m)    Intellectual Property
      (n)    Tangible Assets
      (o)    Inventory
      (p)    Contracts
      (q)    Notes and Accounts Receivable
      (r)    Powers of Attorney
      (s)    Insurance
      (t)    Litigation
      (u)    Product Warranty
      (v)    Product Liability
      (w)    Employees
      (x)    Employee Benefits
      (y)    Guaranties
      (z)    Environment, Health, and Safety
      (aa)   Certain Business Relationships with the Target and Its Sub-sidiaries
      (bb)   Disclosure
      (cc)   Investment
4.    Representations and Warranties of the Buyer
      (a)    Organization of the Buyer
      (b)    Authorization of Transaction
      (c)    Noncontravention
      (d)    Brokers' Fees
5.    Pre-Closing Covenants

000004

(a)  General
(b)  Notices and Consents
(c)  Operation of Business
(d)  Preservation of Business
(e)  Full Access
(f)  Notice of Developments
(g)  Exclusivity
(h)  Title Insurance
(i)  Surveys
6.  Conditions to Obligation to Close
(a)  Conditions to Obligation of the Buyer
(b)  Conditions to Obligation of the Target
7.  Termination
(a)  Termination of Agreement
(b)  Effect of Termination
8.  Post Closing Obligations
9.  Miscellaneous
(a)  Survival of Representations and Warranties
(b)  Press Releases and Public Announcements
(c)  No Third-Party Beneficiaries
(d)  Entire Agreement
(e)  Succession and Assignment
(f)  Counterparts
(g)  Headings
(h)  Notices
(i)  Governing Law
(j)  Amendments and Waivers
(k)  Severability
(l)  Expenses
(m)  Construction
(n)  Incorporation of Exhibits and Schedules
(o)  Specific Performance
(p)  Submission to Jurisdiction
(q)  Tax Matters
(r)  Employee Benefits Matters
(s)  Bulk Transfer Laws
Exhibit A-- Indemnity Agreement with Seller's Stockholders
Exhibit B--List of Assets
Exhibit C--Forms of Assignments
Exhibit D--Form of Assumption
Exhibit E--Allocation Schedule
Exhibit F--Historical Financial Statements
Exhibit G--Management Stock Bonus Plan and Agreement
Exhibit H- Employment Agreement
Exhibit I- Due Diligence Request Checklist

uw 000229

Disclosure Schedule--Exceptions to Representations and Warranties

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "Agreement") is entered into as of this 7th day of December, 1998, by and between Pacific Standard Financial Group, Inc., a Nevada corporation, or Assignee (the "Buyer"), and AMAZIN RAISINS a Delaware corporation (the "Seller"). The Buyer and the Seller are referred to collectively herein as the "Parties."

This Agreement contemplates a transaction in which the Buyer will purchase all of the assets (and assume certain of the liabilities) of the Seller in return for cash and stock.

Now, therefore, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, and covenants herein contained, the Parties agree as follows.

1.    **Definitions.**

"Accredited Investor" has the meaning set forth in Regulation D promulgated under the Securities Act.

"Acquired Assets" means all right, title, and interest in and to all of the assets of the Seller, including all of its (a) real property, leaseholds and sub-leaseholds therein, improvements, fixtures, and fittings thereon, and easements, rights-of-way, and other appurtenances thereto (such as appurtenant rights in and to public streets), (b) tangible personal property (such as machinery, equipment, inventories of raw materials and supplies, manufactured and purchased parts, goods in process and finished goods, furniture, automobiles, trucks, tractors, trailers, tools, jigs, and dies), (c) Intellectual Property, goodwill associated therewith, licenses and sub-licenses granted and obtained with respect thereto, and rights thereunder, remedies against infringements thereof, and rights to protection of interests therein under the laws of all jurisdictions, (d) leases, subleases, and rights thereunder, (e) agreements, contracts, indentures, mortgages, instruments, Security Interests, guaranties, other similar arrangements, and rights thereunder, (f) accounts, notes, and other receivables, (g) securities (such as the capital stock in its Subsidiaries), (h) claims, deposits, prepayments, refunds, causes of action, choses in action, rights of recovery, rights of set off, and rights of recoupment (including any such item relating to the payment of Taxes), (i) franchises, approvals, permits, licenses, orders, registrations, certificates, variances, and similar rights obtained from governments and governmental agencies, (j) books, records, ledgers, files, documents, correspondence, lists, plats, architectural plans, drawings, and specifications, creative materials, advertising and promotional materials, studies, reports, and other printed or written materials, (k) Cash, and (l) rights in and with respect to the assets associated with its Employee Benefit Plans, if any; provided, however, that the Acquired Assets shall not include (i) the corporate charter, qualifications to conduct business as a foreign corporation, arrangements with registered agents

UNP 000230

APR 23 '99  11:29AM FEZ NY 2129862399

P.5/28

Disclosure Schedule--Exceptions to Representations and Warranties

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "Agreement") is entered into as of this 7th day of December, 1998, by and between Pacific Standard Financial Group, Inc., a Nevada corporation, (a wholly owned subsidiary of Delta Food Corporation, which is a wholly owned subsidiary of Capital Silver Mines, Inc. ("CSVM")) (the "Buyer"), and AMAZIN RAISINS INTERNATIONAL INC., a Delaware corporation (the "Seller"). The Buyer and the Seller are referred to collectively herein as the "Parties."

This Agreement contemplates a transaction in which the Buyer will purchase all of the assets (and assume certain of the liabilities) of the Seller in return for cash and stock.

Now, therefore, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, and covenants herein contained, the Parties agree as follows:

1. <u>Definitions.</u>

"Accredited Investor" has the meaning set forth in Regulation D promulgated under the Securities Act.

"Acquired Assets" means all right, title, and interest in and to all of the assets of the Seller, including all of its (a) real property, leaseholds and sub-leaseholds therein, improvements, fixtures, and fittings thereon, and easements, rights-of-way, and other appurtenants thereto (such as appurtenant rights in and to public streets), (b) tangible personal property (such as machinery, equipment, inventories of raw materials and supplies, manufactured and purchased parts, goods in process and finished goods, furniture, automobiles, trucks, tractors, trailers, tools, jigs, and dies), (c) Intellectual Property, goodwill associated therewith, licenses and sub-licenses granted and obtained with respect thereto, and rights thereunder, remedies against infringements thereof, and rights to protection of interests therein under the laws of all jurisdictions, (d) leases, subleases, and rights thereunder, (e) agreements, contracts, indentures, mortgages, instruments, Security Interests, guaranties, other similar arrangements, and rights thereunder, (f) accounts, notes, and other receivables, (g) claims, deposits, prepayments, refunds, causes of action, choses in action, rights of recovery, rights of set off, and rights of recoupment (including any such item relating to the payment of Taxes), (h) franchises, approvals, permits, licenses, orders, registrations, certificates, variances, and similar rights obtained from governments and governmental agencies, (i) books, records, ledgers, files, documents, correspondence, lists, plats, architectural plans, drawings, and specifications, creative materials, advertising and promotional materials, studies, reports, and other printed or written materials, (j) Cash, and (k) rights in and with respect to the assets associated with its Employee Benefit Plans, if any; <u>provided, however</u>, that the Acquired Assets shall not include (i) the corporate charter, qualifications to conduct business as a foreign corporation, arrangements with

MP 000231

11:30AM FEZ IIY 2129862399

P. 6/28

registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, blank stock certificates, and other documents relating to the organization, maintenance, and existence of the Seller as a corporation or (ii) any of the rights of the Seller under this Agreement (or under any side agreement between the Seller on the one hand and the Buyer on the other hand entered into on or after the date of this Agreement).

"Affiliate" has the meaning set forth in Rule 12b-2 of the regulations promulgated under the Securities Exchange Act.

"Affiliated Group" means any affiliated group within the meaning of Internal Revenue Code §1504(a) or any similar group defined under a similar provision of state, local, or foreign law.

"Agreement with Seller Stockholders" means the Agreement with Seller Stockholders entered into concurrently herewith and attached hereto as Exhibit A.

"Assumed Liabilities" means (a) all Liabilities of the Seller set forth on the face of the Most Recent Balance Sheet, (b) all Liabilities of the Seller which have arisen after the Most Recent Fiscal Month End in the Ordinary Course of Business (other than any Liability resulting from, arising out of, relating to, in the nature of, or caused by any breach of contract, breach of warranty, tort, infringement, or violation of law), (c) all obligations of the Seller under the agreements, contracts, leases, licenses, and other arrangements referred to in the definition of Acquired Assets either (i) to furnish goods, services, and other non-Cash benefits to another party after the Closing or (ii) to pay for goods, services, and other non-Cash benefits that another party will furnish to it after the Closing, and (d) all other Liabilities and obligations of the Seller set forth in an appendix to the Disclosure Schedule under an express statement (that the Buyer has initialed) to the effect that the definition of Assumed Liabilities will include the Liabilities and obligations so disclosed; provided, however, that Assumed Liabilities shall not include (i) any Liability of the Seller for Taxes, excluding sales tax generated by the sale of the assets hereunder, (ii) any Liability of the Seller for the unpaid Taxes of Person (other than any of the Seller and its Subsidiaries) under Reg. §1.1502-6 (or any similar vision of state, local, or foreign law), as a transferee or successor, by contract, or otherwise, (iii) obligation of the Seller to indemnify any Person (including any of the Seller Stockholders) by on of the fact that such Person was a director, officer, employee, or agent of any of the Seller and bsidiaries or was serving at the request of any such entity as a partner, trustee, director, officer, oyee, or agent of another entity (whether such indemnification is for judgments, damages, ties, fines, costs, amounts paid in settlement, losses, expenses, or otherwise and whether such nification is pursuant to any statute, charter document, bylaw, agreement, or otherwise), (iv) ability of the Seller for costs and expenses incurred in connection with this Agreement and the tions contemplated hereby, or (v) any Liability or obligation of the Seller under this ent (or under any side agreement between the Seller on the one hand and the Buyer on the and entered into on or after the date of this Agreement).

"Basis" means any past or present fact, situation, circumstance, status, condition, activity, plan, occurrence, event, incident, action, failure to act, or transaction that forms or could

sset Purchase Agreementv 3 wpd

2

ANP 000232

000008

APR 23 '99  11:31AM FEZ NY 2129862399

P.7/28

form the basis for any specified consequence.

"Buyer" has the meaning set forth in the preface above.

"Cash" means cash and cash equivalents (including marketable securities and short term investments) calculated in accordance with GAAP applied on a basis consistent with the preparation of the Financial Statements.

"Closing" has the meaning set forth in §2(d) below.

"Closing Date" has the meaning set forth in §2(d) below.

"Code" means the Internal Revenue Code of 1986, as amended.

"Controlled Group of Corporations" has the meaning set forth in Code §1563.

"Deferred Intercompany Transaction" has the meaning set forth in Reg. §1.1502-13.

"Disclosure Schedule" has the meaning set forth in §3 below.

"Employee Benefit Plan" means any (a) nonqualified deferred compensation or retirement plan or arrangement which is an Employee Pension Benefit Plan, (b) qualified defined contribution retirement plan or arrangement which is an Employee Pension Benefit Plan, (c) qualified defined benefit retirement plan or arrangement which is an Employee Pension Benefit Plan (including any Multiemployer Plan), or (d) Employee Welfare Benefit Plan or material fringe benefit plan or program.

"Employee Pension Benefit Plan" has the meaning set forth in ERISA §3(2).

"Employee Welfare Benefit Plan" has the meaning set forth in ERISA §3(1).

"Environmental, Health, and Safety Laws" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, the Resource Conservation and Recovery Act of 1976, and the Occupational Safety and Health Act of 1970, each as amended, together with all other laws (including rules, regulations, codes, plans, injunctions, judgments, orders, decrees, rulings, and charges thereunder) of federal, state, local, and foreign governments (and all agencies thereof) concerning pollution or protection of the environment, public health and safety, or employee health and safety, including laws relating to emissions, discharges, releases, or threatened releases of pollutants, contaminants, or chemical, industrial, hazardous, or toxic materials or wastes into ambient air, surface water, ground water, or lands or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport, or handling of pollutants, contaminants, or chemical, industrial, hazardous, or toxic materials or wastes.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

WP 000233

APR 23 '99  11:31AM FEZ NY 2129862399

P.8/28

"Excess Loss Account" has the meaning set forth in Reg. §1.1502-19.

"Extremely Hazardous Substance" has the meaning set forth in §302 of the Emergency Planning and Community Right-to-Know Act of 1986, as amended.

"Fiduciary" has the meaning set forth in ERISA §3(21).

"Financial Statement" has the meaning set forth in §3(g) below.

"GAAP" means United States generally accepted accounting principles as in effect from time to time.

"Hart-Scott-Rodino Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Intellectual Property" means (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications, and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions, and reexaminations thereof, (b) all trademarks, service marks, trade dress, logos, trade names, and corporate names, together with all translations, adaptations, derivations, and combinations thereof and including all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith, (c) all copyrightable works, all copyrights, and all applications, registrations, and renewals in connection therewith, (d) all mask works and all applications, registrations, and renewals in connection therewith, (e) all trade secrets and confidential business information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals), (f) all computer software (including data and related documentation), (g) all other proprietary rights, and (h) all copies and tangible embodiments thereof (in whatever form or medium).

"Knowledge" means actual knowledge after reasonable investigation.

"Liability" means any liability that could have a material adverse effect on the business, financial conditions or operations of the Seller (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), including any liability for Taxes.

"Most Recent Balance Sheet" means the balance sheet contained within the Most Recent Financial Statements, including any notes thereto.

"Most Recent Financial Statements" has the meaning set forth in §3(g) below.

VqP 000234

"Most Recent Fiscal Month End" has the meaning set forth in §3(g) below.

"Most Recent Fiscal Year End" has the meaning set forth in §3(g) below.

"Multiemployer Plan" has the meaning set forth in ERISA §3(37).

"Ordinary Course of Business" means the ordinary course of business consistent with past custom and practice (including with respect to quantity and frequency).

"Party" has the meaning set forth in the preface above.

"PBGC" means the Pension Benefit Guaranty Corporation.

"Person" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or a governmental entity (or any department, agency, or political subdivision thereof).

"Post Closing Obligations" has the meaning set forth in §8 below.

"Process Agent" has the meaning set forth in §9(p) below.

"Prohibited Transaction" has the meaning set forth in ERISA §406 and Code §4975.

"Purchase Price" has the meaning set forth in §2(c) below.

"Reportable Event" has the meaning set forth in ERISA §4043.

"Securities Act" means the Securities Act of 1933, as amended.

"Securities Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Security Interest" means any mortgage, pledge, lien, encumbrance, charge, or other security interest, other than (a) mechanic's, materialmen's, and similar liens, (b) liens for Taxes not yet due and payable or for Taxes that the taxpayer is contesting in good faith through appropriate proceedings, (c) purchase money liens and liens securing rental payments under capital lease arrangements, and (d) other liens arising in the Ordinary Course of Business and not incurred in connection with the borrowing of money.

"Subsidiary" means any corporation with respect to which a specified Person (or a Subsidiary thereof) owns a majority of the common stock or has the power to vote or direct the voting of sufficient securities to elect a majority of the directors.

"Survey" has the meaning set forth in §5(i) below.

"Seller" has the meaning set forth in the preface above.

"Seller Share" means any share of the Common Stock, no stated par value, of the Seller.

"Seller Stockholder" means any person who or which holds any Seller Shares.

"Tax" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code §59A), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

2.    **Basic Transaction**.

(a) **Purchase and Sale of Assets**. On and subject to the terms and conditions of this Agreement, the Buyer agrees to purchase from the Seller, and the Seller agrees to sell, transfer, convey, and deliver to the Buyer, all of the Acquired Assets at the Closing for the consideration specified below in this §2. All dollar amounts referred to herein shall be in United States dollars unless otherwise specified.

(b) **Assumption of Liabilities**. On and subject to the terms and conditions of this Agreement, the Buyer agrees to assume and become responsible for all of the Assumed Liabilities at the Closing. The Buyer will not assume or have any responsibility, however, with respect to any other obligation or Liability of the Seller not included within the definition of Assumed Liabilities, except that the Buyer will be responsible for any sales tax and/or transfer tax due as a result of the transfer of assets pursuant to this Agreement. Additionally Buyer will indemnify, defend and hold Seller and Jack Mazin harmless from any leases assumed by Buyer under the terms of this Agreement and Buyer will use its best efforts to arrange for the release from said leases of Seller and Jack Mazin as soon after Closing as reasonably possible.

(c) **Purchase Price**. The Buyer agrees to pay to Seller, or on Seller's behalf, after the December 30, 1998 Closing, but in any event no later than June 30, 1999, $350,000 $CND in cash by wire transfer, at the option of Seller, *with a minimum exchange rate equaling $250,000 $US*, ith additional working capital subsequent to the Closing Date.

In addition to the cash payments, Buyer will adopt at its first regularly held director's meeting ollowing the Closing Date, such meeting to occur no later than 30 days after the Closing Date, a anagement Agreement and Stock Option Plan for the benefit of Seller and Seller's principal officer

000012

APR 23 '99  11:41AM FEZ NY 2129862399

P.11/28

and shareholders, Jack Mazin, a form of which is attached hereto as Appendix G, and incorporated by reference.  Buyer shall form a subsidiary corporation, Amazin Raisins-Pacific Inc., a Nevada corporation, to take possession of the assets purchased herein and to continue the same line of business as Seller. The Management Stock Bonus Agreement shall be an agreement between Buyer, Amazin Raisins-Pacific Inc., and Jack Mazin, wherein Jack Mazin shall own 20% of the stock in Amazin Raisins-Pacific Inc., receive a salary of *$96,000 $US* and additional consideration set forth in the Management Stock Bonus Agreement. Said consideration shall be as detailed in footnote 1.[1]

(d) Closing. Closing shall occur at 11:00 A.M., on or before December 30, 1998, at such location as agreed to between Buyer and Seller, and shall be contingent only upon Seller delivering Exhibit "F" and the assignments attached hereto as Exhibits C and D and Buyer delivering the consideration specified in §2 C.

(e) Deliveries at the Closing. At the Closing, (i) the Seller will deliver to the Buyer the various certificates, instruments, and documents referred to in §6(a) below; (ii) the Buyer will deliver to the Seller the various certificates, instruments, and documents referred to in §6(b) below; (iii) the Seller will execute, acknowledge (if appropriate), and deliver to the Buyer (A) assignments (including real property and Intellectual Property transfer documents) in the forms attached hereto marked collectively Exhibit C and (B) such other instruments of sale, transfer, conveyance, and assignment as the Buyer and its counsel reasonably may request; (iv) the Buyer will execute, acknowledge (if appropriate), and deliver to the Seller (A) an assumption in the form attached hereto as Exhibit D and (B) such other instruments of assumption as the Seller and its counsel reasonably may request; and (v) the Buyer will deliver to Seller, or on Seller's behalf, the consideration specified in §2(c) above, as well as executed copies of Exhibits G and H..

(f) Allocation. The Parties agree to allocate the Purchase Price (and all other capitalizable costs) among the Acquired Assets for all purposes (including financial accounting and tax purposes) in accordance with the allocation schedule attached hereto as Exhibit E.

---

[1] Jack Mazin shall enter into a binding management contract wherein Jack Mazin shall receive a salary and compensation package commensurate with industry standards, to be agreed to between the parties. Jack Mazin shall in addition to his salary, receive as a bonus, 20% of earnings before the payment of interest and taxes and the accounting for depreciation and amortization ("Profits") of Amazin Raisins-Pacific, Inc., payable to him at the end of each fiscal year, pursuant to the management agreement enabling Jack Mazin to earn additional compensation as follows: After payment of all salaries and provision for reserves, 20% of Profits shall be paid directly to Jack Mazin. The 80% balance of Profits remain upstreamed in CSVM for recognition on its consolidated balance sheet. A bonus payable to Jack Mazin in CSVM stock is then paid to Jack Mazin in an amount equal to 140% of the profits upstreamed to CSVM . The cash value of each share of CSVM stock paid to Jack Mazin as a bonus shall be equal to the average share price of CSVM stock for the 60 day period immediately preceding the date on which the bonus is made.

V₄ P 000237

000013

APR 23 '99  11:42AM FEZ NY 2129862399

P.12/28

3. <u>Representations and Warranties of the Seller.</u> The Seller, to the best of Seller's knowledge, represents and warrants to the Buyer that the statements contained in this §3 are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this §3), except as set forth in the disclosure schedule accompanying this Agreement and initialed by the Parties (the "<u>Disclosure Schedule</u>"). The Disclosure Schedule will be arranged in paragraphs corresponding to the lettered and numbered paragraphs contained in this §3.

(a) <u>Organization of the Seller.</u> The Seller is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its incorporation.

(b) <u>Authorization of Transaction.</u> The Seller has full power and authority (including full corporate power and authority) to execute and deliver this Agreement and to perform its obligations hereunder. Without limiting the generality of the foregoing, the board of directors of the Seller and the Seller Stockholders have duly authorized the execution, delivery, and performance of this Agreement by the Seller. This Agreement constitutes the valid and legally binding obligation of the Seller, enforceable in accordance with its terms and conditions.

(c) <u>Noncontravention.</u> Neither the execution and the delivery of this Agreement, nor the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in §2 above), will (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which Seller is subject or any provision of the charter or bylaws of Seller or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which Seller is a party or by which it is bound or to which any of its assets is subject (or result in the imposition of any Security Interest upon any of its assets). Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or governmental agency in order for the Parties to consummate the transactions contemplated by this Agreement (including the assignments and assumptions referred to in §2 above).

(d) <u>Brokers' Fees.</u> The Seller has no Liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement for which the Buyer could become liable or obligated. Seller has no Liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement. Buyer is obligate to pay a fee to American Auditors under a separate written agreement.

(e) <u>Title to Assets.</u> The Seller has good and marketable title to, or a valid leasehold interest in, the properties and assets used by them, located on their premises, or shown on the Most Recent Balance Sheet or acquired after the date thereof, free and clear of all Security Interests, except as disclosed on the Most Recent Balance Sheet and except for properties and assets disposed of in the

APR 23 '99  11:43AM FEZ NY 2129862399

P.13/28

Ordinary Course of Business since the date of the Most Recent Balance Sheet. Without limiting the generality of the foregoing, the Seller has good and marketable title to all of the Acquired Assets, free and clear of any Security Interest or restriction on transfer, except for such security interest as set forth on the Most Recent Balance Sheet.

(f) <u>Tax Returns and Financial Statements.</u> Attached hereto as Exhibit F are copies of the federal tax returns of Seller for fiscal years 1995, 1996 and 1997 and the unaudited balance sheet and statement of income, and cash flow statement as of and for fiscal years 1995, 1996, 1997 and the three months ended November 30, 1998 for the Seller. The Tax Returns and Financial Statements (including the notes thereto) present fairly the financial condition of the Seller as of such dates and the results of operations of the Seller for such periods, are correct and complete, and are consistent with the books and records of the Seller (which books and records are correct and complete); <u>provided, however,</u> that the Most Recent Financial Statements are subject to normal year-end adjustments (which will not be material individually or in the aggregate) and lack footnotes and other presentation items.

