*04-CV-12679*

NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2008-1098

AMAZIN' RAISINS INTERNATIONAL, INC.,

Plaintiff-Appellant,

v.

OCEAN SPRAY CRANBERRIES, INC.,

Defendant-Appellee.

Rachel K. Zimmerman, Merchant & Gould P.C., of Minneapolis, Minnesota, argued for plaintiff-appellant.  With her on the brief were Christopher J. Sorenson, Joshua P. Graham, and Elizabeth A. Zidones.

Jeffrey L. Snow, Kirkpatrick & Lockhart Preston Gates Ellis LLP, of Boston, Massachusetts, argued for defendant-appellee.  With him on the brief was Michael E. Zeliger.

Appealed from:  United States District Court for the District of Massachusetts

Chief Judge Mark L. Wolf

NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2008-1098

AMAZIN' RAISINS INTERNATIONAL, INC.,

                Plaintiff-Appellant,

v.

OCEAN SPRAY CRANBERRIES, INC.,

                Defendant-Appellee.

Appeal from the United States District Court for the District of Massachusetts in Case No. 04-CV-12679, Chief Judge Mark L. Wolf

DECIDED: October 31, 2008

Before NEWMAN and LOURIE, Circuit Judges, and ALSUP,[*] District Judge.

ALSUP, District Judge.

## INTRODUCTION

Amazin' Raisins International, Inc. ("ARI"), appeals a final judgment by the United States District Court for the District of Massachusetts. Amazin' Raisins Int'l, Inc. v. Ocean Spray Cranberries, Inc., Cr. No. 04-12679-MLW, 2007 WL 2386360 (D. Mass. August 20, 2007). ARI appeals both the district court's claim construction and its grant

---

[*] Honorable William Alsup, District Judge, United States District Court for the Northern District of California, sitting by designation.

of summary judgment of non-infringement of U.S. Patent No. 5,188,861 ("'861 patent") in favor of Ocean Spray Cranberries, Inc. ("OSC"). Because we conclude that the district court did not err in its claim construction or its infringement analysis, we affirm.

**STATEMENT**

The '861 patent is directed toward a process for preparing a flavored dried-fruit product having a flavor that does not substantially correspond to the natural flavor of the dried fruit. The process involves two or three steps. *First*, dried-fruit pieces are treated with an acidulant in an amount and for a period of time sufficient to remove the dried fruit's natural flavor. The acidulant may be chosen from the group consisting of tartaric acid, malic acid, citric acid, ascorbic acid, phosphoric acid, and fumaric acid. *Second*, the resulting dried-fruit pieces are dehydrated until a desired moisture content is reached. *Third*, as part of the acidulant treatment (*i.e.*, the first step of the process) or after dehydration (*i.e.*, the second step of the process), a flavoring agent is added to the dried-fruit pieces in an amount and for a period of time which is sufficient to impart the dried fruit with a flavor that is substantially the same as the flavoring agent.

All illustrative examples detailed in the '861 specification describe the process as applied to raisins. For instance, syrup containing a cherry-flavor solution and malic acid could be added to dried raisins for a period of six hours "to allow the solution to be absorbed into the raisins" (col. 6:65–col. 7:2). The treated raisins could then be dehydrated and cooled. The resultant fruit product is a raisin with a cherry *taste*.

Claim 1 of the '861 patent — the sole claim at issue — is the only claim directed to all types of dried fruit. The remaining claims are limited to treating raisins. Claim 1 provides (emphases added):


> A process for preparing a flavored dried fruit product said process comprising:
>
> (a) <u>treating a dried fruit with an acidulant</u> being selected from the group consisting of tartaric acid, malic acid, citric acid, ascorbic acid, phosphoric acid, and fumaric acid, <u>in an amount and for a period of time which is sufficient to substantially remove the natural flavor of the dried fruit</u>;
>
> (b) dehydrating the treated dried fruit to obtain a desired moisture content; and
>
> (c) treating the dried fruit during step (a) or after step (b) with a flavoring agent having a flavor which does not substantially correspond to the natural flavor of the dried fruit, said flavoring agent being employed in an amount sufficient and a period of time which is sufficient to impart to the dried fruit a flavor which is substantially the same as the flavoring agent; and so forming a flavored dried fruit product having an outer surface which is substantially non-sticky whereby the flavored dried fruit product may be easily handled.