(g) <u>Events Subsequent to Most Recent Fiscal Year End.</u> Since the Most Recent Fiscal Year End, there has not been any material adverse change in the business, financial condition, operations, results of operations, or future prospects of any of the Seller. Without limiting the generality of the foregoing, since that date:

(i) Seller has not sold, leased, transferred, or assigned any of its assets, tangible or intangible, other than for a fair consideration in the Ordinary Course of Business;

(ii) Seller has note entered into any agreement, contract, lease, or license (or series of related agreements, contracts, leases, and licenses) either involving more than $10,000.00 or outside the Ordinary Course of Business;

(iii) no party has accelerated, terminated, modified, or canceled any agreement, contract, lease, or license (or series of related agreements, contracts, leases, and licenses) involving more than $10,000.00 to which Seller is a party or by which any of them is bound;

(iv) Seller has not imposed any Security Interest upon any of its assets, tangible or intangible;

(v) Seller has not made any capital expenditure (or series of related capital expenditures) either involving more than $5,000.00 or outside the Ordinary Course of Business;

(vi) Seller has not made any capital investment in, any loan to, or any acquisition of the securities or assets of, any other Person (or series of related capital investments, loans, and acquisitions) either involving more than $5,000.00 or outside the Ordinary Course of Business;

№ 000239

000015

APR 23 '99  11:43AM FEZ NY 2129862399

(vii) Seller has not issued any note, bond, or other debt security or created, incurred, assumed, or guaranteed any indebtedness for borrowed money or capitalized lease obligation either involving more than $2,500.00 singly or $5,000.00 in the aggregate; *other than the lease to the city of Athoville.*

(viii) Seller has not delayed or postponed the payment of accounts payable and other Liabilities outside the Ordinary Course of Business;

(ix) Seller has not canceled, compromised, waived, or released any right or claim (or series of related rights and claims) either involving more than $2,500.00 or outside the Ordinary Course of Business;

(x) Seller has not  granted any license or sublicense of any rights under or with respect to any Intellectual Property;

(xi) Seller has not made or authorized any change in its articles of incorporation or bylaws of any of the Seller and its Subsidiaries;

(xii) Seller has not issued, sold, or otherwise disposed of any of its capital stock, or granted any options, warrants, or other rights to purchase or obtain (including upon conversion, exchange, or exercise) any of its capital stock;

(xiii) Seller has not declared, set aside, or paid any dividend or made any distribution with respect to its capital stock (whether in cash or in kind) or redeemed, purchased, or otherwise acquired any of its capital stock;

(xiv) Seller has not experienced any damage, destruction, or loss (whether or not covered by insurance) to its property;

(xv) Seller has not made any loan to, or entered into any other transaction with, any of its directors, officers, and employees outside the Ordinary Course of Business;

(xvi) Seller has not entered into any employment contract or collective bargaining agreement, written or oral, or modified the terms of any existing such contract or agreement;

(xvii) Seller has not granted any increase in the base compensation of any of its directors, officers, and employees outside the Ordinary Course of Business;

(xviii) Seller has not adopted, amended, modified, or terminated any bonus, profit-sharing, incentive, severance, or other plan, contract, or commitment for the benefit of any of its directors, officers, and employees (or taken any such action with respect to any other Employee Benefit Plan);

000016

APR 23 '99  11:44AM FEZ NY 2129862399

. P.15/28

(xix) Seller has not made any other change in employment terms for any of its directors, officers, and employees outside the Ordinary Course of Business;

(xx) Seller has not made or pledged to make any charitable or other capital contribution outside the Ordinary Course of Business;

(xxi) Seller has not paid any amount to any third party with respect to any Liability or obligation (including any costs and expenses the Seller has incurred or may incur in connection with this Agreement and the transactions contemplated hereby) which would not constitute an Assumed Liability if in existence as of the Closing;

(xxii) there has not been any other material occurrence, event, incident, action, failure to act, or transaction outside the Ordinary Course of Business involving any of the Seller and its Subsidiaries; and

(xxiii) Seller has not committed to any of the foregoing.

(h) <u>Undisclosed Liabilities.</u>  Seller has no Liability (and there is no Basis for any present or future action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand against any of them giving rise to any Liability), except for (i) Liabilities set forth on the face of the Most Recent Balance Sheet (rather than in any notes thereto) and (ii) Liabilities which have arisen after the Most Recent Fiscal Month End in the Ordinary Course of Business (none of which results from, arises out of, relates to, is in the nature of, or was caused by any breach of contract, breach of warranty, tort, infringement, or violation of law).

(i) <u>Legal Compliance.</u> Seller and its respective predecessors and Affiliates has complied with all applicable laws (including rules, regulations, codes, plans, injunctions, judgments, orders, decrees, rulings, and charges thereunder) of federal, state, local, and foreign governments (and all agencies thereof), and no action, suit, proceeding, hearing, investigation, charge, complaint, claim, demand, or notice has been filed or commenced against any of them alleging any failure so to comply.

(j) <u>Tax Matters.</u>

(i) Seller filed all Tax Returns that it was required to file. All such Tax Returns were correct and complete in all respects. All Taxes owed by Seller (whether or not shown on any Tax Return) have been paid. Seller is not currently the beneficiary of any extension of time within which to file any Tax Return. No claim has ever been made by an authority in a jurisdiction where Seller does not file Tax Returns that it is or may be subject to taxation by that jurisdiction. There are no Security Interests on any of the assets of Seller that arose in connection with any failure (or alleged failure) to pay any Tax.

(ii) Seller withheld and paid all Taxes required to have been withheld and paid in

000017

connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party.

(iii) No director or officer (or employee responsible for Tax matters) of Seller expects any authority to assess any additional Taxes for any period for which Tax Returns have been filed. There is no dispute or claim concerning any Tax Liability of the Seller either (A) claimed or raised by any authority in writing or (B) as to which any of the directors and officers (and employees responsible for Tax matters) of the Seller has Knowledge based upon personal contact with any agent of such authority. §3(j) of the Disclosure Schedule lists all federal, state, local, and foreign income Tax Returns filed with respect to Seller for taxable periods ended on or after January 1, 1995, indicates those Tax Returns that have been audited, and indicates those Tax Returns that currently are the subject of audit. The Seller has delivered to the Buyer correct and complete copies of all federal income Tax Returns, examination reports, and statements of deficiencies assessed against or agreed to by Seller since January 1, 1995.

(iv) Seller has note waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

(k) [Blank]

(l) Real Property.

(i) §3(l)(i) of the Disclosure Schedule lists and describes briefly all real property leased to the Seller. The Seller has delivered to the Buyer correct and complete copies of the leases and subleases listed in §3(l)(ii) of the Disclosure Schedule (as amended to date). With respect to each lease and sublease listed in §3(l)(ii) of the Disclosure Schedule:

(A) the lease or sublease is legal, valid, binding, enforceable, and in full force and effect;

(B) the lease or sublease will continue to be legal, valid, binding, enforceable, and in full force and effect on identical terms following the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in §2 above);

(C) no party to the lease or sublease is in breach or default, and no event has occurred which, with notice or lapse of time, would constitute a breach or default or permit termination, modification, or acceleration thereunder;

(D) no party to the lease or sublease has repudiated any provision thereof;

(E) there are no disputes, oral agreements, or forbearance programs in effect

as to the lease or sublease;

(F) with respect to each sublease, the representations and warranties set forth in subsections (A) through (E) above are true and correct with respect to the underlying lease;

(G) Seller has not assigned, transferred, conveyed, mortgaged, deeded in trust, or encumbered any interest in the leasehold or subleasehold;

(H) all facilities leased or subleased thereunder have received all approvals of governmental authorities (including licenses and permits) required in connection with the operation thereof and have been operated and maintained in accordance with applicable laws, rules, and regulations;

(I) all facilities leased or subleased thereunder are supplied with utilities and other services necessary for the operation of said facilities; and

(m) <u>Intellectual Property.</u>

(i) The Seller owns or has the right to use pursuant to license, sublicense, agreement, or permission all Intellectual Property necessary or desirable for the operation of the businesses of the Seller as presently conducted and as presently proposed to be conducted. Each item of Intellectual Property owned or used by Seller immediately prior to the Closing hereunder will be owned or available for use by the Buyer on identical terms and conditions immediately subsequent to the Closing hereunder. Seller has taken all necessary action to maintain and protect each item of Intellectual Property that it owns or uses.

(ii) Seller has not interfered with, infringed upon, misappropriated, or otherwise come into conflict with any Intellectual Property rights of third parties, and the directors and officers (and employees with responsibility for Intellectual Property matters) of the Seller has not received any charge, complaint, claim, demand, or notice alleging any such interference, infringement, misappropriation, or violation (including any claim that Seller and its Subsidiaries must license or refrain from using any Intellectual Property rights of any third party). To the Knowledge of the Seller and its directors and officers (and employees with responsibility for Intellectual Property matters), no third party has interfered with, infringed upon, misappropriated, or otherwise come into conflict with any Intellectual Property rights of the Seller.

(iii) §3(m)(iii) of the Disclosure Schedule identifies each patent or registration which has been issued to the Seller with respect to its Intellectual Property, identifies each pending patent application or application for registration which any of the Seller has made with respect to any of its Intellectual Property, and identifies each license, agreement, or other permission which the Seller has granted to any third party with respect to any of its

mp 000244

APR 23 '99  11:46AM FEZ NY 2129862399                                    P.18/29

Intellectual Property (together with any exceptions). The Seller has delivered to the Buyer correct and complete copies of all such patents, registrations, applications, licenses, agreements, and permissions (as amended to date) [and has made available to the Buyer correct and complete copies of all other written documentation evidencing ownership and prosecution (if applicable) of each such item]. §3(l)(iii) of the Disclosure Schedule also identifies each trade name or unregistered trademark used by any of the Seller and its Subsidiaries in connection with any of its businesses. With respect to each item of Intellectual Property required to be identified in §3(m)(iii) of the Disclosure Schedule:

(A) the Seller and its Subsidiaries possess all right, title, and interest in and to the item, free and clear of any Security Interest, license, or other restriction;

(B) the item is not subject to any outstanding injunction, judgment, order, decree, ruling, or charge;

(C) no action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand is pending or is threatened which challenges the legality, validity, enforceability, use, or ownership of the item; and

(D) Seller has not agreed to indemnify any Person for or against any interference, infringement, misappropriation, or other conflict with respect to the item.

(iv) §3(m)(iv) of the Disclosure Schedule identifies each item of Intellectual Property that any third party owns and that any of the Seller and its Subsidiaries uses pursuant to license, sublicense, agreement, or permission. The Seller has delivered to the Buyer correct and complete copies of all such licenses, sublicenses, agreements, and permissions (as amended to date). With respect to each item of Intellectual Property required to be identified in §3(m)(iv) of the Disclosure Schedule;

(A) the license, sublicense, agreement, or permission covering the item is legal, valid, binding, enforceable, and in full force and effect;

(B) the license, sublicense, agreement, or permission will continue to be legal, valid, binding, enforceable, and in full force and effect on identical terms following the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in §2 above);

(C) no party to the license, sublicense, agreement, or permission is in breach or default, and no event has occurred which with notice or lapse of time would constitute a breach or default or permit termination, modification, or acceleration thereunder;

APR.000245

000021

(D) no party to the license, sublicense, agreement, or permission has repudiated any provision thereof;

(E) with respect to each sublicense, the representations and warranties set forth in subsections (A) through (D) above are true and correct with respect to the underlying license;

(F) the underlying item of Intellectual Property is not subject to any outstanding injunction, judgment, order, decree, ruling, or charge;

(G) no action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand is pending or is threatened which challenges the legality, validity, or enforceability of the underlying item of Intellectual Property; and

(H) Seller has not granted any sublicense or similar right with respect to the license, sublicense, agreement, or permission.

(v) To the Knowledge of the Seller and its directors and officers (and employees with responsibility for Intellectual Property matters), Seller will not interfere with, infringe upon, misappropriate, or otherwise come into conflict with, any Intellectual Property rights of third parties as a result of the continued operation of its businesses as presently conducted and as presently proposed to be conducted.

(vi) Seller and its directors and officers (and employees with responsibility for Intellectual Property matters) are not aware of any new products, inventions, procedures, or methods of manufacturing or processing that any competitors or other third parties have developed which reasonably could be expected to supersede or make obsolete any product or process of any of the Seller and its Subsidiaries.

(n) Tangible Assets. The Seller and its Subsidiaries own or lease all buildings, machinery, equipment, and other tangible assets necessary for the conduct of their businesses as presently conducted and as presently proposed to be conducted. Each such tangible asset is free from defects (patent and latent), has been maintained in accordance with normal industry practice, is in good operating condition and repair (subject to normal wear and tear), and is suitable for the purposes for which it presently is used and presently is proposed to be used.

(o) Inventory. The inventory of the Seller and its Subsidiaries consists of raw materials and supplies, manufactured and purchased parts, goods in process, and finished goods, all of which is merchantable and fit for the purpose for which it was procured or manufactured, and none of which is slow-moving, obsolete, damaged, or defective, subject only to the reserve for inventory writedown set forth on the face of the Most Recent Balance Sheet as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of the Seller and its Subsidiaries.

15

APR 23 '99  11:48AM FEZ NY 2129862399                                    P.20/28

(p) <u>Contracts.</u> §3(p) of the Disclosure Schedule lists the following contracts and agreements to which Seller is a party:

(i) any agreement (or group of related agreements) for the lease of personal property to or from any Person providing for lease payments in excess of $1,000.00 per annum;

(ii) any agreement (or group of related agreements) for the purchase or sale of raw materials, commodities, supplies, products, or other personal property, or for the furnishing or receipt of services, the performance of which will extend over a period of more than one year, result in a material loss to Seller, or involve consideration in excess of $5,000.00;

(iii) any agreement concerning a partnership or joint venture;

(iv) any agreement (or group of related agreements) under which it has created, incurred, assumed, or guaranteed any indebtedness for borrowed money, or any capitalized lease obligation, in excess of $5,000.00 or under which it has imposed a Security Interest on any of its assets, tangible or intangible;

(v) any agreement concerning confidentiality or noncompetition;

(vi) any agreements between Seller and its shareholders, officers and directors;

(vii) any profit sharing, stock option, stock purchase, stock appreciation, deferred compensation, severance, or other material plan or arrangement for the benefit of its current or former directors, officers, and employees;

(viii) any collective bargaining agreement;

(ix) any agreement for the employment of any individual on a full-time, part-time, consulting, or other basis providing annual compensation in excess of $20,000.00 or providing severance benefits;

(x) any agreement under which it has advanced or loaned any amount to any of its directors, officers, and employees outside the Ordinary Course of Business;

(xi) any agreement under which the consequences of a default or termination could have a material adverse effect on the business, financial condition, operations, results of operations, or future prospects of any of the Seller and its Subsidiaries; or

(xii) any other agreement (or group of related agreements) the performance of which involves consideration in excess of $5,000.00.

The Seller has delivered to the Buyer a correct and complete copy of each written agreement listed

000248

APR 23 '99  11:49AM FEZ NY 2129862399

P.21/28

in §3(p) of the Disclosure Schedule (as amended to date) and a written summary setting forth the terms and conditions of each oral agreement referred to in §3(p) of the Disclosure Schedule. With respect to each such agreement: (A) the agreement is legal, valid, binding, enforceable, and in full force and effect; (B) the agreement will continue to be legal, valid, binding, enforceable, and in full force and effect on identical terms following the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in §2 above); (C) no party is in breach or default, and no event has occurred which with notice or lapse of time would constitute a breach or default, or permit termination, modification, or acceleration, under the agreement; and (D) no party has repudiated any provision of the agreement.

(q) <u>Notes and Accounts Receivable.</u> All notes and accounts receivable of the Seller is reflected properly on its books and records, are valid receivables subject to no setoffs or counterclaims, are current and collectible, and will be collected in accordance with their terms at their recorded amounts, subject only to the reserve for bad debts set forth on the face of the Most Recent Balance Sheet (rather than in any notes thereto) as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of the Seller and its Subsidiaries.

(r) <u>Powers of Attorney.</u> There are no outstanding powers of attorney executed on behalf of any of the Seller.

(s) <u>Insurance.</u> §3(s) of the Disclosure Schedule sets forth the following information with respect to each insurance policy (including policies providing property, casualty, liability, and workers' compensation coverage and bond and surety arrangements) to which Seller has been a party, a named insured, or otherwise the beneficiary of coverage at any time within the past 5 years:

(i) the name, address, and telephone number of the agent;

(ii) the name of the insurer, the name of the policyholder, and the name of each covered insured;

(iii) the policy number and the period of coverage;

(iv) the scope (including an indication of whether the coverage was on a claims made, occurrence, or other basis) and amount (including a description of how deductibles and ceilings are calculated and operate) of coverage; and

(v) a description of any retroactive premium adjustments or other loss-sharing arrangements.

With respect to each such insurance policy: (A) the policy is legal, valid, binding, enforceable, and in full force and effect; (B) the policy will continue to be legal, valid, binding, enforceable, and in full force and effect on identical terms following the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in §2 above); (C) neither any of the

MP 000249

APR 23 '99  11:49AM FEZ NY 2129862399

P.22/28

Seller and its Subsidiaries nor any other party to the policy is in breach or default (including with respect to the payment of premiums or the giving of notices), and no event has occurred which, with notice or the lapse of time, would constitute such a breach or default, or permit termination, modification, or acceleration, under the policy; and (D) no party to the policy has repudiated any provision thereof. Seller been covered during the past five years by insurance in scope and amount customary and reasonable for the businesses in which it has engaged during the aforementioned period. §3(s) of the Disclosure Schedule describes any self-insurance arrangements affecting Seller.

(t) <u>Litigation.</u> §3(t) of the Disclosure Schedule sets forth each instance in which Seller(i) is subject to any outstanding injunction, judgment, order, decree, ruling, or charge or (ii) is a party or is threatened to be made a party to any action, suit, proceeding, hearing, or investigation of, in, or before any court or quasi-judicial or administrative agency of any federal, state, local, or foreign jurisdiction or before any arbitrator. None of the actions, suits, proceedings, hearings, and investigations set forth in §3(t) of the Disclosure Schedule could result in any material adverse change in the business, financial condition or operations of Seller. Seller and its directors and officers (and employees with responsibility for litigation matters) have no reason to believe that any such action, suit, proceeding, hearing, or investigation may be brought or threatened against Seller. *Buyer acknowledges an approximately $24,000 $CND lawsuit with All Gold Imports Inc.*

(u) <u>Product Warranty.</u> Each product manufactured, sold, leased, or delivered by Seller has been in conformity with all applicable contractual commitments and all express and implied warranties, and Seller has no Liability (and there is no Basis for any present or future action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand against any of them giving rise to any Liability) for replacement or repair thereof or other damages in connection therewith, subject only to the reserve for product warranty claims set forth on the face of the Most Recent Balance Sheet (rather than in any notes thereto) as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of the Seller. No product manufactured, sold, leased, or delivered by any of the Seller is subject to any guaranty, warranty, or other indemnity beyond the applicable standard terms and conditions of sale or lease. §3(u) of the Disclosure Schedule includes copies of the standard terms and conditions of sale or lease for Seller's products (containing applicable guaranty, warranty, and indemnity provisions).

(v) <u>Product Liability.</u> Seller has no Liability (and there is no Basis for any present or future action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand against any of them giving rise to any Liability) arising out of any injury to individuals or property as a result of the ownership, possession, or use of any product manufactured, sold, leased, or delivered by Seller.

(w) <u>Employees.</u> To the Knowledge of Seller and its directors and officers (and employees with responsibility for employment matters), no executive, key employee, or group of employees has any plans to terminate employment with Seller. Seller is not a party to or bound by any collective bargaining agreement, nor has any of them experienced any strikes, grievances, claims of unfair labor practices, or other collective bargaining disputes. Seller has not committed any unfair labor practice. Seller and its directors and officers (and employees with responsibility for employment matters) has

# EXHIBIT 16
## (Part 2 of 2)

APR 23 '99  11:50AM FEZ NY 2129862399                                P.23/28

no Knowledge of any organizational effort presently being made or threatened by or on behalf of any labor union with respect to employees of Seller.

(x) Employee Benefits.

(i) §3(x) of the Disclosure Schedule lists each Employee Benefit Plan that Seller maintains or to which Seller contributes.

(A) Each such Employee Benefit Plan (and each related trust, insurance contract, or fund) complies in form and in operation in all respects with the applicable requirements of ERISA, the Code, and other applicable laws.

(B) All required reports and descriptions (including Form 5500 Annual Reports, Summary Annual Reports, PBGC-1's, and Summary Plan Descriptions) have been filed or distributed appropriately with respect to each such Employee Benefit Plan. The requirements of Part 6 of Subtitle B of Title I of ERISA and of Code §4980B have been met with respect to each such Employee Benefit Plan which is an Employee Welfare Benefit Plan.

(C) All contributions (including all employer contributions and employee salary reduction contributions) which are due have been paid to each such Employee Benefit Plan which is an Employee Pension Benefit Plan and all contributions for any period ending on or before the Closing Date which are not yet due have been paid to each such Employee Pension Benefit Plan or accrued in accordance with the past custom and practice of the Seller. All premiums or other payments for all periods ending on or before the Closing Date have been paid with respect to each such Employee Benefit Plan which is an Employee Welfare Benefit Plan.

(D) Each such Employee Benefit Plan which is an Employee Pension Benefit Plan meets the requirements of a "qualified plan" under Code §401(a) and has received, within the last two years, a favorable determination letter from the Internal Revenue Service.

(E) The market value of assets under each such Employee Benefit Plan which is an Employee Pension Benefit Plan (other than any Multiemployer Plan) equals or exceeds the present value of all vested and nonvested Liabilities thereunder determined in accordance with PBGC methods, factors, and assumptions applicable to an Employee Pension Benefit Plan terminating on the date for determination.

(F) The Seller has delivered to the Buyer correct and complete copies of the plan documents and summary plan descriptions, the most recent determination letter received from the Internal Revenue Service, the most recent Form 5500 Annual Report, and all related trust agreements, insurance contracts, and other funding

MW 000251

agreements which implement each such Employee Benefit Plan.

(ii) With respect to each Employee Benefit Plan that Seller maintains or ever has maintained or to which it contributes, ever has contributed, or ever has been required to contribute:

(A) No such Employee Benefit Plan which is an Employee Pension Benefit Plan (other than any Multiemployer Plan) has been completely or partially terminated or been the subject of a Reportable Event as to which notices would be required to be filed with the PBGC. No proceeding by the PBGC to terminate any such Employee Pension Benefit Plan (other than any Multiemployer Plan) has been instituted or threatened.

(B) There have been no Prohibited Transactions with respect to any such Employee Benefit Plan. No Fiduciary has any Liability for breach of fiduciary duty or any other failure to act or comply in connection with the administration or investment of the assets of any such Employee Benefit Plan. No action, suit, proceeding, hearing, or investigation with respect to the administration or the investment of the assets of any such Employee Benefit Plan (other than routine claims for benefits) is pending or threatened. Seller and its directors and officers (and employees with responsibility for employee benefits matters) possess no Knowledge of any Basis for any such action, suit, proceeding, hearing, or investigation.

(C) Seller has not incurred, and neither Seller nor its directors and officers (and employees with responsibility for employee benefits matters) have any reason to expect that Seller will incur any Liability to the PBGC (other than PBGC premium payments) or otherwise under Title IV of ERISA (including any withdrawal Liability) or under the Code with respect to any such Employee Benefit Plan which is an Employee Pension Benefit Plan.

(iii) Seller has never contributed to, or ever has been required to contribute to any Multiemployer Plan or has any Liability (including withdrawal Liability) under any Multiemployer Plan.

(iv) Seller has never maintained or contributes, ever has contributed, or ever has been required to contribute to any Employee Welfare Benefit Plan providing medical, health, or life insurance or other welfare-type benefits for current or future retired or terminated employees, their spouses, or their dependents (other than in accordance with Code §4980B).

(y) Guaranties. Seller is not a guarantor or otherwise is liable for any Liability or obligation (including indebtedness) of any other Person.