The examiner originally rejected all claims of the '861 patent as obvious in light of the combination of U.S. Patent No. 1,717,489 ("Barlow"), U.S. Patent No. 4,542,033 ("Agarwala"), and the Chemical Rubber Company Book of Food Additives. In response, ARI argued that while Barlow did disclose a process for treating dried fruit, it only taught repeatedly exposing the external surface of the dried fruit to fruit juice and did not employ the use of any acidulant. Next, ARI distinguished Agarwala by arguing that it only suggested the application of an acidulant to fresh-fruit pieces. Following the response, all claims were allowed.

\*   \*   \*

OSC's process produces sweetened cranberries that are infused with various flavors, such as orange and cherry. The process operates in three steps. Significantly, the *accused* process consists solely of steps two and three. *First*, frozen cranberries

are sorted, sliced, defrosted, and discharged into a piece of equipment called the "counter current extractor" ("CCE"). Water or permeate then flows down the CCE onto the cranberries thereby removing a substantial portion of the cranberries' natural-flavor components. Put in another way, the sugars, acids, and other natural substances in the cranberries are displaced by the incoming water or permeate. The parties agree that the moisture content of the cranberries that enter the CCE is approximately 87%. OSC refers to the cranberries that come out of the CCE as "decharacterized fruit." The parties disagree as to the moisture content of the decharacterized fruit exiting the CCE. OSC maintains that the moisture content is roughly 90%, while ARI argues that it is unknown because it was not measured by either party.

*Second*, the decharacterized fruit enters the "counter current infuser" ("CCI") where it is immersed in an infusion syrup containing sugar, a coloring agent, and citric acid for roughly three hours. The citric acid is used to add a tart flavor to the fruit. The cranberries leaving the CCI are then washed or shaken to remove any excess infusion syrup. At this point, the record is undisputed that the cranberries have a moisture content between 46 to 60%.

*Third*, the cranberries are conveyed into what OSC refers to as a "dryer." In the dryer, the cranberries are subjected to forced air for approximately two hours. The moisture content of the cranberries exiting the dryer is below 18%.

\*         \*         \*

ARI filed suit against OSC in July 2004, alleging that OSC's process for producing its cranberries infringed claim 1 of the '861 patent. OSC moved for summary judgment of non-infringement with respect to three limitations in claim 1: (1) "treating a

dried fruit;" (2) "with an acidulant . . . in an amount and for a period of time which is sufficient to substantially remove the natural flavor of the dried fruit;" and (3) "an outer surface which is substantially non-sticky whereby the flavored dried fruit product may be easily handled." The district court granted summary judgment of non-infringement as to the first two limitations and did not address the third limitation. <u>Amazin' Raisins International, Inc. v. Ocean Spray Cranberries, Inc.</u>, Cr. No. 04-12679, 2007 WL 2386360 (D. Mass. August 20, 2007) ("Summary Judgment Order").

With respect to the first limitation, the district court construed the term "dried fruit" to mean "fruit from which natural moisture has been removed which has approximately 10 to 18% moisture remaining." This was based on the leading paragraph of the detailed description of the invention in the specification, stating (col. 3:58–63) (emphasis added):

> The dried fruits which may be flavored employing the processes of the invention include peach, apple, pear, raisins, prunes, apricots and cherries. <u>Any dried fruit which contains between about 10% to 18% moisture may be employed.</u> The process can be employed on whole or sectioned pieces of dried fruit.

Using this construction, the district court found that OSC's accused process did not treat "dried fruit" because the decharacterized cranberries entering the CCE had a moisture content well above 10 to 18%.