APR 23 '99  11:52AM FEZ NY 2129862399

P. 25/28

(z) Environment, Health, and Safety.

(i) Each of the Seller, and its predecessors and Affiliates has complied with all Environmental, Health, and Safety Laws, and no action, suit, proceeding, hearing, investigation, charge, complaint, claim, demand, or notice has been filed or commenced against any of them alleging any failure so to comply. Without limiting the generality of the preceding sentence, each of the Seller, and its predecessors and Affiliates has obtained and been in compliance with all of the terms and conditions of all permits, licenses, and other authorizations which are required under, and has complied with all other limitations, restrictions, conditions, standards, prohibitions, requirements, obligations, schedules, and timetables which are contained in, all Environmental, Health, and Safety Laws.

(ii) Seller has no Liability (and Seller and its predecessors and Affiliates has not handled or disposed of any substance, arranged for the disposal of any substance, exposed any employee or other individual to any substance or condition, or owned or operated any property or facility in any manner that could form the Basis for any present or future action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand against Seller giving rise to any Liability) for damage to any site, location, or body of water (surface or subsurface), for any illness of or personal injury to any employee or other individual, or for any reason under any Environmental, Health, and Safety Law.

(iii) All properties and equipment used in the business of the Seller and its respective predecessors and Affiliates have been free of asbestos, PCB's, methylene chloride, trichloroethylene, 1,2-trans-dichloroethylene, dioxins, dibenzofurans, and Extremely Hazardous Substances.

(aa) Indemnity Agreement. Seller's Stockholders have executed the Indemnity Agreement attached hereto, marked Exhibit "A" and incorporated by reference.

(bb) Disclosure. The representations and warranties contained in this §3 do not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements and information contained in this §3 not misleading.

4. Representations and Warranties of the Buyer. The Buyer represents and warrants to the Seller that the statements contained in this §4 are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this §4), except as set forth in the Disclosure Schedule. The Disclosure Schedule will be arranged in paragraphs corresponding to the lettered and numbered paragraphs contained in this §4.

(a) Organization of the Buyer. The Buyer is a corporation duly organized, validly existing, and in good standing under the laws of the jurisdiction of its incorporation.

W 000253

Raisins - Asset Purchase Agreement 3 wpd

(b) <u>Authorization of Transaction.</u> The Buyer has full power and authority (including full corporate power and authority) to execute and deliver this Agreement and to perform its obligations hereunder. This Agreement constitutes the valid and legally binding obligation of the Buyer, enforceable in accordance with its terms and conditions.

(c) <u>Noncontravention.</u> Neither the execution and the delivery of this Agreement, nor the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in §2 above), will (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which the Buyer is subject or any provision of its charter or bylaws or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which the Buyer is a party or by which it is bound or to which any of its assets is subject. The Buyer does not need to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or governmental agency in order for the Parties to consummate the transactions contemplated by this Agreement (including the assignments and assumptions referred to in §2 above).

(d) <u>Brokers' Fees.</u> Buyer is to pay American Auditors an acquisition fee pursuant to a separate written agreement between said parties. Seller has no Liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement for which the Buyer may become liable or obligated.

5. <u>Pre-Closing Covenants.</u> The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing.

(a) <u>General.</u> Each of the Parties will use its reasonable best efforts to take all action and to do all things necessary, proper, or advisable in order to consummate and make effective the transactions contemplated by this Agreement (including satisfaction, but not waiver, of the closing conditions set forth in §6 below). ·

(b) <u>Notices and Consents.</u> The Seller will give any notices to third parties that the Buyer reasonably may request in connection with the matters referred to in §3(c) above. Each of the Parties will give any notices to, make any filings with, and use its reasonable best efforts to obtain any authorizations, consents, and approvals of governments and governmental agencies in connection with the matters referred to in §3(c) and §4(c) above.

(c) <u>Operation of Business.</u> The Seller will not engage in any practice, take any action, or enter into any transaction outside the Ordinary Course of Business. Without limiting the generality of the foregoing, the Seller will not (i) declare, set aside, or pay any dividend or make any distribution with respect to its capital stock or redeem, purchase, or otherwise acquire any of its capital stock, (ii) pay any amount to any third party with respect to any Liability or obligation (including any costs and expenses the Seller has incurred or may incur in connection with this Agreement and the transactions

WP 000254

contemplated hereby) which would not constitute an Assumed Liability if in existence as of the Closing, (iii) otherwise engage in any practice, take any action, or enter into any transaction of the sort described in §3(h) above.

(d) <u>Preservation of Business.</u> The Seller will keep its business and properties substantially intact, including its present operations, physical facilities, working conditions, and relationships with lessors, licensors, suppliers, customers, and employees.

(e) <u>Full Access.</u> The Seller will permit representatives of the Buyer to have full access at all reasonable times, and in a manner so as not to interfere with the normal business operations of the Seller to all premises, properties, personnel, books, records (including Tax records), contracts, and documents of or pertaining to Seller.

(f) <u>Notice of Developments.</u> Each Party will give prompt written notice to the other Party of any material adverse development causing a breach of any of its own representations and warranties in §3 and §4 above. No disclosure by any Party pursuant to this §5(f), however, shall be deemed to amend or supplement the Disclosure Schedule or to prevent or cure any misrepresentation, breach of warranty, or breach of covenant.

(g) <u>Exclusivity.</u> The Seller will not (and the Seller will not cause or permit any of its Subsidiaries to) (i) solicit, initiate, or encourage the submission of any proposal or offer from any Person relating to the acquisition of any capital stock or other voting securities, or any substantial portion of the assets, of Seller (including any acquisition structured as a merger, consolidation, or share exchange) or (ii) participate in any discussions or negotiations regarding, furnish any information with respect to, assist or participate in, or facilitate in any other manner any effort or attempt by any Person to do or seek any of the foregoing. The Seller will notify the Buyer immediately if any Person makes any proposal, offer, inquiry, or contact with respect to any of the foregoing.

## 6. <u>Conditions to Obligation to Close.</u>

(a) <u>Conditions to Obligation of the Buyer.</u> The obligation of the Buyer to consummate the transactions to be performed by it in connection with the Closing is subject to satisfaction of the following conditions:

(i) the representations and warranties set forth in §3 above shall be true and correct in all material respects at and as of the Closing Date;

(ii) the Seller shall have performed and complied with all of its covenants hereunder in all material respects through the Closing;

(iii) the Seller and its Subsidiaries shall have procured all of the third party consents

MW7 000255

000031

specified in §5(b) above;

(iv) no action, suit, or proceeding shall be pending before any court or quasi-judicial or administrative agency of any federal, state, local, or foreign jurisdiction or before any arbitrator wherein an unfavorable injunction, judgment, order, decree, ruling, or charge would (A) prevent consummation of any of the transactions contemplated by this Agreement, (B) cause any of the transactions contemplated by this Agreement to be rescinded following consummation, or (C) affect adversely the right of the Buyer to own the Acquired Assets and to operate the former businesses of the Seller;

(v) the Seller shall have delivered to the Buyer a certificate to the effect that each of the conditions specified above in §6(a)(i)-(iv) is satisfied in all respects; and

(vi) the relevant parties shall have entered into side agreements in form and substance as set forth in Exhibits G through H attached hereto and the same shall be in full force and effect; and

The Buyer may waive any condition specified in this §6(a) if it executes a writing so stating at or prior to the Closing.

(b) Conditions to Obligation of the Seller. The obligation of the Seller to consummate the transactions to be performed by it in connection with the Closing is subject to satisfaction of the following conditions:

(i) the representations and warranties set forth in §4 above shall be true and correct in all material respects at and as of the Closing Date;

(ii) the Buyer shall have performed and complied with all of its covenants hereunder in all material respects through the Closing;

(iii) no action, suit, or proceeding shall be pending before any court or quasi-judicial or administrative agency of any federal, state, local, or foreign jurisdiction or before any arbitrator wherein an unfavorable injunction, judgment, order, decree, ruling, or charge would (A) prevent consummation of any of the transactions contemplated by this Agreement or (B) cause any of the transactions contemplated by this Agreement to be rescinded following consummation (and no such injunction, judgment, order, decree, ruling, or charge shall be in effect);

(iv) the Buyer shall have delivered to the Seller a certificate to the effect that each of the conditions specified above in §6(b)(i)-(iii) is satisfied in all respects;

(v) the relevant parties shall have entered into side agreements in form and substance as set forth in Exhibits G through H and the same shall be in full force and effect;

W/7 000256

24

23 '99  12:28PM FEZ NY 2129862399

P.2/36

The Seller may waive any condition specified in this §6(b) if it executes a writing so stating at or prior to the Closing.

### 7. Termination.

(a) Termination of Agreement. Certain of the Parties may terminate this Agreement as provided below:

(i) the Buyer and the Seller may terminate this Agreement by mutual written consent at any time prior to the Closing;

(ii) the Buyer may terminate this Agreement by giving written notice to the Seller at any time prior to the Closing (A) in the event the Seller has breached any material representation, warranty, or covenant contained in this Agreement in any material respect, the Buyer has notified the Seller of the breach, and the breach has continued without cure for a period of 10 days after the notice of breach or (B) if the Closing shall not have occurred on or before December 30, 1998, by reason of the failure of any condition precedent under §6(a) hereof (unless the failure results primarily from the Buyer itself breaching any representation, warranty, or covenant contained in this Agreement); and

(iii) the Seller may terminate this Agreement by giving written notice to the Buyer at any time prior to the Closing (A) in the event the Buyer has breached any material representation, warranty, or covenant contained in this Agreement in any material respect, the Seller has notified the Buyer of the breach, and the breach has continued without cure for a period of 10 days after the notice of breach or (B) if the Closing shall not have occurred on or before December 30, 1998, *or if the June 30, 1999 funding referenced in section 2 C shall have not occurred by reason of buyers default,* by reason of the failure of any condition precedent under §6(b) hereof (unless the failure results primarily from the Seller itself breaching any representation, warranty, or covenant contained in this Agreement).

(b) Effect of Termination. If any Party terminates this Agreement pursuant to §7(a) above, all rights and obligations of the Parties hereunder shall terminate without any Liability of any Party to any other Party (except for any Liability of any Party then in breach).

### 8. Post Closing Obligations.
Buyer shall within 30 days of closing obtained on terms and conditions reasonably satisfactory to it and to Jack Mazin financing to fund the working capital requirements of the acquired business in an amount not less than $750,000.00, which financing shall be secured by the assets of the business and not require the personal guarantee of Jack Mazin.

### 9. Miscellaneous.

(a) Survival of Representations and Warranties. All of the representations and warranties of

the Parties contained in this Agreement shall survive the Closing hereunder as and to the extent provided in the Agreement with Seller Stockholders.

(b) Press Releases and Public Announcements. No Party shall issue any press release or make any public announcement relating to the subject matter of this Agreement prior to the Closing without the prior written approval of the other Party; provided, however, that any Party may make any public disclosure it believes in good faith is required by applicable law or any listing or trading agreement concerning its publicly-traded securities (in which case the disclosing Party will use its reasonable best efforts to advise the other Party prior to making the disclosure).

(c) No Third-Party Beneficiaries. This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

(d) Entire Agreement. This Agreement (including the documents referred to herein) constitutes the entire agreement between the Parties and supersedes any prior understandings, agreements, or representations by or between the Parties, written or oral, to the extent they related in any way to the subject matter hereof.

(e) Succession and Assignment. This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns. No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other Party; provided, however, that the Buyer may (i) assign any or all of its rights and interests hereunder to one or more of its Affiliates and (ii) designate one or more of its Affiliates to perform its obligations hereunder (in any or all of which cases the Buyer nonetheless shall remain responsible for the performance of all of its obligations hereunder).

(f) Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.

(g) Headings. The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

(h) Notices. All notices, requests, demands, claims, and other communications hereunder will be in writing. Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given if (and then two business days after) it is sent by registered or certified mail, return receipt requested, postage prepaid, and addressed to the intended recipient as set forth below:

If to the Seller:

Jack Mazin
c/o Amazin Raisins
36 German Mills Road

Copy to:

Robert E. Semensohn, Esq.
585 Stewart Avenue, Suite 318
Garden City, New York 11530

000034

23 '99  12:29PM FEZ NY 2129862399

P. 4/36

Thornhill Provence, Ontario, Canada
L3T4H5
Ph # 506-789-7605
Fax # 506-789-0190 (905-707-8425)

Fax: (516) 227-2741

If to the Buyer:

Copy to:

Michael Dougherty
Pacific Standard Financial Group, Inc.,
199 Broadway
Laguna Beach, CA 92651
Fax (714) 719-1988

Any Party may send any notice, request, demand, claim, or other communication hereunder to the intended recipient at the address set forth above using any other means (including personal delivery, expedited courier, messenger service, telecopy, telex, ordinary mail, or electronic mail), but no such notice, request, demand, claim, or other communication shall be deemed to have been duly given unless and until it actually is received by the intended recipient. Any Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Party notice in the manner herein set forth.

(i) Governing Law. This Agreement shall be governed by and construed in accordance with the domestic laws of the State of California without giving effect to any choice or conflict of law provision or rule (whether of the State of Nevada or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of California.

(j) Amendments and Waivers. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by the Buyer and the Seller. No waiver by any Party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

(k) Severability. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

(l) Expenses. Each of the Buyer and the Seller will bear his or its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby.

A:\Raisins - Asset Purchase Agreementv.3.wpd          27

WP 000259

000035

23 '99  12:30PM FEZ NY 2129862399

P. 5/36

(m) Construction. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The word "including" shall mean including without limitation.

(n) Incorporation of Exhibits and Schedules. The Exhibits and Schedules identified in this Agreement are incorporated herein by reference and made a part hereof.

(o) Specific Performance. Each of the Parties acknowledges and agrees that the other Party would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached. Accordingly, each of the Parties agrees that the other Party shall be entitled to an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof in any action instituted in any court of the United States or any state thereof having jurisdiction over the Parties and the matter [(subject to the provisions set forth in §8(p) below)], in addition to any other remedy to which it may be entitled, at law or in equity.

(p) Submission to Jurisdiction. Each of the Parties submits to the jurisdiction of any state or federal court sitting in the Southern District of California or County of Dade in any action or proceeding arising out of or relating to this Agreement and agrees that all claims in respect of the action or proceeding may be heard and determined in any such court.

(o) Bulk Transfer Laws. The Buyer acknowledges that the Seller will not comply with the provisions of any bulk transfer laws of any jurisdiction in connection with the transactions contemplated by this Agreement.

000036

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on [as of] the date first above written.


Pacific Standard Financial Group, Inc.,
a Nevada corporation

By: _____
        Michael Dougherty
Title:   President


AMAZIN RAISINS INTERNATIONAL INC
a Delaware corporation

By: _____
        Jack Mazin
Title:   President

000261    PM7

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on [as of] the date first above written.


Pacific Standard Financial Group, Inc.,
a Nevada corporation

By: _____
    Michael Dougherty
Title:   President

AMAZIN RAISINS INTERNATIONAL INC
a Delaware corporation

By: _____
    Jack Mazin
Title:   President

MP 000262

000038

23 '99 12:31PM FEZ NY 2129862399

P.6/36

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on [as of] the date first above written.

Pacific Standard Financial Group, Inc.,
a Nevada corporation

By: _____
        Michael Dougherty
Title:   President

AMAZIN RAISINS INTERNATIONAL INC
a Delaware corporation

By: _____
        Jack Mazin
Title:   President

000263 מש

23 '99  12:31PM FEZ NY 2129862399

P.7/36

EXHIBIT "A"

Indemnity Agreement with Seller's Stockholders

EXHIBIT "B"

List of Acquired Assets

All right, title, and interest in and to all of the assets of the Seller, including all of its

1.  Real property, leaseholds and sub-leaseholds therein, improvements, fixtures, and fittings thereon, and easements, rights-of-way, and other appurtenants thereto (such as appurtenant rights in and to public streets),

(b)  Tangible personal property (such as machinery, equipment, inventories of raw materials and supplies, manufactured and purchased parts, goods in process and finished goods, furniture, automobiles, trucks, tractors, trailers, tools, jigs, and dies),

2.  Intellectual Property, Patents, goodwill associated therewith, licenses and sub-licenses granted and obtained with respect thereto, and rights thereunder, remedies against infringements thereof, and rights to protection of interests therein under the laws of all jurisdictions,

3.  Leases, subleases, and rights thereunder,

(d)  Agreements, contracts, indentures, mortgages, instruments, Security Interests, guaranties, other similar arrangements, and rights thereunder,

(f)  Accounts, notes, and other receivables,

(g)  Securities (such as the capital stock in its Subsidiaries),

(h)  Claims, deposits, prepayments, refunds, causes of action, choses in action, rights of recovery, rights of set off, and rights of recoupment (including any such item relating to the payment of Taxes),

(i)  Franchises, approvals, permits, licenses, orders, registrations, certificates, variances, and similar rights obtained from governments and governmental agencies,

(j)  Books, records, ledgers, files, documents, correspondence, lists, plats, architectural plans, drawings, and specifications, creative materials, advertising and promotional materials, studies, reports, and other printed or written materials,

(k)  Cash, and

(l)  Rights in and with respect to the assets associated with its Employee Benefit Plans;

23 '99  12:32PM FEZ NY 2129862399

P. 9/36

provided, however, that the Acquired Assets shall not include (i) the corporate charter, qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, blank stock certificates, and other documents relating to the organization, maintenance, and existence of the Seller as a corporation or (ii) any of the rights of the Seller under this Agreement (or under any side agreement between the Seller on the one hand and the Buyer on the other hand entered into on or after the date of this Agreement).

AMO 000267

23 '99  12:33PM FEZ NY 2129862399

P.10/36

# EXHIBIT "C"

## List and Forms of Assignments

23 '99  12:33PM FEZ NY 2129862399

P. 11/36

EXHIBIT "D"

List of Assumed Liabilities
Form of Assumption

All Liabilities of the Seller set forth on the face of the Most Recent Balance Sheet (rather than in any notes thereto),

All Liabilities of the Seller which have arisen after the Most Recent Fiscal Month End in the Ordinary Course of Business (other than any Liability resulting from, arising out of, relating to, in the nature of, or caused by any breach of contract, breach of warranty, tort, infringement, or violation of law)

All obligations of the Seller under the agreements, contracts, leases, licenses, and other arrangements referred to in the definition of Acquired Assets either

(i)     to furnish goods, services, and other non-Cash benefits to another party after the Closing, or

(ii)    to pay for goods, services, and other non-Cash benefits that another party will furnish to it after the Closing, and

All other Liabilities and obligations of the Seller set forth in an appendix to the Disclosure Schedule under an express statement (that the Buyer has initialed) to the effect that the definition of Assumed Liabilities will include the Liabilities and obligations so disclosed; provided, however, that the Assumed Liabilities shall not include

(i)     any Liability of the Seller for Taxes,

(ii)    any Liability of the Seller for the unpaid Taxes of any Person (other than any of the Seller and its Subsidiaries) under Reg. §1.1502-6 (or any similar provision of state, local, or foreign law), as a transferee or successor, by contract, or otherwise,

(iii)   any obligation of the Seller to indemnify any Person (including any of the Seller Stockholders) by reason of the fact that such Person was a director, officer, employee, or agent of any of the Seller and its Subsidiaries or was serving at the request of any such entity as a partner, trustee, director, officer, employee, or agent of another entity (whether such indemnification is for judgments, damages, penalties, fines, costs, amounts paid in settlement, losses, expenses, or otherwise and whether such indemnification is pursuant to any statute, charter document, bylaw, agreement, or otherwise),

(iv)    any Liability of the Seller for costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby, or

(v)     any Liability or obligation of the Seller under this Agreement (or under any side agreement between the Seller on the one hand and the Buyer on the other hand entered into on or after the date of this Agreement).

:\Raisins - Asset Purchase Agreementv.3.wpd                34                        000045

23 '99  12:34PM FEZ NY 2129862399

P.12/36

EXHIBIT "E"

Allocation Schedule

000270

23 '99  12:35PM FEZ NY 2129862399

P.13/36

EXHIBIT "F"

Seller's Financial Statements and Tax Returns

000047

23 '99  12:35PM FEZ NY 2129862399

P.14/36

EXHIBIT "G"

Management Stock Bonus Agreement

000272

23 '99  12:36PM FEZ NY 2129862399

P.15/36

EXHIBIT "H"

Employment Agreement

-:\Raisins - Asset Purchase Agreementv.3.wpd

000049

'99  12:36PM FEZ NY 2129862399

P. 16/36

EXHIBIT "I"

Disclosure Statement

§ 3 Representations and Warranties of Seller.

Seller Disclosure Statement
Any exceptions to § 3 of Agreement listed in Disclosure Statement

(a)    Organization of Seller
(b)    Authorization of Board of Directors to Sell
(c)    Noncontravention (sale will not violate corporate charter, bylaws, laws or contract)
(d)    No Commissions/Brokerage Fees
(e)    Good/Marketable Title to Acquired Assets
(f)    Tax Returns/Financial Statements (Exhibit F) are true and correct
(g)    No material changes since date of most recent Financial Statement/Tax Return
h)     No undisclosed liabilities or pending/threatened litigation
i)     Seller and its predecessors have complied with all laws - no citations/charges
i)     Seller has filed all tax returns, no extensions, paid all taxes, no assessments/liens
:)     (Blank)
j      All real property and leases of Seller listed and described/ copies of leases attached/breaches
       or defaults do not exist or are described.
l)     Intellectual Property - all copyrights, patents, trademarks, tradenames or licenses for any of
       the foregoing are listed and identified by registration number, etc.   Seller warrants its right
       to use all tradenames, manufacturing processes, designs, etc. . .
       Right to Use All Equipment on Premises  - working and in good order except for ordinary
       wear and tear
       Inventory on Premises if merchantable and fit for use in Seller's operations — no obsolete,
       damaged or defective inventory which should be written down or off
       List of Contracts to which Seller is a party [purchase contracts in excess of $5,000 or that
       extend over a one year period of time; leases; joint venture or partnership agreements;
       security agreements; loan agreements; confidentiality & non-competition agreements Copies
       of all agreements attached.
       Notes and Receivables and reserve for Bad Debts, properly accounted for (i.e., not subject
       to claims for setoffs or counterclaims or are uncollectible)
       No Powers of Attorney
       List of All Insurance Policies -limits, policy periods, names of insureds, names/addresses
       of agents; premium information; unless stated, all policies in force and effect, Seller knows
       of no breach of false information on applications
       Litigation    Pending, Threatened and Historical -- all types, state, federal, administrative,
                     arbitrations,
       Product Warranty information - terms of warranties

AP 000273

000051

(v)   Product Warranty claims -
(w)   Employee / workforce remains intact, no threatened or pending resignations
(x)   Employee Benefit Plans Identified
(y)   Guaranties (If Seller is a guarantor, obligation is identified, described)
(z)   Compliance with Health, Safety Regulatory Laws
(aa)  Indemnity Signed
(bb)  Representations and Warranties are true and correct

4.   Buyer's Warranties

Disclosure Statement of Buyer

a)   Buyer is a Nevada corporation, duly organized, validly existing, good standing
b)   Authorization to consummate transaction
c)   Non-contravention
d)   No Broker's Fees other than American Auditors

Pacific Standard Financial Group, Inc.,
a Nevada corporation

By: _____
     Michael Dougherty
Title:  President


AMAZIN RAISINS INTERNATIONAL INC.
a Delaware Corporation

By: _____
     Jack Mazin
Title:  President

000052

APR 23 '99  12:37PM FEZ NY 2129862399

| | |
|---|---|
| (v) | Product Warranty claims - |
| (w) | Employee / workforce remains intact, no threatened or pending resignations |
| (x) | Employee Benefit Plans Identified |
| (y) | Guaranties (If Seller is a guarantor, obligation is identified, described) |
| (z) | Compliance with Health, Safety Regulatory Laws |
| (aa) | Indemnity Signed |
| (bb) | Representations and Warranties are true and correct |

Disclosure Statement of Buyer

| | |
|---|---|
| c) | Non-contravention |
| d) | No Broker's Fees other than American Auditors |

Pacific Standard Financial Group, Inc.,
a Nevada corporation

By: _____
    Michael Dougharty
Title:  President


AMAZIN RAISINS INTERNATIONAL INC.
a Delaware Corporation

By: _____
    Jack Mazin
Title:   President

0000276

(v)     Product Warranty claims -
(w)     Employee / workforce remains intact, no threatened or pending resignations
(x)     Employee Benefit Plans Identified
(y)     Guaranties (If Seller is a guarantor, obligation is identified, described)
(z)     Compliance with Health, Safety Regulatory Laws
(aa)    Indemnity Signed
(bb)    Representations and Warranties are true and correct

Disclosure Statement of Buyer

c)      Non-contravention
d)      No Broker's Fees other than American Auditors

Pacific Standard Financial Group, Inc.,
a Nevada corporation

By: _____
        Michael Dougherty
Title:  President


AMAZIN RAISINS INTERNATIONAL INC.
a Delaware Corporation

By: _____
        Jack Mazin
Title:  President

# EXHIBIT 17

## ASSIGNMENT

WHEREAS, AMAZIN RAISINS INTERNATIONAL, INC, of 16 Harmony Hall, Richmond Hill, Ontario L4C 8Z1, Canada, the Assignor, has acquired from the inventors, Jack G. Mazin and Amir Lalji, the entire right, title and interest in United States Patent 5,188,861, which issued on February 23, 1993, entitled PROCESS FOR PREPARING A DRIED FRUIT PRODUCT,

AND WHEREAS, AMAZING FRUIT PRODUCTS LTD. a Corporation of Ontario Canada, Suite 102, 1 Concorde Gate, Toronto, Ontario M3C 3N6, Canada, hereinafter the Assignee, is desirous of acquiring the entire right, title and interest in and to the Patent within the United States of America and its territorial possessions and all foreign countries therefor.