The district court also found that OSC's accused process did not meet the second limitation because the purpose of the acidulant in OSC's process was to add its own tart flavor to the cranberries and not to "substantially remove" the cranberries' natural flavor. More specifically, the district court found that the cranberries' natural flavor was removed during step one of its process — <i>i.e.</i>, in the CCE.

On August 20, 2007, the district court entered final judgment in favor of OSC and ARI timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## ANALYSIS

We review the district court's claim construction and grant of summary judgment of non-infringement de novo. Netscape Commc'ns Corp. v. Konrad, 295 F.3d 1315, 1319 (Fed. Cir. 2002).[1] Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In addition, in deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). On appeal, ARI challenges the district court's construction of the term "dried fruit" and the district court's grant of summary judgment of non-infringement of claim 1. We will address each argument in turn.

A.   Claim Construction

The district court construed the term "dried fruit" to mean "fruit from which natural moisture has been removed which has about 10 to 18% moisture remaining." Summary Judgment Order, slip op. at 30. The district court also construed the term "about" to mean "approximately." ARI argues that the district court erroneously imported a numerical limitation into the claim and that the term "dried fruit" should not be limited by any particular moisture range. Instead, ARI contends that the term "dried fruit" should have been construed to mean "fruit that has had a portion of its natural moisture

---

[1]   Internal citations are omitted from all quoted authorities.

removed." After reviewing the intrinsic record, we conclude that the district court correctly construed the term "dried fruit."

Significantly, the first paragraph of the detailed description of the invention in the specification states in whole part (col. 3:58–63) (emphasis added):

> The dried fruits which may be flavored employing the processes of the invention include peach, apple, pear, raisins, prunes, apricots and cherries. <u>Any dried fruit which contains between about 10% to 18% moisture may be employed.</u> The process can be employed on whole or sectioned pieces of dried fruit.

This passage appears before any preferred embodiments are discussed or any specific examples detailed.

ARI contends that this paragraph should be discounted because those skilled in the art would have read the entirety of the specification to suggest that any piece of fruit with *some* of its natural moisture removed could be employed. ARI, however, cites to no other portion of the specification that repudiates the plain language of the opening paragraph. Nor can it.

"In light of the statutory directive that the inventor provide a 'full' and 'exact' description of the claimed invention, the specification necessarily informs the proper construction of the claims." Phillips v. AWH Corp., 415 F.3d 1303, 1316 (Fed. Cir. 2005). It is hard to understand the import of the underscored sentence other than as defining the dried fruit to which the invention was directed. ARI now requests that this language be deleted from the specification or completely ignored. But the language employed by the patentee could not have been more clear in explaining the dried fruit to which the invention was directed: "Any dried fruit which contains between about 10% to

18% moisture may be employed." To now say that these limits should be ignored would be a direct contradiction to the public-notice function of a patent.

ARI next argues that importing a numerical range into the claim would be improper because the claim does not expressly contain any such limitation. Although it is generally true that we will not limit a claim written in general, descriptive words by a numerical range appearing only in the written description, see Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1249 (Fed. Cir. 1998), "when a patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning, he has defined that term 'by implication.'" Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc., 262 F.3d 1258, 1271 (Fed. Cir. 2001). Again, the passage at issue announces the scope of the detailed description of the invention and precedes all other discussion of any embodiments or examples. In those decisions declining to import a numerical limitation into a claim, the specifications provided varying definitions and usage for the claim terms at issue. See Johnson Worldwide Assocs., Inc. v. Zebco Corp., 175 F.3d 985, 991 (Fed. Cir. 1999); see also Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1310 (Fed. Cir. 1999). Here, however, the specification contains no varied usage or ambiguity.