NOW, THIS INDENTURE WITNESSETH, That for and in consideration of the sum of Ten Dollars, in hand paid to it, and other good and valuable consideration, the receipt whereof is hereby acknowledged, the Assignors have assigned, sold and transferred, and does hereby assign, sell and transfer to the Assignee the entire right, title and interest in the Patent, within the United States of America and its territorial possessions and all foreign countries, and in and to all other applications for LETTERS PATENT for the invention in all other countries, and in and to all divisions and continuations of any of said applications, and in and to any LETTERS PATENT of the United States and foreign countries and all reissues and extensions thereof that may be granted, and the right to apply for LETTERS PATENT in foreign countries with full benefit of such priorities as may now or hereafter be granted to us by local laws or by treaty, including any international convention, for the protection of industrial property, together with the right to extend the protection for said U.S. LETTERS PATENT to the various territorial possessions now owned or which may be hereafter acquired by the United States of America, all said rights to be held and enjoyed by the Assignee for its own use and behoof, and

**PATENT**
**REEL: 015870 FRAME: 0847**

for the use and behoof of its successors or assigns, to the full end
of the respective terms for which said LETTERS PATENTS may be granted,
as fully and entirely as the same would have been held and enjoyed by
the Assignors if this assignment sale had not been made.

In further consideration of said sum of Ten Dollars, and said
other good and valuable consideration, to it paid, the Assignee
covenants and agrees with the Assignee that it has a full and
unencumbered title to the patent hereby assigned, which title is
warranted unto the Assignee, and further agree that they will, without
demanding any further consideration therefor, at the request but at
the expense of the Assignee, do all lawful and just acts, including
the execution and acknowledgment of instruments, furnishing of
information and giving of testimony, that may be or become necessary
for obtaining, sustaining, reexamining or reissuing said United States
and any foreign LETTERS PATENTS for the said invention, and for
maintaining and perfecting the Assignee's right to said invention and
LETTERS PATENT(S), particularly in cases of interference and
litigation.

Signed on behalf of the Assignor and as a legal act thereof this
_31_ day of January 2005.

_____

Jack G. Mazin          President

DECLARATION OF WITNESS

I, _Josh Shanek_ whose full post office address is _3_
_Innisbrook Cres, Thornhill, L3T5A4_, hereby declare that I was personally
present and did see Jack G. Mazin who is personally known to me to be
the person named in the above assignment duly sign and execute the
same.

DECLARED at _Toronto, Ontario_, this _31_ day of January
2005.

PATENT
REEL: 015870 FRAME: 0848

IAR. 10. 2005  6:10PM     DOWELL & DOWELL, P.C.                    NO. 2045   P. 4

_Josh  Granek_

Printed name (Witness)

_Josh Granek_

Signature of Witness

### DECLARATION OF WITNESS

I, _Corinne Mazin_ whose full post office address is _36 German Mills road, Thornhill, on, L3T4N5_ hereby declare that I was personally present and did see _Jack G. Mazin_ who is personally known to me to be the person named in the above assignment duly sign and execute the same.

DECLARED at _Toronto, ontario_, this _31st_ day of _January_ 2005.

_Corinne. Mazin_

Printed name (Witness)

_Corinne Mazin_

Signature of Witness

**RECORDED: 03/10/2005**

**PATENT
REEL: 015870 FRAME: 0849**

# EXHIBIT 18



1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10                       SOUTHERN DIVISION

11  BRETT SALTER,                    )  SA CV 99-912 AHS
                                     )
12                Plaintiff,         )
                                     )  FINDINGS OF FACT AND
13          v.                       )  CONCLUSIONS OF LAW AFTER BENCH
                                     )  TRIAL
14  MERVYN PHELAN et al.,            )
                                     )
15                Defendants.        )
    _____)

16

17          Trial to the Court was held February 8, 2005.  Pursuant

18  to Fed. R. Civ. P. 52 and Local Rule 52 of the Central District

19  of California, the Court issues its findings of fact and

20  conclusions of law with respect to all remaining claims in this

21  action concerning plaintiff Brett Salter ("Plaintiff"),

22  individually and derivatively on behalf of Capitol Silver Mines,

23  Inc. (now known as Internet Culinary Corp.) ("CSM") and all

24  defendants.

25                              I.

26                      **FINDINGS OF FACT**

27  A.      **Defendants' Fraudulent Scheme**

28          1.   At all times relevant hereto, CSM was a

1  corporation incorporated under the laws of the State of Idaho.

2       2.   Defendants Mervyn Phelan ("Phelan"), Bo Phelan

3  ("Bo Phelan"), Craig Brown ("Brown"), and Tom Reichman

4  ("Reichman") embarked upon a scheme to manipulate the market in

5  and for CSM stock, which scheme was designed to harm CSM and to

6  deceive and defraud Plaintiff and other purchasers of CSM stock.

7       3.   In April 1999, in an effort to cause CSM stock to

8  trade and to manipulate the market in and for CSM stock,

9  defendant Phelan, purporting to act as Controller of CSM (with

10  the assistance, consent, and approval of defendants Bo Phelan and

11  Brown), transmitted an "Issuer Information and Disclosure

12  Statement Pursuant to Rule 15c2-11" (the "Disclosure Statement")

13  and an application to Standard & Poors, which knowingly, falsely

14  stated that CSM was a "manufacturer of cheese, frozen foods and

15  specialty flavored raisins."

16       4.   In an effort to cause CSM stock to trade and to

17  manipulate the market in and for CSM stock, defendant Bo Phelan,

18  purporting to act on behalf of CSM, also transmitted

19  correspondence and documents to Standard & Poors in April 1999.

20       5.   In May 1999, defendants Phelan, Brown, and Bo

21  Phelan knowingly, falsely represented to Plaintiff that CSM had

22  acquired a raisin company known as Amazin' Raisins.  In fact, at

23  the time of this representation, CSM had not acquired Amazin'

24  Raisins (and in fact never acquired Amazin' Raisins).

25       6.   In May 1999, defendants Phelan, Brown, and Bo

26  Phelan knowingly, falsely represented to Plaintiff that CSM had

27  acquired a cheese company known as Delta Valley Farms.  In fact,

28  at the time of this representation, CSM had not acquired Delta

1  Valley Farms (and in fact never acquired Delta Valley Farms).

2         7.   Defendant Reichman also knowingly, falsely

3  represented to Plaintiff that the acquisitions of Amazin' Raisins

4  and Delta Valley Farms had been completed.

5         8.   Defendants Phelan and Brown knowingly, falsely

6  represented to Plaintiff that they could and would arrange for

7  Plaintiff to acquire five million shares of restricted CSM stock

8  and control of CSM for $125,000.

9         9.   These defendants further knowingly, falsely

10 represented that the money ($125,000) would not be released and

11 the transaction funded unless and until the acquisitions of Delta

12 Valley Farms and Amazin' Raisins by CSM had been completed.

13        10.  Defendants Phelan and Brown presented Plaintiff

14 with the Disclosure Statement and application to Standard &

15 Poors, which knowingly, falsely stated that CSM was a

16 "manufacturer of cheese, frozen foods and specialty flavored

17 raisins," among other things.

18        11.  Defendants Phelan, Bo Phelan, and Brown also

19 knowingly, falsely represented to Plaintiff (and to CSM's

20 transfer agent, ostensibly through defendants Reichman and former

21 defendant David Kagel) that five million "504 Shares" had been

22 duly authorized by CSM and had been issued for consideration

23 delivered to CSM.  Defendants Phelan, Bo Phelan, and Brown

24 falsely represented to Plaintiff that the five million "504

25 Shares" would be locked up and not available for sale or sold for

26 a period of one year, after which they could be sold, with one

27 half of the proceeds to Plaintiff.  In fact, these defendants

28 never intended to lock up any of the "504 Shares" and instead

3

1  intended to issue the "504 Shares" to themselves (or nominees

2  which they controlled, either directly or indirectly) and

3  intended to (and did) sell or cause the sale of the "504 Shares"

4  in the market, thereby obtaining hundreds of thousands of dollars

5  in wrongfully obtained proceeds.

6          12.  Defendants Phelan, Bo Phelan, Brown, and Reichman

7  knew the foregoing representations were false.

8          13.  Each of these defendants intended to defraud

9  Plaintiff in making the referenced misrepresentations.

10         14.  Plaintiff was justified in relying on those

11 misrepresentations as there was no reason for Plaintiff not to

12 believe the accuracy of the representations.

13         15.  Plaintiff relied on these misrepresentations and

14 omissions by, among other things, entering into an agreement with

15 defendants Phelan, Bo Phelan, and Brown, acquiring 5,000,000

16 restricted shares of CSM stock for the payment of $125,000

17 pursuant to that agreement, and purchasing additional shares of

18 CSM stock in the market, including "504 Shares," for the accounts

19 of others.

20         16.  As a result of and in reliance upon these

21 defendants' misrepresentations and omissions, Plaintiff paid

22 $125,000 for 5 million restricted shares of CSM stock and control

23 of CSM.

24         17.  Plaintiff and defendants Phelan, Bo Phelan, and

25 Brown entered into an agreement dated May 18, 1999.  Pursuant to

26 this agreement, the parties agreed, among other things, that the

27 "504 Shares" would not be issued until the acquisitions of

28 Amazin' Raisins and Delta Valley Farms by CSM were completed,

4

1  that the "504 Shares" would be locked up and not sold for one

2  year, and that thereafter, at defendants' election, those shares

3  would be sold and the proceeds split 50/50 between defendants and

4  Plaintiff.

5       18.  Plaintiff performed pursuant to the May 18, 1999

6  agreement except insofar as excused or prevented by defendants

7  Phelan, Bo Phelan, and Brown.

8  **B.        Issuance and Sale of the "504 Shares"**

9       19.  In furtherance of their scheme, in June 1999,

10  defendants Phelan, Bo Phelan, Brown, and Reichman surreptitiously

11  caused, facilitated and/or directed the issuance and

12  certification of 2,795,000 CSM "504 Shares" by share certificate

13  numbers 1001 through 1017.

14       20.  On or about June 8, 1999, defendant Reichman, at

15  the direction and behest of defendants Phelan, Bo Phelan, and

16  Brown, directed CSM's transfer agent, American Securities

17  Transfer and Trust, to issue certificates for 2,795,000 shares of

18  "504 Shares" without restrictive legend, notwithstanding the

19  facts that the shares were not duly authorized by CSM and that

20  CSM received no consideration for said shares which, if lawfully

21  issued, would have been restricted.

22       21.  In order to conceal their scheme and affiliate

23  status, these defendants caused the "504 Shares" to be

24  certificated in the names of, and delivered to, nominees.  With

25  the exception of one share certificate in the name of Neil

26  Leibman (cert. no. 1014), defendants Phelan, Bo Phelan, and/or

27  Brown exercised beneficial ownership and control over all of the

28  "504 Shares."

22.  Certificate nos. 1001 through 1013 and 1015 through 1017 of the "504 Shares" were issued by CSM's transfer agent, at the direction of defendants Reichman, Phelan, Bo Phelan, and Brown, in the name of entities and individuals who and which were nominees for defendants Phelan, Bo Phelan, and Brown.  These defendants exercised control and a beneficial ownership interest in the "504 Shares" held in the names of these nominees.      23.  No registration statement was filed with the Securities and Exchange Commission ("SEC") with respect to the issuance of the "504 Shares."

24.  The "504 Shares" were not qualified (i.e., registered) with the California Corporations Commissioner.

25.  Prior to the issuance of the "504 Shares," there was a total of approximately 378,000 shares of CSM common stock issued and outstanding.

26.  Except for the one share certificate delivered and retained by Neil Leibman (certificate no. 1014), all of the "504 Shares" (evidenced by certificate numbers 1001-1013 and 1015-1017) were delivered to defendants who are California residents.

27.  The certificates for the 2,795,000 "504 Shares" (share certificate numbers 1001 through 1017) did not contain a restrictive legend.

28.  CSM's bylaws require that duly authorized certificates of CSM stock bear the signature of the President and the Secretary of CSM (or such other officers as are authorized by the board of directors, which authorization never happened).

29.  The certificates for the 2,795,000 "504 Shares" (share certificate numbers 1001 through 1017) were signed only by

1  (or for) defendant Reichman, purportedly as then President of

2  CSM, acting at the direction and behest of defendants Phelan, Bo

3  Phelan, and Brown.

4          30.  There was no board meeting authorizing the

5  issuance of the "504 Shares" at which a majority of the board of

6  directors of CSM was present and authorized the issuance of the

7  "504 Shares."

8          31.  There was no written consent signed by all members

9  of the board of directors of CSM authorizing the issuance of the

10  "504 Shares."

11          32.  CSM received no consideration in exchange for the

12  issuance of the "504 Shares."

13          33.  As part of their scheme to sell the "504 Shares"

14  into the market, these defendants caused brokerage accounts to be

15  opened, typically in the names of others, including "American

16  Auditors," a name they used, and thereafter caused the sale of

17  thousands of the "504 Shares" into the public market.

18          34.  In June 1999, at the direction of one or more of

19  defendants Phelan, Bo Phelan, and Brown, David Kagel opened an

20  account (Account No. 19860014) in the name of American Auditors,

21  LLC at Emmett A. Larkin Company, Inc. ("Larkin"), with respect to

22  which David Kagel supposedly was "trustee" (the "Kagel/American

23  Auditors Account").

24          35.  In an effort to effectuate the sale of "504

25  Shares" and the release of proceeds from the sale of "504

26  Shares," defendants Phelan, Bo Phelan, and Brown directed David

27  Kagel, acting as attorney for CSM and/or for "American Auditors,"

28  to transmit correspondence to third parties, including but not

1 | limited to Larkin, in which Mr. Kagel represented, among other
2 | things, that the "504 Shares" had been lawfully issued and sold,
3 | and were freely tradeable.

4 |          36.  Defendants Phelan, Brown, and Bo Phelan executed
5 | documents authorizing the release of 980,000 "504 Shares" into
6 | the Kagel/American Auditors Account (certificated in the names of
7 | Shockacon Gas Corporation (cert. no. 1003), Evergreen Manor II
8 | (cert. no. 1002), Broadway Acacia, LLC (cert. no. 1001)and Valley
9 | Health Center (cert. no. 1011)), and thereafter caused the sale
10 | of certain of those "504 Shares" out of said account in June
11 | 1999.

12 |          37.  Defendants Phelan, Bo Phelan, Brown, and Reichman
13 | caused the sale of at least two hundred thousand "504 Shares" in
14 | the public market in June 1999.  The sale of "504 Shares" at the
15 | direction of defendants Phelan, Brown, and Bo Phelan enabled
16 | these defendants to obtain hundreds of thousands of dollars in
17 | wrongfully obtained proceeds.

18 |          38.  From June 22, 1999 to June 25, 1999, 175,500 "504
19 | Shares" were sold out of the Kagel/American Auditors Account at
20 | the direction of defendants Phelan, Bo Phelan, and/or Brown.

21 |          39.  Proceeds in the amount of $250,000 from the sale
22 | of "504 Shares" held in the Kagel/American Auditors Account were
23 | wired at the direction of defendants Phelan, Brown, or Bo Phelan,
24 | into an account held in the name of Fidelity Capital Group
25 | Holdings, Inc. (an entity controlled by defendant Brown), which
26 | monies were withdrawn and disposed of by or at the direction of
27 | defendant Phelan and/or Brown on or about June 24, 1999.

28 |          40.  From June 17, 1999 to June 25, 1999, 20,000 "504

Shares" were sold through Account No. 509-133116-230 in the name of American Accounting (controlled by defendant Phelan) at Morgan Stanley, generating approximately $187,000 in proceeds, which proceeds were transferred out of that account by way of three checks, dated June 18, June 21, and June 23, made payable to "American Accounting, Attn. Mervyn Phelan."

41. Instead of benefitting the corporation, the proceeds of the sale of the "504 Shares" went (through shell companies and nominees) to the individuals who then controlled and misused the corporate machinery of CSM, including defendants Phelan, Bo Phelan, Brown, and Reichman.

42. Defendants Phelan, Bo Phelan, and/or Brown currently exercise control over, either directly or indirectly, some of the "504 Shares," certificates for and from those "504 Shares" and/or proceeds from the sale of "504 Shares."

43. As a result of these defendants' acts and omissions, Plaintiff's stock was rendered worthless.

44. These defendants' acts and omissions, including their wrongful issuance and sale of the "504 Shares," caused the price at which the common stock of CSM traded to drop in late June 1999, and ultimately resulted in the cessation of active trading of CSM stock, thereby damaging CSM, Plaintiff, and CSM's other shareholders.

45. Plaintiff incurred damages as a result of defendants Phelan, Bo Phelan, and Brown's breaches of contract. These damages include, but are not limited to, the loss of the $125,000 paid by Plaintiff for the five million shares of restricted CSM stock.

46.  Plaintiff also suffered damages as a proximate result of the acts, omissions, and fraudulent conduct of defendants Phelan, Bo Phelan, Brown, and Reichman.  As a result of these defendants' misrepresentations and omissions, Plaintiff paid $125,000 for five million restricted shares of CSM stock, which stock was rendered worthless by these defendants' fraud and control of which defendants wrongfully seized from Plaintiff.

**C.      Defendants' Further Efforts, Including Corporate**
**         Machinations, to Complete Their Fraudulent Scheme**

47.  Defendants Reichman, Bob Coberly ("Coberly"), Scott Brake ("Brake"), Stephen Reeder ("Reeder"), and Kevin Grace ("Grace") were at relevant times directors and/or officers of CSM.

48.  Defendants Phelan, Brown, Bo Phelan, Reichman, Reeder, Coberly, Brake, and Grace engaged in a scheme to, among other things, misuse the corporate machinery of CSM, and profit at the expense of CSM and its shareholders.

49.  Defendants Phelan, Bo Phelan, and Brown, with the assistance of defendants Grace, Reeder, Coberly, and Brake, thereafter wrongfully regained control of CSM in late August 1999 (by way of a series of choreographed "board meetings") and further misused the corporate machinery of CSM to manipulate the market in and for CSM stock, including by, among other things, issuing and disseminating false press releases and SEC filings (which falsely stated, among other things, that Costco Wholesale Corporation had tested and made projections regarding Amazin' Raisins product, which never happened), changing the name of CSM, changing the trading symbol for CSM, and issuing and selling

1  additional CSM stock in the market.

2      50.  In or about August 1999, certain defendants,

3  including one or more of defendants Phelan, Bo Phelan, Reichman,

4  and Brown, authorized CSM to pay $40,000 to defendant Grace (who

5  at the time was a director and officer of CSM) as a bribe to

6  procure defendant Grace's cooperation in wresting control of CSM.

7      51.  Defendants Reeder, Coberly, Brake, Grace,

8  Reichman, and attorney Lawrence Young participated in a series of

9  CSM board meetings (on August 25, August 27 and September 3,

10  1999) which enabled Phelan, Bo Phelan, Brown, and Reichman to

11  wrongfully regain control of CSM, and enabled these defendants

12  and defendants Reeder, Coberly, and Brake to further misuse CSM's

13  corporate machinery, including by issuing false and misleading

14  press releases and public filings, to enable them to issue and

15  sell additional CSM stock in the market.

16      52.  By way of these purported board meetings,

17  defendants Phelan, Bo Phelan, Brown, Reeder, Coberly, Brake,

18  Grace, Reichman, and attorney Young purported to, among other

19  things, cause CSM to switch transfer agents to facilitate the

20  sale of "504 Shares," and cause CSM to "rescind" CSM's lawful and

21  proper cancellation of the "504 Shares."

22      53.  At all relevant times, including in connection

23  with the August 25, August 27, and September 3 purported board

24  meetings, defendants Coberly, Brake, Reeder, Grace, and Reichman

25  acted at the direction and behest of defendants Phelan, Bo

26  Phelan, and/or Brown, all of whom acted for their own personal

27  financial gain and economic benefit and to the detriment of CSM.

28      54.  On or about August 10, 1999, August 26, 1999, and

11

1 │ August 30, 1999, defendants Phelan, Bo Phelan, and/or Brown,

2 │ through or with the assistance of defendants Reichman, Reeder,

3 │ Coberly, and Brake, under the name of defendant Reichman, issued

4 │ and disseminated press releases containing false and misleading

5 │ information relating to CSM, in an effort to sustain the

6 │ manipulated market in and for CSM stock.

7 │         55.   Defendants Phelan, Bo Phelan, and/or Brown,

8 │ through or with the assistance of defendants Reeder, Coberly, and

9 │ Brake, caused the trading symbol for CSM to be changed on at

10 │ least one occasion subsequent to September 3, 1999, in an effort

11 │ to facilitate their scheme to make further sales of "504 Shares."

12 │         56.   Defendants Phelan, Bo Phelan, and/or Brown,

13 │ through or with the assistance of defendants Reichman, Reeder,

14 │ Coberly, and Brake, caused the name of CSM to be changed

15 │ subsequent to September 3, 1999, in an effort to facilitate their

16 │ scheme to make further sales of "504 Shares."

17 │         57.   On or about September 23, 1999, defendants, under

18 │ the name of defendant Reichman, issued and disseminated a press

19 │ release containing false and misleading information relating to

20 │ CSM, including false statements that Costco Wholesale Corporation

21 │ had tested and made projections regarding Amazin' Raisins

22 │ product, an event which never happened.