ARI also contends that the district court's construction is incorrect because the '861 specification teaches that the dried fruit need only be sufficiently dry to allow absorption of the flavoring solution in an amount somewhat less than 10% by weight of the final product (col. 2:37–39) ("said flavor solution being employed in an amount of about 10 to 100% by weight of final product"). This may be true but is irrelevant. That the flavoring solution can be used in an amount as low as 10% of the final weight of the

product does not speak to the amount of moisture content in the product at the beginning of the process. Even if the final fruit product absorbs only 10% of the flavoring solution, that does not necessarily imply that the dried fruit had a 90% moisture content before being treated.

Accordingly, we conclude that the district court did not err in its construction of the term "dried fruit."

### B. Non-Infringement

ARI maintains that the district court erred in granting summary judgment of non-infringement as to the "substantially remove" limitation and, even using the district court's construction, as to the "dried fruit" limitation. We address each limitation separately.

#### 1. "dried fruit"

ARI's appeal with respect to the "dried fruit" limitation is limited to the district court's grant of summary judgment of non-infringement under the doctrine of equivalents.[2] The district court found that OSC's accused process did not infringe claim 1 under the doctrine of equivalents because: (1) ARI had expressly surrendered fresh fruit during prosecution and (2) any finding of equivalency would necessarily vitiate the "dried fruit" limitation out of the claim. We affirm on the latter ground.

According to ARI, OSC's decharacterized fruit represents an insubstantial change from the "dried fruit" of claim 1. Under the doctrine of equivalents, "a product or process that does not literally infringe upon the express terms of a patent claim may

---

[2] ARI's arguments regarding literal infringement are based solely on its proposed construction for the term "dried fruit." That proposed construction has already been rejected. We therefore only address infringement under the doctrine of equivalents.

nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." Warner-Jenkinson Co. v. Hilton Davis Chemical Co., 520 U.S. 17, 21 (1997). The "all-limitations" rule, however, restricts the doctrine of equivalents in circumstances where its application would necessarily vitiate a claim limitation. In determining whether the application of the all-limitations rule is appropriate, we consider "the totality of the circumstances of each case and determine whether the alleged equivalent can be fairly characterized as an insubstantial change from the claimed subject matter without rendering the pertinent limitation meaningless." Freedman Seating Co. v. Am. Seating Co., 420 F.3d 1350, 1359 (Fed. Cir. 2005).

We agree with the district court that a finding that OSC's decharacterized fruit is an equivalent would essentially render the "dried fruit" limitation meaningless, and thus vitiate that limitation from the claim. As construed, claim 1 requires that the process be applied to a fruit product having a moisture content of approximately 10 to 18%. The undisputed record here is that the decharacterized fruit pieces entering the CCI have roughly a 87 to 90% moisture content.[3] To find that an item of fruit with a moisture content between 87 to 90% is insubstantially different from an item of dried fruit with a

---

[3] In two footnotes in its opening brief, ARI argues that this issue is disputed. More specifically, ARI contends that OSC never actually measures the moisture content of the decharacterized fruit that enters the CCI. For its part, however, ARI has provided no evidence indicating otherwise despite its burden to prove infringement. The parties have stipulated that the moisture content of the fruit pieces entering the CCE is approximately 87%. OSC has proffered evidence in the form of sworn declarations stating that the moisture content of the fruit remains roughly the same throughout the extraction process where the cranberries' natural juices are replaced by water or permeate. There is therefore simply nothing on the current record supporting ARI's argument that the moisture content of the decharacterized fruit is below 87 to 90%. Again, ARI could have easily measured the moisture content of the decharacterized fruit and chose not to.

moisture content between 10 to 18% would defy reason and necessarily render the "dried fruit" limitation meaningless. Accordingly, we affirm the district court's finding that OSC's accused process does not employ "dried fruit" as contemplated by claim 1.