23 │         58.   By letter dated October 14, 1999 signed by or for

24 │ defendant Reichman as President of "Internet Culinary

25 │ Corporation," which was signed and transmitted at the direction

26 │ of defendants Phelan, Bo Phelan, and Brown, these defendants

27 │ offered to cause CSM to indemnify Larkin on behalf of "Internet

28 │ Culinary Corporation" (formerly known as Capitol Silver Mines,

1  Inc.) if Larkin would release certain proceeds from the sale of
2  "504 Shares" held in the Kagel/American Auditors Account (to
3  enable defendants Phelan, Bo Phelan, and Brown to obtain said
4  monies).

5          59.  On or about January 5, 2000, in an effort to
6  further manipulate the market in and for CSM stock, defendants
7  Reichman, Reeder, Coberly, and Brake, at the direction and behest
8  of defendants Phelan, Bo Phelan, and Brown, issued and
9  disseminated (including to the SEC) a Form 10-SB containing false
10 and misleading information relating to CSM, including false
11 statements that CSM had acquired assets of Amazin' Raisins.

12         60.  In or about January 2000, defendants Phelan, Bo
13 Phelan, and/or Brown, acting by, through, or with the assistance
14 of one of more of defendants Reichman, Reeder, Coberly, and
15 Brake, caused CSM to issue additional unregistered shares of CSM
16 stock.

17         61.  Subsequent to the issuance of CSM stock in January
18 2000, defendants Phelan, Bo Phelan, and/or Brown sold or caused
19 the sale of certain of those CSM shares.

20         62.  On or about May 4, 2000, in an effort to further
21 manipulate the market in and for CSM stock, defendants Reichman,
22 Reeder, Coberly, and Brake, at the direction and behest of
23 defendants Phelan, Bo Phelan, and Brown, issued and disseminated
24 a second Form 10-SB containing false and misleading information
25 relating to CSM, including, among other things, false statements
26 that CSM had acquired assets of Amazin' Raisins.

27         63.  After completing their scheme and, more
28 particularly, their illegal sales of CSM stock, including "504

1  Shares," defendants Phelan, Bo Phelan, and/or Brown, through or

2  with the assistance of defendants Reichman, Reeder, Coberly, and

3  Brake, allowed CSM to be delisted and allowed the corporate

4  registration of CSM to lapse.

5          64.  These fiduciary breaches transformed CSM from a

6  public company with a "clean" capital structure into a tainted

7  shell which has issued and outstanding a significant amount of

8  rogue stock, which must be cancelled.

9          65.  On or about March 6, 2002, defendant Reeder,

10  acting at the behest and direction of one or more of defendants

11  Phelan, Bo Phelan, and Brown, caused CSM to file with the Arizona

12  Corporation Commission an "Application to Register Name of a

13  Foreign Corporation in Arizona," and, in connection with that

14  Application, used a phony business address in Mesa, Arizona.

15          66.  On or about March 15, 2002, two business days

16  before trial was scheduled to commence in this action on March

17  19, 2002, one or more of defendants Phelan, Bo Phelan, Brown, and

18  Reeder caused CSM to file a sham bankruptcy petition in the

19  United States Bankruptcy Court for the District of Arizona, for

20  the sole purpose of delaying the trial of this matter.

21          67.  On March 19, 2002, counsel for these defendants,

22  Richard Mata, acting at the direction and behest of defendants

23  Phelan, Bo Phelan, Brown, and Reeder, filed with this Court a

24  "Notice of Stay From Bankruptcy" for the purpose of delaying the

25  trial of this matter.

26          68.  On July 23, 2003, the United Stated Bankruptcy

27  Court for the District of Arizona entered an order dismissing the

28  sham bankruptcy on the grounds that, among other things, the case

14

1 | was not filed in good faith.

2 | 69. The aforementioned actions relating to the sham
3 | Arizona bankruptcy filing caused further severe damage to CSM,
4 | its goodwill, its reputation, and its ability to function as a
5 | public company.

6 | 70. CSM suffered damages as a result of defendants'
7 | breaches of fiduciary duty and fraudulent scheme, including, but
8 | not limited to, the proceeds of defendants' sale of "504 Shares."
9 | These damages exceed $1.1 million, and consist of, at a minimum,
10 | the following:

11 | (a) the $250,000 in proceeds from the sale of
12 | "504 Shares" held in the Kagel/American Auditors Account which
13 | were wired into an account held in the name of Fidelity Capital
14 | Group Holdings, Inc. (an entity controlled by defendant Brown),
15 | which monies were withdrawn and disposed of by or at the
16 | direction of defendant Phelan and/or Brown on or about June 24,
17 | 1999;

18 | (b) the $187,000 in proceeds from the sale of
19 | "504 Shares" through Account No. 509-133116-230 in the name of
20 | American Accounting (controlled by defendant Phelan) at Morgan
21 | Stanley, which proceeds were transferred out of that account by
22 | way of three checks, dated June 18, June 21, and June 23, made
23 | payable to "American Accounting, Attn. Mervyn Phelan"; and

24 | (c) the former "Interpleaded Monies" ($702,587,
25 | plus all interest thereon) and former "Interpleaded Shares"
26 | (804,500 shares) which are the property of CSM and which
27 | currently are in the possession of, or under the control of,
28 | Plaintiff's counsel of record pursuant to the Court's November

1 30, 2001 Order on the Complaint in Intervention of Emmett A.

2 Larkin Company, Inc.

3      71.  CSM has claimed and claims an interest in the "504

4 Shares" and the proceeds from the sale of "504 Shares."

5 II.

6 **CONCLUSIONS OF LAW**

7 A.      **Conclusions of Law Relating to Plaintiff's First Claim**

8          **for Violation of Section 10(b) and Rule 10b-5**

9      72.  Defendants Phelan, Bo Phelan, Brown, and Reichman

10 made material misrepresentations and omissions in connection with

11 the purchase or sale of securities.

12      73.  Defendants Phelan, Bo Phelan, Brown, and Reichman

13 acted with scienter in that they knew the statements to be false

14 and they intended to defraud or deceive Plaintiff and the public.

15      74.  Plaintiff justifiably relied on these defendants'

16 misrepresentations and omissions.

17      75.  Plaintiff suffered damages as a proximate result

18 of these defendants' misrepresentations and omissions.  Plaintiff

19 is entitled to damages for, among other things, the loss of the

20 $125,000 paid by Plaintiff to acquire the five million restricted

21 shares of CSM stock and control of CSM, which shares were

22 rendered worthless by these defendants' acts and omissions.

23      76.  These defendants' acts and omissions constitute

24 securities fraud under section 10(b) of the Securities and

25 Exchange Act of 1934 (the "Securities Exchange Act") and Rule

26 10b-5 thereunder.

27      77.  Defendants Phelan, Bo Phelan, Brown, and

28 Reichman's acts and omissions also constitute market manipulation

1    in violation of section 10(b) and Rule 10b-5 thereunder.

2         78.    Unless restrained, defendants Phelan, Bo Phelan,

3    Reichman, and Brown may continue to conduct further unlawful

4    sales of the "504 Shares" and may further manipulate the market

5    in and for CSM stock to the severe and irreparable harm of CSM,

6    Plaintiff, and its other shareholders.

7         79.    Defendants' violations of the federal securities

8    laws have and continue to irreparably harm CSM's reputation,

9    goodwill, and its ability to raise capital and otherwise function

10   as a public company, justifying an order granting injunctive

11   relief to bar these defendants from any further involvement in

12   the affairs of CSM.    See Ruckle v. Roto American Corp., 339 F.2d

13   24, 26-27 (2nd Cir. 1964).    Injunctive relief shall include the

14   following terms and conditions.

15        (a)    Each of defendants Reichman, Coberly, Brake,

16   Reeder, Grace, Phelan, Brown, and Bo Phelan and all of their

17   "Affiliates" (as that term is defined in Rule 144(a)(1) under the

18   Securities Act of 1933 (the "Securities Act"), as amended),

19   including any and all persons who had any involvement whatsoever

20   in or in connection with the filing of the bad faith bankruptcy

21   case in Arizona, are permanently enjoined from serving as a

22   director or officer of CSM.

23        (b)    For a period of three (3) years from the

24   date hereof, none of these defendants or any of their successors

25   or "Affiliates" (as that term is defined in Rule 144(a)(1) under

26   the Securities Act, as amended), including any and all persons

27   who had any involvement whatsoever in or in connection with the

28   filing of the bad faith bankruptcy case in Arizona, will, either

1    directly or indirectly:

2                     (i)    acquire, offer to acquire, or agree

3    to acquire, directly or indirectly, by purchase or otherwise, any

4    equity or convertible debt securities, or direct or indirect

5    rights, warrants, or options to acquire or convertible debt

6    securities, of CSM;

7                     (ii)   make, or in any way participate,

8    directly or indirectly, in any "solicitation" of "proxies" to

9    vote (as such terms would be applied to CSM under the proxy rules

10   of the United States Securities and Exchange Commission if CSM

11   were a reporting company under the Securities Exchange Act, as

12   amended), or in any manner whatsoever advise or influence or seek

13   to advise or influence any person or entity with respect to the

14   voting of, any voting securities of CSM;

15                    (iii)  form, join, or in any way participate

16   in a "group" within the meaning of Section 13(d)(3) of the

17   Securities Exchange Act, as amended, if CSM were a reporting

18   company under said Act, with respect to any voting securities of

19   CSM; and

20                    (iv)   involve themselves, either directly

21   or indirectly, in or with any matter bearing upon or in any way

22   related to the affairs of CSM, including in particular but not

23   limited to the ongoing management of CSM.

24   **B.      Conclusions of Law Relating to Plaintiff's Second Claim**

25   **         for Common Law Fraud and Deceit**

26           80.   Defendants Phelan, Bo Phelan, Brown, and Reichman

27   misrepresented certain material facts to Plaintiff or suppressed

28   certain material facts from Plaintiff.

                                    18

81.   These defendants' misrepresentations were false and these defendants knew the misrepresentations were false or that they were made recklessly.

82.   These defendants had a duty to disclose the concealed or suppressed material facts.

83.   The failure to disclose the material information was intentional.

84.   The misrepresentations and/or omissions were made with the intent to defraud Plaintiff and to induce reliance.

85.   Plaintiff was unaware of the falsity of the misrepresentations and/or omissions.

86.   Plaintiff justifiably relied on the misrepresentations and/or omissions.

87.   Plaintiff suffered damages as a result of this fraud and is entitled to recover all proximately caused damages. Plaintiff paid $125,000 for five million restricted shares of CSM stock and control of CSM, which stock was rendered worthless by these defendants' fraud and control of which these defendants wrongfully seized from Plaintiff.

C.      **Conclusions of Law Relating to Plaintiff's Third Claim for Breach of Fiduciary Duty**

88.   Defendants Phelan, Brown, and Bo Phelan were <u>de facto</u> directors and officers of CSM during the relevant time period.  A <u>de facto</u> director or officer has the same fiduciary duties as a <u>de jure</u> director or officer.  <u>See Sears v. Stelner (In re Globe Drug Co.)</u>, 104 F.2d 114, 117 (9th Cir. 1939); <u>South Seas Corporation v. Sablan</u>, 525 F. Supp. 1033, 1038 (1981).

89.   Defendants Reichman, Coberly, Brake, Reeder,

1   Grace, Phelan, Brown, and Bo Phelan owed fiduciary duties to CSM

2   and to its shareholders, including Plaintiff.  These duties

3   include (1) the duty to exercise the utmost good faith and

4   honesty in managing the corporation, (2) the duty to act in a

5   manner they reasonably believed to be in the best interests of

6   the corporation, (3) the duty to act with loyalty, (4) the duty

7   of full disclosure, (5) the duty to act fairly with CSM and all

8   of its shareholders, including Plaintiff, in all transactions

9   between them, and (6) the duty to refrain from acting for the

10  purpose of advancing their own economic interests and financial

11  gain rather than that of the corporation and its shareholders.

12  See Steelman v. Mallory, 110 Idaho 510, 513 (1986); Jordan v.

13  Hunter, 124 Idaho 899, 904-905 (1993); Weatherby v. Weatherby

14  Lumber Company, 94 Idaho 504, 506 (1972); Idaho Business

15  Corporation Act § 30-1-35; Idaho Business Corporation Act § 30-1-

16  842.

17          90.  Defendants Reichman, Coberly, Brake, Reeder,

18  Grace, Phelan, Brown and Bo Phelan breached their fiduciary

19  duties to CSM by acting in a manner which was intended to and did

20  further their own and other defendants' pecuniary interests and

21  to enrich themselves at the expense of CSM, which actions were

22  not taken in good faith or in the best interests of CSM and were

23  part of a calculated scheme of self-dealing carried out by misuse

24  of the corporate machinery of CSM.

25          91.  CSM suffered damages as a result of those

26  breaches.  These fiduciary breaches transformed CSM from a public

27  company with a "clean" capital structure into a tainted shell

28  which has issued and outstanding a significant amount of rogue

stock, which must be cancelled.  Furthermore, CSM's goodwill, its reputation, its ability to raise capital, and its ability to function as a public company, among other things, all were severely if not irreparably damaged.  CSM is entitled to damages in an amount sufficient to compensate CSM for all harm to CSM proximately caused by these defendants' breaches.

92.  CSM also is entitled to recover all ill-gotten profits obtained by these defendants as a result of their breaches of fiduciary duty, including but not limited to the proceeds from the sale of all "504 Shares," in an amount in excess of $1.1 million.  See Steelman v. Mallory, 110 Idaho 510, 514 (1986).  This amount includes the following:

(a)  Proceeds in the amount of $250,000 from the sale of "504 Shares" held in the Kagel/American Auditors Account which were wired into an account held in the name of Fidelity Capital Group Holdings, Inc. (an entity controlled by defendant Brown), which monies were withdrawn and disposed of by or at the direction of defendant Phelan and/or Brown on or about June 24, 1999;

(b)  Proceeds in the amount of $187,000 from the sale of "504 Shares" through Account No. 509-133116-230 in the name of American Accounting (controlled by defendant Phelan) at Morgan Stanley, which proceeds were transferred out of that account by way of three checks, dated June 18, June 21, and June 23, made payable to "American Accounting, Attn. Mervyn Phelan"; and

(c)  the former "Interpleaded Monies" ($702,587, plus all interest thereon) and formerly "Interpleaded Shares"

21

1 (804,500 shares) which are the property of CSM and which

2 currently are in the possession of, or under the control of,

3 Plaintiff's counsel of record pursuant to the Court's November

4 30, 2001 Order on the Complaint in Intervention of Emmett A.

5 Larkin Company, Inc.

6      93.   These defendants' actions have irreparably harmed,

7 and may continue to harm, CSM's goodwill, its reputation, and its

8 ability to raise capital, and have virtually extinguished CSM's

9 ability to function as a public company.  Unless restrained,

10 these defendants may continue their misuse of the corporate

11 machinery of CSM, to the severe and irreparable harm of CSM and

12 its shareholders.  CSM is therefore entitled to injunctive relief

13 barring defendants Reichman, Coberly, Brake, Reeder, Grace,

14 Phelan, Brown, and Bo Phelan from engaging in further breaches of

15 their fiduciary duties and from any further involvement with CSM.

16      Injunctive relief shall include the following terms and

17 conditions.

18      (a)   Each of defendants Reichman, Coberly, Brake,

19 Reeder, Grace, Phelan, Brown, and Bo Phelan and all of their

20 "Affiliates" (as that term is defined in Rule 144(a)(1) under the

21 Securities Act, as amended), including any and all persons who

22 had any involvement whatsoever in or in connection with the

23 filing of the bad faith bankruptcy case in Arizona, are

24 permanently enjoined from serving as a director or officer of

25 CSM.

26      (b)   For a period of three (3) years from the

27 date hereof, none of these defendants or any of their successors

28 or "Affiliates" (as that term is defined in Rule 144(a)(1) under

1 | the Securities Act, as amended), including any and all persons

2 | who had any involvement whatsoever in or in connection with the

3 | filing of the bad faith bankruptcy case in Arizona, will, either

4 | directly or indirectly:

5 |                 (i)   acquire, offer to acquire, or agree to

6 | acquire, directly or indirectly, by purchase or otherwise, any

7 | equity or convertible debt securities, or direct or indirect

8 | rights, warrants or options to acquire or convertible debt

9 | securities, of CSM;

10 |                 (ii)   make, or in any way participate,

11 | directly or indirectly, in any "solicitation" of "proxies" to

12 | vote (as such terms would be applied to CSM under the proxy rules

13 | of the United States Securities and Exchange Commission if CSM

14 | were a reporting company under the Securities Exchange Act, as

15 | amended) or in any manner whatsoever advise or influence or seek

16 | to advise or influence any person or entity with respect to the

17 | voting of, any voting securities of CSM;

18 |                 (iii)   form, join, or in any way participate

19 | in a "group" within the meaning of Section 13(d)(3) of the

20 | Securities Exchange Act, as amended, if CSM were a reporting

21 | company under said Act, with respect to any voting securities of

22 | CSM; and

23 |                 (iv)   involve themselves, either directly or

24 | indirectly, in or with any matter bearing upon or in any way

25 | related to the affairs of CSM, including in particular but not

26 | limited to the ongoing management of CSM.

27 | //

28 | //

D.        **Conclusions of Law Relating to Plaintiff's Fourth Claim**
          **for Aiding and Abetting Breach of Fiduciary Duty**

94.    Defendants Phelan, Bo Phelan, and Brown actively participated in defendants Reeder, Coberly, Brake, Grace, and Reichman's breaches of fiduciary duty.

95.    Defendants Phelan, Bo Phelan, and Brown acted for the purpose of advancing their own economic interests and financial gain in taking the above actions.

96.    CSM was injured as a result.  Among other things, these actions transformed CSM from a public company with a "clean" capital structure into a tainted shell which has issued and outstanding a significant amount of rogue stock, which must be cancelled.  Furthermore, CSM's goodwill, its reputation, its ability to raise capital, and its ability to function as a public company, among other things, all were severely and irreparably harmed.  CSM is entitled to damages in an amount sufficient to compensate CSM for all harm to CSM proximately caused by these defendants' breaches.

97.    CSM also is entitled to recover all ill-gotten profits obtained by defendants as a result of their actions, including but not limited to the proceeds from the sale of all "504 Shares," in an amount in excess of $1.1 million.  See Steelman v. Mallory, 110 Idaho 510, 514 (1986).  This amount includes the following:

(a)    Proceeds in the amount of $250,000 from the sale of "504 Shares" held in the Kagel/American Auditors Account which were wired into an account held in the name of Fidelity Capital Group Holdings, Inc. (an entity controlled by defendant

1  Brown), which monies were withdrawn and disposed of by or at the

2  direction of defendant Phelan and/or Brown on or about June 24,

3  1999;

4      (b)    Proceeds in the amount of $187,000 from the

5  sale of "504 Shares" through Account No. 509-133116-230 in the

6  name of American Accounting (controlled by defendant Phelan) at

7  Morgan Stanley, which proceeds were transferred out of that

8  account by way of three checks, dated June 18, June 21, and June

9  23, made payable to "American Accounting, Attn. Mervyn Phelan";

10  and

11      (c)    the former "Interpleaded Monies" ($702,587,

12  plus all interest thereon) and formerly "Interpleaded Shares"

13  (804,500 shares) which are the property of CSM and which

14  currently are in the possession of, or under the control of,

15  Plaintiff's counsel of record pursuant to the Court's November

16  30, 2001 Order on the Complaint in Intervention of Emmett A.

17  Larkin Company, Inc.

18      98.    These defendants' actions have irreparably harmed

19  and may continue to irreparably harm CSM's goodwill, its

20  reputation, and its ability to raise capital, and have virtually

21  extinguished CSM's ability to function as a public company.  CSM

22  is also entitled, therefore, to injunctive relief against these

23  defendants barring them from further involvement with CSM, on the

24  terms and conditions set forth in paragraph 93 above, which

25  paragraph is incorporated herein by reference.

26  E.    Conclusions of Law Relating to Plaintiff's Fifth Claim

27        for Breach of Contract

28      99.    Plaintiff and defendants Phelan, Bo Phelan, and

1  Brown entered into a valid contract.

2          100. Plaintiff performed pursuant to the agreement
3  except insofar as excused or prevented by defendants Phelan, Bo
4  Phelan, and Brown.

5          101. These defendants materially breached the agreement
6  by, among other things,

7                  (a)  wrongfully wresting control of CSM in or
8  about late August 1999;

9                  (b)  causing the transfer agent for CSM, American
10 Securities, to issue certificates for 2,795,000 "504 Shares"
11 without CSM having acquired Amazin' Raisins and Delta Valley
12 Farms and without having escrowed, impounded, or locked up those
13 "504 Shares" for one year;

14                 (c)  causing the transfer agent for CSM to issue
15 certificates for 2,795,000 "504 Shares," which shares were not
16 duly authorized by CSM and for which CSM received no
17 consideration, all in violation of Idaho state law;

18                 (d)  causing the transfer agent for CSM to issue
19 certificates for 2,975,000 "504 Shares," which shares were not
20 freely tradeable and were issued in violation of Federal and
21 California securities laws; and

22                 (e)  causing the sale of certain of the "504
23 Shares" before the expiration of one year and converting the
24 proceeds from such sales.

25         102. Plaintiff incurred damages as a proximate result
26 of these defendants' breaches.  These damages include, but are
27 not limited to, the loss of the $125,000 paid by Plaintiff for
28 the five million shares of restricted CSM stock.

**F.      Conclusions of Law Relating to Plaintiff's Sixth Claim for Conversion**

103. CSM had and continues to have an ownership interest in and/or right to possession of the "504 Shares."

104. Defendants Phelan, Bo Phelan, Brown, and Reichman converted the "504 Shares" by a wrongful act or disposition of CSM's property rights.

105. CSM suffered damages as a result. These damages include, but are not limited to, the proceeds of these defendants' sales of "504 Shares," amounting to more than $1.1 million and consisting of the following:

(a)    Proceeds in the amount of $250,000 from the sale of "504 Shares" held in the Kagel/American Auditors Account which were wired into an account held in the name of Fidelity Capital Group Holdings, Inc. (an entity controlled by defendant Brown), which monies were withdrawn and disposed of by or at the direction of defendant Phelan and/or Brown on or about June 24, 1999;

(b)    Proceeds in the amount of $187,000 from the sale of "504 Shares" through Account No. 509-133116-230 in the name of American Accounting (controlled by defendant Phelan) at Morgan Stanley, which proceeds were transferred out of that account by way of three checks, dated June 18, June 21, and June 23, made payable to "American Accounting, Attn. Mervyn Phelan"; and

(c)    the former "Interpleaded Monies" ($702,587, plus all interest thereon) and formerly "Interpleaded Shares" (804,500 shares) which are the property of CSM and which

1  currently are in the possession of, or under the control of,

2  Plaintiff's counsel of record pursuant to the Court's November

3  30, 2001 Order on the Complaint in Intervention of Emmett A.

4  Larkin Company, Inc.

5  **G.        Conclusions of Law Relating to Plaintiff's Seventh**

6  **          Claim for Constructive Trust**

7          106. CSM had a right to possession and ownership

8  interest in the "504 Shares" and proceeds from the sale of the

9  "504 Shares."

10         107. Defendants Phelan, Brown, Bo Phelan, and Reichman

11  wrongfully acquired and/or detained the "504 Shares" and proceeds

12  from the sale of certain of the "504 Shares."