### 2. "substantially remove"

Although the above is dispositive, we also affirm the district court's grant of summary judgment of non-infringement on the ground that OSC's process does not meet the "substantially remove" limitation of claim 1. Step (a) of claim 1 requires "treating a dried fruit with an acidulant . . . in an amount and for a period of time which is sufficient to substantially remove the natural flavor of the dried fruit." The district court found that OSC's process does not infringe because its acidulant is not used to substantially remove the natural flavor from the cranberries. Rather, in OSC's process the natural flavor of the cranberries is removed in the CCE by water or permeate; the acidulant is only added in the later infusion process. In addition, the district court found that claim 1 required that the acidulant not add its own flavor to the treated fruit. The acidulant in OSC's process, by contrast, adds a tart flavor to the cranberries. No express construction was given for "substantially remove" by the district court.

As an initial matter, we question the district court's finding that claim 1 requires that the acidulant not add its own flavor to the treated fruit. The '861 specification itself states that "[t]he acidulant may also give the dried fruit product a tart taste" (col. 4:39–40). Nothing in the remaining portions of the specification nor in claim 1 remotely suggest otherwise. In its brief, OSC admits as much.

Nonetheless, we find that OSC's process does not meet the "substantially remove" limitation. It is undisputed that the cranberries in OSC's process are run

through the CCE where they are treated with water or permeate to thereby substantially remove the cranberries' natural-flavor components. The acidulant is only added in the CCI where the treated cranberries are infused with flavoring syrup. At no point in the process is the acidulant used by OSC to "remove" the natural flavor from the cranberries.

ARI contends that claim 1 does not require that the acidulant *physically* remove the natural flavor of the fruit, but only that it be used so as to *mask* it. According to ARI, the question is not whether the natural flavor of the fruit has actually been removed, but instead, whether the natural flavor of the fruit can be tasted. We reject this argument for it is in direct contradiction with the express language employed in claim 1. The claim requires that the acidulant "substantially remove" the natural flavor from the dried fruit — not that it "mask," "cover," or "conceal" it. "[W]e have repeatedly declined to rewrite unambiguous patent claim language" and will decline to do so here. Chef Am., Inc. v. Lamb-Weston, Inc., 358 F.3d 1371, 1375 (Fed. Cir. 2004). ARI has pointed to no forceful intrinsic evidence supporting its position. The express claim language requires that the acidulant be added to remove the natural flavor disregarding whether or not other flavors are added for masking purposes. Put in another way, the acidulant can both add its own flavor *and* physically remove the natural flavor.

We reject ARI's argument that the specification teaches this masking effect by providing (col. 4:47–54):

> The selection of a particular acidulant will be made with knowledge of the flavor compatibility of the acidulant with the particular dried fruit to be flavored and the flavoring agent. Thus, flavoring of particular dried fruit or even a particular raisin using the processes of the invention will require a balancing of the flavoring agent and acidulant to achieve a desired result.

*First*, the passage does not change the fact that the claim language expressly states that the acidulant's purpose is to remove the natural flavor from the fruit. Remove means remove, it does not mean merely mask. The specification repeatedly draws a distinction between adding flavor and removing flavor even with respect to the acidulant itself. With this distinction in mind, the patentee chose to use "remove" when claiming the invention. *Second*, claim 1 only requires that the acidulant "*substantially* remove" the natural flavor of the fruit, not that it remove all of it. Flavor compatibility between the natural flavor and the acidulant would therefore still be at issue even after the natural flavor is removed in the patented process. *Third*, the above-quoted passage does not speak to the compatibility of the acidulant with the *natural flavor* of the dried fruit. It only discusses the compatibility between the acidulant and the dried fruit itself. There could be various reasons why a particular acidulant would be better matched with a particular fruit having nothing to do with the fruit's natural flavor. Accordingly, summary judgment of non-infringement was appropriate as to this limitation.[4]

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

CERTIFIED COPY
I HEREBY CERTIFY THIS DOCUMENT
IS A TRUE AND CORRECT COPY
OF THE ORIGINAL ON FILE.

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

By:_____ Date:_____

---

[4] On appeal, ARI makes no argument as to infringement under the doctrine of equivalents with respect to the "substantially remove" limitation.