13         108. By virtue of their actions, defendants Phelan, Bo

14  Phelan, Brown, and Reichman hold any and all remaining "504

15  Shares," the certificates for and from the "504 Shares" and the

16  monies which constitute the proceeds of all sales of "504 Shares"

17  in their possession, custody or control as constructive trustees

18  for CSM's benefit, including the following:

19              (a)  Proceeds in the amount of $250,000 from the

20  sale of "504 Shares" held in the Kagel/American Auditors Account

21  which were wired into an account held in the name of Fidelity

22  Capital Group Holdings, Inc. (an entity controlled by defendant

23  Brown), which monies were withdrawn and disposed of by or at the

24  direction of defendant Phelan and/or Brown on or about June 24,

25  1999;

26              (b)  Proceeds in the amount of $187,000 from the

27  sale of "504 Shares" through Account No. 509-133116-230 in the

28  name of American Accounting (controlled by defendant Phelan) at

1    Morgan Stanley, which proceeds were transferred out of that

2    account by way of three checks, dated June 18, June 21, and June

3    23, made payable to "American Accounting, Attn. Mervyn Phelan";

4    and

5                (c)    the former "Interpleaded Monies" ($702,587,

6    plus all interest thereon) and formerly "Interpleaded Shares"

7    (804,500 shares) which are the property of CSM and which

8    currently are in the possession of, or under the control of,

9    Plaintiff's counsel of record pursuant to the Court's November

10    30, 2001 Order on the Complaint in Intervention of Emmett A.

11    Larkin Company, Inc.

12    **H.**        **Conclusions of Law Relating to Plaintiff's Eighth Claim**

13             **for Unfair Competition Pursuant to California Business**

14             **and Professions Code Section 17200, et seq.**

15        109. Defendants Reichman, Phelan, Brown, and Bo Phelan

16    breached their fiduciary duties to CSM (including under Idaho

17    state law) by acting in a manner which was intended to and did

18    further their own and other defendants' pecuniary interests and

19    to enrich themselves at the expense of CSM, which actions were

20    not taken in good faith or in the best interests of CSM and were

21    part of a calculated scheme of self-dealing carried out by misuse

22    of the corporate machinery of CSM.

23        110. At a minimum, defendants Phelan, Bo Phelan, and

24    Brown aided and abetted in defendants Reeder, Coberly, Brake,

25    Grace, and Reichman's breaches of fiduciary duty to CSM by

26    actively participating in and assisting in such breaches for

27    their own economic interests and financial gain.

28        111. In connection with their scheme, defendants

1 Phelan, Bo Phelan, Reichman, and Brown made intentional

2 misrepresentations and omissions to Plaintiff which constitute

3 common law fraud.

4        112. Defendants Phelan, Bo Phelan, Reichman, and Brown

5 caused the issuance, certification and sale of "504 Shares" in

6 violation of applicable Idaho law.

7        113. Defendants Phelan, Bo Phelan, Reichman, and Brown

8 caused the issuance, certification and sale of the "504 Shares"

9 in violation of applicable federal securities laws (including

10 Rules 504 and 144).

11        114. Defendants Phelan, Bo Phelan, Reichman, and Brown

12 caused the issuance, certification and sale of the "504 Shares"

13 in violation of applicable California securities laws (including

14 section 25100 et seq., of the California Corporations Code).

15        115. Defendants Phelan, Bo Phelan, Reichman, and Brown

16 made misrepresentations and omissions in connection with the sale

17 or purchase of securities in violation of section 10(b) and Rule

18 10b-5 thereunder.

19        116. Defendants Phelan, Bo Phelan, Reichman, and Brown

20 engaged in a scheme to and did manipulate the market in and for

21 CSM stock, in violation of section 10(b) and Rule 10b-5

22 thereunder.

23        117. The foregoing actions of defendants Phelan, Bo

24 Phelan, Reichman, and Brown constitute unlawful, unfair and/or

25 fraudulent business practices and therefore constitute unfair

26 competition under section 17200, et seq., of the California

27 Business and Professions Code.

28        118. Unless restrained, defendants Phelan, Bo Phelan,

1  Reichman and Brown may continue to conduct further unlawful sales

2  of the "504 Shares" or other CSM shares and will further

3  manipulate the market in and for CSM stock, to the severe and

4  irreparable harm of CSM, Plaintiff, and CSM's other shareholders.

5       119. Plaintiff is entitled to restitution of his out-

6  of-pocket losses from these defendants.  Cal. Bus. & Prof. Code §

7  17203; Bank of the West v. Superior Court, 2 Cal.4th 1254, 1266-

8  67 (1992); MAI Systems Corp. v. UIPS, 856 F. Supp. 538, 541 (N.D.

9  Cal. 1994)

10      120. Plaintiff is entitled to injunctive relief under

11  section 17200, et seq., barring these defendants from any further

12  involvement with CSM, on the terms and conditions set forth in

13  paragraph 93 above, which paragraph is incorporated herein by

14  reference.  See  ABC International Traders v. Matsushita Electric

15  Corp., 14 Cal.4th 1247, 1271 (1997).

16  I.       Conclusions of Law Relating to Plaintiff's Ninth Claim

17           for Declaratory Relief

18      121. The "504 Shares" were neither issued for

19  consideration nor duly approved by CSM's board, in violation of

20  applicable Idaho state law.  Idaho Business Corporation Act §§

21  30-1-821, 30-1-824(3) and 30-1-621.

22      122. The stock certificates for the "504 Shares" were

23  signed only by or for defendant Reichman, as President of CSM,

24  even though Idaho state law requires that certificates of stock

25  be signed by two officers of the corporation to be valid.  Idaho

26  Business Corporation Act § 30-1-625.

27      123. CSM was an ineligible "development stage company

28  that either has no specific business plan or purpose or ha[d]

1  indicated that its business plan [was] to engage in a merger or

2  acquisition with an unidentified company or companies, or other

3  entity or person" under old Rule 504(a)(3) (which was in effect

4  prior to April 7, 1999) of the Securities Act, and therefore the

5  issuance and sale of the "504 Shares" violated Rule 504(a)(3) in

6  effect prior to April 7, 1999.  17 C.F.R. § 504.

7      124. Defendants Phelan, Bo Phelan, and Brown were

8  "affiliates" of CSM as that term is defined under Rule 144(a)(1)

9  of the Securities Act (an "affiliate" of an issuer, such as CSM,

10 is "a person that directly, or indirectly through one or more

11 intermediaries, controls . . . such issuer"), and therefore the

12 resale of the "504 Shares" was governed by Rule 144 of the

13 Securities Act.  17 C.F.R. § 144.

14     125. Defendants Phelan, Bo Phelan, Brown, and Reichman

15 violated the sale limitation under Rule 144(e)(1) of the

16 Securities Act (which is 1% of the outstanding shares for any

17 three-month period after the issuance of the "504 Shares.") by

18 causing the sale of at least 200,000 "504 Shares" in June 1999.

19 17 C.F.R. § 144

20     126. Under the new Rule 504 of the Securities Act (in

21 effect after April 7, 1999), the "504 Shares" constituted

22 "restricted securities" under Rule 502(d) of the Securities Act

23 (i.e., shares which must be held for a minimum of one year before

24 public resale under Rule 144), which defendants Phelan, Bo

25 Phelan, and Brown violated by causing the sale of certain of the

26 "504 Shares" beginning in June 1999.  17 C.F.R. § 502; 17 C.F.R.

27 § 504.

28     127. Notwithstanding technical compliance, if any, with

1   the rules of the Securities Act, the issuance of the "504 Shares"

2   was part of a plan or scheme to evade the registration

3   requirements of the Securities Act and thereby violated

4   Regulation D of the Securities Act.

5        128. The "504 Shares" were not exempt securities (i.e.,

6   excluded from qualification requirements) under California

7   Corporations Code section 25100, et seq.

8        129. The offer and sale of the "504 Shares" were not an

9   exempt issuer transaction (i.e., excluded from qualification

10  requirements) under California Corporations Code section 25100,

11  et seq.

12       130. The "504 Shares" were issued, certificated, and

13  sold in violation of California securities laws (including

14  California Corporations Code section 25100, et seq.) because the

15  offer and sale of the "504 Shares" were not qualified (i.e.,

16  registered) in California.

17       If any Findings of Fact are more properly regarded as

18  Conclusions of Law or if any Conclusions of Law are more properly

19  regarded as Findings of Fact, the Court hereby deems each to be

20  the other as may be necessary under the law.

21       The Clerk shall serve these Findings of Fact and

22  Conclusions of Law on all counsel of record.

23       DATED:   February 28, 2005.

24

25

26                              ALICEMARIE H. STOTLER
                                UNITED STATES DISTRICT JUDGE
27

28

# **EXHIBIT 19**

## PATENT ASSIGNMENT

WHEREAS, AMAZING FRUIT PRODUCTS LTD. of 1 Concorde Gate, Suite 102, Toronto, Ontario M3C 3N6, Canada, the **Assignor,** has acquired from the inventors, Jack G. Mazin and Amir Lalji, the entire right, title and interest in United States Patent 5,188,861 which issued on February 23, 1993, entitled PROCESS FOR PREPARING A DRIED FRUIT PRODUCT,

AND WHEREAS, AMAZIN RAISINS INTERNATIONAL, INC. a Corporation of Ontario, Canada, 36 German Mills Rd, Thornhill, Ontario L3T 4H5, Canada, hereinafter the **Assignee,** is desirous of reacquiring the entire right, title and interest in and to the Patent within the United States of America and its territorial possessions and all foreign countries therefor .

NOW, THIS INDENTURE WITNESSETH, That for and in consideration of the sum of Ten Dollars, in hand paid to it, and other good and valuable consideration, the receipt whereof is hereby acknowledged, the Assignor has assigned, sold, and transferred, and does hereby assign, sell and transfer to the Assignee the entire right, title and interest in the Patent, including all claims, damages, or other relief that the Assignor has for infringement of the Patent within the United States of America and its territorial possessions and all foreign countries, and in and to all other applications for LETTERS PATENT for the invention in all other countries, and in and to all divisions and continuations of any of said applications, and in and to any LETTERS PATENT of the United States and foreign countries and all reissues and extensions thereof that may be granted, and the right to apply for LETTERS PATENT in foreign countries with full benefit of such priorities as may now or hereafter be granted to us by local laws or by treaty, including any international convention, for the protection of industrial property, together with the right to extend the protection for said U.S. LETTERS PATENT to the various territorial possessions now owned or which may be hereafter acquired by the United States of America, all said rights to be held and enjoyed by the Assignee for its own use and behoof, and for the use and behoof of its successors or assigns, to the full end of the respective terms for which said LETTER PATENTS may be granted, as fully and entirely as the same would have been held and enjoyed by the Assignor if this assignment sale had not been made.

Page 1 of 3

ARI 0953

In further consideration of said sum of Ten Dollars, and said other good and valuable consideration, to it paid, the Assignor covenants and agrees with the Assignee that it has full and unencumbered title to the Patent hereby assigned, which title is warranted unto the Assignee, and further agree that they will, without demanding any further consideration therefore, at the request but at the expense of the Assignee, do all lawful and just acts, including the execution and acknowledgement of instruments, furnishing of information and giving of testimony, that may be or become necessary for obtaining, sustaining, reexamining or reissuing said United States and any foreign LETTERS PATENTS for said invention, and for maintaining and perfecting the Assignee's right to said invention and LETTERS PATENT(S), particularly in cases of interference and litigation.

Signed on behalf of the Assignor and as a legal act thereof this _____28_____ day of April, 2005.

_____

Jack G. Mazin            President

## DECLARATION OF WITNESS

I, _CLIFFORD RICHLER_____ whose full post office address is _36 Vallancourt / Thornhill, ont___, hereby declare that I was personally present and did see _Jack G. Mazin_ who is personally known to me to be the person named in the above assignment, duly sign and execute the same.

DECLARED at _Toronto, Ontario_, this _28th_ day of _April_, 2005.

_CLIFFORD RICHLER_____          _____
Printed Name of Witness                  Signature of witness

Page 2 of 3

**ARI 0954**

## DECLARATION  OF  WITNESS

I, _CECIUA DIZON_ whose full post office address is _183 COCKSFIELD AVE. #6_ _NORTH YORK, ONT_ hereby declare that I was personally present and did see _Jack G. Mazin_ who is personally known to me to be the person named in the above assignment, duly sign and execute the same.


DECLARED at _Toronto, Ontario_, this _28_ day of _April,_ 2005.


_CECIUA DIZON_
_____
Printed Name of Witness

_____
Signature of Witness


Page 3 of 3

ARI 0955

**EXHIBIT 20**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

AMAZIN' RAISINS INTERNATIONAL, INC.,
an Ontario, Canada corporation,

      Plaintiff,

    v.

OCEAN SPRAY CRANBERRIES, INC., a
Delaware corporation,

      Defendant.

Civ. No. 04-12679-MLW

---

**OCEAN SPRAY'S FIRST SET OF REQUESTS FOR PRODUCTION
OF DOCUMENTS AND THINGS (NOS. 1-60)**

---

Pursuant to Federal Rule of Civil Procedure 34 and LR 34.1, Ocean Spray Cranberries,

Inc. requests that Plaintiff Amazin' Raisins International, Inc. produce for inspection and

copying the following documents and other tangible things that are in its possession, custody, or

control. Production shall take place within 30 days of service of this request at the offices of

Fish & Richardson P.C. in Boston, Massachusetts or at such other location as the parties may

agree. The following definitions and instructions apply.

### DEFINITIONS

1.    "Ocean Spray" means Ocean Spray Cranberries, Inc., including without limitation

all of its corporate locations, and all predecessors, subsidiaries, parents, and affiliates, and all

past or present directors, officers, agents, representatives, employees, consultants, attorneys,

entities acting in joint-venture or partnership relationship with Ocean Spray Cranberries, Inc.,

and others acting on behalf of Ocean Spray Cranberries, Inc.

2.    "ARI," "you," or "your" means Amazin' Raisins International, Inc., including

without limitation all of its corporate locations, and all predecessors, subsidiaries, parents, and

affiliates, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint-venture or partnership relationship with Amazin' Raisins International, Inc., and others acting on behalf of Amazin' Raisins International, Inc.

3.    The definitions of the terms set forth in LR 26.5(c) are fully incorporated herein by reference.

4.    "The '861 patent" means United States Patent No. 5,188,861 and/or the application that resulted in United States Patent No. 5,188,861.

5.    "Infringe" and "infringement" refer to direct infringement, contributory infringement, inducement, literal infringement, and/or infringement under the doctrine of equivalents.

6.    The term "accused products" refers to Ocean Spray's products ARI contends infringe the '861 patent.

7.    The term "accused processes" refers to Ocean Spray's processes ARI contends infringe the '861 patent.

8.    The terms "relate to" or "relating to" mean in whole or in part constituting, containing, embodying, reflecting, describing, analyzing, identifying, stating, referring to, dealing with, or in any way pertaining to.

9.    The singular shall include the plural and vice versa. Any pronoun should be construed to refer to the masculine, feminine, or neuter gender as in each case is most appropriate. The words "and" and "or" shall be construed conjunctively or disjunctively, whichever makes the request most inclusive. The term "any" includes "all" and "all" includes "any;" "each" includes "every" and "every" includes "each;" and "includes" or "including" means "including, but not limited to."

## INSTRUCTIONS

1.      These requests shall apply to all documents in your possession, custody, or control at the present time, or coming into your possession, custody, or control during the litigation.  If you know of the existence, past or present, of any documents and things requested herein, but are unable to produce such documents and things because they are not presently in your possession, custody, or control, you shall so state and shall identify such documents or things, and the person who has possession, custody, or control of the documents or things.

2.      If no documents are responsive to a particular request, you are to state that no responsive documents exist.

3.      For any responsive documents or tangible things that have been lost or destroyed, you shall provide a written statement setting forth (a) the identity of the document; (b) the nature of the document (e.g. letter, memorandum, etc.); (c) the identity of all persons who either sent or received the original or any copy of the document; (d) the date of the document; (e) a description of the subject matter of the document; and (f) the circumstances of the loss or destruction of the document.

4.      If you decline to produce any document or part thereof based on a claim of privilege or any other claim, describe the nature and basis of your claim and the information withheld in a manner sufficient to (a) disclose the facts upon which you rely in asserting your claim; (b) to permit the grounds and reasons for withholding the document to be identified; and (c) to permit the information withheld to be identified.  This information should include the basis for the privilege claimed (or statute, rule, or decision upon which you rely), the name and address of the author(s), addressee(s), the date, the type of document (e.g., letter, memo, etc.),

the subject matter of the document, and the name and address of every recipient of the original or any copy of the document.

5.      All documents requested are to be produced in the same file or other organizational environment in which they are maintained.  For example, a document that is part of a file, docket, or other grouping, should be physically produced together will all other documents from said file, docket, or grouping, in the same order or manner of arrangement as the original.  Alternatively, as to each document and thing produced in response hereto, you shall identify the request for production and where applicable, the interrogatory number, in response to which the document or thing is being produced.

6.      Electronic and computerized information must be produced in an intelligible format or together with a description of the system from which it was derived sufficient to make the material intelligible.

### REQUESTS

REQUEST FOR PRODUCTION NO. 1:

All documents and things requested to be identified in Ocean Spray's interrogatories to ARI and all documents and things that supported or formed the basis for, or that were used in preparation of ARI's responses to Ocean Spray's interrogatories.

REQUEST FOR PRODUCTION NO. 2:

All documents and things identified in ARI's initial disclosures made pursuant to Rule 26 of the Federal Rules of Civil Procedure.

REQUEST FOR PRODUCTION NO. 3:

All documents and things provided to any expert who may provide testimony for ARI during this lawsuit.

REQUEST FOR PRODUCTION NO. 4:

All documents and things that ARI intends to rely on in any motion, during claim

construction, or at any hearing or trial in this action.

REQUEST FOR PRODUCTION NO. 5:

All documents and things concerning the `861 patent.

REQUEST FOR PRODUCTION NO. 6:

All documents and things concerning the prosecution of the `861 patent.

REQUEST FOR PRODUCTION NO. 7:

All documents and things concerning the abandonment of the `861 patent application.

REQUEST FOR PRODUCTION NO. 8:

All documents and things concerning the petition to revive the `861 patent application.

REQUEST FOR PRODUCTION NO. 9:

All documents and things concerning Jack Mazin's statement of unintentional

abandonment in support of the petition to revive the `861 patent application, including

documents and things concerning the statement's allegation that the abandonment was

unintentional due to lack of funds.

REQUEST FOR PRODUCTION NO. 10:

All documents and things concerning Holly D. Kozlowski or the law firm of Lowe, Price,

LeBlanc & Becker.

REQUEST FOR PRODUCTION NO. 11:

All documents and things concerning Linda M. Kurdydyk or the law firm of Bereskin &

Parr.

REQUEST FOR PRODUCTION NO. 12:

All documents and things concerning the scope or interpretation of the claims of the `861 patent.

REQUEST FOR PRODUCTION NO. 13:

All documents and things concerning Jack Mazin.

REQUEST FOR PRODUCTION NO. 14:

All documents and things concerning Amir Lalji.

REQUEST FOR PRODUCTION NO. 15:

All documents and things concerning Ocean Spray.

REQUEST FOR PRODUCTION NO. 16:

All documents and things concerning any communication between ARI and Ocean Spray.

REQUEST FOR PRODUCTION NO. 17:

All documents and things concerning the Accused Products or Accused Processes.

REQUEST FOR PRODUCTION NO. 18:

All documents and things concerning any investigations, tests, studies, or analyses of the Accused Products or Accused Processes.

REQUEST FOR PRODUCTION NO. 19:

All documents and things concerning any reports, opinions, letters, investigations, studies, tests, or analyses of the Accused Products or Accused Processes prepared by or for ARI.

REQUEST FOR PRODUCTION NO. 20:

All documents and things concerning Ocean Spray's alleged infringement of the `861 patent.

6

REQUEST FOR PRODUCTION NO. 21:

All documents and things concerning ARI's contention that Ocean Spray's alleged infringement of the `861 patent is willful.

REQUEST FOR PRODUCTION NO. 22:

All documents and things concerning ARI's contention that it is entitled to attorney fees pursuant to 35 U.S.C. § 285.

REQUEST FOR PRODUCTION NO. 23:

All documents and things concerning ARI's factual basis for initiating this lawsuit.

REQUEST FOR PRODUCTION NO. 24:

All prior art that relates to the subject matter of the `861 patent.

REQUEST FOR PRODUCTION NO. 25:

All documents and things concerning any prior art searches relating to the `861 patent, including documents concerning prior art search criteria and prior art search results.

REQUEST FOR PRODUCTION NO. 26:

All documents and things concerning any secondary indicia of nonobviousness (such as failure of others, long felt need, unexpected results, commercial success, and acquiescence of competitors) with respect to the `861 patent and the nexus (or lack thereof) between the claimed subject matter of the `861 patent and any objective evidence of nonobviousness.

REQUEST FOR PRODUCTION NO. 27:

All documents and things concerning the conception and reduction to practice of the subject matter claimed in the `861 patent.

REQUEST FOR PRODUCTION NO. 28:

All documents and things concerning the research and development of the subject matter of the `861 patent.

REQUEST FOR PRODUCTION NO. 29:

All documents and things concerning any work, research, tests, experiments, or studies whether complete, incomplete, or prematurely terminated, regarding the subject matter of the `861 patent.

REQUEST FOR PRODUCTION NO. 30:

All documents and things concerning the best mode known to each named inventor of practicing the subject matter of the `861 patent at the time of the patent's filing.

REQUEST FOR PRODUCTION NO. 31:

All documents and things concerning the modes known to each named inventor of practicing the subject matter of the `861 patent at the time of the patent's filing date.

REQUEST FOR PRODUCTION NO. 32:

All laboratory or technical notebooks, working papers, or notes of anyone conducting research concerning the subject matter claimed in the `861 patent.

REQUEST FOR PRODUCTION NO. 33:

All laboratory or technical notebooks, working papers, notes of Jack Mazin concerning the subject matter claimed in the `861 patent.

REQUEST FOR PRODUCTION NO. 34:

All laboratory or technical notebooks, working papers, or notes of Amir Lalji concerning the subject matter claimed in the `861 patent.

REQUEST FOR PRODUCTION NO. 35:

All documents and things concerning the level of knowledge, schooling, experience, expertise or relevant technical information of a person having ordinary skill in the art to which the `861 patent pertains.

REQUEST FOR PRODUCTION NO. 36:

All documents and things concerning the first public disclosure to any person of any subject matter claimed in the `861 patent.

REQUEST FOR PRODUCTION NO. 37:

All documents and things concerning any sales, offers for sale, solicitations for possible future sales, or inquiries before the filing date of the `861 patent regarding any product or process that embodies or uses any of the claimed products or processes of the `861 patent.

REQUEST FOR PRODUCTION NO. 38:

All documents and things concerning the ownership of the `861 patent.

REQUEST FOR PRODUCTION NO. 39:

All documents and things concerning the alleged assignment of the `861 patent to ARI.

REQUEST FOR PRODUCTION NO. 40:

All documents and things concerning any damages alleged by ARI in this action.

REQUEST FOR PRODUCTION NO. 41:

All documents and things that ARI intends to rely on to support any calculations of lost profits or a reasonable royalty for the `861 patent.

REQUEST FOR PRODUCTION NO. 42:

All documents and things concerning any attempt to license or assign the `861 patent.

REQUEST FOR PRODUCTION NO. 43:

All documents and things concerning sales of or offers to sell any products covered by the claims of the `861 patent or made using a process claimed in the `861 patent.

REQUEST FOR PRODUCTION NO. 44:

All documents and things concerning the pricing of dried fruit products, including products ARI contends are covered by the claims of the `861 patent.

REQUEST FOR PRODUCTION NO. 45:

All documents and things concerning market share for dried fruit products, including products ARI contends are covered by the claims of the `861 patent.

REQUEST FOR PRODUCTION NO. 46:

All documents and things concerning ARI's capacity to manufacture and sell dried fruit products.

REQUEST FOR PRODUCTION NO. 47:

All documents and things concerning estimates, projections, forecasts, budgets, marketing plans, and strategic plans relating to ARI's manufacture and sale of dried fruit products.

REQUEST FOR PRODUCTION NO. 48:

All documents and things concerning the market and demand for dried fruit products.

REQUEST FOR PRODUCTION NO. 49:

Documents sufficient to identify ARI's sales, costs of sales, and profits from its dried fruit products from 1998 to the present on a year-by year basis.

REQUEST FOR PRODUCTION NO. 50:

Quarterly and annual financial statements (both audited and unaudited) from January 1, 1998 to the present.

REQUEST FOR PRODUCTION NO. 51:

All documents concerning the promotion, marketing, offer for sale, or sale of any product associated with ARI's dried fruit products.

REQUEST FOR PRODUCTION NO. 52:

All documents and things that compare any of ARI's products or processes to any of Ocean Spray's products or processes.

REQUEST FOR PRODUCTION NO. 53:

All documents and things concerning ARI's business planning, business opportunities, market share, competition, or sales, whether actual or projected, with respect to its dried fruit products.

REQUEST FOR PRODUCTION NO. 54:

All documents and things concerning any license in the dried fruit products industry.

REQUEST FOR PRODUCTION NO. 55:

All documents and things concerning the marking of ARI's products.

REQUEST FOR PRODUCTION NO. 56:

All documents and things relating to the marking of ARI's products with the patent number of the `861 patent.

REQUEST FOR PRODUCTION NO. 57:

Documents and things sufficient to show ARI's organizational structure from 1998 to the present.

REQUEST FOR PRODUCTION NO. 58:

All minutes or notes from any ARI board of directors meetings or other management meetings that refer or relate to Ocean Spray, this case or the `861 patent.

REQUEST FOR PRODUCTION NO. 59:

All documents and things concerning any opinion regarding the validity or enforceability of the `861 patent.

REQUEST FOR PRODUCTION NO. 60:

Documents and things sufficient to show ARI's document retention and/or destruction policies from the date of conception of the subject matter claimed in the `861 patent to the present.

Dated:  April 21, 2005

Michael Zeliger (BBO #633654)
FISH & RICHARDSON P.C.
225 Franklin Street
Boston, MA  02110-2804
Telephone:  (617) 542-5070
Facsimile:  (617) 542-8906

Of Counsel:

William R. Woodford (MN #322593)
FISH & RICHARDSON P.C., P.A.
3300 Dain Rauscher Plaza
60 South Sixth Street
Minneapolis, Minnesota 55402
Telephone:  (612) 335-5070

*Attorneys for Defendant*
*Ocean Spray Cranberries, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for Amazin' Raisins International, Inc. via first class mail on this 21st day of April, 2005.

Michael E. Zeliger

60286794.doc

# EXHIBIT 21

**Assignment History**

| Date | Assigned Subject Matter | From | To |
|---|---|---|---|
| 1988-09-14 | Canadian and US applications entitled, "Process for Preparing a Dried Fruit." | Amir Lalji<br>Diversified Laboratories, Ltd. | Jack Mazin |
| 1992-12-15,16 | US application entitled, "Process for Preparing a Dried Fruit Product," that was purportedly executed on June 19th and 26th, 1990. | Jack Mazin<br>Diversified Laboratories, Ltd. | Royal Domain, Inc. |
| 1994-06-07* | US Patent No. 5,188,161 | Royal Domain, Inc. (by Jack as President) | Amazin Raisins International, Inc. |
| 1996-01-25 | PCT Application and all patents therefrom entitled, "Process for Preparing a Dried Fruit Product." | Jack Mazin<br>Amir Lalji | Amazin Raisins International, Inc. |
| 2004-08-16* | US Patent No. 5,188,861 | Jack Mazin<br>Amir Lalji | Amazing Fruit Products, Ltd. |
| 2005-01-31* | US Patent No. 5,188,861 | Amazin Raisins Internation, Inc. (by Jack as President) | Amazing Fruit Products, Ltd. |
| 2005-04-28* | US Patent No. 5,188,861 | Amazing Fruit Products, Ltd (by Jack as President) | Amazin Raisins International, Inc. |

* - Recorded at the USPTO.

**ASSIGNMENT**

WHEREAS, JACK G. MAZIN of 70 Honey Locust Court, Maple, Ontario, Canada, L0J 1E0 and AMIR LALJI of 9JA *Kingsview Blvd, Weston, Ontario, Canada M4K 179* are joint inventors of an invention entitled **PROCESS FOR PREPARING A DRIED FRUIT PRODUCT** as fully described and claimed in an application for Canadian Letters Patent and for which an application for United States Letters Patent was executed by JACK G. MAZIN and AMIR LALJI on the      day of June, 1988 under the above title;

AND WHEREAS when the invention was made, AMIR LALJI was in the employment of DIVERSIFIED RESEARCH LABORATORIES LTD. (hereinafter referred to as Diversified Research) having a principal place of business at 1047 Yonge Street, Toronto, Ontario, Canada, M4W 2L3, and made the invention during the course of such employment;

AND WHEREAS DIVERSIFIED RESEARCH has agreed to assign its interest in the said invention to JACK G. MAZIN;

NOW THEREFORE to all whom it may concern, be it known that for and in consideration of the sum of One Dollar ($1.00) to him in hand paid by DIVERSIFIED RESEARCH and other good and valuable consideration, the receipt of all of which is hereby acknowledged, the said AMIR LALJI hereby confirms that he has sold, assigned and transferred, and does hereby sell, assign and transfer to the said DIVERSIFIED RESEARCH, its successors and assigns, his whole right, title and interest for Canada, the United States of America, and all other countries in and to the said invention and in and to the said applications and any Letters Patent that may be obtained therefor, and in and to any divisions and continuations thereof, together with his right to claim the benefit of the right of priority provided by the International Convention for the Protection of Industrial Property based on said Canadian Application for Letters Patent or U.S. Application for Letters Patent;

AND BE IT KNOWN that for and in consideration of the sum of One Dollar ($1.00) to it in hand paid by the said JACK G. MAZIN and other good and valuable consideration, the receipt of all of which is hereby acknowledged, the said DIVERSIFIED RESEARCH hereby confirms that it has sold, assigned and transferred, and does hereby sell, assign and transfer to the said JACK G. MAZIN, his successors and assigns, its whole right, title and interest for Canada, the United States of America, and all other countries in and to the said invention, and in and to the said applications, and any Letters Patent that may be obtained therefor, and in and to any divisions and continuations thereof, together with its right to claim the benefit of the right of priority provided by the International Convention for the Protection of Industrial Property based on the said Canadian Appplication for Letters Patent or U.S. Application for

ARI 0959

Letters Patent;

AND BE IT KNOWN that the said AMIR LALJI and DIVERSIFIED RESEARCH, hereby agree that when requested, they will without charge to said JACK G. MAZIN, but at the expense of such assignee, sign all papers, take all rightful oaths and do all acts which will be necessary, desirable, or convenient for securing and maintaining patents for said invention in Canada, the U.S. and all other countries, and for vesting title thereto in accordance with this assignment;

AND BE IT KNOWN that in respect of the said application for Canadian Letters Patent and United States Letters Patent, the said AMIR LALJI hereby authorizes and requests the Canadian Commissioner of Patents to issue said Canadian Letters Patent and the United States Commissioner of Patents to issue said United States Letters Patent to said JACK G. MAZIN, the assignee of the entire right, title and interest in and to the same, for his sole use and benefit, and for the use and benefit of his successors and assigns, to the full end of the term for which Letters Patent may be granted, as fully and entirely as the same would have been held by JACK G. MAZIN and AMIR LALJI had this agreement and sale not been made;

9th SIGNED AT                           this
day of June, 1988.


_____
AMIR LALJI


### STATEMENT OF WITNESS

I, FAKHRY GOBRAN         whose full post office
address is 4295 Torino Cres. Mississauga, Ontario, L4W 3T4
state:

That I was personally present and did see AMIR LALJI who is personally known to me to be the person named in the above assignment, duly sign and execute the same.

Signed at
this  9th day of June, 1988.


_____
WITNESS


ARI 0960

EXECUTED AT
this        day of June, 1988.

DIVERSIFIED RESEARCH
LABORATORIES LTD.

By: _____
DR. G.R. LAWFORD
General Manager &
Technical Director

### STATEMENT OF WITNESS

I, Ross LAWFORD
of DIVERSIFIED RESEARCH LABORATORIES LTD., whose full post
office address is 1647 Yonge Street, Toronto, Ontario, Canada
M4R 1T9    hereby state:

THAT THE seal affixed to the attached assignment is
the seal of the said Corporation and has been properly
affixed in accordance with the constitution and by-laws of
the said Corporation, and has been verified in accordance
therewith under the hand(s) of the officer(s) whose
signature(s) appear on the assignment in verification
thereof.

SIGNED AT
this  8th day of June, 1988.

_____
WITNESS

ARI 0961

<u>UNITED STATES</u>

<u>ASSIGNMENT</u>

WHEREAS WE, JACK G. MAZIN and AMIR LALJI whose full post office addresses are 6 Harmony Hill Crescent, Richmond Hill, Ontario, Canada, and 92A Kingsview Blvd., Weston, Ontario, Canada, M9R 1T9, have invented certain new and useful improvements in an invention entitled PROCESS FOR PREPARING A DRIED FRUIT PRODUCT for which an application for United States Letters Patent was executed by Jack G. Mazin on the 19th day of June 1990 and by Amir Lalji on the 26th day of June 1990 under the above title;

AND WHEREAS when the invention was made, AMIR LALJI was in the employment of DIVERSIFIED RESEARCH LABORATORIES LTD. (hereinafter referred to as Diversified Research) having a principal place of business at 1047 Yonge Street, Toronto, Ontario, Canada, M4W 2L3, and made the invention during the course of such employment;

AND WHEREAS DIVERSIFIED RESEARCH has agreed to assign its interest in the said invention to ROYAL DOMAIN INC;

NOW THEREFORE, in consideration of the sum of One Dollar ($1.00) and other good and valuable consideration, the receipt of all of which is hereby acknowledged, I, AMIR LALJI, by these presents confirm that I have sold, assigned and transferred and do hereby sell, assign and transfer unto the said DIVERSIFIED RESEARCH LABORATORIES LTD., the full and exclusive right to the said invention in the United States of America and all other countries and the entire right, title and interest in and to any and all Letters Patent which may be granted therefor, and the entire right, title and interest in and to said application, and in and to any divisions, continuations, continuations-in-part and extensions of said application, together with the right to claim the benefit of the right of priority provided by the International Convention for the Protection of Industrial Property based on said application for United States Letters Patent;

AND WHEREAS JACK G. MAZIN has agreed to assign his interest in the said invention to ROYAL DOMAIN INC;

AND WHEREAS ROYAL DOMAIN INC., a corporation of Ontario, having an address at Suite 2100, 191 University Avenue, Guardian of Canada Tower, Toronto, Ontario, M5H 3M7, has acquired from us the whole right, title and interest for the United States of America and all other countries in and to the said invention and in and to any Letters Patent that may be obtained therefor, and in and to said application;

NOW THEREFORE, in consideration of the sum of One Dollar ($1.00) and other good and valuable consideration, the receipt of all of which is hereby acknowledged, we, JACK G. MAZIN and DIVERSIFIED RESEARCH LABORATORIES LTD., by these presents confirm that we have sold, assigned and transferred and do hereby sell, assign and transfer unto the said ROYAL DOMAIN INC., the full and exclusive right to the said invention in the United States of America and all other countries and the entire right, title and interest in and to any and all Letters Patent which may be granted therefor, and the entire right, title and interest in and

ARI 0962

- 2 -

to said application, and in and to any divisions, continuations, continuations-in-part and extensions of said application, together with the right to claim the benefit of the right of priority provided by the International Convention for the Protection of Industrial Property based on said application for United States Letters Patent;

We agree that we will without further consideration do all such things and execute all such documents as may be necessary or desirable to obtain and maintain patents for said invention and for additions and modifications thereto in any and all countries, and to vest title thereto in said assignee, its successors, assigns and legal representatives or nominees;

We hereby authorize and request the Commissioner of Patents and Trademarks to issue said Letters Patent to said ROYAL DOMAIN INC., the assignee of the entire right, title and interest in and to the same, for its sole use and benefit, and for the use and benefit of its successors and assigns, to the full end of the term for which Letters Patent may be granted as fully and entirely as the same would have been held by us had this assignment and sale not been made.

SIGNED this 15th day of _December_, 1992, at _Toronto_ _____, Ontario, Canada.

_____
JACK G. MAZIN

Witness _S.JOAN M. DARMID_

SIGNED this 16th day of _December_, 1992, at _Weston_ _____, Ontario, Canada.

_____
AMIR LALJI

Witness

SIGNED this _____ day of _____, 1992, at _____ _____, Ontario, Canada.

_____
DIVERSIFIED RESEARCH LABORATORIES

_____
Witness

ARI 0963

**RECORDATION FORM COVER SHEET**
**PATENTS ONLY**

Comparable to PTO-1595

U.S. DEPARTMENT OF COMMERCE
Patent and Trademark Office

To the Honorable Commissioner of Patents and Trademarks: Please record the attached original documents or copy thereof.

| | |
|---|---|
| 1. Name of conveying party(ies):<br><br>Royal Domain, Inc.<br><br>Additional name(s) of conveying party(ies) attached? ___ Yes _X_ No | 2. Name and address of receiving party(ies).<br><br>Name: Amazin Raisins International, Inc.<br><br>Internal Address: _____<br><br>Street Address: 6 Harmony Hill, Richmond Hill<br><br>City: ___ State: _ ZIP: ___<br>Ontario, Canada L4C 8Z1<br><br>Additional name(s) & address(es) attached? ___ Yes _X_ No |

3. Nature of conveyance:

_X_ Assignment    ___ Merger

___ Security Agreement    ___ Change of Name

___ Other _____

Execution Date: June 17, 1994

| | |
|---|---|
| 4. Application number(s) or patent number(s):<br><br>If this document is being filed together with a new application, the execution date of the application is: ___ | |
| A. Patent Application No.(s) | B. Patent No.(s)<br><br>5,188,861 |

Additional numbers attached? ___ Yes _X_ No

| | |
|---|---|
| 5. Name and address of party to whom correspondence concerning document should be mailed:<br><br>Name: Drexler, Goldsmith, Shore & Milnamow, Ltd.<br><br>Address: Two Prudential Plaza - Suite 4700<br>180 North Stetson Avenue<br>Chicago, Illinois 60601 | 6. Total number of applications and patents involved: _1_<br><br>7. Total fee (37 CFR 3.41): ............. $ 40.00<br>_X_ Enclosed<br>___ Authorized to be charged to Deposit Account<br>_X_ The Commissioner is hereby authorized to charge any additional fees which may be required, or credit any overpayment, to Deposit Account No. 04-1644.<br><br>8. Deposit Account number:<br>04-1644<br>(Attach duplicate copy of this page if paying by deposit account) |

**DO NOT USE THIS SPACE**

9. Statement and signature.

To the best of my knowledge and belief, the foregoing information is true and correct and any attached copy is a true copy of the original document.

| | | |
|---|---|---|
| Jack Shore | | July 28, 1994 |
| Name of Person Signing | Signature | Date |

Total number of pages including cover sheet, attachments, and document: _3_

OMB No. 0651-0011 (exp. 4/94)

**Do not detach this portion**

Mail Documents to be recorded with required cover sheet information to:

91851705

050 MH 08/16794 5188861    1.581    40.00 CK

Commissioner of Patents and Trademarks
Box Assignments
Washington, D.C. 20231

Public burden reporting for this sample cover sheet is estimated to average about 30 minutes per document to be recorded, including time for reviewing the document and gathering the data needed, and completing and reviewing the sample cover sheet. Send comments regarding this burden estimate to the United States Patent and Trademark Office, Office of Information Systems, PK2-1000C, Washington, D.C. 20231; and to the Office of Management and Budget, Paperwork Reduction Project (0651-0011), Washington, D.C. 20503.

## ASSIGNMENT

WHEREAS, ROYAL DOMAIN INC., located at 6 Harmony Hill, Richmond Hill, Ontario, Canada L4C 8Z1, is the owner by assignment of the following United States patent:

| Patentee | Patent No. | Granted |
|----------|-----------|---------|
| Jack G. Mazin et al. | 5,188,861 | February 23, 1993 |

WHEREAS, AMAZIN RAISINS INTERNATIONAL, INC., located at 6 Harmony Hill, Richmond Hill, Ontario, Canada L4C 8Z1, is desirous of acquiring the entire right, title and interest in and to said Patents No. 5,188,861.

NOW, THEREFORE, for and in consideration of the sum of One Dollar ($1.00) and other valuable considerations paid to said ROYAL DOMAIN INC. by said AMAZIN RAISINS INTERNATIONAL, INC., receipt of which is acknowledged, said ROYAL DOMAIN INC. hereby sells, assigns, transfers and sets over unto said AMAZIN RAISINS INTERNATIONAL, INC., its successors and assigns the entire right, title and interest in and to said patent and the inventions covered thereby.

IN WITNESS WHEREOF, ROYAL DOMAIN INC. has caused this assignment to be executed by the duly authorized officer below indicated this _17_ day of ___JUNE___, 1994.

ROYAL DOMAIN INC.

By _____
Name: JACK MAZIN
Title: PRESIDENT

Page 1 of 2

Patent No.: 5,188,861        Granted: February 23, 1993

On this _17_ day of _JUNE_____, 1994, before me

came ___Jack Mazin_____ to me known to be the

___President_____ of ROYAL DOMAIN INC., the

assignor of the above assignment, who acknowledges that he

executed the foregoing instrument on behalf of said assignor and

pursuant to authority duly received.

_Mitchell D. Goldsmith_
Notary Public

```
"OFFICIAL SEAL"
MITCHELL D. GOLDSMITH
NOTARY PUBLIC STATE OF ILLINOIS
MY COMMISSION EXPIRES 10/10/94
```

AUG -5 94

RECORDED
PATENT AND TRADEMARK
OFFICE

Page 2 of 2

CANADA

## ASSIGNMENT

WHEREAS we, Jack G. MAZIN and Amir LALJI, whose full post office addresses are 77 Comeau Street, Atholville, New Brunswick, E0K 1A0, Canada and 92A Kingsview Boulevard, Weston, Ontario, M9R 1T9, Canada, respectively, have invented certain new and useful improvements in an invention entitled **PROCESS FOR PREPARING A DRIED FRUIT PRODUCT** for which PCT Application No. PCT/CA93/00034 was filed on the 29th day of January, 1993, and for which the Canadian national phase was entered on the 28th day of July, 1995, under the above title,

AND WHEREAS, **AMAZIN RAISINS INTERNATIONAL, INC.** of 6 Harmony Hill, Richmond Hill, Ontario, L4C 8Z1, Canada, has acquired from us the whole right, title and interest for Canada and all other countries in and to the said invention and in and to any Letters Patent that may be obtained therefor, and in and to said application,

NOW THEREFORE, in consideration of the sum of One Dollar ($1.00) and other good and valuable consideration, the receipt of all of which is hereby acknowledged, we, Jack G. MAZIN and Amir LALJI, by these presents confirm that we have sold, assigned and transferred and do hereby sell, assign and transfer unto the said AMAZIN RAISINS INTERNATIONAL, INC., the full and exclusive right to the said invention in Canada and all other countries and the entire right, title and interest in and to any and all Letters Patent which may be granted therefor, and the entire right, title and interest in and to said application, and in and to any divisions, continuations, continuations-in-part and extensions of said application, together with the right to claim the benefit of the right of priority provided by the International Convention for the Protection of Industrial Property based on said application for Canadian Letters Patent.

**ARI 0964**

- 2 -

We agree that we will without further consideration do all such things and execute all such documents as may be necessary or desirable to obtain and maintain patents for said invention and for additions and modifications thereto in any and all countries, and to vest title thereto in said assignee, its successors, assigns and legal representatives or nominees.

We hereby authorize and request the Commissioner of Patents to issue said Letters Patent to said AMAZIN RAISINS INTERNATIONAL, INC., the assignee of the entire right, title and interest in and to the same, for its sole use and benefit, and for the use and benefit of its successors and assigns, to the full end of the term for which Letters Patent may be granted as fully and entirely as the same would have been held by us had this assignment and sale not been made.

SIGNED this 25th day of JANUARY, 1996, at Toronto, ONTARIO, CANADA.

Witness

JACK G. MAZIN

SIGNED this 25th day of JANUARY, 1996, at Toronto, ONTARIO, CANADA.

Witness

AMIR LALJI

ARI 0965

G. 19. 2004  5:57PM    DOWELL & DOWELL, P. C.                    NO. 8180    P. 1

**5 PAGES SENT BY FACSIMILE August 19, 2004 TO 703 306 5995**
Dowell & Dowell Fax No. 703 415 2559

FORM PTO-1595                                    U.S. DEPARTMENT OF COMMERCE
(REV.6-93)                                       PATENT AND TRADEMARK OFFICE

RECORDATION FORM COVER SHEET
PATENTS ONLY

To the Honorable Commissioner of Patents and Trademarks;
Please record the attached original documents or copy thereof.

| 1. Name of conveying party(ies): <br> Jack G. Mazin <br> Amir Lalji <br><br> Additional name(s) of conveying party(ies) attached? <br> ___ Yes  __X_ No | 2. Name and address of receiving party(ies) <br> Individual Name: <br> and/or <br> Company Name: AMAZING FRUIT PRODUCTS LTD. <br> Street Address: Suite 102, 1 Concorde Gate <br> City: Toronto <br> State: Canada <br> Zip: M3C 3N6 <br> Additional name(s) & address(es) attached? <br> ___Yes  __X__No |
|---|---|
| 3. Nature of conveyance: <br><br> __X_ Assignment        ____ Merger <br> ____ Security Agreement  ____ Change of Name <br><br> ____ Other _____ <br><br> Execution Date: 16 August 2004 | |

4. Application number(s) or patent number(s):
If this document is being filed together with a new application, the execution date of the application is: ___

Title: PROCESS FOR PREPARING A DRIED FRUIT PRODUCT

A. Patent Application No.(s)                    B. Patent No.(s)
                                    |  5 188 861  issued 2/23/93

Additional numbers attached?  ____ Yes  __X__ No

| 5. Name and address of party to whom correspondence concerning document should be mailed: <br> Name: Ralph A. Dowell <br> Internal Address: <br><br> Street Address: Suite 309, <br> 1215 Jefferson Davis Highway <br> Arlington, VA 22202-3124 <br> (703) 415-2555 | 6. Total number of applications and patents involved: __1__ <br><br> 7. Total fee (37CFR 3.41)......$ 40.00 <br><br> ____ Enclosed <br><br> _X_ Authorized to be charged to deposit account <br><br> 8. Deposit account number: 04-1577 <br> (Attach duplicate copy of this page if paying by deposit account) |
|---|---|

DO NOT USE THIS SPACE

9. Statement and signature.
To the best of my knowledge and belief, the foregoing information is true and correct and any attached copy is a true copy of the original document.

Ralph A. Dowell 26.868                              8/19/04
Name of person signing              Signature              Date

Total number of pages including cover sheet, attachments and document:  5

Mail documents to be recorded with required cover sheet information to:
Commission of Patent & Trademarks, Box Assignments
Washington, D.C. 20231

CH $40.00 041577 5188861

**PATENT**
700108445                          **REEL: 015074 FRAME: 0185**

## ASSIGNMENT

WHEREAS, Jack G. Mazin and Amir Lalji, the Assignors, are the inventors and have, the entire right, title and interest in United States Patent 5,188,861, which issued on February 23, 1993, entitled PROCESS FOR PREPARING A DRIED FRUIT PRODUCT,

AND WHEREAS, AMAZING FRUIT PRODUCTS LTD. a Corporation of Ontario Canada, Suite 102, 1 Concorde Gate, Toronto, Ontario M3C 3N6, Canada, hereinafter the Assignee, is desirous of acquiring the entire right, title and interest in and to the Patent within the United States of America and its territorial possessions and all foreign countries therefor.

NOW, THIS INDENTURE WITNESSETH, That for and in consideration of the sum of Ten Dollars, in hand paid to it, and other good and valuable consideration, the receipt whereof is hereby acknowledged, the Assignors have assigned, sold and transferred, and do hereby assign, sell and transfer to the Assignee the entire right, title and interest in the Patent, within the United States of America and its territorial possessions and all foreign countries, and in and to all other applications for LETTERS PATENT for the invention in all other countries, and in and to all divisions and continuations of any of said applications, and in and to any LETTERS PATENT of the United States and foreign countries and all reissues and extensions thereof that may be granted, and the right to apply for LETTERS PATENT in foreign countries with full benefit of such priorities as may now or hereafter be granted to us by local laws or by treaty, including any international convention, for the protection of industrial property, together with the right to extend the protection for said U.S. LETTERS PATENT to the various territorial possessions now owned or which may be hereafter acquired by the United States of America, all said rights to be held and enjoyed by the Assignee for its own use and behoof, and for the use and behoof of its successors or assigns, to the full end of the respective terms for which said LETTERS PATENTS have been or

Page 1 of 4

may be granted, as fully and entirely as the same would have been held and enjoyed by the Assignors if this assignment sale had not been made.

In further consideration of said sum of Ten Dollars, and said other good and valuable consideration, to them paid, the Assignors covenant and agree with the Assignee that they have a full and unencumbered title to the patent(s) hereby assigned, which title is warranted unto the Assignee, and further agree that they will, without demanding any further consideration therefor, at the request but at the expense of the Assignee, do all lawful and just acts, including the execution and acknowledgment of instruments, furnishing of information and giving of testimony, that may be or become necessary for obtaining, sustaining, reexamining or reissuing said United States and any foreign LETTERS PATENTS for the said invention, and for maintaining and perfecting the Assignee's right to said invention and LETTERS PATENT(S), particularly in cases of litigation involving said patents.

Signed on behalf of the Assignor and as a legal act thereof this __16__ day of ~~June~~ 2004.

_____
Jack G. Mazin          President

### DECLARATION OF WITNESS FOR JACK G. MAZIN'S SIGNATURE

I, _MICHAEL MAZIN_ whose full post office address is _____ _8080 KEELE ST, CONCORD ONT L4K 2A3_, hereby declare that I was personally present and did see _Jack G. Mazin_ who is personally known to me to be the person named in the above assignment duly sign and execute the same.

DECLARED at _CONCORD, ONTARIO_, this __16__ day of ~~June~~ 2004.

. 19. 2004  5:58PM    DOWELL & DOWELL, P.C.                    NO. 8180    P. 4

_____
Signature of Witness

### DECLARATION OF WITNESS FOR JACK G. MAZIN'S SIGNATURE

I, _CLIFTON RICHTER_____ whose full post office address is _36_
_Vallonciffe R. Thornvill.ont_, hereby declare that I was personally
present and did see _Jack G. Mazin_ who is personally known to me to be
the person named in the above assignment duly sign and execute the
same.

DECLARED at _CONCORE ..ntorio_, this _16_ day of ~~June~~ _August_
2004.

_____
Signature of Witness

Signed on behalf of the Assignor and as a legal act thereof this
_16_ day of ~~June~~ 2004.
_August_

_____
Amir Lalji

### DECLARATION OF WITNESS FOR AMIR LALJI'S SIGNATURE

I, _Dick Mazin_____ whose full post office address is _36_
_Carmel mills road Thornhill_, hereby declare that I was personally
present and did see _Amir Lalji_ who is personally known to me to be the
person named in the above assignment duly sign and execute the same.

DECLARED at _Contario ontario_, this _16_ day of ~~June~~ _August_
2004.

Page 3 of 4

**PATENT**
**REEL: 015074 FRAME: 0188**

AUG. 19. 2004  5:58PM    DOWELL & DOWELL, P.C.                    NO. 8180    P. 5

_____
Signature of Witness

### DECLARATION OF WITNESS FOR AMIR LALJI'S SIGNATURE

I, _CLIFFORD RICHLER_ whose full post office address is
_96 Vallencliffe RD. Thornhill, Ontario_ hereby declare that I was
personally present and did see **Amir Lalji** who is personally known to
me to be the person named in the above assignment duly sign and
execute the same.

DECLARED at _CONCORDE, Ontario_, this _16_ day of _AUGUST_, 2004.

_____
Signature of Witness

Page 4 of 4

PATENT
REEL: 015074 FRAME: 0189

ASSIGNMENT

WHEREAS, AMAZIN RAISINS INTERNATIONAL, INC, of 16 Harmony Hall, Richmond Hill, Ontario L4C 8Z1, Canada, the Assignor, has acquired from the inventors, Jack G. Mazin and Amir Lalji, the entire right, title and interest in United States Patent 5,188,861, which issued on February 23, 1993, entitled PROCESS FOR PREPARING A DRIED FRUIT PRODUCT,

AND WHEREAS, AMAZING FRUIT PRODUCTS LTD. a Corporation of Ontario Canada, Suite 102, 1 Concorde Gate, Toronto, Ontario M3C 3N6, Canada, hereinafter the Assignee, is desirous of acquiring the entire right, title and interest in and to the Patent within the United States of America and its territorial possessions and all foreign countries. therefor.

NOW, THIS INDENTURE WITNESSETH, That for and in consideration of the sum of Ten Dollars, in hand paid to it, and other good and valuable consideration, the receipt whereof is hereby acknowledged, the Assignors have assigned, sold and transferred, and does hereby assign, sell and transfer to the Assignee the entire right, title and interest in the Patent, within the United States of America and its territorial possessions and all foreign countries, and in and to all other applications for LETTERS PATENT for the invention in all other countries, and in and to all divisions and continuations of any of said applications, and in and to any LETTERS PATENT of the United States and foreign countries and all reissues and extensions thereof that may be granted, and the right to apply for LETTERS PATENT in foreign countries with full benefit of such priorities as may now or hereafter be granted to us by local laws or by treaty, including any international convention, for the protection of industrial property, together with the right to extend the protection for said U.S. LETTERS PATENT to the various territorial possessions now owned or which may be hereafter acquired by the United States of America, all said rights to be held and enjoyed by the Assignee for its own use and behoof, and

Page 1 of 3

ARI 0956

for the use and behoof of its successors or assigns, to the full end
of the respective terms for which said LETTERS PATENTS may be granted,
as fully and entirely as the same would have been held and enjoyed by
the Assignors if this assignment sale had not been made.

In further consideration of said sum of Ten Dollars, and said
other good and valuable consideration, to it paid, the Assignee
covenants and agrees with the Assignee that it has a full and
unencumbered title to the patent hereby assigned, which title is
warranted unto the Assignee, and further agree that they will, without
demanding any further consideration therefor, at the request but at
the expense of the Assignee, do all lawful and just acts, including
the execution and acknowledgment of instruments, furnishing of
information and giving of testimony, that may be or become necessary
for obtaining, sustaining, reexamining or reissuing said United States
and any foreign LETTERS PATENTS for the said invention, and for
maintaining and perfecting the Assignee's right to said invention and
LETTERS PATENT(S), particularly in cases of interference and
litigation.

Signed on behalf of the Assignor and as a legal act thereof this
____ day of January 2005.

_____

Jack G. Mazin          President

DECLARATION OF WITNESS

I, _Josh Marek_____ whose full post office address is 3
Innisbrook Cres. Thornhill, L3T5A9 , hereby declare that I was personally
present and did see Jack G. Mazin who is personally known to me to be
the person named in the above assignment duly sign and execute the
same.

DECLARED at _Tolono, Ontario_, this 31 day of January
2005.

Page 2 of 3

**ARI 0957**

Josh · Granek
_____
Printed name (Witness)

Josh Granek
_____
Signature of Witness


## DECLARATION OF WITNESS

I, _Corinne Mazin_ whose full post office address is _36_
_German Mills road, Thornhill, on. L3T4H5_ hereby declare that I was personally
present and did see <u>Jack G. Mazin</u> who is personally known to me to be
the person named in the above assignment duly sign and execute the
same.

DECLARED at _Toronto, Ontario_ , this _31st_ day of <u>January</u>
2005.

Corinne Mazin
_____
Printed name (Witness)

Corinne Mazin
_____
Signature of Witness

Page 3 of 3

**ARI 0958**

AR. 10. 2005  6:09PM     DOWELL & DOWELL, P.C.                    NO. 2045    P. 1

**4 PAGES SENT BY FACSIMILE March 10, 2005 TO 703 306 5995**

**Dowell & Dowell Fax No. 703 415 2559**

FORM PTO-1595                                   U.S. DEPARTMENT OF COMMERCE
(REV.6-93)                                      PATENT AND TRADEMARK OFFICE

### RECORDATION FORM COVER SHEET
### PATENTS ONLY

Our Docket No.: Amazin Raisins

To the Honorable Commissioner of Patents and Trademarks:
Please record the attached original documents or copy thereof.

| | |
|---|---|
| 1. Name of conveying party(ies) and execution date: <br> AMAZIN RAISINS INTERNATIONAL, INC.   31 Jan 2005 <br><br> Additional name(s) of conveying party(ies) attached? ___ Yes  _X_ No | 2. Name and address of receiving party(ies) <br> Individual Name: <br> and/or <br> Company Name: AMAZING FRUIT PRODUCTS LTD. <br> Street Address: Suite 102, 1 Concorde Gate <br> City: Toronto, Ontario <br> State: Canada <br> Zip: M3C 3N6 <br> Additional name(s) & address(es) attached? ___ Yes  _X_ No |
| 3. Nature of conveyance: <br><br> _X_ Assignment        ___ Merger <br> ___ Security Agreement   ___ Change of Name <br><br> ___ Other | |

4. Application number(s) or patent number(s):
If this document is being filed together with a new application, the execution date of the application is: ___

Title: PROCESS FOR PREPARING A DRIED FRUIT
A. Patent Application No.(s)                    B. Patent No.(s)
                                              5 188 861
            Additional numbers attached?  ___ Yes  _X_ No

| | |
|---|---|
| 5. Name and address of party to whom correspondence concerning document should be mailed: <br> Name: Ralph A. Dowell <br> Internal Address: <br><br> Street Address: Suite 406, <br> 2111 Eisenhower Avenue <br> Alexandria, VA 22314 <br> (703) 415-2555 | 6. Total number of applications and patents involved: _1_ <br><br> 7. Total fee (37CFR 3.41)...... $ 40.00 <br> ___ Enclosed <br> _X_ Authorized to be charged to deposit account <br><br> 8. Deposit account number: 04-1577 <br> (Attach duplicate copy of this page if paying by deposit account) |

9. Statement and signature.
   To the best of my knowledge and belief, the foregoing information is true and correct and any attached copy is a true copy of the original document.

Ralph A. Dowell 26,868                                      10 March 2005
Name of Person signing            Signature                      Date

Total number of pages including cover sheet, attachments and documents:  4

Mail documents to be recorded with required cover sheet information to:
Commission of Patent & Trademarks, Box Assignments
Washington, D.C. 20231

700161093

## ASSIGNMENT

WHEREAS, AMAZIN RAISINS INTERNATIONAL, INC, of 16 Harmony Hall, Richmond Hill, Ontario L4C 8Z1, Canada, the Assignor, has acquired from the inventors, Jack G. Mazin and Amir Lalji, the entire right, title and interest in United States Patent 5,188,861, which issued on February 23, 1993, entitled PROCESS FOR PREPARING A DRIED FRUIT PRODUCT,

AND WHEREAS, AMAZING FRUIT PRODUCTS LTD. a Corporation of Ontario Canada, Suite 102, 1 Concorde Gate, Toronto, Ontario M3C 3N6, Canada, hereinafter the Assignee, is desirous of acquiring the entire right, title and interest in and to the Patent within the United States of America and its territorial possessions and all foreign countries therefor.

NOW, THIS INDENTURE WITNESSETH, That for and in consideration of the sum of Ten Dollars, in hand paid to it, and other good and valuable consideration, the receipt whereof is hereby acknowledged, the Assignors have assigned, sold and transferred, and does hereby assign, sell and transfer to the Assignee the entire right, title and interest in the Patent, within the United States of America and its territorial possessions and all foreign countries, and in and to all other applications for LETTERS PATENT for the invention in all other countries, and in and to all divisions and continuations of any of said applications, and in and to any LETTERS PATENT of the United States and foreign countries and all reissues and extensions thereof that may be granted, and the right to apply for LETTERS PATENT in foreign countries with full benefit of such priorities as may now or hereafter be granted to us by local laws or by treaty, including any international convention, for the protection of industrial property, together with the right to extend the protection for said U.S. LETTERS PATENT to the various territorial possessions now owned or which may be hereafter acquired by the United States of America, all said rights to be held and enjoyed by the Assignee for its own use and behoof, and

Page 1 of 3

for the use and behoof of its successors or assigns, to the full end
of the respective terms for which said LETTERS PATENTS may be granted,
as fully and entirely as the same would have been held and enjoyed by
the Assignors if this assignment sale had not been made.

In further consideration of said sum of Ten Dollars, and said
other good and valuable consideration, to it paid, the Assignee
covenants and agrees with the Assignee that it has a full and
unencumbered title to the patent hereby assigned, which title is
warranted unto the Assignee, and further agree that they will, without
demanding any further consideration therefor, at the request but at
the expense of the Assignee, do all lawful and just acts, including
the execution and acknowledgment of instruments, furnishing of
information and giving of testimony, that may be or become necessary
for obtaining, sustaining, reexamining or reissuing said United States
and any foreign LETTERS PATENTS for the said invention, and for
maintaining and perfecting the Assignee's right to said invention and
LETTERS PATENT(S), particularly in cases of interference and
litigation.

Signed on behalf of the Assignor and as a legal act thereof this
_31_ day of _January_ 2005.

_____

Jack G. Mazin        President

DECLARATION OF WITNESS

I, _Josh Marek_ whose full post office address is _3_
_Innisbrook Cres, Thornhill, L3 TS4Y_, hereby declare that I was personally
present and did see _Jack G. Mazin_ who is personally known to me to be
the person named in the above assignment duly sign and execute the
same.

DECLARED at _TORONTO, ONTARIO_, this _31_ day of _January_
2005.

Page 2 of 3

_Josh  Granek_

Printed name (Witness)

_Josh  Granek_

Signature of Witness

DECLARATION OF WITNESS

I, _Corinne Mazin_ whose full post office address is _36 German Mills road, Thornhill, on. L3T4H5_ hereby declare that I was personally present and did see Jack G. Mazin who is personally known to me to be the person named in the above assignment duly sign and execute the same.

DECLARED at _Toronto, ontario_, this _31st_ day of January 2005.

_Corinne  Mazin_

Printed name (Witness)

_Corinne Mazin_

Signature of Witness

Page 3 of 3

**PATENT**
**REEL: 015870 FRAME: 0849**

**RECORDED: 03/10/2005**

## PATENT ASSIGNMENT

WHEREAS, AMAZING FRUIT PRODUCTS LTD. of 1 Concorde Gate, Suite 102, Toronto, Ontario M3C 3N6, Canada, the **Assignor,** has acquired from the inventors, Jack G. Mazin and Amir Lalji, the entire right, title and interest in United States Patent 5,188,861 which issued on February 23, 1993, entitled PROCESS FOR PREPARING A DRIED FRUIT PRODUCT,

AND WHEREAS, AMAZIN RAISINS INTERNATIONAL, INC. a Corporation of Ontario, Canada, 36 German Mills Rd, Thornhill, Ontario L3T 4H5, Canada, hereinafter the **Assignee,** is desirous of reacquiring the entire right, title and interest in and to the Patent within the United States of America and its territorial possessions and all foreign countries therefor .

NOW, THIS INDENTURE WITNESSETH, That for and in consideration of the sum of Ten Dollars, in hand paid to it, and other good and valuable consideration, the receipt whereof is hereby acknowledged, the Assignor has assigned, sold, and transferred, and does hereby assign, sell and transfer to the Assignee the entire right, title and interest in the Patent, including all claims, damages, or other relief that the Assignor has for infringement of the Patent within the United States of America and its territorial possessions and all foreign countries, and in and to all other applications for LETTERS PATENT for the invention in all other countries, and in and to all divisions and continuations of any of said applications, and in and to any LETTERS PATENT of the United States and foreign countries and all reissues and extensions thereof that may be granted, and the right to apply for LETTERS PATENT in foreign countries with full benefit of such priorities as may now or hereafter be granted to us by local laws or by treaty, including any international convention, for the protection of industrial property, together with the right to extend the protection for said U.S. LETTERS PATENT to the various territorial possessions now owned or which may be hereafter acquired by the United States of America, all said rights to be held and enjoyed by the Assignee for its own use and behoof, and for the use and behoof of its successors or assigns, to the full end of the respective terms for which said LETTER PATENTS may be granted, as fully and entirely as the same would have been held and enjoyed by the Assignor if this assignment sale had not been made.

Page 1 of 3

ARI 0953

In further consideration of said sum of Ten Dollars, and said other good and valuable consideration, to it paid, the Assignor covenants and agrees with the Assignee that it has full and unencumbered title to the Patent hereby assigned, which title is warranted unto the Assignee, and further agree that they will, without demanding any further consideration therefore, at the request but at the expense of the Assignee, do all lawful and just acts, including the execution and acknowledgement of instruments, furnishing of information and giving of testimony, that may be or become necessary for obtaining, sustaining, reexamining or reissuing said United States and any foreign LETTERS PATENTS for said invention, and for maintaining and perfecting the Assignee's right to said invention and LETTERS PATENT(S), particularly in cases of interference and litigation.

Signed on behalf of the Assignor and as a legal act thereof this ____28____ day of April, 2005.

_____

Jack G. Mazin          President

## DECLARATION OF WITNESS

I, _CLIFFORD RICHLER_ whose full post office address is _36 Valloncliffe / Thornhill, ont_ , hereby declare that I was personally present and did see _Jack G. Mazin_ who is personally known to me to be the person named in the above assignment, duly sign and execute the same.

DECLARED at _Toronto, Ontario_ , this _28th_ day of _April_, 2005.

_CLIFFORD RICHLER_                    _____
Printed Name of Witness               Signature of witness

Page 2 of 3

**ARI 0954**

## DECLARATION OF WITNESS

I, _CECILIA DIZON_ whose full post office address is _183 COCKSFIELD AVE. #6_ hereby declare that I was personally
_NORTH YORK, ONT_
present and did see _Jack G. Mazin_ who is personally known to me

to be the person named in the above assignment, duly sign and

execute the same.

DECLARED at _Toronto, Ontario_, this _28_ day of _April,_ 2005.

_CECILIA DIZON_                         _[signature]_

Printed Name of Witness                 Signature of Witness

Page 3 of 3

ARI 0955

# EXHIBIT 22

# Merchant & Gould

### An Intellectual Property Law Firm

3200 IDS Center
80 South Eighth Street
Minneapolis, Minnesota
55402-2215 USA
Tel 612.332.5300
Fax 612.332.9081
www.merchant-gould.com

A Professional Corporation

| | |
|---|---|
| Direct Contact | 612.371.5271<br>mdoscotch@merchant-gould.com |

**RECEIVED APR 12 2005 BY: M.E. ZELIGER**

April 12, 2005

Michael Zeliger
Fish & Richardson P.C.
225 Franklin Street
Boston, MA 02110-2804

**VIA FACSIMILE**
**PURSUANT TO FRE 408**

Re:    Amazin' Raisins International, Inc. v. Ocean Spray Cranberries, Inc.
       Civil Action No. 04-12679-MLW
       M&G No. 14158.1-US-ZA

Dear Mr. Zeliger:

Pursuant to Local Rule 16.1, Plaintiff, Amazin Raisins International, Inc., presents the following written settlement proposal. Although Amazin Raisin believes based upon the information it has to date that the damages for Ocean Spray's infringement of the '861 patent may be several millions of dollars, it is willing to settle this lawsuit for $2,000,000 for all past infringing sales and for a 3.5% royalty on all future sales of Ocean Spray's flavored Craisin products until the expiration of the patent.

Sincerely,

Matthew A. Doscotch

MAD:lmb

cc: Jack Mazin
    William R. Woodford, Esq.

Minneapolis/St. Paul
Denver
Seattle
Atlanta
Washington, DC

# EXHIBIT 23

**Zeliger, Michael E.**

---

**From:**    Christopher J. Sorenson [CSorenson@merchantgould.com]
**Sent:**    Thursday, October 19, 2006 10:31 AM
**To:**      Zeliger, Michael E.; William Woodford
**Cc:**      Douglas Williams; Amy J. Mullenix; Todd S. Werner
**Subject:** ARI v. Ocean Spray -- Confidential Settlement Communication, Subject To FRE 408.

Mike,

ARI has from the beginning of this lawsuit been certain that Ocean Spray's process, beginning with decharacterized fruit, infringes claim 1 of the Mazin patent.  ARI is also appreciative of the efforts that both parties have made to limit the costs and to cooperate in this litigation so that expenses could, where possible, be minimized.

We believe strongly, as we always have, that this case turns on claim construction.  It is unfortunate that it has taken longer than we both expected to have the hearing, but given the Court's comments last week, we believe that the Court understands that patent claims are not to be construed as any person on the street might understand them, but as one of ordinary skill in the art would.  Thus, although there may be some semantic and superficial appeal to the notion that "dried" cannot mean "wet," or that "to remove" cannot mean "to balance," Ocean Spray's basic claim construction lacks merit.

We also intend to fully explore the discovery of all communications between Ocean Spray and its opinion counsel, and to further develop facts pertaining to willful infringement in the coming months.

With that said, ARI is also cognizant of the fact that Ocean Spray is not interested in developing a business relationship that would entail the license or sale of raisin-based products.  However, it is clear that the market is now ready for an alternative to high sugar snack foods, and ARI's business plan is to move swiftly into the United States market with its flavored Raisins.

We propose one of three options to settle this case.

1) Ocean Spray takes a non-exclusive, fully paid license to the Mazin Patent for use with any fruit.  Ocean Spray makes a one time payment of $10,000,000.00 for this license.

2)  Ocean Spray takes a non-exclusive, partially paid license to the Mazin Patent for use with any fruit.  Ocean Spray pays a royalty of 8% on gross revenue from future sales of all accused products, with an up-front payment of $5,000,000.00 for past infringing sales.

3)  Ocean Spray takes a non-exclusive license to Claim 1 of the Mazin Patent, limited in scope to cranberries, and agrees to continue processing its flavored cranberries exclusively with its current counter-current process.  Ocean Spray agrees to mark the accused products with the Mazin Patent.  Ocean Spray agrees to pay $1,000,000.00 for past infringement, and agrees to a future royalty payment of 3% on gross revenue from the sale of the accused products.

We look forward to your response.

Sincerely,

Christopher J. Sorenson, Esq.
Merchant & Gould
An Intellectual Property Law Firm
80 S. 8th St., 3200 IDS Center
Minneapolis, MN 55402
612-336-4645
csorenson@merchant-gould.com

9/11/2007

9/11/2007